IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CASHEDGE, INC., | |
| Plaintiff, | |
| v. | C.A. No. 06-170-JJF |
| YODLEE, INC., | |
| Defendant. | |

**DECLARATION OF KYLE WAGNER COMPTON IN SUPPORT OF
DEFENDANT YODLEE, INC.'S OPENING BRIEF IN SUPPORT OF
ITS MOTION TO TRANSFER**

I, Kyle Wagner Compton, declare as follows:

1.     I am an Associate with Fish & Richardson P.C., counsel for Defendant

Yodlee, Inc. ("Yodlee"). I make the following statements based on personal knowledge,

except where noted.

2.     Attached to this declaration as Exhibit A is a true and accurate copy of

Plaintiff CashEdge's ("CashEdge") web page listing locations of its offices.

3.     Attached to this declaration as Exhibit B is a true and accurate copy of

CashEdge's web page describing its products and services.

4.     Attached to this declaration as Exhibit C is a true and accurate copy of

United States Patent No. 7,013,310 (the " `310 patent").

5.     Attached to this declaration as Exhibit D is a true and accurate copy of

United States Patent No. 6,317,783 (the " `783 patent").

6.     Attached to this declaration as Exhibit E is a true and accurate copy of

United States Patent No. 6,199,077 (the " `077 patent").

7.      Attached to this declaration as Exhibit F is a true and accurate copy of United States Patent No. 6,412,073 (the " '073 patent").

8.      Attached to this declaration as Exhibit G is a true and accurate copy of Yodlee's Letter Dated November 17, 2004 to Sanjiv Dheer as CEO and President of CashEdge.

9.      Attached to this declaration as Exhibit H is a true and accurate copy of CashEdge's Complaint for Declaratory Judgment, filed on June 22, 2005 in the Northern District of California.

10.     Attached to this declaration as Exhibit I is a true and accurate copy of Yodlee's Answer to CashEdge's Complaint for Declaratory Judgment, filed on July 12, 2005 in the Northern District of California.

11.     Attached to this declaration as Exhibit J is a true and accurate copy of *Bayer AG v. Biovail Corp.*, C.A. No. 00-466-JJF, mem. order (D. Del. July 17, 2000).

12.     Attached to this declaration as Exhibit K is a true and accurate copy of *Nilssen v. OSRAM Sylvania, Inc.*, C.A. No. 00-695-JJF, mem. op. (D. Del. May 1, 2001).

13.     Attached to this declaration as Exhibit L is a true and accurate copy of *Green Isle Partners, Inc. v. The Ritz-Carlton Hotel Co.*, C.A. No. 01-202-JJF, mem. op. (D. Del. Nov. 2, 2001).

14.     Attached to this declaration as Exhibit M is a true and accurate copy of the Order dated August 28, 2003 in the case of *Yodlee v. Block Financial*, CA 03-600-JJF.

15.     Attached to this declaration as Exhibit N is a true and accurate copy of *Altera Corp. v. Xilinx, Inc.*, C.A. No. 95-242-JJF, mem. op. (D. Del. Mar. 29, 1996).

16.    Attached to this declaration as Exhibit O is a true and accurate copy of the Transcript of the August 27, 2003 Telephone Conference in the case of *Yodlee v. Block Financial*, CA 03-600-JJF.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed May 3, 2006, in Wilmington, Delaware.

Kyle Wagner Compton

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2006, I electronically filed with the Clerk of Court the attached **DECLARATION OF KYLE WAGNER COMPTON IN SUPPORT OF DEFENDANT YODLEE, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO TRANSFER** using CM/ECF which will send electronic notification of such filing(s) to the following Delaware counsel. In addition, the filing will also be sent via hand delivery to:

Arthur G. Connolly, Jr.                              *Attorneys for Plaintiff*
Connolly Bove Lodge & Hutz LLP                       *CashEdge, Inc.*
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19899

I hereby certify that on May 4, 2006, I have mailed by Federal Express Overnight Mail, the document(s) to the following non-registered participants:

Drew M. Wintringham                                  *Attorneys for Plaintiff*
Mark Rueh                                            *CashEdge, Inc.*
Clifford Chance US LLP
31 West 52nd Street
New York, NY  10019-6131

/s/ William J. Marsden, Jr.
William J. Marsden, Jr.

Exhibit
A





## CashEdge Offices

**Headquarters**

**New York City - USA**
104 Fifth Avenue
New York, NY 10011
Phone: 212-656-9000
Fax:    212-656-9099

**Offices**

**Silicon Valley**
2841 Junction Ave.
Suite 101,
San Jose, CA 95134-1921
Phone: 408-433-2400
Fax:    408-433-2497

**Gurgaon – India**
276, Udyog Vihar,
Phase - IV, Gurgaon
Haryana - 122016
Phone: 91-124-4019914
       91-124-4019915
Fax:    91-124-4104960

**Chennai - India**
107/6, Ampa Manor
3rd Floor, Aminjikarai
Nelson Manikkam Road
Chennai
Phone: 91-44-42082430
Fax:    91-44-42082431

© 2005. ALL RIGHTS RESERVED. Terms and Conditions | Privacy Policy | Security Policy | Sitemap

# Exhibit B

Bank Suite - CashEdge                                                    Page 1 of 1



User Login ⟩

## Bank Suite

The CashEdge Bank Suite enables banks to fully leverage their online channel with proven, comprehensive online financial applications including account opening, account funding, inter-institution funds transfer, data consolidation and person-to-person payments.

Available as individual applications or as an end-to-end solution and used by more than 90 banking institutions, the Bank Suite is easily integrated and implemented, allowing any institution to accelerate its online profitability and customer satisfaction immediately.

CashEdge's broad set of solutions is created on a consistent technology platform. This distinguishing factor enables clients to select stand-alone solutions or enjoy a fully integrated online banking suite that is easily implemented and requires minimal technology management.

Please see below for a list of solutions offered under Bank Suite and click on a specific product for more information:

**Retail Banking**
- OpenNow
- FundNow
- OpenNow | FundNow
- TransferNow
- EZSendNow
- AggregateNow

**Small Business Banking**
- Small Business Transfers
- Small Business Invoicing

© 2005. ALL RIGHTS RESERVED. Terms and Conditions | Privacy Policy | Security Policy | Sitemap

Exhibit
C

US007013310B2

## (12) United States Patent
### Messing et al.

(10) Patent No.: **US 7,013,310 B2**
(45) Date of Patent: **Mar. 14, 2006**

(54) **METHOD AND APPARATUS FOR RETRIEVING AND PROCESSING DATA**

(75) Inventors: **Roy Messing**, Ridgefield, CT (US); **Jeremy N. Sokolic**, New York, NY (US); **Sanjeev Dheer**, Scarsdale, NY (US); **Venkatachari Dilip**, Cupertino, CA (US)

(73) Assignee: **CashEdge, Inc.**, New York, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 531 days.

(21) Appl. No.: **10/040,314**

(22) Filed: **Jan. 3, 2002**

(65) **Prior Publication Data**

US 2003/0126134 A1    Jul. 3, 2003

(51) Int. Cl.
*G06F 17/00* (2006.01)

(52) U.S. Cl. .................. **707/104.1**; 707/102; 707/101; 707/103 R

(58) Field of Classification Search ............. 707/104.1, 707/102, 103 R, 3, 10; 709/225, 228, 230; 382/115; 379/67.1; 715/523
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,805,719 A | * | 9/1998 | Pare, Jr. et al. .............. 382/115 |
| 5,855,020 A | * | 12/1998 | Kirsch ......................... 707/10 |
| 5,895,838 A | * | 4/1999 | Harjunmaa et al. ..... 73/864.13 |
| 6,038,603 A | * | 3/2000 | Joseph ..................... 709/228 |
| 6,381,592 B1 | * | 4/2002 | Reuning ........................ 707/3 |
| 6,609,128 B1 | * | 8/2003 | Underwood ................. 707/10 |
| 6,697,860 B1 | * | 2/2004 | Kung ....................... 709/225 |
| 6,792,082 B1 | * | 9/2004 | Levine .................... 379/67.1 |

* cited by examiner

*Primary Examiner*—Alford Kindred
*Assistant Examiner*—Sana Al-Hashemi
(74) *Attorney, Agent, or Firm*—Lee & Hayes, PLLC

(57) **ABSTRACT**

Data is captured from a web site or other data source. Data is extracted from the web page using a data harvesting script or other data acquisition routine. The extracted data is then normalized and stored in a database. If data cannot be extracted from the web page, a copy of the captured web page is stored without personal information contained in the web page. The data harvesting script is then edited based on an analysis of the captured web page.

**29 Claims, 7 Drawing Sheets**





*Fig. 1*



Fig. 2



*Fig. 3A*



*Fig. 3B*

400

410

*Fig. 4*

500

*Fig. 5*



_Fig. 6_



*Fig. 7*

US 7,013,310 B2

**1**

## METHOD AND APPARATUS FOR RETRIEVING AND PROCESSING DATA

### TECHNICAL FIELD

The present invention relates to the retrieval and processing of data collected from web pages and/or other data sources.

### BACKGROUND

Individuals, businesses, and other organizations typically maintain one or more financial accounts at one or more financial institutions. Financial institutions include, for example, banks, savings and loans, credit unions, mortgage companies, lending companies, and stock brokers. A customer's financial accounts may include asset accounts (such as savings accounts, checking accounts, certificates of deposit (CDs), mutual funds, bonds, and equities) and debt accounts (such as credit card accounts, mortgage accounts, home equity loans, overdraft protection, and other types of loans).

Many financial institutions allow customers to access information regarding their accounts via the Internet or other remote connection mechanism (often referred to as "online banking"). Typically, the customer navigates, using a web browser application, to a web site maintained by the financial institution. The web site allows the customer to login by entering a user identification and an associated password. If the financial institution accepts the user identification and password, the customer is permitted to access information (e.g., account holdings and account balances) regarding the financial accounts maintained at that financial institution.

Similarly, other organizations and institutions allow customer access to other types of accounts, such as email accounts, award (or reward) accounts, online bill payment accounts, etc. A user may navigate a web site or other information source to receive status information regarding one or more of their accounts.

Certain application programs are able to extract data from web pages based on a previously defined layout of information on the web pages. For example, an account balance may be positioned in a particular location of a specific web page. The application program extracts the account balance data from that particular location to obtain a customer's current account balance. However, if the layout of the web page is modified, the previously defined layout of information on the web page is not accurate and the application program cannot properly extract the desired data from the web page.

The systems and methods described herein addresses these and other problems by providing a mechanism for updating the manner in which data is extracted from web pages when a web page layout is changed.

### SUMMARY

The systems and methods described herein automatically extract data from web pages and other data sources associated with various institutions. The data is extracted from a data source, such as a web page using a data harvesting script or other data extraction/data acquisition routine. The extracted data is stored in a database using a standard format. If the layout of data on a particular web page changes, a copy of the web page is captured and stored for future analysis when updating one or more data extraction procedures (e.g., data harvesting scripts). Personal or confidential information is deleted from the captured web page before storing the captured web page.

A particular embodiment captures a web page from an institution's web site. Data is extracted from the web page

**2**

using a data harvesting script. The extracted data is then normalized and stored in a database.

In another embodiment, a web page is captured from a web site. An attempt is made to extract data from the web page using a data harvesting script. If data cannot be extracted from the web page, personal information is removed from the captured web page and the captured web page (without the personal information) is stored.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates an exemplary network environment in which various servers, computing devices, and a financial analysis system exchange data across a network, such as the Internet.

FIG. 2 is a block diagram showing exemplary components and modules of a financial analysis system.

FIGS. 3A and 3B are flow diagrams illustrating procedures for retrieving data from an HTML screen and another data source.

FIGS. 4 and 5 illustrate exemplary web pages associated with a particular financial institution.

FIG. 6 is a flow diagram illustrating a procedure for retrieving financial data and adjusting a data harvesting script if the financial data layout has changed.

FIG. 7 is a block diagram showing pertinent components of a computer in accordance with the invention.

### DETAILED DESCRIPTION

The system and methods described herein are capable of automatically extracting data from web pages or other data sources associated with one or more accounts or institutions, such as financial accounts or financial institutions. A particular web page or data source may contain account information associated with a customer of a particular institution. If an error occurs when attempting to extract data from a web page, a copy of the web page is saved for future analysis in determining the cause of the error and creating a new procedure for extracting data from the web page. When saving a copy of the web page for future analysis, confidential information is removed before storing the web page, thereby reducing the possibility of inadvertently exposing confidential information contained in the web page.

As used herein, the terms "account holder", "customer", "user", and "client" are interchangeable. "Account holder" refers to any person having access to an account. A particular account may have multiple account holders (e.g., a joint checking account having husband and wife as account holders or a corporate account identifying several corporate employees as account holders).

Various financial account and financial institution examples are provided herein for purposes of explanation. However, the methods and procedures described herein can be applied to any type of transaction involving any type of account. For example, a data aggregation system may aggregate data from multiple sources, such as multiple financial accounts, multiple email accounts, multiple online award (or reward) accounts, multiple news headlines, and the like. Similarly, the data retrieval and data processing systems and methods discussed herein may be applied to collect data from any type of account containing any type of data. Thus, the methods and systems described herein can be applied to a data aggregation system or any other account management system instead of the financial analysis system discussed in the examples provided herein.

FIG. 1 illustrates an exemplary network environment **100** in which various servers, computing devices, and a financial analysis system exchange data across a network, such as the Internet. The network environment of FIG. 1 includes mul-

US 7,013,310 B2

3

tiple financial institution servers **102**, **104**, and **106** coupled to a data communication network **108**, such as the Internet. Data communication network **108** may be any type of data communication network using any network topology and any communication protocol. Further, network **108** may include one or more sub-networks (not shown) which are interconnected with one another.

A client computer **110** and a financial analysis system **112** are also coupled to network **108**. Financial analysis system **112** includes a database **114** that stores various data collected and generated by the financial analysis system. Financial analysis system **112** performs various account analysis and data analysis functions, as discussed in greater detail below.

Client computer **110** and financial analysis system **112** may be any type of computing device, such as a desktop computer, a laptop computer, a palmtop computer, a personal digital assistant (PDA), a cellular phone, or a set top box. Client computer **110** communicates with one or more financial institution servers **102–106** to access, for example, information about the financial institution and various user accounts that have been established at the financial institution. Each of the financial institution servers **102–106** is typically associated with a particular financial institution and store data for that financial institution.

The communication links shown between network **108** and the various devices (**102**, **104**, **106**, **110**, and **112**) shown in FIG. 1 can use any type of communication medium and any communication protocol. For example, one or more of the communication links shown in FIG. 1 may be a wireless link (e.g., a radio frequency (RF) link or a microwave link) or a wired link accessed via a public telephone system or another communication network.

FIG. 2 is a block diagram showing exemplary components and modules of financial analysis system **112**. A communication interface **202** allows the financial analysis system **112** to communicate with other devices, such as one or more financial institution servers. In one embodiment, communication interface **202** is a network interface to a local area network (LAN), which is coupled to another data communication network, such as the Internet.

A database control module **204** allows financial analysis system **112** to store data to database **114** and retrieve data from the database. Financial analysis system **112** also stores various financial institution data **206**, which may be used to locate and communicate with various financial institution servers. Financial institution data **206** includes, for example, account balance information, transaction descriptions, transaction amounts, and security holdings.

A variety of data harvesting scripts **208** are also maintained by financial analysis system **112**. For example, a separate data harvesting script **208** may be maintained for each financial institution from which data is extracted. Data harvesting (also referred to as "screen scraping") is a process that allows, for example, an automated script to retrieve data from one or more web pages associated with a web site. Data harvesting may also include retrieving data from a data source using any data acquisition or data retrieval procedure. Additional details regarding data harvesting and data harvesting scripts are provided below.

Financial analysis system **112** includes a data capture module **210** and a data extraction module **214**. The data capture module **210** captures data (such as web pages or OFX data) from one or more data sources. The data extraction module **214** retrieves (or extracts) data from the captured web pages or other data sources. The data extraction module **214** may use one or more data harvesting scripts **208** to retrieve data from a web page. A personal information filter module **212** removes confidential information from a web page. Thus, the majority of the content of the web page

4

can be stored for future access without risking exposure of an account holder's confidential information.

Data capture module **210** may also retrieve data from sources other than web pages. For example, data capture module **210** can retrieve data from a source that supports the Open Financial Exchange (OFX) specification or the Quicken Interchange Format (QIF). OFX is a specification for the electronic exchange of financial data between financial institutions, businesses and consumers via the Internet. OFX supports a wide range of financial activities including consumer and business banking, consumer and business bill payment, bill presentment, and investment tracking, including stocks, bonds, mutual funds, and 401(k) account details. QIF is a specially formatted text file that allows a user to transfer Quicken transactions from one Quicken account register into another Quicken account register or to transfer Quicken transactions to or from another application that supports the QIF format.

A failure analysis module **218** in financial analysis system **212** analyzes the failure of a data harvesting script and determines why the script failed. For example, if a web page is redesigned by a financial institution, a data harvesting script that has not been updated to reflect the new web page design may not operate properly. In this situation, the information sought by the data harvesting script may have been moved to a different location on the new web page. The failure analysis module **218** assists a user in identifying the reason for the script failure. A script editing module **216** assists a user in editing a data harvesting script to function properly with a new web page design.

FIGS. 3A and 3B are flow diagrams illustrating procedures for retrieving data from an HTML screen and another data source. Specifically, FIG. 3A is a flow diagram illustrating a procedure **300** for retrieving data from an HTML screen. Initially, the procedure **300** captures an HTML (HyperText Markup Language) screen from a financial institution web site (block **302**). For example, the HTML screen may be a web page associated with the financial institution. Data is then extracted from the HTML screen using a data harvesting script (block **304**). The extracted data is then normalized (block **306**), which refers to the process of arranging the extracted data into a standard format such that data collected from a variety of different web pages is arranged (or normalized) into the same format. The normalized data is then stored in the database (e.g., database **114** in FIG. 1) for future reference (block **308**).

The normalizing of data is useful when collecting data from multiple sources (e.g., multiple financial institutions). Each financial institution may use different terms for the same type of data. For example, one financial institution may use the term "buy" while another financial institution uses the term "purchase" for the same type of transaction. By normalizing the data, a single database can be used to store financial information related to multiple different financial institutions. Thus, various financial analysis tools and procedures can be used to analyze data across multiple financial institutions or other data sources.

As mentioned above, data harvesting (or screen scraping) is a process that allows an automated script to retrieve data from a web site and store the retrieved data in a database. The data harvesting scripts are capable of navigating web sites and capturing individual HTML pages. For example, JavaScript and images may be removed from the HTML pages or converted into HTML text if it contains account information. A parser then converts the HTML data into a field-delimited XML format. The XML data communicates with enterprise java beans (EJBs) through an XML converter. EJBs perform a series of SQL queries that populate the data into the database. The success of a particular data harvesting process is related to the layout of the web site

US 7,013,310 B2

5                                                                                    6

being harvested in two important ways: 1) the data harvesting script must navigate to the correct HTML page, and 2) the parser must know which cells in the HTML tables contain specific data items.

FIG. 3B is a flow diagram illustrating a procedure **350** for retrieving and processing data from a data source (other than an HTML screen). The data source may be, for example, a financial institution or other provider of financial data. The data source may also be referred to as a "file download source" or a "data download source". The data source may communicate data using the OFX standard, the QIF format, or some other data format. The procedure **350** begins by retrieving data from a data source (block **352**). The procedure identifies data of interest from the retrieved data (block **354**). The data of interest may be, for example, data associated with a particular customer's accounts. The identified data is then normalized (block **356**) and stored in the database (block **358**). The database may contain data related to other customers and/or data collected from other sources (such as HTML screens).

FIGS. 4 and 5 illustrate exemplary web pages **400** and **500**, respectively, associated with a particular financial institution. A particular data harvesting script may look for specific text on the web page to confirm that the script has navigated to the correct site. For example, to ensure that the Vanguard screen scraping script has navigated to the "Quick Links" web page, the script looks for the phrase "Common Tasks" in row 1 of table 1 (see the portion of the web page surrounded by a ring **410**). If this phrase is found, the script can then navigate to row two and select the "Access my Accounts" link that takes the script to a secure login page (e.g., an HTTPS login page). If the script cannot locate the phrase "Common Tasks" it will generate an exception error and stop running.

Once the script has found the correct page, pattern matches are used by the parser to determine the appropriate cell from which to retrieve specific data items. For example, once the data harvesting script has navigated to the "Account Values" page (shown in FIG. 5), the script identifies the correct row from which to retrieve data by pattern matching a combination of the fund/account number and the fund name in columns one and two. The script also matches the column header name and then moves down the column to the appropriate row in the column. In this example, the parser will populate the data field "Account Value" with the data in the cell in row one and column five. This account value information is highlighted by a ring **510** in FIG. 5.

FIG. 6 is a flow diagram illustrating a procedure **600** for retrieving financial data and adjusting a data harvesting script if the financial data layout has changed. Initially, the procedure **600** captures a financial institution screen shot (block **602**). For example, a screen shot associated with a particular financial institution web page or web site. Next, the procedure removes personal and/or confidential information from the screen shot (block **604**). Example personal and/or confidential information that is removed includes customer name, address, telephone number, email address, and social security number.

The procedure **600** then identifies and sorts all failed updates (block **606**). A failed update may occur when a data harvesting script attempts to update a user's account information but the layout of the financial institution's web page has changed. The procedure may search the database for all failed updates by error code (error codes are discussed in greater detail below). The results of the search are provided to one or more individuals responsible for updating screen scraping scripts. Next, bugs are reported and assigned to a particular individual or group for processing (block **608**).

At block **610**, a user accesses the HTML data (i.e., the screen shot captured from the financial institution) to repair the scripts that are not functioning properly. The procedure then continues to block **612**, which captures the next financial institution screen shot. The procedure returns to block **604** to remove personal information from the captured screen shot.

When a data harvesting script is unable to access a particular web page (or web site) or is unable to locate information on the web page an error occurs. The data harvesting script contains error detection mechanisms that identify errors and generate one or more error codes associated with the identified errors. Each error has an associated error code that identifies the particular error. Table 1 below identifies several example error codes as well as a corresponding title and description of the error that occurred.

TABLE 1

| Error Code | Title | Description |
|---|---|---|
| 100 | Web Page Modified | Unable to retrieve account information from financial institution web page due to changes in web page. |
| 101 | Time Out | Unable to retrieve account information due to high network traffic. |
| 102 | Connection Failed | Unable to retrieve account information due to network connection problems. |
| 103 | Web Site Unavailable | Unable to retrieve account information because the financial institution web site is not available. |
| 104 | Login Failure | Unable to retrieve account information because the username/password combination provided by user failed. |

Different actions may be performed depending on the error detected. For example, if the web page has been modified, the screen shot of the modified web page is provided to one or more individuals to analyze and update the corresponding data harvesting script to properly extract data from the modified web page. If the error indicates a failed network connection, the financial analysis system may attempt to retrieve the desired web pages at a later time. If the error indicates that the username and/or password provided by the user is incorrect, the financial analysis system may request the user verify the username and password associated with the account being accessed.

The error codes may be processed by an automated error handling routine to notify the proper individual, or group of individuals, of the error. For example, a database error may be automatically routed to a group of individuals responsible for managing the database. Other error codes may indicate a problem with the information provided by the user. These error codes, such as an invalid password to access a user account, result in sending an error notice to the user, but do not represent a problem with the financial analysis system.

FIG. 7 is a block diagram showing pertinent components of a computer **700** in accordance with the invention. A computer such as that shown in FIG. 7 can be used, for example, to perform various procedures such as those discussed herein. Computer **700** can also be used to access a web site or other computing facility to access various financial information. The computer shown in FIG. 7 can function as a server, a client computer, or a financial analysis system, of the types discussed herein.

Computer **700** includes at least one processor **702** coupled to a bus **704** that couples together various system components. Bus **704** represents one or more of any of several types of bus structures, such as a memory bus or memory controller, a peripheral bus, and a processor or local bus using any of a variety of bus architectures. A random access memory (RAM) **706** and a read only memory (ROM) **708** are coupled to bus **704**. Additionally, a network interface **710**

7

and a removable storage device **712**, such as a floppy disk or a CD-ROM, are coupled to bus **704**. Network interface **710** provides an interface to a data communication network such as a local area network (LAN) or a wide area network (WAN) for exchanging data with other computers and devices. A disk storage **714**, such as a hard disk, is coupled to bus **704** and provides for the non-volatile storage of data (e.g., computer-readable instructions, data structures, program modules and other data used by computer **700**). Although computer **700** illustrates a removable storage **712** and a disk storage **714**, it will be appreciated that other types of computer-readable media which can store data that is accessible by a computer, such as magnetic cassettes, flash memory cards, digital video disks, and the like, may also be used in the exemplary computer.

Various peripheral interfaces **716** are coupled to bus **704** and provide an interface between the computer **700** and the individual peripheral devices. Exemplary peripheral devices include a display device **718**, a keyboard **720**, a mouse **722**, a modem **724**, and a printer **726**. Modem **724** can be used to access other computer systems and devices directly or by connecting to a data communication network such as the Internet.

A variety of program modules can be stored on the disk storage **714**, removable storage **712**, RAM **706**, or ROM **708**, including an operating system, one or more application programs, and other program modules and program data. A user can enter commands and other information into computer **700** using the keyboard **720**, mouse **722**, or other input devices (not shown). Other input devices may include a microphone, joystick, game pad, scanner, satellite dish, or the like.

Computer **700** may operate in a network environment using logical connections to other remote computers. The remote computers may be personal computers, servers, routers, or peer devices. In a networked environment, some or all of the program modules executed by computer **700** may be retrieved from another computing device coupled to the network.

Typically, the computer **700** is programmed using instructions stored at different times in the various computer-readable media of the computer. Programs and operating systems are often distributed, for example, on floppy disks or CD-ROMs. The programs are installed from the distribution media into a storage device within the computer **700**. When a program is executed, the program is at least partially loaded into the computer's primary electronic memory. As described herein, the invention includes these and other types of computer-readable media when the media contains instructions or programs for implementing the steps described below in conjunction with a processor. The invention also includes the computer itself when programmed according to the procedures and techniques described herein.

For purposes of illustration, programs and other executable program components are illustrated herein as discrete blocks, although it is understood that such programs and components reside at various times in different storage components of the computer, and are executed by the computer's processor. Alternatively, the systems and procedures described herein can be implemented in hardware or a combination of hardware, software, and/or firmware. For example, one or more application specific integrated circuits (ASICs) can be programmed to carry out the systems and procedures described herein.

Although the description above uses language that is specific to structural features and/or methodological acts, it is to be understood that the invention defined in the appended claims is not limited to the specific features or acts described. Rather, the specific features and acts are disclosed as exemplary forms of implementing the invention.

8

What is claimed is:

1. A method comprising:

capturing a web page from a web site; comprising:

extracting data from the web page using a data harvesting script;

normalizing the extracted data with data extracted from other web pages;

generating a context-specific error code if the data harvesting script fails to successfully extract data from the web page;

adapting the data harvesting script based on identified changes to the web page; and

storing the normalized data in a database.

2. A method as recited in claim 1 wherein the web site is associated with a financial institution.

3. A method as recited in claim 2 wherein the captured web page contains information regarding a customer's account at the financial institution.

4. A method as recited in claim 1 wherein the web page is an HTML screen.

5. A method as recited in claim 1 further comprising:

capturing a second web page from a second web site;

extracting data from the second web page using the data harvesting script;

normalizing the data extracted from the second web page with data extracted from other web pages;

generating a context-specific error code if the data harvesting script fails to successfully extract data from the second web page;

adapting the data harvesting script based on identified changes to the web page; and

storing the normalized data from the second web page in the database.

6. A method as recited in claim 1 wherein the context-specific error code identifies a type of change necessary to the data harvesting script to properly extract data from the web page.

7. A method as recited in claim 1 further comprising storing a copy of the captured web page if data cannot be extracted from the web page using the data harvesting script.

8. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 1.

9. A method comprising:

retrieving financial data associated with a user's financial account from a data source;

identifying data of interest retrieved from the data source;

generating a context-sensitive error code if the data of interest is not successfully retrieved from the data source, wherein the context-sensitive error code is used to modify the manner in which data is retrieved from the data source;

normalizing the identified data; and

storing the normalized data in a database.

10. A method as recited in claim 9 further comprising:

retrieving financial data associated with a user from a second data source;

normalizing the data retrieved from the second data source; and

storing the normalized data in the database.

11. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 9.

12. A method comprising:

capturing a web page from a web site;

US 7,013,310 B2

9

attempting to extract data from the web page using a data harvesting script;

if data cannot be extracted from the web page;

removing pre-determined personal information from the captured web page;

storing the captured web page without the personal information;

analyzing the web page and the data harvesting script to determine why data could not be extracted from the web page; and

adapting the data harvesting script based on the determination why data could not be extracted from the web page.

13. A method as recited in claim 12 further comprising editing the data harvesting script based on an analysis of the captured web page, wherein the edited data harvesting script successfully extracts data from the web page.

14. A method as recited in claim 12 further comprising:

editing the data harvesting script based on an analysis of the captured web page;

capturing a new version of the web page from the web site; and

extracting data from the web page using the edited data harvesting script.

15. A method as recited in claim 14 further comprising:

normalizing the data extracted from the web page; and

storing the normalized data in a database.

16. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 12.

17. A method comprising:

capturing a first web page from a first financial institution web site;

capturing a second web page from a second financial institution web site;

extracting data from the first web page using a first data harvesting script;

extracting data from the second web page using a second data harvesting script;

normalizing the data extracted from the first web page and the second web page;

generating a context-specific error code if the first data harvesting script fails to successfully extract data from the first web page; and

storing the normalized data in a database.

18. A method as recited in claim 17 further comprising generating an error message if data cannot be extracted from the first web page or the second web page.

19. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 17.

20. A method as recited in claim 17 wherein capturing a first web page includes capturing a first set of web pages.

21. A method as recited in claim 17 wherein capturing a second web page includes capturing a second set of web pages.

22. An apparatus comprising:

a data capture module configured to capture a first web page from a first web site associated with a first

10

financial institution and further configured to capture a second web page from a second web site associated with a second financial institution;

a personal information filter module coupled to the data capture module configured to remove personal information from one or more web pages, wherein the personal information filter module generates a specific error code if the personal information filter module is not able to identify personal information on a particular web page;

a data extraction module coupled to the data capture module and configured to extract data from the first and second web pages using a data harvesting script, the data extraction module further configured to normalize the data extracted from the first and second web pages, and wherein the data extraction module is adaptable based on changes to web pages that occur over time; and

a database control module coupled to the data extraction module and configured to store the normalized data in a common database.

23. An apparatus as recited in claim 22 wherein the data capture module is further configured to retrieve financial data associated with a user's account from a data source.

24. An apparatus as recited in claim 22 wherein the data extraction module is further configured to generate an error message if data cannot be extracted from the web page using the data harvesting script.

25. One or more computer readable media having stored thereon a plurality of instructions that, when executed by one or more processors, cause the one or more processors to:

capture a web page from a financial institution web site;

attempt to extract data from the captured web page using a data harvesting script;

remove personal information from the captured web page;

store the captured web page without the personal information; and

if data cannot be extracted from the web page, generate a context-specific error code and analyze the web page to determine why data could not be extracted from the web page.

26. One or more computer readable media as recited in claim 25, wherein if data cannot be extracted from the web page, the one or more processors further edit the data harvesting script based on an analysis of the captured web page and the context-specific error code.

27. One or more computer readable media as recited in claim 25, wherein the one or more processors further:

normalize the data extracted from the web page; and

store the normalized data in a database, wherein the database contains data extracted from other web pages.

28. A method as recited in claim 12 wherein the personal information includes at least one of: a social security number, an account number, or an account holder's name.

29. A method as recited in claim 22 wherein the personal information includes at least one of: a social security number, an account number, or an account holder's name.

* * * * *

# Exhibit D

US006317783B1

(12) **United States Patent**
Freishtat et al.

(10) Patent No.: **US 6,317,783 B1**
(45) Date of Patent: **Nov. 13, 2001**

(54) **APPARATUS AND METHODS FOR AUTOMATED AGGREGATION AND DELIVERY OF AND TRANSACTIONS INVOLVING ELECTRONIC PERSONAL INFORMATION OR DATA**

(75) Inventors: **Gregg Freishtat; Palaniswamy Rajan**, both of Atlanta, GA (US)

(73) Assignee: **Verticalone Corporation**, Atlanta, GA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/428,511**

(22) Filed: **Oct. 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.⁷ ..................................................... **G06F 13/00**
(52) U.S. Cl. ............................................. **709/218**; 707/10
(58) Field of Search ............................... 707/10; 709/217, 709/218

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,347,632    9/1994    Filepp et al. .......................... 709/202
5,537,314    7/1996    Kanter ................................... 705/14

(List continued on next page.)

OTHER PUBLICATIONS

"Strategic Directions in Database Systems—Breaking Out of the Box," Avi Silberschatz, and Stan Zdonik et al., ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 1 pp. 129–131, Mar. (1996).

"Managing Security and Privacy of information," Sushil Jajodia, ACM Computing Surveys, vol. 28 Issue 4es, Dec. (1996).

"Today's Style Sheet Standards: The Great Vision Blinded," Philip M. Marden, Jr. and Ethan V. Munson, IEEE Computer, pp. 123–125.

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999, Redondo, CA, pp. 15–22.

"A Softbot–based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul., 1994, pp. 72–76.

Primary Examiner—Kenneth R. Coulter
(74) Attorney, Agent, or Firm—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

A system for delivering personal information according to the present invention includes a user store including end user data, a provider store including information provider data, a personal information store including personal information and a processor that communicates with these data stores. The processor selects an end user for personal information aggregation. The processor connects with one or more information providers. The processor then proceeds to retrieve personal information for the selected end user from the connected information providers. This retrieval is based on end user data associated with the selected end user and provider data associated with the connected information providers. The retrieved personal information is stored in the personal information store.

**36 Claims, 11 Drawing Sheets**



US 6,317,783 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,655,089 | 8/1997 | Bucci | 705/40 |
| 5,696,965 * | 12/1997 | Dedrick | 707/10 |
| 5,699,528 | 12/1997 | Hogan | 705/40 |
| 5,710,887 | 1/1998 | Chelliah et al. | 705/26 |
| 5,712,979 | 1/1998 | Graber et al. | 709/224 |
| 5,724,567 * | 3/1998 | Rose | 707/2 |
| 5,825,884 | 10/1998 | Zdepski et al. | 705/78 |
| 5,848,396 | 12/1998 | Gerace | 705/10 |
| 5,860,068 | 1/1999 | Cook | 705/26 |
| 5,862,325 * | 1/1999 | Reed et al. | 709/201 |
| 5,878,219 | 3/1999 | Vance, Jr. et al. | 709/217 |
| 5,884,033 | 3/1999 | Duvall et al. | 709/206 |
| 5,884,045 | 3/1999 | Kurihara | 709/237 |
| 5,893,091 | 4/1999 | Hunt et al. | 707/3 |
| 5,894,554 | 4/1999 | Lowery et al. | 709/203 |
| 5,895,468 | 4/1999 | Whitmyer, Jr. | 707/10 |
| 5,897,622 | 4/1999 | Blinn et al. | 705/26 |
| 5,898,836 | 4/1999 | Freivald et al. | 709/218 |
| 5,913,202 | 6/1999 | Motoyama | 705/35 |
| 5,918,214 | 6/1999 | Perkowski | 705/27 |
| 5,926,798 | 7/1999 | Carter | 705/26 |
| 5,956,709 | 9/1999 | Xue | 707/3 |
| 5,963,915 | 10/1999 | Kirsch | 705/26 |
| 5,978,766 | 11/1999 | Luciw | 705/1 |
| 5,978,779 * | 11/1999 | Stein et al. | 705/37 |
| 5,983,200 | 11/1999 | Slotznick | 705/26 |
| 5,983,227 | 11/1999 | Nazem et al. | 707/10 |
| 5,987,440 * | 11/1999 | O'Neil et al. | 705/44 |
| 5,987,498 | 11/1999 | Athing et al. | 709/203 |
| 5,991,735 | 11/1999 | Gerace | 705/10 |
| 5,991,756 | 11/1999 | Wu | 707/3 |
| 5,995,965 * | 11/1999 | Experton | 707/10 |
| 5,999,975 * | 12/1999 | Kittaka et al. | 709/224 |
| 6,029,175 | 2/2000 | Chow et al. | 707/104 |

* cited by examiner

**Figure 1**
**(Prior Art)**



**Figure 2**

**Figure 3**
**240**





Figure 4
(Prior Art)



Figure 5

**Figure 6**



**Figure 7**



Figure 8



Figure 9



**Figure 10**



## Figure 11



US 6,317,783 B1

## 1

**APPARATUS AND METHODS FOR AUTOMATED AGGREGATION AND DELIVERY OF AND TRANSACTIONS INVOLVING ELECTRONIC PERSONAL INFORMATION OR DATA**

### CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application claims the benefit, pursuant to 35 U.S.C. §119(e), of applicants' provisional U.S. Patent Application Ser. No. 60/105,917, filed Oct. 28, 1998, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data" and of applicants' provisional U.S. Patent Application Ser. No. 60/134,395, filed May 17, 1999, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data".

### BACKGROUND OF INVENTION

1. Field of Invention

The invention relates to an apparatus and process for automated aggregation and delivery of electronic personal information or data (PI). The invention further relates to the automation of transactions involving electronic PI.

2. Description of Related Art

Looking back over the last five years, it is apparent that as the Internet gained momentum, consumers demanded applications or services that make their online experience simpler, easier to use, and more satisfying. The development of successful Internet Sites has corresponded with a number of themes which have developed over the last few years. When carefully analyzed this evolution is a logical development of the emerging digital economy.

Prior to 1994, the Internet was not a mass media, in part, because the existing technologies (FTP, Archie, Usenet, and Gopher) were not user friendly and required the end user to do all of the work (e.g., the end user had to learn of an existing data source, find the address, navigate to the destination, and download the information). As more consumers began accessing the Internet, Search Engines were created to solve this usability issue. With the advent of the commercial Search Engine, additional content could be easily added to the Internet and the end user had a means of finding and accessing this information. Consumers required better tools than Search Engines for organizing and accessing this wealth of generic content. Push technologies were explored, and eventually, the portal strategy was successfully adopted as an efficient way for consumers to easily access a variety of content sources in a single, easy to use format. As the volume of available online content continues to grow exponentially, portals are now confronted with the need to make different types of content available to different consumers based upon their particular preferences and tastes.

The phenomenal success of Internet portals and destination sites has demonstrated the importance of creatively and intelligently aggregating, organizing and presenting the mass of information available on the Web. Search engines, portals and destination sites have Internet strategies based on the frequency, duration and quality of end user visits to their sites. For this reason, destination sites and portals are constantly seeking content and/or technologies which drive quality traffic to their site and keep it there. Recent trends indicate that Internet users are up to 25 times more likely to

## 2

come back to a site when this information is organized according to personal preferences.

FIG. 1 displays the current process of acquiring online PI 100. The end user first selects an information provider site in step 110. The end user proceeds to step 120 by locating and entering the Internet address of the selected information provider. This step may be accomplished in several manners with varying levels of complexity. A simple means for accomplishing this step is the utilization of a bookmark or favorite whereas locating an information provider for the first time might involve significant time and effort performing online searches. In step 130, the end users logs into the selected information provider's Web site utilizing the site's specific logon protocol. This protocol usually involves verifying the identity of the end user using a user name and password or other means of verification, acquiring the verification data from cookies residing on the end user's system or a combination of requested data and cookie data. The end user continues in step 140 by navigating through Web pages on the information provider's Web site until the desired information is located. During this process, the end user is often required to visit Web pages of little or no use to the end user whose goals is to simply acquire the particular PI residing on the Web site. Ultimately in step 150, the end user is presented with the desired PI. The entire process 100 is repeated for each individual piece of PI desired by the end user. Under this PI access model, the end user must visit each separate information provider, track potentially different identity verification data for each, utilize a different user interface at each site and possibly navigate through a significant number of filler Web pages.

FIG. 4 pictorial illustrates the architecture of this current access process. The end user 210 utilizes the client computer 220 to access each PI Web site 250 across the Internet 230. This current model suffers from several significant deficiencies. The end user must login to each site separately. Each separate site has its own graphical user interface. Each site wants the end user to stay and return; each visited site wants to retain end user focus for as long as possible. No true aggregation of PI exists; multiple accesses simply allow sequential access to particular pieces of PI.

One partial solution to these problems has recently evolved in the form of portal sites. Generic portal sites aggregate resources into categories and provide links to sites covering topics within those categories. Yahoo and Excite are examples of generic portal sites. These sites facilitate horizontal aggregation of generic content; horizontal aggregation refers to aggregation of PI access within a particular information provider category such as banks or utility companies. Some portal site allows individual end users a limited capability to select and configure disparate generic PI. Generic PI refers to PI of interest to the particular end user that does not require specific identity verification to obtain. For example, an end user might be interested in the weather forecast for his local area. This information could be integrated into a portal page without requiring identity verification of the particular end user receiving this PI. The individualized portal page provides a significant benefit to users seeking to aggregate generic PI. However, current portal pages do not generally provide PI requiring identity verification such as an end user's stock portfolio or bank balance. Further, these pages do not facilitate transactions utilizing PI.

Under current technology, aggregating PI available over the Internet requires a significant burden in terms of time, effort and learning curve. An end user wishing to access his PI needs to individually visit a variety of information

3

provider sites each with its own requirements, graphical user interface and login protocol.

## SUMMARY OF THE INVENTION

In the present invention, a networked computer is used to facilitate end user access of, manipulation of and transactions involving electronic PI associated with the particular end user such as stock portfolio, local weather, sports scores, bank account balances or other pertinent information or data. According to the present invention, the PI relevant to the particular end user is aggregated on the networked computer. This information or data is delivered to the end user in a unified manner by a variety of selectable delivery platforms such as facsimile, client computer, telephone, conventional mail, electronic mail, pager, other wireless device, Web page or channel or other delivery vehicle. The present invention further facilitates a variety of electronic transactions involving PI such as stock trading, retail purchases, bill payment, bank account fund transfers or other transactions.

A system for delivering personal information according to the present invention includes a user store including end user data, a provider store including information provider data, a personal information store including personal information and a processor that communicates with these data stores. The processor supports the aggregation of personal information. The processor selects an end user for personal information aggregation. Once the end user is selected, the processor connects with one or more information providers. The processor then proceeds to retrieve personal information for the selected end user from the connected information providers. This retrieval is based on end user data associated with the selected end user and provider data associated with the connected information providers. The retrieved personal information is stored in the personal information store.

The above and other objects and advantages of the present invention will become more readily apparent when reference is made to the following description, taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a process diagram of the current process that end users perform to access Internet available PI.

FIG. 2 is a block diagram of the components that could be used to implement present invention.

FIG. 3 is a block diagram of the components of the PI engine.

FIG. 4 is a diagram of the current PI access architecture.

FIG. 5 is a diagram of an architecture supporting PI access utilizing an intermediary Web site.

FIG. 6 is a diagram of the cookie/client cache architecture.

FIG. 7 is a flowchart for accessing pages underlying particular PI via the traditional process of FIG. 1 and via springboard technology.

FIG. 8 depicts the integration model for the dynamic generation of HTML pages.

FIG. 9 displays the run-time process for dynamic generation of HTML page.

FIG. 10 illustrates a process for automated applet interaction utilizing a modified Java virtual machine.

FIG. 11 is a flowchart exemplifying an intermediary Web site transaction structure.

## DETAILED DESCRIPTION OF THE INVENTION

A preferred embodiment of the invention is now described in detail. Referring to the drawings, like numbers indicate

4

like parts throughout the views. As used in the description herein and throughout the claims that follow, the meaning of "a," "an," and "the" includes plural reference unless the context clearly dictates otherwise. Also, as used in the description herein and throughout the claims that follow, the meaning of "in" includes "in" and "on" unless the context clearly dictates otherwise.

In no time, end users will have to log into a large number of different Web Sites, each with separate passwords, security, rules, software and "look and feel"—just to get the information currently obtained by checking one place—the mailbox at the end of the driveway. The Internet will fundamentally change the way in which end users will access Personal Information (PI) and will make e-commerce as familiar as using an ATM. "Personal Information" is all of the data that companies, information providers, have that is specific or unique to each person such as monthly bills, bank account balances, investments information, health care benefits, email, voice and fax messages, $401(k)$ holdings or potentially any other information pertinent to a particular end user.

The present invention alleviates several of the problems with the current PI acquisition methods by automatically aggregating PI, not only generic PI as aggregated by portals but also PI specific to the end user requiring identity verification for access. In one embodiment, the invention automates the PI acquisition and delivery process. FIG. 2 provides a block diagram of components that could be used to implement the present invention. The end user 210 accesses a client computer 220 running client software 270 which in a particular embodiment could be a general Web browser such as Navigator or Communicator (Netscape). The client computer 220 utilizes the Internet 230 to access a PI engine 240 running on a PI host 290. The PI engine 240 examines stored PI for freshness. Any stale PI items are refreshed by directly reacquiring the PI from the particular information provider's Web site 250 running on the provider's computer system 260 accessed across the Internet 230. The PI engine 240 stores the fresh PI in its store 280 and delivers the PI to a selected destination, in this instance across the Internet 230 to the client computer 220 which displays the information to the end user 210 using the client software 270. The PI engine 240 refreshes all stale PI in a like manner prior to forwarding the aggregated PI to both the store 280 and the delivery destination, the client computer 220 in this instance. The PI engine 240 may refresh the PI sequentially or in parallel. For example, the end user's checking account balance would be updated through his bank's Web site, his email from his particular email site, his portfolio information from his broker's site and his electricity bill from his electricity company's site.

FIG. 3 displays a block diagram of the components of the PI engine 240. The PI engine 240 is composed of both storage and processing components. The three primary storage components are the PI store 280, the PI Provider store 310 and the user store 360. The first storage component of the PI engine 240 is the PI store 280. The PI store 280 contains each individual's PI record 375; the PI associated with a particular end user is segregated from the PI of all other end users. The PI engine also utilizes a provider store 310 that maintains general parameters associated with particular PI providers. The general parameters of a PI provider define the types of verification data necessary and the procedures to be followed to gain access to the particular PI provider. Each PI provider record also contains the types of PI provided by the PI provider and the types of transactions supported by the provider. Along with the type of PI or

transaction, the record also contains the additional types of data and procedures necessary to access the PI or execute the transaction. A user store 360 is also necessary to maintain configuration and verification information concerning particular end users. For each end user, the user selected PI providers, PI and transactions are registered along with the verification data necessary to acquire the PI or execute the transaction from the PI provider.

The PI store 280 may be implemented in a variety of ways. Referring to FIG. 2, the PI store 280 may comprise a database residing on the PI Host 290. Under this approach, the PI for each individual end user 210 is stored as a separate record or object 375 in the database. In yet another embodiment, the PI for each end user 210 could be stored in a separate file 375, thus performing the task of segregating PI of different users at the file level.

In addition, or as an alternative, the PI associated with each end user 210 may reside on his/her client computer 220 using cookie technology as specified in D. Kristol and L. Montulli, "HTTP State Management Mechanism", Request For Comments (RFC) 2109, February, 1997 (available at http://www.ietf.org/rfc/rfc2109.txt), which is expressly incorporated herein in its entirety. The PI associate with the end user 210 would be stored as PI cookies 375. This implementation mechanism provides inherent support for segregating PI associated with one end user 375 from PI associated with all other end users. Utilizing this method as a substitute for a centralized store provides a layer of security against unauthorized access. As a further measure, PI data stored in cookies could be stored in an encrypted format.

FIG. 6 provides a diagram of a typical implementation of the PI store 280 using cookie technology; references in the foregoing description are also made to FIG. 3 with respect to the internal workings of the PI engine 240. When an attempt is made to access PI by an end user 210 directly, or through an intermediary Web server, the PI access/transact component 340 of the PI engine 240 would retrieve stored PI 375 from the PI store 280. Under this approach, this stored PI 375 would be received directly from cookies sent by the client computer 220 of the end user 210. The PI access/transact component 340 would perform any decryption if necessary. Any updates required would be obtained by direct access of PI providers 250. The PI deliver component 350 would provide the mechanism for both updating the PI store 280 as well as transmitting the requested PI to the end user 210, directly or through an intermediary Web site. The PI deliver component 350 would place the updated PI in the PI store 280 by replacing the outdated PI cookies 375 stored on the client computer 220. The PI deliver component 350 would also handle any encryption if necessary. The PI deliver component 350 would also be responsible for transmitting requested PI. In a preferred embodiment, the PI store 280 would be implemented using this cookie-based architecture.

The user store 360 may be implemented in a variety of ways. Referring to FIG. 2, the user store 360 may comprise a database residing on the PI Host 290. Under this approach, the personal configuration data for each individual end user 210 is stored as a separate record or object in the database. In addition, or as an alternative, the end user data could be distributed in a manner similar to the cookie/cache architecture describe above with respect to the PI store 280.

In a preferred embodiment, the user store 360 could be implemented through personal information configuration (PIC) files. PIC files store a personal profile such as name,

address, and social security number in secure, encrypted fashion for each end user. PIC files facilitate automatic registration of end users with information Providers via the end user configuration component 330. This component will read the PIC file and, using retrieved personal information, pre-populate registration templates for selected Providers. Then, it will prompt the user to enter required information that is missing from profile, if necessary. If the information is complete, the registration is automatically completed. Next, the end user configure component 330 completes any Provider registration forms, gets responses and updates the end user's PIC.

The four primary processing components access and manipulate the data in the three stores. The processing components may execute on a single processor, such as a file server computer system based on a Pentium class (MMX, PRO, II, III, etc.) central processing unit or an equivalent, or multiple processors. These four processing components are the Baseline configure component 320, the end user configure component 330, the PI access/transact component 340 and the PI delivery component 350 as seen in FIG. 3. The Baseline configure component 320 provides the interface by which new user selectable PI providers are added to the system. This component 320 might be implemented in a variety of ways including trial and error followed by manual entry of configuration information, semi-automated trial and error (automated location of Hypertext Markup Language (HTML) <FORM> elements, Javascript functions and Java applets) followed by manual entry of configuration information or, preferably, configuration by example (executing the protocol in a simulated Web client where the simulated Web client automatically generates a list of required data and a list of steps in the access process). These processes would be utilized at two levels: the first level being the set of data and steps required for general access to the particular PI provider and the second level being the set of additional data and steps required for accessing each particular piece of PI on the PI provider's site. The baseline configuration component 320 may be triggered independently when a new PI provider is added to the system, or it might be triggered as a result of a failure of the PI access/transact component 340 potentially indicating a change in access requirements for the failed access. This latter warning would more likely result where the PI access/transact component 340 has made a comparison between requirements supplied by the Provider store 310, both general to the PI provider and specific to the PI or transaction, and the end user data supplied by the user store 360 after seeking end user verification via a request of the end user to confirm the previously entered required access data via the end user configure component 330 and found an inconsistency. When an inconsistency is determined, updates to the Provider store 320 are made to bring the Provider data into conformance with current access/transaction requirements.

The end user configure component 330 allows an end user to select and configure PI and transactions of interest to the specific user. This configuration information is maintained in the user store 360. When an end user initially subscribes to the system according to the present invention, the system allows the user to select the types and sources of PI and/or transactions desired. First, the system requests permission from the end user to act on his behalf to obtain any selected PI and to execute any authorized transactions. Next, the system provides the user with a list of known information suppliers and the types of PI supplied from and transactions supported by the particular PI provider from the Provider store 320. The system requests the verification data neces-

US 6,317,783 B1

7                                                                              8

sary for accessing each selected PI provider and the addi-
tional data required by the particular PIs and/or transactions
desired from that PI provider. Assuming the end user is
already a registered user with the selected PI provider or the
particular PI provider does not require prior registration, the
data supplied by the end user is placed in the user store **360**.

One method of obtaining any cookie data would be for the
end user to access each previously accessed PI utilizing the
PI engine **240** as a proxy server. The PI engine **240** would
pass the cookie data to the PI provider site with the appro-
priate Web page requests to obtain the PI or execute the
transaction and with the end user's permission retain a copy
of the cookie data in this record in the user store **360**. An
alternate means of obtaining the cookie data would be a
direct upload of the cookie information from the end user's
computer. In a preferred embodiment, no cookie data is
necessary where a user is already registered with a provider.
All that is necessary is the verification data for login.

If the end user does not have the requisite information
because he is not a registered user of a selected PI provider,
the user configure component **330** prompts the user for the
information necessary to register the end user with the PI
provider and performs the registration procedure required by
the PI provider. A simulated Web client could perform this
process automatically supplying the access data as required
and sending any necessary cookie data. The manner in
which such a simulated client registers the end user depends
significantly upon the interaction method used on the PI
provider Web site. If the Web site uses HTML forms and
common gateway interface (CGI) applications, the end user
configure component **330** can formulate a uniform resource
locator (URL) to replicate the effect of actual form usage and
submit this URL to the simulated Web client. The use of a
URL to mimic an HTML form is equivalent to manually
entering the data into the Web <FORM> element. See
Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite
Group Press, 1997, pp. 559–569. If the Web site uses a
mixture of HTML forms and Javascript functions, a simu-
lated Web client with a modified Javascript interpreter could
effectively register the user by following the end user
registration process for the particular PI provider. The reg-
istration process to follow would be obtained from the
record of the particular PI provider in the Provider store **320**.
The Javascript interpreter in the simulated Web client would
follow this procedure and supply the data supplied by the
end user. A similar process could be used if the registration
process on the PI provider Web site utilizes a Java applet. A
Web client with a modified Java bytecode interpreter could
effectively register the user by following the end user
registration process stored for the particular PI provider in
the Provider store **320**. The bytecode interpreter would
supply the data previously entered by the end user rather
than requiring interactive input from the end user. If the PI
provider Web site utilizes a combination of forms, scripts
and applets, the individual procedures above could be used
in combination to accomplish the desired registration.

With reference to FIG. 2 and FIG. 3, a modification of the
Java virtual machine (VM) could allow for automated
interaction between the various functional components of
the PI Engine **240** and Java applet available through pro-
vider Web servers **250**. Templates for interacting with par-
ticular applets could reside in the Provider store **310**. The
specific input data utilized by such templates could be stored
in the User store **360**. When a functional component such as
the end user configure **330** or the access/transact **340** com-
ponents requires automated communication with a Java
applet on a provider Web server **250**, the modified Java VM
would facilitate this interaction.

FIG. 10 illustrates one process utilizing such a modified
Java VM to achieve such automated interaction. The func-
tional component requiring interaction identifies the pro-
vider and the particular applet on that provider with which
the component needs to interact in step **1010**. In step **1020**,
the component accesses the necessary template for interact-
ing with the applet from the Provider store **310**. Proceeding
to step **1030**, the component accesses the User store **360** to
obtain the data required by the template. The modified Java
VM interprets the applet in step **1040** and, rather than
requiring interactive input from a user as in a normal Java
applet execution, awaits input from or output to the inter-
acting functional component of the PI engine. In step **1050**,
the functional component supplies input data to the modified
Java VM according to the accessed template and retrieved
data and receives output data according to the accessed
template. Steps **1040** and **1050** repeat so long as additional
input to or output from the applet continues. Upon termi-
nation of the applet, the functional component continues
with its own processing in step **1060**.

A successful registration could result in displaying the
registration information to the end user for future reference.
Further, the end user configure component **330** stores the
requisite access verification data for the PI provider and the
additional data required to access the selected PI or trans-
action in the user store **360**.

In a preferred embodiment of such automated registration,
any necessary cookie data would be accepted and stored as
needed by the end user configure component **330**. In many
cases, cookie data is session specific and, therefore, of little
long term utility. Cookies generated during the registration
process are used solely during the registration process then
discarded once registration is complete.

A failed registration could result from several situations.
First, the end user attempting to register with the PI provider
does not qualify for registration; for example, an end user
attempting to register with a bank with whom the end user
does not maintain an account and where the bank only
allows access to account holders. Next, the end user may
have supplied improper or incorrect information. For
example, a bank registration process might require a social
security number, a password, a bank account number and the
maiden name of the end user's mother; if the user entered an
incorrect social security number, the registration process
would fail. Finally, the PI provider may have altered the
registration procedure for its Web site. In this situation,
following the process supplied from the Provider store **320**
would yield a failed registration. In the instance of any
registration failure, the end user could be presented with the
data initially supplied to the system for registration. The
system could then ask the end user to double check the
correctness of the information provided and to correct and
resubmit the data if an error is found. A second failure
resulting from the submission of identical requisite data
might generate an error message presented to the end user
stating that either the end user is ineligible to access the
selected PI from the selected PI provider or that alteration by
the PI provider may have caused an error in registration.
This second failure could also trigger a warning suggesting
the need to potentially reconfigure the record for the PI
provider in the Provider store **320**.

Ultimately, the user store **360** would contain a record for
each end user. This record as previous described could be a
database entry, one or more cookies or a file such as a PIC
file. Each record would identify the selected PI providers
along with the general access verification data needed and
also under each PI provider would be a list of PI supplied

US 6,317,783 B1

9

10

and transactions supported by the particular PI provider of interest to the end user along with the additional data, if any, necessary to access that PI or execute that transaction. Specifically, duplicative information such as an end user's name would be centrally stored in the record once.

The end user configure component 330 also allows the end user to select one or more delivery destinations. One destination might be the end user's computer as exemplified by the client computer 220 running client software 270 in FIG. 2; however, a computer is not the only destination contemplated by the present invention. The destination for PI delivery could include facsimile, electronic mail, telephone, conventional mail, pager, other wireless device such as a Palm Pilot (3 Corn), Web page or channel, Web browser or other delivery mechanism. The present invention also contemplates indirect access of PI by the end user utilizing a Web site as an intermediary; however, such indirect access would not require the end user to specify a delivery destination unless additional delivery options were desired.

Further, access to the end user configure component 330 may occur through direct access to the PI engine via the Internet as contemplated by the client computer 220 running client software 270 in FIG. 2; however, alternative methods of access are equally feasible. For example, the user might indirectly access the PI engine through the use of an intermediary Web site. A telephone interface to allow access to the end user configure component is another alternative.

With reference to FIG. 3, the PI access/transact component 340 supports the update, acquisition and transaction functionality of the PI engine 240. The PI access/transact component 340 is responsible for accessing and storing user PI and executing transactions authorized by the end user. When access or update is needed for a selected end user, the PI access/transact component 340 combines information from the Provider store 320 and the user store 360 to update end user PI in the PI store 280. For each piece of PI requiring access or update, the PI access/transact component 340 looks up the access procedure and information needed for the particular PI in the Provider store 320. The verification and access data is found in the user store 360. The PI access/transact component 340 utilizes this information to connect to the PI provider's Web site across the Internet and to access the PI. Where multiple pieces of PI require updating or access, the accesses may occur in series or parallel.

Requested transactions would be similarly supported. For each transaction, the PI access/transact component 340 combines information from the Provider store 320 and the user store 360 to perform the requested transaction. The PI access/transact component 340 looks up the transaction procedure and information needed for the particular transaction in the Provider store 320. The verification and access data is found in the user store 360. The PI access/transact component 340 utilizes this information to perform the transaction across the Internet from the PI provider's Web site

A simulated Web client could perform access or transaction processes automatically supplying access and verification data as necessary. The manner in which such a simulated client access PI or execute transactions depends significantly upon the interaction method used on the PI provider Web site. If the Web site uses HTML forms and common gateway interface (CGI) applications, the PI access/transact component 340 can formulate a uniform resource locator (URL) to replicate the effect of actual form

usage and submit this URL to the simulated Web client. The use of a URL to mimic an HTML form is equivalent to manually entering the data into the Web <FORM> element. See Kerven, Foust, Zakour, HTML 3.2 Plus How-To, Waite Group Press, 1997, pp. 559–569. If the Web site uses a mixture of HTML forms and Javascript functions, a simulated Web client with a modified Javascript interpreter could effectively access the PI or perform the transaction by following the PI access/transact process for the particular PI or transaction respectively. The access or transaction process to follow would be obtained from the record of the particular PI or transaction in the Provider store 320. The Javascript interpreter in the simulated Web client would follow this procedure and supply the data found in the user store 360. A similar process could be used if the PI provider Web site utilizes a Java applet. A Web client with a modified Java bytecode interpreter could effectively access PI or perform transactions by following process stored for the particular PI or transaction in the Provider store 320. The bytecode interpreter would supply the data from the user store 360 rather than requiring interactive input from the end user. If the PI provider Web site utilizes a combination of forms, scripts and applets, the individual procedures above could be used in combination to accomplish the desired access.

In a preferred embodiment of such automated accesses or transactions, any necessary cookie data would be accepted and stored as needed by the PI access/transact component 340. In many cases, cookie data is session specific and, therefore, of little long term utility. Cookies generated are used solely during these functions then discarded once the mining or transaction operation is complete.

In order to provide personal information to an end-user quickly after login, it is necessary for the PI access/transact component 340 to select an end user for data harvesting prior to the login of the end user. One approach to this solution is to update all of an end user's PI whenever the end user, directly or through an intermediary Web site, requests access to his/her PI. Another approach would be to update all of an end user's PI supplied by a particular provider whenever PI from that supplier is requested. Thus, the act of logging into the system by an end user effectively selects that end user for immediate PI update. However, this approach may result in the inefficient use of the PI Engine 240 resources.

Given the large number of potential users and providers, and the goal of providing the freshest data possible, another embodiment includes an algorithm developed to optimize the schedule in which end users are selected for data harvesting from a provider. This algorithm factors in the provider's update policy, the user's login habits, and the user-provider account characteristics. The proper application of the algorithm should ensure that PI is harvested as infrequently as possible for a given user, thus minimizing system resource consumption.

If the next provider update time and the next expected user login can be accurately predicted, a model can be created that will allow for smarter harvesting. Rather than harvesting data for all users of a provider at once when the provider updates its site, the harvesting can be spread out over time based on expected login times of users and network activity profiles. For example, if Provider A updates its site on Friday night and a large number of users of that provider are not expected to login again until Monday morning, the harvesting load can be distributed across multiple days. This has the advantage of minimizing both the peak loading of the PI Engine 240 as well as consumption of the provider's bandwidth by the PI Engine 240. To gain this optimization, the PI Engine 240 must maintain and

US 6,317,783 B1

11

refine models of each provider and user. Such data can be maintained in the provider store **310** and the user store **360** respectively.

Each time a user utilizes the PI Engine **240**, the time and date may be captured. Once a sufficient number of login times are accumulated, they may be analyzed with respect to day of month, day of week, and time of day. These are used in a model to predict the next expected user login. The model is then tested and refined with subsequent logins until a measurable degree of confidence is established. Once high confidence is determined, the user model is incorporated into the adaptive harvesting scheduler. Until a high confidence level is reached for a particular end user one of the aforementioned harvesting approaches may be used.

Each provider updates its site based on policy driven by their unique resources and business model. For any adaptive scheduler to work, the policy for each provider must be modeled. In some cases, the policy is self-evident. In others, it must be determined empirically. A provider's policy will most likely fall into one of the following categories:

Type I. Updated periodically for all users
Type II. Updated periodically relative to each user
Type III. Updated in a pseudo-random manner

The following three approaches may be used based upon provider type.

Type I Provider Policy Scheduling Algorithm

1. Assume users with a "no confidence" model have an immediate login time.
2. Order the users chronologically based on their predicted login time.
3. Shift the expected login time for all users back one hour.
4. Perform a density curve fit along temporal boundaries to get a polynomial function that can be used to determine the number of user accounts to harvest for a given epoch.
5. Perform an integral matching algorithm with the inverse of the network activity curve for the time period in question to adjust the distribution curve.
6. If possible, re-distribute peak harvesting time toward time zero to flatten the distribution curve.
7. Assign harvesting times to the sorted users according to the distribution curve.
8. Monitor time and harvest the user account when appropriate.

Type II Provider Policy Scheduling Algorithm

For each provider that falls into this category, an attribute of the user must be identified that determines when the personal information is updated. In some cases, the user may need to be queried for the information. In others, it can be determined from the harvested information. If the attribute cannot be established for a user via either of these means, the provider site may be monitored daily for changes in personal information until a pattern is established.

Since there is a natural, even distribution of accounts updated by a provider for a given day, a user's account can be harvested an hour before his expected login time. As in the Type I algorithm, users with a "no confidence" model should be immediately harvested.

Type III Provider Policy Scheduling Algorithm

This type of policy is the most difficult of all. Since the provider updates a user's account in a non-deterministic manner, a decision must be made for each provider as to the criticality of the information. For those providers, each user account should be harvested daily, perhaps even more frequently. For those less critical providers, user accounts should be harvested less frequently and possible when overall system activity is low.

The PI deliver component **350** is responsible for formatting and delivering the PI to the end user. Usually delivery

12

will only occur subsequent to updating all stale PI. The PI will be delivered to one or more destinations (e.g. facsimile, telephone, pager, Web browser, e-mail, etc.) as specified in the user store **360** except where the PI is accessed via an intermediary Web site. Where the destination is not an intermediary Web site, the PI deliver component **350** performs all formatting necessary to deliver the PI to the appropriate destinations. For example, where the destination is a Web browser, the PI would be formatted as an HTML document, or where the destination is a telephone, the PI would be submitted for voice synthesis and transmission.

In the case of an intermediary Web site, the PI is delivered in a format configurable by the intermediary Web site. FIG. 5 pictorial illustrates a possible embodiment of the current invention utilizing an intermediary Web site. An end user **210** utilizes a client computer **220** to access an intermediary Web site **510** across the Internet **230**. The end user **210** logs into the intermediary Web site **510**. The intermediary Web site **510** contacts the PI engine **240** across the Internet **230** and directly receives the end user's PI updated as required from the PI provider Web sites **250**. The intermediary Web site **510** receives the PI, incorporates it into pages according to its particular formatting style and graphical user interface and delivers these pages to the end user **210**. The use of the PI engine **240** is transparent to the end user **210**. Further, an intermediary Web site **510** serving aggregate PI to an end user **210** may, and most likely will, simultaneously serve as a PI provider.

In another embodiment, this formatting occurs via a dynamic HTML generation system combining stylistic and layout information from a variety of sources. The PI deliver component **350** generates custom HTML pages dynamically. These pages are customized based on a number of stylistic factors (such as background color, foreground color, font size, color and style, page layout, etc) from a variety of sources and content from a variety of sources. Information providers, distributors, the end user, the PI deliver component **350** or any combination of these sources, or other relevant sources, may provide customization factors used in the page generation. Finally, each HTML page must be filled in with data. The data used in such pages may originate from such sources as information providers, distributors, the end user, the PI deliver component **350** or any combination of these sources, or other relevant sources. The required solution is a system representing a generic algorithm for performing such HTML generation at run-time. The style and content may be provided in any suitable format such as the Extensible Stylesheet Language (XSL), as specified by W3C in http://www.w3.org/TR/WD-xsl/, which is expressly incorporated herein by reference in its entirety, and/or the Extensible Markup Language (XML) as specified by W3C in http://www.w3.org/TR/REC-xml, which is expressly incorporated herein by reference in its entirety, or other suitable formatting standard. The key requirements for such a system are complete encapsulation of the problem domain and run-time efficiency.

In preferred embodiments, the solution is based on the following basic model as depicted in FIG. 8:

1. Six sets of customization factors are identified: distributor content **810**, provider content **820**, distributor style specification **830**, provider style specification **840**, user-specific content **850** and user-specific style **860**.
2. Each set of customization factors **810–860** is considered a separate, independent and required input to the run-time system **870** that performs dynamic page generation.
3. Each input **810–860** will be in form of an XML stream.

US 6,317,783 B1

13

4. Output **880** will be in form of an HTML stream.

5. The dynamic page generation system **870** will produce valid output **880** for each set of six valid inputs **810–860**.

FIG. 9 illustrates an actual run-time sequence of input processing by such a system **870**:

1. Distributor content **810** is combined with provider content **820** and with user-specific content **850** to produce a complete content specification **930** by the content merger unit **910**.

2. Distributor style **830** is combined with provider style **840** and with user-specific style **860** to produce a complete style specification **940** by the style merger unit **920**.

3. The style specification **940** is applied by the style applicator **950** to content specification **930** in order to produce the resulting page **880**.

In order to completely encapsulate the problem domain, the following requirements must be placed on the system **870**:

1. Each XML input **810–860** is a valid XML stream.

2. All content specifications **810, 820** and **850** are valid with respect to the same Document Type Definition.

3. All style specifications **830, 840** and **860** are valid with respect to the same Document Type Definition (such as the XSL DTD standard).

4. The merging units **910** and **920** whose task is to take two or more XML streams and produce a combined XML output must be able to produce such output for any set of valid XML inputs.

Another method of performing this task would be to format PI as HTML elements with predefined CLASS attributes. The intermediary Web site receiving these elements could dynamically include them in page forwarded to the end user of the PI. The pages incorporating such elements could include different style information associated with the predefined CLASS set. Level 1 cascading style sheet convention could be used to implement such configurability. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To,* Waite Group Press, 1997, pp. 651–693; Walsh, "An Introduction to Cascading Style Sheets," *World Wide Web Journal,* Winter 1997, pp. 147–156. This option requires minimal programmatic support by the intermediary Web site but restricts to some degree the intermediary Web sites flexibility in presenting the PI to the end user.

Alternatively, an intermediary Web site could develop an application utilizing a standardized application programming interface (API) to directly access the PI data. In this instance, the PI deliver component **350** could either be bypassed or potentially used as the component responsible for servicing API requests for data. Under this model, the intermediary Web site would be responsible for all formatting decisions with respect to the raw PI data. This implementation option requires additional programmatic support by the intermediary Web site but allows for greater flexibility in the use of the raw PI.

The ability to utilize an intermediate Web site to deliver PI is of significant utility. This capability allows an end user already familiar with an existing PI provider to access not only the PI associated with the particular PI provider but also all PI from other PI providers in the comfort of a familiar user interface, namely the existing PI provider Web site. In this situation, the request for PI would directly originate with the intermediary PI provider Web site and indirectly from the end user. Security measures would restrict access to authorized intermediate Web site access. These measure might include verification of the end user and the intermediate Web site. Further, verification of the association

14

between the end user and the particular intermediate Web site might also be required for additional security.

In addition, the use of an intermediary Web site also supports a novel transaction model. In this transaction model, the intermediary site subsidizes, or fully compensates, the PI engine administrator for services provided to the end user. These transactions are facilitated via the auditing and tracking capabilities of the PI engine. These capabilities allow the calculation of per user fees, per transaction fees, per access fees or some combination thereof to be assessed. The assessed values could be directly charged to the intermediary Web site. Alternatively, such values could be debited from a minimum monthly fee charged to the intermediary Web site with any fees beyond the minimum charged directly to the intermediary Web site.

FIG. 11 depicts a flowchart of a typical process according to the described model. The intermediary Web site pays a minimum monthly fee in step **1110**. In step **1120**, the PI engine audits and tracks end user usage via the intermediary Web site. The audited usage is used to assess a fee on a per user, per access, per transaction or combination basis. In step **1130**, this audited amount is debited from the fee paid in step **1110**. In step **1140**, the intermediary Web site is charged for any fees in excess of the minimum fee paid.

Often an end user may require access to the underlying Web page generated by the provider of a particular piece of PI. The delivery component may deliver not only the PI but also an access point directly to the provider's page supplying that PI. The access point may take the form of a link, a form button or some other interactive access mechanism.

Such an access point significantly improves the efficiency of accessing the underlying page by the end user as exhibited by FIG. 7. In the traditional process **100** for accessing PI, the end user must proceed through numerous intermediary pages requiring a variety of often tedious interactions before reaching the desired page.

The end user must first identify the Provider **110**. Next, the end user must locate the Provider's Web address **120**. Then, the user the requests the Provider's login page **130**. If the end user does not remember the requisite information, this information must be found, or the desired information will remain inaccessible via the Web. The end user then navigates the Provider's Web site **140**. This often entails visiting the Provider's main page **710** followed by viewing a variety of intermediate pages on the Provider's site **720**. The end user may have to backtrack several times to the main page **710** or accidentally leave the system entirely forcing a second login **140** before finally locating the desired information **150**.

Utilizing springboard technology, the entire process **750** is streamlined into the single click of an access point. The delivery component of the PI Engine delivers an access point to the Provider's underlying page along with the PI. As a consequence, the end user need only perform a single interaction with the PI presentation page **760**. This interaction immediately performs the requisite interactions with the Provider's Web site to bring the user to the desired underlying Web page **150**.

In one embodiment, this springboard technology could be implemented utilizing a Java applet. With respect to FIG. 2, the applet would be downloaded from the PI Host **290** by the end user's client software **270**, usually a Web browser, and executed locally by the end user's computer **220**. The applet would drive the client software **270** to the desired page. Such an applet could retrieve procedures and data for driving the client software from the Provider store **310** and the User store **360**.

US 6,317,783 B1

15

In a further embodiment, the PI engine 240 could act as a proxy server directly accessing the Provider store 310 and the User store 360 as required. When the PI engine 240 receives the request to jump to the source of a particular piece of PI, the engine performs the necessary actions to navigate to the desire page and forwards the desired page to the end user's computer 220. Further interactions with the page might require additional proxying by the PI engine 240 as accumulated cookie data may reside on the PI Host 290. This embodiment is limited to use in handling standard HTTP traffic rather than secure HTTP traffic.

In a preferred embodiment, the springboard provides the end user with automated login into the PI Provider site 250 and allows the end user 210 to navigate via the client software 270. This automated login could be accomplished through the utilization of a hypertext transfer protocol (HTTP) redirect. Upon receiving the a springboard access request from the end user 210 via the client software 270, the PI Host 290 requests the login page from the PI Provider site 250 targeted by the springboard access. The PI engine 240 running on the PI Host 290 receives this login page and constructs a login request by accessing the proper data in the Provider store 310 and the User store 360. The login request is embedded in the HTTP redirect which is forward to the client software 270. The client software 270 is redirected to the targeted PI Provider site 250, and the end user 210 is automatically logged into this site.

Alternatively, this functionality could be implemented via a Java applet as described above. In addition, the PI engine 240 could generate a Javascript page containing the pertinent login request rather than an HTTP redirect. The Javascript page could be returned to the client software 270. This page would then be executed by the client software 270 to accomplish the automated login.

The PI engine 240 of FIG. 3 may also include a site monitor 370 processing component. This component would systematically monitor supported PI provider Web sites for changes. This component enhances the ability of the system to identify alterations in PI provider Web site procedures, data requirements and cookies requirements. This component increases system efficiency by supplementing or supplanting alteration identification via feedback from the PI access/transact component 340.

A further embodiment of the present invention might support the localize manipulation of PI. This could be accomplished where the client software 270 running on the client computer 220 in FIG. 2 is a specialized Web client rather than a general Web client such as Netscape. This specialized client might utilize Web channel technology to automate the local PI download and update processes. Where the PI store is implemented via the aforementioned cookie architecture, this specialized client may provide direct local access to stored PI.

In another embodiment, the PI engine 240 of FIG. 3 might support both system supported PI providers as well as PI providers specific to particular end users. In this embodiment, an end user is not limited to PI available from PI providers present in the Provider store 310. For an end user to add PI provided by a non-supported PI provider, the end user would access the Baseline configure component 320 and create a configuration for the non-supported PI provider. The PI provider and PI configuration along with the verification and access data would be stored along with the user's record in the user store 360.

A further embodiment of the present invention supports the inclusion of PI transaction procedures and access requirements in the Provider store 310 of FIG. 3. The end

16

user specific information necessary to realize such a transaction would reside with the user record in the user store 360. The functionality of the PI access/transact component 340 would expand to support the performance of transactions. This additional functionality could be supported in a manner similar to the procedure described above with respect to performance of access utilizing a simulated Web client. A further feature of this embodiment would include automated or semi-automated account management by providing trigger events to automatically initiate a transaction.

For instance, with reference to FIG. 2 an end user 210 would be able to maintain his/her accounts online through the PI Engine 240. If an information provider has the capability of receiving payments online, the PI Engine 240 could support complete or partial automation of such transactions. If there is a billing due date for a certain information provider, PI Engine 240 could flag that information and send email to the end user 210 notifying him/her of the bill due. Thus, the user will not have to check each of his/her providers individually for due date information. The PI Engine 240 could also automated payments on a limited range of billing amount for providers who allow payments over their Web servers 260, then send an email to the user with the notification of payment.

Due date acquisition could be accomplished utilizing the PI access/transact component 340 seen in FIG. 3. The due date information would be available to the end user via any delivery means supported by the PI deliver component 350. The PI access/transact component 340 would use standard e-commerce bill-paying methods to pay the user's bill/s to the provider if he/she chooses. Once the bill is paid, then an email notification will be sent to the user with the provider information and payment information. The user can specify the range of amount stored in the user store 360 that will be paid automatically. If the bill exceeds the amount specified by the user, then PI engine will simply send out an email notification to the user instead of paying the bill automatically.

The embodiments described above are given as illustrative examples only. It will be readily appreciated that many deviations may be made from the specific embodiment disclosed in this specification without departing from the invention. Accordingly, the scope of the invention is to be determined by the claims below rather than being limited to the specifically described embodiments above.

What is claimed is:

1. A method for delivering non-public personal information relating to an end user via a wide-area computer network to an end user from at least one of a plurality of information providers securely storing the personal information under control of a processor located remotely from the information providers and the end user, the method comprising the steps of:

(a) the processor connecting with at least one information provider;

(b) for a selected end user, the processor retrieving personal information for the selected end user from the connected at least one information provider based on end user data associated with the selected end user and information provider data associated with the connected one or more information providers, the end user data including information identifying the plurality of information providers securely storing the personal information relating to the end user, the provider data including a protocol for instructing the processor how to access the securely stored personal information via the network, the information accessible to the processor

17

using the protocol also being accessible by the end user via the network independently of the system for delivering personal information; and

(c) the processor storing the retrieved personal information in a personal information store for access by the selected end user.

2. The method of claim 1, further comprising the step of monitoring information providers for changes.

3. The method of claim 1, further comprising the step of updating the provider store to conform with requirements of the information provider.

4. The method of claim 1, further comprising the step of executing a transaction for the selected end user with a selected information provider based on the accessed end user and the accessed information provider data associated with the selected information provider.

5. The method of claim 4, wherein the execution step is triggered according to the accessed end user data.

6. The method of claim 1, further comprising the step of outputting the personal information associated with the selected end user from the personal information store.

7. The method of claim 6, wherein the outputting step outputs the personal information to a delivery platform specified in the accessed end user data.

8. The method of claim 7, wherein the specified delivery platform is selected from the group consisting of electronic mail, facsimile, pager, telephone, wireless device, ftp server, Web server, gopher server and Web client.

9. The method of claim 6, wherein the outputting step outputs the personal information via a world wide web site.

10. The method of claim 9, wherein the outputting step outputs personal information as a formatted Web page to the world wide web site.

11. The method of claim 9, wherein the outputting step outputs personal information as formatted Web elements to the world wide web site.

12. The method of claim 9, wherein the outputting step outputs personal information data to the world wide web site.

13. The method of claim 1, wherein the connecting step comprises the substeps of:

(i) accessing the end user data associated with the selected end user;

(ii) identifying information providers specified in the accessed end user data; and

(iii) establishing a communication link with each of the identified information providers.

14. The method of claim 1, further comprising the step of outputting the retrieved personal information to an intermediary web site, wherein the intermediary web site has an associated user interface format.

15. The method of claim 14, wherein the retrieved personal information is output to the intermediary web site in a format other than the format associated with the intermediary web site.

16. The method of claim 14, wherein the intermediary web site outputs the retrieved personal information to a web client, and the web client displays the retrieved personal information.

17. The method of claim 16, wherein the web client displays the retrieved personal information in the format associated with the intermediary web site.

18. A computer-readable, digital storage device storing executable instructions which cause a processor to deliver non-public personal information relating to an end user from at least one of a plurality of information providers securely storing the personal information to the end user via a wide-area computer network by performing the steps comprising of:

18

(a) connecting with at least one information provider;

(b) for a selected end user, retrieving personal information for the selected end user from the connected at least one information provider based on end user data associated with the selected end user and information provider data associated with the connected one or more information providers, the end user data including information identifying the plurality of information providers securely storing the personal information relating to the end user, the provider data including a protocol for instructing the processor how to access the securely stored personal information via the network, the information accessible to the processor using the protocol also being accessible by the end user via the network independently of the system for delivering personal information; and

(c) storing the retrieved personal information in a personal information store.

19. The storage device of claim 18, further storing executable instructions to perform the connecting step by performing substeps comprising of:

(i) accessing the end user data associated with the selected end user;

(ii) identifying information providers specified in the accessed end user data; and

(iii) establishing a communication link with each of the identified information providers.

20. A system for delivering non-public personal information relating to an end user via a network from at least one of a plurality of information providers, the information providers securely storing the personal information, the system comprising:

(a) a user store for storing end user data associated with each end user, the user store including information identifying the plurality of information providers securely storing the personal information relating to the end user;

(b) a provider store for storing information provider data associated with each information provider, the provider data including a protocol for instructing the processor how to access the securely stored personal information via the network, the information accessible to the processor using the protocol also being accessible by the end user via the network independently of the system for delivering personal information;

(c) a personal information store for storing personal information associated with each end user retrieved from the information providers;

(d) a processor in communication with the user store, the provider store and the personal information store, for performing the steps of:

(i) connecting with at least one information provider;

(ii) for a selected end user, retrieving personal information for the selected end user from the connected at least one information provider based on end user data associated with the selected end user and information provider data associated with the connected one or more information providers; and

(iii) storing the retrieved personal information in the personal information store for accessible to the selected end user.

21. The system of claim 20, wherein the processor performs the additional step of monitoring information providers for changes.

22. The system of claim 20, wherein the processor performs the additional step of updating the provider store to conform with requirements of the information provider.

US 6,317,783 B1

19

**23**. The system of claim **20**, wherein the processor performs the additional step of executing a transaction for the selected end user with a selected information provider based on the end user data associated with the selected end user and the information provider data associated with the selected information provider.

**24**. The system of claim **23**, wherein the processor automatically performs the transaction execution step according to end user data in the user store.

**25**. The system of claim **20**, wherein the processor performs the additional step of outputting the personal information associated with the selected end user from the personal information store.

**26**. The system of claim **25**, wherein the outputting step performed by the processor outputs the personal information to a delivery platform specified in the end user data associated with the selected end user.

**27**. The system of claim **26**, wherein the specified delivery platform is selected from the group consisting of electronic mail, facsimile, pager, telephone, wireless device, ftp server, Web server, gopher server and Web client.

**28**. The system of claim **25**, wherein the outputting step of the processor outputs the personal information via a world wide web site.

**29**. The system of claim **28**, wherein the outputting step of the processor outputs personal information as a formatted Web page to the world wide web site.

**30**. The system of claim **28**, wherein the outputting step of the processor outputs personal information as formatted Web elements to the world wide web site.

20

**31**. The system of claim **28**, wherein the outputting step outputs personal information data to the world wide web site.

**32**. The system of claim **20**, wherein the connecting step of the processor performs the following substeps:

(A) accessing the end user data associated with the selected end user;

(B) identifying information providers specified in the accessed end user data; and

(C) establishing a communication link with each of the identified information providers.

**33**. The system of claim **20**, further including an intermediary web site having an associated user interface format, wherein the processor performs the additional step of outputting the retrieved personal information to the intermediary web site.

**34**. The system of claim **33**, wherein the retrieved personal information is output by the processor to the intermediary web site in a format other than the format associated with the intermediary web site.

**35**. The system of claim **33**, further including a web client, wherein the intermediary web site outputs the retrieved personal information to the web client, and the web client displays the retrieved personal information.

**36**. The system of claim **35**, wherein the web client displays the retrieved personal information in the format associated with the intermediary web site.

*   *   *   *   *

# Exhibit E

US006199077B1

(12) **United States Patent**
Inala et al.

(10) Patent No.: **US 6,199,077 B1**
(45) Date of Patent: **Mar. 6, 2001**

(54) **SERVER-SIDE WEB SUMMARY GENERATION AND PRESENTATION**

(75) Inventors: **Suman Kumar Inala**, Santa Clara; **P Venkat Rangan**, San Diego; **Ramakrishna Satyavolu**, Santa Clara, all of CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/323,598**

(22) Filed: **Jun. 1, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/208,740, filed on Dec. 8, 1998.

(51) Int. Cl.[7] .................................................. **G06F 17/21**
(52) U.S. Cl. .......................... **707/501**; 709/202; 709/218; 713/202; 704/1
(58) Field of Search ................................. 707/501, 513, 707/1, 3, 4, 5, 9–10; 713/201–202; 705/26–27; 709/202, 218; 704/1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,649,186 | * 7/1997 | Ferguson | 707/10 |
| 5,708,825 | * 1/1998 | Sotomayor | 707/501 |
| 5,794,233 | * 8/1998 | Rubinstein | 707/4 |
| 5,855,015 | * 12/1998 | Shoham | 707/5 |
| 5,931,907 | * 8/1999 | Davies et al. | 709/218 |
| 5,983,227 | * 11/1999 | Nazem et al. | 707/10 |
| 5,987,466 | * 11/1999 | Greer et al. | 707/10 |
| 6,029,180 | * 2/2000 | Murata et al. | 707/501 |
| 6,029,182 | * 2/2000 | Nehab et al. | 707/523 |
| 6,032,162 | * 2/2000 | Burke | 707/501 |
| 6,038,668 | * 8/2000 | Chipman et al. | 713/201 |
| 6,041,326 | * 3/2000 | Amro et al. | 707/10 |
| 6,108,686 | * 8/2000 | Williams, Jr. | 709/202 |
| 6,119,101 | * 9/2000 | Peckover | 705/10 X |

OTHER PUBLICATIONS

Stanley, Tracey, "Intelligent Searching Agents on the Web", 4 pages, <http://www.ariadne.ac.uk/issu7/search–engines/> Jan. 1997.*

Jansen, James, "Using an Intelligent Agent to Enhance Search Ingine Performance", 16 pages, <http o://www.first-monday.dk/issues/issue2_3/jansen/> Dec. 1998.*

Lesser, Victor et al, "BIG: A Resource_Bounded Information Gathering Agent", 18 pages, <http://dis.cs.umass.edu/research/big/> Jan. 1998.*

* cited by examiner

*Primary Examiner*—Joseph H. Feild
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency

(57) **ABSTRACT**

A portal server includes a software agent configured to do summary searches for subscribers based on Internet destinations provided by the subscribers, to retrieve information from such destinations based on pre-programmed site information, and to download the summary information to the subscriber. The destinations and the nature of the information to be retrieved is pre-programmed. There is further a configuration and initiation interface for a subscriber to set up and start a summary search. In some cases the summary searches are configured for individual clients as templates stored and retrieved at the Internet-connected server. Also in some cases retrieved information is immediately sent to the subscriber, and in other situations such information is saved at the portal to be retrieved by a subscriber at a later time. In preferred embodiments of the invention autologins are accomplished for a subscriber at Internet destinations by use of pre-stored configuration information.

**12 Claims, 6 Drawing Sheets**





*Fig. 1*



*Fig. 2*



*Fig. 3*



*Fig. 4*



*Fig. 5*



*Fig. 6*

US 6,199,077 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SERVER-SIDE WEB SUMMARY GENERATION AND PRESENTATION

## CROSS-REFERENCE TO RELATED DOCUMENTS

The present invention is a continuation in part (CIP) to patent application Ser. No. 09/208,740 entitled "Method and Apparatus for Providing and Maintaining a User-Interactive Portal System Accessible via Internet or other Switched-Packet-Network" filed on Dec. 8, 1998,pending, disclosure of which is incorporated herein in its entirely herein by reference.

## FIELD OF THE INVENTION

The present invention is in the field of Internet navigation including various communication means and connection technologies and pertains more particularly to methods and apparatus, including software, for gathering summary information from users or enterprise-selected WEB sites and presenting the information as HTML to the user using either a push or pull technology.

## BACKGROUND OF THE INVENTION

The information network known as the World Wide Web (WWW), which is a subset of the well-known Internet, is arguably the most complete source of publicly accessible information available. Anyone with a suitable Internet appliance such as a personal computer with a standard Internet connection may access (go on-line) and navigate to information pages (termed web pages) stored on Internet-connected servers for the purpose of garnering information and initiating transactions with hosts of such servers and pages.

Many companies offer various subscription services accessible via the Internet. For example, many people now do their banking, stock trading, shopping, and so forth from the comfort of their own homes via Internet access. Typically, a user, through subscription, has access to personalized and secure WEB pages for such functions. By typing in a user name and a password or other personal identification code, a user may obtain information, initiate transactions, buy stock, and accomplish a myriad of other tasks.

One problem that is encountered by an individual who has several or many such subscriptions to Internet-brokered services is that there are invariably many passwords and/or log-in codes to be used. Often a same password or code cannot be used for every service, as the password or code may already be taken by another user. A user may not wish to supply a code unique to the user such as perhaps a social security number because of security issues, including quality of security, that may vary from service to service. Additionally, many users at their own volition may choose different passwords for different sites so as to have increased security, which in fact also increases the number of passwords a user may have.

Another issue that can plague a user who has many passworded subscriptions is the fact that they must book-mark many WEB pages in a computer cache so that they may quickly find and access the various services. For example, in order to reserve and pay for airline travel, a user must connect to the Internet, go to his/her book-marks file and select an airline page. The user then has to enter a user name and password, and follow on-screen instructions once the page is delivered. If the user wishes to purchase tickets

from the WEB site, and wishes to transfer funds from an on-line banking service, the user must also look for and select the personal bank or account page to initiate a funds transfer for the tickets. Different user names and passwords may be required to access these other pages, and things get quite complicated.

Although this preceding example is merely exemplary, it is generally known that much work related to finding WEB pages, logging in with passwords, and the like is required to successfully do business on the WEB.

A service known to the inventor and described in the related case listed under the cross-reference to related documents section provides a WEB service that allows a user to store all of his password protected pages in one location such that browsing and garnering information from them is much simplified. A feature of the above service allows a user to program certain tasks into the system such that requested tasks are executed by an agent (software) based on user instruction. The service stores user password and log-in information and uses the information to log-in to the user's sites, thus enabling the user to navigate without having to manually input log-in or password codes to gain access to the links.

The above-described service uses a server to present a user-personalized application that may be displayed as an interactive home page that contains all of his listed sites (hyperlinks) for easy navigation. The application lists the user's URL's in the form of hyperlinks such that a user may click on a hyperlink and navigate to the page wherein login, if required, is automatic, and transparent to the user.

The application described above also includes a software agent that may be programmed to perform scheduled tasks for the user including returning specific summaries and updates about user-account pages. A search function is provided and adapted to cooperate with the software agent to search user-entered URL's for specific content if such pages are cached somewhere in their presentable form such as at the portal server, or on the client's machine.

In addition to the features described above, it is desirable that the software agent in conjunction with the search function be enabled to navigate to any URL or group of URL's, provided as input by a user or otherwise deemed appropriate by the service provider, for the purpose of providing summary information regarding updated content for each URL, which may be presented as an HTML information-page to the user.

What is clearly needed is a method and apparatus that can independently navigate to user-supplied or known URL's, login with the appropriate password information at each URL (if required), and return requested summary information to a user in the form of a human and machine-readable HTML document. Such a system would provide an effective summarization service wherein important information may be presented to a user without requiring that the user invoke hyperlinks at his personal portal home page.

## SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet Portal is provided, comprising an Internet-connected server; and a portal software executing on the server, including a summary software agent. The Portal maintains a list of Internet destinations specific for a subscriber, and the summary software agent accesses the Internet destinations, retrieves information according to pre-programmed criteria, and summarizes the retrieved information for delivery to the subscriber.

US 6,199,077 B1

3

In one embodiment the Portal further comprises a configuration and intitiation interface for a subscriber to set up and start a summary search, and summary searches may be configured for individual clients as templates stored and retrieved at the Internet-connected server. In some cases summary information is stored to be later downloaded at request of the subscriber, and in others the information is immediately pushed to the client. Also in some embodiments autologins are performed for the subscriber at each Internet site according to a data stored for the subscriber at the Portal.

Methods for practicing the invention in several embodiments are provided as well in the descriptions that follow, and for the first time a system is enabled allowing subscribers to quickly access multiple WEB sites without lengthy log-in procedures, and to also summarize and download the data resulting from a summary search.

BRIEF DESCRIPTION OF THE DRAWINGS
FIGURES

FIG. 1 is an overview of an Internet portal system and network according to an embodiment of the present invention.

FIG. 2 is an exemplary plan view of a personalized Portal home page application as it may be seen on a display monitor according to an embodiment of the present invention.

FIG. 3 is a flow diagram illustrating user interaction with the Internet portal of FIG. 1.

FIG. 4 is a block diagram illustrating a summarization software agent and capabilities thereof according to an embodiment of the present invention.

FIG. 5 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 operating in a user-defined mode.

FIG. 6 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 in a User-independent smart mode with minimum user input.

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

According to a preferred embodiment of the present invention, a unique Internet portal is provided and adapted to provide unique services to users who have obtained access via an Internet or other network connection from an Internet-capable appliance. Such an interface provides users with a method for storing many personal WEB pages and further provides search function and certain task-performing functions. The methods and apparatus of the present invention are taught in enabling detail below.

FIG. 1 is an overview of an Internet portal system 11 and Internet network 13 according to an embodiment of the present invention. Portal system 11, in this embodiment, operates as an ISP in addition to a unique network portal, but may, in other embodiments be implemented as a stand-alone Internet server. In yet other embodiments the service and apparatus described herein may also be provided by such as a search and listing service (AltaVista™, Yahoo™) or by any other enterprise hosting a WEB-connected server.

Internet 13 is representative of a preferred use of the present invention, but should not be considered limiting, as the invention could apply in other networks and combinations of networks.

ISP 15 in this embodiment comprises a server 31, a modem bank 33, represented here by a single modem, and

4

a mass storage repository 29 for storing digital data. The modem bank is a convenience, as connection to the server could be by another type of network link. ISP 15, as is typical in the art, provides Internet access services for individual subscribers. In addition to well-known Internet access services, ISP 15 also provides a unique subscription service as an Internet portal for the purpose of storing many WEB pages or destinations along with any passwords and or personal codes associated with those pages, in a manner described in more detail below. This unique portal service is provided by execution of Portal Software 35, which is termed by the inventors the Password-All suite. The software of the invention is referred to herein both as the Portal Software, and as the Password-all software suite. Also, in much of the description below, the apparatus of the invention is referred to by the Password-All terminology, such as the *Password-All Server or Password-All Portal.*

ISP 15 is connected to Internet 13 as shown. Other equipment known in the art to be present and connected to a network such as Internet 13, for example, IP data routers, data switches, gateway routers, and the like, are not illustrated here but may be assumed to be present. Access to ISP 15 is through a connection-oriented telephone system as is known in the art, or through any other Internet/WEB access connection, such as through a cable modem, special network connection (e.g. T1), ISDN, and so forth. Such connection is illustrated via access line 19 from Internet appliance 17 through modem bank 33.

In a preferred embodiment a user has access to Internet Password-All Portal services by a user name and password as is well known in the art, which provides an individualized WEB page to the subscriber. In another embodiment wherein a user has other individuals that use his or her Internet account, then an additional password or code unique to the user may be required before access to portal 31 is granted. Such personalized Portal WEB pages may be stored in repository 29, which may be any convenient form of mass storage.

Three Internet servers 23, 25, and 27, are shown in Internet 13, and represent Internet servers hosted by various enterprises and subscribed to by a user operating appliance 17. For example, server 23 may be a bank server wherein interactive on-line banking and account managing may be performed. Server 25 may be an investment server wherein investment accounts may be created and managed. Server 27 may be an airline or travel server wherein flights may be booked, tickets may be purchased, and so on. In this example, all three servers are secure servers requiring user ID and password for access, but the invention is not necessarily limited to just secure services.

In a preferred embodiment of the present invention, a subscribing user operating an Internet-capable appliance, such as appliance 17, connects to Password-All Portal system 11 hosted by ISP 15, and thereby gains access to a personalized, interactive WEB page, which in turn provides access to any one of a number of servers on Internet 13 such as servers 23, 25, and 27, without being required to enter additional passwords or codes. In a preferred embodiment the software that enables this service is termed Password-All by the inventors. Password-All may be considered to be a software suite executing on the unique server, and in some instances also on the user's station (client). Additional interactivity provided by portal software 35 allows a connected user to search his listed pages for information associated with keywords, text strings, or the like, and allows a user to program user-defined tasks involving access and interaction with one or more Internet-connected servers such

as servers **23**, **25**, and **27** according to a pre-defined time schedule. These functions are taught in enabling detail below.

FIG. 2 is an illustration of a personalized portal page as may be seen on a display monitor according to an embodiment of the present invention, provided by Password-All Portal software **35** executing on server **31**, in response to secure access by a subscriber. Page **32** presents an interactive listing **34** of user-subscribed or member WEB pages, identified in this example by URL, but which may also be identified by any convenient pseudonym, preferably descriptive, along with user name and typically encrypted password information for each page. Listed in a first column under destination, are exemplary destinations I.BC.com, My Bank.com, My Stocks.com, My shopping.com, Mortgage.com, and Airline.com. These are but a few of many exemplary destinations that may be present and listed as such on page **33**. In order to view additional listings listed but not immediately viewable from within application **33**, a scroll bar **35** is provided and adapted to allow a user to scroll up or down the list to enable viewing as is known in the art.

Items listed in list **34** in this example may be considered destinations on such as servers **23**, **25**, and **27** of FIG. 1. Typically the URL associated with an item on this list will not take a user to a server, per se, but to a page stored on a server. User names and password data associated with each item in list **34** are illustrated in respective columns labeled user name, and password, to the right of the column labeled destination. Each listing, or at least a portion of each listing, is a hyperlink invoking, when selected, the URL to that destination. In some instances a particular service may have more than one associated URL. For example, My Bank.com may have more than one URL associated for such as different accounts or businesses associated also with a single subscriber. In this case there may be a sub-listing for different destinations associated with a single higher-level listing. This expedient is not shown, but given this teaching the mechanism will be apparent to those with skill in the art.

In some embodiments one page **33** may be shared by more than one user, such as a husband and wife sharing a common account and subscription. An instance of this is illustrated herein with respect to the server labeled Mortgage.com wherein both a John and a Jane Doe are listed together under the column labeled user name. In another embodiment, a network of individuals, perhaps business owners, authorized co-workers, investment parties, or the like may share one application. In this way, system **11** may be adapted for private individuals as well as business uses.

After gaining access to application **33** which is served via Internet portal server **31** of FIG. 1, a user may scroll, highlight, and select any URL in his or her list **34** for the purpose of navigation to that particular destination for further interaction. Application **33** already has each password and user name listed for each URL. It is not necessary, however, that the password and user name be displayed for a user or users. These may well be stored transparently in a user's profile, and invoked as needed as a user makes selections. Therefore, a user is spared the need of entering passwords and user names for any destinations enabled by list **34**. Of course, each list **34** is built, configured and maintained by a subscribing user or users, and an editing facility is also provided wherein a user may edit and update listings, including changing URL's adding and deleting listings, and the like.

In another aspect of the invention new listings for a user's profile, such as a new passthrough to a bank or other

enterprise page, may be added semi-automatically as follows: Typically, when a user opens a new account with an enterprise through interaction with a WEB page hosted by the enterprise, the user is required to provide certain information, which will typically include such as the user's ID, address, e-mail account, and so forth, and typically a new user name and password to access the account. In this process the user will be interacting with the enterprise's page from his/her browser. A Password-All plug-in is provided wherein, after entering the required information for the new enterprise, the user may activate a pre-determined signal (right click, key stroke, etc.), and the Password-All suite will then enter a new passthrough in the user's Password. All profile at the Password-All Portal server.

In a related method for new entries, the enterprise hosting the Password-All Portal may, by agreement with other enterprises, provide log-in and sign-up services at the Password-All Portal, with most action transparent to the user. For example, there may be, at the Password-All Portal, a selectable browser list of cooperating enterprises, such as banks, security services, and the like, and a user having a Password-All Portal subscription and profile may select among such cooperating enterprises and open new accounts, which will simultaneously and automatically be added to the Password-All Portal page for the user and to the server hosted by the cooperating enterprise. There may be some interactivity required for different accounts, but in the main, much information from the user's profile may be used directly without being re-entered.

The inventors have anticipated that many potential users may well be suspicious of providing passwords and user names to an enterprise hosting a Password-All Portal Server executing a service like Password-All according to embodiments of the present invention. To accommodate this problem, in preferred embodiments, it is not necessary that the user provide the cleartext password to Password. All. Instead, an encrypted version of each password is provided. When a user links to his passthrough page in Password-All invokes a Password-All Portal server, when he/she invokes a hyperlink, the encrypted password is returned to the user's system, which then, by virtue of the kept encryption key or master password, invokes the true and necessary password for connection to the selected destination. It is thus not necessary that cleartext passwords be stored at the Password-All Portal server, where they may be vulnerable to attack from outside sources, or to perceived misuse in other ways as well.

In a related safety measure, in a preferred embodiment of the invention, a user's complete profile is never stored on a single server, but is distributed over two or more, preferably more, servers, so any problem with any one server will minimize the overall effect for any particular user.

Password-All, as described above, allows a user to access a complete list of the user's usual cyberspace destinations, complete with necessary log-on data, stored in an encrypted fashion, so a user may simply select a destination (a hyperlink) in the Password-All list, and the user's browser then invokes the URL for the selected destination. In an added feature, Password-All may display banner ads and other types of advertisement during the navigation time between a hyperlink being invoked and the time the destination WEB page is displayed.

In yet another embodiment of the invention, a user/subscriber need not access the Password-All page to enjoy the advantages of the unique features provided. In this variation, a Plug-In is provided for the subscriber's WEB

US 6,199,077 B1

7                                                                              8

browser. If the subscriber navigates by use of the local browser to a WEB page requiring a secure log-in, such as his/her on-line banking destination, when the subscriber is presented with an input window for ID and Password, the plug in may be activated by a predetermined user input, such as a hot key or right click of the mouse device. The plug-in then accesses, transparently, the Password-All page (which may be cached at the client), and automatically accesses and provides the needed data for log-on.

In yet another aspect of the invention a search option 37 allows a user to search list 34 for specific URL's based on typed input such as keywords or the like. In some cases, the number of URL's stored in list 34 can be extensive making a search function such as function 37 an attractive option. A criteria dialog box 51 illustrated as logically separated from and below list 34 is provided and adapted to accept input for search option 37 as is known in the art. In one embodiment, search option 37 may bring up a second window wherein a dialog box such as box 51 could be located.

In another aspect of the invention the search function may also be configured in a window invoked from window 33, and caused to search all or selected ones of listed destinations, and to return results in a manner that may be, at least to some extent, configured by a user. For example, a dialog box may be presented wherein a user may enter a search criteria, and select among all of the listed destinations. The search will then be access each of the selected destinations in turn, and the result may be presented to the user as each instance of the criteria is found, or results may be listed in a manner to be accessed after the search.

Preferably the search function is a part of the Password-All Portal software, available for all users, and may be accessed by hyperlinks in user's personal pages. In some embodiments users may create highly individualized search functions that may be stored in a manner to be usable only by the user who creates such a function.

In many aspects of the invention, knowledge of specific WEB pages, and certain types of WEB pages, is highly desirable. In many embodiments characteristics of destination WEB pages are researched by persons (facilitators) maintaining and enhancing Password-All Portal software 35, and many characteristics may be provided in configuration modules for users to accomplish specific tasks. In most cases these characteristics are invoked and incorporated transparent to the user.

In yet another aspect of the present invention, the Password-All suite is structured to provide periodic reports to a user, in a manner to be structured and timed by the user, through the user's profile. For example, reports of changes in account balances in bank accounts, stock purchases, stock values, total airline travel purchases, frequent-flier miles, and the like may be summarized and provided to the users in many different ways. Because the Password-All Portal server with the Password-All software site handles a broad variety of transactional traffic for a user, there is an opportunity to summarize and collect and process statistics in many useful ways. In preferred embodiments of the invention such reports may be furnished and implemented in a number of different ways, including being displayed on the user's secure personal WEB page on the Password-All Portal.

In addition to the ability of performing tasks as described above, task results including reports, and hard documents such as airline tickets may be sent over the Internet or other data packet-networks to user-defined destinations such as fax machines, connected computer nodes, e-mail servers, and other Internet-connected appliances. All tasks may be set-up and caused to run according to user-defined schedules while the user is doing something else or is otherwise not engaged with the scheduled task.

In another embodiment of the present invention, recognizing the increasing use of the Internet for fiscal transactions, such as purchasing goods and services, a facility is provided in a user's profile to automatically track transactions made at various destinations, and to authorize payment either on a transaction-by-transaction basis, or after a session, using access to the user's bank accounts, all of which may be pre-programmed and authorized by the user.

Other functions or options illustrated as part of application 35 include a last URL option 41, an update function 43, and an add function 45. Function 41 allows a user to immediately navigate to a last visited URL. Update function 43 provides a means of updating URL's for content and new address. An add function enables a user to add additional URL's to list 34. Similarly, function 45 may also provide a means to delete entries. Other ways to add accounts are described above. It should be noted that the services provided by the unique Password-All Portal in embodiments of the present invention, and by the Password-All software suite are not limited to destinations requiring passwords and user names. The Password-All Portal and software in many embodiments may also be used to manage all of a user's bookmarks, including editing of bookmarks and the like. In this aspect, bookmarks will typically be presented in indexed, grouped, and hierarchical ways.

There are editing features provided with Password-All for adding, acquiring, deleting, and otherwise managing bookmarks. As a convenience, in many embodiments of the invention, bookmarks may be downloaded from a user's Password-All site, and loaded onto the same user's local browser. In this manner, additions and improvements in the bookmark set for a user may be used without the necessity of going to Password-All. Further, bookmarks may be uploaded from a user's local PC to his/her home page on the Password-All site by use of one or more Password-All plug-ins.

It will be apparent to the skilled artisan, given the teaching herein, that the functionality provided in various embodiments of the invention is especially applicable to Internet-capable appliances that may be limited in input capability. For example, a set-top box in a WEB TV application may well be without a keyboard for entering IDs and Passwords and the like. In practice of the present invention keyboard entry is minimized or eliminated. The same comments apply to many other sorts of Internet appliances.

In preferred embodiments of the invention, once a subscriber-user is in Password-All, only an ability to point-and-click is needed for all navigation. To get into the Password-All site, using a limited apparatus, such as an appliance without a keyboard or keypad, a Smartcard or embedded password may be used, or some other type of authentication.

It will be apparent to one with skill in the art that an interactive application such as application 33 may be provided in a form other than a WEB page without departing from the spirit and scope of the present invention. For example, an application such as application 33 may be provided as a downloadable module or program that may be set-up and configured off-line and made operational when on-line.

FIG. 3 is a flow diagram illustrating user interaction with the Internet Password-All Portal of FIG. 1. The following

9

process steps illustrated, according to an embodiment of the present invention, are intended to illustrate exemplary user-steps and automated software processes that may be initiated and invoked during interaction with an Internet portal of the present invention such as portal 31 of FIG. 1. In step 53 a user connects to the Internet or another previously described switched-packet network via a compatible appliance such as Internet appliance 17 of FIG. 1.

At step 55, a user enters a user-name and password, which, in one embodiment, may simply be his ISP user name and password. In another embodiment, a second password or code would be required to access an Internet portal such as portal server 31 of FIG. 1 after logging onto the Internet through the ISP. In some cases, having a special arrangement with the ISP, there may be one password for both Internet access through the ISP and for Password-All. At step 57 a personal WEB page such as page 32 of FIG. 2 is displayed via Internet portal server 31. At minimum, the personalized WEB page will contain all user configured URL's, and may also be enhanced by a search function, among other possibilities.

In step 58 a user will, minimally, select a URL from his or her bookmarked destinations, and as is known by hyper-link technology, the transparent URL will be invoked, and the user will navigate to that destination for the purpose of normal user interaction. In this action, the Password-All Portal software transparently logs the user on to the destination page, if such log-on is needed.

At step 60 the user invokes a search engine by clicking on an option such as described option 37 of FIG. 2. At step 62, the user inputs search parameters into a provided text field such as text field 51 of FIG. 2. After inputting such parameters, the user starts the search by a button such as button 52. The search engine extracts information in step 64. Such information may be, in one option, of the form of URL's fitting the description provided by search parameters. A searched list of URL's may be presented in a separate generated page in step 66 after which a user may select which URL to navigate to. In an optional search function, the user may provide search criteria, and search any or all of the possible destinations for the criteria.

In another embodiment wherein WEB pages are cached in their presentable form, information extracted in step 64 may include any information contained in any of the stored pages such as text, pictures, interactive content, or the like. In this case, one displayed result page may provide generated links to search results that include the URL associated with the results. Perhaps by clicking on a text or graphic result, the associated WEB page may be displayed for the user with the result highlighted and in view with regards to the display window.

Enhanced Agent for WEB Summaries

In another aspect of the present invention, a software agent, termed a gatherer by the inventors, is adapted to gather and return summary information about URL's according to user request or enterprise discretion. This is accomplished in embodiments of the present invention by a unique scripting and language parsing method provided by the inventor wherein human knowledge workers associated with the service provide written scripts to such a gatherer according to subscriber or enterprise directives. Such a software gatherer, and capabilities thereof, is described in enabling detail below.

Referring now to FIG. 1, there is illustrated an exemplary architecture representing a portal service-network which, in this case is hosted by ISP 15. Portal software 35 in this

10

embodiment executes on portal server 31 set-up at the ISP location. Mass repository 29 is used for storing subscriber information such as passwords, login names, and the like. Internet servers 23, 25, and 27 represent servers that are adapted to serve WEB pages of enterprises patronized by a subscriber to the portal service such as one operating Internet appliance 17.

The main purpose of portal software 35 as described above with reference to FIG. 2, is to provide an interactive application that lists all of the subscriber's WEB sites in the form of hyperlinks. When a user invokes a hyperlink from his personal list, software 35 uses the subscriber's personal information to provide an automatic and transparent login function for the subscriber while jumping the subscriber to the subject destination.

Referring again to FIG. 2, an interactive list 34 containing user-entered hyperlinks and a set of interactive tools is displayed to a subscriber by portal software 35 of FIG. 1. One of the tools available to a subscriber interacting with list 34 is agent (software) 39. Agent 39 may be programmed to perform certain tasks such as obtaining account information, executing simple transactions, returning user-requested notification information about upcoming events, and so on. Search function 37 and update function 43 may be integrated with agent 39 as required to aid in functionality.

It is described in the above disclosure that agent 39 may, in some embodiments, search for and return certain summary information contained on user-subscribed WEB pages, such as account summaries, order tracking information and certain other information according to user-defined parameters. This feature may be programmed by a user to work on a periodic time schedule, or on demand.

In the following disclosure, enhancements are provided to agent 39. Such enhancements, described in detail below, may be integrated into agent 39 of portal software 35 (FIGS. 1 and 2); and may be provided as a separate agent or gatherer to run with portal software 35; or may, in some embodiments, be provided as a standalone service that is separate from portal software 35.

FIG. 4 is a block diagram illustrating a summarization software agent 67 and various capabilities and layers thereof according to an embodiment of the present invention. Summarization agent 67, hereinafter termed gatherer 67, is a programmable and interactive software application adapted to run on a network server. Gatherer 67 may, in one embodiment, be integrated with portal software 35 of FIG. 1 and be provided in the form of a software module separate from agent 39 (FIG. 2). In another embodiment, gatherer 67 may be a part of agent 39 as an enhancement to the function of that agent as previously described. In still another embodiment, gatherer 67 may be provided as a parent or client-side application controlled by a separate service from the portal service described above.

In this exemplary embodiment gatherer 67 is a multi-featured software application having a variety of sub-modules and interface modules incorporated therein to provide enhanced function. Gatherer 67 has a client/service interface layer 69 adapted to enable directive input from both a client (user) and a knowledge worker or workers associated with the service. A browser interface 77 is provided in layer 69, and adapted to provide access to application 67 from a browser running on a client's PC or other Internet or network appliance. Interface 77 facilitates bi-directional communication with a user's browser application (not shown) for the purpose of allowing the user to input summary requests into gatherer 67 and receive sum-

11
12

mary results. Interface **77** supports all existing network communication protocols such as may be known in the art, and may be adapted to support future protocols.

Layer **69** also comprises a unique input scripting module **79** that is adapted to allow a human knowledge worker to create and supply directive scripts containing the site logic needed by gatherer **67** to find and retrieve data from a WEB site. In this case, gatherer **67** executes and runs on a network server such as server **31** of FIG. **1**. However, this is not required in order to practice the present invention.

It is assumed in this example that gatherer **67** is part of the portal software suite **35** running on server **31** of FIG. **1**. Gatherer **67** may be provided as several dedicated agents, or as one multi-functional agent without departing from the spirit and scope of the present invention. For example, one gatherer **67** may be scripted and programmed to execute a single user request with additional gatherers **67** called upon to perform additional user-requests. Alternatively, one gatherer **67** may be dedicated and assigned to each individual user and adapted to handle all requests from that user.

Interface layer **69** facilitates exchange of information from both a client and a knowledge worker. A client operating a WEB browser with an appropriate plug-in is enabled to communicate and interact with gatherer **67**. For example, a user may enter a request to return a summary of pricing for all apartments renting for under $1000.00 per month located in a given area (defined by the user) from apartments.com (one of user's registered WEB sites). The just mentioned request would be categorized as either a periodic request, or a one time (on demand) request. The communicated request initiates a service action wherein a knowledge worker associated with the service uses module **79** to set-up gatherer **67** to perform it's function. Module **79** is typically executed from a network-connected PC operated by the knowledge worker.

According to an embodiment of the present invention, a unique scripting method facilitated by module **79** is provided to enable gatherer **67** to obtain the goal information requested by a user. For example, the above mentioned example of WEB-site apartments.com has a specific HTML (hyper-text-markup-language) logic that it uses to create its site and post its information. Such site logic is relatively standard fare for a majority of different sites hosted by different entities. Using this knowledge, a knowledge worker creates a site-specific script or template for gatherer **67** to follow. Such a template contains descriptions and locations of the appropriate fields used, for example, at apartments.com. Apartment description, location, deposit information, rental information, agent contact information, and other related fields are matched in terms of location and label description on the template created with module **79**. Completed templates are stored in a database contained in a storage facility such as, perhaps, repository **29** of FIG. **1**. Such templates may be reused and may be updated (edited) with new data.

In one embodiment, one script may contain site logics for a plurality of WEB pages, and instructions for specific navigational instruction and password or login information may be contained therein and executed serially, such as one site at a time. It is important to note that the knowledge worker or workers may perform much of their scripting via automatic controls such as by object linking and embedding (OLE) and a minor portion of scripting may be performed manually in an appropriate computer language, many of which are known in the art.

Gatherer **67** also has a process layer **71** adapted for internal information gathering and parameter configuration.

An optional portal server interface **81** is provided and adapted to allow gatherer **67** to provide updated information to a user's list of hyperlinks and also to obtain data from portal server **31** if required. For example, required hyperlinks may be mirrored from a user's home page to a scripting template for navigational purposes. In an embodiment wherein gatherer **67** is part of a standalone service, a convention for providing user login information may be supplied at the client's end when a request is made. For example, an encrypted password may be supplied by a client plug-in and gatherer **67** may temporarily borrow the user's encryption key when auto login is performed.

An appliance configuration module **83** is provided and adapted to allow a user to define and configure an Internet appliance to communicate with the service and receive summary information. Such appliances may include but are not limited to palm top PC's, lap top PC's, cellular telephones, WEB TV's, and so on. Typically, a user will be presented a configuration WEB page from a network server that displays in his browser window on his desktop PC. The page contains an interface for communicating device parameters and communication protocol types to module **83**. In this way, a user may configure a preferred device for receipt of summary information. Device parameters and communication protocols inherent to such a device are incorporated into the scripting of the site template and are used as instructions for WEB summary delivery.

A navigation layer **73** is provided and adapted to perform the function of external site navigation and data gathering for gatherer **67**. To this end, a communication interface/browser control module **85** is provided and adapted to function as a WEB browser to access WEB sites containing WEB data. Control **85** receives it's instruction from the scripted template created by the knowledge worker.

A parsing engine **87** is provided and adapted to parse individual WEB sites according to a template created via scripting module **79**. Parsing engine **87** may be a PERL engine, an IE HTML engine, or any other or combination of known parsing engines. The template (not shown) tells control **85** and parsing engine **87** where to go and what fields at the destination site to look for to access desired data. Once the data fields are located, parsing engine **87** gathers current data in the appropriate field, and returns that data to the service for further processing such as data conversion, compression and storage, and the like.

Because WEB sites use tools that use consistent logic in setting up their sites, this logic may be used by the summarization service to instruct control **83** and parsing engine **87**. The inventor provides herein an exemplary script logic for navigating to and garnishing data from Amazon™.com. The hyperlinks and/or actual URLs required for navigation are not shown, but may be assumed to be included in the template script. In this example, a company name Yodlee (known to the inventors) is used in the script for naming object holders and object containers, which are in this case Active X™ conventions. In another embodiment, Java™ script or another object linking control may be used. The scripted template logic example is as follows:

```
# Site amazon.orders.x - shows status of orders from Amazon
login( 7 );
get( "/exec/obidos/order-list/" );
my @tables = get_tables_containing_text( "Orders:" );
my $order_list = new Yodlee::ObjectHolder( 'orders' );
```

US 6,199,077 B1

13

14

-continued

```
$order_list->source( 'amazon' );
$order_list->link_info( get_link_info( ) );
my @href_list;
my @container_list;
foreach my $table ( @tables ) {
        my @rows = get_table_rows( );
    foreach my $i ( 0 . . $#rows ) {
        select_row( $i );
        my $text = get_text( $rows[ $i ] );
        next if $text =~ /Orders:|Status/;
        my @items = get_row_items( );
        next unless @items >= 4;
        my( $order_num, $date, $status );
        select_cell( 1 );
        $order_num = get_cell_text( );
        my $href = get_url_of_first_href( get_cell( ) );
        select_cell( 2 );
        $date = get_cell_text( );
        select_cell( 3 );
        $status = get_cell_text( );
        next unless defined $order_num and defined $date and defined
$status;
        my $order = new Yodlee::Container( 'orders' );
        $order->order_number( $order_num );
        $order->date( $date );
        $order->status( $status );
        $order_list->push_object( $order );
        if( defined $href ) {
            push( @href_list, $href );
            push( @container_list, $order );
    foreach my $i ( 0 . . $#href_list ) {
        get( $href_list[ $i ] );
        @tables = get_tables_containing_text( "Items Ordered:" );
    foreach my $table ( @tables ) {
        my @rows = get_table_rows( );
    foreach my $j ( 0 . . $#rows ) {
        select_row( $j );
        my $href = get_url_of_first_href( get_row( ) );
        next unless defined $href;
        my @child_list = get_children( get_row( ), 'a' );
        next unless defined $child_list[ 0 ];
        my $text = get_text( $child_list[ 0 ] );
        $container_list[ i ]->description( $text );
        }
    }
}
result( $order_list );
```

The above example is a script that instructs control 85 and parser 87 to navigate to and obtain data from Amazon™.com, specifically that data that reflects the user's current order status. Scripts may also be written to obtain virtually any type of text information available from any site. For example, a user may wish to obtain the New York Times headlines, the top ten performing stocks, a comparative list of flights from San Francisco to New York, etc. In one embodiment, metadata may be associated with and used in-place of the actual scripted language for the purpose of reducing complication in the case of many scripts on one template.

A data processing layer 75 is provided and adapted to store, process, and present returned data to users according to enterprise rules and client direction. A database interface module 89 is provided and adapted to provide access for gatherer 67 to a mass repository such as repository 29 of FIG. 1, for the purpose of storing and retrieving summary data, templates, presentation directives, and so on. Gatherer agent 67 may also access data through interface 89 such as profile information, user account and URL information, stored site logics and so on. Data scanned from the WEB is stored in a canonical format in a database such as repository 29, or in another connected storage facility. All stored data is, of course, associated with an individual who requested it,

or for whom the data is made available according to enterprise discretion.

A summarization page module 91 is provided and adapted to organize and serve a WEB summary page to a user. Module 91, in some embodiments, may immediately push a WEB summary to a user, or module 91 may store such summarized pages for a user to access via a pull method, in which case a notification may be sent to the user alerting him of the summary page availability. Summarization module 91 includes an HTML renderer that is able to format data into HTML format for WEB page display. In this way, e-mail messages and the like may be presented as HTML text on a user's summarization page. Moreover, any summary data from any site may include an embedded hyperlink to that site. In this way, a user looking at an e-mail text in HTML may click on it and launch the appropriate e-mail program. Other sites will, by default, be linked through the summary page.

Many users will access their summary data through a WEB page as described above, however, this is not required in order to practice the present invention. In some embodiments, users will want their summary information formatted and delivered to one of a variety of Internet-capable appliances such as a palm top or, perhaps a cell phone. To this end, the renderer is capable of formatting and presenting the summary data into a number of formats specific to alternative devices. Examples of different known formats include, but are not limited to XML, plain text, VoxML, HDML, audio, video, and so on.

In a preferred embodiment of the present invention, gather 67 is flexible in such a way as it may act according to enterprise rules, client directives, or a combination of the two. For example, if a user makes a request for summary data about a user/subscribed WEB page to be periodically executed and presented in the form of a HTML document, then gather 67 would automatically access and analyze the required internal information and user provided information to formulate a directive. Using scripting module 79, a knowledge worker provides a template (if one is not already created for that site) that contains the "where to go" and "what to get" information according to site logic, user input, and known information.

Alternatively, if a user requests a summary about data on one of his sites such as, perhaps, current interest rates and re-finance costs at his mortgage site, the service may at it's own discretion provide an additional unsolicited summary from an alternate mortgage site for comparison. This type of summarization would be designed to enhance a user's position based on his profile information. In this case, updated data about latest interest rates, stock performances, car prices, airline ticket discounts, and so on would be stored by the service for comparative purposes. If a user request for a summary can be equaled or bettered in terms of any advantage to the user, such summary data may be included.

In many cases, created templates may be re-used unless a WEB site changes it's site logic parameters, in which case, the new logic must be accessed and any existing templates must be updated, or a new template may be created for the site. The templates contain site-specific script obtained from the site and stored by the knowledge workers. In one embodiment, companies hosting WEB pages automatically provide their site logics and any logic updates to the service by virtue of an agreement between the service and the WEB hosts.

In an alternative embodiment gatherer 67 may be implemented as a client application installed on a user's PC. In

US 6,199,077 B1

15                                                      16

this embodiment, a user would not be required to supply log-in or password codes. Summarization scripts may be sent to the client software and templates may be automatically created with the appropriate scripts using log-in and password information encrypted and stored locally on the user's machine.

In addition to providing WEB summary information, gatherer 67 may also be used to provide such as automatic registration to new sites, and for updating old registration information to existing sites. For example, if a user whishes to subscribe, or register at a new site, only the identification of the site is required from the user as long as his pertinate information has not changed. If a new password or the like is required, gatherer 67 through control module 73 may present login or password codes from a list of alternative codes provided by a user. In another embodiment, a database (not shown) containing a wealth of password options may be accessed by gatherer 67 for the purpose of trying different passwords until one is accepted by the site. Once a password or log-in code is accepted, it may be sent to a user and stored in his password list and at the network level.

It will be apparent to one with skill in the art that a software application such as gatherer 67 may be implemented in many separate locations connected in a data network. For example, a plurality of gatherer applications may be distributed over many separate servers linked to one or more mass repositories. Client applications include but are not limited to a WEB-browser plug-in for communicating to the service. Plug-in extensions may also be afforded to proxy servers so that auto-login and data access may still be performed transparent to a user.

In another embodiment, plug-ins enabling communication with gatherer 67 may be provided and configured to run on other network devices for the purpose of enabling such a device to initiate a request and get a response without the need for a desktop computer.

In most embodiments a user operating a desktop PC will order a one time or periodic summary related to some or all of his subscribed WEB sites. A logical flow of an exemplary request/response interaction is provided below.

FIG. 5 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 operating in a user-defined mode. In step 93, a user has initiated a new request for a summary (summary order). It is assumed for the purpose of discussion, that the request of step 93 involves a site wherein no template has been created. In step 95, the request is received and analyzed. A knowledge worker will likely perform this step. The new request may be posted to the user's portal home page, sent directly to gatherer 67, or even communicated through e-mail or other media to the service.

In step 97 a knowledge worker accesses particular site logic associated with the request URLs. For example, if the request involves a plurality of URLs, then all site logics for those URLs are accessed. Logic may be available in a repository such as repository 29 of FIG. 1 if they were obtained at the time of user registration to a particular URL, or sent in by WEB-site hosts shortly after registration. If it is a completely new URL, then the logic must be obtained from the site. In most cases however, the logic will be known by virtue of a plurality of users accessing common URLs. Therefore cross-linking in a database of logic/user associations may be performed to access a logic for a site that is new to one particular user, but not new to another.

In step 99, the knowledge worker creates a template by virtue of scripting module 79 (FIG. 4) containing all site logic, URLs, log-in and password information, and the user request information. As described previously, templates may be re-used for a same request. In most cases, scripting may be mostly automated with minimum manual input performed by the knowledge worker. In many cases, an existing template will match a new request exactly, and may be re-used. In that case steps 97, 99, and 101 would not be required.

In step 101 the template is stored and associated with the requesting user. The stored template may now be retrieved at a scheduled time for performing the summary gathering. At step 103, a browser control such as module 85 of FIG. 4 is activated to access the stored template and navigate to specified URLs for the purpose of gathering summary data. If a timing function is attributed to the template stored in step 101, then the template may self execute and call up the browser function. In another embodiment, the knowledge worker may notify the browser control to get the template for it's next task. In some embodiments, a plurality of controls may be used with one template as previously described.

In step 105, automatic log-in is performed, if required, to gain access to each specified URL. In step 107, a specified WEB-page is navigated to and parsed for requested data according to the logic on the template. If there are a plurality of WEB -pages to parse, then this step is repeated for the number of pages. A variety of parsing engines may be used for this process such as an IE™ parser, or a PERL™ parser. Only the requested data is kept in step 107.

A request may be an on-demand request requiring immediate return, or a scheduled request wherein data may be posted. At step 109, such logic is confirmed. If the data is to be presented according to a periodic schedule, then summary data parsed in step 107 is stored for latter use in step 111. In step 113, the summary data is rendered as HTML if not already formatted, and displayed in the form of a summary WEB-page in step 115. The summary page may be posted for access by a user at a time convenient to the user (pull), or may be pushed as a WEB-page to the user and be made to automatically display on the user's PC. Notification of summary page availability may also be sent to a user to alert him of completion of order.

If the summary data is from a one-time on-demand request and required immediately by a user, then a network appliance and data delivery method (configured by the user) is confirmed, and the data is rendered in the appropriate format for delivery and display in step 117. In step 119, the summary data is delivered according to protocol to a user's designated appliance. In step 121 a user receives requested information in the appropriate format.

It will be apparent to one with skill in the art that there may be more or fewer logical steps as well as added sub-steps than are illustrated in this example. For example, step 105 may in other embodiments include sub-steps such as getting an encryption key from a user. In still another embodiment, part of a request may be rendered as HTML as in step 113 while certain other portions of the same request data might be rendered in another format and delivered via alternative methods. There are many possibilities.

The method and apparatus of the present invention may be used to present summaries to users without user input. Process logic such as this is detailed below.

FIG. 6 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 in a User-independent smart mode with minimum or no user input. In step 117 an enterprise-initiated summary

17

process begins. In this case, the enterprise may be assisting a user in finding a better deal or, perhaps presenting the individual with summaries from and links to alternative pages not yet subscribed to by a user.

In step 119, a database containing user information and parameters is accessed and reviewed. Certain information specific to a user may be required to initiate an enterprise-sponsored summary report. At step 121, the knowledge worker accesses the site logic specific to the specified target site or sites for summarization. In step 123, the knowledge worker modifies an existing user template, or creates a new one if necessary. At step 125 the template is stored in a repository such as repository 29 and associated with the user.

As described in FIG. 5, the template either self-executes according to a timed function and invokes a browser control such as control 85 (FIG. 4), or is accessed by control 85 as a result of task notification. In step 127, the browser control begins navigation. Auto logins are performed, if required, in step 129 to gain access to selected sites. If the WEB pages are new to a user, and the user has no registration with the WEB site, then through agreement, or other convention, the service may be provided access to such sites. Such an agreement may be made, for example, if the host of the WEB site realizes a possibility of gaining a new customer if the customer likes the summary information presented. In many other situations, no password or login information is required to obtain general information that is not personal to a client.

In step 131, all sites are parsed for summary data and stored in canonical fashion in step 133. At step 135, the data is compiled and rendered as HTML for presentation on a summary page. In step 137, a WEB summary containing all of the data is made available to a user and the user is notified of it's existence.

Providing certain information not requested by a user may aid in enhancing a user's organization of is current business on the WEB. Moreover, unsolicited WEB summaries may provide better opportunities than the current options in the user's profile. Of course, assisting a user in this manner will require that the enterprise (service) have access to the user's profile and existing account and service information with various WEB sites on the user's list. A user may forbid use of a user's personal information, in which case, no enterprise-initiated summaries would be performed unless they are conducted strictly in an offer mode instead of a comparative mode.

The method and apparatus also may be practiced in a language and platform independent manner, and be implemented over a variety of scalable server architectures.

The method and apparatus of the present invention may be practiced via private individuals on the Internet, businesses operating on a WAN connected to the Internet, businesses operating via private WAN, and so on. There are many customizable situations.

The present invention as taught herein and above should be afforded the broadest of scope. The spirit and scope of the present invention is limited only by the claims that follow.

18

What is claimed is:

1. An Internet Portal, comprising:
an Internet-connected server;
a list of addresses of Internet sites associated with a specific person, which sites store information specific to the person; and
a software suite executing on the server, the software suite including a set of gathering spitware agents, with at least one gatherer agent dedicated to each of the Internet sites;
wherein the Portal accomplishes a gathering cycle by accessing individual ones of the Internet sites, authenticating too each site accessed as the person, and the gathering agent dedicated to each site accessed extracts data from that site.

2. The Portal of claim 1 further comprising a configuration and initiation interface for the person to set up and start a gathering cycle.

3. The Portal of claim 1 wherein the data gathered by the gathering agents is summarized and/or aggregated at the portal to be provided to the person.

4. The Portal of claim 1 wherein the data gathered by the path agents is data specific to the person.

5. The Portal of claim 1 wherein the portal stores user names and passwords for the person for each Internet site visited and uses the stored user games and passwords to authenticate to each site as the person.

6. The Portal of claim 1 wherein the gathering agents comprise a parsing process in searching the accessed sites for data.

7. In an Internet Portal system, a method for gathering data specific to a person from a plurality of Internet sites storing data specific to that person, the method comprising the steps of:
(a) initiating a gathering cycle accessing individual ones of the plurality of sites;
(b) authenticating to the sites as the person; and
(c) executing a software gathering agent at each site accessed to gather data from the site, the gathering agent dedicated to each site accessed.

8. The method of claim 7 wherein the Portal further comprises a configuration and initiation interface, and further comprising a step for the person to configure and initiate a gathering cycle through the interface.

9. The method of claim 7 further comprising a step for summarizing at the Portal the data gathered by the gathering agents, the resulting summary to be provided to the person.

10. The method of claim 7 wherein the data gathered by the gathering agents is specific to the person.

11. The method of claim 7 wherein in step (a) the portal stores user names and passwords for the person for each Internet site visited, and uses the stored user names and passwords to authenticate to each site as the person.

12. The method of claim 7 wherein in step (c) the gathering agents comprise a parsing process in searching the accessed sites for data.

*  *  *  *  *

Exhibit
F

US006412073B1

(12) **United States Patent**
Rangan

(10) Patent No.: **US 6,412,073 B1**
(45) Date of Patent: *** Jun. 25, 2002**

(54) **METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK**

(75) Inventor: **P. Venkat Rangan**, San Diego, CA (US)

(73) Assignee: **Yodiee.com, Inc**, Redwood Shores, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/208,740**

(22) Filed: **Dec. 8, 1998**

(51) Int. Cl.[7] ........................ **G06F 12/14; G06F 17/60; H04L 9/00**

(52) U.S. Cl. ..................... **713/202**; 713/201; 713/162; 705/14; 705/76

(58) Field of Search ................................ 713/162, 202, 713/201; 705/76, 14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,918,019 A | * | 6/1999 | Valencia | 395/200.57 |
| 6,000,033 A | * | 12/1999 | Kelley et al. | 713/201 |
| 6,014,502 A | * | 1/2000 | Moraes | 395/200 |
| 6,023,684 A | * | 2/2000 | Pearson | 705/35 |
| 6,085,229 A | * | 7/2000 | Newman et al. | 709/203 |
| 6,148,402 A | * | 11/2000 | Campbell | 713/200 |

| | | | | |
|---|---|---|---|---|
| 6,182,229 B1 | * | 1/2001 | Nielsen | 713/202 |
| 6,192,407 B1 | * | 2/2001 | Smith et al. | 709/229 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. | 707/S01 |
| 6,065,120 A1 | * | 5/2001 | Laursen et al. | 713/201 |
| 6,233,608 B1 | * | 5/2001 | Laursen et al. | 709/217 |
| 6,330,592 B1 | * | 12/2001 | Makuch et al. | 709/217 |
| 2001/0000537 A1 | * | 4/2001 | Inala et al. | 707/500 |
| 2001/0020242 A1 | * | 9/2001 | Gupta et al. | 707/501.1 |

OTHER PUBLICATIONS

Fryer et al (Eds.), Microsoft Computer Dictionary, 1997, 3rd Edition,. pp. 238–240, 487.*

* cited by examiner

*Primary Examiner*—Norman M. Wright
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet Portal is enabled by software executing on an Internet-connected server. The Portal, in response to a log-on by a user, presents a secure and personalized page for and to the user, the personalized page having listed plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by the subscriber, such as by a point-and-click technique, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. In an enhanced embodiment a search function is provided wherein a user may configure searches in any or all of the listed destinations on a personalized page. Provision is provided for log-on by limited appliances, such as by a Smartcard or embedded password, and in some embodiments functionality is provided in a browser plug-in wherein a user may navigate to a site, and, in response to a request for log-in data, the subscriber may use a hot key or pointer input, which will cause the browser to access and provide the needed data from the Password-All source.

**39 Claims, 3 Drawing Sheets**



Case 1:06-cv-00170-JJF    Document 14-3    Filed 05/04/2006    Page 20 of 48



*Fig. 1*



*Fig. 2*



*Fig. 3*

US 6,412,073 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK

### FIELD OF THE INVENTION

The present invention is in the field of Internet navigation and browsing, and pertains more particularly to methods and apparatus for providing and maintaining an Internet portal configured to provide access to an interaction with other Internet information sources.

### BACKGROUND OF THE INVENTION

The information network known as the world wide web (WWW), which is a subset of the well-known Internet, is arguably the most complete source of publicly-accessible information available. Anyone with a suitable Internet appliance such as a personal computer with a standard Internet connection may access (go on-line) and navigate to information pages (termed web pages) stored on Internet-connected servers for the purpose of garnering information and initiating transactions with hosts of such servers and pages.

Many companies offer various subscription services accessible via the Internet. For example, many people now do their banking, stock trading, shopping, and so forth from the comfort of their own homes via Internet access. Typically, a user, through subscription, has access to personalized and secure WEB pages for such functions. By typing in a user name and a password or other personal identification code, a user may obtain information, initiate transactions, buy stock, and accomplish a myriad of other tasks.

One problem that is encountered by an individual who has several or many such subscriptions to Internet-brokered services is that there are invariably many passwords and/or log-in codes to be used. Often a same password or code cannot be used for every service, as the password or code may already be taken by another user. A user may not wish to supply a code unique to the user such as perhaps a social security number because of security issues, including quality of security, that may vary from service to service. Additionally, many users at their own volition may choose different passwords for different sites so as to have increased security, which in fact also increases the number of passwords a user may have.

Another issue that can plague a user who has many passworded subscriptions is the fact that they must book-mark many WEB pages in a computer cache so that they may quickly find and access the various services. For example, in order to reserve and pay for airline travel, a user must connect to the Internet, go to his/her book-marks file and select an airline page. The user then has to enter a user name and password, and follow on-screen instructions once the page is delivered. If the user wishes to purchase tickets from the WEB site, and wishes to transfer funds from an on-line banking service, the user must also look for and select the personal bank or account page to initiate a funds transfer for the tickets. Different user names and passwords may be required to access these other pages, and things get quite complicated.

Although this preceding example is merely exemplary, it is generally known that much work related to finding WEB pages, logging in with passwords, and the like is required to successfully do business on the WEB.

What is clearly needed is an interactive Internet portal that will enable users to store their WEB pages, user names, and passwords, and that can accomplish pre-defined tasks such as navigation and interaction between WEB servers based on user pre-programming (user profiles). Such a system would greatly simplify on-line or network-based business transactions.

### SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet Portal is provided, comprising an Internet-connected server; and a portal software executing on the server. The portal, in response to a log-on by a user, presents a secure and personalized page for the user, the personalized page having a list of Internet destinations enabled by hyperlinks, wherein, upon invocation of a hyperlink by the subscriber, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information required for user access at the destination.

The Portal server can be a part of an Internet server used for another purpose, and may be hosted therefore by such as an Internet service provider (ISP).

In some embodiments search functions are provided, and in the same or other embodiments, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software accesses and displays one or more informative displays to the user. Informative displays may be one or more advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In another aspect of the invention an Internet Portal is provided comprising an Internet-connected server; and a portal software executing on the server. In this aspect the portal interacts with a browser plug-in executing on a subscriber's computer station, such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user. In this embodiment as well, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software cooperates with the user's browser plug-in to access and display one or more informative displays to the user. The informative displays may be one or more advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In yet another aspect an Internet Portal application executable on an Internet-connected server is provided, comprising a log-on facility adapted for users to enter log-on information for access to the Portal application; and a plurality of stored personal pages associated each with one or more specific users. In this aspect individual personalized pages list plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by a user, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. After transparent log-on to an invoked destination, the page at the destination is conveyed to and displayed for the user. The application may be adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe. There may also be a search function adapted to search selected ones of listed destinations in user's pages for defined search criteria.

US 6,412,073 B1

3                                                                                          4

In this aspect as well, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software can access and display one or more informative displays to the user, which may be advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In yet another aspect an Internet Portal application executable on an Internet-connected server is provided, comprising a log-on facility adapted or users to enter log-on information for access to the Portal application; and plurality of stored personal pages associated each with one or more specific users. The portal application interacts with a browser plug-in executing on a subscriber's computer station, such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user.

In this embodiment as well as others, the application may be adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe. Also, as in some other embodiments, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software, in cooperation with the browser plug-in, accesses and displays one or more informative displays to the user, which may be commercial advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In addition to the apparatus and software applications provided, several methods are taught in the following enabling disclosure as well. In the disclosure, for the first time, an invention is described that allows a subscriber to safely and securely navigate to any of multiple destinations on the Internet with a single point-and-click, and in the case of destinations requiring secure log on, the log on may be accomplished completely transparently to the user, while still maintaining strict security of the user's passwords and other security data.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 is an overview of an Internet portal-system and network according to an embodiment of the present invention.

FIG. 2 is an exemplary plan view of a personalized Portal home page application as it may be seen on a display monitor according to an embodiment of the present invention.

FIG. 3 is a flow diagram illustrating user interaction with the Internet portal of FIG. 1.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

According to a preferred embodiment of the present invention, a unique Internet portal is provided and adapted to provide unique services to users who have obtained access via an Internet or other network connection from an Internet-capable appliance. Such an interface provides users with a method for storing many personal WEB pages and further provides search function and certain task-performing functions. The methods and apparatus of the present invention are taught in enabling detail below.

FIG. 1 is an overview of an Internet portal system 11 and Internet network 13 according to an embodiment of the

present invention. Portal system 11, in this embodiment, operates as an ISP in addition to a unique network portal, but may, in other embodiments be implemented as a stand-alone Internet server. In yet other embodiments the service and apparatus described herein may also be provided by such as a search and listing service (AltaVista™, Yahoo™) or by any other enterprise hosting a WEB-connected server.

Internet 13 is representative of a preferred use of the present invention, but should not be considered limiting, as the invention could apply in other networks and combinations of networks.

ISP 15 in this embodiment comprises a server 31, a modem bank 33, represented here by a single modem, and a mass storage repository 29 for storing digital data. The modem bank is a convenience, as connection to the server could be by another type of network link. ISP 15, as is typical in the art, provides Internet access services for individual subscribers. In addition to well-known Internet access services, ISP 15 also provides a unique subscription service as an Internet portal for the purpose of storing many WEB pages or destinations along with any passwords and or personal codes associated with those pages, in a manner described in more detail below. This unique portal service is provided by execution of Portal Software 35, which is termed by the inventors the Password-All suite. The software of the invention is referred to herein both as the Portal Software, and as the Password-all software suite. Also, in much of the description below, the apparatus of the invention is referred to by the Password-All terminology, such as the Password-All Server or Password-All Portal.

ISP 15 is connected to Internet 13 as shown. Other equipment known in the art to be present and connected to a network such as Internet 13, for example, IP data routers, data switches, gateway routers, and the like, are not illustrated here but may be assumed to be present. Access to ISP 15 is through a connection-oriented telephone system as is known in the art, or through any other Internet/WEB access connection, such as through a cable modem, special network connection (e.g. T1), ISDN, and so forth. Such connection is illustrated via access line 19 from Internet appliance 17 through modem bank 33.

In a preferred embodiment a user has access to Internet Password-All Portal services by a user name and password as is well-known in the art, which provides an individualized WEB page to the subscriber. In another embodiment wherein a user has other individuals that use his or her Internet account, then an additional password or code unique to the user may be required before access to portal 31 is granted. Such personalized Portal WEB pages may be stored in repository 29, which may be any convenient form of mass storage.

Three Internet servers 23, 25, and, 27, are shown in Internet 13, and represent Internet servers hosted by various enterprises and subscribed to by a user operating appliance 17. For example, server 23 may be a bank server wherein interactive on-line banking and account managing may be performed. Server 25 may be an investment server wherein investment accounts may be created and managed. Server 27 may be an airline or travel server wherein flights may be booked, tickets may be purchased, and so on. In this example, all three servers are secure servers requiring user ID and password for access, but the invention is not necessarily limited to just secure services.

In a preferred embodiment of the present invention, a subscribing user operating an Internet-capable appliance, such as appliance 17, connects to Password-All Portal

5

system 11 hosted by ISP 15, and thereby gains access to a personalized, interactive WEB page, which in turn provides access to any one of a number of servers on Internet 13 such as servers 23, 25, and 27, without being required to enter additional passwords or codes. In a preferred embodiment the software that enables this service is termed Password-All by the inventors. Password-All may be considered to be a software suite executing on the unique server, and in some instances also on the user's station (client). Additional interactivity provided by portal software 35 allows a connected user to search his listed pages for information associated with keywords, text strings, or the like, and allows a user to program user-defined tasks involving access and interaction with one or more Internet-connected servers such as servers 23, 25, and 27 according to a pre-defined time schedule. These functions are taught in enabling detail below.

FIG. 2 is an illustration of a personalized portal page as may be seen on a display monitor according to an embodiment of the present invention, provided by Password-All Portal software 35 executing on server 31, in response to secure access by a subscriber. Page 32 presents an interactive listing 34 of user-subscribed or member WEB pages, identified in this example by URL, but which may also be identified by any convenient pseudonym, preferably descriptive, along with user name and typically encrypted password information for each page. Listed in a first column under destination, are exemplary destinations LBC.com, My Bank.com, My Stocks.com, My shopping.com, Mortgage.com, and Airline.com. These are but a few of many exemplary destinations that may be present and listed as such on page 33. In order to view additional listings listed but not immediately viewable from within application 33, a scroll bar 35 is provided and adapted to allow a user to scroll up or down the list to enable viewing as is known in the art.

Items listed in list 34 in this example may be considered destinations on such as servers 23, 25, and 27 of FIG. 1. Typically the URL associated with an item on this list will not take a user to a server, per se, but to a page stored on a server. User names and password data associated with each item in list 34 are illustrated in respective columns labeled user name, and password, to the right of the column labeled destination. Each listing, or at least a portion of each listing, is a hyperlink invoking, when selected, the URL to that destination. In some instances a particular service may have more than one associated URL. For example, My Bank.com may have more than one URL associated for such as different accounts or businesses associated also with a single subscriber. In this case there may be a sub-listing for different destinations associated with a single higher-level listing. This expedient is not shown, but, given this teaching the mechanism will be apparent to those with skill in the art.

In some embodiments one page 33 may be shared by more than one user, such as a husband and wife sharing a common account and subscription. An instance of this is illustrated herein with respect to the server labeled Mortgage.com wherein both a John and a Jane Doe are listed together under the column labeled user name. In another embodiment, a network of individuals, perhaps business owners, authorized co-workers, investment parties, or the like may share one application. In this way, system 11 may be adapted for private individuals as well as business uses.

After gaining access to application 33 which is served via Internet portal server 31 of FIG. 1, a user may scroll, highlight, and select any URL in his or her list 34 for the purpose of navigation to that particular destination for further interaction. Application 33 already has each pass-

6

word and user name listed for each URL. It is not necessary, however, that the password and user name be displayed for a user or users. These may well be stored transparently in a user's profile, and invoked as needed as a user makes selections. Therefore, a user is spared the need of entering passwords and user names for any destinations enabled by list 34. Of course, each list 34 is built, configured and maintained by a subscribing user or users, and an editing facility is also provided wherein a user may edit and update listings, including changing URL's adding and deleting listings, and the like.

In another aspect of the invention new listings for a user's profile, such as a new passthrough to a bank or other enterprise page, may be added semi-automatically as follows: Typically, when a user opens a new account with an enterprise through interaction with a WEB page hosted by the enterprise, the user is required to provide certain information, which will typically include such as the user's ID, address, e-mail account, and so forth, and typically a new user name and password to access the account. In this process the user will be interacting with the enterprise's page from his/her browser. A Password-All plug-in is provided wherein, after entering the required information for the new enterprise, the user may activate a pre-determined signal (right click, key stroke, etc.), and the Password-All suite will then enter a new passthrough in the user's Password. All profile at the Password-All Portal server.

In a related method for new entries, the enterprise hosting the Password-All Portal may, by agreement with other enterprises, provide log-in and sign-up services at the Password-All Portal, with most action transparent to the user. For example, there may be, at the Password-All Portal, a selectable browser list of cooperating enterprises, such as banks, security services, and the like, and a user having a Password-All Portal subscription and profile may select among such cooperating enterprises and open new accounts, which will simultaneously and automatically be added to the Password-All Portal page for the user and to the server hosted by the cooperating enterprise. There may be some interactivity required for different accounts, but in the main, much information from the user's profile may be used directly without being re-entered.

The inventors have anticipated that many potential users may well be suspicious of providing passwords and user names to an enterprise hosting a Password-All Portal Server executing a service like Password-All according to embodiments of the present invention. To accommodate this problem, in preferred embodiments, it is not necessary that the user provide the cleartext password to Password.All. Instead, an encrypted version of each password is provided. When a user links to his passthrough page in Password-All at the Password-All Portal server, when he/she invokes a hyperlink, the encrypted password is returned to the user's system, which then, by virtue of the kept encryption key or master password, invokes the true and necessary password for connection to the selected destination. It is thus not necessary that cleartext passwords be stored at the Password-All Portal server, where they may be vulnerable to attack from outside sources, or to perceived misuse in other ways as well.

In a related safety measure, in a preferred embodiment of the invention, a user's complete profile is never stored on a single server, but is distributed over two or more, preferably more, servers, so any problem with any one server will minimize the overall effect for any particular user.

Password-All, as described above, allows a user to access a complete list of the user's usual cyberspace destinations,

US 6,412,073 B1

7

complete with necessary log-on data, stored in an encrypted fashion, so a user may simply select a destination (a hyperlink) in the Password-All list, and the user's browser then invokes the URL for the selected destination. In an added feature, Password-All may display banner ads and other types of advertisement during the navigation time between a hyperlink being invoked and the time the destination WEB page is displayed.

In yet another embodiment of the invention, a user/subscriber need not access the Password-All page to enjoy the advantages of the unique features provided. In this variation, a Plug-In is provided for the subscriber's WEB browser. If the subscriber navigates by use of the local browser to a WEB page requiring a secure log-in, such as his/her on-line banking destination, when the subscriber is presented with an input window for ID and Password, the plug in may be activated by a predetermined user input, such as a hot key or right click of the mouse device. The plug-in then accesses, transparently, the Password-All page (which may be cached at the client), and automatically accesses and provides the needed data for log-on.

In yet another aspect of the invention a search option 37 allows a user to search list 34 for specific URL's based on typed input such as keywords or the like. In some cases, the number of URL's stored in list 34 can be extensive making a search function such as function 37 an attractive option. A criteria dialog box 51 illustrated as logically separated from and below list 34 is provided and adapted to accept input for search option 37 as is known in the art. In one embodiment, search option 37 may bring up a second window wherein a dialog box such as box 51 could be located.

In another aspect of the invention the search function may also be configured in a window invoked from window 33, and caused to search all or selected ones of listed destinations, and to return results in a manner that may be, at least to some extent, configured by a user. For example, a dialog box may be presented wherein a user may enter a search criteria, and select among all of the listed destinations. The search will then be access each of the selected destinations in turn, and the result may be presented to the user as each instance of the criteria is found, or results may be listed in a manner to be accessed after the search.

Preferably the search function is a part of the Password-All Portal software, available for all users, and may be accessed by hyperlinks in user's personal pages. In some embodiments users may create highly individualized search functions that may be stored in a manner to be usable only by the user who creates such a function.

In many aspects of the present invention a knowledge of specific WEB pages, and certain types of WEB pages, is highly desirable. In many embodiments characteristics of destination WEB pages are researched by persons (facilitators) maintaining and enhancing Password-All Portal software 35, and many characteristics may be provided in configuration modules for users to accomplish specific tasks. In most cases these characteristics are invoked and incorporated transparent to the user.

In yet another aspect of the present invention, the Password-All suite is structured to provide periodic reports to a user, in a manner to be structured and timed by the user, through the user's profile. For example, reports of changes in account balances in bank accounts, stock purchases, stock values, total airline travel purchases, frequent-flier miles, and the like may be summarized and provided to the users in many different ways. Because the Password-All Portal server with the Password-All software site handles a broad

8

variety of transactional traffic for a user, there is an opportunity to summarize and collect and process statistics in many useful ways. In preferred embodiments of the invention such reports may be furnished and implemented in a number of different ways, including being displayed on the user's secure personal WEB page on the Password-All Portal.

In addition to the ability of performing tasks as described above, task results including reports, and hard documents such as airline tickets may be sent over the Internet or other data packet-networks to user-defined destinations such as fax machines, connected computer nodes, e-mail servers, and other Internet-connected appliances. All tasks may be set-up and caused to run according to user-defined schedules while the user is doing something else or is otherwise not engaged with the scheduled task.

In another embodiment of the present invention, recognizing the increasing use of the Internet for fiscal transactions, such as purchasing goods and services, a facility is provided in a user's profile to automatically track transactions made at various destinations, and to authorize payment either on a transaction-by-transaction basis, or after a session, using access to the user's bank accounts, all of which may be pre-programmed and authorized by the user.

Other functions or options illustrated as part of application 35 include a last URL option 41, an update function 43, and an add function 45. Function 41 allows a user to immediately navigate to a last visited URL. Update function 43 provides a means of updating URL's for content and new address. An add function enables a user to add additional URL's to list 34. Similarly, function 45 may also provide a means to delete entries. Other ways to add accounts are described above. It should be noted that the services provided by the unique Password-All Portal in embodiments of the present invention, and by the Password-All software suite are not limited to destinations requiring passwords and user names. The Password-All Portal and software in many embodiments may also be used to manage all of a user's bookmarks, including editing of bookmarks and the like. In this aspect, bookmarks will typically be presented in indexed, grouped, and hierarchical ways.

There are editing features provided with Password-All for adding, acquiring, deleting, and otherwise managing bookmarks. As a convenience, in many embodiments of the invention, bookmarks may be downloaded from a user's Password-All site, and loaded onto the same user's local browser. In this manner, additions and improvements in the bookmark set for a user may be used without the necessity of going to Password-All. Further, bookmarks may be uploaded from a user's local PC to his/her home page on the Password-All site by use of one or more Password-All plug-ins.

It will be apparent to the skilled artisan, given the teaching herein, that the functionality provided in various embodiments of the invention is especially applicable to Internet-capable appliances that may be limited in input capability. For example, a set-top box in a WEB TV application may well be without a keyboard for entering IDs and Passwords and the like. In practice of the present invention keyboard entry is minimized or eliminated. The same comments apply to many other sorts of Internet appliances.

In preferred embodiments of the invention, once a subscriber-user is in Password-All, only an ability to point-and-click is needed for all navigation. To get into the Password-All site, using a limited apparatus, such as an appliance without a keyboard or keypad, a Smartcard or embedded password may be used, or some other type of authentication.

9

It will be apparent to one with skill in the art that an interactive application such as application 33 may be provided in a form other than a WEB page without departing from the spirit and scope of the present invention. For example, an application such as application 33 may be provided as a downloadable module or program that may be set-up and configured off-line and made operational when on-line.

FIG. 3 is a flow diagram illustrating user interaction with the Internet Password-All Portal of FIG. 1. The following process steps illustrated, according to an embodiment of the present invention, are intended to illustrate exemplary user-steps and automated software processes that may be initiated and invoked during interaction with an Internet portal of the present invention such as portal 31 of FIG. 1. In step 53 a user connects to the Internet or another previously described switched-packet network via a compatible appliance such as Internet appliance 17 of FIG. 1.

At step 55, a user enters a user-name and password which, in one embodiment, may simply be his ISP user name and password. In another embodiment, a second password or code would be required to access an Internet portal such as portal server 31 of FIG. 1 after logging onto the Internet through the ISP. In some cases, having a special arrangement with the ISP, there may be one password for both Internet access through the ISP and for Password-All. At step 57 a personal WEB page such as page 32 of FIG. 2 is displayed via Internet portal server 31. At minimum, the personalized WEB page will contain all user configured URL's, and may also be enhanced by a search function, among other possibilities.

In step 58 a user will, minimally, select a URL from his or her bookmarked destinations, and as is known by hyperlink technology, the transparent URL will be invoked, and the user will navigate to that destination for the purpose of normal user interaction. In this action, the Password-All Portal software transparently logs the user on to the destination page, if such log-on is needed.

At step 60 the user invokes a search engine by clicking on an option such as described option 37 of FIG. 2. At step 62, the user inputs search parameters into a provided text field such as text field 51 of FIG. 2. After inputting such parameters, the user starts the search by a button such as button 52. The search engine extracts information in step 64. Such information may be, in one option, of the form of URL's fitting the description provided by search parameters. A searched list of URL's may be presented in a separate generated page in step 66 after which a user may select which URL to navigate to. In an optional search function, the user may provide search criteria, and search any or all of the possible destinations for the criteria.

In another embodiment wherein WEB pages are cached in their presentable form, information extracted in step 64 may include any information contained in any of the stored pages such as text, pictures, interactive content, or the like. In this case, one displayed result page may provide generated links to search results that include the URL associated with the results. Perhaps by clicking on a text or graphic result, the associated WEB page will be displayed for the user with the result highlighted and in view with regards to the display window.

The method and apparatus of the present invention may be practiced via private individuals on the Internet, businesses operating on a WAN connected to the Internet, businesses operating via private WAN, and so on. There are many customizable situations.

The present invention as taught herein and above should be afforded the broadest of scope. The spirit and scope of the present invention is limited only by the claims that follow.

10

What is claimed is:

1. An Internet Portal, comprising:
an Internet-connected server; and
a portal software executing on the server;
wherein the Portal, in response to log-on by a user from a user's Internet-connected appliance, presents a secure and personalized page for the user, the personalized page having a list of Internet destinations, pre-selected by the user and enabled by hyperlinks, wherein, upon invocation of a hyperlink by the user, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information required for user access at the destination.

2. The Internet Portal of claim 1 wherein required log-on information includes a password, and wherein the password is stored at the Internet Portal in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

3. The Internet Portal of claim 1 wherein the user connects to the Portal through an Internet Service Provider (ISP), and after transparent log-on to an invoked destination, the page at the destination is conveyed to and displayed for the user.

4. The Internet Portal of claim 1 wherein the Portal is enabled by software executing at a server hosted by an Internet Service Provider (ISP) to which the user subscribes.

5. The Internet Portal of claim 1 further comprising a search function adapted to search selected ones of listed destinations for defined search criteria.

6. The Internet Portal of claim 1 wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software accesses and displays one or more informative displays to the user.

7. The Internet Portal of claim 6 wherein the informative displays comprise one or more advertisements.

8. The Internet Portal of claim 1 wherein the Portal software, interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a pre-determined signal, automatically adds the new destination for the user's Portal page.

9. The Internet Portal of claim 1 wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WEB page.

10. The Internet Portal of claim 9 wherein the summarization is automatic in period and scope, subject to edit by the user.

11. An Internet Portal, comprising:
an Internet-connected server; and
a portal software executing on the server;
wherein the portal interacts with a browser plug-in executing on a user's Internet-connected appliances such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user.

12. The Internet Portal of claim 11 wherein required log-on information includes a password, and wherein the password is stored at the Internet Portal in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

13. The Internet Portal of claim 11 wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software cooperates with the user's browser plug-in to access and display one or more informative displays to the user.

14. The Internet Portal of claim 12 wherein the informative displays comprise one or more advertisements.

11

**15**. The Internet Portal of claim **11** wherein the Portal software, interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a pre-determined signal, automatically adds the new destination for the user's Portal page.

**16**. The Internet Portal of claim **11** wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WEB page.

**17**. The Internet Portal of claim **16** wherein the summarization is automatic in period and scope, subject to edit by the user.

**18**. An Internet Portal software application executing on an Internet-connected server, comprising:

a log-on portion providing an interactive display for users to enter log-on information from an Internet-connected appliance for access to the Portal application; and

a plurality of displayable stored personal pages associated each with one or more specific users;

wherein individual personalized pages, rendered in an interactive display, list plural Internet destinations enabled by hyperlinks, the destinations pre-selected by the associated users, and upon invocation of a hyperlink by the associated user, the portal software invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination.

**19**. The Internet Portal application of claim **18** wherein log-on information includes a password, and wherein the password is stored at the Internet server in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

**20**. The Internet Portal application of claim **18** wherein, after transparent log-on to an invoked destination, the page at the destination is conveyed to and displayed for the user.

**21**. The Internet Portal application of claim **18** adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe.

**22**. The Internet Portal application of claim **18** further comprising a search function adapted to search selected ones of listed destinations in user's pages for defined search criteria.

**23**. The Internet Portal application of claim **18** wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software accesses and displays one or more informative displays to the user.

**24**. The Internet Portal application of claim **18** wherein the informative displays comprise one or more advertisements.

**25**. The Internet Portal application of claim **18** wherein the Portal application enables users to pre-select destinations by interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a predetermined signal, automatically adds the new destination for the user's Portal page.

**26**. The Internet Portal application of claim **18** wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WBB page.

**27**. The Internet Portal application of claim **26** wherein the summarization is automatic in period and scope, subject to edit by the user.

**28**. An Internet Portal software application executing on an Internet-connected server, comprising:

a log-on portion providing an interactive display for users to enter log-on information for access to the Portal application; and

a plurality of displayable stored personal pages associated each with one or more specific users;

wherein the portal application interacts with a browser plug-in executing on a subscriber's Internet-connected

12

appliance, such that, when the user invokes a destination, pre-selected by the associated user, from the browser, accessing the associated user's personal page, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user.

**29**. The Internet Portal application of claim **28** wherein required log-on information includes a password, and wherein the password is stored at the Internet Portal in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

**30**. The Internet Portal application of claim **28** adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe.

**31**. The Internet Portal application of claim **28** wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software, in cooperation with the browser plug-in, accesses and displays displays one or more informative displays to the user.

**32**. The Internet Portal application of claim **31** wherein the informative displays comprise one or more advertisements.

**33**. The Internet Portal application of claim **28** wherein the Portal application enables users to pre-select destinations by interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a pre-determined signal, automatically adds the new destination for the user's Portal page.

**34**. The Internet Portal application of claim **28** wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WEB page.

**35**. The Internet Portal of claim **34** wherein the summarization is automatic in period and scope, subject to edit by the user.

**36**. A method for accessing and interacting with WEB pages on the Internet, comprising steps of:

(a) using an Internet-capable appliance, logging on to a Portal server, which returns a personalized page for the user logging on, the personalized page having listed plural Internet destinations enabled by hyperlinks, the destinations pre-selected by the user;

(b) selecting a hyperlink in the personalized page, thereby invoking a URL for a destination, and, upon connection to the destination, automatically providing user log-on information for the user; and

(c) interacting with the page automatically provided.

**37**. The method of claim **36** wherein the Portal server is a part of an Internet Service Provider (ISP).

**38**. The method of claim **36** further comprising a step for invoking a search function adapted to search selected ones of listed destinations for defined search criteria.

**39**. A method for accessing and interacting with WEB pages on the Internet, comprising steps of:

(a) using an Internet-capable appliance, logging on to a Portal server as a subscriber, the portal server storing data associated with Internet destinations pre-selected by the subscriber;

(b) using a browser with a plug-in for interacting with a Portal server executing on the Internet-capable appliance, invoking a URL to a destination WEB page;

(b) upon being presented with a log-in interface by the destination WEB page, calling the Portal server by the plug-in; and

(c) furnishing necessary log-in data by the Portal server, and accomplishing secure log-in for the subscriber substantially transparently to the subscriber.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,412,073 B1                                    Page 1 of 1
DATED        : June 25, 2002
INVENTOR(S)  : P. Venkat Rangan and Sam Inala

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Title page,</u>
Item [73], Assignee, now reads "**Yodiee.com, Inc**, Redwood Shores, CA (US)" should read -- **Yodlee.com, Inc.,** Redwood Shores, CA (US) --

Signed and Sealed this

Fifth Day of August, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

Exhibit
G



## YODLEE

| 3600 BRIDGE PARKWAY, SUITE 200 | | TEL (650) 980-3600 |
| --- | --- | --- |
| Redwood City, CA 94065 USA | | FAX (650) 980-3602 |

November 17, 2004

Sanjeev Dheer
CEO and President
CashEdge
104 Fifth Avenue
New York, New York  10011

Re:    Yodlee, Inc., v. CashEdge Inc., et al.

Dear Mr. Dheer:

As you know, Yodlee, Inc. has long been a pioneer in the field of data aggregation. Yodlee's contributions to this field have been recognized in fifteen U.S. patents and many worldwide counterpart patents. Yodlee invests significantly in research and development and believes that the patent system is intended to protect that investment and the innovation that results from it.  In addition to its issued patents, Yodlee has numerous patent applications pending worldwide.

CashEdge offers several products and services that are based on data aggregation technology. While CashEdge is certainly entitled to compete with Yodlee in this field, it is not entitled to use Yodlee's technology in doing so.  Yodlee is committed to enforcing its intellectual property rights in order protect its technology innovations.

Yodlee is prepared to enter into discussions with CashEdge regarding a potential license to one or more Yodlee patents.  In order to frame the discussions, we suggest that CashEdge review at least the following Yodlee United States Patents: 6,567,850, 6,317,783, 6,199,077, 6,633,910, and 6,510,451.  We anticipate discussing each of these patents with you during any license negotiations.  Finally, in order to expedite your preparation for such a meeting, we have enclosed a CD with electronic copies of each of these patents and their respective file histories.

Please respond by November 30, 2004 in order to arrange a mutually agreeable time for further discussions.

Sincerely,

Anil Arora
CEO and President

Enclosures
50230040.doc

ATLANTA  ONE CONCOURSE PARKWAY SUITE 660  •  ATLANTA, GA 30328

Exhibit
H

1 | DANIEL R. HARRIS (State Bar No. 188417)
NANCY K. RABER (State Bar No. 192744)
2 | **CLIFFORD CHANCE US LLP**
990 MARSH ROAD
3 | MENLO PARK, 94025-1949
Telephone: (650) 566-4300
4 | Facsimile: (650) 566-4399
E-Mail: Daniel.Harris@CliffordChance.com
5 |
**E-Filing**
6 | Attorneys for Plaintiff CashEdge, Inc.

7

8 UNITED STATES DISTRICT COURT

9 NORTHERN DISTRICT OF CALIFORNIA

10 SAN FRANCISCO DIVISION

11 **C 05 2554**

12 | CASHEDGE INC.                    Case No. ___

13 |            Plaintiff,           **COMPLAINT FOR DECLARATORY JUDGEMENT OF NON-INFRINGEMENT,**

14 | vs.                             **INVALIDITY, AND UNENFORCEABILITY OF U.S. PATENT**

15 | YODLEE, INC.                    **NOS. 6,567,850; 6,317,783; 6,199,077; 6,633,910; 6,510,451; 6,802,042; 6,412,073; 6,594,766; and 6,405,245.**

16 |            Defendant.

17 **DEMAND FOR JURY TRIAL**

18

19 **I.    COMPLAINT**

20    1.    Plaintiff, CashEdge Inc. ("CashEdge"), by its undersigned attorneys, as and for its

21 Complaint against defendant Yodlee, Inc. ("Yodlee"), alleges as follows:

22    2.    This is an action by CashEdge against Yodlee that United States Letters Patents

23 Nos. 6,567,850; 6,317,783; 6,199,077; 6,633,910; 6,510,451; 6,802,042; 6,412,073; 6,594,766; and

24 6,405,245 (collectively, the "Yodlee Patents") are not infringed by any of CashEdge's products and

25 services including, but not limited to CashEdge's Advanced Account Aggregation, Online Money

26 Movement / Transfer Now, Accounting Opening / Open Now, Advisor Suite solutions and

27 corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites

28

<div align="center">1</div>
<div align="center">COMPLAINT</div>

JUN. 22. 2005  11:41AM    CLIFFORD_CHANCE                                    NO. 5027    P. 7

1   ("CashEdge's Products and Services") or are otherwise invalid or unenforceable. Copies of the first

2   page of each of the Yodlee Patents are annexed hereto as Exhibit A.

3                                    **II.    THE PARTIES**

4         3.      Upon information and belief, Yodlee is a corporation organized and existing under

5   the laws of the State of Delaware having its principal place of business at 3600 Bridge Parkway,

6   Suite 200, Redwood City, California 94065-1170.

7         4.      CashEdge is a corporation organized and existing under the laws of the State of

8   Delaware and having its principal place of business at 104 Fifth Avenue, New York, NY 10011.

9                              **III.    JURISDICTION AND VENUE**

10        5.      This action arises under the Patent Laws of the United States, Title 35, United States

11  Code § 101, et seq., and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12        6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and

13  2201(a).

14        7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400.

15                                   **IV.    COUNT I**

16                        (Invalidity and Non-Infringement of the Yodlee Patents)

17        8.      CashEdge repeats and re-alleges paragraphs 1 - 7 hereof as if fully set forth herein.

18        9.      Upon information and belief, United States Patent No. 6,567,850 (the "'850 patent"),

19  entitled "System and Method for Determining Revenue From an Intermediary Derived From

20  Servicing Data Requests," issued on May 20, 2003 and is currently assigned to Yodlee.

21        10.     Upon information and belief, United States Patent No. 6,317,783 (the "'783 patent"),

22  entitled "Apparatus and Methods for Automated Aggregation and Delivery of and Transactions

23  Involving Electronic Personal Information or Data," issued on November 13, 2001 and is currently

24  assigned to Yodlee.

25        11.     Upon information and belief, United States Patent No. 6,199,077 (the "'077 patent"),

26  entitled "Server-Side Web Summary Generation and Presentation," issued on March 6, 2001 and is

27  currently assigned to Yodlee.

28

10317038.tif - 6/22/2005 11:43:50 AM                                                  NYB 1504156.1

1       12.    Upon information and belief, United States Patent No. 6,633,910 (the "'910 patent"),

2 entitled "Method and Apparatus for Enabling Real Time Monitoring and Notification of Data

3 Updates for Web-Based Data Synchronization Services," issued on October 14, 2003 and is

4 currently assigned to Yodlee.

5       13.    Upon information and belief, United States Patent No. 6,510,451 (the "'451 patent"),

6 entitled "System for Completing a Multi-Component Task Initiated by a Client Involving Web Sites

7 Without Requiring Interaction from the Client," issued on January 21, 2003 and is currently assigned

8 to Yodlee.

9       14.    Upon information and belief, United States Patent No. 6,802,042 (the "'042 patent"),

10 entitled "Method and Apparatus for Providing Calculated and Solution-Oriented Personalized

11 Summary Reports to a User Through a Single User-Interface System for Completing a Multi-

12 Component Task Initiated by a Client Involving Web Sites Without Requiring Interaction from the

13 Client," issued on October 5, 2004 and is currently assigned to Yodlee.

14       15.    Upon information and belief, United States Patent No. 6,412,073 (the "'073 patent"),

15 entitled "Method and Apparatus for Providing and Maintaining A User-Interactive Portal System

16 Accessible Via Internet or Other Switched-Packet Network," issued on June 25, 2002 and is

17 currently assigned to Yodlee.

18       16.    Upon information and belief, United States Patent No. 6,594,766 (the "'766 patent"),

19 entitled "Method and Apparatus for Providing and Maintaining A User-Interactive Portal System

20 Accessible Via Internet and Other Switched-Packet Network," issued on July 15, 2003 and is

21 currently assigned to Yodlee.

22       17.    Upon information and belief, United States Patent No. 6,405,245 (the "'245 patent"),

23 entitled "System and Method for Automated Access to Personal Information," issued on June 11,

24 2002 and is currently assigned to Yodlee.

25       18.    Yodlee and its affiliates have, inter alia, filed suit and have threatened suit, orally and

26 in writing, against CashEdge with respect to one or more of the Yodlee Patents. Furthermore, Yodlee

27 has asserted its entire portfolio as something it would enforce against CashEdge and is seeking to

28 substantially restrict or close down CashEdge's business activities alleging it would assert of its

3

COMPLAINT

NYB 1504156.1

1  patent portfolio against CashEdge's Products and Services. CashEdge is in reasonable apprehension

2  that Yodlee will commence suit against CashEdge for alleged infringement of one or more of the

3  Yodlee Patents. Thus, as to each of the Yodlee Patents, an actual and justiciable controversy exists

4  between CashEdge and Yodlee with respect to the validity and infringement of the patent.

5    19.    As to each of the Yodlee Patents, the patent is not infringed by any of CashEdge's

6  Products and Services, and said patents are otherwise invalid or unenforceable for failure to comply,

7  inter alia, with the requirements of 35 U.S.C. § 102, 103 and/or 112.

8                    **V.    PRAYER FOR RELIEF**

9    WHEREFORE, CashEdge prays for judgment and relief against Yodlee as follows:

10    A.    Declaring that each of the Yodlee Patents is invalid and unenforceable;

11    B.    Declaring that none of CashEdge's Products and Services infringe any valid claim of

12  any of the Yodlee Patents;

13    C.    Directing Yodlee to pay CashEdge's costs, expenses and reasonable attorneys' fees

14  pursuant to 35 U.S.C. §§ 284 and 285;

15    D.    Granting CashEdge such other and further relief as the Court may deem just and

16  proper.

17  Dated: June 22, 2005                    Respectfully submitted,

18                        Daniel R. Harris (State Bar No. 188417)
                          Nancy K. Raber (State Bar No. 192744)
19                        **CLIFFORD CHANCE US LLP**
                          990 Marsh Road
20                        Menlo Park, CA 94025-1949
                          Tel: (650) 566-4300
21                        Fax: (650) 566-4399

22
                          By: _Nancy K Rabel_
23                        Nancy K. Raber
                          Attorney for Plaintiff,
24                        CashEdge Inc.

25  ///

26  ///

27  ///

28  ///

                                4
                          COMPLAINT

1

## VI.  NOTICE

2      Pursuant to Civil L.R. 3-16, the undersigned, counsel of record for plaintiff CashEdge Inc.,

3    certifies that as of this date, other than the named parties, there is no such interest to report.

4    Dated: June 22, 2005                                  Respectfully submitted,

5                                                          Daniel R. Harris (State Bar No. 188417)
                                                           Nancy K. Raber (State Bar No. 192744)
6                                                          **CLIFFORD CHANCE US LLP**
                                                           990 Marsh Road
7                                                          Menlo Park, CA 94025-1949
                                                           Tel: (650) 566-4300
8                                                          Fax: (650) 566-4399

9
                                                           By: _Nancy K Rabel_
10                                                         Nancy K. Raber
                                                           Attorney for Plaintiff,
11                                                         CashEdge Inc.

12
## VII.  JURY DEMAND
13
       CashEdge hereby demands trial by jury on all issues in this Action.
14
     Dated: June 22, 2005                                  Respectfully submitted,
15
                                                           Daniel R. Harris (State Bar No. 188417)
16                                                         Nancy K. Raber (State Bar No. 192744)
                                                           **CLIFFORD CHANCE US LLP**
17                                                         990 Marsh Road
                                                           Menlo Park, CA 94025-1949
18                                                         Tel: (650) 566-4300
                                                           Fax: (650) 566-4399
19
                                                           By: _Nancy K. Rabel_
20                                                         Nancy K. Raber
                                                           Attorney for Plaintiff,
21                                                         CashEdge Inc.

22
     Of counsel:
23
     Drew M. Wintringham, III
24   **CLIFFORD CHANCE US LLP**
     31 West 52nd Street
25   New York, NY 10019-6131
     Tel: (212) 878-8000
26   Fax: (212) 878-8375

27

28

10317038.tif - 6/22/2005 11:43:50 AM                                          NYB 1504156.1

**EXHIBIT A**

US006199077B1

(12) **United States Patent**      (10) Patent No.:    **US 6,199,077 B1**
Inala et al.                        (45) Date of Patent:    **Mar. 6, 2001**

(54) **SERVER-SIDE WEB SUMMARY GENERATION AND PRESENTATION**

(75) Inventors: **Suman Kumar Inala**, Santa Clara; P **Venkat Rangan**, San Diego; **Ramakrishna Satyavolu**, Santa Clara, all of CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Sunnyvale, CA (US)

(*) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/323,598**

(22) Filed: **Jun. 1, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/208,740, filed on Dec. 8, 1998.

(51) Int. Cl.⁷ .................................................. G06F 17/21
(52) U.S. Cl. .............. 707/501; 709/202; 709/218; 713/202; 704/1
(58) Field of Search .......................... 707/501, 513, 707/1, 3, 4, 5, 9–10; 713/201–202; 705/26–27; 709/202, 218; 704/1

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,649,186 | * 7/1997 | Ferguson | 707/10 |
| 5,708,825 | * 1/1998 | Sotomayor | 707/501 |
| 5,794,233 | * 8/1998 | Rubinstein | 707/4 |
| 5,855,015 | * 12/1998 | Shoham | 707/5 |
| 5,931,907 | * 8/1999 | Davies et al. | 709/218 |
| 5,983,227 | * 11/1999 | Nazem et al. | 707/10 |
| 5,987,466 | * 11/1999 | Greer et al. | 707/10 |
| 6,029,180 | * 2/2000 | Murata et al. | 707/501 |
| 6,029,182 | * 2/2000 | Nehab et al. | 707/523 |
| 6,032,162 | * 2/2000 | Burke | 707/501 |
| 6,038,668 | * 8/2000 | Chipman et al. | 713/201 |
| 6,041,326 | * 3/2000 | Amro et al. | 707/10 |
| 6,108,686 | * 8/2000 | Williams, Jr. | 709/202 |
| 6,119,101 | * 9/2000 | Peckover | 705/10 X |

OTHER PUBLICATIONS

Stanley, Tracey, "Intelligent Searching Agents on the Web", 4 pages, <http://www.ariadne.ac.uk/issu7/search-engines/> Jan. 1997.*
Jansen, James, "Using an Intelligent Agent to Enhance Search Engine Performance", 16 pages, <http o://www.first-monday.dk/issues/issue2_3/jansen/> Dec. 1998.*
Lesser, Victor et al, "BIG: A Resource_Bounded Information Gathering Agent", 18 pages, <http://dis.cs.umass.edu/research/big/> Jan. 1998.*

* cited by examiner

*Primary Examiner*—Joseph H. Feild
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency

(57)            **ABSTRACT**

A portal server includes a software agent configured to do summary searches for subscribers based on Internet destinations provided by the subscribers, to retrieve information from such destinations based on pre-programmed site information, and to download the summary information to the subscriber. The destinations and the nature of the information to be retrieved is pre-programmed. There is further a configuration and initiation interface for a subscriber to set up and start a summary search. In some cases the summary searches are configured for individual clients as templates stored and retrieved at the Internet-connected server. Also in some cases retrieved information is immediately sent to the subscriber, and in other situations such information is saved at the portal to be retrieved by a subscriber at a later time. In preferred embodiments of the invention autologins are accomplished for a subscriber at Internet destinations by use of pre-stored configuration information.

**12 Claims, 6 Drawing Sheets**



US006317783B1

## (12) United States Patent

Freishtat et al.

(10) Patent No.: **US 6,317,783 B1**

(45) Date of Patent: **Nov. 13, 2001**

(54) **APPARATUS AND METHODS FOR AUTOMATED AGGREGATION AND DELIVERY OF AND TRANSACTIONS INVOLVING ELECTRONIC PERSONAL INFORMATION OR DATA**

(75) Inventors: **Gregg Freishtat; Palaniswamy Rajan**, both of Atlanta, GA (US)

(73) Assignee: **Verticalone Corporation**, Atlanta, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/428,511**

(22) Filed: **Oct. 27, 1999**

### Related U.S. Application Data

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.[7] .................................... G06F 13/00
(52) U.S. Cl. .............................. 709/218; 707/10
(58) Field of Search .................... 707/10; 709/217, 709/218

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,347,632 | 9/1994 | Filepp et al. | 709/202 |
| 5,537,314 | 7/1996 | Kanter | 705/14 |

(List continued on next page.)

#### OTHER PUBLICATIONS

"Strategic Directions in Database Systems—Breaking Out of the Box," Avi Silberschatz, and Stan Zdonik et al., ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 1 pp. 129–131, Mar. (1996).

"Managing Security and Privacy of information," Sushil Jajodia, ACM Computing Surveys, vol. 28 Issue 4es, Dec. (1996).

"Today's Style Sheet Standards: The Great Vision Blinded," Philip M. Marden, Jr. and Ethan V. Munson, IEEE Computer, pp. 123–125.

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999, Redondo, CA, pp. 15–22.

"A Softbot–based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul., 1994, pp. 72–76.

Primary Examiner—Kenneth R. Coulter
(74) Attorney, Agent, or Firm—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

A system for delivering personal information according to the present invention includes a user store including end user data, a provider store including information provider data, a personal information store including personal information and a processor that communicates with these data stores. The processor selects an end user for personal information aggregation. The processor connects with one or more information providers. The processor then proceeds to retrieve personal information for the selected end user from the connected information providers. This retrieval is based on end user data associated with the selected end user and provider data associated with the connected information providers. The retrieved personal information is stored in the personal information store.

**36 Claims, 11 Drawing Sheets**



US006405245B1

## (12) United States Patent
### Burson et al.

(10) Patent No.: **US 6,405,245 B1**
(45) Date of Patent: *Jun. 11, 2002

(54) **SYSTEM AND METHOD FOR AUTOMATED ACCESS TO PERSONAL INFORMATION**

(75) Inventors: **Robert Burson; Dima Ulberg; Gregg Freishtat**, all of Atlanta, GA (US)

(73) Assignee: **Verticalone Corporation**, Atlanta, GA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/427,602**

(22) Filed: **Oct. 27, 1999**

#### Related U.S. Application Data

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.[7] .......................................... G06F 13/00
(52) U.S. Cl. .......................... 709/217; 707/10; 345/705
(58) Field of Search ............................ 707/10; 709/230; 709/217; 345/705

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,347,632 A | 9/1994 | Filepp et al. .............. 709/202 |
| 5,537,314 A | 7/1996 | Kanter ........................ 705/14 |
| 5,655,089 A | 8/1997 | Bucci .......................... 705/40 |
| 5,696,965 A | * 12/1997 | Dedrick ...................... 707/10 |
| 5,699,528 A | 12/1997 | Hogan ........................ 705/40 |
| 5,710,887 A | 1/1998 | Chelliah et al. ............ 705/26 |
| 5,712,979 A | 1/1998 | Graber et al. .............. 709/224 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0786728 A1 | 7/1997 |
| EP | 0848538 A | 6/1998 |

| | | |
|---|---|---|
| WO | WO 98/28698 | 7/1998 |

#### OTHER PUBLICATIONS

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999, Redondo, CA, pp. 15–22.

"A Softbot-based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul. 1994, pp. 72–76.

"Strategic Directions in Database Systems—Breaking Out of the Box," Avi Silberschatz and Stan Zdonik et al., ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 1 pp. 129–131, Mar. (1996).

"Managing Security and Privacy of Information," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 4es, Dec. (1996).

"Today's Style Sheet Standards: The Great Vision Blinded," Philip M. Marden, Jr. and Ethan V. Munson, IEEE Computer, pp. 123–125, Nov. (1999).

*Primary Examiner*—Kenneth R. Coulter
(74) *Attorney, Agent, or Firm*—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

This invention is a system and method for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider. A representation of the personal information and a link corresponding to the personal information are presented to the end use via a client computer. Upon activation of the link, the client computer is automatically driven to the personal information provider presenting to the user via the client computer a page on the personal information provider.

**9 Claims, 11 Drawing Sheets**



US006412073B1

(12) **United States Patent**
Rangan

(10) Patent No.: **US 6,412,073 B1**
(45) Date of Patent: *Jun. 25, 2002

(54) **METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK**

(75) Inventor: **P. Venkat Rangan**, San Diego, CA (US)

(73) Assignee: **Yodlee.com, Inc**, Redwood Shores, CA (US)

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/208,740**

(22) Filed: **Dec. 8, 1998**

(51) Int. Cl.[7] .......................... G06F 12/14; G06F 17/60; H04L 9/00

(52) U.S. Cl. ..................... 713/202; 713/201; 713/162; 705/14; 705/76

(58) Field of Search ............................... 713/162, 202, 713/201; 705/76, 14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,918,019 A | * | 6/1999 | Valencia ................. | 395/200.57 |
| 6,000,033 A | * | 12/1999 | Kelley et al. ............... | 713/201 |
| 6,014,502 A | * | 1/2000 | Moraes ....................... | 395/200 |
| 6,023,684 A | * | 2/2000 | Pearson ...................... | 705/35 |
| 6,085,229 A | * | 7/2000 | Newman et al. ............. | 709/203 |
| 6,148,402 A | * | 11/2000 | Campbell .................... | 713/200 |

| | | | | |
|---|---|---|---|---|
| 6,182,229 B1 | * | 1/2001 | Nielsen ................... | 713/202 |
| 6,192,407 B1 | * | 2/2001 | Smith et al. ............... | 709/229 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. ............... | 707/501 |
| 6,065,120 A1 | * | 5/2001 | Laursen et al. ............. | 713/201 |
| 6,233,608 B1 | * | 5/2001 | Laursen et al. ............. | 709/217 |
| 6,330,592 B1 | * | 12/2001 | Makuch et al. ............. | 709/217 |
| 2001/0000537 A1 | * | 4/2001 | Inala et al. ............... | 707/500 |
| 2001/0020242 A1 | * | 9/2001 | Gupta et al. ............... | 707/501.1 |

OTHER PUBLICATIONS

Fryer et al (Eds.), Microsoft Computer Dictionary, 1997, 3rd Edition,. pp. 238–240, 487.*

* cited by examiner

*Primary Examiner*—Norman M. Wright
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet Portal is enabled by software executing on an Internet-connected server. The Portal, in response to a log-on by a user, presents a secure and personalized page for and to the user, the personalized page having listed plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by the subscriber, such as by a point-and-click technique, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. In an enhanced embodiment a search function is provided wherein a user may configure searches in any or all of the listed destinations on a personalized page. Provision is provided for log-on by limited appliances, such as by a Smartcard or embedded password, and in some embodiments functionality is provided in a browser plug-in wherein a user may navigate to a site, and, in response to a request for log-in-data, the subscriber may use a hot key or pointer input, which will cause the browser to access and provide the needed data from the Password-All source.

**39 Claims, 3 Drawing Sheets**



US006510451B2

## (12) United States Patent
### Wu et al.

(10) Patent No.: **US 6,510,451 B2**
(45) Date of Patent: **Jan. 21, 2003**

(54) **SYSTEM FOR COMPLETING A MULTI-COMPONENT TASK INITIATED BY A CLIENT INVOLVING WEB SITES WITHOUT REQUIRING INTERACTION FROM THE CLIENT**

(75) Inventors: **Jonathan Wu**, Mountain View, CA (US); **Suman Kumar Inala**, Santa Clara, CA (US); **Ramakrishna Satyavolu**, Santa Clara, CA (US); **P Venkat Rangan**, San Diego, CA (US); **Sreeranga P. Rajan**, Santa Clara, CA (US); **Neil Daswani**, Edison, NJ (US); **Anand Rangarajan**, Sunnyvale, CA (US); **Christoph Kern**, Santa Clara, CA (US); **Srihari Kumar**, Santa Clara, CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Redwood Shores, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/419,708**

(22) Filed: **Oct. 14, 1999**

(65) **Prior Publication Data**

US 2002/0035592 A1 Mar. 21, 2002

(51) Int. Cl.[7] .......................................... G06F 15/16
(52) U.S. Cl. ................................ 709/203; 209/219
(58) Field of Search .............................. 709/201, 203, 709/205, 216, 219; 705/5, 26; 701/201

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,619,648 A | 4/1997 | Canale et al. | |
| 5,897,620 A * | 4/1999 | Walker et al. | 705/5 |
| 5,926,798 A * | 7/1999 | Carter | 705/26 |
| 5,948,040 A * | 9/1999 | DeLorme et al. | 701/201 |
| 6,134,534 A * | 10/2000 | Walker et al. | 705/26 |

* cited by examiner

*Primary Examiner*—Le Hien Luu
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet portal system for accomplishing a multi-component task involving interaction with one or more Internet Web sites includes an Internet-connected server having access to client-related data, an internet-capable client station usable by a client, and software executing on the server for managing individual component tasks in execution of the multi-component task. The software, in response to initiation of a multi-component task specified by the client, defines the component tasks, identifies Internet Web sources for completion of the tasks, manages interaction with the identified Web sites gathering results of the interactions, integrates the gathered results, and communicates final results to the client at the client station. Tasks may be such as trip planning and may include payment for services rendered at Web sites, such as airline reservations, car rentals and the like. A similar system is provided for broadcasting messages to multiple Internet destinations, and further for gathering answers to such messages and communicating the answers to the client.

**14 Claims, 5 Drawing Sheets**



US006567850B1

(12) **United States Patent**
Freishtat et al.

(10) Patent No.: **US 6,567,850 B1**
(45) Date of Patent: **May 20, 2003**

(54) **SYSTEM AND METHOD FOR DETERMINING REVENUE FROM AN INTERMEDIARY DERIVED FROM SERVICING DATA REQUESTS**

(75) Inventors: **Gregg Freishtat**, Atlanta, GA (US); **Palaniswamy Rajan**, Atlanta, GA (US)

(73) Assignee: **Yodlee, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/427,794**

(22) Filed: **Oct. 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.[7] .......................... G06F 15/173
(52) U.S. Cl. .......................... 709/224; 705/34
(58) Field of Search .......................... 705/34; 709/224

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,987,538 A | * | 1/1991 | Johnson et al. ............ 364/401 |
| 5,347,632 A | | 9/1994 | Filepp et al. |
| 5,446,891 A | | 8/1995 | Kaplan et al. |
| 5,481,672 A | | 1/1996 | Okuno et al. |
| 5,483,445 A | * | 1/1996 | Pickering ................... 364/406 |
| 5,537,314 A | | 7/1996 | Kanter |
| 5,590,196 A | | 12/1996 | Moreau |
| 5,613,012 A | | 3/1997 | Hoffman et al. |
| 5,619,648 A | | 4/1997 | Canale et al. |
| 5,640,577 A | | 6/1997 | Scharmer |
| 5,644,576 A | | 7/1997 | Bauchot et al. |
| 5,649,186 A | | 7/1997 | Ferguson |
| 5,655,089 A | | 8/1997 | Bucci ...................... 395/240 |
| 5,696,965 A | | 12/1997 | Dedrick |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0786728 A1 | 7/1997 |
| EP | 0848338 A | 6/1998 |
| JP | 7074817 | 3/1995 |
| WO | WO 97/16796 | 5/1997 |
| WO | WO 98/28698 | 7/1998 |
| WO | WO01/33759 A1 | 5/2001 |

OTHER PUBLICATIONS

Unknown, Roboword, Multilingual Dictionary Tool, Jul. 27, 1997, pates 1–3, all.
Chaum, D. Security without identification: tran saction systems to make big brother obsolete. Communication of the ACM. Oct. 1985. vol. 28. Issue 10 pp. 1030–1044.
Stanley, Tracey, "Intelligent Searching Agents on the Web", Jan. 1997, 4 pages, <http://www.ariadne.ac.u k/issue7/search-engines/>.
Jansen, Janes, "Using an Intelligent Agent to Enhance Search Engine Performance", Dec. 1998, 13 pages, <http://www.firstmonday.dk/issues/issue2_3/jansen/>.

(List continued on next page.)

*Primary Examiner*—Kenneth R. Rice
(74) *Attorney, Agent, or Firm*—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

This invention is a system and method for determining revenue from an intermediary derived from end user interactions involving personal information via the intermediary. A host computer monitors interactions between end users and personal information providers via an intermediary computer. The host computer communicates with a personal information store for storing personal information associated with end users and an accounting store for storing accounting data associated with the intermediary computer. The host computer includes a processor that receives requests concerning personal information from the intermediary computer and services these requests based on personal information in the personal information store. The host computer processor updates the accounting data associated with the intermediary computer and generates invoices to the intermediary computer based on the updated accounting data.

**23 Claims, 11 Drawing Sheets**





US006594766B2

## (12) United States Patent
### Rangan et al.

(10) Patent No.: **US 6,594,766 B2**
(45) Date of Patent: **Jul. 15, 2003**

(54) **METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK**

(75) Inventors: **P. Venkat Rangan**, San Diego, CA (US); **Sam Inala**, Redmond, WA (US)

(73) Assignee: **Yodlee.com, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/180,146**

(22) Filed: **Jun. 25, 2002**

(65) **Prior Publication Data**

US 2002/0184534 A1 Dec. 5, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/208,740, filed on Dec. 8, 1998, now Pat. No. 6,412,073.

(51) Int. Cl.7 .......................... G06F 12/14; G06F 17/60; H04L 9/00

(52) U.S. Cl. ...................... 713/202; 713/201; 713/162; 705/14; 705/76

(58) Field of Search ................................. 713/202, 201, 713/162; 705/14, 76

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,918,019 A | * | 6/1999 | Valencia | 709/227 |
| 6,000,033 A | * | 12/1999 | Kelley et al. | 713/201 |
| 6,014,502 A | * | 1/2000 | Moraes | 709/219 |
| 6,023,684 A | * | 2/2000 | Pearson | 705/35 |
| 6,065,120 A | * | 5/2000 | Laursen et al. | 713/201 |
| 6,085,229 A | * | 7/2000 | Newman et al. | 709/203 |
| 6,148,402 A | * | 11/2000 | Campbell | 713/200 |
| 6,182,229 B1 | * | 1/2001 | Nielsen | 713/202 |
| 6,192,407 B1 | * | 2/2001 | Smith et al. | 709/229 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. | 715/501.1 |
| 6,233,608 B1 | * | 5/2001 | Laursen et al. | 709/217 |
| 6,330,592 B1 | * | 12/2001 | Makuch et al. | 709/217 |
| 6,412,073 B1 | * | 6/2002 | Rangan | 713/202 |
| 2001/0000537 A1 | * | 4/2001 | Inala et al. | 707/500 |
| 2001/0020242 A1 | * | 9/2001 | Gupta et al. | 707/501.1 |

### OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/208,740, Rangan et al.

* cited by examiner

*Primary Examiner*—Norman M. Wright
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet Portal is enabled by software executing on an Internet-connected server. The Portal, in response to a log-on by a user, presents a secure and personalized page for and to the user, the personalized page having listed plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by the subscriber, such as by a point-and-click technique, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. In an enhanced embodiment a search function is provided wherein a user may configure searches in any or all of the listed destinations on a personalized page. Provision is provided for log-on by limited appliances, such as by a Smartcard or embedded password, and in some embodiments functionality is provided in a browser plug-in wherein a user may navigate to a site, and, in response to a request for log-in data, the subscriber may use a hot key or pointer input, which will cause the browser to access and provide the needed data from the Password-All source.

**30 Claims, 3 Drawing Sheets**



US006633910B1

(12) **United States Patent** (10) Patent No.: **US 6,633,910 B1**

Rajan et al. (45) Date of Patent: **Oct. 14, 2003**

(54) **METHOD AND APPARATUS FOR ENABLING REAL TIME MONITORING AND NOTIFICATION OF DATA UPDATES FOR WEB-BASED DATA SYNCHRONIZATION SERVICES**

(75) Inventors: **Steeranga P. Rajan**, Santa Clara, CA (US); **Jonathan Wu**, Mountain View, CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/461,505**

(22) Filed: **Dec. 14, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/398,320, filed on Sep. 16, 1999, now Pat. No. 6,477,565.

(51) Int. Cl.[7] .......................................... G06F 15/173
(52) U.S. Cl. ...................... 709/224; 709/226; 709/221
(58) Field of Search ............................ 709/224, 226, 709/221, 234; 717/168, 171, 172, 173, 174

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,978,828 A * 11/1999 Greer et al. .............. 709/224

| | | | | |
|---|---|---|---|---|
| 6,012,087 A | * | 1/2000 | Freivald et al. | 709/218 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. | 707/501.1 |
| 6,219,818 B1 | * | 4/2001 | Freivald et al. | 714/799 |
| 6,253,198 B1 | * | 6/2001 | Perkins | 707/3 |
| 6,275,858 B1 | * | 8/2001 | Bates et al. | 709/228 |
| 6,366,933 B1 | * | 4/2002 | Ball et al. | 707/511 |
| 6,370,141 B1 | * | 4/2002 | Giordano et al. | 370/386 |
| 6,477,565 B1 | * | 11/2002 | Daswani et al. | 709/217 |

* cited by examiner

*Primary Examiner*—Zarni Maung
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet subscription system for alerting subscribers to changes in data maintained at Internet sites has an input interface for a subscriber to specify a data condition to be monitored and a condition for notification and a gatherer for gathering data changes from one or more Internet sites. A guard compares data changes with the condition for notification, and a notification alert system notifies the subscriber of a change that meets the condition for notification. The system is particularly suited to notification requirements regarding metadata changes over multiple sources. Users can configure the system to many different frequencies and many different data and notification conditions. Alerts may be made to many different devices in many different ways as well, and may or may not include specific data.

**11 Claims, 4 Drawing Sheets**



US006802042B2

(12) **United States Patent**
Rangan et al.

(10) Patent No.: **US 6,802,042 B2**
(45) Date of Patent: **\*Oct. 5, 2004**

(54) **METHOD AND APPARATUS FOR PROVIDING CALCULATED AND SOLUTION-ORIENTED PERSONALIZED SUMMARY-REPORTS TO A USER THROUGH A SINGLE USER-INTERFACE**

(75) Inventors: **P. Venkat Rangan**, San Diego, CA (US); **Manoj Sharma**, College Park, MD (US); **Sreeranga P. Rajan**, Santa Clara, CA (US); **Jonathan Wu**, Mountain View, CA (US)

(73) Assignee: **Yodlee.Com, Inc.**, Redwood Shores, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/425,626**

(22) Filed: **Oct. 22, 1999**

(65) **Prior Publication Data**

US 2002/0078079 A1 Jun. 20, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/323,598, filed on Jun. 1, 1999.

(51) Int. Cl.[7] ............................................. G06F 15/00
(52) U.S. Cl. ..................... 715/501.1; 715/500; 707/5; 709/217
(58) Field of Search ........................ 707/501, 3–5; 705/26; 709/217; 715/501.1, 500

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,459,306 A \* 10/1995 Stein et al. ................. 235/383
5,855,008 A \* 12/1998 Goldhaber et al. ............ 705/14

5,923,736 A \* 7/1999 Shachar .................. 379/93.17
5,924,090 A \* 7/1999 Krellenstein ................. 707/5
5,937,168 A    8/1999 Anderson et al.

(List continued on next page.)

OTHER PUBLICATIONS

Hilbert et al., Agents for Collecting Application Usage Data over the Internet, ACM 1998, pp. 149–156.\*
Schwartz et al., Applying an Information Gathering Architecture to Netfind: a White Pages Tool for a Changing and Growing Internet, IEEE 1994, pp. 426–439.\*

(List continued on next page.)

Primary Examiner—Stephen S. Hong
Assistant Examiner—Cong-Lac Huynh
(74) Attorney, Agent, or Firm—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet-connected portal system has a data repository, a data-gathering system, a request processor, a plurality of report algorithms, and a report processor. The request processor receives a request from a user and matches the request to an individual one of the report algorithms. The data-gathering subsystem accesses plural Internet sites associated with the user and extracts raw data therefrom according to needs of the report algorithm. The report processor processes the raw data according to the report algorithm into metasummarized information defined by the report algorithm, and the portal system transmits the metasummarized information as a report to a destination associated with the report request. In some cases there is an aggregated-data database in the data repository storing aggregated data retrieved for specific users periodically, and the request processor checks the aggregated-data database for needed data before requiring the data-gathering system to retrieve data from the associated Internet sites. In the instance that the needed data is stored in the aggregated-data database, the report is prepared from the aggregated data. Reports can be in a mix of text and graphic formats.

**14 Claims, 10 Drawing Sheets**





UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
                                    )
                                    )
                                    )
CASHEDGE INC.                       )
               Plaintiff(s)         )
                                    )        C 05-02554 RS
     -v-                            )
                                    )   ORDER SETTING INITIAL CASE MANAGEMENT
YODLEE, INC.                        )   CONFERENCE
               Defendant(s)         )
                                    )
```

     IT IS HEREBY ORDERED that this action is assigned to the
Honorable Richard Seeborg.  When serving the complaint or
notice of removal, the plaintiff or removing defendant must
serve on all other parties a copy of this order, the handbook
entitled "Dispute Resolution Procedures in the Northern District
of California," the Notice of Assignment to United States Magistrate
Judge for Trial, and all other documents specified in Civil Local Rule 4-2.
Counsel must comply with the case schedule listed below unless the
Court otherwise orders.

     IT IS FURTHER ORDERED that this action is assigned to the
Alternative Dispute Resolution (ADR) Multi-Option Program governed
by ADR Local Rule 3.  Counsel and clients must familiarize themselves
with that rule and with the handbook entitled "Dispute Resolution
Procedures in the Northern District of California."

                    CASE SCHEDULE   [ADR MULTI-OPTION PROGRAM]

| Date | Event | Governing Rule |
|------|-------|----------------|
| 06/22/2005 | Complaint filed | |
| 10/05/2005 | Last day to meet and confer re initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP 26(f) & ADR LR 3-5 |
| 10/05/2005 | Last day to file Joint ADR Certification with Stipulation to ADR process or Notice of Need for ADR Phone Conference | Civil L.R. 16-8 |
| 10/19/2005 | Last day to complete initial disclosures or state objection in Rule 26(f) Report, file/serve Case Management Statement, and file/serve Rule 26(f) Report | FRCivP 26(a)(1) Civil L.R.16-9 |
| 10/26/2005 | Case Management Conference in 4 at 2:30 PM | Civil L.R. 16-10 |

# Exhibit

# I

1   David M. Barkan (State Bar No. 160825/barkan@fr.com)
    Craig R. Compton (State Bar No. 215491/compton@fr.com)
2   FISH & RICHARDSON P.C.
    500 Arguello Street, Suite 500
3   Redwood City, California 94063
    Telephone: (650) 839-5070
4   Facsimile: (650) 839-5071

5   Attorneys for Defendant
    YODLEE, INC.

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      (San Francisco Division)

11

12  CASHEDGE INC.,                    Case No. C-05-2554 RS

13              Plaintiff,
                                      **ANSWER TO COMPLAINT FOR**
14       v.                           **DECLARATORY JUDGEMENT OF NON-**
                                      **INFRINGEMENT, INVALIDITY, AND**
15                                    **UNENFORCEABILITY OF U.S. PATENT**
                                      **NOS. 6,567,850; 6,317,783; 6,199,077;**
16  YODLEE, INC.,                     **6,633,910; 6,510,451; 6,802,042; 6,412,073;**
                                      **6,594,766; AND 6,405,245**
17              Defendant.
                                      **JURY TRIAL DEMANDED**
18

19

20

21       For its Answer to CashEdge Inc.'s ("CashEdge" or "Plaintiff") Complaint for Declaratory

22  Judgement of Non-Infringement, Invalidity, and Unenforceability of U.S. Patent Nos. 6,567,850;

23  6,317,783; 6,199,077; 6,633,910; 6,510,451; 6,802,042; 6,412,073; 6,594,766; and 6,405,245,

24  Defendant Yodlee, Inc. ("Yodlee" or "Defendant") responds as follows:

25       1.   No response is required to CashEdge's recitation that its allegations follow the first

26  numbered paragraph.

27       2.   Denied.

28       3.   Admitted.

                               1
                                      ANSWER TO COMPLAINT FOR DECLARATORY JUDGEMENT
                                                            Case No. C 05 2554 RS

1    4.    Admitted.

2    5.    Admitted.

3    6.    Admitted.

4    7.    Yodlee admits that venue is proper in the Northern District of California; however,

5    Yodlee contends that this matter should be consolidated with the closely related action that Yodlee

6    filed and served first, Case No. C-05-01550-SI.  All the claims alleged by CashEdge in this

7    Complaint should have been presented as counterclaims in Case No. C-05-01550-SI.  CashEdge's

8    Complaint in this action needlessly burdens the administrative resources of the Court.

9    8.    The answers of paragraphs 1-7 are incorporated as if fully set forth herein.

10    9.    Admitted.

11    10.    Admitted.

12    11.    Admitted.

13    12.    Admitted.

14    13.    Admitted.

15    14.    Denied because the complaint misstates the title of the patent.  Admitted that United

16    States Patent No. 6,802,042 (the "'042 patent"), entitled "Method and Apparatus for Providing

17    Calculated and Solution-Oriented Personalized Summary-Reports to a User through a Single User-

18    Interface," issued on October 5, 2004 and is currently assigned to Yodlee.

19    15.    Admitted.

20    16.    Admitted.

21    17.    Admitted.

22    18.    Admitted that Yodlee had already filed and served a complaint against CashEdge

23    regarding CashEdge's infringement of the '850 patent, '783 patent, '077 patent, '910 patent, '451

24    patent, and '042 patent before the filing and service of this complaint.  Except as expressly

25    admitted, Yodlee denies the remaining allegations of paragraph 18.

26    19.    Denied.

27    / / /

28    / / /

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNTERCLAIM

### Patent Infringement

For its counterclaim against CashEdge, Yodlee alleges as follows:

### THE PARTIES

20.    Yodlee is a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 3600 Bridge Parkway, Suite 200, Redwood City, California 94065-1170.

21.    CashEdge Inc. states it is a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 104 Fifth Avenue, New York, NY 10011, and Yodlee further asserts that CashEdge has an office at 2841 Junction Ave. Suite 101, San Jose, CA 95134-1921.

### JURISDICTION AND VENUE

22.    This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.  This Court has jurisdiction over the causes of action stated herein pursuant to 35 U.S.C. § 101 et seq. and 28 U.S.C. §§ 1331 and 1338(a).

23.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b).

### THE PATENTS

24.    Yodlee is the owner of all right, title, and interest in and to United States Patent No. 6,567,850 (the "'850 patent"), entitled "System and Method for Determining Revenue From an Intermediary Derived From Servicing Data Requests," which was duly and legally issued by the United States Patent and Trademark Office on May 20, 2003.

25.    Yodlee is the owner of all right, title, and interest in and to United States Patent No. 6,317,783 (the "'783 patent"), entitled "Apparatus and Methods for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data," which was duly and legally issued by the United States Patent and Trademark Office on November 13, 2001.

26.    Yodlee is the owner of all right, title, and interest in and to United States Patent No. 6,199,077 (the "'077 patent"), entitled "Server-Side Web Summary Generation and

3

1  Presentation," which was duly and legally issued by the United States Patent and Trademark Office

2  on March 6, 2001.

3        27.    Yodlee is the owner of all right, title, and interest in and to United States Patent No.

4  6,633,910 (the "'910 patent"), entitled "Method and Apparatus for Enabling Real Time Monitoring

5  and Notification of Data Updates for Web-Based Data Synchronization Services," which was duly

6  and legally issued by the United States Patent and Trademark Office on October 14, 2003.

7        28.    Yodlee is the owner of all right, title, and interest in and to United States Patent

8  No. 6,510,451 (the "'451 patent"), entitled "System for Completing a Multi-Component Task

9  Initiated by a Client Involving Web Sites Without Requiring Interaction from the Client," which

10  was duly and legally issued by the United States Patent and Trademark Office on January 21, 2003.

11        29.    Yodlee is the owner of all right, title, and interest in and to United States Patent

12  No. 6,802,042 (the "'042 patent"), entitled "Method and Apparatus for Providing Calculated and

13  Solution-Oriented Personalized Summary-Reports to a User Through a Single User-Interface"

14  which duly and legally issued by the United States Patent and Trademark Office on October 5,

15  2004.

16        30.    Yodlee is the owner of all right, title, and interest in and to United States Patent

17  No. 6,412,073 (the "'073 patent"), entitled "Method and Apparatus for Providing and Maintaining a

18  User-Interactive Portal System Accessible Via Internet or Other Switched-Packet-Network," which

19  was duly and legally issued by the United States Patent and Trademark Office on June 25, 2002.

20        31.    Yodlee is the owner of all right, title, and interest in and to United States Patent

21  No. 6,594,766 (the "'766 patent"), entitled "Method and Apparatus for Providing and Maintaining a

22  User-Interactive Portal System Accessible Via Internet or Other Switched-Packet-Network," which

23  was duly and legally issued by the United States Patent and Trademark Office on July 15, 2003.

24        32.    Yodlee is the owner of all right, title, and interest in and to United States Patent

25  No. 6,405,245 (the "'245 patent"), entitled "System and Method for Automated Access to Personal

26  Information," which was duly and legally issued by the United States Patent and Trademark Office

27  on June 11, 2002.

28  / / /

1     **COUNT ONE:  INFRINGEMENT OF THE '850 PATENT**

2         33.     Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

3 fully set forth herein.

4         34.     CashEdge has infringed and continues to infringe one or more claims of the '850

5 patent by making, using, offering for sale, and selling in the United States data aggregation products

6 and services, as well as applications and solutions that utilize data aggregation techniques, that

7 embody the claimed inventions of the '850 patent, including but not limited to CashEdge's

8 Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

9 corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

10         35.     CashEdge has induced and continues to induce others to infringe, and/or has

11 committed and continue to commit acts of contributory infringement of one or more claims of the

12 '850 patent.

13         36.     On information and belief, CashEdge has had and continues to have knowledge of

14 the '850 patent.

15         37.     On information and belief, CashEdge's acts of infringement as set forth in the

16 previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

17         38.     As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

18 an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

19 infringing activities are enjoined by this Court.

20         39.     Yodlee is entitled to damages adequate to compensate for the infringement, but in no

21 event less than a reasonable royalty for the use made of the inventions by CashEdge.

22         40.     Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

23 agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

24 infringing the '850 patent, Yodlee will be greatly and irreparably harmed.

25     **COUNT TWO:  INFRINGEMENT OF THE '783 PATENT**

26         41.     Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

27 fully set forth herein.

28 /// /

1    42.    CashEdge has infringed and continues to infringe one or more claims of the '783

2    patent by making, using, offering for sale, and selling in the United States data aggregation products

3    and services, as well as applications and solutions that utilize data aggregation techniques, that

4    embody the claimed inventions of the '783 patent, including but not limited to CashEdge's

5    Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

6    corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

7    43.    CashEdge has induced and continues to induce others to infringe, and/or has

8    committed and continue to commit acts of contributory infringement of one or more claims of the

9    '783 patent.

10    44.    On information and belief, CashEdge has had and continues to have knowledge of

11    the '783 patent.

12    45.    Upon information and belief, CashEdge's acts of infringement as set forth in the

13    previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

14    46.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

15    an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

16    infringing activities are enjoined by this Court.

17    47.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

18    event less than a reasonable royalty for the use made of the inventions by CashEdge.

19    48.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

20    agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

21    infringing the '783 patent, Yodlee will be greatly and irreparably harmed.

22    **COUNT THREE:  INFRINGEMENT OF THE '077 PATENT**

23    49.    Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

24    fully set forth herein.

25    50.    CashEdge has infringed and continues to infringe one or more claims of the '077

26    patent by making, using, offering for sale, and selling in the United States data aggregation products

27    and services, as well as applications and solutions that utilize data aggregation techniques, that

28    embody the claimed inventions of the '077 patent, including but not limited to CashEdge's

1  Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

2  corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

3       51.    CashEdge has induced and continues to induce others to infringe, and/or has

4  committed and continue to commit acts of contributory infringement of one or more claims of the

5  '077 patent.

6       52.    On information and belief, CashEdge has had and continues to have knowledge of

7  the '077 patent.

8       53.    On information and belief, CashEdge's acts of infringement as set forth in the

9  previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

10      54.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

11  an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

12  infringing activities are enjoined by this Court.

13      55.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

14  event less than a reasonable royalty for the use made of the inventions by CashEdge.

15      56.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

16  agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

17  infringing the '077 patent, Yodlee will be greatly and irreparably harmed.

18              **COUNT FOUR:  INFRINGEMENT OF THE '910 PATENT**

19      57.    Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

20  fully set forth herein.

21      58.    CashEdge has infringed and continues to infringe one or more claims of the '910

22  patent by making, using, offering for sale, and selling in the United States data aggregation products

23  and services, as well as applications and solutions that utilize data aggregation techniques, that

24  embody the claimed inventions of the '910 patent, including but not limited to CashEdge's

25  Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

26  corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

27  / / /

28  / / /

7

ANSWER TO COMPLAINT FOR DECLARATORY JUDGEMENT
Case No. C 05 2554 RS

1     59.     CashEdge has induced and continues to induce others to infringe, and/or has

2     committed and continue to commit acts of contributory infringement of one or more claims of the

3     '910 patent.

4     60.     On information and belief, CashEdge has had and continues to have knowledge of

5     the '910 patent.

6     61.     Upon information and belief, CashEdge's acts of infringement as set forth in the

7     previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

8     62.     As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

9     an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

10    infringing activities are enjoined by this Court.

11    63.     Yodlee is entitled to damages adequate to compensate for the infringement, but in no

12    event less than a reasonable royalty for the use made of the inventions by CashEdge.

13    64.     Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

14    agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

15    infringing the '910 patent, Yodlee will be greatly and irreparably harmed.

16    **COUNT FIVE:  INFRINGEMENT OF THE '451 PATENT**

17    65.     Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

18    fully set forth herein.

19    66.     CashEdge has infringed and continues to infringe one or more claims of the '451

20    patent by making, using, offering for sale, and selling in the United States data aggregation products

21    and services, as well as applications and solutions that utilize data aggregation techniques, that

22    embody the claimed inventions of the '451 patent, including but not limited to CashEdge's

23    Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

24    corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites

25    67.     CashEdge has induced and continues to induce others to infringe, and/or has

26    committed and continue to commit acts of contributory infringement of one or more claims of the

27    '451 patent.

28    / / /

8

1    68.    On information and belief, CashEdge has had and continues to have knowledge of

2    the '451 patent.

3    69.    Upon information and belief, CashEdge's acts of infringement as set forth in the

4    previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

5    70.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

6    an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

7    infringing activities are enjoined by this Court.

8    71.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

9    event less than a reasonable royalty for the use made of the inventions by CashEdge.

10    72.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

11    agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

12    infringing the '451 patent, Yodlee will be greatly and irreparably harmed.

13    ## COUNT SIX:  INFRINGEMENT OF THE '042 PATENT

14    73.    Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

15    fully set forth herein.

16    74.    CashEdge has infringed and continues to infringe one or more claims of the '042

17    patent by making, using, offering for sale, and selling in the United States data aggregation products

18    and services, as well as applications and solutions that utilize data aggregation techniques, that

19    embody the claimed inventions of the '042 patent, including but not limited to CashEdge's

20    Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

21    corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

22    75.    CashEdge has induced and continues to induce others to infringe, and/or has

23    committed and continue to commit acts of contributory infringement of one or more claims of the

24    '042 patent.

25    76.    On information and belief, CashEdge has had and continues to have knowledge of

26    the '042 patent.

27    77.    Upon information and belief, CashEdge's acts of infringement as set forth in the

28    previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

9

78.     As a result of CashEdge's infringement, Yodlee has suffered monetary damages in an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's infringing activities are enjoined by this Court.

79.     Yodlee is entitled to damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the inventions by CashEdge.

80.     Unless preliminary and permanent injunctions are issued enjoining CashEdge, its agents, servants, employees, attorneys, representatives, and all others acting on its behalf from infringing the '042 patent, Yodlee will be greatly and irreparably harmed.

## COUNT SEVEN:  INFRINGEMENT OF THE '073 PATENT

81.     Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if fully set forth herein.

82.     CashEdge has infringed and continues to infringe one or more claims of the '073 patent by making, using, offering for sale, and selling in the United States data aggregation products and services, as well as applications and solutions that utilize data aggregation techniques, that embody the claimed inventions of the '073 patent, including but not limited to CashEdge's Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

83.     CashEdge has induced and continues to induce others to infringe, and/or has committed and continue to commit acts of contributory infringement of one or more claims of the '073 patent.

84.     On information and belief, CashEdge has had and continues to have knowledge of the '073 patent.

85.     Upon information and belief, CashEdge's acts of infringement as set forth in the previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

86.     As a result of CashEdge's infringement, Yodlee has suffered monetary damages in an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's infringing activities are enjoined by this Court.

///

1    87.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

2   event less than a reasonable royalty for the use made of the inventions by CashEdge.

3    88.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

4   agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

5   infringing the '073 patent, Yodlee will be greatly and irreparably harmed.

6                    **COUNT EIGHT:  INFRINGEMENT OF THE '766 PATENT**

7    89.    Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

8   fully set forth herein.

9    90.    CashEdge has infringed and continues to infringe one or more claims of the '766

10   patent by making, using, offering for sale, and selling in the United States data aggregation products

11   and services, as well as applications and solutions that utilize data aggregation techniques, that

12   embody the claimed inventions of the '766 patent, including but not limited to CashEdge's

13   Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

14   corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

15   91.    CashEdge has induced and continues to induce others to infringe, and/or has

16   committed and continue to commit acts of contributory infringement of one or more claims of the

17   '766 patent.

18   92.    On information and belief, CashEdge has had and continues to have knowledge of

19   the '766 patent.

20   93.    Upon information and belief, CashEdge's acts of infringement as set forth in the

21   previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

22   94.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

23   an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

24   infringing activities are enjoined by this Court.

25   95.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

26   event less than a reasonable royalty for the use made of the inventions by CashEdge.

27   / / /

28   / / /

11

1      96.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

2  agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

3  infringing the '766 patent, Yodlee will be greatly and irreparably harmed.

4      **COUNT NINE: INFRINGEMENT OF THE '245 PATENT**

5      97.    Yodlee incorporates by reference and realleges paragraphs 22 through 32 above as if

6  fully set forth herein.

7      98.    CashEdge has infringed and continues to infringe one or more claims of the '245

8  patent by making, using, offering for sale, and selling in the United States data aggregation products

9  and services, as well as applications and solutions that utilize data aggregation techniques, that

10  embody the claimed inventions of the '245 patent, including but not limited to CashEdge's

11  Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

12  corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

13      99.    CashEdge has induced and continues to induce others to infringe, and/or has

14  committed and continue to commit acts of contributory infringement of one or more claims of the

15  '245 patent.

16      100.    On information and belief, CashEdge has had and continues to have knowledge of

17  the '245 patent.

18      101.    Upon information and belief, CashEdge's acts of infringement as set forth in the

19  previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

20      102.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

21  an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

22  infringing activities are enjoined by this Court.

23      103.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

24  event less than a reasonable royalty for the use made of the inventions by CashEdge.

25      104.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

26  agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

27  infringing the '245 patent, Yodlee will be greatly and irreparably harmed.

28  ///

**PRAYER FOR RELIEF**

WHEREFORE, Yodlee prays for judgment against CashEdge as follows:

(a)    Dismissing CashEdge's Complaint for Declaratory Judgment with prejudice and awarding CashEdge nothing;

(b)    That CashEdge has infringed the '850 patent, the '783 patent, the '077 patent, the '910 patent, the '451 patent, the '042 patent, the '073 patent, the '766 patent, and the '245 patent;

(c)    That CashEdge's infringement has been willful;

(d)    Awarding Yodlee damages for CashEdge's infringement;

(e)    Trebling the damages award for infringement because of the willful nature of the infringement in accordance with 35 U.S.C. § 284;

(f)    Preliminarily and permanently enjoining CashEdge, its officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with it from infringing the '850 patent, the '783 patent, the '077 patent, the '910 patent, the '451 patent, the '042 patent, the '073 patent, the '766 patent, and the '245 patent;

(g)    Declaring this an exceptional case under 35 U.S.C. § 285 and awarding Yodlee its costs, expenses and attorneys fees in this action;

(h)    Awarding Yodlee such further relief as this Court may deem proper.

**JURY DEMAND**

Yodlee hereby demands a trial by jury of all issues in this action.

Dated: July 12, 2005              FISH & RICHARDSON P.C.

By:  \s\ David M. Barkan
        David M. Barkan

Attorneys for Defendant
YODLEE, INC.

50286788.doc

13

1     <u>**CERTIFICATION PURSUANT TO CIVIL L.R. 3-16**</u>

2     Pursuant to Civil L.R. 3-16, the undersigned certifies that the following listed persons,

3 associations of persons, firms, partnerships, corporations (including parent corporations) or other

4 entities (i) have a financial interest in the subject matter in controversy or in a party to the

5 proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could be

6 substantially affected by the outcome of this proceeding:

7     Yodlee, Inc. has no parent corporations and the only other entity that has any interest in this

8 matter is S1 Corporation, which owns a percentage of Yodlee, Inc.

9 Dated: July 12, 2005             FISH & RICHARDSON P.C.

10

11                   By:    \s\ David M. Barkan

12                         David M. Barkan

13                   Attorneys for Defendant
                   YODLEE, INC.

14

15    50286788.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

ANSWER TO COMPLAINT FOR DECLARATORY JUDGEMENT
Case No. C 05 2554 RS

Exhibit
J



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BAYER AG,                              :
BAYER CORPORATION,                     :
                                       :
        Plaintiffs,                    :
                                       :
    v.                                 : Civil Action No. 00-466-JJF
                                       :
BIOVAIL CORPORATION,                   :
ELAN CORPORATION, PLC                  :
ELAN PHARMA, LTD                       :
        and                            :
TEVA PHARMACEUTICALS USA, INC          :
                                       :
        Defendants.                    :

## MEMORANDUM ORDER

Presently before the Court is the Defendants' Motion to Dismiss or Transfer. (D.I. 17). The Defendants argue that the case should be dismissed on the basis of res judicata and collateral estoppel, or in the alternative that the case be transferred to the Northern District of Georgia, Gainesville Division. (D.I. 18 at 1).

Although, the Court has formed a view on the merits of the Motion to Dismiss, the Court believes that the interests of the parties and justice would best be served by a resolution of the issue presented here by the Georgia court which presided over the related cases.

The Court is authorized to transfer an action pursuant to 28 U.S.C. § 1404(a) where:

> For the convenience of the parties and the
> witnesses, in the interest of justice, a
> district court may transfer any civil action
> to any other district or division where it
> might have been brought.

28 U.S.C.A. § 1404(a) (West 1993).

The Defendants contend is that judicial economy would best be served if the case was transferred to the Northern District of Georgia in light of the extensive history of similar litigation between the parties in that court. (D.I. 18 at 23). The Plaintiffs contend that the Defendants do not offer any record evidence favoring transfer and that the deference given to the Plaintiffs' choice of forum should not be disturbed. (D.I. 36 at 31).

While the Court recognizes that the Plaintiffs' choice of forum is ordinarily given substantial deference, the need for judicial consistency outweighs the Plaintiffs' choice of forum in the instance case. Given the prior similar and complex litigation between the parties in the Northern District of Georgia[1], the Court concludes that it is the proper forum for adjudication of this case. The Court credits the Defendants' representation that this action could have originally been brought in the Northern District of Georgia (D.I. 18 at 24-5),

---

[1] At oral argument counsel for the Defendants represented that Judge O'Kelley had completed "80 or 90 percent" of the work necessary in the instant action.

2

therefore, the case will be transferred to the United States District Court in the Northern District of Georgia, Gainesville Division.

NOW THEREFORE, IT IS HEREBY ORDERED THIS 17 DAY OF JULY, 2000 that Defendants' Motion to Transfer (D.I. 17) is GRANTED, the Defendants' Motion to Dismiss (D.I. 17) is DENIED with leave to renew before the Georgia court.

_____
UNITED STATES DISTRICT JUDGE

3

# Exhibit K

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

OLE K. NILSSEN and            :
GEO FOUNDATION, LTD.,       :
                                 :
     Plaintiffs,            :
                                 :
     v.                   :     Civil Action No. 00-695-JJF
                                 :
OSRAM SYLVANIA, INC. and   :
OSRAM SYLVANIA PRODUCTS, INC.,   :
                                 :
     Defendants.        :

_____

Donald F. Parsons, Jr., Esquire and Mona A. Lee, Esquire of MORRIS, NICHOLS, ARSHT &
TUNNELL, Wilmington, Delaware.
Of Counsel: Harry J. Roper, Esquire, Raymond N. Nimrod, Esquire, John E. Titus, Esquire, and
Jonathon Hill, Esquire of ROPER & QUIGG, Chicago, Illinois.
Attorneys for Plaintiffs.

Richard K. Herrmann, Esquire of BLANK ROME COMISKY & MCCAULEY LLP,
Wilmington, Delaware.
Of Counsel: Brian D. Sieve, Esquire, Thomas G. Pasternak, Esquire, Andrew M. Johnstone,
Esquire, and Kevin J. O'Shea, Esquire of KIRKLAND & ELLIS, Chicago, Illinois.
Attorneys for Defendants.

_____

## **MEMORANDUM OPINION**

May 1, 2001
Wilmington, Delaware

**FARNAN, District Judge.**

Presently before the Court is Defendants' Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (D.I. 15).  For the reasons stated below, the Court will grant the motion.

## BACKGROUND

Ole K. Nilssen ("Mr. Nilssen") is a Florida resident with his principal place of business in Chicago, Illinois.[1]  (D.I. 1 at ¶ 4).  Mr. Nilssen is engaged in the business of "identifying, formulating plans for, developing know-how and technology for, and implementing (via licensing agreements) promising new business opportunities in the field of electronics, including electronic ballasts." (D.I. 1 at ¶ 8).  Geo Foundation ("Geo") is a non-profit corporation incorporated in the Cayman Islands, British West Indies.  (D.I. 1 at ¶ 5)(Mr. Nilssen and Geo collectively referred to as "Plaintiffs").

OSRAM Sylvania, Inc. and OSRAM Sylvania Products, Inc. (collectively "Defendants") are Delaware corporations with their principal places of business in Danvers, Massachusetts. (D.I. 13 at ¶ 6-7).  Defendants are engaged in the business of making and selling electronic ballasts.  (D.I. 13 at ¶¶ 11).

Plaintiffs filed the instant action against Defendants on August 1, 2000.  In their Complaint, Plaintiffs contend that Defendants wilfully infringe twenty-six patents that were

---

[1] Mr. Nilssen contends that his ongoing business in Illinois, Innovations Center, "is now defunct." (D.I. 24, Exh. 1 at ¶ 8).  However, Plaintiffs' Complaint alleges that Mr. Nilssen is currently engaged in "business opportunities." (D.I. 1 at ¶ 4).  Further, Mr. Nilssen admits that he still travels to Illinois regularly to "bring closure to [his] other business dealings that take place in Illinois." (D.I. 24, Exh. 1 at ¶ 8).  The Court concludes that, for purposes of the instant motion, this record sufficiently establishes that Mr. Nilssen's principal place of business is in Illinois.

2

invented and are owned by Mr. Nilssen and of which Geo holds exclusive licenses.[2] (D.I. 1 at ¶¶ 9, 10, 13).  On January 24, 2001, Defendants filed the instant motion to transfer the case to the United States District Court for the Northern District of Illinois.  (D.I. 15).

## DISCUSSION

Under 28 U.S.C. § 1404(a), "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Since it is undisputed that Plaintiffs could have brought the instant action in the Northern District of Illinois, the Court's only task is to determine whether the factors enumerated in § 1404(a) warrant a transfer under the circumstances.

In determining whether or not to transfer venue under § 1404(a), a district court must consider a number of different factors.  These factors include several private interests: (1) the convenience of the parties due to their relative physical and financial conditions, (2) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (3) the location of books and records, to the extent that these books and records could not be produced in a certain forum.  Memminger v.

---

[2]  These patents include U.S. Patent No. B1 4,667,345; U.S. Patent No. 4,857,806; U.S. Patent No. 4,954,754; U.S. Patent No. 4,983,887; U.S. Patent No. 5,013,974; U.S. Patent No. 5,047,690; U.S. Patent No. 5,164,637; U.S. Patent No. 5,185,560; U.S. Patent No. 5,189,342; U.S. Patent No. 5,191,262; U.S. Patent No. 5,214,356; U.S. Patent No. 5,233,270; U.S. Patent No. 5,341,067; U.S. Patent No. 5,343,123; U.S. Patent No. 5,402,043; U.S. Patent No. 5,416,386; U.S. Patent No. 5,432,409; U.S. Patent No. 5,446,347; U.S. Patent No. 5,471,118; U.S. Patent No. 5,479,074; U.S. Patent No. 5,481,160; U.S. Patent No. 5,510,680; U.S. Patent No. 5,510,681; U.S. Patent No. 5,621,279; U.S. Patent No. 5,736,819 and U.S. Patent No. 6,002,210.  (D.I. 1 at ¶ 9).

InfoCure Corp., C.A. No. 00-707-JJF, slip op. at 4 (D. Del. Nov. 14, 2000)(citing Jumara v. State

Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)).[3]  These factors also include several public

interests:

> (1) the enforceability of the judgment, (2) practical considerations regarding the
> ease, speed, or expense of trial, (3) the administrative difficulty due to court
> congestion, (4) the local interest in deciding local controversies in the home forum,
> (5) the public policies of the two fora, and (6) the trial judge's familiarity with the
> applicable state law in diversity cases.

Id. (citing Jumara, 55 F.3d at 879-80).  When determining whether or not transfer is warranted

under the circumstances, district courts must balance all of the relevant factors.  Jumara, 55 F.3d

at 883.  "The burden is upon the [moving party] to establish that the balance of the [factors]

strongly weighs in favor of the requested transfer, and a transfer will be denied if the factors are

evenly balanced or weigh only slightly in favor of the transfer."  Memminger, slip op. at 4-5.

Below, the Court will analyze the factors relevant to the instant motion.

A.      **Convenience of the Parties**

   The Court concludes that the convenience of the parties due to their relative physical and

financial conditions weighs slightly in favor of transfer.  Defendants' principal places of business

are located in Danvers, Massachusetts.  (D.I. 16 at 5).  Many of Defendants' accused products are

manufactured in Lake Zurich, Illinois, which is within the Northern District of Illinois.  (D.I. 16 at

---

  [3]  Jumara also listed the following private interests that district courts should consider: (1)
the plaintiff's choice of forum, (2) the defendant's preferred forum, and (3) whether the claim
arose elsewhere.  55 F.3d at 879.  Subsequent decisions of this Court, however, have determined
that these interests are subsumed by the other Jumara factors.  Memminger, slip op. at 5.
Therefore, to avoid considering the same interests twice, the Court will not considered them
separately.  Id.

5). Defendants' contacts with Delaware, on the other hand, are minimal: Defendants are

incorporated under Delaware law, Defendants have one salesperson who works out of a home

office in Delaware, and some of Defendants' accused products are sold in Delaware.[4] (D.I. 16 at

5). See Memminger, slip op. at 6-7 (recognizing that the mere fact a defendant is incorporated in

a given forum does not mean that transfer to another forum is not warranted); Amersham

Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 11 F. Supp. 2d 729, 730-30 (S.D.N.Y.

1998)(holding that the Southern District of New York's connection to the litigation was

"tenuous" for purposes of venue transfer analysis when the defendant was incorporated in New

York and over 100 of the defendant's allegedly infringing products were sold in New York).

Also supporting the requested transfer is the fact that Mr. Nilssen's principal place of business is

in Illinois, and that several of his current and former employees reside in Illinois.

Based on these considerations, the Court concludes that it would be more convenient to

litigate in the Northern District of Illinois rather than in Delaware. However, this factor weighs

only slightly in favor of transfer because both Defendants are large companies that are financially

capable of litigating in a distant forum. Motorola Inc. v. PC-Tel, Inc., 58 F. Supp. 2d 349, 358

(D. Del. 1999)(holding that when the party seeking transfer is a multimillion dollar company,

unless the company can articulate "some unique or unexpected burden" associated with litigating

in a distant forum, this factor only weighs slightly in favor of transfer).

---

[4] Plaintiffs' contention that their "claim arose" in Delaware, because some of Defendants' accused products are sold in Delaware, lacks merit. Defendants' products are sold nationwide; therefore, Delaware does not have any special "connection" to the case that would weigh against the requested transfer.

**B.    Convenience of the Witnesses**

The Court concludes that the convenience of the witnesses weighs strongly in favor of transfer.  The convenience of the witnesses is the most important factor in venue transfer analysis. Mentor Graphics v. Quickturn Design Sys., Inc., 77 F. Supp. 2d 505, 510 (D. Del. 1999).  The convenience of a witness is only relevant, however, "to the extent that the witness may actually be unavailable for trial in one of the fora."  Asten Inc. v. Weavexx Corp., 2000 WL 1728354, at *4 (D. Del. Feb. 11, 2000)(quoting Jumara, 55 F.3d at 879).  A party need not allege that a witness definitely will be unavailable for trial; rather, it is sufficient for purposes of venue transfer analysis if the witness is not subject to a court's subpoena power.  Mentor Graphics, 77 F. Supp. 2d at 511.  However, witnesses employed by the parties are not considered by a court conducting venue transfer analysis because the parties are obligated to procure the presence of their own employees at trial.  Id.

In the instant case, Defendants contend that no witnesses reside in Delaware but that a number of principal witnesses reside in the Northern District of Illinois, including: (1) Dale Fiene - an employee of Mr. Nilssen, (2) Robert Schneider - a former employee of Mr. Nilssen, (3) employees of Defendants, (4) employees of Motorola, Inc, and (5) employees of Advance Transformer, Inc. ("Advance").  (D.I. 16 at 10).  In response, Plaintiffs contend that Defendants' contentions are unavailing because (1) Defendants have failed to explain the nature of these witnesses' testimony, and in several cases, have even failed to name the witnesses, (2) Defendants have failed to show that the use of videotaped deposition testimony would be an inadequate substitute for live trial testimony, and (3) Defendants have not alleged that any witnesses actually

6

will be unavailable for trial. (D.I. 25 at 11).

The Court concludes that Plaintiffs' second and third arguments can be summarily rejected. As to Plaintiffs' third argument, as previously discussed, a party only needs to establish that witnesses might be unavailable for trial. As to Plaintiffs' second argument, the Court concludes that videotaped depositions are not an adequate substitute for live trial testimony when conducting venue transfer analysis because "[v]ideo depositions . . . are unlikely to hold the rapt attention of a jury." AlliedSignal, Inc. v. Cooper Auto., Inc., 1997 U.S. Dist. LEXIS 22902, at *11 n.4 (D. Del. July 30, 1997).

Plaintiffs' first argument warrants more consideration. One of these witnesses, Dale Fiene, is a current employee of Mr. Nilssen; therefore, the Court concludes that Mr. Fiene should not be considered in the analysis.[5] (D.I. 24 at 9). The Court also agrees that Defendants' employees do not weigh into the analysis. However, Mr. Schneider, a former employee of Mr. Nilssen, and employees from Motorola and Advance do warrant consideration because they are potential third party witnesses.

Plaintiffs contend that these potential third party witnesses do not weigh in favor of transfer because Defendants have failed to specifically identify many of these witnesses by name and/or the content of their testimony. (D.I. 24 at 10-11). However, Defendants specifically identify Mr. Schneider and note that his testimony is relevant because Mr. Schneider has submitted a number of affidavits to the PTO on Mr. Nilssen's behalf. (D.I. 16 at 10). Mr.

---

[5] To the extent that Mr. Nilssen admits that Mr. Fiene is a current employee, such admission belies Mr. Nilssen's attempt to downplay the extent of his business contacts in Illinois.

Schneider's knowledge is relevant to Defendants' affirmative defenses, especially Defendants' allegations of inequitable conduct by Mr. Nilssen during the prosecution of many of the patents in suit.

Defendants' potential witnesses from Motorola and Advance have not been identified by name. However, Defendants indicate that Motorola's employees will testify about Motorola's business dealings with Mr. Nilssen and about prior art to the patents in suit. (D.I. 16 at 10). Defendants also indicate that Advance's employees will provide relevant testimony about a reasonable royalty and about prior art.[6] (D.I. 16 at 10). The Court concludes that such identification, especially when fact discovery has yet to take place and when Plaintiffs have yet to specify the specific patent claims and products implicated in the lawsuit, is sufficient for purposes of venue transfer analysis.[7] Therefore, the Court concludes that the convenience of the witnesses strongly weighs in favor of transfer.

**C.     Practical Considerations**

The Court also concludes that practical considerations regarding the ease, speed, or expense of trial strongly weigh in favor of the requested transfer. If related cases are pending in the district to which transfer is sought, such fact weighs in favor of the transfer. Affymetrix, Inc.

---

[6] Advance's employees are knowledgeable on such issues because Advance has a license agreement with Mr. Nilssen. (D.I. 16 at 10).

[7] The cases cited by Plaintiffs in which the Court refused to afford unnamed witnesses any weight in the analysis involved situations where the movant merely stated that some witnesses existed that would not be available for trial. (D.I. 24 at 10-11)(citing Motorola, 58 F. Supp. 2d at 359; Sunds Defribator, Inc. v. Durametal Corp., 1997 WL 74660, at *3 (D. Del. Jan. 31, 1997)). Defendants' identification of the witnesses distinguishes the instant case from Motorola and Sunds Defribator.

v. Synteni, Inc., 28 F. Supp. 2d 192, 206 (D. Del. 1998).  In a recent case granting a motion to

transfer, the Court relied heavily on the existence of patent litigation in another forum involving "a

parent patent of the one at issue" and a patent involving a similar type of product which was

arguably "directly related" to the patent at issue.  Brunswick Corp. v. Precor Incorp., 2000 WL

1876477, at *3, n.2 (D. Del. Dec. 12, 2000).

 In the instant action, Plaintiffs allege infringement of twenty-six patents, at least six of

which are also being litigated in the Northern District of Illinois.[8]  In the Illinois cases, Markman

rulings have already been issued and case dispositive motions have already been filed.  (D.I. 16 at

4).  Therefore, the Court concludes that the waste of judicial resources in requiring two different

courts to construe at least six of the same patents,[9] and to render Markman rulings on each of

these patents, is a factor that strongly weighs in favor of transfer.[10]

---

 [8]  The number of patents in the instant case that overlap with patents involved in cases
pending in the Northern District of Illinois is in dispute.  Defendants contend that thirteen of the
patents in this case are being litigated in Nilssen v. Motorola, Inc., Case No. 96-5571, and that
three of these patents are also being litigated in Nilssen v. MagneTek, Inc., Case No. 98-2229.
(D.I. 16 at 4).  Plaintiffs respond that only six patents overlap between the Motorola case and the
action presently before the Court.  (D.I. 24 at 12 & n.4).  The Court concludes that it is
unnecessary to determine exactly how many of the patents overlap and will accept as true, for
purposes of this motion, that only six patents overlap.

 [9]  Defendants point out that the file wrapper for one of the overlapping patents consists of
over 1,700 pages.

 [10]  Plaintiffs contend that the doctrine of collateral estoppel will prevent any waste of
judicial resources by precluding duplicative litigation.  However, collateral estoppel only applies
when a final judgment is rendered, so it could take months or years for collateral estoppel to
become applicable.  If Markman rulings are issued in the instant case that conflict with those
rendered in the Northern District of Illinois prior to collateral estoppel becoming applicable, this
could result in inconsistent judgements virtually guaranteeing that one of the judgments will get
reversed on appeal.  This judicial waste can be avoided by granting the instant motion to transfer.

9

## CONCLUSION

In balance, the Court concludes that the relevant factors strongly weigh in favor of a transfer to the Northern District of Illinois. Both the convenience of the witnesses and practical considerations strongly weigh in favor of transfer, and the convenience of the parties weighs slightly in favor of transfer. On the other hand, no factors weigh against the requested transfer.[11] As a result, the Court concludes that a transfer to the Northern District of Illinois is warranted under the circumstances.

An appropriate Order will be entered.

---

[11] Plaintiffs contend that they have a legitimate desire to litigate in Delaware in order to quickly resolve the matter, and that this factor weighs in favor of transfer. (D.I. 24 at 12). However, the statistical evidence submitted by Defendants reveal that civil cases are, on average, resolved more quickly in the Northern District of Illinois than in Delaware; however, in cases that ultimately go to trial, Delaware is a more expedient forum. (D.I. 16, Exh. H). Furthermore, Plaintiffs have admitted that the slow pace in the cases pending in the Northern District of Illinois is "due to the pace set by the lawyers." (D.I. 25, Exh. B at 2). Plaintiffs nonetheless assert that, because a trial date has already been set in the instant case for February 11, 2002, the instant suit will be resolved more quickly if tried in Delaware. However, in complex patent cases such as this, the initial trial date is often pushed back as discovery problems arise. Considering the number of patents at issue in this case and that discovery has yet to commence, the February 11, 2002 trial date looks unrealistic.

After the briefing in this matter was completed, Plaintiffs sent two letters to the Court (D.I. 27; D.I. 28) indicating that the summary judgment motions pending in the Northern District of Illinois cases were going to be further delayed because the motions had been referred to a special master. However, the Northern District of Illinois's referral order, which is attached to one of Plaintiffs' letters, highlights the fact that quick resolution of the lawsuit in this District is unlikely. The Order stated that: "the voluminous documents and arguments involved in the case" and "the legal and factual complexity of the case" would be such a drain on judicial resources that the appointment of a special master is warranted. (D.I. 28). The Court concludes that requiring two different courts to duplicate much of the same work would be inefficient and would not produce a more expedient resolution in this forum.

10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

OLE K. NILSSEN, and             :
GEO FOUNDATION, LTD.,           :
                                :
        Plaintiffs,             :
                                :
    v.                          :        Civil Action No. 00-695-JJF
                                :
OSRAM SYLVANIA, INC, and        :
OSRAM SYLVANIA PRODUCTS, INC.,  :
                                :
        Defendants.             :

## O R D E R

At Wilmington, this 1 day of May, 2001, for the reasons set forth in the

Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion to Transfer Pursuant to 28

U.S.C. § 1404(a) (D.I. 15) is **GRANTED**.

_____
UNITED STATES DISTRICT JUDGE

# Exhibit L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GREEN ISLE PARTNERS, LTD., S.E.,    :
                                    :
        Plaintiff,                  :
                                    :
        v.                          :    Civil Action No. 01-202-JJF
                                    :
THE RITZ-CARLTON HOTEL CO.,         :
L.L.C., et al.,                     :
                                    :
        Defendants.                 :

MEMORANDUM ORDER

Presently before the Court is Defendants' Motion To Dismiss,
Or In The Alternative, To Stay Or Transfer. (D.I.18). For the
reasons discussed, the Court will grant Defendants' Motion To
Transfer Under 28 U.S.C. §1404(a).[1] (D.I.18).

I.    BACKGROUND

Plaintiff, Green Isle Partners, Ltd. S.E., ("Green Isle") is
a Florida limited partnership. (D.I.1). The Ritz-Carlton Hotel
Company, L.L.C., and The Ritz-Carlton Hotel Company of Puerto
Rico, Inc., (collectively "Ritz-Carlton Defendants") are Delaware
corporations, headquartered in Georgia. (D.I.27 at 4). Marriott
International Inc., Marriott Distribution Services, Inc., and
Marriott International Capital Corp., (collectively "Marriott
Defendants") are also incorporated in Delaware with their
principal place of business in Maryland. Id.

---

[1]Because the Court will transfer this action, it will not
consider Defendant's Motion To Dismiss Or In The Alternative, To
Stay, as these motions are best addressed by the United States
District Court for the District of Puerto Rico.

On March 30, 2001, Green Isle filed an eleven-count Complaint, arising from the development and operations of its Ritz-Carlton, San Juan Hotel, Spa & Casino in Puerto Rico ("Hotel"), against the Ritz-Carlton Defendants, the Marriott Defendants, and Avendra, L.L.C. ("Avendra"), (collectively "Defendants"). (D.I.1). This is the third litigation commenced concerning the Hotel. (D.I.27 at 5). In October 2000, Green Isle commenced an action in the Delaware Chancery Court against the Ritz-Carlton Defendants seeking the production of the Ritz-Carlton Defendants' books and records relating to the Hotel, and in November 2000, the Ritz-Carlton Defendants filed an action against Green Isle in the Courts of Puerto Rico alleging breach of contract, unjust enrichment, promissory estoppel, and negligent misrepresentation. Id. Additionally, Green Isle has filed for bankruptcy in the United States District Court for the Southern District of Florida under Chapter 11 of the Bankruptcy Code. (D.I.27 at 5-6).

On May 25, 2001, Defendants filed the instant Motion To Dismiss, Or In The Alternative, To Stay Or Transfer. (D.I.19).

II.  DISCUSSION

Transfer of a civil action is governed by 28 U.S.C. §1404(a) which provides, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might

have been brought." The thought behind §1404(a) is that when a civil action "presents issues and requires witnesses that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court." White v. ABCO Engineering Corp., 199 F.3d 140, 143 (3d Cir. 1999) citing Continental Grain Co. v. Barge FBL-585, 364 U.S. 19 (1960).

The United States Court of Appeals for the Third Circuit has instructed that when reviewing a motion to transfer under 28 U.S.C. §1404(a) district courts must consider a number of public and private interests. Specifically, the private interests to be considered are

> (1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial conditions, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.

Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).

The public interests are

> (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

3

Id. When determining whether or not transfer is warranted in the circumstances presented, district courts must balance all of the relevant factors. Id. at 883. The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. See Continental Cas. Co. v. American Home Assurance Co., 61 F.Supp. 2d 128, 131 (D.Del. 1999). Because it is undisputed that Plaintiff could have brought the instant action in the District of Puerto Rico, the Court's only task is to determine whether the factors enumerated in § 1404(a) and by the Third Circuit, warrant a transfer.

At the outset, Green Isle contends that its choice of forum is paramount, and should not be disturbed. (D.I.27 at 36). The Defendants contend that Green Isle's choice of forum is less important because Green Isle has no connection to Delaware. (D.I.19 at 36).

The Court recognizes that the plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed. Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1920). However, when the plaintiff's choice of forum is not its "home turf,"[2] the transfer of a case will generally be regarded

---

[2] "Home turf" is defined as the forum closest to the plaintiff's residence or principal place of business which can exercise personal jurisdiction over the defendants. Continental

4

as less inconvenient to a plaintiff if the plaintiff has not chosen its home turf or a forum where the alleged wrongful activity occurred. In re ML-Lee Acquisition Fund II, L.P., 816 F.Supp. 973, 976 (D.Del. 1993). Another factor in the balance of convenience is whether the plaintiff has offered any "substantive reasons ... indicating that the convenience to it of litigating in [this forum] even approaches the inconvenience which trial in this forum will impose on the defendants and their witness." Continental Cas. Co., 61 F.Supp. 2d at 131 quoting Clopay Corp. v. Newell Companies, Inc., 527 F.Supp 733, 737 (D.Del. 1981).[3]

A.   PRIVATE INTERESTS[4]

1.   CONVENIENCE OF THE PARTIES

Green Isle contends that this district is convenient for Defendants because the Marriott Defendants and the Ritz-Carlton Defendants are incorporated in Delaware. (D.I.27 at 36-37). Moreover, Green Isle contends that Defendants are wealthy,

---

Cas. Co. v. American Home Assurance Co., 61 F.Supp. 2d 128, 131 n5 (D.Del. 1999).

[3]Green Isle chose to file this action in Delaware because it is "where all the Defendants are incorporated and because all the defendants subjected themselves to suit in Delaware." (D.I.27 at 36).

[4]The Court will not separately consider the first three private interests enumerated by the Third Circuit, specifically, the plaintiff's choice of forum, the defendant's choice of forum, and whether the claim arose elsewhere, because the Court concludes that consideration of such factors are subsumed in an examination of the remaining factors. See Continental Casualty Co., 61 F.Supp.2d at 131 n7.

5

multinational corporations in the travel industry, and therefore, are capable of financing a trial in Delaware. Id. at 37. Defendants respond that Puerto Rico would be a more convenient forum for all parties because the parties have extensive contacts with Puerto Rico and have demonstrated the ability to litigate in that forum. (D.I.19 at 36-37). Specifically, Defendants contend that Puerto Rico would be convenient for Green Isle because it has previously litigated in Puerto Rico and maintains outside counsel in Puerto Rico. Id. at 37.

The Court acknowledges that a defendant who chooses to incorporate in Delaware should not be heard to complain when another entity has chosen to sue it in Delaware. However, where a defendant can demonstrate that an alternative forum would be more convenient and would better serve the interests of justice, because that forum has substantial connections with the litigation, incorporation in Delaware will not prevent transfer. See SAS of Puerto Rico, Inc. v. Puerto Rico Telephone, Co., 833 F.Supp. 450 (D.Del. 1993). In the instant case, the Court concludes that incorporation in Delaware will not preclude the transfer of this action, because, as discussed, the Defendants have demonstrated that the District of Puerto Rico would be a more convenient forum and has substantial connections to the litigation.

6

2.    CONVENIENCE OF THE WITNESSES

Defendants have identified several nonparty witnesses[5] who would be called to testify regarding the operation of the Hotel and the Hotel's local purchasing and distribution practices, but are not subject to compulsory process in this District. (D.I.19 at 38-39). In response, Green Isle has not identified any witnesses who would be inconvenienced by a trial in Puerto Rico. (D.I.27). Therefore, the Court concludes that this factor weighs heavily in favor of transfer.

3.    LOCATION OF BOOKS AND RECORDS

Defendants contend that all the sources of proof are located in Puerto Rico, and thus this factor should weigh in favor of transfer. (D.I.19 at 38-39). Green Isle responds that the location of books and records should be irrelevant in light of the current technology. (D.I.27 at 37-38). While the Court recognizes that current technology has reduced the burden of litigating in distant forums, it is still an inconvenience. The Court finds that it would be more convenient for the parties to litigate in Puerto Rico, where all or most of the sources of proof are located. Therefore, the Court concludes that this factor weighs slightly in favor of transfer.

---

[5]Ken DeStefano, former Green Isle on-site representative, Dilio Mena, former Director of Finance at the Hotel, Eric Rodriguez, former Casino Manager and employee of the Hotel and several local vendors. (D.I.19 at 38-39).

B.   PUBLIC FACTORS[6]

1.   PRACTICAL CONSIDERATIONS THAT COULD MAKE TRIAL
     EASY, EXPEDITIOUS, OR INEXPENSIVE

Defendants do not offer practical considerations that could
make trial easy, expeditious, or inexpensive in Puerto Rico other
than those already discussed, i.e. nonparty witnesses located in
Puerto Rico, books and records located in Puerto Rico, and other
substantial connections to Puerto Rico.  Similarly, Green Isle
does not offer any practical considerations that would make trial
in Delaware easy, expeditious, or inexpensive.  Therefore, to
avoid double-counting, the Court will assign this factor no
weight.

2.   ADMINISTRATIVE DIFFICULTIES POSED BY COURT
     CONGESTION

The Court's own research reveals that the median times to
civil trial in Puerto Rico and Delaware differ by only two
months. Federal Court Management Statistics 2000, available at
http://www.uscourts.gov/cgi-bin/cmsd2000.pl.  Therefore, the
Court assigns no weight to this factor.

3.   LOCAL INTEREST IN RESOLVING LOCAL CONTROVERSIES AT
     HOME

Defendants contend that Puerto Rico has an interest in
resolving litigation surrounding real property located in Puerto

---

[6]The Court will not address the enforceability of a judgment
and the public policies of the fora as these factors are not
contested by the parties and not relevant to the instant case.

6

Rico. (D.I.19 at 40). Green Isle responds that Puerto Rico does not have a local interest because the cause of action arose, not in Puerto Rico, but in Georgia, Maryland, or Florida. (D.I.27 at 34-35). Because the Court is not examining the merits of the Complaint, it is unclear where the cause of action arose. Therefore, it is unclear in whose favor this factor should weigh. However, it is clear that this factor does not weigh in favor of this litigation continuing in Delaware.

4.    THE TRIAL JUDGE'S FAMILIARITY WITH THE APPLICABLE STATE LAW

The parties dispute what law, Puerto Rico, Georgia, or Florida, will apply to Green Isle's common law causes of action. (D.I.19 at 30; D.I.27 at 31). Again, because the Court is not examining the merits of the Complaint, the Court cannot make a determination of what law will apply. Accordingly, it is unclear in whose favor this factor should weigh. However, the parties agree that Delaware law will not apply to the common law causes of action, and therefore, this factor does not weigh in favor of this litigation continuing in Delaware. Id.

B.    SUMMARY

The Court concludes that a balancing of the private interests heavily favors transferring this case to the District of Puerto Rico. The potential unavailability of Defendants' nonparty witnesses for trial is a substantial factor in the Court's decision to transfer. Furthermore, litigating in Puerto

9

Rico, where the sources of proof are located, will clearly be more convenient for all parties.

While the public interests appear to be in equipoise, Green Isle has not established a substantial connection to this forum, in any of the public interests, that is sufficient to overcome the private interests that weigh in favor of transfer. Therefore, under the facts of this case, the Defendants Delaware incorporation, alone, is not enough to maintain this action in this forum.

NOW THEREFORE, IT IS HEREBY ORDERED this ___ day of November that:

(1)   Defendants' Motion To Transfer Pursuant To 28 U.S.C. § 1404(a)(D.I.18) is **GRANTED**.

(2)   This action shall be transferred to The United States District Court for the District of Puerto Rico.

UNITED STATES DISTRICT JUDGE

10

# Exhibit M

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

2003 AUG 28  PM 2:44

YODLEE, INC.                        :
                                    :
          Plaintiff,                :
                                    :
     v.                             :    Civil Action No. 03-600-JJF
                                    :
BLOCK FINANCIAL CORPORATION and     :
H&R BLOCK INC.                      :
                                    :
          Defendants.               :

### ORDER

WHEREAS, currently pending is Defendant, H&R Block's Motion to dismiss (D.I. 16) and Defendant, Block Financial Corporation's Motion to Transfer the Case to the Western District of Missouri (D.I. 19);

WHEREAS, the Court held a telephonic conference on the above-cited motions on Wednesday, August 27, 2003;

WHEREAS, the Court considered the public and private factors required to decide a motion to transfer and made its findings on five (5) relevant factors on the record during the telephone conference;

NOW THEREFORE, for the reasons cited during the telephone conference on August 27, 2003, IT IS HEREBY ORDERED this 28 day of August, 2003, that:

1) Block Financial Corporation's Motion to Transfer the Case to the Western District of Missouri (D.I. 19) is **GRANTED**;

2) H&R Block's Motion to Dismiss (D.I. 16) is **DENIED**, on

procedural grounds, with leave to renew.

_____

UNITED STATES DISTRICT JUDGE

Exhibit N

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ALTERA CORPORATION,                    :
                                       :
          Plaintiff and                :
          Counterdefendant,            :
                                       :
     v.                                :   Civil Action No. 95-242-JJF
                                       :
XILINX, INC.,                          :
                                       :
          Defendant and               :
          Counterclaimant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Bruce M. Stargatt, Josy W. Ingersoll, James P. Hughes, Jr., of
YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware.  Herbert
F. Schwartz, Robert J. Goldman, Douglas J. Gilbert, of  FISH &
NEAVE, New York, New York.  Attorneys for Plaintiff.

Douglas E. Whitney, Lisa B. Baeurle, of MORRIS, NICHOLS, ARSHT &
TUNNELL, Wilmington, Delaware.  Alan H. MacPherson, Joseph A.
Greco, Kenneth E. Leeds, Scott R. Brown, Peter H. Kang, of
SKJERVEN, MORRILL, MACPHERSON, FRANKLIN & FRIEL, San Jose,
California.  Attorneys for Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MEMORANDUM OPINION

March 29, 1996

Wilmington, Delaware

FARNAN, District Judge

## I.   INTRODUCTION

Presently before the court is the Motion to Transfer (D.I. 9) of Defendant Xilinx, Inc. ("Xilinx") pursuant to 29 U.S.C. § 1404(a).  Xilinx asks the Court to transfer the present case to the United States District Court for the Northern District of California.  (D.I. 10).[1]  Judge Eugene Lynch of that district already has before him two lawsuits between the parties, one filed by Xilinx and the other filed by Altera Corporation ("Altera").  Xilinx claims that the convenience of the parties and interests of justice direct that the present lawsuit should also be before the same judge.  (D.I. 10 at 4-6).  Altera disputes the transfer, claiming that these same factors mandate that the lawsuit remain in this district.

The Court agrees with Xilinx that the convenience of the parties and interests of justice are better served by the transfer of the case to the Northern District of California, and will grant Xilinx's Motion to Transfer to that district.

## II.   BACKGROUND

Altera is a California corporation with its principal place of business in San Jose, California, and was founded in 1983.  Xilinx is a Delaware Corporation with its principal place of business in San Jose, California, and was founded in 1984.

---

1.  Originally, Xilinx wanted the cases transferred to Judge Aguilar in the San Jose Division of the Northern District of California, but they have since been transferred to Judge Eugene Lynch in San Francisco.

1

Both companies manufacture integrated circuits known as "programmable logic devices," which a customer can configure through software programs to perform a variety of logic functions. Many of the devices can be configured to change the logic functions originally programmed into the chip. Until 1992, Altera made Erasable Programmable Logic Devices ("EPLDs") based on Erasable Programmable Read Only Memory ("EPROM"), while Xilinx made Field Programmable Gate Arrays ("FPGAs") based on Static Random Access Memory ("SRAM").

In the fall of 1992, Altera developed the "FLEX 8000" family, a line of products using FPGA based on SRAM, the device and memory systems heretofore used by Xilinx. Xilinx notified Altera that the new line infringed its patents. In turn, Altera notified Xilinx that Xilinx products infringed Altera's patents, although Altera had never accused Xilinx of patent infringement when these products had issued and been patented.

Xilinx sued Altera for patent infringement in the district court in San Jose, California, and later that day, Altera sued Xilinx in the same court against Xilinx. The district court joined the cases for discovery purposes, but decided that the trials would proceed separately, and the Xilinx's lawsuit would be tried first.

On April 20, 1995, Altera brought suit in this Court, claiming that Xilinx's "next generation" products infringed its patents. On May 30, 1995, Xilinx counterclaimed, claiming that Altera products infringed Xilinx's patents.

2

III.  DISCUSSION

Section 1404(a) vests district courts with broad discretion in deciding whether to transfer a case to another district.  It provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought."  28 U.S.C. § 1404(a).  While a plaintiff's choice of a proper forum is a paramount consideration in determining a transfer request, where the convenience of the parties or the interests of justice is strongly in favor of the defendant, the plaintiff's choice will not prevail.  Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970), cert. denied, 401 U.S. 910 (1971) (citations omitted).

After weighing the assertions and arguments of both parties, the Court concludes that the interests of justice and convenience of the parties outweigh the plaintiff's choice of forum.  As a threshold matter, there is no dispute that the action could have been brought in the Northern District of California, since two other lawsuits involving the same parties have been brought there.

The balance of the convenience of the parties tilts toward California, because the headquarters of both parties are located in Northern California, as is their principle places of business.  Moreover, most of the documents and witnesses relevant to the litigation are located in California.

3

Moreover, judicial economy is better served by transferring this case to the Northern District of California. The district court in California is familiar with the complex technologies, product structures and prior art involved as well as at least one of the patents.[2]  While the Court is mindful of Altera's concern that its case may not be heard in Northern California until 1997 because of the civil per-judge caseload, the Court believes that the Northern District of California is fully capable of efficiently handling this patent case.

### IV.   CONCLUSION

For the reasons discussed, the Court will grant Xilinx' Motion to Transfer to the Northern District of California.

An appropriate Order will follow.

---

2.  Altera contends that only one patent overlaps, and that is the patent at issue in Xilinx's counterclaim.  (See D.I.27 at 29 & n.21.)

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ALTERA CORPORATION,                    :
                                       :
          Plaintiff and               :
          Counterdefendant,           :
                                       :
     v.                                :    Civil Action No. 95-242-JJF
                                       :
XILINX, INC.,                          :
                                       :
          Defendant and               :
          Counterclaimant.            :

## O R D E R

     At Wilmington this ____ day of March, 1996, for the reasons set forth in the Memorandum Opinion issued this date,

     IT IS HEREBY ORDERED that Xilinx' Motion to Transfer to the Northern District of California (D.I. 9) is GRANTED.


                    _____
                    UNITED STATES DISTRICT JUDGE

Exhibit
O

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3                        - - -
 4   YODLEE, INC.,              :    CIVIL ACTION
 5              Plaintiff       :
 6        vs.                   :
 7   BLOCK FINANCIAL CORPORATION,:
     and H&R BLOCK GROUP, INC., :
 8                              :
 9        Defendants            :    NO. 03-600 (JJF)
10                        - - -
11                      Wilmington, Delaware
12                      Wednesday, August 27, 2003
                        1:00 o'clock, p.m.
13                   *** Telephone conference
14
15   BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.
                        - - -
16
17   APPEARANCES:
18           FISH & RICHARDSON P.C.
             BY:  WILLIAM J. MARSDEN, JR., ESQ.
19
20                   -and-
21
22
23                   Valerie J. Gunning
                     Official Court Reporter
24
25
```

Page 2

```
 1   APPEARANCES (Continued):
 2
 3   FISH & RICHARDSON P.C.
     BY:  DAVID M. BARKAN, ESQ.
          (Redwood City, California)
 4
 5       Counsel for Plaintiff
 6   YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
     BY:  JOHN W. SHAW, ESQ.
 7
 8       -and-
 9
10   STANDLEY & GILCHRIST
     BY:  JEFFREY S. STANDLEY, ESQ. and
          F. MICHAEL SPEED, ESQ.
11        (Dublin, Ohio)
12       Counsel for Defendants
13           - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1              PROCEEDINGS

2

3        (REPORTER'S NOTE: The following is a telephone

4   conference, held in chambers, beginning at 1:00 p.m.)

5

6        THE COURT: Good afternoon. Judge Farnan.

7        MR. SHAW: Your Honor?

8        THE COURT: Yes. Good afternoon.

9        MR. SHAW: Good afternoon, your Honor.

10       Your Honor, John Shaw, for defendant Block

11   Financial Corporation and H&R Block Group, Inc. And I

12   have with me on the phone Mike Speed and Jeff Standley.

13       MR. SPEED: Jeff Standley is not here yet. Go

14   ahead anyway.

15       MR. MARSDEN: For the plaintiff Yodlee it's

16   William Marsden, from Fish & Richardson. And I have with

17   me on the phone David Barkan.

18       MR. BARKAN: Good afternoon, your Honor.

19       THE COURT: Good afternoon. All right. Is

20   there anything that the parties wanted to add to the

21   papers they submitted on the motion to transfer?

22       MR. SHAW: Your Honor, John Shaw.

23       From the defendants' perspective we're content

24   to rely on the papers subsequent to answering any

Page 4

1   questions you may have.

2        MR. BARKAN: Your Honor, this is David Barkan.

3        From the plaintiff's perspective, we're content

4   as well.

5        THE COURT: All right. Let me ask you two

6   questions so I have it clear in my mind: When the parties

7   talk about the case in front of Chief Judge Whipple in

8   Missouri, and they talk about their views of the technical

9   issues are before -- that are before Chief Judge Whipple,

10  my understanding is that you agree that it is related

11  technology, but not exact. In other words, I guess

12  somebody used the term mirror image with regard to

13  technical issues. It's not mirror image, but there really

14  is no dispute that it's related?

15       MR. BARKAN: Your Honor, this is David Barkan

16  for the plaintiff.

17       Our position is that the Block patents in

18  Kansas City are related in the sense that they potentially

19  are prior art, although we think it's likely that as this

20  case goes on, Block will probably assert both the patent

21  in the simplification case as well as its own patents in

22  Kansas City as prior art, and these two patents in Kansas

23  City are really not terribly relevant prior art. I would

24  be happy to go into details as to why, if that's helpful.

25       THE COURT: Why don't you do that?

Page 5

1    MR. BARKAN: Okay. The two biggest
2  distinctions between the Block patents in Kansas City and
3  what we have in the present case is that in the present
4  case, the problem that Yodlee, in this case, was a patent
5  that we acquired from a company called Vertical One was
6  trying to solve was how to get people to be able to
7  access their information that was already available on
8  the Internet.
9        They were not trying to answer the question of
10 connectivity in the first place. They were simply trying
11 to find a way to better access information that people
12 could get to already, but in a very cumbersome and not
13 very useful way.
14       They also were trying to solve security
15 issues dealing with, since most of this information is
16 individuals' personal financial information, a lot of it
17 had to have password access and other kinds of security
18 protection.
19       The Block patents, to the contrary, actually
20 start out with the opposite premise. They start out
21 with the premise that people cannot get their information
22 electronically through any means, and they're providing
23 one particular means of going about and getting it, but
24 it's a very different kind of problem that they're trying
25 to solve. That was a very different time frame.

Page 6

1    THE COURT: All right. What does Yodlee have
2  to say, if anything?
3    MR. SHAW: Your Honor, John Shaw.
4        The term mirror image I think most people use
5  indicate two identical patents, seek declaratory judgment,
6  noninfringement, for example. The patents certainly are
7  related and I think more related than Mr. Barkan has
8  described. Mr. Speed may also jump in here. He has
9  been the person handling the Kansas City case for Block
10 Financial.
11    MR. SPEED: Your Honor, this is Mike Speed.
12       Jeff Standley is here too. We've been handling
13 the litigation for Block in Kansas City, as David Barkan has
14 been handling it on behalf of Yodlee in Kansas City.
15       The technology is absolutely related and it's
16 not as dissimilar as the plaintiff has made it out.
17       The Block patents were designed to fix the
18 problem of being able to access data from multiple sources
19 and bring them back into one location electronically. That's
20 the very same problem that the Yodlee patent tried to solve.
21       Now, the Yodlee patent had the benefit of three
22 years of additional Internet technology to start with. It
23 had the benefit of some patents that were out there, such
24 as the Block patents that could very well be prior art.
25 But the problem is the same.

Page 7

1        The problem is you have a central -- you want
2  a central location that a customer can go to. And from
3  there, they can -- and if you will, your Honor, picture
4  it has a hub in a spoke on a bicycle wheel. You have the
5  hub, which is the technological center. You bring back
6  data from all of these variety of sources and you
7  aggregate them in the center. Both of those patents deal
8  with technology.
9        Chief Judge Whipple is going to have to address
10 that technology from the top down starting with prior art as
11 early as I think 1993 in the upcoming trial in the case in
12 Kansas City. That same prior art that's going to be
13 litigated there is going to be, in our minds, necessary and
14 important in the case that Yodlee brought against us, so we
15 think that the issue of the counter-aggregation is what makes
16 these things nearly identical in terms of technology.
17    THE COURT: My second question is, and I
18 apologize. I asked for Yodlee. I meant Block: What
19 dispositive motions -- as I understand it, there's a
20 November trial date. What dispositive motions are still
21 pending before Chief Judge Whipple?
22    MR. BARKAN: Your Honor, this is David Barkan
23 for Yodlee.
24       There are five motions pending right now,
25 although four of them fall into groups. There's a motion

Page 8

1  from Yodlee, the defendant, in Kansas City for
2  noninfringement. There's a summary judgment motion of
3  infringement that Block filed. And our position is neither
4  of those motions would impact this case in Delaware.
5        There's a motion filed by Yodlee for
6  unenforceability of the Block patent and a motion for
7  summary judgment by Block of no unenforceability and, again,
8  we don't think that would implicate the issues in the
9  current case.
10       And then Yodlee also filed a motion for
11 summary judgment of invalidity, but it's based on a best-
12 mode violation, not on prior art by itself.
13    THE COURT: Okay. I'm going to provide a list
14 of reasons essentially that in my view warrant the transfer
15 of this case.
16       First, that it's the same parties that are in
17 the Missouri case.
18       Second, I find that the -- that there's related,
19 similar technology, although not identical, but that the
20 technology in the Missouri case would be implicated in
21 the judges being able to get up to speed with regard to
22 the technical issues of the case.
23       Third, I find there is a largely common field
24 of prior art.
25       Fourth, I find that the convenience of the

Telephone Conference                    CondenseIt™                    Wednesday, August 27, 2003

Page 9

1   parties and witnesses are unaffected if the case is
2   transferred to Missouri or remains here in Delaware.
3          And, fifth, I find that the interests of
4   justice weigh heavily on the side of a transfer. And
5   among the reasons that I find support that conclusion is
6   that there are, as in any patent case, complex legal
7   issues which, although not precisely overlapping, are
8   affected and related between the two cases, the case filed
9   here in Delaware and the Missouri case, and that these
10  issues should be decided in a consistent manner,
11  particularly where the same parties are involved in related
12  technology or closely related technology. And the way to
13  ensure that is to have one Federal Judge issue rulings so
14  that an appellate record is made clear and that there's
15  no confusion between two courts on such complex issues.
16         For these reasons, I'm going to enter an order
17  that transfers the case to Missouri. I'm going to deny the
18  motion to dismiss, so that the case goes to Missouri with a
19  clean procedural record with leave to renew. It will be
20  denied without any decision on the merits.
21         Okay. Thank you very much.
22         (Counsel respond "Thank you, your Honor.")
23         (Telephone conference concluded at 1:12 p.m.)
24               - - -
25

**Telephone Conference**   **CondenseIt™**   **-and - N**

**-and** [2] 1:20     2:8
**00** [2]     1:12     3:5
**03-600** [1]          1:9
**1** [3]     1:12     3:5
9:23
**12** [1]  9:23
**1993** [1] 7:11
**2003** [1] 1:11
**27** [1]  1:11
**able** [3]  5:6     6:18
8:21
**absolutely** [1]  6:15
**access** [4]          5:7
5:11   5:17   6:18
**acquired** [1]  5:5
**ACTION** [1]          1:4
**add** [1]  3:21
**additional** [1]  6:22
**address** [1]          7:9
**affected** [1]  9:8
**afternoon** [5]          3:7
3:9     3:10     3:19
3:20
**again** [1]          8:7
**against** [1]  7:14
**aggregate** [1]  7:7
**agree** [1] 4:10
**ahead** [1]          3:15
**among** [1]          9:5
**answer** [1]  5:9
**answering** [1]  3:25
**anyway** [1]          3:15
**apologize** [1]  7:18
**APPEARANCES** [2]
1:16     2:1
**appellate** [1]  9:14
**art** [8]     4:19     4:22
4:23   6:24     7:10
7:12   8:12     8:24
**assert** [1]  4:20
**August** [1]  1:11
**available** [1]  5:7
**Barkan** [12]          2:3
3:18   3:19     4:2
4:2     4:15     4:15
5:1     6:7     6:13
7:22   7:22
**based** [1]  8:11
**beginning** [1]  3:5
**behalf** [1]          6:14
**benefit** [1]  6:21
6:23
**best** [1]  8:11
**better** [1]          5:11
**between** [3]          5:2
9:8     9:15
**bicycle** [1]          7:4
**biggest** [1]  5:1
**Block** [16]          1:7
1:7     3:11     3:12
4:17   4:20     5:2
5:19   6:9     6:13
6:17   6:24     7:18

**bring** [2] 6:19     7:5
**brought** [1]          7:14
**C** [1]     3:2
**California** [1]  2:3
**cannot** [1]          3:2
**case** [21] 4:7     4:20
4:21   5:3     5:4
5:4     6:9     7:11
7:14   8:4     8:9
8:15   8:17     8:20
8:22   9:1     9:6
9:8     9:9     9:17
9:18
**cases** [1] 9:8
**center** [2]          7:5
7:7
**central** [2]          7:1
7:2
**certainly** [1]  6:6
**chambers** [1]  3:5
**Chief** [4]          4:7
4:9     7:9     7:21
**City** [10] 2:3     4:18
4:22   4:23     5:2
6:9     6:13     6:14
7:12   8:1
**CIVIL** [1]          1:4
**clean** [1] 9:19
**clear** [2] 4:6     9:14
**closely** [1]  9:12
**common** [1]  8:23
**company** [1]  5:5
**complex** [2]  9:6
9:15
**CONAWAY** [1]
2:6
**concluded** [1]  9:23
**conclusion** [1]  9:5
**conference** [3]  1:12
3:5     9:23
**confusion** [1]  9:15
**connectivity** [1]
5:10
**consistent** [1]  9:10
**content** [2]          3:24
4:3
**Continued** [1]  2:1
**contrary** [1]  5:19
**convenience** [1]
8:25
**Corporation** [2] 1:7
3:12
**Counsel** [3]          2:4
2:12   9:22
**counter-aggregation**
[1]     7:15
**Court** [10]          1:1
1:23   3:7     3:9
3:20   4:5     4:25
6:1     7:17     8:13
**courts** [1]  9:15
**cumbersome** [1]
5:12

**current** [1]          8:3
**customer** [1]  7:2
**D** [1]     3:2
**data** [2]  6:18     7:6
**date** [1]  7:20
**David** [6]          2:3
3:18   4:2     4:15
6:13   7:22
**deal** [1]  7:7
**dealing** [1]  5:15
**decided** [1]  9:10
**decision** [1]  9:20
**declaratory** [1]  6:5
**defendant** [2]  3:11
8:1
**Defendants** [1]
2:12
**defendants'** [1] 3:24
**Delaware** [5]          1:2
1:11   8:4     9:2
9:9
**denied** [1]  9:20
**deny** [1] 9:17
**described** [1]  6:8
**designed** [1]  6:17
**details** [1]  4:24
**different** [1]  5:24
5:25
**dismiss** [1]  9:18
**dispositive** [2]  7:19
7:20
**dispute** [1]  4:14
**dissimilar** [1]  9:6
**distinctions** [1] 5:2
**DISTRICT** [2]  1:1
1:2
**down** [1]          7:10
**Dublin** [1]  2:11
**E** [2]     3:2     3:2
**early** [1] 7:11
**electronically** [1]
5:22   6:19
**ensure** [1]          9:13
**enter** [1] 9:16
**ESQ** [5] 1:18     2:3
2:6     2:10     2:10
**essentially** [1] 8:14
**exact** [1] 4:11
**example** [1]  6:6
**F** [1]     2:10
**fall** [1]  7:25
**Farnan** [2]          1:14
3:7
**Federal** [1]  9:13
**field** [1] 8:23
**fifth** [1] 9:3
**filed** [4] 8:3     8:5
8:10   9:8
**financial** [4]          1:7
3:12   5:16     6:10
**first** [5] 5:10     8:16
**Fish** [1] 1:18     2:2

3:17
**five** [1]  7:24
**fix** [1]   6:17
**following** [1]          3:4
**four** [1]  7:25
**Fourth** [1]          8:25
**frame** [1]          5:25
**front** [1] 4:7
**G** [1]     3:2
**GILCHRIST** [1]
2:9
**goes** [2]  4:20     9:18
**Good** [5]          3:7
3:9     3:10     3:19
3:20
**Group** [2]          1:7
3:12
**groups** [1]  7:25
**guess** [1]  4:11
**Gunning** [1]  1:23
**H&R** [1] 1:7     3:12
**handling** [3]  6:9
6:12   6:14
**happy** [1]          4:24
**heavily** [1]  9:4
**held** [1] 3:5
**helpful** [1]  4:24
**Honor** [12]          3:8
3:10   3:11     3:19
3:23   4:2     4:15
6:3     6:11     7:3
7:22   9:22
**HONORABLE** [1]
1:14
**hub** [2]  7:4     7:5
**identical** [3]  6:5
7:16   8:19
**image** [3]          4:12
4:13   6:4
**impact** [1]  8:4
**implicate** [1]  8:8
**implicated** [1]  8:20
**important** [1]  7:14
**Inc** [3]  1:4     1:7
3:12
**indicate** [1]  6:5
**individuals'** [1]
5:16
**information** [5] 5:7
5:11   5:15     5:16
5:21
**infringement** [1]
8:3
**interests** [1]  9:3
**Internet** [2]  5:8
6:22
**invalidity** [1]  8:11
**involved** [1]  9:11
**issue** [2] 7:15     9:13
**issues** [8]          4:9
4:13   5:15     8:8
8:22   9:7     9:10
9:15

**itself** [1] 8:12
**J** [3]     1:14     1:18
1:23
**Jeff** [3]  3:13     3:14
6:12
**JEFFREY** [1]  2:10
**JJF** [1]  1:9
**John** [4] 2:6     3:11
3:23   6:3
**JOSEPH** [1]          1:14
**JR** [2]   1:14     1:18
**Judge** [6]          3:7
4:7     4:9     7:9
7:21   9:13
**judges** [1]  8:21
**judgment** [4]  6:5
8:2     8:7     8:11
**jump** [1] 6:8
**justice** [1]  9:4
**Kansas** [9]          4:18
4:22   4:22     5:2
6:9     6:13     6:14
7:12   8:1
**kind** [1]  5:24
**kinds** [1]          5:17
**largely** [1]  8:23
**leave** [1] 9:19
**legal** [1] 9:6
**likely** [1]          4:19
**list** [1]  8:13
**litigated** [1]  7:13
**litigation** [1]  6:13
**LLP** [2]  2:6
**location** [1]          6:19
7:2
**M** [1]     2:3
**makes** [1]  7:15
**manner** [1]  9:10
**Marsden** [3]          1:18
3:16   3:17
**may** [4]  4:1     6:8
**means** [2]          5:22
5:23
**meant** [1]  7:18
**merits** [1]  9:20
**MICHAEL** [1]  2:10
**Mike** [2] 3:13     6:11
**mind** [1] 4:6
**minds** [1]          7:13
**mirror** [3]          4:12
4:13   6:4
**Missouri** [7]          4:8
8:17   8:20     9:2
9:9     9:17     9:18
**mode** [1]          8:12
**most** [2] 5:15     6:4
**motion** [7]          3:22
7:25   8:2     8:5
8:6     8:10     9:18
**motions** [4]          7:19
7:20   7:24     8:4
**multiple** [1]  6:18
**N** [1]     3:2

**Yodlee vs. Block, et al., CA No. 03-600 (JJF)**          Index Page 1

**Telephone Conference**                    **CondenseIt™**                    **nearly - YOUNG**

nearly [1]          7:16
necessary [1]       7:13
neither [1]         8:3
noninfringement [2]
   6:6      8:2
NOTE [1]            3:4
November [1]        7:20
now [2]   6:21      7:24
O [1]      3:2
o'clock [1]         1:12
Official [1]        1:23
Ohio [1] 2:11
one [4]    5:5      5:23
   6:19    9:13
opposite [1]        5:20
order [1] 9:16
overlapping [1] 9:7
own [1]   4:21
P [1]      3:2
P.C [2]    1:18     2:2
p.m [3]    1:12     3:5
   9:23
papers [2]          3:22
   3:25
particular [1]      5:23
particularly [1] 9:11
parties [5]         3:21
   4:6      8:16    9:1
   9:11
password [1]        5:17
patent [6]          4:20
   5:4     6:20     6:21
   8:6     9:6
patents [11]        4:17
   4:21    4:22     5:2
   5:19    6:5      6:6
   6:17    6:23     6:24
   7:7
pending [2]         7:21
   7:24
people [4]          5:6
   5:11    5:21     6:4
person [1]          6:9
personal [1]        5:16
perspective [2] 3:24
   4:3
phone [2]           3:13
   3:18
picture [1]         7:3
place [1] 5:10
plaintiff [5]       1:5
   2:4     3:16     4:16
   6:16
plaintiff's [1]     4:3
position [2]        4:17
   8:3
potentially [1] 4:18
precisely [1]       9:7
premise [2]         5:20
   5:21
present [2]         5:3
   5:3
problem [6]         5:4
   5:24    6:18     6:20

procedural [1]      9:19
protection [1]      5:18
provide [1]         8:13
providing [1]       5:22
questions [2]       4:1
   4:6
R [1]      3:2
really [2]          4:13
   4:23
reasons [3]         8:14
   9:5     9:16
record [2]          9:14
   9:19
Redwood [1]        2:3
regard [2]          4:12
   8:21
related [10]        4:10
   4:14    4:18     6:7
   6:7     6:15     8:18
   9:8     9:11     9:12
relevant [1]        4:23
rely [1]   3:25
remains [1]         9:2
renew [1]           9:19
Reporter [1]        1:23
REPORTER'S [1]
   3:4
respond [1]         9:22
Richardson [3] 1:18
   2:2     3:17
right [4] 3:20      4:5
   6:1     7:24
rulings [1]         9:13
S [2]      2:10     3:2
second [2]          7:17
   8:18
security [2]        5:14
   5:17
seek [1]  6:5
sense [1]           4:18
Shaw [8]            5:6
   3:8     3:10     3:11
   3:23    3:23     6:3
   6:3
side [1]  9:4
similar [1]         8:19
simplification [1]
   4:21
simply [1]          5:10
solve [4] 5:6       5:14
   5:25    6:20
sources [2]         6:18
   7:6
speed [7]           2:10
   3:13    3:14     6:8
   6:11    6:11     8:21
spoke [1]           7:4
Standley [5]        2:9
   2:10    3:13     3:14
   6:12
STARGATT [1]
   2:6
start [3] 5:20      5:20

6:22
starting [1]        7:10
STATES [1]          1:1
still [1]  7:20
submitted [1]       3:22
subsequent [1]      3:25
such [2]  6:23      9:15
summary [3]         8:2
   8:7     8:11
support [1]         9:5
TAYLOR [1]          2:6
technical [3]       4:8
   4:13    8:22
technological [1]
   7:5
technology [10] 4:11
   6:15    6:22     7:8
   7:10    7:16     8:19
   8:20    9:12     9:12
telephone [3]       1:12
   3:4     9:23
term [2]  4:12      6:4
terms [1]           7:16
terribly [1]        4:23
Thank [2]           9:21
   9:22
Third [1]           8:23
three [1] 6:21
through [1]         5:22
too [1]   6:12
top [1]   7:10
transfer [3]        3:22
   8:14    9:4
transferred [1] 9:2
transfers [1]       9:17
trial [2] 7:11      7:20
tried [1] 6:20
trying [5]          5:6
   5:9     5:10     5:14
   5:24
two [6]   4:5       4:22
   5:1     6:5      9:8
   9:15
U.S.D.C.J [1]       1:14
unaffected [1]      9:1
understand [1] 7:19
unenforceability [2]
   8:6     8:7
UNITED [1]          1:1
up [1]    8:21
upcoming [1]        7:11
used [1] 4:12
useful [1]          5:13
Valerie [1]         1:23
variety [1]         7:6
Vertical [1]        5:5
view [1] 8:14
views [1]           4:8
violation [1]       8:12
vs [1]    1:6
W [1]      2:6
warrant [1]         8:14

Wednesday [1] 1:11
weigh [1]           9:4
wheel [1]           7:4
Whipple [4]         4:7
   4:9     7:9      7:21
William [2]         1:18
   3:17
Wilmington [1] 1:11
without [1]         9:20
witnesses [1]       9:1
words [1]           4:11
years [1] 16:22
yet [1]   3:14
Yodlee [13]         1:4
   3:16    5:4      6:1
   6:14    6:20     6:21
   7:14    7:18     7:23
   8:1     8:5      8:10
YOUNG [1]           2:6

**Yodlee vs. Block, et al., CA No. 03-600 (JJF)**