IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CASHEDGE, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | C.A. No. 06-170-(JJF) |
| YODLEE, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ARTHUR G. CONNOLLY, III

I, Arthur G. Connolly, III, declare under penalty of perjury:

1.      I am a member of the firm of Connolly Bove Lodge & Hutz, LLP, counsel for plaintiff CashEdge, Inc. in the patent suit brought by against defendant Yodlee, Inc.  I submit this declaration in support of Plaintiff CashEdge, Inc.'s Brief In Opposition To Yodlee's Motion To Transfer.

2.      Attached as Exhibit 1 to this Declaration is a true and correct copy of a Complaint For Patent Infringement filed in United States District Court for the Northern District of California by Yodlee, Inc. on April 14, 2005.

3.      Attached as Exhibit 2 to this Declaration is a true and correct copy of a Complaint For Declaratory Judgement Of Non-Infringement, Invalidity And Unenforceability Of U.S. Patent Nos. 6,567,850; 6,317,783; 6,199,077; 6,633,910; 6,510,451; 6,802,042; 6,412,073; 6,594,766; and 6,405,245 filed  in United States District Court for the Northern District of California by CashEdge, Inc. on June 22, 2005.

4.    Attached as Exhibit 3 to this Declaration is a true and correct copy of Civil Pretrial Minutes issued by the United States District Court for the Northern District of California dated August 19, 2005.

5.    Attached as Exhibit 4 to this Declaration is a true and correct copy of excerpts from Yodlee, Inc's Disclosure of Asserted Claims and Preliminary Infringement Contentions dated September 30, 2005.

6.    Attached as Exhibit 5 to this Declaration is a true and correct copy of excerpts from CashEdge's Preliminary Invalidity Contentions dated November 28, 2005.

7.    Attached as Exhibit 6 to this Declaration is a true and correct copy of excerpts from Yodlee's Proposed Preliminary Identification of Claim Terms Pursuant to Patent Local Rule 4-1 and CashEdge, Inc.'s Proposed Terms and Claim Elements for Construction, each dated December 12, 2005.

8.    Attached as Exhibit 7 to this Declaration is a true and correct copy of excerpts from Yodlee's Preliminary Claim Construction Pursuant to Patent Local Rule 4-2 and CashEdge Inc.'s Preliminary Proposed Claim Constructions.

9.    Attached as Exhibit 8 to this Declaration is a true and correct copy of excerpts from a Joint Claim Construction and Prehearing Statement filed by Yodlee, Inc. and CashEdge, Inc. in United States District Court for the Northern District of California.

10.    Attached as Exhibit 9 to this Declaration is a true and correct copy of a Stipulation and [Proposed] Order Re Extension Of Time In Which To Complete

Mediation filed May 19, 2006 in United States District Court for the Northern District of California.

11.    Attached as Exhibit 10 to this Declaration is a true and correct copy of an excerpt from CashEdge, Inc's web site entitled CashEdge Offices.

12.    Attached as Exhibit 11 to this Declaration is a true and correct copy of an excerpt from CashEdge, Inc's web site entitled Corporate Profile.

13.    Attached as Exhibit 12 to this Declaration is a true and correct copy of excerpts from CashEdge, Inc's web site entitled Bank Suite.

14.    Attached as Exhibit 13 to this Declaration is a true and correct copy of the results from search report of CashEdge patents and patent applications.

15.    Attached as Exhibit 14 to this Declaration is a true and correct copy of U.S. Patent No. 7,013,310.

16.    Attached as Exhibit 15 to this Declaration is a true and correct copy of excerpts from Yodlee, Inc's web site entitled Contact Us.

17.    Attached as Exhibit 16 to this Declaration is a true and correct copy of excerpts from Yodlee, Inc's web site entitled Solutions Overview.

18.    Attached as Exhibit 17 to this Declaration is a true and correct copy of a Press Release posted on Yodlee's web site dated April 10, 2006.

19.    Attached as Exhibit 18 to this Declaration is a true and correct copy of U.S. Patent No. 6,633,910.

20.    Attached as Exhibit 19 to this Declaration is a true and correct copy of U.S. Patent No. 6,510,451.

21.    Attached as Exhibit 20 to this Declaration is a true and correct copy of U.S. Patent No. 6,802,042.

22.    Attached as Exhibit 21 to this Declaration is a true and correct copy of U.S. Patent No. 6,412,073.

23.    Attached as Exhibit 22 to this Declaration is a true and correct copy of U.S. Patent No. 6,594,766.

24.    Attached as Exhibit 23 to this Declaration is a true and correct copy of U.S. Patent No. 6,405,245.

25.    Attached as Exhibit 24 to this Declaration is a true and correct copy of U.S. Patent No. 6,567,850.

26.    Attached as Exhibit 25 to this Declaration is a true and correct copy of U.S. Patent No. 6,199,077.

27.    Attached as Exhibit 26 to this Declaration is a true and correct copy of U.S. Patent No. 6,317,783.

I declare under the penalty of perjury that the foregoing is true and correct.


Executed on May 24, 2006, in Wilmington, Delaware.


Arthur G. Connolly, III

4

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 24, 2006, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF which will send notification of such filing

to the following counsel of record:

William J. Marsden, Jr., Esq.
Kyle Wagner Compton, Esq.
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
Wilmington, DE 19899


I FURTHER CERTIFY that on May 24, 2006 a copy of the foregoing document was

served upon the following counsel in the manner indicated:

By Federal Express:
David M. Barkan, Esq.
Craig R. Compton, Esq.
Fish & Richardson, P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063


　　　　　　　　　　　　 /s/Arthur G. Connolly, III
　　　　　　　　　　　　Arthur G. Connolly, III (#2667)

#460674_1

# EXHIBIT 1

David M. Barkan (State Bar No. 160825/barkan@fr.com)
Craig R. Compton (State Bar No. 215491/compton@fr.com)
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, California 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Attorneys for Plaintiff
YODLEE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| YODLEE, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| CASHEDGE INC. | **JURY TRIAL DEMANDED** |
| Defendants. | |

For its Complaint against Defendant CashEdge Inc. ("CashEdge"), Plaintiff Yodlee, Inc. ("Yodlee") alleges as follows:

## THE PARTIES

1. Yodlee is a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 3600 Bridge Parkway, Suite 200, Redwood City, California 94065-1170.

2. Upon information and belief, CashEdge Inc. is a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 104 Fifth Avenue, New York, NY 10011 and another office at 692 Tasman Drive, Milpitas, CA 95035.

1

COMPLAINT FOR PATENT INFRINGEMENT

<div align="center">

**JURISDICTION AND VENUE**

</div>

3.  This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.  This Court has jurisdiction over the causes of action stated herein pursuant to 35 U.S.C. § 101 et seq. and 28 U.S.C. §§ 1331 and 1338(a).

4.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b).

<div align="center">

**THE PATENTS**

</div>

5.  Yodlee is the owner of all right, title, and interest in and to United States Patent No. 6,567,850 (the "'850 patent"), entitled "System and Method for Determining Revenue From an Intermediary Derived From Servicing Data Requests," which was duly and legally issued by the United States Patent and Trademark Office on May 20, 2003.  A copy of the '850 patent is attached hereto as Exhibit A.

6.  Yodlee is the owner of all right, title, and interest in and to United States Patent No. 6,317,783 (the "'783 patent"), entitled "Apparatus and Methods for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data," which was duly and legally issued by the United States Patent and Trademark Office on November 13, 2001.  A copy of the '783 patent is attached hereto as Exhibit B.

7.  Yodlee is the owner of all right, title, and interest in and to United States Patent No. ,199,077 (the "'077 patent"), entitled "Server-Side Web Summary Generation and Presentation," which was duly and legally issued by the United States Patent and Trademark Office on March 6, 2001.  A copy of the '077 patent is attached hereto as Exhibit C.

8.  Yodlee is the owner of all right, title, and interest in and to United States Patent No. 6,633,910 (the "'910 patent"), entitled "Method and Apparatus for Enabling Real Time Monitoring and Notification of Data Updates for Web-Based Data Synchronization Services," which was duly and legally issued by the United States Patent and Trademark Office on October 14, 2003.  A copy of the '910 patent is attached hereto as Exhibit D.

9.  Yodlee is the owner of all right, title, and interest in and to United States Patent No. 6,510,451 (the "'451 patent"), entitled "System for Completing a Multi-Component Task Initiated by a Client Involving Web Sites Without Requiring Interaction from the Client," which

<div align="center">

2

</div>

<div align="right">

COMPLAINT FOR PATENT INFRINGEMENT

</div>

1   was duly and legally issued by the United States Patent and Trademark Office on January 21, 2003.

2   A copy of the '451 patent is attached hereto as Exhibit E.

3        10.  Yodlee is the owner of all right, title, and interest in and to United States Patent

4   No. 6,802,042 (the "'042 patent"), entitled "Method and Apparatus for Providing Calculated and

5   Solution-Oriented Personalized Summary Reports to a User Through a Single User-Interface

6   System for Completing a Multi-Component Task Initiated by a Client Involving Web Sites Without

7   Requiring Interaction from the Client," which was duly and legally issued by the United States

8   Patent and Trademark Office on October 5, 2004.  A copy of the '042 patent is attached hereto as

9   Exhibit F.

10                **COUNT ONE:  INFRINGEMENT OF THE '850 PATENT**

11       11.  Yodlee incorporates by reference and realleges paragraphs 1 through 10 above as if

12   fully set forth herein.

13       12.  CashEdge has infringed and continues to infringe one or more claims of the '850

14   patent by making, using, offering for sale, and selling in the United States data aggregation products

15   and services, as well as applications and solutions that utilize data aggregation techniques, that

16   embody the claimed inventions of the '850 patent, including but not limited to CashEdge's

17   Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

18   corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

19       13.  CashEdge has induced and continues to induce others to infringe, and/or has

20   committed and continue to commit acts of contributory infringement of one or more claims of the

21   '850 patent.

22       14.  On information and belief, CashEdge has had and continues to have knowledge of

23   the '850 patent.

24       15.  On information and belief, CashEdge's acts of infringement as set forth in the

25   previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

26       16.  As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

27   an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

28   infringing activities are enjoined by this Court.

<div align="center">3</div>

17.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the inventions by CashEdge.

18.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its agents, servants, employees, attorneys, representatives, and all others acting on its behalf from infringing the '850 patent, Yodlee will be greatly and irreparably harmed.

### COUNT TWO:  INFRINGEMENT OF THE '783 PATENT

19.    Yodlee incorporates by reference and realleges paragraphs 1 through 10 above as if fully set forth herein.

20.    CashEdge has infringed and continues to infringe one or more claims of the '783 patent by making, using, offering for sale, and selling in the United States data aggregation products and services, as well as applications and solutions that utilize data aggregation techniques, that embody the claimed inventions of the '783 patent, including but not limited to CashEdge's Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

21.    CashEdge has induced and continues to induce others to infringe, and/or has committed and continue to commit acts of contributory infringement of one or more claims of the '783 patent.

22.    On information and belief, CashEdge has had and continues to have knowledge of the '783 patent.

23.    Upon information and belief, CashEdge's acts of infringement as set forth in the previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

24.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's infringing activities are enjoined by this Court.

25.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the inventions by CashEdge.

4

COMPLAINT FOR PATENT INFRINGEMENT

26.     Unless preliminary and permanent injunctions are issued enjoining CashEdge, its agents, servants, employees, attorneys, representatives, and all others acting on its behalf from infringing the '783 patent, Yodlee will be greatly and irreparably harmed.

### COUNT THREE:  INFRINGEMENT OF THE '077 PATENT

27.     Yodlee incorporates by reference and realleges paragraphs 1 through 10 above as if fully set forth herein.

28.     CashEdge has infringed and continues to infringe one or more claims of the '077 patent by making, using, offering for sale, and selling in the United States data aggregation products and services, as well as applications and solutions that utilize data aggregation techniques, that embody the claimed inventions of the '077 patent, including but not limited to CashEdge's Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

29.     CashEdge has induced and continues to induce others to infringe, and/or has committed and continue to commit acts of contributory infringement of one or more claims of the '077 patent.

30.     On information and belief, CashEdge has had and continues to have knowledge of the '077 patent.

31.     On information and belief, CashEdge's acts of infringement as set forth in the previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

32.     As a result of CashEdge's infringement, Yodlee has suffered monetary damages in an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's infringing activities are enjoined by this Court.

33.     Yodlee is entitled to damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the inventions by CashEdge.

34.     Unless preliminary and permanent injunctions are issued enjoining CashEdge, its agents, servants, employees, attorneys, representatives, and all others acting on its behalf from infringing the '077 patent, Yodlee will be greatly and irreparably harmed.

5

1    <u>**COUNT FOUR: INFRINGEMENT OF THE '910 PATENT**</u>

2    35.    Yodlee incorporates by reference and realleges paragraphs 1 through 10 above as if

3    fully set forth herein.

4    36.    CashEdge has infringed and continues to infringe one or more claims of the '910

5    patent by making, using, offering for sale, and selling in the United States data aggregation products

6    and services, as well as applications and solutions that utilize data aggregation techniques, that

7    embody the claimed inventions of the '910 patent, including but not limited to CashEdge's

8    Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

9    corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

10    37.    CashEdge has induced and continues to induce others to infringe, and/or has

11    committed and continue to commit acts of contributory infringement of one or more claims of the

12    '910 patent.

13    38.    On information and belief, CashEdge has had and continues to have knowledge of

14    the '910 patent.

15    39.    Upon information and belief, CashEdge's acts of infringement as set forth in the

16    previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

17    40.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

18    an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

19    infringing activities are enjoined by this Court.

20    41.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

21    event less than a reasonable royalty for the use made of the inventions by CashEdge.

22    42.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

23    agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

24    infringing the '910 patent, Yodlee will be greatly and irreparably harmed.

25    <u>**COUNT FIVE: INFRINGEMENT OF THE '451 PATENT**</u>

26    43.    Yodlee incorporates by reference and realleges paragraphs 1 through 10 above as if

27    fully set forth herein.

28

COMPLAINT FOR PATENT INFRINGEMENT

44.   CashEdge has infringed and continues to infringe one or more claims of the '451 patent by making, using, offering for sale, and selling in the United States data aggregation products and services, as well as applications and solutions that utilize data aggregation techniques, that embody the claimed inventions of the '451 patent, including but not limited to CashEdge's Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites

45.   CashEdge has induced and continues to induce others to infringe, and/or has committed and continue to commit acts of contributory infringement of one or more claims of the '451 patent.

46.   On information and belief, CashEdge has had and continues to have knowledge of the '451 patent.

47.   Upon information and belief, CashEdge's acts of infringement as set forth in the previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

48.   As a result of CashEdge's infringement, Yodlee has suffered monetary damages in an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's infringing activities are enjoined by this Court.

49.   Yodlee is entitled to damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the inventions by CashEdge.

50.   Unless preliminary and permanent injunctions are issued enjoining CashEdge, its agents, servants, employees, attorneys, representatives, and all others acting on its behalf from infringing the '451 patent, Yodlee will be greatly and irreparably harmed.

## COUNT SIX: INFRINGEMENT OF THE '042 PATENT

51.   Yodlee incorporates by reference and realleges paragraphs 1 through 10 above as if fully set forth herein.

52.   CashEdge has infringed and continues to infringe one or more claims of the '042 patent by making, using, offering for sale, and selling in the United States data aggregation products and services, as well as applications and solutions that utilize data aggregation techniques, that embody the claimed inventions of the '042 patent, including but not limited to CashEdge's

7

1    Advanced Account Aggregation, Online Money Movement, Advisor Suite solutions and

2    corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites.

3          53.    CashEdge has induced and continues to induce others to infringe, and/or has

4    committed and continue to commit acts of contributory infringement of one or more claims of the

5    '451 patent.

6          54.    On information and belief, CashEdge has had and continues to have knowledge of

7    the '451 patent.

8          55.    Upon information and belief, CashEdge's acts of infringement as set forth in the

9    previous paragraphs have been willful and in reckless disregard of Yodlee's patent rights.

10         56.    As a result of CashEdge's infringement, Yodlee has suffered monetary damages in

11   an amount not yet determined, and will continue to suffer damages in the future unless CashEdge's

12   infringing activities are enjoined by this Court.

13         57.    Yodlee is entitled to damages adequate to compensate for the infringement, but in no

14   event less than a reasonable royalty for the use made of the inventions by CashEdge.

15         58.    Unless preliminary and permanent injunctions are issued enjoining CashEdge, its

16   agents, servants, employees, attorneys, representatives, and all others acting on its behalf from

17   infringing the '042 patent, Yodlee will be greatly and irreparably harmed.

18                            **PRAYER FOR RELIEF**

19         WHEREFORE, Yodlee prays for judgment against CashEdge as follows:

20         (a)    That CashEdge has infringed the '850 patent, the '783 patent, the '077 patent, the

21   '910 patent, the '451 patent and the '042 patent;

22         (b)    That CashEdge's infringement has been willful;

23         (c)    Awarding Yodlee damages for CashEdge's infringement;

24         d)     Trebling the damages award for infringement because of the willful nature of the

25   infringement in accordance with 35 U.S.C. § 284;

26         (e)    Preliminarily and permanently enjoining CashEdge, its officers, agents, servants,

27   employees, and attorneys, and all those persons in active concert or participation with it from

28

                                    8

                              COMPLAINT FOR PATENT INFRINGEMENT

1  infringing the '850 patent, the '783 patent, the '077 patent, the '910 patent, the '451 patent, and the

2  '042 patent;

3      (f)    Declaring this an exceptional case under 35 U.S.C. § 285 and awarding Yodlee its

4  costs, expenses and attorneys fees in this action; and

5      (g)    Awarding Yodlee such further relief as this Court may deem proper.

6                          **JURY DEMAND**

7      Yodlee hereby demands a trial by jury of all issues in this action.

8  Dated:  April 14, 2005                FISH & RICHARDSON P.C.

9

10                                  By: /s/
11                                      David M. Barkan

12                                  Attorneys for Plaintiff
                                    YODLEE, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PATENT INFRINGEMENT

1

## CERTIFICATION PURSUANT TO CIVIL L.R. 3-16

2        Pursuant to Civil L.R. 3-16, the undersigned certifies that the following listed persons,

3  associations of persons, firms, partnerships, corporations (including parent corporations) or other

4  entities (i) have a financial interest in the subject matter in controversy or in a party to the

5  proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could be

6  substantially affected by the outcome of this proceeding:

7        Yodlee, Inc. has no parent corporations and the only other entity that has any interest in this

8  matter is S1 Corporation, which owns a percentage of Yodlee, Inc.

9  Dated: April 14, 2005                    FISH & RICHARDSON P.C.

10

11                                  By:    /s/
                                         _____
12                                        David M. Barkan

13                                  Attorneys for Plaintiff
                                    YODLEE, INC.
14

15  50230030.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">10</div>

# EXHIBIT 2



JUN. 77. 2009 11:41AM    CLIFFORD_CHANCE                                      NO. 3027   P. 0

FILED
05 JUN 22 PM 1:07
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  DANIEL R. HARRIS (State Bar No. 188417)
   NANCY K. RABER (State Bar No. 192744)
2  **CLIFFORD CHANCE US LLP**
   990 MARSH ROAD
3  MENLO PARK, 94025-1949
   Telephone: (650) 566-4300
4  Facsimile: (650) 566-4399
   E-Mail: Daniel.Harris@CliffordChance.com
5
                                                    **E-Filing**
6  Attorneys for Plaintiff CashEdge, Inc.

7

8                      UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11                      C 05 2554

12  CASHEDGE INC.                    Case No. ___            RS

13            Plaintiff,             **COMPLAINT FOR DECLARATORY
                                     JUDGEMENT OF NON-INFRINGEMENT,**
14     vs.                           **INVALIDITY, AND
                                     UNENFORCEABILITY OF U.S. PATENT**
15  YODLEE, INC.                     **NOS. 6,567,850; 6,317,783; 6,199,077;
                                     6,633,910; 6,510,451; 6,802,042; 6,412,073;**
16            Defendant.             **6,594,766; and 6,405,245.**

17                                   **DEMAND FOR JURY TRIAL**

18                                   **BY FAX**

19                        I.    **COMPLAINT**

20        1.     Plaintiff, CashEdge Inc. ("CashEdge"), by its undersigned attorneys, as and for its

21  Complaint against defendant Yodlee, Inc. ("Yodlee"), alleges as follows:

22        2.     This is an action by CashEdge against Yodlee that United States Letters Patents

23  Nos. 6,567,850; 6,317,783; 6,199,077; 6,633,910; 6,510,451; 6,802,042; 6,412,073; 6,594,766; and

24  6,405,245 (collectively, the "Yodlee Patents") are not infringed by any of CashEdge's products and

25  services including, but not limited to CashEdge's Advanced Account Aggregation, Online Money

26  Movement / Transfer Now, Accounting Opening / Open Now, Advisor Suite solutions and

27  corresponding products in CashEdge's Bank, Credit Union and Wealth Management Suites

28
                                          1
                                    COMPLAINT

10317038.tif - 6/22/2005 11:43:50 AM                                      NYB 1504156.1

JUN. 22. 2009 11:41AM   CLIFFORD_CHANCE                                    NO. 3027   P. 7

1  ("CashEdge's Products and Services") or are otherwise invalid or unenforceable. Copies of the first

2  page of each of the Yodlee Patents are annexed hereto as Exhibit A.

## II.   THE PARTIES

3      3.    Upon information and belief, Yodlee is a corporation organized and existing under

5  the laws of the State of Delaware having its principal place of business at 3600 Bridge Parkway,

6  Suite 200, Redwood City, California 94065-1170.

7      4.    CashEdge is a corporation organized and existing under the laws of the State of

8  Delaware and having its principal place of business at 104 Fifth Avenue, New York, NY 10011.

## III.   JURISDICTION AND VENUE

10     5.    This action arises under the Patent Laws of the United States, Title 35, United States

11  Code § 101, et seq., and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12     6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and

13  2201(a).

14     7.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400.

## IV.   COUNT I

### (Invalidity and Non-Infringement of the Yodlee Patents)

17     8.    CashEdge repeats and re-alleges paragraphs 1 - 7 hereof as if fully set forth herein.

18     9.    Upon information and belief, United States Patent No. 6,567,850 (the "'850 patent"),

19  entitled "System and Method for Determining Revenue From an Intermediary Derived From

20  Servicing Data Requests," issued on May 20, 2003 and is currently assigned to Yodlee.

21     10.   Upon information and belief, United States Patent No. 6,317,783 (the "'783 patent"),

22  entitled "Apparatus and Methods for Automated Aggregation and Delivery of and Transactions

23  Involving Electronic Personal Information or Data," issued on November 13, 2001 and is currently

24  assigned to Yodlee.

25     11.   Upon information and belief, United States Patent No. 6,199,077 (the "'077 patent"),

26  entitled "Server-Side Web Summary Generation and Presentation," issued on March 6, 2001 and is

27  currently assigned to Yodlee.

28

<div align="center">2

COMPLAINT</div>

JUN. 22. 2009 11:41AM     CLIFFORD_CHANCE                           NO. 3027    P. 8

1       12.     Upon information and belief, United States Patent No. 6,633,910 (the "'910 patent"),

2   entitled "Method and Apparatus for Enabling Real Time Monitoring and Notification of Data

3   Updates for Web-Based Data Synchronization Services," issued on October 14, 2003 and is

4   currently assigned to Yodlee.

5       13.     Upon information and belief, United States Patent No. 6,510,451 (the "'451 patent"),

6   entitled "System for Completing a Multi-Component Task Initiated by a Client Involving Web Sites

7   Without Requiring Interaction from the Client," issued on January 21, 2003 and is currently assigned

8   to Yodlee.

9       14.     Upon information and belief, United States Patent No. 6,802,042 (the "'042 patent"),

10  entitled "Method and Apparatus for Providing Calculated and Solution-Oriented Personalized

11  Summary Reports to a User Through a Single User-Interface System for Completing a Multi-

12  Component Task Initiated by a Client Involving Web Sites Without Requiring Interaction from the

13  Client," issued on October 5, 2004 and is currently assigned to Yodlee.

14      15.     Upon information and belief, United States Patent No. 6,412,073 (the "'073 patent"),

15  entitled "Method and Apparatus for Providing and Maintaining A User-Interactive Portal System

16  Accessible Via Internet or Other Switched-Packet Network," issued on June 25, 2002 and is

17  currently assigned to Yodlee.

18      16.     Upon information and belief, United States Patent No. 6,594,766 (the "'766 patent"),

19  entitled "Method and Apparatus for Providing and Maintaining A User-Interactive Portal System

20  Accessible Via Internet and Other Switched-Packet Network," issued on July 15, 2003 and is

21  currently assigned to Yodlee.

22      17.     Upon information and belief, United States Patent No. 6,405,245 (the "'245 patent"),

23  entitled "System and Method for Automated Access to Personal Information," issued on June 11,

24  2002 and is currently assigned to Yodlee.

25      18.     Yodlee and its affiliates have, inter alia, filed suit and have threatened suit, orally and

26  in writing, against CashEdge with respect to one or more of the Yodlee Patents. Furthermore, Yodlee

27  has asserted its entire portfolio as something it would enforce against CashEdge and is seeking to

28  substantially restrict or close down CashEdge's business activities alleging it would assert of its

<center>3</center>
<center>COMPLAINT</center>

1  patent portfolio against CashEdge's Products and Services. CashEdge is in reasonable apprehension

2  that Yodlee will commence suit against CashEdge for alleged infringement of one or more of the

3  Yodlee Patents. Thus, as to each of the Yodlee Patents, an actual and justiciable controversy exists

4  between CashEdge and Yodlee with respect to the validity and infringement of the patent.

5        19.    As to each of the Yodlee Patents, the patent is not infringed by any of CashEdge's

6  Products and Services, and said patents are otherwise invalid or unenforceable for failure to comply,

7  inter alia, with the requirements of 35 U.S.C. § 102, 103 and/or 112.

8            **V.    PRAYER FOR RELIEF**

9      WHEREFORE, CashEdge prays for judgment and relief against Yodlee as follows:

10      A.    Declaring that each of the Yodlee Patents is invalid and unenforceable;

11      B.    Declaring that none of CashEdge's Products and Services infringe any valid claim of

12  any of the Yodlee Patents;

13      C.    Directing Yodlee to pay CashEdge's costs, expenses and reasonable attorneys' fees

14  pursuant to 35 U.S.C. §§ 284 and 285;

15      D.    Granting CashEdge such other and further relief as the Court may deem just and

16  proper.

17  Dated: June 22, 2005                   Respectfully submitted,

18                           Daniel R. Harris (State Bar No. 188417)

                            Nancy K. Raber (State Bar No. 192744)

19                           **CLIFFORD CHANCE US LLP**

                            990 Marsh Road

20                           Menlo Park, CA 94025-1949

                            Tel: (650) 566-4300

21                           Fax: (650) 566-4399

22

23                           By: _Nancy K Raber_

                            Nancy K. Raber

24                           Attorney for Plaintiff,

                            CashEdge Inc.

25  ///

26  ///

27  ///

28  ///

JUN. 22. 2005 11:42AM    CLIFFORD_CHANCE                                    NO. 3027    P. 10

1

2                                    VI.    NOTICE

3          Pursuant to Civil L.R. 3-16, the undersigned, counsel of record for plaintiff CashEdge Inc.,

4    certifies that as of this date, other than the named parties, there is no such interest to report.

     Dated: June 22, 2005                          Respectfully submitted,

5
                                                   Daniel R. Harris (State Bar No. 188417)
6                                                  Nancy K. Raber (State Bar No. 192744)
                                                   CLIFFORD CHANCE US LLP
7                                                  990 Marsh Road
                                                   Menlo Park, CA 94025-1949
8                                                  Tel: (650) 566-4300
                                                   Fax: (650) 566-4399
9
                                                   By: *Nancy K. Raber*
10                                                 Nancy K. Raber
                                                   Attorney for Plaintiff,
11                                                 CashEdge Inc.

12                                   VII.    JURY DEMAND

13         CashEdge hereby demands trial by jury on all issues in this Action.

14   Dated: June 22, 2005                          Respectfully submitted,

15
                                                   Daniel R. Harris (State Bar No. 188417)
16                                                 Nancy K. Raber (State Bar No. 192744)
                                                   CLIFFORD CHANCE US LLP
17                                                 990 Marsh Road
                                                   Menlo Park, CA 94025-1949
18                                                 Tel: (650) 566-4300
                                                   Fax: (650) 566-4399
19
                                                   By: *Nancy K. Raber*
20                                                 Nancy K. Raber
                                                   Attorney for Plaintiff,
21                                                 CashEdge Inc.

22   Of counsel:

23   Drew M. Wintringham, III
     CLIFFORD CHANCE US LLP
24   31 West 52nd Street
     New York, NY 10019-6131
25   Tel: (212) 878-8000
     Fax: (212) 878-8375
26

27

28
                                            5
                                        COMPLAINT

10317038.tif - 6/22/2005 11:43:50 AM                                        NYB 1504156.1

JUN. 22. 2005 11:43AM     CLIFFORD_CHANCE                    NO. 5027    P. 11

**EXHIBIT A**

JUN. 22. 2005 11:43AM    CLIFFORD_CHANCE                                    NO. 3027   P. 12

US00619907B1

(12) **United States Patent**                    (10) Patent No.:        **US 6,199,077 B1**
Inala et al.                                      (45) Date of Patent:             **Mar. 6, 2001**

(54) SERVER-SIDE WEB SUMMARY
     GENERATION AND PRESENTATION

(75) Inventors: **Suman Kumar Inala**, Santa Clara; P
     **Venkat Rangan**, San Diego;
     **Ramakrishna Satyavolu**, Santa Clara,
     all of CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Sunnyvale, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this
                patent is extended or adjusted under 35
                U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/323,598**

(22) Filed:     **Jun. 1, 1999**

          **Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/208,740, filed on
     Dec. 8, 1998.

(51) Int. Cl.⁷ ............................................... G06F 17/21
(52) U.S. Cl. ................... 707/501; 709/202; 709/218;
                                       713/202; 704/1
(58) Field of Search ............................. 707/501, 513,
     707/1, 3, 4, 5, 9–10; 713/201–202; 705/26–27;
                                       709/202, 218; 704/1

(56)                **References Cited**

            **U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 5,649,186 | * | 7/1997 | Ferguson ......................... 707/10 |
| 5,708,825 | * | 1/1998 | Sotomayor ....................... 707/501 |
| 5,794,233 | * | 8/1998 | Rubinstein ....................... 707/4 |
| 5,855,015 | * | 12/1998 | Shoham ......................... 707/5 |
| 5,931,907 | * | 8/1999 | Davies et al. .................... 709/218 |
| 5,983,227 | * | 11/1999 | Nazem et al. .................... 707/10 |
| 5,987,466 | * | 11/1999 | Greer et al. ...................... 707/10 |
| 6,029,180 | * | 2/2000 | Murata et al. ................... 707/501 |
| 6,029,182 | * | 2/2000 | Nehab et al. .................... 707/523 |
| 6,032,162 | * | 2/2000 | Burke ............................. 707/501 |
| 6,038,668 | * | 8/2000 | Chipman et al. ................. 713/201 |

| | | | |
|---|---|---|---|
| 6,041,326 | * | 3/2000 | Amro et al. ..................... 707/10 |
| 6,108,686 | * | 8/2000 | Williams, Jr. ................... 709/202 |
| 6,119,101 | * | 9/2000 | Peckover ....................... 705/10 X |

                **OTHER PUBLICATIONS**

Stanley, Tracey, "Intelligent Searching Agents on the Web",
4 pages, <http://www.ariadne.ac.uk/issue7/search-engines/>
Jan. 1997.*
Jansen, James, "Using an Intelligent Agent to Enhance
Search Engine Performance", 16 pages,Dec. 1998.*
Lesser, Victor et al, "BIG: A Resource Bounded Informa-
tion Gathering Agent", 18 pages, <http://dis.cs.umass.edu/
research/big/> Jan. 1998.*

* cited by examiner

*Primary Examiner*—Joseph H. Feild
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central
Coast Patent Agency

(57)                    **ABSTRACT**

A portal server includes a software agent configured to do
summary searches for subscribers based on Internet desti-
nations provided by the subscribers, to retrieve information
from such destinations based on pre-programmed site
information, and to download the summary information to
the subscriber. The destinations and the nature of the infor-
mation to be retrieved is pre-programmed. There is further
a configuration and initiation interface for a subscriber to
set up and start a summary search. In some cases the
summary searches are configured for individual clients as
templates stored and retrieved at the Internet-connected
server. Also in some cases retrieved information is imme-
diately sent to the subscriber, and in other situations such
information is saved at the portal to be retrieved by a
subscriber at a later time. In preferred embodiments of the
invention autologins are accomplished for a subscriber at
Internet destinations by use of pre-stored configuration
information.

            **12 Claims, 6 Drawing Sheets**



JUN. 22. 2009 11:44AM    CLIFFORD_CHANCE    NO. 3027    P. 13

US006317783B1

(12) **United States Patent**
Freishtat et al.

(10) Patent No.: **US 6,317,783 B1**
(45) Date of Patent: **Nov. 13, 2001**

(54) **APPARATUS AND METHODS FOR AUTOMATED AGGREGATION AND DELIVERY OF AND TRANSACTIONS INVOLVING ELECTRONIC PERSONAL INFORMATION OR DATA**

(75) Inventors: **Gregg Freishtat; Palaniswamy Rajan**, both of Atlanta, GA (US)

(73) Assignee: **Verticalone Corporation**, Atlanta, GA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/428,511**

(22) Filed: **Oct. 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.[7] ............................................. G06F 13/00
(52) U.S. Cl. .............................................. 709/218; 707/10
(58) Field of Search ........................... 707/10; 709/217, 709/218

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,347,632 | 9/1994 | Filepp et al. | 709/202 |
| 5,537,314 | 7/1996 | Kanter | 705/14 |

(List continued on next page.)

OTHER PUBLICATIONS

"Strategic Directions in Database Systems—Breaking Out of the Box," Avi Silberschatz, and Stan Zdonik et al., ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 1 pp. 129–131, Mar. (1996).

"Managing Security and Privacy of information," Sushil Jajodia, ACM Computing Surveys, vol. 28 Issue 4es, Dec. (1996).

"Today's Style Sheet Standards: The Great Vision Blinded," Philip M. Marden, Jr. and Ethan V. Munson, IEEE Computer, pp. 123–125.

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999, Redondo, CA, pp. 15–22.

"A Softbot-based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul., 1994, pp. 72–76.

*Primary Examiner*—Kenneth R. Coulter
(74) *Attorney, Agent, or Firm*—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

A system for delivering personal information according to the present invention includes a user store including end user data, a provider store including information provider data, a personal information store including personal information and a processor that communicates with these data stores. The processor selects an end user for personal information aggregation. The processor connects with one or more information providers. The processor then proceeds to retrieve personal information for the selected end user from the connected information providers. This retrieval is based on end user data associated with the selected end user and provider data associated with the connected information providers. The retrieved personal information is stored in the personal information store.

**36 Claims, 11 Drawing Sheets**



JUN. 22. 2005  11:44AM    CLIFFORD_CHANCE                                NO. 5021   P. 19

US006405245B1

**(12) United States Patent**
Burson et al.

(10) Patent No.: **US 6,405,245 B1**
(45) Date of Patent: ***Jun. 11, 2002**

(54) **SYSTEM AND METHOD FOR AUTOMATED ACCESS TO PERSONAL INFORMATION**

(75) Inventors: **Robert Burson; Dima Ulberg; Gregg Freishtat**, all of Atlanta, GA (US)

(73) Assignee: **Verticalone Corporation**, Atlanta, GA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/427,602**

(22) Filed: **Oct. 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.⁷ .................................................. G06F 13/00
(52) U.S. Cl. ................... 709/217; 707/10; 345/705
(58) Field of Search ............................ 707/10; 709/230; 709/217; 345/705

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 5,347,632 A | 9/1994 | Filepp et al. | 709/202 |
| 5,537,314 A | 7/1996 | Kanter | 705/14 |
| 5,655,089 A | 8/1997 | Bucci | 705/40 |
| 5,696,965 A | * 12/1997 | Dedrick | 707/10 |
| 5,699,528 A | 12/1997 | Hogan | 705/40 |
| 5,710,887 A | 1/1998 | Chelliah et al. | 705/26 |
| 5,712,979 A | 1/1998 | Graber et al. | 709/224 |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| EP | 0786728 A1 | 7/1997 |
| EP | 0848338 A | 6/1998 |

| | | |
|---|---|---|
| WO | WO 98/28698 | 7/1998 |

**OTHER PUBLICATIONS**

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999, Redondo, CA, pp. 15–22.

"A Softbot-based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul. 1994, pp. 72–76.

"Strategic Directions in Database Systems—Breaking Out of the Box," Avi Silberschatz and Stan Zdonik et al., ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 1 pp. 129–131, Mar. (1996).

"Managing Security and Privacy of Information," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 4ca, Dec. (1996).

"Today's Style Sheet Standards: The Great Vision Blinded," Philip M. Marden, Jr. and Ethan V. Munson, IEEE Computer, pp. 123–125, Nov (1999).

Primary Examiner—Kenneth R. Coulter
(74) Attorney, Agent, or Firm—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

This invention is a system and method for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider. A representation of the personal information and a link corresponding to the personal information are presented to the end use via a client computer. Upon activation of the link, the client computer is automatically driven to the personal information provider presenting to the user via the client computer a page on the personal information provider.

**9 Claims, 11 Drawing Sheets**



US006412073B1

(12) **United States Patent**
Rangan

(10) Patent No.: **US 6,412,073 B1**
(45) Date of Patent: *Jun. 25, 2002

(54) **METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK**

(75) Inventor: P. Venkat Rangan, San Diego, CA (US)

(73) Assignee: Yodlee.com, Inc, Redwood Shores, CA (US)

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/208,740

(22) Filed: Dec. 8, 1998

(51) Int. Cl.$^7$ .................... G06F 12/14; G06F 17/60; H04L 9/00

(52) U.S. Cl. .............. 713/202; 713/201; 713/162; 705/14; 705/76

(58) Field of Search ........................ 713/162, 202, 713/201; 705/76, 14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,918,019 A | * | 6/1999 | Valencia | 395/200.57 |
| 6,000,033 A | * | 12/1999 | Kelley et al. | 713/201 |
| 6,014,502 A | * | 1/2000 | Moraes | 395/200 |
| 6,023,684 A | * | 2/2000 | Pearson | 705/26 |
| 6,085,229 A | * | 7/2000 | Newman et al. | 709/203 |
| 6,148,402 A | * | 11/2000 | Campbell | 713/200 |
| 6,182,229 B1 | * | 1/2001 | Nielsen | 713/202 |
| 6,192,407 B1 | * | 2/2001 | Smith et al. | 709/229 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. | 707/501 |
| 6,065,120 A1 | * | 5/2001 | Laursen et al. | 713/201 |
| 6,233,608 B1 | * | 5/2001 | Laursen et al. | 709/217 |
| 6,330,592 B1 | * | 12/2001 | Makuch et al. | 709/217 |
| 2001/0000537 A1 | * | 4/2001 | Inala et al. | 707/500 |
| 2001/0020242 A1 | * | 9/2001 | Gupta et al. | 707/501.1 |

OTHER PUBLICATIONS

Fryer et al (Eds.), Microsoft Computer Dictionary, 1997, 3rd Edition, pp. 238–240, 487.*

* cited by examiner

Primary Examiner—Norman M. Wright
(74) Attorney, Agent, or Firm—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet Portal is enabled by software executing on an Internet-connected server. The Portal, in response to a log-on by a user, presents a secure and personalized page for and to the user, the personalized page having listed plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by the subscriber, such as by a point-and-click technique, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. In an enhanced embodiment a search function is provided wherein a user may configure searches in any or all of the listed destinations on a personalized page. Provision is provided for log-on by limited appliances, such as by a Smartcard or embedded password, and in some embodiments functionality is provided in a browser plug-in wherein a user may navigate to a site, and, in response to a request for log-in data, the subscriber may use a hot key or pointer input, which will cause the browser to access and provide the needed data from the Password-All source.

**39 Claims, 3 Drawing Sheets**



JUN. 22. 2005 11:43AM    CLIFFORD_CHANCE                      NO. 3027    P. 16

US006510451B2

### (12) United States Patent
Wu et al.

(10) Patent No.: **US 6,510,451 B2**
(45) Date of Patent: **Jan. 21, 2003**

(54) **SYSTEM FOR COMPLETING A MULTI-COMPONENT TASK INITIATED BY A CLIENT INVOLVING WEB SITES WITHOUT REQUIRING INTERACTION FROM THE CLIENT**

(75) Inventors: Jonathan Wu, Mountain View, CA (US); Suman Kumar Inala, Santa Clara, CA (US); Ramakrishna Satyavolu, Santa Clara, CA (US); P Venkat Rangan, San Diego, CA (US); Sreeranga P. Rajan, Santa Clara, CA (US); Neil Daswani, Edison, NJ (US); Anand Rangarajan, Sunnyvale, CA (US); Christoph Kern, Santa Clara, CA (US); Srihari Kumar, Santa Clara, CA (US)

(73) Assignee: Yodlee.com, Inc., Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/419,708

(22) Filed: Oct. 14, 1999

(65) **Prior Publication Data**
US 2002/0035592 A1 Mar. 21, 2002

(51) Int. Cl.⁷ ............................ G06F 15/16
(52) U.S. Cl. ...................... 709/203; 209/219
(58) Field of Search ...................... 709/201, 203, 709/205, 216, 219; 705/5, 26; 701/201

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,619,648 A | 4/1997 | Canale et al. | |
| 5,887,620 A | * 4/1999 | Walkes et al. | ............ 705/5 |
| 5,926,798 A | * 7/1999 | Carter | ............ 705/26 |
| 5,948,040 A | * 9/1999 | DeLorme et al. | ............ 701/201 |
| 6,134,534 A | * 10/2000 | Walkes et al. | ............ 705/26 |

* cited by examiner

*Primary Examiner*—Le Hien Luu
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet portal system for accomplishing a multi-component task involving interaction with one or more Internet Web sites includes an Internet-connected server having access to client-related data, an Internet-capable client station usable by a client, and software executing on the server for managing individual component tasks in execution of the multi-component task. The software, in response to initiation of a multi-component task specified by the client, defines the component tasks, identifies Internet Web sources for completion of the tasks, manages interaction with the identified Web sites gathering results of the interactions, integrates the gathered results, and communicates final results to the client at the client station. Tasks may be such as trip planning and may include payment for services rendered at Web sites, such as airline reservation, car rentals and the like. A similar system is provided for broadcasting messages to multiple Internet destinations, and further for gathering answers to such messages and communicating the answers to the client.

14 Claims, 5 Drawing Sheets



10317038.tif - 6/22/2005 11:43:50 AM

JUN. 22. 2005 11:46AM    CLIFFORD_CHANCE                    NO. 3027    P. 17

US006567850B1

## (12) United States Patent
Freishtat et al.

(10) Patent No.: **US 6,567,850 B1**
(45) Date of Patent: **May 20, 2003**

(54) **SYSTEM AND METHOD FOR DETERMINING REVENUE FROM AN INTERMEDIARY DERIVED FROM SERVICING DATA REQUESTS**

(75) Inventors: **Gregg Freishtat**, Atlanta, GA (US); **Palaniswamy Rajan**, Atlanta, GA (US)

(73) Assignee: **Yodlee, Inc.**, Redwood Shores, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/427,794

(22) Filed: **Oct. 27, 1999**

### Related U.S. Application Data

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.[7] .................................... **G06F 15/173**
(52) U.S. Cl. .............................. **709/224**, 705/34
(58) Field of Search ...................... 705/34; 709/224

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,987,538 A | * 1/1991 | Johnson et al. | ............ 364/401 |
| 5,347,632 A | 9/1994 | Filepp et al. | |
| 5,446,891 A | 8/1995 | Kaplan et al. | |
| 5,481,672 A | 1/1996 | Okuno et al. | |
| 5,483,445 A | * 1/1996 | Pickering | ............ 364/406 |
| 5,537,314 A | 7/1996 | Kanter | |
| 5,590,196 A | 12/1996 | Moreau | |
| 5,613,012 A | 3/1997 | Hoffman et al. | |
| 5,619,648 A | 4/1997 | Canale et al. | |
| 5,640,577 A | 6/1997 | Scharmer | |
| 5,644,576 A | 7/1997 | Bauchot et al. | |
| 5,649,186 A | 7/1997 | Ferguson | |
| 5,655,089 A | 8/1997 | Bucci | ............ 395/240 |
| 5,696,965 A | 12/1997 | Dedrick | |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0786728 A1 | 7/1997 |
| EP | 0848338 A | 6/1998 |
| JP | 7074817 | 3/1995 |
| WO | WO 97/16796 | 5/1997 |
| WO | WO 98/28698 | 7/1998 |
| WO | WO01/33759 A1 | 5/2001 |

#### OTHER PUBLICATIONS

Unknown, Roboword, Multilingual Dictionary Tool, Jul. 27, 1997, pages 1–3, all.

Chaum, D. Security without identification: tran saction systems to make big brother obsolete. Communication of the ACM. Oct. 1985. vol. 28. Issue 10 pp. 1030–1044.

Stanley, Tracey, "Intelligent Searching Agents on the Web", Jan. 1997, 4 pages, <http://www.ariadne.ac.u k/issue7/search-engines/>.

Jansen, James, "Using an Intelligent Agent to Enhance Search Engine Performance", Dec. 1998, 13 pages, <http://www.firstmonday.dk/issues/issue2_3/jansen/>.

(List continued on next page.)

*Primary Examiner*—Kenneth R. Rice
(74) *Attorney, Agent, or Firm*—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

This invention is a system and method for determining revenue from an intermediary derived from end user interactions involving personal information via the intermediary. A host computer monitors interactions between end users and personal information providers via an intermediary computer. The host computer communicates with a personal information store for storing personal information associated with end users and an accounting store for storing accounting data associated with the intermediary computer. The host computer includes a processor that receives requests concerning personal information from the intermediary computer and services these requests based on personal information in the personal information store. The host computer processor updates the accounting data associated with the intermediary computer and generates invoices to the intermediary computer based on the updated accounting data.

**23 Claims, 11 Drawing Sheets**



10317038.tif - 6/22/2005 11:43:50 AM

US006594766B2

(12) **United States Patent**
Rangan et al.

(10) Patent No.: **US 6,594,766 B2**
(45) Date of Patent: **Jul. 15, 2003**

(54) **METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK**

(75) Inventors: P. Venkat Rangan, San Diego, CA (US); Sam Inala, Redmond, WA (US)

(73) Assignee: Yodlee.com, Inc., Redwood Shores, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 10/180,146

(22) Filed: Jun. 25, 2002

(65) **Prior Publication Data**

US 2002/0184534 A1 Dec. 5, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/208,740, filed on Dec. 8, 1998, now Pat. No. 6,412,073.

(51) Int. Cl.[7] .................... G06F 12/14; G06F 17/60; H04L 9/00

(52) U.S. Cl. .................. 713/202; 713/201; 713/162; 705/14; 705/76

(58) Field of Search ....................... 713/202, 201, 713/162; 705/14, 76

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,918,019 A | * | 6/1999 | Valencia | 709/227 |
| 6,000,033 A | * | 12/1999 | Kelley et al. | 713/201 |
| 6,014,502 A | * | 1/2000 | Moraes | 709/219 |
| 6,023,684 A | * | 2/2000 | Pearson | 705/35 |
| 6,065,120 A | * | 5/2000 | Laursen et al. | 713/201 |

| | | | | |
|---|---|---|---|---|
| 6,085,229 A | * | 7/2000 | Newman et al. | 709/203 |
| 6,148,402 A | * | 11/2000 | Campbell | 713/200 |
| 6,182,229 B1 | * | 1/2001 | Nielsen | 713/202 |
| 6,192,407 B1 | * | 2/2001 | Smith et al. | 709/229 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. | 715/501.1 |
| 6,233,608 B1 | * | 5/2001 | Laursen et al. | 709/217 |
| 6,330,592 B1 | * | 12/2001 | Makuch et al. | 709/217 |
| 6,412,073 B1 | * | 6/2002 | Rangan | 713/202 |
| 2001/0000537 A1 | * | 4/2001 | Inala et al. | 707/500 |
| 2001/0020242 A1 | * | 9/2001 | Gupta et al. | 707/501.1 |

OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/208,740, Rangan et al.

* cited by examiner

*Primary Examiner*—Norman M. Wright
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet Portal is enabled by software executing on an Internet-connected server. The Portal, in response to a log-on by a user, presents a secure and personalized page for and to the user, the personalized page having listed plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by the subscriber, such as by a point-and-click technique, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. In an enhanced embodiment, a search function is provided wherein a user may configure searches in any or all of the listed destinations on a personalized page. Provision is provided for log-on by limited appliances, such as by a Smartcard or embedded password, and in some embodiments functionality is provided in a browser plug-in wherein a user may navigate to a site, and, in response to a request for log-in data, the subscriber may use a hot key or pointer input, which will cause the browser to access and provide the needed data from the Password-All source.

**30 Claims, 3 Drawing Sheets**



JUN. 22. 2009 11:47AM    CLIFFORD_CHANCE                                     NO. 5027    P. 19

US006633910B1

(12) **United States Patent**
Rajan et al.

(10) Patent No.: **US 6,633,910 B1**
(45) Date of Patent: **Oct. 14, 2003**

(54) **METHOD AND APPARATUS FOR ENABLING REAL TIME MONITORING AND NOTIFICATION OF DATA UPDATES FOR WEB-BASED DATA SYNCHRONIZATION SERVICES**

(75) Inventors: **Sreeranga P. Rajan**, Santa Clara, CA (US); **Jonathan Wu**, Mountain View, CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Redwood Shores, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/461,505**

(22) Filed: **Dec. 14, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/398,320, filed on Sep. 16, 1999, now Pat. No. 6,477,565.

(51) Int. Cl.⁷ ............................................. G06F 15/173
(52) U.S. Cl. .................... 709/224; 709/226; 709/221
(58) Field of Search ............................ 709/224, 226, 709/221, 234; 717/168, 171, 172, 173, 174

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,978,828 A * 11/1999 Greer et al. .................. 709/224

| | | | |
|---|---|---|---|
| 6,012,087 A | * | 1/2000 | Freivald et al. .......... 709/218 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. .......... 707/501.1 |
| 6,219,818 B1 | * | 4/2001 | Freivald et al. .......... 714/799 |
| 6,253,198 B1 | * | 6/2001 | Perkins .......... 707/3 |
| 6,275,858 B1 | * | 8/2001 | Bates et al. .......... 709/228 |
| 6,366,933 B1 | * | 4/2002 | Ball et al. .......... 707/511 |
| 6,370,141 B1 | * | 4/2002 | Giordano et al. .......... 370/386 |
| 6,477,565 B1 | * | 11/2002 | Daswani et al. .......... 709/217 |

* cited by examiner

*Primary Examiner*—Zarni Maung
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57)                **ABSTRACT**

An Internet subscription system for alerting subscribers to changes in data maintained at Internet sites has an input interface for a subscriber to specify a data condition to be monitored and a condition for notification and a gatherer for gathering data changes from one or more Internet sites. A guard compares data changes with the condition for notification, and a notification alert system notifies the subscriber of a change that meets the condition for notification. The system is particularly suited to notification requirements regarding metadata changes over multiple sources. Users can configure the system to many different frequencies and many different data and notification conditions. Alerts may be made to many different devices in different ways as well, and may or may not include specific data.

11 Claims, 4 Drawing Sheets



10317038.tif - 6/22/2005 11:43:50 AM

US006802042B2

(12) **United States Patent**
Rangan et al.

(10) Patent No.: **US 6,802,042 B2**
(45) Date of Patent: *Oct. 5, 2004

(54) **METHOD AND APPARATUS FOR PROVIDING CALCULATED AND SOLUTION-ORIENTED PERSONALIZED SUMMARY-REPORTS TO A USER THROUGH A SINGLE USER-INTERFACE**

(75) Inventors: P. Venkat Rangan, San Diego, CA (US); Manoj Sharma, College Park, MD (US); Sreeranga P. Rajan, Santa Clara, CA (US); Jonathan Wu, Mountain View, CA (US)

(73) Assignee: Yodlee.Com, Inc., Redwood Shores, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 09/425,626

(22) Filed: Oct. 22, 1999

(65) **Prior Publication Data**
US 2002/0078079 A1 Jun. 20, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/323,598, filed on Jun. 1, 1999.

(51) Int. Cl.[7] .................................. G06F 15/00
(52) U.S. Cl. ..................... 715/501.1; 715/500; 707/5; 709/217
(58) Field of Search ...................... 707/501, 3–5; 705/26; 709/217; 715/501.1, 500

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,459,306 A * 10/1995 Stein et al. .............. 235/383
5,855,008 A * 12/1998 Goldhaber et al. .......... 705/14
5,923,736 A * 7/1999 Shachar .............. 379/93.17
5,924,090 A * 7/1999 Krellenstein .............. 707/5
5,937,168 A * 8/1999 Anderson et al.

(List continued on next page.)

OTHER PUBLICATIONS

Hilbert et al., Agents for Collecting Application Usage Data over the Internet, ACM 1998, pp. 149–156.*
Schwartz et al., Applying an Information Gathering Architecture to Netfind: a White Pages Tool for a Changing and Growing Internet, IEEE 1994, pp. 426–439.*

(List continued on next page.)

*Primary Examiner*—Stephen S. Hong
*Assistant Examiner*—Cong-Lac Huynh
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet-connected portal system has a data repository, a data-gathering system, a request processor, a plurality of report algorithms, and a report processor. The request processor receives a request from a user and matches the request to an individual one of the report algorithms. The data-gathering subsystem accesses plural Internet sites associated with the user and extracts raw data therefrom according to needs of the report algorithm. The report processor processes the raw data according to the report algorithm into metasummarized information defined by the report algorithm, and the portal system transmits the metasummarized information as a report to a destination associated with the report request. In some cases there is an aggregated-data database in the data repository storing aggregated data retrieved for specific users periodically, and the request processor checks the aggregated-data database for needed data before requiring the data-gathering system to retrieve data from the associated Internet sites. In the instance that the needed data is stored in the aggregated-data database, the report is prepared from the aggregated data. Reports can be in a mix of text and graphic formats.

**14 Claims, 10 Drawing Sheets**



# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

<u>CIVIL PRETRIAL MINUTES</u>

Date:<u>8/19/05</u>

Case No.   <u>C05-1550.e SI & C-05-2554.e</u>          Judge:  <u>SUSAN ILLSTON</u>

Title: <u>YODLEE</u>  -v-  <u>SASHEDGE</u>

Attorneys: Barkan              Wintringham

Deputy Clerk: <u>Tracy Sutton</u>  Court Reporter: none

**PROCEEDINGS**

1)   <u>Initial Case Management Conference - HELD</u>
2)   _____
3)   _____

Order to be prepared by: (  )Pltf   (  )Deft   (  )Court

Disposition : (  ) GRANTED, (  ) DENIED, (  ) GRANTED/DENIED IN   (  ) SUBMITTED
                              PART

Case continued to <u>2/24/06 @ 2:30 p.m.</u> for Further Case Management

Case continued to <u>6/24/06   @ 2:30 p.m.</u> for Further Case Management Conference

Tutorial:<u>4/19/06 @ 3:00 p.m.</u> (2 hrs)
Claim Construction hearing: <u>4/26/06 @ 3 p.m.</u> (2 hrs)

Case continued to <u>  @ 9:00 a.m.</u> for Motions
(Motion due , Opposition  Reply )

Case continued to <u>  @ 3:30 p.m.</u> for Pretrial Conference

Case continued to <u>  @ 8:30 a.m.</u> for Trial (:  Days)
Discovery Cutoff:  Designate Experts by: , Rebuttal Experts:, Expert Discovery Cutoff:

ORDERED AFTER HEARING:
(See attached Patent Local Rule Schedule.)

The Court hereby orders that this case be consolidated with C-05-2254 for all purposes.

This case shall be referred to the Court's mediation program.

The parties have agreed to participate in a mediation session in either late May or early June 2005.

Case 3:05-cv-01550-SI     Document 25-1     Filed 08/23/2005     Page 2 of 4

# EXHIBIT 4

1   David M. Barkan (State Bar No. 160825/barkan@fr.com)
    Craig R. Compton (State Bar No. 215491/compton@fr.com)
2   FISH & RICHARDSON P.C.
    500 Arguello Street, Suite 500
3   Redwood City, California 94063
    Telephone: (650) 839-5070
4   Facsimile: (650) 839-5071

5   Attorneys for Plaintiff
    YODLEE, INC.

6

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11

12   YODLEE, INC.,                   Case No. C-05-1550 SI

13             Plaintiff,

                      **PLAINTIFF YODLEE, INC.'S**
14       v.                  **DISCLOSURE OF ASSERTED CLAIMS**
                      **AND PRELIMINARY INFRINGEMENT**
15   CASHEDGE INC.,           **CONTENTIONS [PATENT L.R. 3-1]**

16

17                Defendant.

18

19       Plaintiff Yodlee, Inc. ("Yodlee"), hereby submits its Disclosure of Asserted Claims and

20   Preliminary Infringement Contentions, pursuant to Patent Local Rule 3-1, as follows:

21                   **DISCLOSURE QUALIFICATIONS**

22       This disclosure is based upon information and documents presently available to and located

23   by Yodlee and its attorneys. Formal discovery has just begun and Yodlee's investigation and

24   analysis of the infringing products is ongoing. The information provided in these disclosures is

25   subject to revision and supplementation in accordance with the Patent Local Rules.

26       **A.**     **Asserted Claims [Patent L.R. 3-1(a)]**

27       Based on information obtained to date, Yodlee asserts that Defendant CashEdge, Inc.

28   ("CashEdge") has infringed and/or is infringing the following claims of the following United States

1

☐ **EXPRESS MAIL:**     Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by the United

2                      States Postal Service.

3

☐ **OVERNIGHT DELIVERY:**     Such correspondence was given on the same day in the ordinary course of business to an authorized courier or a driver authorized by

4                      that courier to receive documents.

5

    I declare that I am employed in the office of a member of the bar of this Court at whose

6    direction the service was made.

7

    I declare under penalty of perjury that the above is true and correct. Executed on

8    September 30, 2005, at Redwood City, California.

9                                      _____
                                       Victoria L. Friscia

10

11    50301679.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

# EXHIBIT 5

Drew M. Wintringham, III (admitted *pro hac vice*)
Mark W. Rueh (admitted *pro hac vice*)
James V. Mahon (admitted *pro hac vice*)
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 878-8000
Fax: (212) 878-8375

Daniel R. Harris (State Bar No. 188417)
Nancy K. Raber (State Bar No. 192744)
CLIFFORD CHANCE US LLP
990 Marsh Road
Menlo Park, CA 94025-1949
Tel:  (650) 566-4300
Fax:  (650) 566-4399

Attorneys for Defendant
CashEdge, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Yodlee, Inc.,<br><br>            Plaintiff,<br><br>    v.<br><br>CashEdge, Inc.,<br><br>            Defendant. | Case No. C 05-01550 SI<br><br>**CASHEDGE'S PRELIMINARY INVALIDITY CONTENTIONS** |

        In accordance with Patent L.R. 3-3, following are CashEdge's Preliminary Invalidity

Contentions for the asserted claims of U.S. Patent Nos. 6,199,077;  6,317,783;  6,405,245;

6,412,073;  6,510,451;  6,594,766;  6,663,910;  6,667,850 and 6,802,042 ("the asserted patents").

1  Drew M. Wintringham, III (*admitted pro hac vice*)
   James V. Mahon (*admitted pro hac vice*)
2  Mark W. Rueh (*admitted pro hac vice*)
3  **CLIFFORD CHANCE US LLP**
   31 West 52nd Street
4  New York, New York 10019
   Telephone: (212) 878-8000
5  Facsimile: (212) 878-8375

6  Daniel R. Harris (State Bar No. 188417)
   Nancy K. Raber (State Bar No. 192744)
7  **CLIFFORD CHANCE US LLP**
8  990 Marsh Road
   Menlo Park, CA 94025-1949
9  Tel: (650) 566-4300
   Fax: (650) 566-4399
10
11 Attorneys for Defendant Cashedge, Inc.

12

13                  **UNITED STATES DISTRICT COURT**

14                 **NORTHERN DISTRICT OF CALIFORNIA**

15

16  YODLEE, INC.                    )    **Case No. O5 cv 01550 (SI)**
                                    )
17          Plaintiff,              )
                                    )
18      vs.                         )    **CERTIFICATE OF SERVICE**
                                    )
19  CASHEDGE, INC.                  )
                                    )
20          Defendant.             )
    _____    )
21

22

23

24

25

26

27

28

NYB 1516202 1

1

## CERTIFICATE OF SERVICE

2      I declare that I am a paralegal working at the law firm of Clifford Chance US LLP in

3   New York, NY. I am over the age of eighteen years and not a party to the within cause. My

4   business address is 31 West 52nd Street, New York, New York 10019.

5      I certify that on the 28th day of November, 2005, a true and correct copy of the within

6

7   document : **CASHEDGE'S PRELIMINARY INVALIDITY CONTENTIONS** was served

8   on the following person by depositing a true copy of said document enclosed in a wrapper

9   addressed as shown below, into the custody of an overnight service (by Federal Express) for

10   overnight delivery, prior to the latest time designated by that service for overnight delivery:

11

12   Craig R. Compton, Esq.
     Fish & Richardson P.C.
13   500 Arguello Street, Suite 500
     Redwood City, CA 94063

14   I declare under penalty of perjury that the foregoing is true and correct, and that this
     declaration was executed in New York, New York, on November 28, 2005.

15

16

17                                 _____
                                   Trish Keats
18

19

20

21

22

23

24

25

26

27

28

-2-

# EXHIBIT 6

1  David M. Barkan (CSB No. 160825/barkan@fr.com)
   Craig R. Compton (CSB No. 215491/compton@fr.com)
2  FISH & RICHARDSON P.C.
   500 Arguello Street, Suite 500
3  Redwood City, CA 94063
   Telephone: (650) 839-5070
4  Facsimile: (650) 839-5071

5  Attorneys for Plaintiff
   YODLEE, INC.

6

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9               SAN FRANCISCO DIVISION

10

11  YODLEE, INC.                    C 05-01550 (SI)

       Plaintiff,
12                                  **YODLEE'S PRELIMINARY**
                                    **IDENTIFICATION OF CLAIM TERMS**
13      v.                          **PURSUANT TO PATENT LOCAL RULE**
                                    **4-1**
    CASHEDGE, INC.
14
       Defendant.
15

16

17      **I.    Unites States Patent No. 6,567,850**

18          •   Intermediary computer

19          •   Servicing the received request

20          •   End user

21          •   Personal information provider

22          •   Accounting data

23          •   Computer-readable storage device

24          •   Processor

25          •   Personal information store

26          •   Invoice

27          •   Accounting store

28

VIII.   Unites States Patent No. 6,594,766

- Internet portal
- Portal software
- Log-on facility
- User-defined functions

IX.   Unites States Patent No. 6,405,245

- Personal information provider
- Protocol
- Automated access to personal information
- End user data
- Personal information provider data
- Client computer
- Navigation script
- Computer-readable storage device
- User store
- Personal information provider store
- Processor

Dated: December 12, 2005                FISH & RICHARDSON P.C.

                                         By: _David M. B_____
                                              David M. Barkan

                                         Attorneys for Plaintiff
                                         YODLEE, INC.

1

## PROOF OF SERVICE

2      I am employed in the County of San Mateo. My business address is Fish & Richardson
P.C., 500 Arguello Street, Suite 500, Redwood City, California 94063. I am over the age of 18
3  and not a party to the foregoing action.

4      I am readily familiar with the business practice at my place of business for collection and
processing of correspondence for personal delivery, for mailing with United States Postal Service,
5  for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight
service.
6
       On December 12, 2005, I caused a copy of the following document(s):
7
       YODLEE'S PRELIMINARY IDENTIFICATION OF CLAIM TERMS PURSUANT TO
8  PATENT LOCAL RULE 4-1

9  to be served on the interested parties in this action by placing a true and correct copy thereof,
enclosed in a sealed envelope, and addressed as follows:
10
       Mark Ruehl                              Attorneys for Defendant
11     Clifford Chance US LLP                  CASHEDGE, INC.
       990 Marsh Road
12     Menlo Park, CA 94025-1947
       Telephone: (650) 566-4300
13     Facsimile: (650) 566-4399

14
   | XX | **FEDERAL** | The envelope was deposited on the same day in the ordinary course |
15  |    | **EXPRESS:** | of business with a facility regularly maintained by Federal Express. |

16
       I declare that I am employed in the office of a member of the bar of this Court at whose
17  direction the service was made.

18     I declare under penalty of perjury that the above is true and correct. Executed on
19  December 12, 2005, at Redwood City, California.

20                                            _____
                                                  Christie Norsley
21
50314445.doc
22

23

24

25

26

27

28



1  Drew M. Wintringham, III (admitted *pro hac vice*)
   Mark W. Rueh (admitted *pro hac vice*)
2  **CLIFFORD CHANCE US LLP**
3  31 West 52nd Street
   New York, New York 10019
4  Telephone: (212) 878-8000
   Facsimile: (212) 878-8375
5  Drew.Wintringham@cliffordchance.com
   Mark.Rueh@cliffordchance.com
6
7  Daniel R. Harris (State Bar No. 188417)
   Q. Huy D. Do (State Bar No. 184462)
8  **CLIFFORD CHANCE US LLP**
   990 Marsh Road
9  Menlo Park, California 94025-1949
   Tel: (650) 566-4300
10 Fax: (650) 566-4399
   Daniel.Harris@cliffordchance.com
11 Huy.Do@cliffordchance.com
12
   Attorneys for Defendant
13 CashEdge, Inc.

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                    SAN FRANCISCO DIVISION

17
   YODLEE, INC.                    )   CASE NO. CO5 01550 SI
18                                  )
              Plaintiff,            )   CASHEDGE, INC.'S PROPOSED TERMS AND
19                                  )   CLAIM ELEMENTS FOR CONSTRUCTION
          v.                        )
20                                  )
   CASHEDGE, INC.                   )
21                                  )
              Defendant.            )
22  _____ )

23

24

25  In accordance with Patent L.R. 4-1, Defendant CashEdge, Inc. ("CashEdge") herein identifies the

26  claim terms and elements in Patent Nos. 6,199,077, 6,317,783, 6,405,245, 6,412,073, 6,510,451,

27

28  **CASHEDGE, INC.'S PROPOSED TERMS AND
   CLAIM ELEMENTS FOR CONSTRUCTION**
                                            **CASE NO. C05 01550 SI**

Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019

December 12, 2005

Drew M. Wintringham, III (*pro hac vice*)
Mark W. Rueh (*pro hac vice*)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000
Facsimile: (212) 878-8375

Daniel R. Harris (State Bar No. 188417)
Q. Huy D. Do (State Bar No. 184462)
**CLIFFORD CHANCE US LLP**
990 Marsh Road
Menlo Park, California 94025-1949
Tel: (650) 566-4300
Fax: (650) 566-4399

By: _____

Attorneys for Defendant,
CashEdge, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019

CASHEDGE, INC.'S PROPOSED TERMS AND
CLAIM ELEMENTS FOR CONSTRUCTION

CASE NO. C05 01550 SI

13

Drew M. Wintringham, III (*admitted pro hac vice*)
Mark W. Rueh (*admitted pro hac vice*)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000
Facsimile: (212) 878-8375

Daniel R. Harris (State Bar No. 188417)
Nancy K. Raber (State Bar No. 192744)
**CLIFFORD CHANCE US LLP**
990 Marsh Road
Menlo Park, CA 94025-1949
Tel: (650) 566-4300
Fax: (650) 566-4399

Attorneys for Defendant CashEdge, Inc.

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| YODLEE, INC. | ) | Case No. O5 cv 01550 (SI) |
| Plaintiff, | ) | |
| vs. | ) | **CERTIFICATE OF SERVICE** |
| CASHEDGE, INC. | ) | |
| Defendant. | ) | |

NYB 1517449 1

<u>**CERTIFICATE OF SERVICE**</u>

I declare that I am a paralegal working at the law firm of Clifford Chance US LLP in New York, NY. I am over the age of eighteen years and not a party to the within cause. My business address is 31 West 52nd Street, New York, New York 10019.

I certify that on the 12th day of December, 2005, a true and correct copy of the within document : **CASHEDGE, INC'S PROPOSED TERMS AND CLAIM ELEMENTS FOR CONSTRUCTION** was served on the following person by depositing a true copy of said document enclosed in a wrapper addressed as shown below, into the custody of an overnight service (by Federal Express) for overnight delivery, prior to the latest time designated by that service for overnight delivery:

David M. Barkan, Esq.
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in New York, New York, on December 12, 2005.

Trish Keats

-2-

NYB 1517449.1

# EXHIBIT 7

1  David M. Barkan (CSB No. 160825/barkan@fr.com)
   Craig R. Compton (CSB No. 215491/compton@fr.com)
2  FISH & RICHARDSON P.C.
   500 Arguello Street, Suite 500
3  Redwood City, CA 94063
   Telephone: (650) 839-5070
4  Facsimile: (650) 839-5071

5  Attorneys for Plaintiff
   YODLEE, INC.
6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11  YODLEE, INC.

12       Plaintiff,                    C 05-01550 (SI)

13       v.                            **YODLEE'S PRELIMINARY PROPOSED
                                       CLAIM CONSTRUCTION PURSUANT
14  CASHEDGE, INC.                     TO PATENT LOCAL RULE 4-2**

15       Defendant.

16

17       Pursuant to Patent Local Rule 4-2, Plaintiff Yodlee, Inc. ("Yodlee"), by and through its

18  counsel, hereby submits its preliminary proposed construction of each claim term, phrase, or

19  clause identified by the parties in their respective Lists Of Proposed Terms And Claim Elements

20  as follows[1]:

21       1.    **United States Patent No. 6,567,850**

| Term | Preliminary Construction | Preliminary Identification of Extrinsic Evidence |
|------|--------------------------|--------------------------------------------------|
| Intermediary computer | A computer that interacts with the end user and the host system. | |
| Servicing the received request | Act on or process a request made by or on behalf of an end user. | Service: Work performed (or offered) by a server. This may mean simply serving simple requests for |

---

[1] Yodlee may offer expert testimony in support of its claim construction positions, including but not limited to the testimony of Dr. Yannis Papakonstantinou. Dr. Papakonstantinou and/or other experts may also offer testimony regarding one with ordinary skill in the art during the relevant time period.

01/18/2006 19:20 FAX 6508395071          FISH & RICHARDSON                    ☑064

1   rebuttal to any extrinsic evidence or argument that CashEdge and/or any other participant in the

2   claim construction hearing may offer to support its claim constructions.

3

4

5   Dated: January 18, 2006                          FISH & RICHARDSON P.C.

6

7                                                    By: _____

8                                                        David M. Barkan

9                                                    Attorneys for Plaintiff
                                                     YODLEE, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am employed in the County of San Mateo. My business address is Fish & Richardson P.C., 500 Arguello Street, Suite 500, Redwood City, California 94063. I am over the age of 18 and not a party to the foregoing action.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with United States Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

On January 18, 2006, I caused a copy of the following document(s):

YODLEE'S PRELIMINARY PROPOSED CLAIM CONSTRUCTION PURSUANT TO PATENT LOCAL RULE 4-2

to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

Mark Ruehl                                  Attorneys for Defendant
Clifford Chance US LLP                      CASHEDGE, INC.
990 Marsh Road
Menlo Park, CA 94025-1947
Telephone: (650) 566-4300
Facsimile: (650) 566-4399

Daniel R. Harris                            Attorneys for Defendant
Clifford Chance US LLP                      CASHEDGE, INC
990 Marsh Road
Menlo Park, CA 94025-1947
Telephone: (650) 566-4300
Facsimile: (650) 566-4399

| | | |
|---|---|---|
| XX | **FEDERAL EXPRESS:** | The envelope was deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express. |
| XX | **FACSIMILE:** | The aforesaid document was faxed to the facsimile transmission machine with the facsimile machine number stated above. Upon completion of the transmission, the transmitting machine issued a transmission report showing the transmission was complete and without error. |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury that the above is true and correct. Executed on January 18, 2006, at Redwood City, California.

Christie Horsley

50321732.doc

YODLEE'S PRELIMINARY PROPOSED CLAIM CONSTRUCTION
PURSUANT TO PATENT LOCAL RULE 4-2

1    Drew M. Wintringham, III (admitted *pro hac vice*)

2    Mark W. Rueh (admitted *pro hac vice*)
     **CLIFFORD CHANCE US LLP**

3    31 West 52nd Street
     New York, New York 10019

4    Telephone: (212) 878-8000
     Facsimile: (212) 878-8375

5    Drew.Wintringham@cliffordchance.com
     Mark.Rueh@cliffordchance.com

6

7    Daniel R. Harris (State Bar No. 188417)
     Q. Huy D. Do (State Bar No. 184462)

8    **CLIFFORD CHANCE US LLP**
     990 Marsh Road

9    Menlo Park, California 94025-1949
     Tel: (650) 566-4300

10   Fax: (650) 566-4399

11   Daniel.Harris@cliffordchance.com
     Huy.Do@cliffordchance.com

12   Attorneys for Defendant

13   CashEdge, Inc.

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16                        SAN FRANCISCO DIVISION

17   YODLEE, INC.                    )  CASE NO. CO5 01550 SI
                                     )
18           Plaintiff,             )  CASHEDGE, INC.'S PRELIMINARY PROPOSED
                                     )  CLAIM CONSTRUCTIONS
19      v.                           )
                                     )
20   CASHEDGE, INC.                  )
                                     )
21           Defendant.             )
                                     )
22   _____)

23

24

25

26       In accordance with Patent L.R. 4-2, following are CashEdge Inc.'s ("CashEdge") Preliminary

27   Proposed Claim Constructions for the asserted claims of U.S. Patent Nos. 6,199,077, 6,317,783,

28   CASHEDGE, INC.'S PRELIMINARY
     PROPOSED CLAIM CONSTRUCTIONS
                                                        CASE NO. C05 01550 SI
                                                        NYB 1520135.1

(left margin vertical text) Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019



January 18, 2006

Drew M. Wintringham, III (*pro hac vice*)
Mark W. Rueh (*pro hac vice*)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000
Facsimile: (212) 878-8375
Drew.Wintringham@cliffordchance.com
Mark.Rueh@cliffordchance.com

Daniel R. Harris (State Bar No. 188417)
Q. Huy D. Do (State Bar No. 184462)
**CLIFFORD CHANCE US LLP**
990 Marsh Road
Menlo Park, California 94025-1949
Tel: (650) 566-4300
Fax: (650) 566-4399
Daniel.Harris@cliffordchance.com
Huy.Do@cliffordchance.com

By: _____

Attorneys for Defendant,
CashEdge, Inc.

CASHEDGE INC.'S PRELIMINARY
PROPOSED CLAIM CONSTRUCTIONS

16

CASE NO. C05 01550 SI
NYB 1520135.1

**EXHIBIT 8**

1  David M. Barkan (CSB No. 160825/barkan@fr.com)
   Craig R. Compton (CSB No. 215491/compton@fr.com)
2  FISH & RICHARDSON P.C.
   500 Arguello Street, Suite 500
3  Redwood City, CA 94063
   Telephone: (650) 839-5070
4  Facsimile: (650) 839-5071

5  Attorneys for Plaintiff
   YODLEE, INC.
6
   Drew M. Wintringham, III (Admitted *Pro Hac Vice*/drew.wintringham@cliffordchance.com)
7  Mark W. Rueb (Admitted *Pro Hac Vice*/Mark.Rueb@CliffordChance.com)
   CLIFFORD CHANCE US LLP
8  31 West 52nd Street
   New York, NY 10019-6131
9  Telephone: (212) 878-8000
   Facsimile: (212) 878-8375
10
   Daniel R. Harris (CSB No. 188417/daniel.harris@cliffordchance.com)
11 Nancy K. Raber (CSB No. 192744/nancy.raber@cliffordchance.com)
   CLIFFORD CHANCE US LLP
12 990 Marsh Road
   Menlo Park, California 94025-1947
13 Telephone: (650) 566-4300
   Facsimile: (650) 566-4399
14
   Attorneys for Defendant
15 CASHEDGE, INC.

16                 UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

18                   SAN FRANCISCO DIVISION

19 YODLEE, INC.                    Case No. C 05-01550 (SI)

20     Plaintiff,                  **JOINT CLAIM CONSTRUCTION AND
                                    PREHEARING STATEMENT PURSUANT
21     v.                          TO PATENT LOCAL RULE 4-3**

22 CASHEDGE, INC.

23     Defendant.

24

25       Plaintiff Yodlee, Inc. ("Yodlee") and Defendant CashEdge, Inc. ("CashEdge"), by and

26 through their respective counsel, hereby respectfully submit the following Joint Claim

27

28

1  of persons having ordinary skill in those arts concerned with the technology disclosed in the

2  patents-in-suit, how the terms proposed collectively by both sides in this action for construction

3  are used by a person having ordinary skill in the art, and the operability of the alleged inventions

4  disclosed in the patents-in-suit. Dr. Kommu may provide insight in how such a person would

5  interpret such terms in the context of the intrinsic and extrinsic evidence. Dr. Kommu may also

6  testify on issues concerning whether certain claim elements should be governed by 35 U.S.C. §

7  112(6) and the structures(s), act(s), and/or material(s), and equivalents disclosed in the respective

8  specifications of the patents-in-suit, if any, for such claim elements. Dr. Kommu's testimony will

9  be based on his review of the patent claim language, specification, file history, his knowledge of

10  how such terms would have been used by those with ordinary skill in the art at the relevant time,

11  and other evidence that may be proffered by the parties. Dr. Kommu may also provide testimony

12  and/or a declaration responding to Yodlee's proffered claim construction expert.

13

14  Dated: February 10, 2006                     Respectfully submitted,

15                                               FISH & RICHARDSON P.C.

16

17                                               By:  /s/ Craig R. Compton
18                                                    Craig R. Compton
                                                 Attorneys for Plaintiff
19                                               YODLEE, INC.

20  Dated: February 10, 2006                     Respectfully submitted,

21                                               CLIFFORD CHANCE US LLP

22

23                                               By:  /s/ Mark W. Rueh
24                                                    Mark W. Rueh
                                                 Attorneys for Defendant
25                                               CASHEDGE, INC.

26

27

28

1     Pursuant to General Order No. 45, Section X(B) regarding signatures, I attest under

2 penalty of perjury that concurrence in the filing of this document has been obtained from Mark W.

3 Rueh.

4

5                                        FISH & RICHARDSON P.C.

6

7                                        By: /s/ Craig R. Compton
                                              Craig R. Compton
8                                        Attorneys for Plaintiff
                                         YODLEE, INC.
9

10   1522013_1.DOC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                          72     JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT
                                 PURSUANT TO PATENT LOCAL RULE 4-3
                                 Case No. C 05-01550 (SI)s

# EXHIBIT 9

1 | David M. Barkan (State Bar No. 160825/barkan@fr.com)
| Craig R. Compton (State Bar No. 215491/compton@fr.com)
2 | FISH & RICHARDSON P.C.
| 500 Arguello Street, Suite 500
3 | Redwood City, California 94063
| Telephone: (650) 839-5070
4 | Facsimile:  (650) 839-5071

5 | Attorneys for Plaintiff YODLEE, INC.

6 | Drew M. Wintringham, III (Admitted *Pro Hac Vice*/drew.wintringham@cliffordchance.com)
| Mark W. Rueh (Admitted *Pro Hac Vice*/ mark.rueh@cliffordchance.com)
7 | CLIFFORD CHANCE US LLP
| 31 West 52nd Street
8 | New York, NY 10019-6131
| Telephone: (212) 878-8000
9 | Facsimile:  (212) 878-8375

10 | Daniel R. Harris (State Bar No. 188417/ daniel.harris@cliffordchance.com)
| Nancy K. Raber (State Bar No. 192744/ nancy.raber@cliffordchance.com)
11 | CLIFFORD CHANCE US LLP
| 990 Marsh Road
12 | Menlo Park, California 94025-1947
| Telephone: (650) 566-4300
13 | Facsimile:  (650) 566-4399

14 | Attorneys for Defendant
| CASHEDGE, INC.

15 |

16 | UNITED STATES DISTRICT COURT

17 | NORTHERN DISTRICT OF CALIFORNIA

18 | (SAN FRANCISCO DIVISION)

19 | YODLEE, INC.,                                    Case No. C 05-01550 (SI)

20 |                          Plaintiff,    **STIPULATION AND [PROPOSED]**
|                                          **ORDER RE EXTENSION OF TIME IN**
21 | v.                                      **WHICH TO COMPLETE MEDIATION**

22 | CASHEDGE, INC.,

23 |                          Defendant.

24 |

25 | The parties to the above-entitled action, Plaintiff Yodlee, Inc. ("Yodlee") and Defendant

26 | CashEdge, Inc. ("CashEdge"), jointly submit this Stipulation and [Proposed] Order Re Extension

27 | of Time in Which to Complete Mediation and request that the Court adopt the proposed extension.

28 |

1  On April 18, 2006, the parties participated in a pre-mediation teleconference with Court-appointed

2  mediator Debra Mellinkoff. All parties are in agreement that a mediation would be most

3  productive if it took place within 60 days following the issuance of the Claim Construction Order.

4  The parties therefore request that the deadline for mediation be extended to 60 days after the

5  issuance of the Claim Construction Order.

6

7  Dated: May 19, 2006                              Dated: May 19, 2006

8  FISH & RICHARDSON P.C.                           CLIFFORD CHANCE LLP

9
   By:   /s/ David M. Barkan                        By   /s/ Mark W. Rueh
10         David M. Barkan                                Mark W. Rueh

11 Attorneys for Plaintiff                          Attorneys for Defendant
12 YODLEE, INC.                                     CASHEDGE, INC.

13

14                              **DECLARATION**

15       Pursuant to General Order No. 45, Section X(B) regarding signatures, I attest under

16  penalty of perjury that concurrence in the filing of this document has been obtained from Mark W.

17  Rueh.

18  Dated: May 19, 2006                             FISH & RICHARDSON P.C.

19
                                                    By:  \s\ David M. Barkan
20                                                        David M. Barkan

21                                                  Attorneys for Plaintiff
22                                                  YODLEE, INC.

23                              **ORDER**

24       IT IS SO ORDERED.

25  Dated: _____, 2006

26
                                                    _____
27                                                  Honorable Susan Illston
                                                    United States District Judge
28  50343703

2    STIPULATION AND [PROPOSED] ORDER RE EXTENSION OF TIME
     IN WHICH TO COMPLETE MEDIATION
     Case No. C 05-01550 (SI)

# EXHIBIT 10

Contact Us - CashEdge                                                    Page 1 of 1

User Login ›



## CashEdge Offices

**CashEdge Offices**

**Email Addresses**

**Contact Us Form**

### Headquarters

**New York City - USA**
104 Fifth Avenue
New York, NY 10011

Phone: 212-656-9000
Fax:   212-656-9099

### Offices

**Silicon Valley**
2841 Junction Ave.
Suite 101,
San Jose, CA 95134-1921

Phone: 408-433-2400
Fax:   408-433-2497

**Gurgaon - India**
276, Udyog Vihar,
Phase - IV, Gurgaon
Haryana - 122016
Phone: 91-124-4019914
         91-124-4019915
Fax:   91-124-4104960

**Chennai - India**
107/6, Ampa Manor
3rd Floor, Aminjikarai
Nelson Manikkam Road
Chennai

Phone: 91-44-42082430
Fax:   91-44-42082431

© 2005. ALL RIGHTS RESERVED. Terms and Conditions | Privacy Policy | Security Policy | Sitemap

# EXHIBIT 11

Corporate Profile





| Corporate Profile |
| Executive Bios |
| Career Opportunities |
| Contact Us |

## Corporate Profile

CashEdge provides innovative, online financial applications for banks, credit unions and wealth management firms. CashEdge's solutions include end-to-end online account opening and funding, funds transfer and data consolidation. These proven solutions are flexible, scalable and supported by extensive risk management capabilities.

With CashEdge, financial institutions are able to create compelling online offerings that attract customers, generate revenues and reduce costs.

CashEdge serves over 450 financial institutions in North America including four of the top ten banks. CashEdge has offices in New York, Silicon Valley and India.

© 2005. ALL RIGHTS RESERVED. Terms and Conditions | Privacy Policy | Security Policy | Sitemap

# EXHIBIT 12



User Login )



## Bank Suite

### OpenNow™ — Instant Account Opening

OpenNow is a real-time online account opening solution that enables financial institutions to facilitate instant account opening through their web site. OpenNow increases the new account closure rate by reducing the time and complexity of the new account opening process. Prospective customers can apply and be approved for a new account online in a single session through an automated authentication and verification process.

Product Suites

Bank Suite

Credit Union Suite

Wealth Management Suite



**OpenNow**

DOWNLOAD >>

© 2005. ALL RIGHTS RESERVED. Terms and Conditions  | Privacy Policy | Security Policy | Sitemap

Bank Suite - CashEdge







## Bank Suite

**FundNow™ — New Account Funding**

FundNow is a real-time online account funding solution that enables financial institutions to increase their new account funding rate by reducing the time and complexity of the new account funding process. Prospective customers can fund a new account online in a single session through an automated "account and funds availability" verification.



**FundNow**
DOWNLOAD »

© 2005. ALL RIGHTS RESERVED. Terms and Conditions | Privacy Policy | Security Policy | Sitemap







## Bank Suite

### TransferNow™ — Inter-institution Transfer

TransferNow enables financial institutions to offer secure inter-institution funds transfer services that extend their online offerings and generate new revenue streams. With TransferNow, your customers can transfer money between their accounts held at over 23,000 banks, credit unions and brokerages. TransferNow automates the authentication of the user and the external account, provides a comprehensive risk management system and moves the funds using ACH and other payment networks.



DOWNLOAD ≫

© 2005. ALL RIGHTS RESERVED. Terms and Conditions | Privacy Policy | Security Policy | Sitemap





**Product Suites**

**Bank Suite**

**Credit Union Suite**

**Wealth Management Suite**

## Bank Suite

**AggregateNow™ — Financial Account Consolidation**

AggregateNow enables financial institutions to offer customers the ability to see and manage all of their accounts, held away and hosted in your financial institution, in one convenient interface. AggregateNow gathers data from most financial institutions, providing the broadest coverage and convenience available anywhere. AggregateNow allows you to increase your customer retention rate by positioning your financial institution at the core of your customers' financial transactions.



DOWNLOAD »

© 2005. ALL RIGHTS RESERVED. Terms and Conditions | Privacy Policy | Security Policy | Sitemap

# EXHIBIT 13

File 351:Derwent WPI 1963-2006/UD,UM &UP=200632
(c) 2006  Thomson Derwent

1/9/1
**DIALOG(R)File 351:Derwent WPI**
**(c) 2006  Thomson Derwent. All rts. reserv.**

**015658357   \*\*Image available\*\***
**WPI Acc No: 2003-720542/200368**
**XRPX Acc No: N03-576019**
**Sensitive data handling method for online services, involves providing**
**multiple operation modes defining different trust options to user based**
**on which sensitive data associated with user is handled**
Patent Assignee: CASHEDGE INC (CASH-N); DHEER S (DHEE-I); DILIP V (DILI-I);
SOKOLIC J N (SOKO-I)
Inventor: DHEER S; DILIP V; SOKOLIC J N
Number of Countries: 100  Number of Patents: 004
Patent Family:

| Patent No | Kind | Date | Applicat No | Kind | Date | Week |
|---|---|---|---|---|---|---|
| US 20030135752 | A1 | 20030717 | US 200244289 | A | 20020111 | 200368 B |
| WO 200361187 | A1 | 20030724 | WO 2003US664 | A | 20030108 | 200368 |
| AU 2003235662 | A1 | 20030730 | AU 2003235662 | A | 20030108 | 200421 |
| GB 2399437 | A | 20040915 | WO 2003US664 | A | 20030108 | 200461 |
| | | | GB 200414223 | A | 20040624 | |

Priority Applications (No Type Date): US 200244289 A 20020111
Patent Details:

| Patent No | Kind | Lan | Pg | Main IPC | Filing Notes |
|---|---|---|---|---|---|
| US 20030135752 | A1 | | 14 | H04K-001/00 | |
| WO 200361187 | A1 | E | | H04L-009/00 | |

Designated States (National): AE AG AL AM AT AU AZ BA BB BG BR BY BZ CA
CH CN CO CR CU CZ DE DK DM DZ EC EE ES FI GB GD GE GH GM HR HU ID IL IN
IS JP KE KG KP KR KZ LC LK LR LS LT LU LV MA MD MG MK MN MW MX MZ NO NZ
OM PH PL PT RO RU SD SE SG SK SL TJ TM TN TR TT TZ UA UG UZ VN YU ZA ZM
ZW
Designated States (Regional): AT BE BG CH CY CZ DE DK EA EE ES FI FR GB
GH GM GR HU IE IT KE LS LU MC MW MZ NL OA PT SD SE SI SK SL SZ TR TZ UG
ZM ZW

| AU 2003235662 | A1 | | H04L-009/00 | Based on patent WO 200361187 |
|---|---|---|---|---|
| GB 2399437 | A | | G06F-001/00 | Based on patent WO 200361187 |

Abstract (Basic): US 20030135752 A1
    NOVELTY - The multiple operation modes defining different trust
options for handling data such as login credentials or other sensitive
data, are provided to the user. The selection of one of the operation
modes is received from the user. The sensitive data associated with
user is handled in accordance with the selected operation mode.
    DETAILED DESCRIPTION - INDEPENDENT CLAIMS are also included for the
following:
    (1) computer readable memory storing sensitive data handling or
processing program; and
    (2) computer readable media having storing sensitive data handling
or processing instructions.
    USE - For handling sensitive data such as login credentials,

financial data, financial accounts, buying or selling goods and
services, asset account, debt account, interest bearing and
non-interest bearing accounts, certificates of deposits (CDs), mutual
funds, bonds and equities, mortgage accounts, credit card accounts,
home equity loans, overdraft protection, margin accounts, personal
loans in online services.

ADVANTAGE - Allows the user to efficiently handle the sensitive
data by providing the multiple trust modes.

DESCRIPTION OF DRAWING(S) - The figure shows the flow diagram
explaining the sensitive data handling process.

pp; 14 DwgNo 5/7

Title Terms: SENSITIVE; DATA; HANDLE; METHOD; SERVICE; MULTIPLE; OPERATE;
MODE; DEFINE; OPTION; USER; BASED; SENSITIVE; DATA; ASSOCIATE; USER;
HANDLE

Derwent Class: T01; T05

International Patent Class (Main): G06F-001/00; H04K-001/00; H04L-009/00

International Patent Class (Additional): G06F-011/30; G06F-011/300;
G06F-012/14; G06F-012/144; H04L-009/32; H04L-009/322

File Segment: EPI

Manual Codes (EPI/S-X): T01-N01A1; T01-N01A2A; T01-N01A2F; T01-S03; T05-L02

1/9/2
**DIALOG(R)File 351:Derwent WPI**
**(c) 2006  Thomson Derwent. All rts. reserv.**
 015608698   **Image available**
**WPI Acc No: 2003-670855/200363**
**Related WPI Acc No: 2002-196008; 2003-139621; 2005-020089; 2005-597412;**
 **2005-604267; 2006-210778**
**XRPX Acc No: N03-535682**
 Retrieving and processing method for data, involves storing normalized
 data in database such that normalized data are obtained by normalizing
 data extracted from web page using data harvesting script
Patent Assignee: DHEER S (DHEE-I); DILIP V (DILI-I); MESSING R (MESS-I);
 SOKOLIC J N (SOKO-I); CASHEDGE INC (CASH-N)
Inventor: DHEER S; DILIP V; MESSING R; SOKOLIC J N
Number of Countries: 001  Number of Patents: 002
Patent Family:
Patent No    Kind  Date    Applicat No   Kind  Date    Week
US 20030126134 A1  20030703  US 200240314   A   20020103  200363 B
US 7013310    B2  20060314  US 200240314   A   20020103  200620

Priority Applications (No Type Date): US 200240314 A 20020103
Patent Details:
Patent No  Kind Lan Pg   Main IPC    Filing Notes
US 20030126134 A1    14 G06F-007/00
US 7013310    B2    G06F-017/00

Abstract (Basic): US 20030126134 A1
    NOVELTY - The method involves storing the normalized data in a
 database. The normalized data are obtained by normalizing the data
 extracted from a web page using a data harvesting script. The web page
 is captured from a web site.
    DETAILED DESCRIPTION - INDEPENDENT CLAIMS are also included for the
 following:
    (a) an apparatus for retrieving and processing data; and
    (b) the computer readable media.
    USE - Used for retrieving and processing the data collected from
 web pages or other data sources. Used for financial analysis systems.
 Used for e.g. data aggregation system or any other account management
 system.
    ADVANTAGE - Enables automatic extraction of data from web pages or
 other data sources associated with one or more accounts or
 institutions, such as financial accounts or financial institutions.
 Reduces the possibility of inadvertently exposing confidential
 information contained in the web page.
    DESCRIPTION OF DRAWING(S) - The figure shows the block diagram of
 the financial analysis system.
    pp; 14 DwgNo 2/7
Title Terms: RETRIEVAL; PROCESS; METHOD; DATA; STORAGE; NORMALISE; DATA;
 DATABASE; NORMALISE; DATA; OBTAIN; NORMALISE; DATA; EXTRACT; WEB; PAGE;
 DATA; HARVEST; SCRIPT
Derwent Class: T01
International Patent Class (Main): G06F-007/00; G06F-017/00
File Segment: EPI
Manual Codes (EPI/S-X): T01-J05B4P; T01-J11A; T01-N03A1; T01-S03

1/9/3
DIALOG(R)File 351:Derwent WPI
(c) 2006 Thomson Derwent. All rts. reserv.

014605274   **Image available**
WPI Acc No: 2002-425978/200245
Related WPI Acc No: 2002-590358; 2004-098061
XRPX Acc No: N02-334971
Computerized financial transaction method used in banks, involves
depositing assets withdrawn from one account to another account, when two
accounts have common account holder
Patent Assignee: CASHEDGE INC (CASH-N)
Inventor: DHEER S; DILIP V
Number of Countries: 095  Number of Patents: 003
Patent Family:

| Patent No | Kind | Date | Applicat No | Kind | Date | Week |
|---|---|---|---|---|---|---|
| WO 200225534 | A2 | 20020328 | WO 2001US27433 | A | 20010905 | 200245 B |
| AU 200188708 | A | 20020402 | AU 200188708 | A | 20010905 | 200252 |
| GB 2384084 | A | 20030716 | WO 2001US27433 | A | 20010905 | 200347 |
| | | | GB 20036433 | A | 20030320 | |

Priority Applications (No Type Date): US 2000665919 A 20000920
Patent Details:

| Patent No | Kind | Lan | Pg | Main IPC | Filing Notes |
|---|---|---|---|---|---|
| WO 200225534 | A2 | E | 67 | G06F-017/60 | |

   Designated States (National): AE AG AL AM AT AU AZ BA BB BG BR BY BZ CA
   CH CN CO CR CU CZ DE DK DM DZ EC EE ES FI GB GD GE GH GM HR HU ID IL IN
   IS JP KE KG KP KR KZ LC LK LR LS LT LU LV MA MD MG MK MN MW MX MZ NO NZ
   PL PT RO RU SD SE SG SI SK SL TJ TM TR TT TZ UA UG UZ VN YU ZA ZW
   Designated States (Regional): AT BE CH CY DE DK EA ES FI FR GB GH GM GR
   IE IT KE LS LU MC MW MZ NL OA PT SD SE SL SZ TR TZ UG ZW

| AU 200188708 | A | | | G06F-017/60 | Based on patent WO 200225534 |
| GB 2384084 | A | | | G06F-017/60 | Based on patent WO 200225534 |

Abstract (Basic): WO 200225534 A2
      NOVELTY - Assets withdrawn from one account at specific payment
   network are deposited to another account at a payment network different
   from the prior one, when the two accounts have a common account holder.
      DETAILED DESCRIPTION - INDEPENDENT CLAIMS are also included for the
   following:
      (a) One/more computer-readable memories storing financial
   transaction program;
      (b) Financial management apparatus
      USE - In financial institutions like banks, savings and loans,
   credit unions, mortgage companies, lending companies and for stock
   brokers, for transaction in asset accounts like savings accounts, debt
   accounts like credit card and mortgage accounts, home equity loans,
   overdraft protection, other loans, margin accounts, personal loans, for
   money market accounts, checking accounts, certificates of deposit,
   mutual funds, bonds and equities.
      ADVANTAGE - Fund transfers are initiated to automatically execute

the recommended fund adjustments, if initiated by the user.

DESCRIPTION OF DRAWING(S) - The figure illustrates a network like Internet using which various servers, computing devices and financial management systems exchange data.

pp; 67 DwgNo 1/19

Title Terms: COMPUTER; FINANCIAL; TRANSACTION; METHOD; BANK; DEPOSIT; WITHDRAW; ONE; ACCOUNT; ACCOUNT; TWO; ACCOUNT; COMMON; ACCOUNT; HOLD

Derwent Class: T01; T05

International Patent Class (Main): G06F-017/60

File Segment: EPI

Manual Codes (EPI/S-X): T01-N01A1; T01-S03; T05-L02

1/9/4

**DIALOG(R)File 351:Derwent WPI**
**(c) 2006 Thomson Derwent. All rts. reserv.**

014375305   **Image available**
**WPI Acc No: 2002-196008/200225**
**Related WPI Acc No: 2003-139621; 2003-670855; 2005-020089; 2005-597412;**
**2005-604267; 2006-210778**
**XRPX Acc No: N02-148863**
 Analyzing financial data by recommending adjustment of assets among asset
 accounts to increase account holder interest earned
Patent Assignee: CASHEDGE INC (CASH-N)
Inventor: DHEER S, DILIP V
Number of Countries: 096  Number of Patents: 003
Patent Family:
Patent No   Kind  Date    Applicat No   Kind  Date    Week
WO 200210959  A2  20020207  WO 2001US23327  A   20010724  200225 B
AU 200180757  A   20020213  AU 200180757   A   20010724  200238
EP 1303818   A1  20030423  EP 2001959173  A   20010724  200329
                 WO 2001US23327  A   20010724

Priority Applications (No Type Date): US 2000621946 A 20000724
Patent Details:
Patent No Kind Lan Pg  Main IPC   Filing Notes
WO 200210959  A2 E  56 G06F-017/00
 Designated States (National): AE AG AL AM AT AU AZ BA BB BG BR BY BZ CA
 CH CN CO CR CU CZ DE DK DM DZ EC EE ES FI GB GD GE GH GM HR HU ID IL IN
 IS JP KE KG KP KR KZ LC LK LR LS LT LU LV MA MD MG MK MN MW MX MZ NO NZ
 PL PT RO RU SD SE SG SI SK SL TJ TM TR TT TZ UA UG UZ VN YU ZA ZW
 Designated States (Regional): AT BE CH CY DE DK EA ES FI FR GB GH GM GR
 IE IT KE LS LU MC MW MZ NL OA PT SD SE SL SZ TR TZ UG ZW
 AU 200180757  A    G06F-017/00  Based on patent WO 200210959
 EP 1303818   A1 E   G06F-017/00  Based on patent WO 200210959
 Designated States (Regional): AL AT BE CH CY DE DK ES FI FR GB GR IE IT
 LI LT LU LV MC MK NL PT RO SE SI TR

Abstract (Basic): WO 200210959 A2
     NOVELTY - Method consists in analyzing asset accounts having a
 common account holder for associated attributes such as interest rates
 and determining whether an adjustment of assets would benefit the
 holder. The best market interest rates are identified for similar asset
 accounts and opening a new asset account is recommended if available
 rates are better. The asset accounts are associated with financial
 institutions.
     DETAILED DESCRIPTION - There are INDEPENDENT CLAIMS for (1) a
 financial data analysis program, (2) a financial management system.
     USE - Method is for analyzing multiple financial accounts and other
 market data for optimisation of assets or liabilities.
     ADVANTAGE - Method enables recommendations for adjustment of
 account funds.
     DESCRIPTION OF DRAWING(S) - The figure shows a network environment
 for the method.
     pp; 56 DwgNo 1/15

Title Terms: FINANCIAL; DATA; ADJUST; ACCOUNT; INCREASE; ACCOUNT; HOLD;
  INTEREST
Derwent Class: T01
International Patent Class (Main): G06F-017/00
File Segment: EPI
Manual Codes (EPI/S-X): T01-J05A2C; T01-M06A1A; T01-N01A2F; T01-S03

# EXHIBIT 14



US007013310B2

(12) **United States Patent**
  Messing et al.

(10) **Patent No.:     US 7,013,310 B2**
(45) **Date of Patent:     Mar. 14, 2006**

(54) **METHOD AND APPARATUS FOR RETRIEVING AND PROCESSING DATA**

(75) Inventors: **Roy Messing**, Ridgefield, CT (US); **Jeremy N. Sokolic**, New York, NY (US); **Sanjeev Dheer**, Scarsdale, NY (US); **Venkatachari Dilip**, Cupertino, CA (US)

(73) Assignee: **CashEdge, Inc.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 531 days.

(21) Appl. No.: **10/040,314**

(22) Filed: **Jan. 3, 2002**

(65) **Prior Publication Data**

US 2003/0126134 A1 Jul. 3, 2003

(51) **Int. Cl.**
  *G06F 17/00*       (2006.01)

(52) **U.S. Cl.** .................. 707/104.1; 707/102; 707/101; 707/103 R

(58) **Field of Classification Search** .............. 707/104.1, 707/102, 103 R, 3, 10; 709/225, 228, 230; 382/115; 379/67.1; 715/523
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,805,719 A | * | 9/1998 | Pare, Jr. et al. ............. | 382/115 |
| 5,855,020 A | * | 12/1998 | Kirsch ......................... | 707/10 |
| 5,895,838 A | * | 4/1999 | Harjunmaa et al. ...... | 73/864.13 |
| 6,038,603 A | * | 3/2000 | Joseph ....................... | 709/228 |
| 6,381,592 B1 | * | 4/2002 | Reuning ...................... | 707/3 |
| 6,609,128 B1 | * | 8/2003 | Underwood ................. | 707/10 |
| 6,697,860 B1 | * | 2/2004 | Kung ......................... | 709/225 |
| 6,792,082 B1 | * | 9/2004 | Levine ....................... | 379/67.1 |

* cited by examiner

*Primary Examiner*—Alford Kindred
*Assistant Examiner*—Sana Al-Hashemi
(74) *Attorney, Agent, or Firm*—Lee & Hayes, PLLC

(57)       **ABSTRACT**

Data is captured from a web site or other data source. Data is extracted from the web page using a data harvesting script or other data acquisition routine. The extracted data is then normalized and stored in a database. If data cannot be extracted from the web page, a copy of the captured web page is stored without personal information contained in the web page. The data harvesting script is then edited based on an analysis of the captured web page.

**29 Claims, 7 Drawing Sheets**







*Fig. 1*



*Fig. 2*



302 — CAPTURE AN HTML SCREEN FROM A FINANCIAL INSTITUTION

304 — EXTRACT DATA FROM THE HTML SCREEN USING A DATA HARVESTING SCRIPT

306 — NORMALIZE THE EXTRACTED DATA

308 — STORE THE NORMALIZED DATA IN THE DATABASE

*Fig. 3A*



352 — RETRIEVE DATA FROM A DATA SOURCE

354 — IDENTIFY DATA OF INTEREST RETRIEVED FROM THE DATA SOURCE

356 — NORMALIZE THE IDENTIFIED DATA

358 — STORE THE NORMALIZED DATA IN THE DATABASE

*Fig. 3B*

400



*Fig. 4*

500

510



*Fig. 5*



602 — CAPTURE A FINANCIAL INSTITUTION SCREEN SHOT

604 — REMOVE PERSONAL INFORMATION FROM THE SCREEN SHOT

606 — IDENTIFY AND SORT FAILED UPDATES

608 — REPORT AND ASSIGN BUGS

610 — ACCESS HTML DATA TO REPAIR SCRIPTS

612 — CAPTURE NEXT FINANCIAL INSTITUTION SCREEN SHOT

600

*Fig. 6*



*Fig. 7*

US 7,013,310 B2

1

# METHOD AND APPARATUS FOR RETRIEVING AND PROCESSING DATA

## TECHNICAL FIELD

The present invention relates to the retrieval and processing of data collected from web pages and/or other data sources.

## BACKGROUND

Individuals, businesses, and other organizations typically maintain one or more financial accounts at one or more financial institutions. Financial institutions include, for example, banks, savings and loans, credit unions, mortgage companies, lending companies, and stock brokers. A customer's financial accounts may include asset accounts (such as savings accounts, checking accounts, certificates of deposit (CDs), mutual funds, bonds, and equities) and debt accounts (such as credit card accounts, mortgage accounts, home equity loans, overdraft protection, and other types of loans).

Many financial institutions allow customers to access information regarding their accounts via the Internet or other remote connection mechanism (often referred to as "online banking"). Typically, the customer navigates, using a web browser application, to a web site maintained by the financial institution. The web site allows the customer to login by entering a user identification and an associated password. If the financial institution accepts the user identification and password, the customer is permitted to access information (e.g., account holdings and account balances) regarding the financial accounts maintained at that financial institution.

Similarly, other organizations and institutions allow customer access to other types of accounts, such as email accounts, award (or reward) accounts, online bill payment accounts, etc. A user may navigate a web site or other information source to receive status information regarding one or more of their accounts.

Certain application programs are able to extract data from web pages based on a previously defined layout of information on the web pages. For example, an account balance may be positioned in a particular location of a specific web page. The application program extracts the account balance data from that particular location to obtain a customer's current account balance. However, if the layout of the web page is modified, the previously defined layout of information on the web page is not accurate and the application program cannot properly extract the desired data from the web page.

The systems and methods described herein addresses these and other problems by providing a mechanism for updating the manner in which data is extracted from web pages when a web page layout is changed.

## SUMMARY

The systems and methods described herein automatically extract data from web pages and other data sources associated with various institutions. The data is extracted from a data source, such as a web page using a data harvesting script or other data extraction/data acquisition routine. The extracted data is stored in a database using a standard format. If the layout of data on a particular web page changes, a copy of the web page is captured and stored for future analysis when updating one or more data extraction procedures (e.g., data harvesting scripts). Personal or confidential information is deleted from the captured web page before storing the captured web page.

A particular embodiment captures a web page from an institution's web site. Data is extracted from the web page using a data harvesting script. The extracted data is then normalized and stored in a database.

In another embodiment, a web page is captured from a web site. An attempt is made to extract data from the web page using a data harvesting script. If data cannot be extracted from the web page, personal information is removed from the captured web page and the captured web page (without the personal information) is stored.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates an exemplary network environment in which various servers, computing devices, and a financial analysis system exchange data across a network, such as the Internet.

FIG. 2 is a block diagram showing exemplary components and modules of a financial analysis system.

FIGS. 3A and 3B are flow diagrams illustrating procedures for retrieving data from an HTML screen and another data source.

FIGS. 4 and 5 illustrate exemplary web pages associated with a particular financial institution.

FIG. 6 is a flow diagram illustrating a procedure for retrieving financial data and adjusting a data harvesting script if the financial data layout has changed.

FIG. 7 is a block diagram showing pertinent components of a computer in accordance with the invention.

## DETAILED DESCRIPTION

The system and methods described herein are capable of automatically extracting data from web pages or other data sources associated with one or more accounts or institutions, such as financial accounts or financial institutions. A particular web page or data source may contain account information associated with a customer of a particular institution. If an error occurs when attempting to extract data from a web page, a copy of the web page is saved for future analysis in determining the cause of the error and creating a new procedure for extracting data from the web page. When saving a copy of the web page for future analysis, confidential information is removed before storing the web page, thereby reducing the possibility of inadvertently exposing confidential information contained in the web page.

As used herein, the terms "account holder", "customer", "user", and "client" are interchangeable. "Account holder" refers to any person having access to an account. A particular account may have multiple account holders (e.g., a joint checking account having husband and wife as account holders or a corporate account identifying several corporate employees as account holders).

Various financial account and financial institution examples are provided herein for purposes of explanation. However, the methods and procedures described herein can be applied to any type of transaction involving any type of account. For example, a data aggregation system may aggregate data from multiple sources, such as multiple financial accounts, multiple email accounts, multiple online award (or reward) accounts, multiple news headlines, and the like. Similarly, the data retrieval and data processing systems and methods discussed herein may be applied to collect data from any type of account containing any type of data. Thus, the methods and systems described herein can be applied to a data aggregation system or any other account management system instead of the financial analysis system discussed in the examples provided herein.

FIG. 1 illustrates an exemplary network environment 100 in which various servers, computing devices, and a financial analysis system exchange data across a network, such as the Internet. The network environment of FIG. 1 includes mul-

US 7,013,310 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

tiple financial institution servers 102, 104, and 106 coupled to a data communication network 108, such as the Internet. Data communication network 108 may be any type of data communication network using any network topology and any communication protocol. Further, network 108 may include one or more sub-networks (not shown) which are interconnected with one another.

A client computer 110 and a financial analysis system 112 are also coupled to network 108. Financial analysis system 112 includes a database 114 that stores various data collected and generated by the financial analysis system. Financial analysis system 112 performs various account analysis and data analysis functions, as discussed in greater detail below.

Client computer 110 and financial analysis system 112 may be any type of computing device, such as a desktop computer, a laptop computer, a palmtop computer, a personal digital assistant (PDA), a cellular phone, or a set top box. Client computer 110 communicates with one or more financial institution servers 102–106 to access, for example, information about the financial institution and various user accounts that have been established at the financial institution. Each of the financial institution servers 102–106 is typically associated with a particular financial institution and store data for that financial institution.

The communication links shown between network 108 and the various devices (102, 104, 106, 110, and 112) shown in FIG. 1 can use any type of communication medium and any communication protocol. For example, one or more of the communication links shown in FIG. 1 may be a wireless link (e.g., a radio frequency (RF) link or a microwave link) or a wired link accessed via a public telephone system or another communication network.

FIG. 2 is a block diagram showing exemplary components and modules of financial analysis system 112. A communication interface 202 allows the financial analysis system 112 to communicate with other devices, such as one or more financial institution servers. In one embodiment, communication interface 202 is a network interface to a local area network (LAN), which is coupled to another data communication network, such as the Internet.

A database control module 204 allows financial analysis system 112 to store data to database 114 and retrieve data from the database. Financial analysis system 112 also stores various financial institution data 206, which may be used to locate and communicate with various financial institution servers. Financial institution data 206 includes, for example, account balance information, transaction descriptions, transaction amounts, and security holdings.

A variety of data harvesting scripts 208 are also maintained by financial analysis system 112. For example, a separate data harvesting script 208 may be maintained for each financial institution from which data is extracted. Data harvesting (also referred to as "screen scraping") is a process that allows, for example, an automated script to retrieve data from one or more web pages associated with a web site. Data harvesting may also include retrieving data from a data acquisition or data retrieval procedure. Additional details regarding data harvesting and data harvesting scripts are provided below.

Financial analysis system 112 includes a data capture module 210 and a data extraction module 214. The data capture module 210 captures data (such as web pages or OFX data) from one or more data sources. The data extraction module 214 retrieves (or extracts) data from the captured web pages or other data sources. The data extraction module 214 may use one or more data harvesting scripts 208 to retrieve data from a web page. A personal information filter module 212 removes confidential information from a web page. Thus, the majority of the content of the web page

can be stored for future access without risking exposure of an account holder's confidential information.

Data capture module 210 may also retrieve data from sources other than web pages. For example, data capture module 210 can retrieve data from a source that supports the Open Financial Exchange (OFX) specification or the Quicken Interchange Format (QIF). OFX is a specification for the electronic exchange of financial data between financial institutions, businesses and consumers via the Internet. OFX supports a wide range of financial activities including consumer and business banking, consumer and business bill payment, bill presentment, and investment tracking, including stocks, bonds, mutual funds, and 401(k) account details. QIF is a specially formatted text file that allows a user to transfer Quicken transactions from one Quicken account register into another Quicken account register or to transfer Quicken transactions to or from another application that supports the QIF format.

A failure analysis module 218 in financial analysis system 212 analyzes the failure of a data harvesting script and determines why the script failed. For example, if a web page is redesigned by a financial institution, a data harvesting script that has not been updated to reflect the new web page design may not operate properly. In this situation, the information sought by the data harvesting script may have been moved to a different location on the new web page. The failure analysis module 218 assists a user in identifying the reason for the script failure. A script editing module 216 assists a user in editing a data harvesting script to function properly with a new web page design.

FIGS. 3A and 3B are flow diagrams illustrating procedures for retrieving data from an HTML screen and another data source. Specifically, FIG. 3A is a flow diagram illustrating a procedure 300 for retrieving data from an HTML screen. Initially, the procedure 300 captures an HTML (HyperText Markup Language) screen from a financial institution web site (block 302). For example, the HTML screen may be a web page associated with the financial institution. Data is then extracted from the HTML screen using a data harvesting script (block 304). The extracted data is then normalized (block 306), which refers to the process of arranging the extracted data into a standard format such that data collected from a variety of different web pages is arranged (or normalized) into the same format. The normalized data is then stored in the database (e.g., database 114 in FIG. 1) for future reference (block 308).

The normalizing of data is useful when collecting data from multiple sources (e.g., multiple financial institutions). Each financial institution may use different terms for the same type of data. For example, one financial institution may use the term "buy" while another financial institution uses the term "purchase" for the same type of transaction. By normalizing the data, a single database can be used to store financial information related to multiple different financial institutions. Thus, various financial analysis tools and procedures can be used to analyze data across multiple financial institutions or other data sources.

As mentioned above, data harvesting (or screen scraping) is a process that allows an automated script to retrieve data from a web site and store the retrieved data in a database. The data harvesting scripts are capable of navigating web sites and capturing individual HTML pages. For example, JavaScript and images may be removed from the HTML pages or converted into HTML text if it contains account information. A parser then converts the HTML data into a field-delimited XML format. The XML data communicates with enterprise java beans (EJBs) through an XML converter. EJBs perform a series of SQL queries that populate the data into the database. The success of a particular data harvesting process is related to the layout of the web site

US 7,013,310 B2

5

being harvested in two important ways: 1) the data harvesting script must navigate to the correct HTML page, and 2) the parser must know which cells in the HTML tables contain specific data items.

FIG. 3B is a flow diagram illustrating a procedure 350 for retrieving and processing data from a data source (other than an HTML screen). The data source may be, for example, a financial institution or other provider of financial data. The data source may also be referred to as a "file download source" or a "data download source". The data source may communicate data using the OFX standard, the QIF format, or some other data format. The procedure 350 begins by retrieving data from a data source (block 352). The procedure identifies data of interest from the retrieved data (block 354). The data of interest may be, for example, data associated with a particular customer's accounts. The identified data is then normalized (block 356) and stored in the database (block 358). The database may contain data related to other customers and/or data collected from other sources (such as HTML screens).

FIGS. 4 and 5 illustrate exemplary web pages 400 and 500, respectively, associated with a particular financial institution. A particular data harvesting script may look for specific text on the web page to confirm that the script has navigated to the correct site. For example, to ensure that the Vanguard screen scraping script has navigated to the "Quick Links" web page, the script looks for the phrase "Common Tasks" in row 1 of table 1 (see the portion of the web page surrounded by a ring 410). If this phrase is found, the script can then navigate to row two and select the "Access my Accounts" link that takes the script to a secure login page (e.g., an HTTPS login page). If the script cannot locate the phrase "Common Tasks" it will generate an exception error and stop running.

Once the script has found the correct page, pattern matches are used by the parser to determine the appropriate cell from which to retrieve specific data items. For example, once the data harvesting script has navigated to the "Account Values" page (shown in FIG. 5), the script identifies the correct row from which to retrieve data by pattern matching a combination of the fund/account number and the fund name in columns one and two. The script also matches the column header name and then moves down the column to the appropriate row in the column. In this example, the parser will populate the data field "Account Value" with the data in the cell in row one and column five. This account value information is highlighted by a ring 510 in FIG. 5.

FIG. 6 is a flow diagram illustrating a procedure 600 for retrieving financial data and adjusting a data harvesting script if the financial data layout has changed. Initially, the procedure 600 captures a financial institution screen shot (block 602). For example, a screen shot associated with a particular financial institution web page or web site. Next, the procedure removes personal and/or confidential information from the screen shot (block 604). Example personal and/or confidential information that is removed includes customer name, address, telephone number, email address, and social security number.

The procedure 600 then identifies and sorts all failed updates (block 606). A failed update may occur when a data harvesting script attempts to update a user's account information but the layout of the financial institution's web pages have changed. The procedure may search the database for all failed updates by error code (error codes are discussed in greater detail below). The results of the search are provided to one or more individuals responsible for updating screen scraping scripts. Next, bugs are reported and assigned to a particular individual or group for processing (block 608).

At block 610, a user accesses the HTML data (i.e., the screen shot captured from the financial institution) to repair

6

the scripts that are not functioning properly. The procedure then continues to block 612, which captures the next financial institution screen shot. The procedure returns to block 604 to remove personal information from the captured screen shot.

When a data harvesting script is unable to access a particular web page (or web site) or is unable to locate information on the web page an error occurs. The data harvesting script contains error detection mechanisms that identify errors and generate one or more error codes associated with the identified errors. Each error has an associated error code that identifies the particular error. Table 1 below identifies several example error codes as well as a corresponding title and description of the error that occurred.

TABLE 1

| Error Code | Title | Description |
|---|---|---|
| 100 | Web Page Modified | Unable to retrieve account information from financial institution web page due to changes in web page. |
| 101 | Time Out | Unable to retrieve account information due to high network traffic. |
| 102 | Connection Failed | Unable to retrieve account information due to network connection problems. |
| 103 | Web Site Unavailable | Unable to retrieve account information because the financial institution web site is not available. |
| 104 | Login Failure | Unable to retrieve account information because the username/password combination provided by user failed. |

Different actions may be performed depending on the error detected. For example, if the web page has been modified, the screen shot of the modified web page is provided to one or more individuals to analyze and update the corresponding data harvesting script to properly extract data from the modified web page. If the error indicates a failed network connection, the financial analysis system may attempt to retrieve the desired web pages at a later time. If the error indicates that the username and/or password provided by the user is incorrect, the financial analysis system may request the user verify the username and password provided with the account being accessed.

The error codes may be processed by an automated error handling routine to notify the proper individual, or group of individuals, of the error. For example, a database error may be automatically routed to a group of individuals responsible for managing the database. Other error codes may indicate a problem with the information provided by the user. These error codes, such as an invalid password to access a user account, result in sending an error notice to the user, but do not represent a problem with the financial analysis system.

FIG. 7 is a block diagram showing pertinent components of a computer 700 in accordance with the invention. A computer such as that shown in FIG. 7 can be used, for example, to perform various procedures such as those discussed herein. Computer 700 can also be used to access a web site or other computing facility to access various financial information. The computer shown in FIG. 7 can function as a server, a client computer, or a financial analysis system, of the types discussed herein.

Computer 700 includes at least one processor 702 coupled to a bus 704 that couples together various system components. Bus 704 represents one or more of any of several types of bus structures, such as a memory bus or memory controller, a peripheral bus, and a processor or local bus using any of a variety of bus architectures. A random access memory (RAM) 706 and a read only memory (ROM) 708 are coupled to bus 704. Additionally, a network interface 710

US 7,013,310 B2

7

and a removable storage device 712, such as a floppy disk or a CD-ROM, are coupled to bus 704. Network interface 710 provides an interface to a data communication network such as a local area network (LAN) or a wide area network (WAN) for exchanging data with other computers and devices. A disk storage 714, such as a hard disk, is coupled to bus 704 and provides for the non-volatile storage of data (e.g., computer-readable instructions, data structures, program modules and other data used by computer 700). Although computer 700 illustrates a removable storage 712 and a disk storage 714, it will be appreciated that other types of computer-readable media which can store data that is accessible by a computer, such as magnetic cassettes, flash memory cards, digital video disks, and the like, may also be used in the exemplary computer.

Various peripheral interfaces 716 are coupled to bus 704 and provide an interface between the computer 700 and the individual peripheral devices. Exemplary peripheral devices include a display device 718, a keyboard 720, a mouse 722, a modem 724, and a printer 726. Modem 724 can be used to access other computer systems and devices directly or by connecting to a data communication network such as the Internet.

A variety of program modules can be stored on the disk storage 714, removable storage 712, RAM 706, or ROM 708, including an operating system, one or more application programs, and other program modules and program data. A user can enter commands and other information into computer 700 using the keyboard 720, mouse 722, or other input devices (not shown). Other input devices may include a microphone, joystick, game pad, scanner, satellite dish, or the like.

Computer 700 may operate in a network environment using logical connections to other remote computers. The remote computers may be personal computers, servers, routers, or peer devices. In a networked environment, some or all of the program modules executed by computer 700 may be retrieved from another computing device coupled to the network.

Typically, the computer 700 is programmed using instructions stored at different times in the various computer-readable media of the computer. Programs and operating systems are often distributed, for example, on floppy disks or CD-ROMs. The programs are installed from the distribution media into a storage device within the computer 700. When a program is executed, the program is at least partially loaded into the computer's primary electronic memory. As described herein, the invention includes these and other types of computer-readable media when the media contains instructions or programs for implementing the steps described below in conjunction with a processor. The invention also includes the computer itself when programmed according to the procedures and techniques described herein.

For purposes of illustration, programs and other executable program components are illustrated herein as discrete blocks, although it is understood that such programs and components reside at various times in different storage components of the computer, and are executed by the computer's processor. Alternatively, the systems and procedures described herein can be implemented in hardware or a combination of hardware, software, and/or firmware. For example, one or more application specific integrated circuits (ASICs) can be programmed to carry out the systems and procedures described herein.

Although the description above uses language that is specific to structural features and/or methodological acts, it is to be understood that the invention defined in the appended claims is not limited to the specific features or acts described. Rather, the specific features and acts are disclosed as exemplary forms of implementing the invention.

8

What is claimed is:

1. A method comprising:
capturing a web page from a web site; comprising:
extracting data from the web page using a data harvesting script;
normalizing the extracted data with data extracted from other web pages;
generating a context-specific error code if the data harvesting script fails to successfully extract data from the web page;
adapting the data harvesting script based on identified changes to the web page; and
storing the normalized data in a database.

2. A method as recited in claim 1 wherein the web site is associated with a financial institution.

3. A method as recited in claim 2 wherein the captured web page contains information regarding a customer's account at the financial institution.

4. A method as recited in claim 1 wherein the web page is an HTML screen.

5. A method as recited in claim 1 further comprising:
capturing a second web page from a second web site;
extracting data from the second web page using the data harvesting script;
normalizing the data extracted from the second web page with data extracted from other web pages;
generating a context-specific error code if the data harvesting script fails to successfully extract data from the second web page;
adapting the data harvesting script based on identified changes to the web page; and
storing the normalized data from the second web page in the database.

6. A method as recited in claim 1 wherein the context-specific error code identifies a type of change necessary to the data harvesting script to properly extract data from the web page.

7. A method as recited in claim 1 further comprising storing a copy of the captured web page if data cannot be extracted from the web page using the data harvesting script.

8. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 1.

9. A method comprising:
retrieving financial data associated with a user's financial account from a data source;
identifying data of interest retrieved from the data source;
generating a context-sensitive error code if the data of interest is not successfully retrieved from the data source, wherein the context-sensitive error code is used to modify the manner in which data is retrieved from the data source;
normalizing the identified data; and
storing the normalized data in a database.

10. A method as recited in claim 9 further comprising:
retrieving financial data associated with a user from a second data source;
normalizing the data retrieved from the second data source; and
storing the normalized data in the database.

11. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 9.

12. A method comprising:
capturing a web page from a web site;

US 7,013,310 B2

9

10

attempting to extract data from the web page using a data harvesting script;

if data cannot be extracted from the web page;

removing pre-determined personal information from the captured web page;

storing the captured web page without the personal information;

analyzing the web page and the data harvesting script to determine why data could not be extracted from the web page; and

adapting the data harvesting script based on the determination why data could not be extracted from the web page.

13. A method as recited in claim 12 further comprising editing the data harvesting script based on an analysis of the captured web page, wherein the edited data harvesting script successfully extracts data from the web page.

14. A method as recited in claim 12 further comprising:

editing the data harvesting script based on an analysis of the captured web page;

capturing a new version of the web page from the web site; and

extracting data from the web page using the edited data harvesting script.

15. A method as recited in claim 14 further comprising:

normalizing the data extracted from the web page; and

storing the normalized data in a database.

16. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 12.

17. A method comprising:

capturing a first web page from a first financial institution web site;

capturing a second web page from a second financial institution web site;

extracting data from the first web page using a first data harvesting script;

extracting data from the second web page using a second data harvesting script;

normalizing the data extracted from the first web page and the second web page;

generating a context-specific error code if the first data harvesting script fails to successfully extract data from the first web page; and

storing the normalized data in a database.

18. A method as recited in claim 17 further comprising generating an error message if data cannot be extracted from the first web page or the second web page.

19. One or more computer-readable memories containing a computer program that is executable by a processor to perform the method recited in claim 17.

20. A method as recited in claim 17 wherein capturing a first web page includes capturing a first set of web pages.

21. A method as recited in claim 17 wherein capturing a second web page includes capturing a second set of web pages.

22. An apparatus comprising:

a data capture module configured to capture a first web page from a first web site associated with a first

financial institution and further configured to capture a second web page from a second web site associated with a second financial institution;

a personal information filter module coupled to the data capture module configured to remove personal information from one or more web pages, wherein the personal information filter module generates a specific error code if the personal information filter module is not able to identify personal information on a particular web page;

a data extraction module coupled to the data capture module and configured to extract data from the first and second web pages using a data harvesting script, the data extraction module further configured to normalize the data extracted from the first and second web pages, and wherein the data extraction module is adaptable based on changes to web pages that occur over time; and

a database control module coupled to the data extraction module and configured to store the normalized data in a common database.

23. An apparatus as recited in claim 22 wherein the data capture module is further configured to retrieve financial data associated with a user's account from a data source.

24. An apparatus as recited in claim 22 wherein the data extraction module is further configured to generate an error message if data cannot be extracted from the web page using the data harvesting script.

25. One or more computer readable media having stored thereon a plurality of instructions that, when executed by one or more processors, cause the one or more processors to:

capture a web page from a financial institution web site;

attempt to extract data from the captured web page using a data harvesting script;

remove personal information from the captured web page;

store the captured web page without the personal information; and

if data cannot be extracted from the web page, generate a context-specific error code and analyze the web page to determine why data could not be extracted from the web page.

26. One or more computer readable media as recited in claim 25, wherein if data cannot be extracted from the web page, the one or more processors further edit the data harvesting script based on an analysis of the captured web page and the context-specific error code.

27. One or more computer readable media as recited in claim 25, wherein the one or more processors further:

normalize the data extracted from the web page; and

store the normalized data in a database, wherein the database contains data extracted from other web pages.

28. A method as recited in claim 12 wherein the personal information includes at least one of: a social security number, an account number, or an account holder's name.

29. A method as recited in claim 22 wherein the personal information includes at least one of: a social security number, an account number, or an account holder's name.

* * * * *

# EXHIBIT 15



SOLUTIONS | TECHNOLOGY | CUSTOMERS | COMPANY

# ABOUT YODLEE

YODLEE

**About Yodlee**

**Press Room**

**Career Opportunities**

**Contact Us** >>

## CONTACT US

Contact to:        Marketing

Personal Details

Name:

Company:

Email Address:

Phone Number:

Your Comments:

Send us your inquiry

Yodlee does not sell directly to end users. All of our products are available through our clients, which include financial institutions and portals, and their Yodlee-powered services are typically offered free of charge under their private branding.

## Yodlee Offices

**Yodlee, Inc. Headquarter, Redwood City**
3600 Bridge Parkway, Suite 200
Redwood City, CA 94065
Telephone: +1 650 980 3600
Fax: +1 650 980 3602

**Yodlee, Inc. Atlanta**
One Concourse Parkway
Suite 660
Atlanta, GA 30328

**Yodlee, Inc. United Kingdom**
100 Pall Mall
St James's
London, SW1Y 5HP

**Yodlee, Inc. India**
"The Sirius", 69/3 Millers Road
Bangalore 560 052, India
Telephone: +91 80 2238 6930

Contact Us                                                                                    Page 2 of 2

Telephone: +44 0207 664 8845                              Fax: +91 80 2235 5863
Fax: +44 0207 664 8847
International@yodlee.com



contact us | careers | press room

© 2006 Yodlee, Inc.

# EXHIBIT 16



**SOLUTIONS | TECHNOLOGY | CUSTOMERS | COMPANY**



# SOLUTIONS OVERVIEW

**Solutions Overview >>**

Yodlee Solutions

Industry Leadership

Flexible Deployment
Options

**Personal Finance**

**Wealth Management**

**Risk Management**

**Market Research**

## Yodlee Helps Financial Services Providers:

- **Increase Share of Wallet** from better targeted promotions and deeper customer insights

- **Gain Transactional Revenue** from Funds Transfers and card-based Bill Payments.

- **Double an FSP's Cross-Sell** effectiveness to existing and prospective customers.

- **Increase Assets** under management.

- **Increase Customer Retention & Satisfaction** to help attract & retain the most valuable customers with highly "sticky" solutions

## Personal Finance & Bill Pay

- **OnCenter** – a powerful suite of personal finance applications, including portfolio manager, alerts, bill reminders, expense tracker, net worth view, and more makes an FSP's site highly "sticky"

- **Funds Transfer** – enables real-time money movement between any two financial accounts

- **BillDirect** – an inexpensive and feature-rich bill pay service with robust bill presentment and compelling alerts

- **CardDirect** – the only bill pay to enable card payments and earn FSPs interchange revenue

- **Direct Payments SDK** – the easiest way to "card-enable" existing bill pay applications to earn revenue for every payment

## Wealth Management

- **AdvisorView** – increases assets under management by giving advisors a more holistic client view and event-triggered alerts (e.g., 401k Rollovers)

## Risk Management

- **Instant Account Verification** – dramatically reduces the risks and costs of online transactions by verifying account ownership and available funds in real-time

**Market Research**
**RESOURCES**

Yodlee solutions to help Financial Services Providers - Personal Finance, Wealth Management, Ri...    Page 2 of 2

- **InsideView** – provides deep, rich account data to help market research firms automate data collection from consumer panels to lower costs, decrease panelist attrition, and enhance data insights on consumer behavior

Yodlee, Inc. is the leading provider of innovative, reliable and secure technology solutions that enable more satisfying and profitable relationships for financial institutions and their clients. Based on the patented Yodlee Platform, Yodlee solutions enable powerful Personal Finance, Wealth Management, Risk Management and Market Research applications for more than 150 leading companies, including AOL, Bank of America, Charles Schwab, E*TRADE FINANCIAL Corporation, Fidelity, JPMorgan Chase, Merrill Lynch, MSN, and Wachovia.



contact us | careers | press room

© 2006 Yodlee, Inc.

# EXHIBIT 17





# ABOUT YODLEE

## About Yodlee

## Press Room >>

Yodlee in the News

Recent Press Releases

2004 Press Releases

2003 Press Releases

Older Press Releases

Media Contacts

## Career Opportunities

## Contact Us

# PRESS ROOM

## Yodlee Launches New AccountOpening Product

### Redwood City, Calif. - April 10, 2006

Yodlee Inc. today added a new product to its suite of solutions - Yodlee AccountOpening - to help financial institutions streamline and expedite the process of opening new bank and accounts online.

With Yodlee AccountOpening, financial institutions can reduce the risk associated with oper accounts, increase the number of accounts successfully opened, and provide a superior on experience for customers.

"The reality is that opening an account online today is not easy, and nearly 70 percent of ac opened online never get funded," said Peter Hazlehurst, senior vice president of product development at Yodlee. "We realized in looking at the problem that our technology could dr simplify the process and reduce risk. AccountOpening is a natural complement to our AccountVerification and FundsTransfer solutions, providing an elegant and complete offerir

Yodlee AccountOpening enables financial institutions to use their website, self-service bran and other channels to open new accounts and fund them immediately through an automate that links credit databases, normalizes data and creates a dashboard in real-time so institut immediately assess risk for any consumer opening an account.

"Online account opening will play an increasingly important role within the retail banking ind banks continue to look for lower cost channels to acquire and service customers, and geog becomes less of a deciding factor on where consumers bank," said Dan Schatt, senior anal Celent, LLC. "Consumers value quick and convenient solutions. The ability to open and fun account seamlessly without sending in a physical check or interacting with a branch teller o center representative provides a solid consumer value proposition."

### How it Works

A typical online account opening process involves three key components

1. Verification of Account Ownership
2. Initial (as well as ongoing) Funding of the account
3. Identity Verification.

Yodlee Press Releases

Yodlee already addresses both real-time verification, via its AccountVerification product, an to-account money movement, via its FundsTransfer product. The third piece: identity verific leverages Yodlee's patented data gathering techniques to check external database sources matching as many components as required - including address, phone number, driver's lice social security number, credit record, etc. - for a complete, real-time 'decisioning dashboard financial institution.

The three integrated components together make up Yodlee AccountOpening - the most cor customizable account opening solution available. AccountOpening enables financial instituti seamlessly gather all required data from new customers and complete their initial deposit o purchase transaction all in the same session, decreasing abandonment and increasing tran revenues.

## Flexible Deployment Options

Because each financial institution has its own unique process for handling account opening offers multiple options for deployment. Financial institutions can deploy Yodlee's solutions a outsourced ASP solution or only select the components needed. Alternatively, financial inst can use the developer-friendly software developer kit (SDK) to write their own user interface branch, kiosk and phone channels. Yodlee AccountOpening will be available Q2/2006 and with Yodlee's professional services expertise to ensure a fully integrated, customized accou opening solution.

AccountOpening joins Yodlee's suite of financial solutions, which includes BillDirect for reve generating electronic bill presentment and payment, OnCenter and FundsTransfer for perso financial management, AdvisorView for wealth management, and AccountVerification for ris management. Today, there are over seven million consumers using Yodlee-powered servic many of the leading bank, brokerage, and portal sites, with more than two million accounts refreshed/updated via the Yodlee Platform each day.

## About Yodlee

Yodlee powers financial applications for millions of consumers at the leading banks, brokera portals, helping financial services providers (FSPs) drive more satisfying and profitable cust relationships from their online channel. Yodlee's suite of solutions - including bill pay, PFM, advisor applications - automate and simplify consumers' financial chores while generating n revenue opportunities for FSPs. The company's patented technology brings together the isl personal account data users typically have scattered at various financial websites to offer a centralized, secure way to manage their money, track their net worth, pay bills, and protect fraud. Yodlee has amassed nearly seven million users, over $250 billion in aggregated asse the network, and more than 100 clients, including the world's top financial institutions and p such as Ameriprise Financial, AOL, Bank of America, Fidelity, JPMorgan Chase, Merrill Lyr and Wachovia. Yodlee operates in the United States and the UK and is headquartered in R City, Calif. For more information, visit www.yodlee.com.

# # #

Yodlee is a registered trademark of Yodlee, Inc.



careers | contact us | press room

© 2006 Yodlee, Inc.

# EXHIBIT 18



US006633910B1

(12) **United States Patent**
Rajan et al.

(10) Patent No.: **US 6,633,910 B1**
(45) **Date of Patent:** **Oct. 14, 2003**

(54) **METHOD AND APPARATUS FOR ENABLING REAL TIME MONITORING AND NOTIFICATION OF DATA UPDATES FOR WEB-BASED DATA SYNCHRONIZATION SERVICES**

(75) Inventors: **Steeranga P. Rajan**, Santa Clara, CA (US); **Jonathan Wu**, Mountain View, CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/461,505**

(22) Filed: **Dec. 14, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/398,320, filed on Sep. 16, 1999, now Pat. No. 6,477,565.

(51) Int. Cl.⁷ ............................................. **G06F 15/173**
(52) U.S. Cl. ........................ 709/224; 709/226; 709/221
(58) Field of Search ................................ 709/224, 226, 709/221, 234; 717/168, 171, 172, 173, 174

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,978,838 A  * 11/1999  Greer et al. ................. 709/224

| | | | | |
|---|---|---|---|---|
| 6,012,087 A | * | 1/2000 | Freivald et al. | 709/218 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. | 707/501.1 |
| 6,219,818 B1 | * | 4/2001 | Freivald et al. | 714/799 |
| 6,253,198 B1 | * | 6/2001 | Perkins | 707/3 |
| 6,275,858 B1 | * | 8/2001 | Bates et al. | 709/228 |
| 6,366,933 B1 | * | 4/2002 | Ball et al. | 707/511 |
| 6,370,141 B1 | * | 4/2002 | Giordano et al. | 370/386 |
| 6,477,565 B1 | * | 11/2002 | Daswani et al. | 709/217 |

* cited by examiner

Primary Examiner—Zarni Maung
(74) Attorney, Agent, or Firm—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet subscription system for alerting subscribers to changes in data maintained at Internet sites has an input interface for a subscriber to specify a data condition to be monitored and a condition for notification and a gatherer for gathering data changes from one or more Internet sites. A guard compares data changes with the condition for notification, and a notification alert system notifies the subscriber of a change that meets the condition for notification. The system is particularly suited to notification requirements regarding metadata changes over multiple sources. Users can configure the system to many different frequencies and many different data and notification conditions. Alerts may be made to many different devices in different ways as well, and may or may not include specific data.

**11 Claims, 4 Drawing Sheets**





*Fig. 1*



*Fig. 2*



*Fig. 3*



***Fig. 4***

US 6,633,910 B1

**1**

# METHOD AND APPARATUS FOR ENABLING REAL TIME MONITORING AND NOTIFICATION OF DATA UPDATES FOR WEB-BASED DATA SYNCHRONIZATION SERVICES

## CROSS-REFERENCE TO RELATED DOCUMENTS

The present invention is a continuation-in-part (CIP) to a patent application entitled "Method and Apparatus for Restructuring of Personalized Data for Transmission from a Data Network to Connected and Portable Network Appliances" filed on Sep. 16, 1999 and accorded Ser. No. 09/398,320, now U.S. Pat. No. 6,477,565, disclosure of which is included in it's entirety by reference. The present invention is further related to U.S. patent application Ser. No. 09/323,598 filed on Jun. 1, 1999 and entitled "Method and Apparatus for Obtaining and Presenting WEB Summaries to Users", now U.S. Pat. No. 6,199,077, disclosure of which is also included herein by reference.

## FIELD OF THE INVENTION

The present invention is in the field of network information services including data gathering and transmission over wired and wireless network connections and pertains more particularly to methods and apparatus for monitoring changes to aggregated data in real time and notifying user/subscribers of such changes over user-prescribed mediums and connected devices.

## BACKGROUND OF THE INVENTION

The information system known in the art as the Internet, and the Internet subset known as the World Wide Web (WWW), is the largest publicly accessible source of information in the world. Anyone with an Internet-capable appliance and an Internet connection can navigate the Web to access virtually any type of data that may be held in any one of millions of network-connected servers adapted for the purpose.

The most usual network appliance used for navigating the Web and downloading data therefrom is the personal computer (PC). More recently however, a host of other electronic communication devices have been adapted for network connection and navigation on the Internet. Some of these better known devices include cellular telephones, personal digital assistants (PDA's), pagers, and notebook and laptop computers. Some types of these appliances access the Internet via wireless connection. In other cases, data from the Internet is transmitted to such devices through a gateway to a network specific to the device. An example would be that of a cellular phone or pager capable of accessing e-mail and other Internet accounts information.

The Internet operates under a shared bandwidth protocol wherein data packets are transmitted. Each transmission competes with all other current transmissions for available bandwidth resources. The total amount of bandwidth resource available to network appliances accessing the Internet is a function of network traffic, reliability and capability of lines, power of appliance processor, nature of intermediary network, and a host of other variables. It is not always possible to maintain an Internet connection for any reliable length of time considering all of these variables. Sometimes, there are periods when a device simply cannot gain access at all. In other cases physical connection is only possible on a periodic basis, and an appliance is therefore only intermittently connected.

**2**

Even with the more powerful and traditional PCs and notebook computers there may be times when available bandwidth suddenly drops resulting in a disconnect or "moof" as it is often termed. If a moof occurs when attempting to download data, another attempt must be made to reaccess the network, re-navigate to the data source, and attempt a retry of the data download. This can be frustrating for users operating such devices as cell phones, pagers or PDA's which are already operating on high latency and/or low bandwidth connections.

Administrators of network equipment and connection architecture as well as companies that host such as WEB-based information services and the like are improving aspects of communication with various portable network devices by upgrading lines and equipment, developing better data compression and bandwidth reservation techniques and lobbying for more bandwidth for wireless intermediary networks. However, one area that has been largely overlooked is the very format and structure of data that is transmitted. For example, HTML or XML-scripted content is largely unsuitable for transmission under low bandwidth conditions to small portable devices. As a result, such devices having lower memory and operating under lower bandwidth resources are limited to certain types of data such as only e-mail or voice mail.

A system known to the inventor and listed under the Cross-Reference to Related Documents section provides a capability of automated login and navigation to Internet or other network-connected sources for the purpose of retrieving and presenting WEB summaries to subscribers according to client/enterprise directives. This service uses scripted templates prepared by knowledge workers using known site logic to enable navigation, not just to the site, but to specific content posted on the site. A parsing method is then used to identify appropriate data based on the provided script directives.

The data obtained by the above-described method is stored in a server-accessible data repository for user access (via PC), or pushed to a user (PC or alternate appliance) according to enterprise rules. The data is typically presented in the form of a WEB page made accessible to a user having suitable equipment for retrieving and viewing such a page. However, in another embodiment, the data is re-formatted for transmission to a user-specified Internet appliance such as a cell phone, laptop, PDA, etc. The user must typically first access the service using a device that supports a browser interface. Data is then forwarded to alternative devices only on user request, and assuming the user has configured his or her alternative device for the service. In order to receive some types of data, special software and/or hardware changes must be made to the alternative appliances.

The above service does not support independent device access to the Internet (except for devices already capable of browser navigation), nor can it deliver certain content retrieved in a format that is not readily convertible to a format specific to the software running on such alternative devices. Moreover much content that would be convertible may still overload the memory of certain alternative devices, such as pagers or cell phones, if additional data restructuring and synchronization steps are not taken.

It will be appreciated that there is a growing variety of existing and new portable-type devices that are being adapted for Internet access. Most of these devices communicate according to device-specific protocol and are unable to receive and disseminate certain other types of data under normal circumstance. Furthermore, low bandwidth connec-

US 6,633,910 B1

3

tion states and limited memory provisions preclude many of these devices from broad Internet navigation capabilities and limit download capability in terms of time and type of data content that may be received.

A system known to the inventor and described in the cross-referenced patent application entitled "Method and Apparatus for Restructuring of Personalized Data for Transmission from a Data Network to Connected and Portable Network Appliances" allows data aggregated on a user's behalf to be restructured for delivery to varied portable devices by either a push or pull method. The data is restructured such that it may be easily stored and displayed according to specific device protocol. User/subscribers may elect to pre-configure a number of devices to the service. Once configured to the service, such devices may be used to synchronize with the aggregated data source maintained by the service on behalf of the user.

A possible problem with this system is that a user must periodically log-on and attempt synchronization with the aggregated data source to see if any new data has arrived. If new data is pushed to a user, it may happen at an inconvenient time such as when a user is engaged in some other important activity with a designated receiving device. In one aspect user notification of new data is posted on a WEB page such as a user's home page. However, a user must access the page with an Internet-navigation-capable device in order to see if there is any new data.

What is clearly needed is a method and apparatus allowing a user/subscriber to specify events and event triggers that may occur in data specific to the user and maintained for the user at specified Web sites, and for monitoring changes to such data on behalf of the user, and then notifying to the user of the occurrence of such data changes and events over any user-selected and defined medium and communication device. Such a system would be a convenience to a user in that he or she would be conveniently made aware of the existence of new aggregated data and/or specific and user-defined events in data, before having to log on to the service to check for new data, or having other important work interrupted by an unscheduled data-push to an otherwise engaged peripheral device.

SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet subscription system for alerting subscribers to changes in data maintained at Internet sites is provided, comprising an input interface for a subscriber to specify a data condition to be monitored and a condition for notification; a gatherer for gathering data changes from one or more Internet sites; a guard for comparing data changes with the condition for notification; and a notification alert system for notifying the subscriber of a change that meets the condition for notification.

In various embodiments of the system of the invention the condition for notification comprises data changes at two or more sites (metadata changes). In some embodiments there is a user-amendable time function to control frequency of access by the gatherer to Internet sites. Also in various the alert system sends an alert by the Internet network to a client's Internet-connected device. Such an alert may or may not include specific data from the sites in addition to the alert. Alerts may be by the Internet, by message systems to which a user subscribes, or by wireless network to devices not enabled for Internet connection, such as pagers and cell phones.

The system of the invention and methods of practicing the invention are taught in enabling detail below, and provide

4

for the first time a way for subscribers to monitor a very broad range of data, and to configure sophisticated conditions for a service to compare and notify the subscriber of changes in data over multiple sites.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 is a basic overview of a communication network wherein a data aggregation and tunneling service is hosted and operated according to an embodiment of the present invention.

FIG. 2 is a block diagram illustrating an exemplary hierarchy existing between various components of the data aggregation and tunneling service of FIG. 1.

FIG. 3 is a block diagram illustrating an exemplary client request/result loop progressing through the various process phases attributed to the service of the present invention.

FIG. 4 is a block diagram illustrating integration of various components of the monitoring and notification software of the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

According to a preferred embodiment of the present invention, a method and apparatus is provided that allows virtually any Internet-based data to be accessed, restructured, and then transmitted to a wide variety of network-capable appliances without requiring special software or hardware additions to the receiving devices, and in a form that the receiving device may display the data using an existing application on the device typically used for an entirely different purpose and function. Such method and apparatus is described in enabling detail below.

FIG. 1 is a basic overview of a communication network 9 wherein a data aggregation and tunneling service is hosted and operated according to an embodiment of the present invention. Communication network 9 comprises a data packet network 11, which is the well known Internet in this example, an Internet Service Provider (ISP) 15, and at least one exemplary wireless data network 13.

Network 11 may be another type of data packet network instead of the Internet such as perhaps a private or corporate wide area network (WAN) as long as Transfer Control Protocol/Internet protocol (TCP/IP) or other suitable network protocols are supported. Network 11, hereinafter referred to as Internet 11 for example purposes, is exemplified herein as a preferred embodiment because of the large public accessibility to the network. Such public accessibility lends to a preferred embodiment for hosting a large data-information service such as the service described in the cross-referenced application 09/323,598.

Internet 11 may comprise any geographical portion of the global network including such as data sub-networks connected thereto. Internet 11 has an Internet backbone 19 distributed throughout, which represents the many lines and connections making up the wired Internet. Three data servers 21, 23, and 25 are illustrated within Internet 11 and connected to backbone 19.

Servers 21–25 are, in this embodiment, file servers known in the art for serving data in such as hypertext markup language (HTML), XML, or other suitable languages associated with electronic information pages known as WEB pages in the art. It should be noted here that servers 21–25 are not limited to only serving WEB pages. In some embodiments, other data such as E-commerce data associ-

US 6,633,910 B1

5

ated with on-line forms, digital authorization certificates, secure digital signature forms and the like, may also be held in such servers. Moreover, any one of servers 21–25 may be adapted as an E-mail server or may be subject to any other adaptation for serving data.

ISP 15 is adapted, in this example, for providing Internet connection services as known in the art. Illustrated within ISP 15 are a main connection server 33, a mass data-repository 31, and a modem bank 29. Main server 33 is directly connected to Internet 11 as shown. Main server 33 is adapted to perform normal Internet service routines as known in the art, and is additionally enhanced via a unique software instance 51 for enabling practice of the present invention.

In one embodiment, an additional server may be provided for executing software 51 and enabling practice of the present invention in conjunction with main server 33. In another embodiment, more than one such server may be provided and adapted to execute individual instances of software 51. The inventor illustrates just one server 33 and SW 51 for the purpose of simplifying illustration and deems it sufficient for the purpose of explaining the present invention.

Main server 33 is connected to a data center 37 by a data link 35. Data center 37, among other tasks, provides an ISP (Internet) interface to server 33 for various wireless data networks represented by network 13. Network 13 is further characterized by the illustration of a communication satellite 17, which provides satellite rebroadcast of uplinked data streams from data center 37 and a backlink to data center 37 as illustrated by a dotted double arrow. As previously described, network 13 may be plural in the sense that plural wireless data networks common to certain communication devices may accomplish an interface to ISP 15 (server 33) through such as satellite 17 or another type of wireless transceiver/receiver and data center 37.

Within network 13 a variety of Internet-capable appliances are illustrated. As examples there are a pager 39, a notebook computer 41, and a cellular telephone 43. In this example, appliances 39–43 broadcast data, which is picked up by satellite 17 and relayed to data center 37. Similarly, data arriving to satellite 17 from data center 37 is broadcast to and received by appliances 39, 43, and 41 as illustrated herein with dotted double arrows representing respective two-way communication links. In the case of appliances 39 and 43, network 13 might be a cellular network typically implemented for those devices. In the case of notebook 41, network 13 may be a wireless Internet service using cellular or other suitable wireless technologies.

As previously described, main server 33 is also connected to modem bank 29 as is known in the art of landline Internet access through an ISP. A personal computer (PC) 45 operated by a user/subscriber to the service of the present invention is illustrated as connected to modem bank 29 by an Internet connection line 49. Line 49 may be a conventional telephone line, an integrated digital services network (ISDN) connection line, or any other suitable wired connection such as ADSL. A PDA 47 is illustrated by a dotted double arrow as having a wireless communication link to PC 45 as is common in the art of computer peripherals.

In the example of a subscriber service, data repository 31 would contain data about individual subscribers to the service of the present invention (user profiles and other user-specific records). Repository 31 may be an optical storage facility or any other convenient facility that is adapted for storing large amounts of data. Repository 31 is

6

illustrated as connected to main server 33 by a data connection 27. In this example, repository 31 is considered an off-line storage facility that is accessible to server 33. In another embodiment repository 31 may be a part of server 33, or in any other network-connected location such as on-line, or on a connected local area network (LAN). In addition to holding data specific to individual subscribers such as account information, address parameters, user ID and authorization data, repository 31 may also hold data gathered from such as Internet 11 before being delivered to or being accessed by users.

SW 51 executing on server 33 is provided, for the purpose of enabling a unique data-gathering and tunneling service that allows users operating such as appliances 39–43, and 47 to have structured access to data such as may be sourced in one of servers 21–25; and, to have the data restructured in an intelligent fashion for delivery to a specific Internet appliance that may not be normally adapted for receiving and displaying the data.

Software 51 provides, in this case, a unique subscriber service hosted by ISP 15 in which the service may be accessed and utilized by using any Internet-capable appliance . For the purpose of discussion, an Internet-capable appliance shall include any electronic communication device capable of a direct or indirect (through a connected network) connection to a data packet network such as Internet 11. Such devices may also include devices that may only receive data from such as Internet 11 as long as a separate device is used to access the service and upload a data request.

In practice of the present invention, a user operating such as cellular telephone 41, for example, accesses ISP 15 from anywhere in network 13 through a wireless path, exemplified herein by satellite 17 to data center 37, and registers a request for data. The data request in some cases may be manually initiated by a user, and in other cases automatically initiated on a periodic basis while the device is connected to the Internet. In some cases a request will be automatically initiated when the device connects to the Internet.

The nature of a request may vary under a broad set of rules set-up by a hosting enterprise (ISP 15) for types of requests. For example, one request may be for a data result of a site-specific search according to defined parameters such as was described in the characterization of a WEB summary disclosed in application Ser. No. 09/323,598. Another type of request may be for information about departure/arrival parameters and gate instructions associated with purchased airline tickets. Still another type of request may include a desire to access only the existing incoming mail from a certain individual or individuals. There are many possibilities. In a preferred embodiment a script for data requests may be a part of a user profile, and a single generic request from a user may trigger a variety of data searches and retrievals from Internet 11 on behalf of the user.

Data center 37 processes requests from network 13 and forwards them to main server 33 where they implemented. Various technological enhancements may be implemented in data center 37 to facilitate communication and interface capability with various portable appliances such as appliances 39–43. One example would be to provide an interactive voice response (IVR) unit (not shown) that may take a vocal or touch-tone initiated request originating from such as cell phone 43. Such an IVR may be included in data center 37 as a client interface.

The nature and content of a request from cell phone 43, for example, is analyzed and restructured into an equivalent

US 6,633,910 B1

7

Internet Protocol (P) request that can be uploaded into main server 33 over data link 35. This process is, in a preferred embodiment, performed in data center 37 with the data center having access to a portion of software 51 dedicated to the specific function. In another embodiment, a specific portion of software 51 may be provided to be executable on a connected machine at data center 37 for the purpose of analyzing requests of varied protocol and restructuring them into requests that can be understood on server 33.

Once a request from cell phone 43 is registered in main server 33 as an IP data request, data about the user is accessed from repository 31 for verification and authorization purposes. A scripted template supplied by a knowledge worker (not shown) is provided for accessing site logic during navigation and parsing as initiated by SW 51. Such knowledge workers may be stationed at data center 37, ISP 15, or any other centralized location that is connected to the service by network connection. The scripting, navigating, and parsing technology is fully explained and detailed in the co-related application Ser. No. 09/323,598. However, further innovation is required in order to accomplish the goal of the present invention, which is the intelligent restructuring of data coming into and leaving from the service of the present invention.

In the present example a ready request is queued for execution by SW 51 according to on-demand or in a scheduled fashion. Server 33, upon executing the request, navigates to one or more of servers 21–25 (for example, as representative of plural servers in the Internet) holding the requested data. The location of the data is then identified according to site logic provided in the scripted template. Located data is then parsed for specified content to be returned. The resulting data is aggregated in repository 31 if the request has a scheduled delivery or user access time. If the return data follows an on-demand criteria, then it is immediately processed and delivered over data link 35 to data center 37 for further processing before being broadcast over network 13 to a user operating such as cell phone 43.

In another aspect of the present invention, requests and return data may be registered and received by a user operating a PDA such as PDA 47, which is a peripheral to PC 45 illustrated as wired to Internet 11. In this embodiment, a user operating PDA 47 registers a request to server 33 under control from PDA 47. Additional processing concerning obtaining and returning information is the same as with previously described embodiment except that instead of using data center 37 as an interface, PC 45 acts as the interfacing machine. If requested data arrives to PC 45 in a format that is not discernable to PDA 47, then data restructuring may be performed in PC 45 by a provided instance of SW 51 that is dedicated to the purpose. PDA 47 would require no modification in either hardware or software. In yet another embodiment the client machine may be PC 45.

The method and apparatus of the present invention provides a unique capability of restructuring data in an intelligent way. That is, instead of simply converting one format of data into another, a first data set is analyzed and understood so that an alternate data set in a format specific to applications executable on a receiving device may be created that reflects the desired content and function of the first data set. More detail about how this is accomplished is provided below.

FIG. 2 is a block diagram illustrating an exemplary hierarchy and data transformation and flow existing between various components of the data aggregation and tunneling

8

service of FIG. 1. The service of the present invention in a preferred embodiment comprises three basic component layers. These component layers are illustrated herein as layer 53, layer 55 and layer 57. Layer 53 is best described as a source-data interface layer. This portion of the service is dedicated to navigating to and obtaining data from Internet-connected data sources. Data sources (S1-n) are analogous to servers 21–25 of FIG. 1. It will be appreciated that the number of data sources that are available on a network such as Internet 11 (FIG. 1) is vast. Data collected from S1–Sn is continually aggregated into such as repository 31 (FIG. 1) as indicated by the bi-directional arrows linking each S1–Sn to aggregation service 54. Aggregated data is tagged according to requesting user and target receiving device.

Layer 53 includes all of the means and processes required for locating and parsing user-requested data according to site-specific scripting techniques and funneling the collected data back to aggregation for storage under a user-specific ID parameters. Most, if not all of the data retrieved in layer 53 will be in the form of HTML, XML, or a similar protocol. Other than XML types of data may include various multi-media types associated with audio and video data, animated graphic data, or still graphic data. All data requested by any one user is aggregated under that user's ID parameters.

Data stored in aggregation is forwarded to layer 55 according to a pre-assigned schedule for processing. Layer 55 provides an internal process comprising data restructuring and primary interface capabilities. Data processing is the first phase of layer 55 as illustrated by process 56. It is in the main the data processing phase that is unique and distinguishes the present invention from that disclosed in the copending and referenced application Ser. No. 09/323,598.

Instead of simply converting data from one language or format into another in an attempt to render it usable to a specific Internet appliance, the present invention seeks to rewrite original data in an alternate format or language that accurately represents the data presented in the original format in terms of content and function. Data expressed in this alternate format (standardized) is then restructured into the appropriate device-specific format for transmission.

To accomplish the above-described task, it is required that data obtained in layer 53 be at least machine-legible in its given language or format and understood by software 51. SW 51 must also know parameters encompassing the formats and data presentation schemes of various software routines used in various Internet-capable appliances. For example, an HTML description of a flight reservation and gate instruction as presented on an information page (WEB page) would not be expressed as a text block in such as an electronic calendar, or a PDA. Rather, the same information would have to be restructured and expressed as a series of entries expressing time and date functions associated with the particular flight schedule.

In a preferred embodiment, an algorithm is employed as part of software 51 that can take information from provided input data-templates and restructure the information to fit pre-designed and associated output data-templates. For example, an input template is created for one or more records of network-based data. The input template renders the original data into a proprietary language similar to HTML and XML. The proprietary language or code expresses the original data in a standard format that may then be manipulated by algorithm. The input template holds the rendered data according to mapped slots.

An output template is created that is generic to the parameters and presentation scheme associated with a spe-

US 6,633,910 B1

9                                                  10

cific Internet-capable appliance that will receive the data record or records. The output template holds the specific slots wherein data will be rendered by the algorithm. The algorithm uses provided data-restructuring rules to identify data contained in an input data template and re-map it by matching the data to appropriate data-slots presented in an output data template. As a result, one or more input records (parsed and rendered data) will produce one or more output records (data remapped by algorithm).

Data templates as described above, are not analogous to logic templates described in the co-related application Ser. No. 09/323,598. Data templates work in conjunction with scripted logic-templates used to find and parse the requested data. Input templates are request-generic while output templates are device-generic. For example, there are many variations of data formats and languages that can be used when presenting data on a WEB page. Therefore, an input template should be modeled to facilitate the specific data fields, language, and format in which requested data is expected to be found. In some cases, an input template may be enhanced to support a variety of differing formats and/or languages, and be made to hold more slots for data not necessarily requested. The output template is device generic and contains only usable data-slots that may be presented on its associated device.

In one embodiment of the present invention, a knowledge base (not shown) could be provided as part of SW 51 and used to equate data parameters associated with frequently requested data types from a network to data parameters that are generic to various network appliances. In this method, categories and titles describing oft-requested data records such as flight reservations, account balance information, order status information, and the like are created, coded and stored in the knowledge base. Device-specific equivalents described as rules for presenting the type data to each specific model device are also stored in the knowledge base and equated.

When a data request comes in, a runtime engine (software application) takes the input data and finds the category and subtitle that matches it. Then the data presentation rules concerning the specific receiving device are matched from the knowledge base. In this way, appropriate output records may be created that are specific to the type and model of device that is targeted to receive the data.

In one embodiment, the knowledge base method is used in conjunction with the template/algorithm method. As use of the service progresses, the knowledge base is updated with new categories and subtitles associated with repetitive requests. The knowledge base may also be updated to reflect parameters associated with new types and models of network capable devices. There are many such possibilities.

Component layer 55 includes an interfacing data center such as data center 37 represented in FIG. 1 and a desktop PC such as PC 45 of FIG. 1. Output templates contain device specific data that is ready for transmission to target devices such as devices 39–47 of FIG. 1. As output templates are completed, they may be held for requesting users at a storage facility (not shown) held in a data center, or pushed to requesting users based on the original request. Similarly, output records destined for such as Internet-connected PCs may be held therein for remote access, or pushed to requesting users operating peripherals such as PDA 47 of FIG. 1.

Component layer 57 represents various network capable appliances as described above and their associated transmission networks. Illustrated within layer 57 is a PDA with a remote (wireless) link to PC in layer 55 as shown by

double-arrow connecting line. Also illustrated within layer 57 is a pager, a notebook, and a mobile phone, all having remote (wireless) connections to the data center represented in layer 55 as shown by the double-arrow connecting lines. The PC illustrated in layer 55 may be a desktop PC operated by one or more users. In another embodiment, it may be a powerful workstation shared by many users. The represented data center has all of the interface means required to bridge the appliances of layer 57 to the service.

It will be apparent to one with skill in the art that knowledge workers associated with creating input and output templates may perform their services from anywhere in a connected network without departing from the spirit and scope of the present invention. In one embodiment, input templates are supplied by knowledge workers associated with the service, while output templates are created by knowledge workers that are associated with various network hosting entities.

In another embodiment, the service of the present invention may be provided as a turnkey package wherein companies may set-up their own specific information services using the implements of the present invention.

It will also be apparent to one with skill in the art that an intermediary language derived in part from HTML and XML languages may be proprietary in nature and used as an intermediary data-conversion language between such as pure HTML and device specific protocol without departing from the spirit and scope of the present invention. Codes specific to such an intermediate language may be licensed to entities wishing to recreate the service for their own purposes.

FIG. 3 is a block diagram illustrating client request/result loop progressing through the various process phases of the service of the present invention in a preferred embodiment. In step 57 a client (user/subscriber) initiates a request for data. Such a request may be initiated from a network capable appliance like appliances 39–43 of FIG. 1. A client may also initiate a request from a standard PC such as PC 45 of FIG. 1, or a PDA such as PDA 47 of FIG. 1. Browser software of any sort is not required for a device to access the service. In this way, a low bandwidth device may be used to practice the present invention without depending on a parent or associated machine. For example, devices not having IP capability or navigational software would interface with such as data center 37 of FIG. 1 in order to gain access. Appropriate equipment and means for bridging networks is made available in data center 37. An Internet-capable appliance having a browser function and Internet connection capability may, of course, gain access through normal wired or wireless channels.

In step 59, a request from a client is registered to the service. If the request is initiated from a device using a wireless network wherein a data center such as center 37 is the interface, then the request data may be converted from the protocol used by the requesting device to a suitable IP protocol for registering at a server such as server 33 in ISP 15 (FIG. 1). If an Internet-connected PC or workstation is the interface, and a requesting device is a remote peripheral such as PDA 47, then the original request will arrive already in suitable IP format.

In step 61, the client request is compared against a database for additional information about the initiator of the request and, perhaps to finish the package by associating the appropriate templates to the request. The templates may be stored under specific user ID for repeat requests, and created new for cases where no template is available. This includes

US 6,633,910 B1

11                                                                    12

the scripting templates of 09/323,598 as well as input/output templates of the present invention. Once all information and planned routines are incorporated into a request, it may be queued for execution.

In step 63, the service navigates to a data source or sources specified in the request on behalf of the client. Site-logic scripting provided by template, along with a data-parsing convention is used to locate and identify data associated with the client's request. Data sources will typically be information pages written in such as HTML or XML. However, this is not to be construed as a limitation. Other types of data as well as some multimedia content may be located and parsed according to site logic.

In step 67, all data obtained in step 63 is aggregated and tagged according to a user-specific and device specific manner. In some cases the data found during navigation is simply stored in one location for a client with the stored data retaining it's original format. In another case, data is rendered to an intermediate form of it's original language for the purpose of providing a standard format from whence further re-structuring may occur.

In step 69, aggregated data is restructured from its original format (if applicable) to it's final format (device specific) in preparation for transmission. In other cases, the data is stored for client access at his or her convenience. In a preferred embodiment, the above-described template method with algorithm is used. In an alternative method, a knowledge base technique is used. In still another embodiment, the two methods may be combined. It is assumed that by the time data restructuring occurs, an input and an output template containing the appropriate data fields pertaining to a target device have been provided. A software module (not shown) termed a data renderer converts the original data in aggregation into a suitable intermediary language that is understood to be standard to the system and compatible, in terms of further slot-mapping, according to any supported protocols specific to various network appliances interacting with the service. The intermediate language may be of a proprietary nature and licensed to other entities for use. In an embodiment wherein a knowledge base system is used, an intermediate language would not specifically be required.

The input template contains the rendered data in specific field-slots that are understood by the software algorithm. The algorithm also understands the field-slots associated with the output template. This is accomplished by creating specific rules for the algorithm to follow in operation. The algorithm re-maps the data from the input template into the field-slots in the output template according to the applicable rules. During this operation a second data renderer inserts and in some instances writes new data for insertion to specific field slots chosen by the algorithm.

In one embodiment, output templates may be provided with additional functional routines (based on the content of inserted data) that may be caused to activate a notification system or the like that is generic to a particular receiving device. For example, a round trip flight description may be rendered as a series of appointment book entries in such as a PDA. The additional notification routine in the output template may, according to the data, set an alarm or other audible alert to activate at a convenient time before the scheduled departure, as a reminder to the user.

In step 71 output records are delivered to specified devices through their respective interfaces and connected networks. In step 73, a receiving appliance incorporates the data in usual fashion. Steps 71 and 73 may also be construed

as steps for delivering and incorporating only updates to existing information. For example, the client send/return loop represented by steps 57 through 73 can be initiated for one or more requests and then be reactivated to receive periodic updates to already received data. For example, input and output records already sent to a client may be stored at the service for reference and tagged with client ID, time, date, etc. If an update request comes in from a client it can be noted in a new output template designed to carry only the new information. During the process at step 69, the input template containing the previous data is compared to the input template containing the current data The discrepant data in the new input template is remapped to appropriate field-slots in a new output template. In this way, the record only reflects the new data. In step 73 then, the new data overwrites the old data. Data obtained through the service may be routinely and periodically updated in a push or pull fashion.

In another embodiment, synchronization (updating) may be performed in step 63. For example, a new update request may arrive wherein the previous input record is obtained and used to partially direct the function of parsing during the navigation process. The rule would in effect direct the parser to designate only data that is different from the old input template for collection. In this case, the algorithm may be employed in reverse fashion so that the intermediate language in an input template may be converted back to original language as seen by a parser.

In still another embodiment, the parsing engine may be equipped to read both languages. The parsing process may also include the algorithm function for re-mapping the data.

It will be apparent to one with skill in the art that the method and apparatus of the present invention may be applied to the method and apparatus disclosed in the co-related application Ser. No. 09/323,598 to provide a new and unique service without departing from the spirit and scope of the present invention. It will also be apparent that the method and apparatus of the present invention may stand alone from Ser. No. 09/323,598 as long as a suitable method for site navigation and parsing is included in the new service.

The service of the present invention may be adapted to serve specific wireless networks and client/devices connected to them. It may also be broadened to include many wired communication networks, including the Internet and PSTN networks. Conventions may be provided to such as SW 51 for the location, parsing and restructuring of virtually any type of data that may be held on a digital network. Even conventions such as video may be played and interpreted by the service for data mapping to provided output templates for creating records that reflect the content or at least a summary of content contained in the video.

SPECIFIC EXAMPLES

The present invention in certain embodiments is to be first brought to the public after the filing of the present patent application by a new Internet company named Yodlee.com in Sunnyvale, Calif. In the first implementations the service practicing the present invention is called Yodlee2Go. Specific features of the Yodlee2Go service are included here as further examples of the present invention. In these examples restructured information is provided to onto the Palm™ but this information could be inserted onto any other mobile device as well. Many cell phones, for example, have calendar and address book applications built in, so the restructured information could be inserted onto those devices as well, and into many others.

US 6,633,910 B1

13

14

1. Travel Reservations. If you book your travel reservations through an online travel agency such as BizTravel.Com or Travelocity.Com and you have added the travel site to your Yodlee home page, then your travel reservation information is synchronized onto your Palm, for example, into several places. For each travel reservation that you have:

   a. One record is entered into your Date Book for each "leg" of the flight. The description of the record contains the airline name on which you will by flying, your flight number, and the departure and arrival airport codes.

   b. In addition, an alarm is automatically set to go off one hour before your flight time. You may change the alarm time for a particular flight by clicking on the "Details" button in your Date Book. (You may also change the default alarm time to be different than one hour by changing your Yodlee2Go preferences. This is described in Section x of this user manual.)

   c. If you click on the "Note" button in the Details dialog box, you can view your confirmation number, the price that you paid for the ticket, the flight mileage, and the name of the travel agency with which you booked the flight.

   d. Since Yodlee2Go knows which travel agency you booked the flight with, it synchronizes the contact information for that travel agency into your address book. This way, you will have the phone number of the travel agency with you if you run into problems at the airport. (Also, don't forget that you have your confirmation number in the note attached to the date book record!)

   e. Finally, since Yodlee2Go inserts a memo into your Memo Pad application containing the entire itinerary for each of your flights.

2. Frequent Flyer Miles. If you have added any airline sites in the frequent flyer miles category onto your Yodlee home page, then all of your frequent flyer information is copied into a single memo in your Memo Pad application on your Palm. The memo is titled "Frequent Flyer Miles" and can be accessed by clicking on the Memo Pad application on your Palm.

3. Bank Statements. If you do your online banking on the web, and you have added your bank's site to your Yodlee home page, then a summarized version of your bank statements will by synchronized into the Memo Pad application on your Palm. One memo will be created for each of your online bank accounts. Each memo will contain the balances in each of your accounts and a total balance across all your accounts at that bank.<

4. Credit Card, Telephone Statements, and other Billing Information. If you have added any credit card or billing sites to your Yodlee home page, then this information will be synchronized onto your Palm to help you remember to pay your bills on time. For each bill, Yodlee2Go will insert one entry in your list of things to do in your To Do List application on your Palm device. The entry will contain the name of the company from which you received the bill, the due date, and the amount due by the due date. If you click on the "Details" button, and then click on the "Note" button to view more information about the bill.

5. Stock Portfolio Information. If you have added your online stock broker (such as E*trade) onto your Yodlee home page, then your stock portfolio information will be synchronized onto your Palm device by Yodlee2Go.

Yodlee2Go will create one memo pad entry in your Memo Pad application that contains a consolidated statement of all of your stocks across all online brokerages that you have added to your Yodlee home page. The memo is titled "Stock Quotes," and also contains a summary of the total worth of all of your stock portfolios.

Real Time Monitoring and User Notification

In one aspect of the present invention, the inventor provides a system whereby users may define event triggers and change criteria, which the system stores as Notification Conditions (NC), and convenient notification may be made to user/subscribers in the event that the NCs are met. Such configuration, monitoring and notification is accomplished by unique software that allows for notification events to be sent to users over a wide variety of mediums and associated communications devices.

FIG. 4 is a block diagram illustrating the components and operation of the monitoring and notification software of the present invention with the data aggregation and tunneling software 51 of FIGS. 1 and 2 according to an embodiment of the present invention. As described in FIGS. 1 and 2 above, software 51 provides a complete data gathering, aggregating, and tunneling service wherein data may be delivered to a variety of portable devices over mediums specific to those devices. Software 51 comprises a data aggregation software 76. Software 76 is analogous in function to layer 53 in FIG. 2. An Internet network cloud 75 is illustrated herein and labeled World Wide Web (WWW). WWW 75 represents a source for data such as (S1–Sn) of FIG. 2, which are understood in this embodiment to be on-line data sources, or web servers. It will be appreciated that the number of data sources of varying types available in cloud 75 is very large. A Gathering Sub-System (GSS) 77 is provided as part of software 76 and adapted to perform the navigation to various sources in cloud 75 for the purpose of parsing and obtaining data from them based on the scripting and template methods taught above and in related cross-referenced patent applications. Any new data found in source sites that does not match a last input template used at the source site is regarded as new data or a change in data. GSS 77 has access to at least a "last used" input template created by a knowledge worker on behalf of a user subscribing to the data source. A guard module 81 is provided for receiving source data from GSS 77 and to process the data for archiving into a provided database 87. In some cases, GSS 77 may send all data requested from the site if no "last used" template is available for comparison. In some aspects guard 81 may mine data from database 87 as illustrated by a bi-directional arrow connecting the two components, in order to compare aggregated data with new data from a same source. Database 87 is analogous to repository 31 of FIG. 1.

The flow of data flow from cloud 75 to database 87 is illustrated by the directional arrows, one emanating from GSS 77 and progressing toward guard 81, and a bi-directional arrow connecting guard 81 and database 87. A double arrow connecting GSS 77 to cloud 75 represent bi-directional data flow associated with navigation to and obtaining data from various network-based data sources. By the conventions just described, the aggregation software obtains source data from cloud 75 and aggregates it into database 81 on behalf of and according to directions of a user.

In some cases, data is not simply aggregated for a user, but processed and delivered to a user immediately if a user has

US 6,633,910 B1

15                                                                16

directed the service to do so. This case is represented herein by the bracketed directional arrow emanating from software 76, bypassing database 87, and progressing toward a data restructuring software 89. Data restructuring software 89 is analogous to software layer 55 of FIG. 2. Software 89 is responsible for restructuring and re-mapping aggregated or source data into formats that are specific to portable devices designated by users to receive the data such as those illustrated in FIG. 1. For the purpose of the present invention, however, monitoring and notification applies more specifically and most often to data that is held in aggregation for a user.

Referring again to FIG. 4, a user interface 83 is provided and enables a user to configure the monitoring and notification software of the present invention. Interface 83 may be such as a user's enhanced Internet browser application. Interface 83 may be analogous to browser interface 57 of FIG. 3. In other embodiments interface capability such as through an IVR or the like may be provided through such as data center 37 of FIG. 1. In still other embodiments, configuration of the monitoring and notification software of the present invention may be accomplished by a knowledge worker employed by the service with configuration performed as a result of a telephone call, e-mail, fax, or other communication with a subscriber.

An illustrated directional arrow labeled input associated with interface 83 exemplifies user input for purpose of configuration. A notification control module 85 is provided for allowing a user to be notified of any specified data changes that occur with respect to source or aggregated data. A double arrow linking module 85 to interface 83 illustrates bi-directional data flow representing input data for configuration, and an optional notification path back to interface 83.

Module 85 also acts, in this embodiment, as a reporting module to the monitoring and notification software components GSS 77 and guard 81 as illustrated by a directional arrow emanating from module 85 and progressing toward software 76. In this way, a user need only interface with notification module 85 in order to program all required components of the monitoring and notification software of the present invention. However, this is not specifically required in order to practice the present invention. There are many ways to program the monitoring and notification software according to user preference. The use of notification module 85 as a programming interface and reporting module is meant to be a convenience only.

As described above, a user may program control module 85 according to user-specific parameters. For example, a user may select which data sources to monitor and what data to monitor. In a preferred embodiment the subscription service of the invention has profiles for each user, and the profile for a user will include a user's data sources, data maintained at each source, passwords and user names to be used for access, and one or more profiles for data aggregation and reporting. In this embodiment it is not necessary for the user to specify the data sources, but just the nature of the data and a quantification. For example, a user may configure to be notified when his or her net bank balances over several accounts at several different banks falls below a specified amount.

In the embodiment just described, a user may specify a broad range of notification conditions over many sites (metadata), such as for example: (1) notify me when the price for a first class flight to Atlanta on any of three different airlines falls below $1000; (2) notify me when my aggregate

short-term debt over six credit cards at six different sites reaches $10,000. Conditions can be even more complicated, such as: Notify me by cell phone when the value of my stock portfolio according to data at two different brokerages reaches ten percent of my net worth, and send a report showing the details to my e-mail address as an attachment to an e-mail message, zipped with a password.

A user may select a specific frequency (i.e. how often the formula of the request is calculated) for each request entered. A user may enter specific criteria needed to trigger a notification with respect to any included data source, data, change in data, or condition met with respect to aggregated data over any number of sources. As an example, a user may wish to be notified if his/her net worth falls below a certain amount, or if a particular stock price is falling at a pre-specified rate. A user further may configure a specific device and medium or a plurality of devices and mediums for receiving notification events indicating data changes meeting notification criteria. In a more sophisticated embodiment, a user may configure a notification event that is dependent on combined criteria associated with a variety of data sources.

A time function (T) 79 is provided and associated with GSS 77. T function 79 tells GSS 77 how often it must check for data changes at included data sources. T 79 may be programmed to trigger GSS 77 to check all included data sources according to one frequency, or it may be variably programmed to trigger GSS 77 to check separate sources according to a same frequency or according to separate frequencies. There are many possibilities. A frequency may be as short, such as once every 10 minutes, or quite long, such as once per week. There are no limitations. In some applications T 79 may be set to near o or "real time monitor" mode. This mode may be used to continuously monitor a site wherein data is frequently and rapidly changing, such as, for example, a stock server.

Guard 81 is programmed to compare data changes entered into database 87 from specified sources to notification criteria entered by a user during configuration. This data set is termed a notification condition (NC). If guard 81 receives a data change that matches a pre-programmed NC, then guard 81 issues a notification event to notification control module 85 as illustrated by a directional arrow connecting the two components. In either case, guard 81 processes received data and enters it into database 87 on behalf of a user.

Notification control module 85, upon receiving a notification event from guard 81, decides how the event will be propagated to a requesting user based on user directive. For example, if a user requested that notification be sent back to his or her browser interface such as interface 83, then the notification event would be sent by module 85 over the appropriate data network to interface 83, which may be running on a user's home or office PC.

In other embodiments, a user may request that notification be sent to any one or a combination of a variety of portable devices that are configured to the service. In this case, module 85 passes the notification event to software 89, which interfaces with such as data center 37 of FIG. 1. Software 89 then restructures and re-maps the notification event for delivery to a specified device such as devices 39, 43, and 41 of FIG. 1 over suitable networks. This assumes that a notification event comprises at least summary data describing the nature of the data changes and where to access such changes. In this regard, an Input template similar to one described in FIG. 2 above is used as well as

US 6,633,910 B1

17

an output template associated with the format of the receiving device (if required). Software **89** restructures the notification data for delivery as it would for normal data synchronization.

In still another embodiment, notification events comprise simple codes that alert a user to a change, but do not describe a data change in any other way. Information in such a notification event may be limited such that data restructuring is not required to propagate notification to user specified devices. For example, if a user has requested notification to his or her paging device of a change in a specified bank account, then such a page may simply list the last four digits of his account number. The user, having pre-configured the criteria for the data change, will already know what the notification is about. In the event that data restructuring is not required for a notification event, then such events may be directly propagated to the appropriate devices via suitable network interfaces provided in such as data center **37** of FIG. 1. Some specific examples of NC criteria that a user may configure into the monitoring and notification software of the present invention are listed below.

1) Stock Market/Portfolio Monitoring Across Multiple Accounts:

By summarizing the user's financial information across multiple investment accounts, the monitoring and notification service of the present invention can alert the user when his/her net worth changes by a predefined amount on a user-defined platform.

2) Auction/Shopping Status Monitoring:

In an online auction, mere minutes or seconds can determine whether a bidder wins or loses an item. When the user is outbid in an online auction, the monitoring and notification service of the present invention can forward that information to the user so that he/she can act on that information. A user can specify more complex logic. For instance, if the user were bidding on two similar items in an online auction, he can ask to be notified only when he's been outbid in on both items. The decision logic is a core component of the notification service, because it acts as a filter for the data/metadata that is collected by the gathering subsystem (GSS).

3) Real Time User Notification Through Messenger Services:

If changes in the data/metadata meet the criteria defined by the decision logic, the information is rendered onto a user-specified device. The user enters into the notification/monitoring service, the username for his account in a selected messaging service, as well as his account information for other included web services, such as banks, credits cards, stock market accounts, shopping and auction stores, etc. The user also specifies the conditions (i.e. data value changes) in which he must be notified. When a condition is met, the user is notified of the change through his messaging account.

In most instances of the present invention, a NC associated with a guard application will be configured to trigger based on any source data changes as compared to aggregated metadata already deposited in a database such as database **87**. In this case, guard **81** may be used to mine database **87** for existing data to compare against received data changes from Web-based sources.

In another embodiment a second guard (not shown) may be provided as a notification guard. In this case guard **81** simply receives and processes source data from GSS **77** for aggregation into database **87**. The second notification guard would be enabled to understand the nature of the metadata changes after source data is entered and to equate them with NC criteria in order to determine if NC conditions are met and a NC event should be propagated. There are many possibilities.

18

In still another embodiment, guard **81** could be configured to simply notify a user regarding any data change at a selected source site without requiring the data to be aggregated in database **87**. This may be a case wherein a user opts to visit the source site to review changes. Such a case may apply more often to general up-dates at casual user-visited data sources such as entertainment sites, catalog sites and the like.

It will be apparent to one with skill in the art that the monitoring and notification software of the present invention may be set up to monitor and notify a user of data changes anywhere in the system, including in the network represented in this example, by cloud **75** without departing from the spirit and scope of the present invention. Virtually any kind of data-change notification can be propagated to a user based on what a user programs the service to do.

The method and apparatus of the present invention has many broad applications and therefore should be afforded the broadest of scope. The method and apparatus of the present invention is limited only by the claims that follow.

What is claimed is:

1. An Internet subscription system for alerting subscribers to changes in data maintained at Internet sites, comprising:

an input interface for a subscriber to specify a data condition to be monitored and a condition for notification;

a gatherer for gathering data changes from one or more Internet sites;

a guard for comparing data changes with the condition for notification; and

a notification alert system for notifying the subscriber, at a communication device other than an Internet-connected device, of a change that meets the condition for notification;

characterized in that the alert includes specific data gathered from the specified Internet sites.

2. The system of claim 1 wherein the condition for notification comprises changes in the data at two or more data sources.

3. The system of claim 1 further comprising a user-amendable time function to control frequency of access by the gatherer to Internet sites.

4. The system of claim 1 wherein the device is one of a cell telephone, a pager, or a hand-held computing device.

5. The system of claim 1 wherein the alert system sends an alert by the Internet network to a client's Internet-connected device.

6. The system of claim 1 wherein the alert system sends an alert by a wireless network to a device compatible with the wireless network but incapable of Internet connection.

7. A method for alerting a subscriber to changes in metadata, comprising steps of:

(a) configuring a subscription service by the subscriber to monitor specific data at specific Internet-connected sites;

(b) setting a metadata notification condition on the subscription service by the subscriber;

(c) gathering data changes from the specific Internet-connected sites;

(d) processing the data changes for meeting the condition for notification; and

(e) providing a notification alert to the subscriber at a communication device other than an Internet-connected device, for a change in the metadata that meets the condition for notifications;

US 6,633,910 B1

19

wherein the alert includes specific data gathered from the Internet sites.

8. The method of claim 7 further comprising a step for a user to set a time function to control frequency of processing and comparison of metadata with the condition for notification.

9. The method of claim 7 wherein the notification alert in step (e) comprises an alert on the Internet network to a client's Internet-connected device.

20

10. The method of claim 7 wherein, in step (e) the alert is made by a wireless network to a device compatible with the wireless network but incapable of Internet connection.

11. The method of claim 10 wherein the device is one of a cell telephone, a pager, or a hand-held computing device.

* * * * *

# EXHIBIT 19



US006510451B2

(12) **United States Patent**   (10) **Patent No.:**     **US 6,510,451 B2**
Wu et al.                        (45) **Date of Patent:**        **Jan. 21, 2003**

(54) **SYSTEM FOR COMPLETING A MULTI-COMPONENT TASK INITIATED BY A CLIENT INVOLVING WEB SITES WITHOUT REQUIRING INTERACTION FROM THE CLIENT**

(75) Inventors: **Jonathan Wu**, Mountain View, CA (US); **Suman Kumar Inala**, Santa Clara, CA (US); **Ramakrishna Satyavolu**, Santa Clara, CA (US); **P Venkat Rangan**, San Diego, CA (US); **Sreeranga P. Rajan**, Santa Clara, CA (US); **Neil Daswani**, Edison, NJ (US); **Anand Rangarajan**, Sunnyvale, CA (US); **Christoph Kern**, Santa Clara, CA (US); **Srihari Kumar**, Santa Clara, CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/419,708**

(22) Filed: **Oct. 14, 1999**

(65) **Prior Publication Data**
US 2002/0035592 A1 Mar. 21, 2002

(51) Int. Cl.⁷ .................................................. G06F 15/16
(52) U.S. Cl. .............................. 709/203; 209/219
(58) Field of Search .......................... 709/201, 203, 709/205, 216, 219; 705/5, 26; 701/201

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,619,648 A | 4/1997 | Canale et al. | |
| 5,897,620 A | * 4/1999 | Walker et al. | ................. 705/5 |
| 5,926,798 A | * 7/1999 | Carter | ...................... 705/26 |
| 5,948,040 A | * 9/1999 | DeLorme et al. | .......... 701/201 |
| 6,134,534 A | * 10/2000 | Walker et al. | ............... 705/26 |

* cited by examiner

*Primary Examiner*—Le Hien Luu
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet portal system for accomplishing a multi-component task involving interaction with one or more Internet Web sites includes an Internet-connected server having access to client-related data, an internet-capable client station usable by a client, and software executing on the server for managing individual component tasks in execution of the multi-component task. The software, in response to initiation of a multi-component task specified by the client, defines the component tasks, identifies Internet Web sources for completion of the tasks, manages interaction with the identified Web sites gathering results of the interactions, integrates the gathered results, and communicates final results to the client at the client station. Tasks may be such as trip planning and may include payment for services rendered at Web sites, such as airline reservations, car rentals and the like. A similar system is provided for broadcasting messages to multiple Internet destinations, and further for gathering answers to such messages and communicating the answers to the client.

**14 Claims, 5 Drawing Sheets**





Fig. 1



**Fig. 2**

*Fig. 3*



*Fig. 4*

Case 1:06-cv-00170-JJF     Document 20-5     Filed 05/24/2006     Page 23 of 28



*Fig. 5*

US 6,510,451 B2

1

# SYSTEM FOR COMPLETING A MULTI-COMPONENT TASK INITIATED BY A CLIENT INVOLVING WEB SITES WITHOUT REQUIRING INTERACTION FROM THE CLIENT

## FIELD OF THE INVENTION

The present invention is in the field of information propagation and gathering applied to network-based services, and pertains particularly to methods and apparatus including software for dividing a main user task into a plurality of subtasks to be performed by user-selected WEB-based services.

## BACKGROUND OF THE INVENTION

The World Wide Web (WWW) as a subset of the well-known Internet network is arguably the largest source for public-access information in the world. For example, anyone with a personal computer, the appropriate software, and a modem can access sites on the Web and obtain information on virtually any subject. As public access and use of the Internet has increased, so too have a variety of WEB-based services catering to many subscribers. Examples of tasks performed by WEB services include airline reservations, hotel reservations, car rental reservations, appointments, memo calendar services and so on. In particular, financial services based on the Internet are becoming widely used due to their ubiquity and ease of access.

Many companies, through innovative applications, have made it progressively easier to use their individual Web services. However, performing a main task that requires the sequential or parallel completion of many sub-tasks is seriously hampered by the fractured nature of the diverse Web services. A user would still be required to visit several WEB services and manually configure such sub-tasks in order to ultimately accomplish the main goal. For example, a generic task needs to be manually decomposed into serviceable subtasks, and each of the subtasks needs to be manually delegated to each of the performing Web services. The results of the subtasks would then have to be manually combined to obtain the resultant task.

What is clearly needed is a method and apparatus that allows a user to accomplish a main task including completion of sub-tasks performed by diverse WEB services without requiring that the user manually visit each WEB service associated with a sub-task and, in some cases, without a user being required to specifically identify a subtask.

## SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet portal system for accomplishing a multi-component task involving interaction with one or more Internet Web sites is provided, comprising an Internet-connected server having access to client-related data; an internet-capable client station usable by a client; and software executing on the server for managing individual component tasks in execution of the multi-component task. The software, in response to initiation of a multi-component task specified by the client, defines the component tasks, identifies Internet Web sources for completion of the tasks, manages interaction with the identified Web sites gathering results of the interactions, integrates the gathered results, and communicates final results to the client at the client station.

In the system in some embodiments individual ones of the component tasks involve payment for services rendered in the interaction with the one or more Internet Web sites, and wherein one of the component tasks is transfer of funds from a client account in payment for the service rendered. Also in preferred embodiments the software provides an input interface for the client to define a task. The input interface may enable the client to participate in defining component tasks and in selecting the Web sites for completion of component tasks.

In some embodiments of the invention the multi-component task involves arranging services for a trip, including one or more of airline reservations, lodging reservations, or reservation of a rental vehicle. In a similar system, also in an embodiment of the invention, the component tasks comprise messages to be sent to individual ones of multiple Web servers.

In these embodiments the messages sent may require answers, and the component tasks further comprise gathering the answers and communicating the answers to the client.

In another aspect of the invention a method for accomplishing a multi-component task involving interaction with one or more Internet Web sites is provided, comprising steps of (a) initiation of a multi-component task by a client via an internet connected client station to an Internet connected subscription server having access to client-related data; (b) definition of component tasks by software executing on the Internet-connected subscription server; (c) identification of Web servers for completion of the component tasks; (d) managing of execution of the component tasks by the software, including interaction with the Web servers identified; and (e) gathering and integrating results of the component tasks and communicating final results tot be client at the client station.

In the method individual ones of the component tasks may involve payment for services rendered in the interaction with the one or more Internet Web sites, and one of the component tasks is then transfer of funds from a client account in payment for the service rendered. The software in preferred embodiments provides an input interface for the client to define a task, and the input interface may enable the client to participate in defining component tasks and in selecting the Web sites for completion of component tasks. An example of such a system is one in n the multi-component task involves arranging services for a trip, including one or more of airline reservations, lodging reservations, or reservation of a rental vehicle.

In another embodiment a method according to the invention has tasks comprising sending messages to individual ones of multiple Web servers. In this method the messages sent in some embodiments may require answers, and the component tasks then further comprise gathering the answers and communicating the answers to the client.

In another aspect of the invention an Internet messaging system for broadcasting messages to multiple Internet-connected servers is provided, comprising an Internet-connected server having access to client-related data; an internet-capable client station usable by a client; and software executing on the server for managing the Internet messaging system. The software, in response to initiation by the client from the client station, including specifying a message, identifies Web destinations for broadcast, and broadcasts the message to the identified Web destinations.

In some messaging systems in embodiments of the invention the message requests an answer, and the software gathers the answers and communicates the answers to the client.

US 6,510,451 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

In yet another aspect a method for message broadcast on the Internet is provided, comprising steps of (a) specifying a message by a client at an Internet-connected client station; (b) communicating the message to an Internet-connected message server enabled by software; (c) initiating the broadcast by the client from the client station; (d) identifying Web destinations for receipt of the broadcast message; and (e) broadcasting the message by the message server to the identified destinations. In some embodiments the message requests an answer, and there are then further steps for gathering answers to the message and communicating the answers to the client.

In embodiments of the invention described in enabling detail below, for the first time clients of an Internet portal service are enabled to initiate multi-component tasks at a single entry point, and systems operating according to the invention manage completion of the tasks and furnish results to the client.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 is an overview of a communication network practicing WEB-service processes according to an embodiment of the present invention.

FIG. 2 is a block diagram illustrating task decomposition and delegation of subtasks to various WEB services by virtue of software executing on platforms of FIG. 1 according to an embodiment of the present invention.

FIG. 3 is a block diagram illustrating subtask gathering and scattering functions and contact management capabilities of software executed in the architecture of FIG. 1 according to an embodiment of the present invention.

FIG. 4 is a block diagram illustrating contact management message dissemination, propagation, and response gathering capabilities of the software according to an embodiment of the present invention.

FIG. 5 is a process flow chart illustrating logical steps practicing message dissemination, propagation and response gathering functions of the software according to an embodiment of the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 is an overview of a communication network 9 practicing WEB-service manifolding according to an embodiment of the present invention. Network 9 comprises a data-packet network 11, an Internet service provider (ISP) 13, and an exemplary user premise 15. Network 11 is, in this embodiment, the well-known Internet network and will hereinafter be termed Internet 11. In other embodiments Internet 11 may instead be a private or corporate wide area network (WAN). The inventor chooses to illustrate Internet 11 as an example in a preferred embodiment because of its large public accessibility.

Within Internet 11 there are illustrated a plurality of WEB servers 17 (1–n) that are connected to an Internet backbone 19. Backbone 19 represents the many connection points and services interconnecting Web sites making up Internet 11. It will be appreciated that the portion of Internet 11 represented herein may take on the scope of a local, regional, or even global network.

WEB servers 17 (1–n) represent any data serving machines (Web sites) that are individually hosted by a like number of separate WEB services. For example, one of WEB servers 17(1–n) may be a hotel reservation server

while another may be a car rental server, and so on. For the purpose of the present invention, it is not important to what each server 17 (1–n) is dedicated. It is only important to note that each server 17 (1–n), in this example is responsible for a delegated portion of a general task initiated by a user. It is through the cooperation of all servers 17 (1–n) that a main task may be accomplished.

ISP 13 is configured as a normal ISP according to conventions well-known in the art of Internet access. A main connection server 21 is provided within ISP 13 and adapted to handle Internet connections by virtue of a modem bank represented herein by a modem icon 31. Connection server 21 manages Internet connections by subscribers by virtue of connection to Internet backbone 19. A special server 23 is provided herein and adapted to manage practice of the present invention. Server 23 can, in some embodiments, be described as a portal server responsible for managing WEB-services on behalf of subscribing users. In this regard, it is a WEB server having it's own continuous Internet connection to backbone 19. Server 23 is connected in some embodiments to connection server 21 by a communication link 29, wherein the ISP provides services according to the present invention. In other embodiments server is a portal server in the Web, and not a part of ISP 13.

Server 23 has a data repository 25 connected thereto by a data-link as is known in the art. Repository 25 stores data about users and on behalf of users that subscribe to the management service of the present invention. In addition to specific user data such as identification, account information, and the like, additional profiling data consisting of any data associated with a user profile regarding WEB services that a user may subscribe to may be stored in repository 25 and accessed by server 23 on a user's behalf. Repository 25 may be an optical data-storage system, or any other archival system capable of mass warehousing of data. Repository 25 may be held off line, or on-line and may utilize database software as required for the purpose of organizing, sorting, and managing data.

User premise 15 comprises a personal computer (PC) 35 having Internet access capability by any of a variety of means known in the art. In this example user access to Internet 11 from PC 35 is by virtue of a telephone connection line 33, typically through a Public Switched Telephony Network (PSTN). Other means that may be used to connect PC 35 to Internet 11 include cable connection, integrated services digital network (ISDN) connection, satellite connection, etc. Moreover, Internet-capable devices other than PC 35 may be used to practice the present invention such as a notebook computer, a WEB TV, hand-held devices, and any other known device having a display means and suitable memory for supporting Internet navigation, or navigating through a proxy.

Server 23 has a software application 27 installed therein and configured to facilitate WEB-service manifolding on behalf of a user subscriber base. The term manifolding is used by the inventor to describe a seamless cooperation in the data transfer and dissemination between WEB servers from a single-point interface, which is facilitated by software 27. Software 27 manages task decomposition and delegation as well as contact management in association with WEB servers 17 (1–n) on behalf of a subscribing user. A user operating PC 35 can utilize server 23 and software 27 to delegate several subtasks to appropriate WEB servers such as WEB servers 17 (1–n) from a single interface such that the subtasks are performed by servers 17 (1–n) in order to facilitate a main task for a user. In addition to the ability of decomposing a main task into subtasks and delegating the

US 6,510,451 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

subtasks to be performed, software 27 also allows a user to multicast various types of messaging to a plurality of WEB servers and to have responses routed back to the user's single point interface.

It will be apparent to one with skill in the art that server 23 is adapted as a user-interfacing WEB server, and as such could logically be held within the premise of ISP 13 as is shown in this embodiment. However, server 23 may be anywhere within Internet 11 without departing from the spirit and scope of the present invention.

FIG. 2 is a block diagram illustrating task decomposition and delegation of subtasks to various WEB services by virtue of the software of FIG. 1 according to an embodiment of the present invention. Software 27 provides a single point interface (browser interface) for a user to delegate a task. For example, if a task defines traveling to a scheduled business meeting that is out of the local area of the user, then subtasks would include such as making travel arrangements, making hotel reservations, acquiring a car rental, and so on.

In this example of methodology, a user enters a main task (appointment for meeting) in a subscribed-to appointment calendar service 12. The appointment calendar service 12, which may represent a service hosted by WEB server 23, or one of WEB servers 17 (1–n) of FIG. 1, may in some embodiments, be the only WEB service a user must interface with to from his or her single-point interface in order to accomplish the task. This is because the abstract definition and entered parameters of the appointment include time, date, location, and whom the appointment is with. Such parameters become rules that effect all of the sub-parameters that must be met in order to enable the user to accomplish the scheduled meeting (main task). Software 27 acts to research what parameters will be necessary to allow the user to make the scheduled appointment according to appointment parameters or rules. This research is accomplished by accessing appropriate databases stored in such as repository 25 of FIG. 1, which contain user profile data regarding subscribed-to WEB services.

Software 27 utilizes helper applications 37 (G1–G6). These helper applications are termed guards by the inventor. In this example there are 6 guards 37 (G1–G6), however there may be more or fewer without departing from the spirit and scope of the present invention. Guards 37 (G1–G6) verify parameters associated with facts known about the appointment and the user-data specific to the user's subscribed-to WEB services. For example, if the appointment is in Chicago and the user is in Maine, then an airline reservation is required. G1 in this case would be set to true. Information about the location of the user may be stored in a database such that if a user proceeds to another location it is known. In other cases a user may simply set the guard manually to true (need reservation).

If G1 is true, then G2 (need hotel accommodations) will likely be true unless a user has made plans to stay with a friend instead of using a hotel. G3 (need a rental car) will also be true provided that a user is not being received in such as a company car once he arrives at the meeting locality. In most cases, a user may set guards to true or false from within the single-point interface. In other instances, guards may be automatically set by default based on known data about a user.

If guards G1–G3 are true, then subtasks representing each part of a main task are propagated to the appropriate WEB services represented by three center blocks labeled Airline Service 14, Hotel Service 16, and Car Rental Service 18. These services represent selected user services. That is to

say that if a user, for example, typically patronizes more than one airline, then he or she may select the one service to which a subtask will be delegated. Generally speaking, the service blocks illustrated in this example represent such as WEB servers 17 (1–n) of FIG. 1 as is indicated in the example. In other embodiments, a user may select more than one source for completion of a subtask, and configure criteria such that the sources compete. For example, a user entering an overall task for which an airline reservation is one subtask, may configure for more than one airline reservation server to complete the subtask, and accept as a solution that option that produces (a) lowest fare, (b) fewest connecting flights, (c) certain departure and arrival windows, (d) first class only, or a combination of such criteria.

Returning to the present example, if guards G1–G3 are true, then the services must be compensated (paid) for accomplishing the subtasks. An accounting/financing service 20, subscribed to by the user, arranges transfer of funds from a user account such as an expense account to various WEB services accomplishing subtasks. G4–G6, the payment paths, then would be true because G1–G3 were determined to be true in this example. The subtask delegated to and accomplished by an accounting service is delegated the subtask of paying for the other provided services.

Software 27 in a preferred embodiment is implemented with transaction protocol as known in the art, so that historical data is saved for each transaction and step in a transaction. This feature allows rollback and rollforward actions in case a step fails. There is an example in this disclosure of performance of subtasks in making and paying for an airline reservation. If, in that process, the ticketing subtask fails right before a subscriber is to pay for the reservation, having the transaction mechanism in place allows for error recovery so that no data is lost, and the process can be restarted and successfully completed.

The methodology described above allows a user to simply enter a main task at a single-point interface, and then go about his or her business while subtasks such as acquiring a hotel reservation and booking and paying for a flight are performed by the service in the background. In a preferred embodiment, a single-point interface takes the form of a user's browser interface communicating with software 27 running on a server such as server 23, executing the unique software 27 of the present invention. In another embodiment, a single-point interface may take the form of an interactive WEB page maintained on any Internet-connected server.

All that is required to practice the present invention is a browser interface operated by a user such that the interface may communicate with at least one management server on-line and running software 27. Such a server or servers must have access to such as repository 25 for data access and the capability of multicasting determined subtasks to the appropriate user-selected servers for completion, and receiving and organizing the results. More detail about decomposing a main task into subtasks is presented below.

FIG. 3 is a block diagram illustrating subtask gathering and scattering functions and contact management capabilities of software 27 of FIG. 1 according to an embodiment of the present invention. Software 27 manages the decomposition of a general task by utilizing scripted scattering and gathering agents. For example, a main task entered as task 39 is first researched against updated database information in order to define the subtasks. Once defined and verified by guard functions as described in FIG. 2, a scattering agent 41

US 6,510,451 B2

| 7 | 8 |

disperses the subtasks to the selected WEB services according to the data type required by those services. For example, WEB communication 45 accomplished via browsing technique would use HTML or other suitable languages. POP3 communication 47 would cover e-mail. News communication 49 would cover such as instant messaging and posting.

A means for WEB calendar scattering 51 provides an update function to the user's calendar service. For example, if for some reason a flight cannot be obtained, then a notification may be routed back to a user's WEB calendar service alarming him of a need to reschedule. A means for contact management and message dissemination is also provided for multicasting a message and disseminating responses according to various formats used at various WEB services.

Once subtasks are performed or verifiably assured, a gathering agent represented by element 43 collects and disseminates all of the required data from various WEB services and presents the data to the user. Such data may include additional calendar entries at a user's calendar service such as scheduled time of flight arrival, scheduled availability of hotel room, and so on. Moreover, if a user coordinates with a mapping service, detailed maps may be provided illustrating directions to meetings, hotels, and so on.

Application Layer Multicast Architecture (ALMA)

In another aspect of the present invention, a user is enabled to unify WEB messaging and posting to a plurality of WEB servers from a single-point interface. The inventor defines ALMA as a contact management and dissemination service integrated as a feature of software 27 of FIG. 1. Such means was briefly described in FIG. 3 and is represented by element number 53. ALMA may be configured by a user to operate as either a unidirectional implementation (no responses required) or as a bi-directional implementation (responses gathered).

FIG. 4 is a block diagram illustrating contact management message dissemination, propagation, and response gathering capabilities of the software of FIG. 1 according to an embodiment of the present invention.

In typical contact management, a user must visit numerous WEB sites in order to post messages and gather responses from such as news groups, message boards, job services, and so on. This task can be quite time consuming depending on the nature of the message and number of sites hosting the message. However, in this example of ALMA, a user may operate from a single-point interface without physically visiting such sites as is described below.

A user 55 decides to post a request for knowledge about a certain topic to a plurality of sites illustrated in this example as WEB community 59, news group A (61), and news group B (63). An audience 66 comprises users 65, 67, and 69, which are communicating with their respective services as illustrated by the directional arrows emanating from users 65–69 and propagating toward services 59–63. Services 59–63 are subscribed to by user 55 as well, and have required parameters entered into such as repository 25 of FIG. 1. In this way, a user may select services that are topically appropriate to his or her request.

ALMA uses scattering/gathering agents 57 in much the same manner as the task scattering and gathering described in FIG. 3 using a same single-point interface. Scatterer 57 multicasts a single request to selected posting services 59–63. Message dissemination scripts are used to format the request of user 55 into acceptable formats generic to services

59–63, and to reformat back to user 55 (bi-directional mode). As users 65–69 respond to the posted request, gatherer 57 collects the responses and routes them back to the interface of user 55. The bi-directional nature of scattering and then gathering is illustrated herein by the bi-directional arrows connecting means 57 to services 59–63 respectively. By using this method, a user does not have to visit several WEB sites to post messages and gather responses.

As described above, ALMA may also be used in a unidirectional fashion. For example, if user 55 is posting a job resume, and services 59–63 are WEB-based job centers, then unidirectional implementation is appropriate. Users 65–69 representing employers may choose to respond by conventional means such as e-mail or by telephone.

It will be apparent to one with skill in the art that ALMA may function as an integrated feature of software 27 without departing from the spirit and scope of the present invention. ALMA may share the same user interface and data repository as the previously described method of decomposing tasks and delegating subtasks to various WEB services. In another embodiment, ALMA may be provided as a stand-alone implementation.

As described above, Java scripting is used in some embodiments to implement scatterer/gatherer functions as well as for any automated log-in and password requirements for gaining access to protected sites. Such scripts are understood in the art and known to the inventor. Knowledge workers may prepare, store, and update scripts on behalf of subscribed users. Individual scripts are designed to be generic in basic function allowing for easy and, in some cases, automated modification or tailoring for specific user implementations. In many cases, advanced users may create and tailor their own scripts using a provided tool-kit. There are many possibilities.

As described above, a user may practice ALMA from a single-point interface such as from within a WEB browser application. A basic process exhibiting bi-directional ALMA is detailed below.

FIG. 5 is a process flow chart illustrating logical steps for practicing the ALMA feature of the software of FIG. 1 according to an embodiment of the present invention. At step 71, a user operating from a single-point interface initiates a request. Such a request may be to get response from applicants for a posted rental property or the like.

At step 73, contact management software queries a database such as one held in repository 25 of FIG. 1 and looks for listed sites that would logically accommodate the user request. For example, if the rental property is near a college, then on-line university message boards and the like may be utilized. Similarly, property rental services allowing private rental postings may be utilized. Such services may already be listed in a user's database if the nature of the request is one that is repeatedly implemented such as might be the case of a landlord owning and renting many properties.

In one embodiment, a search function may be used to locate applicable WEB services prior to initiating a request. In another embodiment, the service may maintain a separate database containing a variety of recommended sites. There is theoretically no limit to the number of separate sites that a user may post a same message to.

At step 75, a user selects site destinations to which his or her message will be sent and posted. If applicable or allowed by a site, a user may also configure how long the message should be posted, etc. Such data parameters may be incorporated into scripting if known ahead of time.

US 6,510,451 B2

9     10

At step 77, a user submits a message for posting. At step 79, the contact manager using ALMA disseminates the message for various destinations, and multicasts the message to the various site servers contained in the script. Additional requirements such as any passwords or log-in names to gain access to subscribed-to sites are included in the script logic. At step 81, responses to the user's message are routed back to the user. This may be a periodic process wherein the sites are re-accessed automatically by the gathering agent to check for responses. In some cases, a user may configure a gatherer agent as to when and how often to check for responses to an original posting.

Gathered responses may appear in a user's browser interface as an interactive list of hyperlinks indicating the date, time, and origination (URL) of the site that a particular response was gathered from. By clicking on the body portion of the response, a user may read the response off-line without navigating to the site to view the response. In this case, the responses are completely parsed and downloaded to such as repository 25 of FIG. 1 or, in some cases, the user's own storage system.

In another embodiment, a gathering agent may simply notify a user of the existence of responses, perhaps listing the date, time, URL, and number of responses. In this case, the user would navigate to desired URL's to view the responses. In still another embodiment representing unidirectional ALMA, a user may direct that all responses be sent by e-mail from responders. There are many possibilities.

It will be apparent to one with skill in the art that the method and apparatus of the present invention may be practiced over a variety of architectures comprising data-packet network equipment and appropriate user operated devices without departing from the spirit and scope of the present invention. For example, a user may practice the present invention from a corporate local area network (LAN), from a private residence over a PSTN network, from a mobile position using a wireless device, and so on.

In one embodiment, the service of the present invention may be scaled up by using a powerful processor and many connected WEB services such that logistics or the like may be evaluated for complicated tasks such as simulated civilian evacuation models or flood preparedness drills.

The method and apparatus of the present invention should be afforded the broadest possible scope in view of the many possible embodiments described herein and known to the inventor. The spirit and scope of the present invention should be limited only by the claims that follow.

What is claimed is:

1. An Internet portal system for accomplishing a multi-component task involving interaction with one or more Internet Web sites, comprising:

an Internet-connected server having access to client-related data;

an internet-capable client station usable by a client; and

software executing on the server for managing individual component tasks in execution of the multi-component task;

wherein the software, in response to initiation of a multi-component task specified by the client, transparently to the client, and without interaction from the client defines the component tasks based on pre-programmed client-related data, identifies third-part Internet Web sources needed for completion of the tasks, performs and manages interaction with the identified Web sites,

gathering results of the interactions, integrates the gathered results, and communicates final results to the client at the client station.

2. The system of claim 1 wherein individual ones of the component tasks involve payment for services rendered in the interaction with the one or more Internet Web sites, and wherein one of the component tasks is transfer of funds from a client account in payment for the service rendered.

3. The system of claim 1 wherein the software provides an input interface for the client to define a task.

4. The system of claim 3 wherein the input interface enables the client to participate in defining component tasks and in selecting the Web sites for completion of component tasks.

5. The system of claim 1 wherein the multi-component task involves arranging services for a trip, including one or more of airline reservations, lodging reservations, or reservation of a rental vehicle.

6. The system of claim 1 wherein the component tasks comprise messages to be sent to individual ones of multiple Web servers.

7. The system of claim 6 wherein the messages sent require answers, and the component tasks further comprise gathering the answers and communicating the answers to the client.

8. A method for accomplishing, after initiation by a client and completely transparent to a client and without interaction from the client following the initiation, a multi-component task involving interaction with one or more Internet Web sites, comprising steps of:

(a) defining component tasks based on pre-programmed client-related data by software executing on the Internet-connected subscription server;

(b) identifying third-party Web servers for completion of the component tasks;

(c) managing execution of the component tasks by the software, including interaction with the Web servers identified, and

(d) gathering and integrating results of the component tasks and communicating final results to the client at the client station.

9. The method of claim 8 wherein individual ones of the component tasks involve payment for services rendered in the interaction with the one or more Internet Web sites, and wherein one of the component tasks is transfer of funds from a client account in payment for the service rendered.

10. The method of claim 8 wherein the software provides an input interface for the client to define a task.

11. The method of claim 10 wherein the input interface enables the client to participate in defining component tasks and in selecting the Web sites for completion of component tasks.

12. The method of claim 8 wherein the multi-component task involves arranging services for a trip, including one or more of airline reservations, lodging reservations, or reservation of a rental vehicle.

13. The method of claim 8 wherein the component tasks comprise messages to be sent to individual ones of multiple Web servers.

14. The method of claim 13 wherein the messages sent require answers, and the component tasks further comprise gathering the answers and communicating the answers to the client.

* * * * *

# EXHIBIT 20

US006802042B2

(12) **United States Patent**

Rangan et al.

(10) Patent No.: **US 6,802,042 B2**
(45) Date of Patent: **\*Oct. 5, 2004**

(54) **METHOD AND APPARATUS FOR PROVIDING CALCULATED AND SOLUTION-ORIENTED PERSONALIZED SUMMARY-REPORTS TO A USER THROUGH A SINGLE USER-INTERFACE**

(75) Inventors: **P. Venkat Rangan**, San Diego, CA (US); **Manoj Sharma**, College Park, MD (US); **Sreeranga P. Rajan**, Santa Clara, CA (US); **Jonathan Wu**, Mountain View, CA (US)

(73) Assignee: **Yodlee.Com, Inc.**, Redwood Shores, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/425,626**

(22) Filed: **Oct. 22, 1999**

(65) **Prior Publication Data**

US 2002/0078079 A1 Jun. 20, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/323,598, filed on Jun. 1, 1999.

(51) Int. Cl.7 ............................................. **G06F 15/00**
(52) U.S. Cl. ...................... **715/501.1**; 715/500; 707/5; 709/217
(58) Field of Search ................................. 707/501, 3–5; 705/26; 709/217; 715/501.1, 500

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,459,306 A | \* | 10/1995 | Stein et al. .................. 235/383 |
| 5,855,008 A | \* | 12/1998 | Goldhaber et al. ........... 705/14 |
| 5,923,736 A | \* | 7/1999 | Shachar .................. 379/93.17 |
| 5,924,090 A | \* | 7/1999 | Krellenstein ................... 707/5 |
| 5,937,168 A | | 8/1999 | Anderson et al. |

(List continued on next page.)

OTHER PUBLICATIONS

Hilbert et al., Agents for Collecting Application Usage Data over the Internet, ACM 1998, pp. 149–156.\*

Schwartz et al., Applying an Information Gathering Architecture to Netfind: a White Pages Tool for a Changing and Growing Internet, IEEE 1994, pp. 426–439.\*

(List continued on next page.)

*Primary Examiner*—Stephen S. Hong
*Assistant Examiner*—Cong-Lac Huynh
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet-connected portal system has a data repository, a data-gathering system, a request processor, a plurality of report algorithms, and a report processor. The request processor receives a request from a user and matches the request to an individual one of the report algorithms. The data-gathering subsystem accesses plural Internet sites associated with the user and extracts raw data therefrom according to needs of the report algorithm. The report processor processes the raw data according to the report algorithm into metasummarized information defined by the report algorithm, and the portal system transmits the metasummarized information as a report to a destination associated with the report request. In some cases there is an aggregated-data database in the data repository storing aggregated data retrieved for specific users periodically, and the request processor checks the aggregated-data database for needed data before requiring the data-gathering system to retrieve data from the associated Internet sites. In the instance that the needed data is stored in the aggregated-data database, the report is prepared from the aggregated data. Reports can be in a mix of text and graphic formats.

**14 Claims, 10 Drawing Sheets**



**US 6,802,042 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,963,967 | A | 10/1999 | Umen et al. |
| 5,974,406 | A * | 10/1999 | Bisdikian et al. .............. 707/1 |
| 6,038,601 | A * | 3/2000 | Lambert et al. ............. 709/226 |
| 6,041,307 | A * | 3/2000 | Ahuja et al. .................... 705/8 |
| 6,073,173 | A * | 6/2000 | Bittinger et al. ............ 709/224 |
| 6,078,929 | A * | 6/2000 | Rao ............................... 707/200 |
| 6,088,722 | A * | 7/2000 | Herz et al. ................... 709/217 |
| 6,105,131 | A * | 8/2000 | Carroll ........................ 713/155 |
| 6,119,101 | A * | 9/2000 | Peckover ...................... 705/26 |
| 6,128,624 | A * | 10/2000 | Papierniak et al. ......... 707/104 |
| 6,134,548 | A * | 10/2000 | Gottsman et al. ............. 707/5 |
| 6,151,600 | A * | 11/2000 | Dedrick ....................... 707/10 |
| 6,157,618 | A * | 12/2000 | Boss et al. .................. 370/252 |
| 6,159,015 | A * | 12/2000 | Buffington et al. ........ 434/236 |
| 6,182,142 | B1 * | 1/2001 | Win et al. ................... 709/229 |
| 6,195,651 | B1 * | 2/2001 | Handel et al. .................. 707/2 |
| 6,199,077 | B1 * | 3/2001 | Inala et al. .............. 707/501.1 |
| 6,202,062 | B1 * | 3/2001 | Cameron et al. ............... 707/3 |
| 6,246,983 | B1 * | 6/2001 | Zou et al. ................... 704/260 |
| 6,253,208 | B1 * | 6/2001 | Wittgreffe et al. ...... 707/104.1 |
| 6,260,039 | B1 * | 7/2001 | Schneck et al. ............. 707/10 |
| 6,266,774 | B1 * | 7/2001 | Sampath et al. ............. 713/201 |
| 6,278,993 | B1 * | 8/2001 | Kumar et al. ................... 707/3 |
| 6,282,278 | B1 * | 8/2001 | Doganata et al. ........... 379/202 |
| 6,286,043 | B1 * | 9/2001 | Cuomo et al. ............... 709/223 |
| 6,317,718 | B1 * | 11/2001 | Fano ............................... 705/1 |
| 6,339,761 | B1 * | 1/2002 | Cottingham .................. 705/14 |
| 6,349,257 | B1 * | 2/2002 | Liu et al. .................... 701/200 |
| 6,349,307 | B1 * | 2/2002 | Chen ........................... 707/103 |
| 6,351,467 | B1 * | 2/2002 | Dillon ......................... 370/432 |
| 6,356,834 | B1 * | 3/2002 | Hancock et al. ............ 701/200 |
| 6,356,905 | B1 * | 3/2002 | Gershman et al. ........... 707/10 |
| 6,377,567 | B1 * | 4/2002 | Leonard ...................... 370/352 |
| 6,385,655 | B1 * | 5/2002 | Smith et al. ................ 709/232 |
| 6,412,073 | B1 * | 6/2002 | Rangan ........................ 713/202 |
| 6,496,855 | B1 * | 12/2002 | Hunt et al. .................. 709/217 |
| 6,517,587 | B2 * | 2/2003 | Satyavolu et al. ....... 715/501.1 |
| 6,539,370 | B1 * | 3/2003 | Chang et al. ................... 707/2 |
| 6,675,350 | B1 * | 1/2004 | Abrams et al. .......... 715/501.1 |

## OTHER PUBLICATIONS

Lukose et al., Surfing as a Real Option, ACM 1998, pp. 45–51.*

Jones et al., Credentials for Privacy and Interoperation, IEEE 8/95, pp. 92–100.*

Bina et al., Secure Access to Data over the Internet, IEEE 9/94, pp. 99–102.*

Iqbal et al., A Simplified and an Efficient Packet Level Internet Access Control Scheme, IEEE 11/92, pp. 963–967.*

Chakrabarti et al., Mining the Web's link structure, Computer, 8/99, pp. 60–67.*

Das et al., Experiments in using agent–based retrieval from distributed heterogeneous database, Knowledge and Data Engineering Exchange Works, 11/97, abstract.*

Frecon, WEBPATH–a three dimensional Web history, Information Visualization IEEE Symposium on, 10/98, pp. 3–10.*

Park, Intelligent query and browsing information retrieval (IQBIR) agent, Acoustics, Speech and Signal Processing, IEEE International Conference, 5/98, pp. 1173–1176.*

* cited by examiner



*Fig. 1*



*Fig. 2*



*Fig. 3*



Knowledge Worker

Client

Scripting Input Module — 79

Appliance Configuration Module — 83

Parsing Engine — 87

Summarization Page — 91

67

Browser Interface/User — 77

Portal Sever Interface — 81

Com Interface/ Browser Ctl — 85

Database Interface — 89

69

71

73

75

*Fig. 4*



*Fig. 5*



*Fig. 6*



*Fig. 7*



*Fig. 8*



*Fig. 9*



*Fig. 10*

US 6,802,042 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHOD AND APPARATUS FOR PROVIDING CALCULATED AND SOLUTION-ORIENTED PERSONALIZED SUMMARY-REPORTS TO A USER THROUGH A SINGLE USER-INTERFACE

## CROSS-REFERENCE TO RELATED DOCUMENTS

The present invention is a continuation in part (CIP) to patent application Ser. No. 09/323,598 entitled "Method and Apparatus for Obtaining and Presenting WEB Summaries to Users" filed on Jun. 1, 1999, which is a CIP to patent application Ser. No. 09/208,740 entitled "Method and Apparatus for Providing and Maintaining a User-Interactive Portal System Accessible via Internet or other Switched-Packet-Network" filed on Dec. 8, 1998, now U.S. Pat. No. 6,412,073, disclosures of which are incorporated herein in their entirety by inclusion.

## FIELD OF THE INVENTION

The present invention is in the field of Internet navigation including various communication means and connection technologies. The present invention pertains more particularly to methods and apparatus, including software, for gathering summary information for users from user-subscribed WEB services and aggregating the collected data such that a user, through a single interface, may view varied calculated and summarized reports reflecting user activity among a plurality of user-subscribed services.

## BACKGROUND OF THE INVENTION

The information network known as the World Wide Web (WWW), which is a subset of the well-known Internet, is arguably the most complete source of publicly accessible information available. Anyone with a suitable Internet appliance such as a personal computer with a standard Internet connection may access (go on-line) and navigate to information pages (termed web pages) stored on Internet-connected servers for the purpose of gathering information and initiating transactions with hosts of such servers and pages.

Many companies offer various subscription services accessible via the Internet. For example, many people now do their banking, stock trading, shopping, and so forth from the comfort of their own homes via Internet access. Typically, a user, through subscription, has access to personalized and secure WEB pages for such functions. By typing in a user name and a password or other personal identification code, a user may obtain information, initiate transactions, buy stock, and accomplish a myriad of other tasks.

One problem that is encountered by an individual who has several or many such subscriptions to Internet-brokered services is that there are invariably many passwords and/or log-in codes to be used. Often a same password or code cannot be used for every service, as the password or code may already be taken by another user. A user may not wish to supply a code unique to the user such as perhaps a social security number because of security issues, including quality of security, that may vary from service to service. Additionally, many users at their own volition may choose different passwords for different sites so as to have increased security, which in fact also increases the number of passwords a user may have.

Another issue that can plague a user who has many passworded subscriptions is the fact that they must bookmark many WEB pages in a computer cache so that they may quickly find and access the various services. For example, in order to reserve and pay for airline travel, a user must connect to the Internet, go to his/her book-marks file and select an airline page. The user then has to enter a user name and password, and follow on-screen instructions once the page is delivered. If the user wishes to purchase tickets from the WEB site, and wishes to transfer funds from an on-line banking service, the user must also look for and select the personal bank or account page to initiate a funds transfer for the tickets. Different user names and passwords may be required to access these other pages, and things get quite complicated.

Although this preceding example is merely exemplary, it is generally known that much work related to finding WEB pages, logging in with passwords, and the like is required to successfully do business on the WEB.

A service known to the inventor and described in patent application Ser. No. 09/208,740 entitled "Method and Apparatus for Providing and Maintaining a User-Interactive Portal System Accessible via Internet or other Switched-Packet-Network", now U.S. Pat. No. 6,412,073 provides a WEB service that allows a user to store all of his password protected pages in one location such that browsing and garnering information from them is much simplified. A feature of the above service allows a user to program certain tasks into the system such that requested tasks are executed by an agent (software) based on user instruction. The service stores user password and log-in information and uses the information to log-in to the user's sites, thus enabling the user to navigate without having to manually input log-in or password codes to gain access to the links.

The above-described service uses a server to present a user-personalized application that may be displayed as an interactive home page that contains all of his listed sites (hyperlinks) for easy navigation. The application lists the user's URL's in the form of hyperlinks such that a user may click on a hyperlink and navigate to the page wherein login, if required, is automatic, and transparent to the user.

The application described above also includes a software agent that may be programmed to perform scheduled tasks for the user including returning specific summaries and updates about user-account pages. A search function is provided and adapted to cooperate with the software agent to search user-entered URL's for specific content if such pages are cached somewhere in their presentable form such as at the portal server, or on the client's machine.

In addition to the features described above, patent application Ser. No. 09/323,598 entitled "Method and Apparatus for Obtaining and Presenting WEB Summaries to Users" describes a software agent used in conjunction with a search function that is enabled to navigate to any URL or group of URL's. provided as input by a user or otherwise deemed appropriate by the service provider, for the purpose of providing summary information regarding updated content for each URL, which may be presented as an HTML information-page to the user.

The above described service uses known site logic for navigating to specific "chunks" of data contained in Web pages at the site. Logic scripts are prepared by knowledge workers operating on behalf of users. With such scripts, gatherer agents may navigate directly to data portions that users are interested in.

Users who subscribe to many on-line services generally do all of their banking, investing, travel arranging, shopping, and so on while on-line with the Internet. Having all of his

US 6,802,042 B2

3

or her services available at one portal provides a convenience to a user in not having to remember a plurality of passwords, or to be required to physically log-on to each site. Similarly, the ability to obtain summary data associated with selected sites through one interface allows a user to greatly speed any decision making process related to his or her on-line activity. However, summary information may not help a user with certain other concerns. For example, obtaining accurate financial information concerning his entire portfolio of banking and investments would require much user calculation depending on the exact nature of the result desired. Similarly compiling a trend that reflects a user's on-line activity at a plurality of shopping services may also require considerable calculation to be performed by a user. Summary data presented in the above methods is general in nature and reflects such as updates, status of orders, and the like.

What is clearly needed is a method and apparatus that can perform complicated calculations on aggregated summary data held on behalf of a user such that a user may be presented exact data reports reflecting activity across multiple user accounts. Such a system would provide a convenient and effective enhancement to a data summarization service wherein important calculated information may be presented to a user without requiring that the user perform his or her own analysis on summary data to obtain a solution oriented result.

SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet portal system for gathering raw data from Internet sites and presenting meta-summarized information from the data to a requesting user is provided, comprising an Internet connected portal system having a data repository; a data gathering system operating on the portal system, gathering data from multiple Internet sites; a request processor for receiving and defining a user's request; a plurality of stored report algorithms; and a report processor for processing the raw data and presenting reports to requesting users. The request processor receives the request and matches the request to an individual one of the report algorithms, the data-gathering subsystem accesses plural Internet sites associated with the user and extracts raw data therefrom according to needs of the report algorithm, the report processor processes the raw data according to the report algorithm into meta-summarized information defined by the report algorithm, and the portal system transmits the meta-summarized information as a report to a destination associated with the report request.

In some embodiments the portal system further comprises an aggregated-data database in the data repository storing aggregated data retrieved for specific users periodically, and wherein the request processor checks the aggregated-data database for needed data before requiring the data-gathering system to retrieve data from the associated Internet sites, and in the instance that the needed data is stored in the aggregated-data database, the report is prepared from the aggregated data.

In various embodiments the report processor prepares and presents reports in both text and graphic formats. In some cases the data used in preparing a report is time related, and the report generated includes presentation of data trend. Also in some embodiments the reports may include one or more of tables, bar charts, pie charts, and line graphs in a report generated for a user.

Reports may be returned to the destination where a request originates., or an alternative site may be associated

4

with a request, and the report is then sent to the alternative site. For alternative sites, data formats may be changed for a report, such as synthesized voice, e-mail, pager message, or facsimile format, and wherein the format used for the report generated is determined by the nature of the report destination specified in the received request.

In another aspect of the present invention a method for gathering raw data from Internet sites and presenting meta-summarized information from the data to a requesting user is provided, comprising steps of (a) receiving a report request by a report processor at an Internet-connected portal system from a user; (b) matching the request to an individual one of multiple report algorithms stored at the portal system; (c) gathering raw data by a data gathering system operating on the portal system from multiple Internet sites associated with the requesting user; (d) processing the raw data according to the report algorithm into meta-summarized information defined by the report algorithm; and (e) transmitting the meta-summarized information as a report to a destination associated with the report request. The portal system may further comprise an aggregated-data database in the data repository storing aggregated data retrieved for specific users periodically, and there may be a further step for checking the aggregated data database for needed data before requiring the data-gathering system to retrieve data from the associated Internet sites. In the instance that the needed data is stored in the aggregated-data database, the preparing the report from the aggregated data.

In embodiments of the present invention, taught in enabling detail below, for the first time a portal system is provided wherein data may be gathered and stored from sites associated with specific subscribers and users, and users may request specialized reports prepared from the data gathered, such as meta-summarized and trend reports.

BRIEF DESCRIPTION OF THE DRAWING
FIGURES

FIG. 1 is an overview of an Internet portal system and network according to an embodiment of the present invention.

FIG. 2 is an exemplary plan view of a personalized Portal home page application as it may be seen on a display monitor according to an embodiment of the present invention.

FIG. 3 is a flow diagram illustrating user interaction with the Internet portal of FIG. 1.

FIG. 4 is a block diagram illustrating a summarization software agent and capabilities thereof according to an embodiment of the present invention.

FIG. 5 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 operating in a user-defined mode.

FIG. 6 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 in a User-independent smart mode with minimum user input.

FIG. 7 is an overview of a meta-summarization process according to an embodiment of the present invention.

FIG. 8 is a block diagram illustrating components and functions of the database-reporting engine of FIG. 7 according to an embodiment of the present invention.

FIG. 9 is a process flow diagram illustrating logical user and system steps for initialization to completion of a meta-summarized report according to an embodiment of the present invention.

US 6,802,042 B2

| 5 | 6 |

FIG. 10 is a representative view actual screen shot of a meta-summarized report on display in a user's browser interface according to an embodiment of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

According to a preferred embodiment of the present invention, a unique Internet portal is provided and adapted to provide unique services to users who have obtained access via an Internet or other network connection from an Internet-capable appliance. Such an interface provides users with a method for storing many personal WEB pages and further provides search function and certain task-performing functions. The methods and apparatus of the present invention are taught in enabling detail below.

FIG. 1 is an overview of an Internet portal system 11 and Internet network 13 according to an embodiment of the present invention. Portal system 11, in this embodiment, operates as an ISP in addition to a unique network portal, but may, in other embodiments be implemented as a stand-alone Internet server. In yet other embodiments the service and apparatus described herein may also be provided by such as a search and listing service (AltaVist™, Yahoo™) or by any other enterprise hosting a WEB-connected server.

Internet 13 is representative of a preferred use of the present invention, but should not be considered limiting, as the invention could apply in other networks and combinations of networks.

ISP 15 in this embodiment comprises a server 31, a modem bank 33, represented here by a single modem, and a mass storage repository 29 for storing digital data. The modem bank is a convenience, as connection to the server could be by another type of network link. ISP 15, as is typical in the art, provides Internet access services for individual subscribers. In addition to well-known Internet access services, ISP 15 also provides a unique subscription service as an Internet portal for the purpose of storing many WEB pages or destinations along with any passwords and or personal codes associated with those pages, in a manner described in more detail below. This unique portal service is provided by execution of Portal Software 35, which is termed by the inventors the Password-All suite. The software of the invention is referred to herein both as the Portal Software, and as the Password-all software suite. Also, in much of the description below, the apparatus of the invention is referred to by the Password-All terminology, such as the Password-All Server or Password-All Portal.

ISP 15 is connected to Internet 13 as shown. Other equipment known in the art to be present and connected to a network such as Internet 13, for example, IP data routers, data switches, gateway routers, and the like, are not illustrated here but may be assumed to be present. Access to ISP 15 is through a connection-oriented telephone system as is known in the art, or through any other Internet/WEB access connection, such as through a cable modem, special network connection (e.g. T1), ISDN, and so forth. Such connection is illustrated via access line 19 from Internet appliance 17 through modem bank 33.

In a preferred embodiment a user has access to Internet Password-All Portal services by a user name and password as is well known in the art, which provides an individualized WEB page to the subscriber. In another embodiment wherein a user has other individuals that use his or her Internet account, then an additional password or code unique to the user may be required before access to portal 31 is

granted. Such personalized Portal WEB pages may be stored in repository 29, which may be any convenient form of mass storage.

Three Internet servers 23, 25, and 27, are shown in Internet 13, and represent Internet servers hosted by various enterprises and subscribed to by a user operating appliance 17. For example, server 23 may be a bank server wherein interactive on-line banking and account managing may be performed. Server 25 may be an investment server wherein investment accounts may be created and managed. Server 27 may be an airline or travel server wherein flights may be booked, tickets may be purchased, and so on. In this example, all three servers are secure servers requiring user ID and password for access, but the invention is not necessarily limited to just secure services.

In a preferred embodiment of the present invention, a subscribing user operating an Internet-capable appliance, such as appliance 17, connects to Password-All Portal system 11 hosted by ISP 15, and thereby gains access to a personalized, interactive WEB page, which in turn provides access to any one of a number of servers on Internet 13 such as servers 23, 25, and 27, without being required to enter additional passwords or codes. In a preferred embodiment the software that enables this service is termed Password-All by the inventors. Password-All may be considered to be a software suite executing on the unique server, and in some instances also on the user's station (client). Additional interactivity provided by portal software 35 allows a connected user to search his listed pages for information associated with keywords, text strings, or the like, and allows a user to program user-defined tasks involving access and interaction with one or more Internet-connected servers such as servers 23, 25, and 27 according to a pre-defined time schedule. These functions are taught in enabling detail below.

FIG. 2 is an illustration of a personalized portal page as may be seen on a display monitor according to an embodiment of the present invention, provided by Password-All Portal software 35 executing on server 31, in response to secure access by a subscriber. Page 32 presents an interactive listing 34 of user-subscribed or member WEB pages, identified in this example by URL, but which may also be identified by any convenient pseudonym, preferably descriptive, along with user name and typically encrypted password information for each page. Listed in a first column under destination, are exemplary destinations LBC.com, My Bank.com, My Stocks.com, My shopping.com, Mortgage.com, and Airline.com. These are but a few of many exemplary destinations that may be present and listed as such on page 33. In order to view additional listings listed but not immediately viewable from within application 33, a scroll bar 35 is provided and adapted to allow a user to scroll up or down the list to enable viewing as is known in the art.

Items listed in list 34 in this example may be considered destinations on such as servers 23, 25, and 27 of FIG. 1. Typically the URL associated with an item on this list will not take a user to a server, per se, but to a page stored on a server. User names and password data associated with each item in list 34 are illustrated in respective columns labeled user name, and password, to the right of the column labeled destination. Each listing, or at least a portion of each listing, is a hyperlink invoking, when selected, the URL to that destination. In some instances a particular service may have more than one associated URL. For example, My Bank.com may have more than one URL associated for such as different accounts or businesses associated also with a single subscriber. In this case there may be a sub-listing for

US 6,802,042 B2

7

different destinations associated with a single higher-level listing. This expedient is not shown, but given this teaching the mechanism will be apparent to those with skill in the art.

In some embodiments one page 33 may be shared by more than one user, such as a husband and wife sharing a common account and subscription. An instance of this is illustrated herein with respect to the server labeled Mortgage.com wherein both a John and a Jane Doe are listed together under the column labeled user name. In another embodiment, a network of individuals, perhaps business owners, authorized co-workers, investment parties, or the like may share one application. In this way, system 11 may be adapted for private individuals as well as business uses.

After gaining access to application 33 which is served via Internet portal server 31 of FIG. 1, a user may scroll, highlight, and select any URL in his or her list 34 for the purpose of navigation to that particular destination for further interaction. Application 33 already has each password and user name listed for each URL. It is not necessary, however, that the password and user name be displayed for a user or users. These may well be stored transparently in a user's profile, and invoked as needed as a user makes selections. Therefore, a user is spared the need of entering passwords and user names for any destinations enabled by list 34. Of course, each list 34 is built, configured and maintained by a subscribing user or users, and an editing facility is also provided wherein a user may edit and update listings, including changing URL's adding and deleting listings, and the like.

In another aspect of the invention new listings for a user's profile, such as a new passthrough to a bank or other enterprise page, may be added semi-automatically as follows: Typically, when a user opens a new account with an enterprise through interaction with a WEB page hosted by the enterprise, the user is required to provide certain information, which will typically include such as the user's ID, address, e-mail account, and so forth, and typically a new user name and password to access the account. In this process the user will be interacting with the enterprise's page from his/her browser. A Password-All plug-in is provided wherein, after entering the required information for the new enterprise, the user may activate a pre-determined signal (right click, key stroke, etc.), and the Password-All suite will then enter a new passthrough in the user's Password-All profile at the Password-All Portal server.

In a related method for new entries, the enterprise hosting the Password-All Portal may, by agreement with other enterprises, provide log-in and sign-up services at the Password-All Portal, with most action transparent to the user. For example, there may be, at the Password-All Portal, a selectable browser list of cooperating enterprises, such as banks, security services, and the like, and a user having a Password-All Portal subscription and profile may select among such cooperating enterprises and open new accounts, which will simultaneously and automatically be added to the Password-All Portal page for the user and to the server hosted by the cooperating enterprise. There may be some interactivity required for different accounts, but in the main, much information from the user's profile may be used directly without being re-entered.

The inventors have anticipated that many potential users may well be suspicious of providing passwords and user names to an enterprise hosting a Password-All Server executing a service like Password-All according to embodiments of the present invention. To accommodate this problem, in preferred embodiments, it is not necessary that

8

the user provide the cleartext password to Password-All. Instead, an encrypted version of each password is provided. When a user links to his passthrough page in Password-All at the Password-All Portal server, when he/she invokes a hyperlink, the encrypted password is returned to the user's system, which then, by virtue of the kept encryption key or master password, invokes the true and necessary password for connection to the selected destination. It is thus not necessary that cleartext passwords be stored at the Password-All Portal server, where they may be vulnerable to attack from outside sources, or to perceived misuse in other ways as well.

In a related safety measure, in a preferred embodiment of the invention, a user's complete profile is never stored on a single server, but is distributed over two or more, preferably more, servers, so any problem with any one server will minimize the overall effect for any particular user.

Password-All, as described above, allows a user to access a complete list of the user's usual cyberspace destinations, complete with necessary log-on data, stored in an encrypted fashion, so a user may simply select a destination (a hyperlink) in the Password-All list, and the user's browser then invokes the URL for the selected destination. In an added feature, Password-All may display banner ads and other types of advertisement during the navigation time between a hyperlink being invoked and the time the destination WEB page is displayed.

In yet another embodiment of the invention, a user/subscriber need not access the Password-All page to enjoy the advantages of the unique features provided. In this variation, a Plug-In is provided for the subscriber's WEB browser. If the subscriber navigates by use of the local browser to a WEB page requiring a secure log-in, such as his/her on-line banking destination, when the subscriber is presented with an input window for ID and Password, the plug-in may be activated by a predetermined user input, such as a hot key or right click of the mouse device. The plug in then accesses, transparently, the Password-All page (which may be cached at the client), and automatically accesses and provides the needed data for log-on.

In yet another aspect of the invention a search option 37 allows a user to search list 34 for specific URL's based on typed input such as keywords or the like. In some cases, the number of URL's stored in list 34 can be extensive making a search function such as function 37 an attractive option. A criteria dialog box 51 illustrated as logically separated from and below list 34 is provided and adapted to accept input for search option 37 as is known in the art. In one embodiment, search option 37 may bring up a second window wherein a dialog box such as box 51 could be located.

In another aspect of the invention the search function may also be configured in a window invoked from window 33, and caused to search all or selected ones of listed destinations, and to return results in a manner that may be, at least to some extent, configured by a user. For example, a dialog box may be presented wherein a user may enter a search criteria, and select among all of the listed destinations. The search will then be access each of the selected destinations in turn, and the result may be presented to the user as each instance of the criteria is found, or results may be listed in a manner to be accessed after the search.

Preferably the search function is a part of the Password-All Portal software, available for all users, and may be accessed by hyperlinks in user's personal pages. In some embodiments users may create highly individualized search functions that may be stored in a manner to be usable only by the user who creates such a function.

US 6,802,042 B2

9

In many aspects of the present invention, knowledge of specific WEB pages, and certain types of WEB pages, is highly desirable. In many embodiments characteristics of destination WEB pages are researched by persons (facilitators) maintaining and enhancing Password-All Portal software 35, and many characteristics may be provided in configuration modules for users to accomplish specific tasks. In most cases these characteristics are invoked and incorporated transparent to the user.

In yet another aspect of the present invention, the Password-All suite is structured to provide periodic reports to a user, in a manner to be structured and timed by the user, through the user's profile. For example, reports of changes in account balances in bank accounts, stock purchases, stock values, total airline travel purchases, frequent-flier miles, and the like may be summarized and provided to the users in many different ways. Because the Password-All Portal server with the Password-All software site handles a broad variety of transactional traffic for a user, there is an opportunity to summarize and collect and process statistics in many useful ways. In preferred embodiments of the invention such reports may be furnished and implemented in a number of different ways, including being displayed on the user's secure personal WEB page on the Password-All Portal.

In addition to the ability of performing tasks as described above, task results including reports, and hard documents such as airline tickets may be sent over the Internet or other data packet-networks to user-defined destinations such as fax machines, connected computer nodes, e-mail servers, and other Internet-connected appliances. All tasks may be set-up and caused to run according to user-defined schedules while the user is doing something else or is otherwise not engaged with the scheduled task.

In another embodiment of the present invention, recognizing the increasing use of the Internet for fiscal transactions, such as purchasing goods and services, a facility is provided in a user's profile to automatically track transactions made at various destinations, and to authorize payment either on a transaction-by-transaction basis, or after a session, using access to the user's bank accounts, all of which may be pre-programmed and authorized by the user.

Other functions or options illustrated as part of application 35 include a last URL option 41, an update function 43, and an add function 45. Function 41 allows a user to immediately navigate to a last visited URL. Update function 43 provides a means of updating URL's for content and new address. An add function enables a user to add additional URL's to list 34. Similarly, function 45 may also provide a means to delete entries. Other ways to add accounts are described above. It should be noted that the services provided by the unique Password-All Portal in embodiments of the present invention, and by the Password-All software suite are not limited to destinations requiring passwords and user names. The Password-All Portal and software in many embodiments may also be used to manage all of a user's bookmarks, including editing of bookmarks and the like. In this aspect, bookmarks will typically be presented in indexed, grouped, and hierarchical ways.

There are editing features provided with Password-All for adding, acquiring, deleting, and otherwise managing bookmarks. As a convenience, in many embodiments of the invention, bookmarks may be downloaded from a user's Password-All site, and loaded onto the same user's local browser. In this manner, additions and improvements in the bookmark set for a user may be used without the necessity

10

of going to Password-All. Further, bookmarks may be uploaded from a user's local PC to his/her home page on the Password-All site by use of one or more Password-All plug-ins.

It will be apparent to the skilled artisan, given the teaching herein, that the functionality provided in various embodiments of the invention is especially applicable to Internet-capable appliances that may be limited in input capability. For example, a set-top box in a WEB TV application may well be without a keyboard for entering IDs and Passwords and the like. In practice of the present invention keyboard entry is minimized or eliminated. The same comments apply to many other sorts of Internet appliances.

In preferred embodiments of the invention, once a subscriber-user is in Password-All, only an ability to point-and-click is needed for all navigation. To get into the Password-All site, using a limited apparatus, such as an appliance without a keyboard or keypad, a Smartcard or embedded password may be used, or some other type of authentication.

It will be apparent to one with skill in the art that an interactive application such as application 33 may be provided in a form other than a WEB page without departing from the spirit and scope of the present invention. For example, an application such as application 33 may be provided as a downloadable module or program that may be set-up and configured off-line and made operational when on-line.

FIG. 3 is a flow diagram illustrating user interaction with the Internet Password-All Portal of FIG. 1. The following process steps illustrated, according to an embodiment of the present invention, are intended to illustrate exemplary user-steps and automated software processes that may be initiated and invoked during interaction with an Internet portal of the present invention such as portal 31 of FIG. 1. In step 53 a user connects to the Internet or another previously described switched-packet network via a compatible appliance such as Internet appliance 17 of FIG. 1.

At step 55, a user enters a user-name and password, which, in one embodiment, may simply be his ISP user name and password. In another embodiment, a second password or code would be required to access an Internet portal such as portal server 31 of FIG. 1 after logging onto the Internet through the ISP. In some cases, having a special arrangement with the ISP, there may be one password for both Internet access through the ISP and for Password-All. At step 57 a personal WEB page such as page 32 of FIG. 2 is displayed via Internet portal server 31. At minimum, the personalized WEB page will contain all user configured URL's, and may also be enhanced by a search function, among other possibilities.

In step 58 a user will, minimally, select a URL from his or her bookmarked destinations, and as is known by hyper-link technology, the transparent URL will be invoked, and the user will navigate to that destination for the purpose of normal user interaction. In this action, the Password-All Portal software transparently logs the user on to the destination page, if such log-on is needed.

At step 60 the user invokes a search engine by clicking on an option such as described option 37 of FIG. 2. At step 62, the user inputs search parameters into a provided text field such as text field 51 of FIG. 2. After inputting such parameters, the user starts the search by a button such as button 52. The search engine extracts information in step 64. Such information may be, in one option, of the form of URL's fitting the description provided by search parameters.

US 6,802,042 B2

11

A searched list of URL's may be presented in a separate generated page in step 66 after which a user may select which URL to navigate to. In an optional search function, the user may provide search criteria, and search any or all of the possible destinations for the criteria.

In another embodiment wherein WEB pages are cached in their presentable form, information extracted in step 64 may include any information contained in any of the stored pages such as text, pictures, interactive content, or the like. In this case, one displayed result page may provide generated links to search results that include the URL associated with the results. Perhaps by clicking on a text or graphic result, the associated WEB page will be displayed for the user with the result highlighted and in view with regards to the display window.

Enhanced Agent for WEB Summaries

In another aspect of the present invention, a software agent, termed a gatherer by the inventors, is adapted to gather and return summary information about URL's according to user request or enterprise discretion. This is accomplished in embodiments of the present invention by a unique scripting and language parsing method provided by the inventor wherein human knowledge workers associated with the service provide written scripts to such a gatherer according to subscriber or enterprise directives. Such a software gatherer, and capabilities thereof, is described in enabling detail below.

Referring now to FIG. 1, there is illustrated an exemplary architecture representing a portal service-network which, in this case is hosted by ISP 15. Portal software 35 in this embodiment executes on portal server 31 set-up at the ISP location. Mass repository 29 is used for storing subscriber information such as passwords, login names, and the like. Internet servers 23, 25, and 27 represent servers that are adapted to serve WEB pages of enterprises patronized by a subscriber to the portal service such as one operating Internet appliance 17.

The main purpose of portal software 35 as described above with reference to FIG. 2, is to provide an interactive application that lists all of the subscriber's WEB sites in the form of hyperlinks. When a user invokes a hyperlink from his personal list, software 35 uses the subscriber's personal information to provide an automatic and transparent login function for the subscriber while jumping the subscriber to the subject destination.

Referring again to FIG. 2, an interactive list 34 containing user-entered hyperlinks and a set of interactive tools is displayed to a subscriber by portal software 35 of FIG. 1. One of the tools available to a subscriber interacting with list 34 is agent (software) 39. Agent 39 may be programmed to perform certain tasks such as obtaining account information, executing simple transactions, returning user-requested notification information about upcoming events, and so on. Search function 37 and update function 43 may be integrated with agent 39 as required to aid in functionality.

It is described in the above disclosure that agent 39 may, in some embodiments, search for and return certain summary information contained in user-subscribed WEB pages, such as account summaries, order tracking information and certain other information according to user-defined parameters. This feature may be programmed by a user to work on a periodic time schedule, or on demand.

In the following disclosure, enhancements are provided to agent 39. Such enhancements, described in detail below, may be integrated into agent 39 of portal software 35 (FIGS.

12

1 and 2); and may be provided as a separate agent or gatherer to run with portal software 35; or may, in some embodiments, be provided as a standalone service that is separate from portal software 35.

FIG. 4 is a block diagram illustrating a summarization software agent 67 and various capabilities and layers thereof according to an embodiment of the present invention. Summarization agent 67, hereinafter termed gatherer 67, is a programmable and interactive software application adapted to run on a network server. Gatherer 67 may, in one embodiment, be integrated with portal software 35 of FIG. 1 and be provided in the form of a software module separate from agent 39 (FIG. 2). In another embodiment, gatherer 67 may be a part of agent 39 as an enhancement to the function of that agent as previously described. In still another embodiment, gatherer 67 may be provided as a parent or client-side application controlled by a separate service from the portal service described above.

In this exemplary embodiment gatherer 67 is a multi-featured software application having a variety of sub-modules and interface modules incorporated therein to provide enhanced function. Gatherer 67 has a client/service interface layer 69 adapted to enable directive input from both a client (user) and a knowledge worker or workers associated with the service. A browser interface 77 is provided in layer 69, and adapted to provide access to application 67 from a browser running on a client's PC or other Internet or network appliance. Interface 77 facilitates bi-directional communication with a user's browser application (not shown) for the purpose of allowing the user to input summary requests into gatherer 67 and receive summary results. Interface 77 supports all existing network communication protocols such as may be known in the art, and may be adapted to support future protocols.

Layer 69 also comprises a unique input scripting module 79 that is adapted to allow a human knowledge worker to create and supply directive scripts containing the site logic needed by gatherer 67 to find and retrieve data from a WEB site. In this case, gatherer 67 executes and runs on a network server such as server 31 of FIG. 1. However, this is not required in order to practice the present invention.

It is assumed in this example that gatherer 67 is part of the portal software suite 35 running on server 31 of FIG. 1. Gatherer 67 may be provided as several dedicated agents, or as one multi-functional agent without departing from the spirit and scope of the present invention. For example, one gatherer 67 may be scripted and programmed to execute a single user request with additional gatherers 67 called upon to perform additional user-requests. Alternatively, one gatherer 67 may be dedicated and assigned to each individual user and adapted to handle all requests from that user.

Interface layer 69 facilitates exchange of information from both a client and a knowledge worker. A client operating a WEB browser with an appropriate plug-in is enabled to communicate and interact with gatherer 67. For example, a user may enter a request to return a summary of pricing for all apartments renting for under $1000.00 per month located in a given area (defined by the user) from apartments.com (one of user's registered WEB sites). The just mentioned request would be categorized as either a periodic request, or a one time (on demand) request. The communicated request initiates a service action wherein a knowledge worker associated with the service uses module 79 to set-up gatherer 67 to perform it's function. Module 79 is typically executed from a network-connected PC operated by the knowledge worker.

US 6,802,042 B2

13

According to an embodiment of the present invention, a unique scripting method facilitated by module 79 is provided to enable gatherer 67 to obtain the goal information requested by a user. For example, the above mentioned example of WEB-site apartments.com has a specific HTML (hyper-text-markup-language) logic that it uses to create its site and post its information. Such site logic is relatively standard fare for a majority of different sites hosted by different entities. Using this knowledge, a knowledge worker creates a site-specific script or template for gatherer 67 to follow. Such a template contains descriptions and locations of the appropriate fields used, for example, at apartments.com. Apartment description, location, deposit information, rental information, agent contact information, and other related fields are matched in terms of location and label description on the template created with module 79. Completed templates are stored in a database contained in a storage facility such as, perhaps, repository 29 of FIG. 1. Such templates may be reused and may be updated (edited) with new data.

In one embodiment, one script may contain site logics for a plurality of WEB pages, and instructions for specific navigational instruction and password or login information may be contained therein and executed serially, such as one site at a time. It is important to note that the knowledge worker or workers may perform much of their scripting via automatic controls such as by object linking and embedding (OLE) and a minor portion of scripting may be performed manually in an appropriate computer language, many of which are known in the art).

Gatherer 67 also has a process layer 71 adapted for internal information gathering and parameter configuration. An optional portal server interface 81 is provided and adapted to allow gather 67 to provide updated information to a user's list of hyperlinks and also to obtain data from portal server 31 if required. For example, required hyperlinks may be mirrored from a user's home page to a scripting template for navigational purposes. In an embodiment wherein gatherer 67 is part of a standalone service, a convention for providing user login information may be supplied at the client's end when a request is made. For example, an encrypted password may be supplied by a client plug in and gatherer 67 may temporarily borrow the user's encryption key when auto login is performed.

An appliance configuration module 83 is provided and adapted to allow a user to define and configure an Internet appliance to communicate with the service and receive summary information. Such appliances may include but are not limited to palm top PC's, lap top PC's, cellular telephones, WEB TV's, and so on. Typically, a user will be presented a configuration WEB page from a network server that displays in his browser window on his desktop PC. The page contains an interface for communicating device parameters and communication protocol types to module 83. In this way, a user may configure a preferred device for receipt of summary information. Device parameters and communication protocols inherent to such a device are incorporated into the scripting of the site template and are used as instructions for WEB summary delivery.

A navigation layer 73 is provided and adapted to perform the function of external site navigation and data gathering for gatherer 67. To this end, a communication interface/browser control module 85 is provided and adapted to function as a WEB browser to access WEB sites containing WEB data. Control 85 receives it's instruction from the scripted template created by the knowledge worker.

A parsing engine 87 is provided and adapted to parse individual WEB sites according to a template created via scripting module 79. Parsing engine 87 may be a Pearl

14

engine, an IE HTML engine, or any other or combination of known parsing engines. The template (not shown) tells control 85 and parsing engine 87 where to go and what fields at the destination site to look for to access desired data. Once the data fields are located, parsing engine 87 gathers current data in the appropriate field, and returns that data to the service for further processing such as data conversion, compression and storage, and the like.

Because WEB sites use tools that use consistent logic in setting up their sites, this logic may be used by the summarization service to instruct control 83 and parsing engine 87. The inventor provides herein an exemplary script logic for navigating to and garnishing data from amazon™.com. The hyperlinks and/or actual URLs required for navigation are not shown, but may be assumed to be included in the template script. In this example, a company name Yodlee (known to the inventors) is used in the script for naming object holders and object containers, which are in this case Active X™ conventions. In another embodiment, Java™ script or another object linking control may be used. The scripted template logic example is as follows:

```
# Site amazon.orders.x - shows status of orders from Amazon
login( 7);
get( "/exec/obidos/order-list/")
my @tables = get_tables_containing_text( "Orders:");
my $order_list = new Yodlee::ObjectHolder( 'orders');
$order_list->source( 'amazon');
$order_list->link_info( get_link_info() );
my @href_list,
my @container_list;
foreach my $table ( @tables) {
        my @rows = get_table_rows();
foreach my $i ( 0 .. $#rows) {
        select__row( $i);
        my $text = get_cell( $rows[ $i] );
        next if $text =~/Orders:Status/;
        my @items = get_row_items();
        next unless @items => 4;
        my( $order_num, $date, $status );
        select_cell( 1);
        $order_num = get_cell_text();
        my $href = get_url_of_first_href( get_cell() );
        select_cell( 2);
        $date = get_cell_text();
        select_cell( 3 );
        $status = get_cell_text();
        next unless defined $order_num and defined $date and
        defined $status;
        my $order = new Yodlee::Container( 'orders')
        $order->order_number( $order_num);
        $order->date( $date);
        $order->status( $status);
        $order_list->push_object( $order);
        if( defined $href) {
                push( @href_list, $href);
                push( @container_list, $order);
foreach my $i ( 0 .. $#href_list) {
        get( $href_list[ $i] );
        @tables = get_tables_containing_text( "Items Ordered:");
foreach my $table ( @tables ) {
        my @rows = get_table_rows();
foreach my $j (0 .. $#rows) {
        select__row( $j );
        my $href = get_url_of_first_href( get_row() );
        next unless defined $href
        my @child_list = get_children( get_row(), 's');
        next unless defined $child_list[ 0 ];
        my $text = get_text( $child_list[ 0 ]);
        $container_list[ $i ]->description( $text);
        }
}
}
result( $order_list );
```

The above example is a script that instructs control 85 and parser 87 to navigate to and obtain data from

US 6,802,042 B2

**15**

Amazon™.com, specifically that data that reflects the user's current order status. Scripts may also be written to obtain virtually any type of text information available from any site. For example, a user may wish to obtain the New York Times headlines, the top ten performing stocks, a comparative list of flights from San Francisco to New York, etc. In one embodiment, metadata may be associated with and used in-place of the actual scripted language for the purpose of reducing complication in the case of many scripts on one template.

A data processing layer 75 is provided and adapted to store, process, and present returned data to users according to enterprise rules and client direction. A database interface module 89 is provided and adapted to provide access for gatherer 67 to a mass repository such as repository 29 of FIG. 1, for the purpose of storing and retrieving summary data, templates, presentation directives, and so on. Gatherer agent 67 may also access data through interface 89 such as profile information, user account and URL information, stored site logics and so on. Data scanned from the WEB is stored in a canonical format in a database such as repository 29, or in another connected storage facility. All stored data is, of course, associated with an individual who requested it, or for whom the data is made available according to enterprise discretion.

A summarization page module 91 is provided and adapted to organize and serve a WEB summary page to a user. Module 91, in some embodiments, may immediately push a WEB summary to a user, or module 91 may store such summarized pages for a user to access via a pull method, in which case a notification may be sent to the user alerting him of the summary page availability. Summarization module 91 includes an HTML renderer that is able to format data into HTML format for WEB page display. In this way, e-mail messages and the like may be presented as HTML text on a user's summarization page. Moreover, any summary data from any site may include an embedded hyperlink to that site. In this way, a user looking at an e-mail text in HTML may click on it and launch the appropriate e-mail program. Other sites will, by default, be linked through the summary page.

Many users will access their summary data through a WEB page as described above, however, this is not required in order to practice the present invention. In some embodiments, users will want their summary information formatted and delivered to one of a variety of Internet-capable appliances such as a palm top or, perhaps a cell phone. To this end, the renderer is capable of formatting and presenting the summary data into a number of formats specific to alternative devices. Examples of different known formats include, but are not limited to XML, plain text, VoxML, HDML, audio, video, and so on.

In a preferred embodiment of the present invention, gather 67 is flexible in such a way as it may act according to enterprise rules, client directives, or a combination of the two. For example, if a user makes a request for summary data about a user/subscribed WEB page to be periodically executed and presented in the form of a HTML document, then gather 67 would automatically access and analyze the required internal information and user provided information to formulate a directive. Using scripting module 79, a knowledge worker provides a template (if one is not already created for that site) that contains the "where to go" and "what to get" information according to site logic, user input, and known information.

Alternatively, if a user requests a summary about data on one of his sites such as, perhaps, current interest rates and re-finance costs at his mortgage site, the service may at it's

**16**

own discretion provide an additional unsolicited summary from an alternate mortgage site for comparison. This type of summarization would be designed to enhance a user's position based on his profile information. In this case, updated data about latest interest rates, stock performances, car prices, airline ticket discounts, and so on would be stored by the service for comparative purposes. If a user request for a summary can be equaled or bettered in terms of any advantage to the user, such summary data may be included.

In many cases, created templates may be re-used unless a WEB site changes it's site logic parameters, in which case, the new logic must be accessed and any existing templates must be updated, or a new template may be created for the site. The templates contain site-specific script obtained from the site and stored by the knowledge workers. In one embodiment, companies hosting WEB pages automatically provide their site logics and any logic updates to the service by virtue of an agreement between the service and the WEB hosts.

In an alternative embodiment gatherer 67 may be implemented as a client application installed on a user's PC. In this embodiment, a user would not be required to supply log-in or password codes. Summarization scripts may be sent to the client software and templates may be automatically created with the appropriate scripts using log-in and password information encrypted and stored locally on the user's machine.

In addition to providing WEB summary information, gatherer 67 may also be used to provide such as automatic registration to new sites, or for updating old registration information to existing sites. For example, if a user whishes to subscribe, or register at a new site, only the identification of the site is required from the user as long as his pertinate information has not changed. If a new password or the like is required, gatherer 67 through control module 73 may present login or password codes from a list of alternative codes provided by a user. In another embodiment, a database (not shown) containing a wealth of password options may be accessed by gatherer 67 for the purpose of trying different passwords until one is accepted by the site. Once a password or log-in code is accepted, it may be sent to a user and stored in his password list and at the network level.

It will be apparent to one with skill in the art that a software application such as gatherer 67 may be implemented in many separate locations connected in a data network. For example, a plurality of gatherer applications may be distributed over many separate servers linked to one or more mass repositories. Client applications include but are not limited to a WEB-browser plug-in for communicating to the service. Plug-in extensions may also be afforded to proxy servers so that auto-login and data access may still be performed transparent to a user.

In another embodiment, plug-ins enabling communication with gatherer 67 may be provided and configured to run on other network devices for the purpose of enabling such a device to initiate a request and get a response without the need for a desktop computer.

In most embodiments a user operating a desktop PC will order a one time or periodic summary related to some or all of his subscribed WEB sites. A logical flow of an exemplary request/response interaction is provided below.

FIG. 5 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 operating in a user-defined mode. In step 93, a user has initiated a new request for a summary (summary order). It is assumed for the purpose of discussion, that the request

US 6,802,042 B2

17

of step 93 involves a site wherein no template has been created. In step 95, the request is received and analyzed. A knowledge worker will likely perform this step. The new request may be posted to the user's portal home page, sent directly to gatherer 67, or even communicated through e-mail or other media to the service.

In step 97 a knowledge worker accesses particular site logic associated with the request URLs. For example, if the request involves a plurality of URLs, then all site logics for those URLs are accessed. Logic may be available in a repository such as repository 29 of FIG. 1 if they were obtained at the time of user registration to a particular URL, or sent in by WEB-site hosts shortly after registration. If it is a completely new URL, then the logic must be obtained from the site. In most cases however, the logic will be known by virtue of a plurality of users accessing common URLs. Therefore cross-linking in a database of logic/user associations may be performed to access a logic for a site that is new to one particular user, but not new to another.

In step 99, the knowledge worker creates a template by virtue of scripting module 79 (FIG. 4) containing all site logic, URLs, log-in and password information, and the user request information. As described previously, templates may be re-used for a same request. In most cases, scripting may be mostly automated with minimum manual input performed by the knowledge worker. In many cases, an existing template will match a new request exactly, and may be re-used. In that case steps 97, 99, and 101 would not be required.

In step 101 the template is stored and associated with the requesting user. The stored template may now be retrieved at a scheduled time for performing the summary gathering. At step 103, a browser control such as module 85 of FIG. 4 is activated to access the stored template and navigate to specified URLs for the purpose of gathering summary data. If a timing function is attributed to the template stored in step 101, then the template may self execute and call up the browser function. In another embodiment, the knowledge worker may notify the browser control to get the template for it's next task. In some embodiments, a plurality of controls may be used with one template as previously described.

In step 105, automatic log-in is performed, if required, to gain access to each specified URL. In step 107, a specified WEB-page is navigated to and parsed for requested data according to the logic on the template. If there are a plurality of WEB—pages to parse, then this step is repeated for the number of pages. A variety of parsing engines may be used for this process such as an IE™ parser, or a Pearl™ parser. Only the requested data is kept in step 107.

A request may be an on-demand request requiring immediate return, or a scheduled request wherein data may be posted. At step 109, such logic is confirmed. If the data is to be presented according to a periodic schedule, then summary data parsed in step 107 is stored for latter use in step 111. In step 113, the summary data is rendered as HTML if not already formatted, and displayed in the form of a summary WEB-page in step 115. The summary page may be posted for access by a user at a time convenient to the user (pull), or may be pushed as a WEB-page to the user and be made to automatically display on the user's PC. Notification of summary page availability may also be sent to a user to alert him of completion of order.

If the summary data is from a one-time on-demand request and required immediately by a user, then a network appliance and data delivery method (configured by the user)

18

is confirmed, and the data is rendered in the appropriate format for delivery and display in step 117. In step 119, the summary data is delivered according to protocol to a user's designated appliance. In step 121 a user receives requested information in the appropriate format.

It will be apparent to one with skill in the art that there may be more or fewer logical steps as well as added sub-steps than are illustrated in this example. For example, step 105 may in other embodiments include sub-steps such as getting an encryption key from a user. In still another embodiment, part of a request may be rendered as HTML as in step 113 while certain other portions of the same request data might be rendered in another format and delivered via alternative methods. There are many possibilities.

The method and apparatus of the present invention may be used to present summaries to users without user input. Process logic such as this is detailed below.

FIG. 6 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 in a User-independent smart mode with minimum or no user input. In step 117 an enterprise-initiated summary process begins. In this case, the enterprise may be assisting a user in finding a better deal or, perhaps presenting the individual with summaries from and links to alternative pages not yet subscribed to by a user.

In step 119, a database containing user information and parameters is accessed and reviewed. Certain information specific to a user may be required to initiate an enterprise-sponsored summary report. At step 121, the knowledge worker accesses the site logic specific to the specified target site or sites for summarization. In step 123, the knowledge worker modifies an existing user template, or creates a new one if necessary. At step 125 the template is stored in a repository such as repository 29 and associated with the user.

As described in FIG. 5, the template either self-executes according to a timed function and invokes a browser control such as control 85 (FIG. 4), or is accessed by control 85 as a result of task notification. In step 127, the browser control begins navigation. Auto logins are performed, if required, in step 129 to gain access to selected sites. If the WEB pages are new to a user, and the user has no registration with the WEB site, then through agreement, or other convention, the service may be provided access to such sites. Such an agreement may be made, for example, if the host of the WEB site realizes a possibility of gaining a new customer if the customer likes the summary information presented. In many other situations, no password or login information is required to obtain general information that is not personal to a client.

In step 131, all sites are parsed for summary data and stored in canonical fashion in step 133. At step 135, the data is compiled and rendered as HTML for presentation on a summary page. In step 137, a WEB summary containing all of the data is made available to a user and the user is notified of it's existence.

Providing certain information not requested by a user may aid in enhancing a user's organization of is current business on the WEB. Moreover, unsolicited WEB summaries may provide better opportunities than the current options in the user's profile. Of course, assisting a user in this manner will require that the enterprise (service) have access to the user's profile and existing account and service information with various WEB sites on the user's list. A user may forbid use of a user's personal information, in which case, no enterprise-initiated summaries would be performed unless they are conducted strictly in an offer mode instead of a comparative mode.

US 6,802,042 B2

**19**

The method and apparatus also may be practiced in a language and platform independent manner, and be implemented over a variety of scalable server architectures.

### Presenting Meta-Summarized Reports

In another aspect of the present invention, a method is provided largely through unique software wherein summary reports may be ordered and presented to users, the reports reflecting calculated and solution-orientated results. This type of summarizing is termed meta-summarization by the inventors, because it is a summarization over a plurality of data sources. Such a method is described in enabling detail below.

FIG. 7 is an overview of a meta-summarization process according to an embodiment of the present invention. The term "meta-summary" is used by the inventor in this embodiment also to distinguish the meta-summary process taught herein from the summary process taught above in this specification; in that meta-summarizing involves interpreting and calculating data for reporting a solution-orientated result derived from data retrieved from multiple network sources.

In this embodiment, a portal station 151 is provided and adapted by virtue of software and hardware, to perform WEB-summary and presentation services according to embodiments described in the co-patent applications listed above. Station 151 may be an ISP, a main Internet server, or other network connected server or interface station. In this example, portal station 151 is continuously connected to a source network, which is in this embodiment, the Internet network represented by Internet cloud 139. The above-described network connection is afforded by an Internet-connection line 149 from station 151 to an Internet backbone 147. Internet backbone 147 represents all lines and connections, including sub-nets that make up a global Internet 139.

Portal station 151 has a means provided therein for maintaining a portal interface 153. Portal interface 153 is a file-server interface in this example, however in other embodiments, differing types of network-interface hardware may be substituted therefor. Interface 153 provides hyper-text-transfer protocol (HTTP) pages over an Internet-connection such as path 161 to subscribing users operating such as an illustrated network-adapted PC 163. A user operating PC 163 may go on-line, in this case by such as a dial-up connection, and communicate with portal interface 153 over connection path 161. Connection path 161 may be a normal telephone line, an ISDN line, or another known type of Internet-connection link including wireless connection. A dial-up connection is illustrated herein only as a more common connection method.

A data repository 157 is provided within station 151 and adapted to warehouse aggregated data on behalf of and about a user. Data repository 157 may be part of the same hardware supporting portal interface 153 or it may be a separate hardware implementation connected by a data link. Repository 157 may be of the form of optical storage, or any other known implementation used for storing large amounts of digital data. Repository 157 may be assumed to support varied database programs as may be required to manipulate and organize data or metadata stored therein.

A data gathering sub-system GSS 159 is provided within station 151 and is adapted as a software and hardware implementation capable of navigating data-packet networks, such as Internet 139, upon instruction. GSS 159 represents automated browser control/navigation as described in

**20**

co-pending patent application Ser. No. 09/523,598. GSS 159 is analogous to navigation layer 73 described in FIG. 4 above.

A plurality of network-connected data sources represented herein by file/data servers 141–145 are illustrated in Internet 139. Servers 141–145 are user-subscribed servers known to portal station 151. For example, servers 141–145 may represent one user's collective WEB-services for banking and investment. Such options include banking, stock trading, retirement account servers, insurance servers, and so on. It is noted here that servers 141–145 are assumed to represent separate WEB-based services subscribed to by one user and are not affiliated with one another. For example, a user operating such as PC 163 would do all of his on-line banking, trading, and investing using servers 141–145 in this example.

In another embodiment, servers 141–145 may represent all of a user's frequented on-line shopping services. The fact that all of servers 141–145 are topically related but not affiliated with one another in this example serves only to aid in explanation of the present invention as will be seen below.

It is taught in the co-pending patent application entitled "Method and Apparatus for Obtaining and Presenting WEB Summaries to Users" that site navigation, parsing data, and returning data to users or storage is enabled, in part, by site-logic templates provided typically by knowledge workers. This aspect is represented herein by a PC 167 adapted for a knowledge worker (KW). A KW working from a station such as PC 167 provides site-logic scripts for navigation to data requested by a user and stored in any one of or all of servers 141–145. Such scripts are provided to GSS 159 over a data link 165. Summary data stored in such as repository 157 is stored for user access. In some cases wherein a user requests immediate data return, data is sent directly to such as portal interface 153 where a user may then access the data immediately.

According to an embodiment of the present invention, a novel database-reporting engine DBRE 155 is provided and adapted to perform formulative processes to aggregated data on behalf of a user. DBRE 155 is in itself a database utility and is in a preferred embodiment a part of the software environment of repository 157. In another embodiment DBRE 155 may be part of the software environment of portal interface 153.

In this embodiment, DBRE 155 acts as a first "gathering agent" and checks repository 157 first for user requested data upon request. User-history records of all user transactions at all of his registered WEB-based services are preferably maintained in repository 157 and are accessible to DBRE 155. In some cases, services such as those represented by servers 141–145 may provided complete transaction histories that may be obtained and stored in repository 157 and updated periodically. In some cases however, such services may not retain history records for users. In this case, a user accessing such services through his or her portal interface 153 may track each transaction over a normal course of time resulting in a history record for transactions at that service that is maintained in repository 157.

In the case of servers 141–45, each contains some form of financial portfolio data connected to one user. For example, server 141 may represent a banking service where a user has a savings account. Server 142 may represent a banking service where the user has a checking account. Server 143 may represent an on-line investment company maintaining a fast-changing portfolio of investments and losses for the particular user. Server 144 may represent a banking com-

US 6,802,042 B2

21

pany where the user has an individual retirement account (IRA). Server 145 may represent a mortgage company holding data about the users property portfolios. Each site presumably holds current account-status information and a financial history of transactions performed by a particular user.

To illustrate, assume that all financial data particular to one user is provided by or obtained from servers 141–145, aggregated in data repository 157, and updated periodically. A user operating PC 163 may access portal interface 153 by way of Internet connection 161 and request a specific result that involves some or all of the data across multiple servers 141–145. One example may be a user-initiated command "calculate my current net-worth". The resulting meta-summarized report would inform a user of his or her calculated net-worth with all financial data from all financial data-sources (servers 141–145) analyzed in the process of answering the user query.

In this case DBRE 155 utilizes only data that is already aggregated in repository 157. Therefore, it is not specifically required that GSS 159 navigate on behalf of the user in a case where data held in aggregation is current and sufficient to satisfy a user request. However, if a user's particular request, such as the one stated in the above example, requires navigation to one or more of servers 141–145, GSS 159, using site logic provided by KW 167, would navigate to each required site and retrieve the required data. After the required data is aggregated in repository 157, DBRE 155 may analyze the aggregated data and generate an accurate report from the aggregated data based on a user's request.

It will be apparent to one with skill in the art that providing a unique engine such as DBRE 155 on a user-side of repository 157 saves precious bandwidth resource required by individual site navigation and return of data ordered by a user. Added storage space is required in repository 157 for the purpose of storing complete activity histories from multiple WEB services on behalf of users. However, adding such resource and saving bandwidth represents an intelligent implementation in light of the many techniques known in the art for compressing and archiving data. More detail about the function of DBRE 155 is presented below.

FIG. 8 is a block diagram illustrating additional detail, components and functions of DBRE 155 of FIG. 7 according to an embodiment of the present invention. DBRE 155 is a functional interface capable of obtaining, analyzing, and preparing data for presentation to a user. As such, it contains certain sub-modules responsible for performing certain required functions. For example, a control-logic module 171 is provided as part of DBRE 155 and adapted to parse and confirm a user's request as well as to insure that a user-selected presentation format is available and appropriate for the type of data result requested by a user. Such options are contained in an options database 173 illustrated as connected to control module 171 by a double arrow representing bi-directional communication.

Options database 173 may be part of DBRE 155 as illustrated herein, or part of repository 157 and made accessible to DBRE 155. In the case of DBRE 155 maintaining its own databases such as options database 173, and a previously described database containing user histories across multiple accounts, then DBRE 155 would be resident in a machine having enough storage memory to hold all required data. Such a machine could be a processor/server. In another embodiment, all stored data is held in repository 157.

DBRE 155 also has a runtime engine 177, which performs data analyzing and calculation in order to form specific data results or solutions for users based on user request. Engine

22

177 has access to all of the mathematical tools and system knowledge required to perform its objectives which can vary considerably. A knowledge base (not shown) may be used as a source of intelligence for engine 177 as is generally known in the art of configuration models.

Engine 177 performs a wide variety of mathematical functions including such as statistical analysis, summing, averaging, and so on. In one embodiment, algebraic, geometric, and trigonometric functions are also provided for performing more complex calculations. In most cases however, user requests will be geared more toward averaging, summing, predicting probabilities, deriving percentages, and so on. For example, summing multiple bank balances would be a common task. Analyzing on-line spending trends across multiple on-line shopping services would be another example of a common task. A more complicated report might compare shopping trends with income potential and produce a ratio figure along with recommended ways to improve on the ratio without sacrificing needed goods. There are many possibilities.

A graphics user interface (GUI) module 181 is provided within DBRE 155 and adapted to prepare data according to requested format and a requesting display type. GUI module 181 has knowledge of which presentation option was selected from options database 173, and knowledge of the parameters (hardware and software platform) of a particular device or station that will receive a report. It is not required that a report be directed back to an originating device. In some embodiments, a user may direct a meta-summary report to alternative receiving devices over different mediums. This assumes, of course, that the receiving devices and data networks are known to the system.

In practice of the present invention, a user initiates a request illustrated herein as an arrow labeled input to a pre-configured request 169 from such as his or her browser interface. Request 169 is parsed for meaning in control-logic module 171. If there is an error detected in the original request 169, such as missing information or an option selection that is not available, then an error report is immediately sent back to that user as illustrated by the arrow labeled error report. Control-logic module 171 may check options database 173 to determine if an unavailable option was selected and present an alternative available option back with the error report.

Once module 171 has confirmed a request and confirmed a presentation option, it accesses a guard (GI) 175 resident on the client side of such as repository 157 of FIG. 7 to see if there is enough current data stored therein to enable formulation of a valid result. Data obtained from repository 157 of FIG. 1 by way of database interaction is included in guard 175 and passed to engine 177 for processing. If however, a required portion of data is missing from repository 155, GSS 159 of FIG. 7 may be invoked to retrieve the requested data. An error message may, in this case, be sent back to a user informing him of a requirement to navigate for a portion of required data.

All of the data required to return a requested report is funneled into runtime engine 177. All of the appropriate calculations are performed and the resulting data illustrated herein as raw data-results 157 is passed into GUI module 181. GUI module 181 then prepares the result data for presentation to a user illustrated herein as an arrow labeled output.

As described above, a report may be very simple or quite complex, including text and graphical elements as well. In one embodiment, all of the process steps performed on included data may be broken down and reported to a user along with a final result. Presentation options may include spreadsheets, graphs, text reports, pie charts, and so on.

US 6,802,042 B2

23

In the example presented above, DBRE **155** is a multifunctional module that may be broken down into cooperating sub-modules. However, this is not required to practice the present invention. One with skill in the art will recognize that there are other orders of modules and distribution paths that may be utilized to accomplish the same function. For example, DBRE **155** (FIG. **7**) may interface directly with GSS **159** (FIG. **7**) instead of being enhanced for gathering from aggregated data. In this case GSS **159** would first check repository **157** before determining if navigation is required. In another embodiment navigation may be required by default to insure that all data in aggregation is current. There are many possibilities.

FIG. **9** is a process flow diagram illustrating logical user and system steps from initialization to completion of a meta-summarized report according to an embodiment of the present invention. At step **183**, a user initiates a meta-summary report request from such as PC **163** of FIG. **7** using a browser/portal interface. A request might be to sum all of my interest earnings from all of my interest bearing accounts over a 1-year period and return a monthly average. In a preferred embodiment such a request may be made in a "natural language" understood by the portal software.

At step **185**, control logic registers and confirms feasibility of the original request. This step includes parsing the request, confirming a presentation option, confirming presentation delivery parameters (software, hardware, medium) and so on. Once a request is approved for action, a data gatherer at step **187** accesses the database, such as in repository **157** (FIG. **7**) for required data. Such a gatherer, termed a bot by the inventor, may be part of DBRE **155** as illustrated in FIG. **8**, or part of GSS **159** of FIG. **7**.

At step **189** it is determined whether or not there is sufficient data available in aggregation to complete the request. If the decision is yes, then the required data is extracted from the database (DB) in step **191**. At step **193** the extracted data is processed according to tools that accomplish the user's request, which is a solution-orientated result. Text records of processing may also be forwarded to a user if requested. In this way a user might review several steps taken to arrive at a solution-oriented result.

At step **193**, the raw result data is prepared according to user-requested presentation options in such as GUI module **181** of FIG. **8**. A presentation option may consist of simple text results appearing on a user's portal home page. In one embodiment, a separate WEB page may be constructed that displays varied versions of the same result such as a time chart, a text paragraph explaining the chart, and a table reflecting result values. A meta-summary dealing with an averaged interest rate, as described in an example above, may be presented in a variety of ways. For example, each account and individual result may be listed, followed by a summed result over a particular time span, followed by an average figure over a smaller increment of time. There are no limits to presentation possibilities as long as the appropriate software containers are supported at both ends of the interaction. In most cases, a browser interface supporting full interactive function will be utilized. In step **197**, the prepared GUI data is sent to a requesting user such as one operating PC **163** of FIG. **7** over an Internet connection such as connection **161**. It should be noted here again that many devices are capable of effecting an interface with DBRE **155** of FIG. **8** and receiving result data. The success of configuring varied devices to the system will depend on provided network and data interfaces.

If in step **189** it is determined that there is not enough data or the right kind of data already in aggregation to complete a request, then the request is passed over to a GSS, such as

24

GSS **159** of FIG. **7** in step **199**. In one embodiment gathering is the sole responsibility of GSS **159** as has already been described. In step **201** site logic templates are obtained from such as a KW operating a PC such as PC **167** of FIG. **7**. If the navigation templates required are the same as templates that have been previously used, then such templates may be obtained from a connected data store.

At step **203**, a GSS such as GSS **159** of FIG. **8** navigates to and extracts data from required WEB sites in order to complete the aggregated data store on behalf of the requesting user. At step **205**, the data is passed into aggregation in a database assigned for the purpose in such as repository **157**. After all of the required data has been aggregated in step **205**, steps **191** through **197** are repeated.

It will be apparent to one with skill in the art that the process steps described above represent a mostly automated or completely automated process. Moreover, there may be other sub-routines added without departing from the spirit and scope of the present invention such as adding a user notification step in the event that in step **189**, data is insufficient.

It will also be apparent to one with skill in the art that a process routine such as the one described herein may be altered according to an alternate operating environment without departing from the spirit and scope of the present invention. For example, if a user is interfacing from a wireless device through such as a data center network interface, then added steps may be required to convert data to a format understood on a different network. There are many diverse applications.

FIG. **10** is a representative view of an actual screen shot **207** of a meta-summarized report **209** on display in a user's browser interface according to an embodiment of the present invention. In a more common implementation of the present invention, a user interfaces with such as a portal server by utilizing a common browser interface, many brands of which are known in the art and readily available. In this particular example, a Microsoft™ browser application known as the Internet Explorer™ (IE) is used. However the system of the present invention works with any software interface capable of navigating a data packet network.

Summary report **209** consists of individual bank, investment and account listings complete with the names of the institutions. Summaries of the individually reported information for both bank accounts and stock accounts are found beneath each group listing. Report **209** is a rather simplified example of many graphical possibilities and presentation methods. Depending on the complexity of a request, a meta-summarized report may contain virtually any type of presentation mediums. Some examples include, but the invention is not limited to limited to, Gant charts, time graphs, pie charts, flow charts, text summaries, and so on. In another embodiment, a summarized report may contain interactive options for looking at the same data in different ways, or even calculating further results from the results presented. A user has many options when accomplishing interface with the system of the present invention through a fully functional browser application installed on a powerful PC. Interface through other devices such as personal digital assistant's, cellular telephones, and the like will obviously limit presentation options, however, the use of such devices for interface is possible and may, in some situations, be preferred. Such situations may be business meetings, interviews, and other situations wherein a user may need to access some summary data, but does not have access to his personal computer station. Moreover, such data may be previously ordered and sent to a place other than at his or her

US 6,802,042 B2

25

personal computer. With appropriate interface to telephony networks, such information may, if directed by a user, be faxed to a meeting place, e-mailed to an associate's e-mail address, and so on. There are many diverse applications, many of which have already been stated.

The method and apparatus of the present invention may be practiced via private individuals on the Internet, businesses operating on a WAN connected to the Internet, businesses operating via private WAN, and so on. There are many customizable situations. The present invention as taught herein and above should be afforded the broadest of scope. The spirit and scope of the present invention is limited only by the claims that follow.

What is claimed is:

1. An Internet portal system for gathering raw data from Internet sites and presenting reports from the data to a requesting user, comprising:

an Internet-connected portal system having a data repository;

a data gathering system operating on the portal system, gathering data from multiple Internet sites specifically associated to, and storing secured information personal to the requesting user;

a request processor for receiving a users request made according to an individual one of a plurality of pre-defined user requests;

a plurality of stored report algorithms, individual ones of the report algorithms associated with individual ones of the pre-defined plurality of user requests; and

a report processor for executing individual ones of the plurality of report algorithms to prepare and present reports to requesting users;

characterized in that the request processor receives the user's request and matches the user's request to the associated report algorithm, the data-gathering subsystem securely logs on to the Internet sites associated with the user, on behalf of the requesting user, and extracts raw data therefrom according to needs of the report algorithm, the report processor processes the collected raw data into a report defined by the report algorithm, and the portal system transmits the report to die user.

2. The system of claim 1 wherein the portal system further comprises an aggregated-data database in the data repository storing aggregated data retrieved for specific users periodically, and wherein the request processor checks the aggregated-data database for needed data before requiring the data-gathering system to retrieve data from the associated Internet sites, and in the instance that the needed data is stored in the aggregated-data database, the report is prepared from the aggregated data.

3. The system of claim 1 wherein the report processor prepares and presents reports in both text and graphic formats.

4. The system of claim 1 wherein data used in preparing a report is time related, and the report generated includes presentation of data trend.

5. The system of claim 3 wherein the report processor includes one or more of tables, bar charts, pie charts, and line graphs in a report generated for a user.

6. The system of claim 1 wherein the report destination is specified in the received request, and is other than the source site of the user request.

26

7. The system of claim 6 wherein the report processor is enabled to translate data format for prepared reports among a plurality of multimedia data formats, including one or more of synthesized voice, e-mail, pager message, or facsimile format, and wherein the format used for the report generated is determined by the nature of the report destination specified in the received request.

8. A method for gathering raw data from Internet sites and presenting reports from the data to a requesting user, comprising steps of:

(a) receiving a report request made according to an individual one of a plurality of pre-defined user requests, by a report processor at an Internet-connected portal system from a user;

(b) matching the request to an individual one of multiple report algorithms stored at the portal system, wherein individual ones of the report algorithms are associated with individual ones of the report requests;

(c) securely logging in to one of the multiple Internet sites associated with the requesting user, on behalf of the user,

(d) gathering secured raw data personal to the requesting user by a data gathering system operating on the portal system from multiple Internet sites associated with the requesting user, the sites selected according to needs of the report algorithm;

(e) executing the report algorithm to process the raw data gathered into a report defined by the report algorithm; and

(f) transmitting the report to the requesting user.

9. The method of claim 8 wherein the portal system further comprises an aggregated-data database in the data repository storing aggregated data retrieved for specific users periodically, and further comprising a step for checking the aggregated-data database for needed data before requiring the data-gathering system to retrieve data from the associated Internet sites and in the instance that the needed data is stored in the aggregated-data database, the preparing the report from the aggregated data.

10. The method of claim 8 wherein the report processor prepares and presents reports in both text and graphic formats.

11. The method of claim 8 wherein data used in preparing a report is time related, and the report generated includes presentation of data trend.

12. The method of claim 10 wherein the report processor includes one or more of tables, bar charts, pie charts, and line graphs in a report generated for a user.

13. The method of claim 8 wherein the report destination is specified in the received request, and is other than the source site of the user request.

14. The method of claim 13 wherein the report processor is enabled to translate data format for prepared reports among a plurality of multimedia data formats, including one or more of synthesized voice, e-mail, pager message, or facsimile format, and wherein the format used for the report generated is determined by the nature of the report destination specified in the received request.

* * * * *

# EXHIBIT 21



US006412073B1

(12) **United States Patent**　　　(10) Patent No.:　　**US 6,412,073 B1**
Rangan　　　　　　　　　　　　　(45) Date of Patent:　　\*Jun. 25, 2002

(54) **METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK**

(75) Inventor: **P. Venkat Rangan**, San Diego, CA (US)

(73) Assignee: **Yodlee.com, Inc**, Redwood Shores, CA (US)

(\*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/208,740**

(22) Filed: **Dec. 8, 1998**

(51) Int. Cl.[7] ........................ **G06F 12/14**; G06F 17/60; H04L 9/00

(52) U.S. Cl. ...................... **713/202**; 713/201; 713/162; 705/14; 705/76

(58) Field of Search .................................. 713/162, 202, 713/201; 705/76, 14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,918,019 | A | \* | 6/1999 | Valencia | 395/200.57 |
| 6,000,033 | A | \* | 12/1999 | Kelley et al. | 713/201 |
| 6,014,502 | A | \* | 1/2000 | Moraes | 395/200 |
| 6,023,684 | A | \* | 2/2000 | Pearson | 705/35 |
| 6,085,229 | A | \* | 7/2000 | Newman et al. | 709/203 |
| 6,148,402 | A | \* | 11/2000 | Campbell | 713/200 |

| | | | | | |
|---|---|---|---|---|---|
| 6,182,229 | B1 | \* | 1/2001 | Nielsen | 713/202 |
| 6,192,407 | B1 | \* | 2/2001 | Smith et al. | 709/229 |
| 6,199,077 | B1 | \* | 3/2001 | Inala et al. | 707/S01 |
| 6,065,120 | A | \* | 5/2001 | Laursen et al. | 713/201 |
| 6,233,608 | B1 | \* | 5/2001 | Laursen et al. | 709/217 |
| 6,330,592 | B1 | \* | 12/2001 | Makuch et al. | 709/217 |
| 2001/0000537 | A1 | \* | 4/2001 | Inala et al. | 707/S00 |
| 2001/0020242 | A1 | \* | 9/2001 | Gupta et al. | 707/S01.1 |

OTHER PUBLICATIONS

Fryer et al (Eds.), Microsoft Computer Dictionary, 1997, 3rd Edition,. pp. 238–240, 487.\*

\* cited by examiner

*Primary Examiner*—Norman M. Wright
(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57)　　　　　**ABSTRACT**

An Internet Portal is enabled by software executing on an Internet-connected server. The Portal, in response to a log-on by a user, presents a secure and personalized page for and to the user, the personalized page having listed plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by the subscriber, such as by a point-and-click technique, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. In an enhanced embodiment a search function is provided wherein a user may configure searches in any or all of the listed destinations on a personalized page. Provision is provided for log-on by limited appliances, such as by a Smartcard or embedded password, and in some embodiments functionality is provided in a browser plug-in wherein a user may navigate to a site, and, in response to a request for log-in data, the subscriber may use a hot key or pointer input, which will cause the browser to access and provide the needed data from the Password-All source.

**39 Claims, 3 Drawing Sheets**





*Fig. 1*



*Fig. 2*



*Fig. 3*

US 6,412,073 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK**

### FIELD OF THE INVENTION

The present invention is in the field of Internet navigation and browsing, and pertains more particularly to methods and apparatus for providing and maintaining an Internet portal configured to provide access to an interaction with other Internet information sources.

### BACKGROUND OF THE INVENTION

The information network known as the world wide web (WWW), which is a subset of the well-known Internet, is arguably the most complete source of publicly-accessible information available. Anyone with a suitable Internet appliance such as a personal computer with a standard Internet connection may access (go on-line) and navigate to information pages (termed web pages) stored on Internet-connected servers for the purpose of garnering information and initiating transactions with hosts of such servers and pages.

Many companies offer various subscription services accessible via the Internet. For example, many people now do their banking, stock trading, shopping, and so forth from the comfort of their own homes via Internet access. Typically, a user, through subscription, has access to personalized and secure WEB pages for such functions. By typing in a user name and a password or other personal identification code, a user may obtain information, initiate transactions, buy stock, and accomplish a myriad of other tasks.

One problem that is encountered by an individual who has several or many such subscriptions to Internet-brokered services is that there are invariably many passwords and/or log-in codes to be used. Often a same password or code cannot be used for every service, as the password or code may already be taken by another user. A user may not wish to supply a code unique to the user such as perhaps a social security number because of security issues, including quality of security, that may vary from service to service. Additionally, many users at their own volition may choose different passwords for different sites so as to have increased security, which in fact also increases the number of passwords a user may have.

Another issue that can plague a user who has many passworded subscriptions is the fact that they must bookmark many WEB pages in a computer cache so that they may quickly find and access the various services. For example, in order to reserve and pay for airline travel, a user must connect to the Internet, go to his/her book-marks file and select an airline page. The user then has to enter a user name and password, and follow on-screen instructions once the page is delivered. If the user wishes to purchase tickets from the WEB site, and wishes to transfer funds from an on-line banking service, the user must also look for and select the personal bank or account page to initiate a funds transfer for the tickets. Different user names and passwords may be required to access these other pages, and things get quite complicated.

Although this preceding example is merely exemplary, it is generally known that much work related to finding WEB pages, logging in with passwords, and the like is required to successfully do business on the WEB.

What is clearly needed is an interactive Internet portal that will enable users to store their WEB pages, user names, and passwords, and that can accomplish pre-defined tasks such as navigation and interaction between WEB servers based on user pre-programming (user profiles). Such a system would greatly simplify on-line or network-based business transactions.

### SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet Portal is provided, comprising an Internet-connected server; and a portal software executing on the server. The portal, in response to a log-on by a user, presents a secure and personalized page for the user, the personalized page having a list of Internet destinations enabled by hyperlinks, wherein, upon invocation of a hyperlink by the subscriber, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information required for user access at the destination.

The Portal server can be a part of an Internet server used for another purpose, and may be hosted therefore by such as an Internet service provider (ISP).

In some embodiments search functions are provided, and in the same or other embodiments, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software accesses and displays one or more informative displays to the user. Informative displays may be one or more advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In another aspect of the invention an Internet Portal is provided comprising an Internet-connected server; and a portal software executing on the server. In this aspect the portal interacts with a browser plug-in executing on a subscriber's computer station, such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user. In this embodiment as well, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software cooperates with the user's browser plug-in to access and display one or more informative displays to the user. The informative displays may be one or more advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In yet another aspect an Internet Portal application executable on an Internet-connected server is provided, comprising a log-on facility adapted for users to enter log-on information for access to the Portal application; and a plurality of stored personal pages associated each with one or more specific users. In this aspect individual personalized pages list plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by a user, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. After transparent log-on to an invoked destination, the page at the destination is conveyed to and displayed for the user. The application may be adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe. There may also be a search function adapted to search selected ones of listed destinations in user's pages for defined search criteria.

US 6,412,073 B1

3

In this aspect as well, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software can access and display one or more informative displays to the user, which may be advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In yet another aspect an Internet Portal application executable on an Internet-connected server is provided, comprising a log-on facility adapted to users to enter log-on information for access to the Portal application; and plurality of stored personal pages associated each with one or more specific users. The portal application interacts with a browser plug-in executing on a subscriber's computer station, such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user.

In this embodiment as well as others, the application may be adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe. Also, as in some other embodiments, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software, in cooperation with the browser plug-in, accesses and displays one or more informative displays to the user, which may be commercial advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In addition to the apparatus and software applications provided, several methods are taught in the following enabling disclosure as well. In the disclosure, for the first time, an invention is described that allows a subscriber to safely and securely navigate to any of multiple destinations on the Internet with a single point-and-click, and in the case of destinations requiring secure log on, the log on may be accomplished completely transparently to the user, while still maintaining strict security of the user's passwords and other security data.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 is an overview of an Internet portal-system and network according to an embodiment of the present invention.

FIG. 2 is an exemplary plan view of a personalized Portal home page application as it may be seen on a display monitor according to an embodiment of the present invention.

FIG. 3 is a flow diagram illustrating user interaction with the Internet portal of FIG. 1.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

According to a preferred embodiment of the present invention, a unique Internet portal is provided and adapted to provide unique services to users who have obtained access via an Internet or other network connection from an Internet-capable appliance. Such an interface provides users with a method for storing many personal WEB pages and further provides search function and certain task-performing functions. The methods and apparatus of the present invention are taught in enabling detail below.

FIG. 1 is an overview of an Internet portal system 11 and Internet network 13 according to an embodiment of the

4

present invention. Portal system 11, in this embodiment, operates as an ISP in addition to a unique network portal, but may, in other embodiments be implemented as a stand-alone Internet server. In yet other embodiments the service and apparatus described herein may also be provided by such as a search and listing service (AltaVista™, Yahoo™) or by any other enterprise hosting a WEB-connected server.

Internet 13 is representative of a preferred use of the present invention, but should not be considered limiting, as the invention could apply in other networks and combinations of networks.

ISP 15 in this embodiment comprises a server 31, a modem bank 33, represented here by a single modem, and a mass storage repository 29 for storing digital data. The modem bank is a convenience, as connection to the server could be by another type of network link. ISP 15, as is typical in the art, provides Internet access services for individual subscribers. In addition to well-known Internet access services, ISP 15 also provides a unique subscription service as an Internet portal for the purpose of storing many WEB pages or destinations along with any passwords and or personal codes associated with those pages, in a manner described in more detail below. This unique portal service is provided by execution of Portal Software 35, which is termed by the inventors the Password-All suite. The software of the invention is referred to herein both as the Portal Software, and as the Password-all software suite. Also, in much of the description below, the apparatus of the invention is referred to by the Password-All terminology, such as the Password-All Server or Password-All Portal.

ISP 15 is connected to Internet 13 as shown. Other equipment known in the art to be present and connected to a network such as Internet 13, for example, IP data routers, data switches, gateway routers, and the like, are not illustrated here but may be assumed to be present. Access to ISP 15 is through a connection-oriented telephone system as is known in the art, or through any other Internet/WEB access connection, such as through a cable modem, special network connection (e.g. T1), ISDN, and so forth. Such connection is illustrated via access line 19 from Internet appliance 17 through modem bank 33.

In a preferred embodiment a user has access to Internet Password-All Portal services by a user name and password as is well-known in the art, which provides an individualized WEB page to the subscriber. In another embodiment wherein a user has other individuals that use his or her Internet account, then an additional password or code unique to the user may be required before access to portal 31 is granted. Such personalized Portal WEB pages may be stored in repository 29, which may be any convenient form of mass storage.

Three Internet servers 23, 25, and 27, are shown in Internet 13, and represent Internet servers hosted by various enterprises and subscribed to by a user operating appliance 17. For example, server 23 may be a bank server wherein interactive on-line banking and account managing may be performed. Server 25 may be an investment server wherein investment accounts may be created and managed. Server 27 may be an airline or travel server wherein flights may be booked, tickets may be purchased, and so on. In this example, all three servers are secure servers requiring user ID and password for access, but the invention is not necessarily limited to just secure services.

In a preferred embodiment of the present invention, a subscribing user operating an Internet-capable appliance, such as appliance 17, connects to Password-All Portal

US 6,412,073 B1

5

system 11 hosted by ISP 15, and thereby gains access to a personalized, interactive WEB page, which in turn provides access to any one of a number of servers on Internet 13 such as servers 23, 25, and 27, without being required to enter additional passwords or codes. In a preferred embodiment the software that enables this service is termed Password-All by the inventors. Password-All may be considered to be a software suite executing on the unique server, and in some instances also on the user's station (client). Additional interactivity provided by portal software 35 allows a connected user to search his listed pages for information associated with keywords, text strings, or the like, and allows a user to program user-defined tasks involving access and interaction with one or more Internet-connected servers such as servers 23, 25, and 27 according to a pre-defined time schedule. These functions are taught in enabling detail below.

FIG. 2 is an illustration of a personalized portal page as may be seen on a display monitor according to an embodiment of the present invention, provided by Password-All Portal software 35 executing on server 31, in response to secure access by a subscriber. Page 32 presents an interactive listing 34 of user-subscribed or member WEB pages, identified in this example by URL, but which may also be identified by any convenient pseudonym, preferably descriptive, along with user name and typically encrypted password information for each page. Listed in a first column under destination, are exemplary destinations LBC.com, My Bank.com, My Stocks.com, My shopping.com, Mortgage.com, and Airline.com. These are but a few of many exemplary destinations that may be present and listed as such on page 33. In order to view additional listings listed but not immediately viewable from within application 33, a scroll bar 35 is provided and adapted to allow a user to scroll up or down the list to enable viewing as is known in the art.

Items listed in list 34 in this example may be considered destinations on such as servers 23, 25, and 27 of FIG. 1. Typically the URL associated with an item on this list will not take a user to a server, per se, but to a page stored on a server. User names and password data associated with each item in list 34 are illustrated in respective columns labeled user name, and password, to the right of the column labeled destination. Each listing, or at least a portion of each listing, is a hyperlink invoking, when selected, the URL to that destination. In some instances a particular service may have more than one associated URL. For example, My Bank.com may have more than one URL associated for such as different accounts or businesses associated also with a single subscriber. In this case there may be a sub-listing for different destinations associated with a single higher-level listing. This expedient is not shown, but, given this teaching the mechanism will be apparent to those with skill in the art.

In some embodiments one page 33 may be shared by more than one user, such as a husband and wife sharing a common account and subscription. An instance of this is illustrated herein with respect to the server labeled Mortgage.com wherein both a John and a Jane Doe are listed together under the column labeled user name. In another embodiment, a network of individuals, perhaps business owners, authorized co-workers, investment parties, or the like may share one application. In this way, system 11 may be adapted for private individuals as well as business uses.

After gaining access to application 33 which is served via Internet portal server 31 of FIG. 1, a user may scroll, highlight, and select any URL in his or her list 34 for the purpose of navigation to that particular destination for further interaction. Application 33 already has each pass-

6

word and user name listed for each URL. It is not necessary, however, that the password and user name be displayed for a user or users. These may well be stored transparently in a user's profile, and invoked as needed as a user makes selections. Therefore, a user is spared the need of entering passwords and user names for any destinations enabled by list 34. Of course, each list 34 is built, configured and maintained by a subscribing user or users, and an editing facility is also provided wherein a user may edit and update listings, including changing URL's adding and deleting listings, and the like.

In another aspect of the invention new listings for a user's profile, such as a new passthrough to a bank or other enterprise page, may be added semi-automatically as follows: Typically, when a user opens a new account with an enterprise through interaction with a WEB page hosted by the enterprise, the user is required to provide certain information, which will typically include such as the user's ID, address, e-mail account, and so forth, and typically a new user name and password to access the account. In this process the user will be interacting with the enterprise's page from his/her browser. A Password-All plug-in is provided wherein, after entering the required information for the new enterprise, the user may activate a pre-determined signal (right click, key stroke, etc.), and the Password-All suite will then enter a new passthrough in the user's Password. All profile at the Password-All Portal server.

In a related method for new entries, the enterprise hosting the Password-All Portal may, by agreement with other enterprises, provide log-in and sign-up services at the Password-All Portal, with most action transparent to the user. For example, there may be, at the Password-All Portal, a selectable browser list of cooperating enterprises, such as banks, security services, and the like, and a user having a Password-All Portal subscription and profile may select among such cooperating enterprises and open new accounts, which will simultaneously and automatically be added to the Password-All Portal page for the user and to the server hosted by the cooperating enterprise. There may be some interactivity required for different accounts, but in the main, much information from the user's profile may be used directly without being re-entered.

The inventors have anticipated that many potential users may well be suspicious of providing passwords and user names to an enterprise hosting a Password-All Portal Server executing a service like Password-All according to embodiments of the present invention. To accommodate this problem, in preferred embodiments, it is not necessary that the user provide the cleartext password to Password.All. Instead, an encrypted version of each password is provided. When a user links to his passthrough page in Password-All at the Password-All Portal server, when he/she invokes a hyperlink, the encrypted password is returned to the user's system, which then, by virtue of the kept encryption key or master password, invokes the true and necessary password for connection to the selected destination. It is thus not necessary that cleartext passwords be stored at the Password-All Portal server, where they may be vulnerable to attack from outside sources, or to perceived misuse in other ways as well.

In a related safety measure, in a preferred embodiment of the invention, a user's complete profile is never stored on a single server, but is distributed over two or more, preferably more, servers, so any problem with any one server will minimize the overall effect for any particular user.

Password-All, as described above, allows a user to access a complete list of the user's usual cyberspace destinations,

US 6,412,073 B1

7

complete with necessary log-on data, stored in an encrypted fashion, so a user may simply select a destination (a hyperlink) in the Password-All list, and the user's browser then invokes the URL for the selected destination. In an added feature, Password-All may display banner ads and other types of advertisement during the navigation time between a hyperlink being invoked and the time the destination WEB page is displayed.

In yet another embodiment of the invention, a user/subscriber need not access the Password-All page to enjoy the advantages of the unique features provided. In this variation, a Plug-In is provided for the subscriber's WEB browser. If the subscriber navigates by use of the local browser to a WEB page requiring a secure log-in, such as his/her on-line banking destination, when the subscriber is presented with an input window for ID and Password, the plug-in may be activated by a predetermined user input, such as a hot key or right click of the mouse device. The plug-in then accesses, transparently, the Password-All page (which may be cached at the client), and automatically accesses and provides the needed data for log-on.

In yet another aspect of the invention a search option 37 allows a user to search list 34 for specific URL's based on typed input such as keywords or the like. In some cases, the number of URL's stored in list 34 can be extensive making a search function such as function 37 an attractive option. A criteria dialog box 51 illustrated as logically separated from and below list 34 is provided and adapted to accept input for search option 37 as is known in the art. In one embodiment, search option 37 may bring up a second window wherein a dialog box such as box 51 could be located.

In another aspect of the invention the search function may also be configured in a window invoked from window 33, and caused to search all or selected ones of listed destinations, and to return results in a manner that may be, at least to some extent, configured by a user. For example, a dialog box may be presented wherein a user may enter a search criteria, and select among all of the listed destinations. The search will then be access each of the selected destinations in turn, and the result may be presented to the user as each instance of the criteria is found, or results may be listed in a manner to be accessed after the search.

Preferably the search function is a part of the Password-All Portal software, available for all users, and may be accessed by hyperlinks in user's personal pages. In some embodiments users may create highly individualized search functions that may be stored in a manner to be usable only by the user who creates such a function.

In many aspects of the present invention a knowledge of specific WEB pages, and certain types of WEB pages, is highly desirable. In many embodiments characteristics of destination WEB pages are researched by persons (facilitators) maintaining and enhancing Password-All Portal software 35, and many characteristics may be provided in configuration modules for users to accomplish specific tasks. In most cases these characteristics are invoked and incorporated transparent to the user.

In yet another aspect of the present invention, the Password-All suite is structured to provide periodic reports to a user, in a manner to be structured and timed by the user, through the user's profile. For example, reports of changes in account balances in bank accounts, stock purchases, stock values, total airline travel purchases, frequent-flier miles, and the like may be summarized and provided to the users in many different ways. Because the Password-All Portal server with the Password-All software site handles a broad

8

variety of transactional traffic for a user, there is an opportunity to summarize and collect and process statistics in many useful ways. In preferred embodiments of the invention such reports may be furnished and implemented in a number of different ways, including being displayed on the user's secure personal WEB page on the Password-All Portal.

In addition to the ability of performing tasks as described above, task results including reports, and hard documents such as airline tickets may be sent over the Internet or other data packet-networks to user-defined destinations such as fax machines, connected computer nodes, e-mail servers, and other Internet-connected appliances. All tasks may be set-up and caused to run according to user-defined schedules while the user is doing something else or is otherwise not engaged with the scheduled task.

In another embodiment of the present invention, recognizing the increasing use of the Internet for fiscal transactions, such as purchasing goods and services, a facility is provided in a user's profile to automatically track transactions made at various destinations, and to authorize payment either on a transaction-by-transaction basis, or after a session, using access to the user's bank accounts, all of which may be pre-programmed and authorized by the user.

Other functions or options illustrated as part of application 35 include a last URL option 41, an update function 43, and an add function 45. Function 41 allows a user to immediately navigate to a last visited URL. Update function 43 provides a means of updating URL's for content and new address. An add function enables a user to add additional URL's to list 34. Similarly, function 45 may also provide a means to delete entries. Other ways to add accounts are described above. It should be noted that the services provided by the unique Password-All Portal in embodiments of the present invention, and by the Password-All software suite are not limited to destinations requiring passwords and user names. The Password-All Portal and software in many embodiments may also be used to manage all of a user's bookmarks, including editing of bookmarks and the like. In this aspect, bookmarks will typically be presented in indexed, grouped, and hierarchical ways.

There are editing features provided with Password-All for adding, acquiring, deleting, and otherwise managing bookmarks. As a convenience, in many embodiments of the invention, bookmarks may be downloaded from a user's Password-All site, and loaded onto the same user's local browser. In this manner, additions and improvements in the bookmark set for a user may be used without the necessity of going to Password-All. Further, bookmarks may be uploaded from a user's local PC to his/her home page on the Password-All site by use of one or more Password-All plug-ins.

It will be apparent to the skilled artisan, given the teaching herein, that the functionality provided in various embodiments of the invention is especially applicable to Internet-capable appliances that may be limited in input capability. For example, a set-top box in a WEB TV application may well be without a keyboard for entering IDs and Passwords and the like. In practice of the present invention keyboard entry is minimized or eliminated. The same comments apply to many other sorts of Internet appliances.

In preferred embodiments of the invention, once a subscriber-user is in Password-All, only an ability to point-and-click is needed for all navigation. To get into the Password-All site, using a limited apparatus, such as an appliance without a keyboard or keypad, a Smartcard or embedded password may be used, or some other type of authentication.

US 6,412,073 B1

9

It will be apparent to one with skill in the art that an interactive application such as application 33 may be provided in a form other than a WEB page without departing from the spirit and scope of the present invention. For example, an application such as application 33 may be provided as a downloadable module or program that may be set-up and configured off-line and made operational when on-line.

FIG. 3 is a flow diagram illustrating user interaction with the Internet Password-All Portal of FIG. 1. The following process steps illustrated, according to an embodiment of the present invention, are intended to illustrate exemplary user-steps and automated software processes that may be initiated and invoked during interaction with an Internet portal of the present invention such as portal 31 of FIG. 1. In step 53 a user connects to the Internet or another previously described switched-packet network via a compatible appliance such as Internet appliance 17 of FIG. 1.

At step 55, a user enters a user-name and password which, in one embodiment, may simply be his ISP user name and password. In another embodiment, a second password or code would be required to access an Internet portal such as portal server 31 of FIG. 1 after logging onto the Internet through the ISP. In some cases, having a special arrangement with the ISP, there may be one password for both Internet access through the ISP and for Password-All. At step 57 a personal WEB page such as page 32 of FIG. 2 is displayed via Internet portal server 31. At minimum, the personalized WEB page will contain all user configured URL's, and may also be enhanced by a search function, among other possibilities.

In step 58 a user will, minimally, select a URL from his or her bookmarked destinations, and as is known by hyperlink technology, the transparent URL will be invoked, and the user will navigate to that destination for the purpose of normal user interaction. In this action, the Password-All Portal software transparently logs the user on to the destination page, if such log-on is needed.

At step 60 the user invokes a search engine by clicking on an option such as described option 37 of FIG. 2. At step 62, the user inputs search parameters into a provided text field such as text field 51 of FIG. 2. After inputting such parameters, the user starts the search by a button such as button 52. The search engine extracts information in step 64. Such information may be, in one option, of the form of URL's fitting the description provided by search parameters. A searched list of URL's may be presented in a separate generated page in step 66 after which a user may select which URL to navigate to. In an optional search function, the user may provide search criteria, and search any or all of the possible destinations for the criteria.

In another embodiment wherein WEB pages are cached in their presentable form, information extracted in step 64 may include any information contained in any of the stored pages such as text, pictures, interactive content, or the like. In this case, one displayed result page may provide generated links to search results that include the URL associated with the results. Perhaps by clicking on a text or graphic result, the associated WEB page will be displayed for the user with the result highlighted and in view with regards to the display window.

The method and apparatus of the present invention may be practiced via private individuals on the Internet, businesses operating on a WAN connected to the Internet, businesses operating via private WAN, and so on. There are many customizable situations.

The present invention as taught herein and above should be afforded the broadest of scope. The spirit and scope of the present invention is limited only by the claims that follow.

10

What is claimed is:

1. An Internet Portal, comprising:
an Internet-connected server; and
a portal software executing on the server;
wherein the Portal, in response to log-on by a user from a user's Internet-connected appliance, presents a secure and personalized page for the user, the personalized page having a list of Internet destinations, pre-selected by the user and enabled by hyperlinks, wherein, upon invocation of a hyperlink by the user, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information required for user access at the destination.

2. The Internet Portal of claim 1 wherein required log-on information includes a password, and wherein the password is stored at the Internet Portal in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

3. The Internet Portal of claim 1 wherein the user connects to the Portal through an Internet Service Provider (ISP), and after transparent log-on to an invoked destination, the page at the destination is conveyed to and displayed for the user.

4. The Internet Portal of claim 1 wherein the Portal is enabled by software executing at a server hosted by an Internet Service Provider (ISP) to which the user subscribes.

5. The Internet Portal of claim 1 further comprising a search function adapted to search selected ones of listed destinations for defined search criteria.

6. The Internet Portal of claim 1 wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software accesses and displays one or more informative displays to the user.

7. The Internet Portal of claim 6 wherein the informative displays comprise one or more advertisements.

8. The Internet Portal of claim 1 wherein the Portal software, interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a pre-determined signal, automatically adds the new destination for the user's Portal page.

9. The Internet Portal of claim 1 wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WEB page.

10. The Internet Portal of claim 9 wherein the summarization is automatic in period and scope, subject to edit by the user.

11. An Internet Portal, comprising:
an Internet-connected server; and
a portal software executing on the server;
wherein the portal interacts with a browser plug-in executing on a user's Internet-connected appliances such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user.

12. The Internet Portal of claim 11 wherein required log-on information includes a password, and wherein the password is stored at the Internet Portal in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

13. The Internet Portal of claim 11 wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software cooperates with the user's browser plug-in to access and display one or more informative displays to the user.

14. The Internet Portal of claim 12 wherein the informative displays comprise one or more advertisements.

US 6,412,073 B1

11

15. The Internet Portal of claim 11 wherein the Portal software, interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a pre-determined signal, automatically adds the new destination for the user's Portal page.

16. The Internet Portal of claim 11 wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WEB page.

17. The Internet Portal of claim 16 wherein the summarization is automatic in period and scope, subject to edit by the user.

18. An Internet Portal software application executing on an Internet-connected server, comprising:

a log-on portion providing an interactive display for users to enter log-on information from an Internet-connected appliance for access to the Portal application; and

a plurality of displayable stored personal pages associated each with one or more specific users;

wherein individual personalized pages, rendered in an interactive display, list plural Internet destinations enabled by hyperlinks, the destinations pre-selected by the associated users, and upon invocation of a hyperlink by the associated user, the portal software invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination.

19. The Internet Portal application of claim 18 wherein log-on information includes a password, and wherein the password is stored at the Internet server in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

20. The Internet Portal application of claim 18 wherein, after transparent log-on to an invoked destination, the page at the destination is conveyed to and displayed for the user.

21. The Internet Portal application of claim 18 adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe.

22. The Internet Portal application of claim 18 further comprising a search function adapted to search selected ones of listed destinations in user's pages for defined search criteria.

23. The Internet Portal application of claim 18 wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software accesses and displays one or more informative displays to the user.

24. The Internet Portal application of claim 23 wherein the informative displays comprise one or more advertisements.

25. The Internet Portal application of claim 18 wherein the Portal application enables users to pre-select destinations by interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a predetermined signal, automatically adds the new destination for the user's Portal page.

26. The Internet Portal application of claim 18 wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WEB page.

27. The Internet Portal application of claim 26 wherein the summarization is automatic in period and scope, subject to edit by the user.

28. An Internet Portal software application executing on an Internet-connected server, comprising:

a log-on portion providing an interactive display for users to enter log-on information for access to the Portal application; and

a plurality of displayable stored personal pages associated each with one or more specific users;

wherein the portal application interacts with a browser plug-in executing on a subscriber's Internet-connected

12

appliance, such that, when the user invokes a destination, pre-selected by the associated user, from the browser, accessing the associated user's personal page, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user.

29. The Internet Portal application of claim 28 wherein required log-on information includes a password, and wherein the password is stored at the Internet Portal in an encrypted form, and is exchanged with cooperating software at the user's appliance, where it is decrypted and passed on to the destination for log-on.

30. The Internet Portal application of claim 28 adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe.

31. The Internet Portal application of claim 28 wherein, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software, in cooperation with the browser plug-in, accesses and displays displays one or more informative displays to the user.

32. The Internet Portal application of claim 31 wherein the informative displays comprise one or more advertisements.

33. The Internet Portal application of claim 28 wherein the Portal application enables users to pre-select destinations by interacting with a logged-on user, upon the user creating a new account at a WEB site and providing a pre-determined signal, automatically adds the new destination for the user's Portal page.

34. The Internet Portal application of claim 28 wherein the Portal periodically summarizes account information for accounts at destinations listed on the user's WEB page.

35. The Internet Portal of claim 34 wherein the summarization is automatic in period and scope, subject to edit by the user.

36. A method for accessing and interacting with WEB pages on the Internet, comprising steps of:

(a) using an Internet-capable appliance, logging on to a Portal server, which returns a personalized page for the user logging on, the personalized page having listed plural Internet destinations enabled by hyperlinks, the destinations pre-selected by the user;

(b) selecting a hyperlink in the personalized page, thereby invoking a URL for a destination, and, upon connection to the destination, automatically providing user log-on information for the user; and

(c) interacting with the page automatically provided.

37. The method of claim 36 wherein the Portal server is a part of an Internet Service Provider (ISP).

38. The method of claim 36 further comprising a step for invoking a search function adapted to search selected ones of listed destinations for defined search criteria.

39. A method for accessing and interacting with WEB pages on the Internet, comprising steps of:

(a) using an Internet-capable appliance, logging on to a Portal server as a subscriber, the portal server storing data associated with Internet destinations pre-selected by the subscriber;

(a) using a browser with a plug-in for interacting with a Portal server executing on the Internet-capable appliance, invoking a URL to a destination WEB page;

(b) upon being presented with a log-in interface by the destination WEB page, calling the Portal server by the plug-in; and

(c) furnishing necessary log-in data by the Portal server, and accomplishing secure log-in for the subscriber substantially transparently to the subscriber.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,412,073 B1                                          Page 1 of  1
DATED        : June 25, 2002
INVENTOR(S) : P. Venkat Rangan and Sam Inala

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Title page,</u>
Item [73], Assignee, now reads "**Yodiee.com, Inc**, Redwood Shores, CA (US)" should
read -- **Yodlee.com, Inc.**, Redwood Shores, CA (US) --

Signed and Sealed this

Fifth Day of August, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

# EXHIBIT 22



US006594766B2

(12) **United States Patent**
Rangan et al.

(10) Patent No.: **US 6,594,766 B2**
(45) Date of Patent: **Jul. 15, 2003**

(54) **METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET NETWORK**

(75) Inventors: **P. Venkat Rangan**, San Diego, CA (US); **Sam Inala**, Redmond, WA (US)

(73) Assignee: **Yodlee.com, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/180,146**

(22) Filed: **Jun. 25, 2002**

(65) **Prior Publication Data**

US 2002/0184534 A1 Dec. 5, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/208,740, filed on Dec. 8, 1998, now Pat. No. 6,412,073.

(51) Int. Cl.7 .......................... **G06F 12/14**; G06F 17/60; H04L 9/00

(52) U.S. Cl. ...................... **713/202**; 713/201; 713/162; 705/14; 705/76

(58) Field of Search ................................ 713/202, 201, 713/162; 705/14, 76

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,918,019 A | * | 6/1999 | Valencia | 709/227 |
| 6,000,033 A | * | 12/1999 | Kelley et al. | 713/201 |
| 6,014,502 A | * | 1/2000 | Moraes | 709/219 |
| 6,023,684 A | * | 2/2000 | Pearson | 705/35 |
| 6,065,120 A | * | 5/2000 | Laursen et al. | 713/201 |
| 6,085,229 A | * | 7/2000 | Newman et al. | 709/203 |
| 6,148,402 A | * | 11/2000 | Campbell | 713/200 |
| 6,182,229 B1 | * | 1/2001 | Nielsen | 713/202 |
| 6,192,407 B1 | * | 2/2001 | Smith et al. | 709/229 |
| 6,199,077 B1 | * | 3/2001 | Inala et al. | 715/501.1 |
| 6,233,608 B1 | * | 5/2001 | Laursen et al. | 709/217 |
| 6,330,592 B1 | * | 12/2001 | Makuch et al. | 709/217 |
| 6,412,073 B1 | * | 6/2002 | Rangan | 713/202 |
| 2001/0000537 A1 | * | 4/2001 | Inala et al. | 707/500 |
| 2001/0020242 A1 | * | 9/2001 | Gupta et al. | 707/501.1 |

OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/208,740, Rangan et al.

* cited by examiner

*Primary Examiner*—Norman M. Wright

(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency, Inc.

(57) **ABSTRACT**

An Internet Portal is enabled by software executing on an Internet-connected server. The Portal, in response to a log-on by a user, presents a secure and personalized page for and to the user, the personalized page having listed plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by the subscriber, such as by a point-and-click technique, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. In an enhanced embodiment a search function is provided wherein a user may configure searches in any or all of the listed destinations on a personalized page. Provision is provided for log-on by limited appliances, such as by a Smartcard or embedded password, and in some embodiments functionality is provided in a browser plug-in wherein a user may navigate to a site, and, in response to a request for log-in data, the subscriber may use a hot key or pointer input, which will cause the browser to access and provide the needed data from the Password-All source.

**30 Claims, 3 Drawing Sheets**





Fig. 1



*Fig. 2*



*Fig. 3*

US 6,594,766 B2

**1**

## METHOD AND APPARATUS FOR PROVIDING AND MAINTAINING A USER-INTERACTIVE PORTAL SYSTEM ACCESSIBLE VIA INTERNET OR OTHER SWITCHED-PACKET-NETWORK

This is a continuation of U.S. application Ser. No. 09/208,740 filed Dec. 8, 1998, now patented as U.S. Pat. No. 6,412,073 on Jun. 25, 2002.

### FIELD OF THE INVENTION

The present invention is in the field of Internet navigation and browsing, and pertains more particularly to methods and apparatus for providing and maintaining an Internet portal configured to provide access to an interaction with other Internet information sources.

### BACKGROUND OF THE INVENTION

The information network known as the world wide web (WWW), which is a subset of the well-known Internet, is arguably the most complete source of publicly-accessible information available. Anyone with a suitable Internet appliance such as a personal computer with a standard Internet connection may access (go on-line) and navigate to information pages (termed web pages) stored on Internet connected servers for the purpose of garnering information and initiating transactions with hosts of such servers and pages.

Many companies offer various subscription services accessible via the Internet. For example, many people now do their banking, stock trading, shopping, and so forth from the comfort of their own homes via Internet access. Typically, a user, through subscription, has access to personalized and secure WEB pages for such functions. By typing in a user name and a password or other personal identification code, a user may obtain information, initiate transactions, buy stock, and accomplish a myriad of other tasks.

One problem that is encountered by an individual who has several or many such subscriptions to Internet-brokered services is that there are invariably many passwords and/or log-in codes to be used. Often a same password or code cannot be used for every service, as the password or code may already be taken by another user. A user may not wish to supply a code unique to the user such as perhaps a social security number because of security issues, including quality of security, that may vary from service to service. Additionally, many users at their own volition may choose different passwords for different sites so as to have increased security, which in fact also increases the number of passwords a user may have.

Another issue that can plague a user who has many passworded subscriptions is the fact that they must bookmark many WEB pages in a computer cache so that they may quickly find and access the various services. For example, in order to reserve and pay for airline travel, a user must connect to the Internet, go to his/her book-marks file and select an airline page. The user then has to enter a user name and password, and follow on-screen instructions once the page is delivered. If the user wishes to purchase tickets from the WEB site, and wishes to transfer funds from an on-line banking service, the user must also look for and select the personal bank or account page to initiate a funds transfer for the tickets. Different user names and passwords may be required to access these other pages, and things get quite complicated.

**2**

Although this preceding example is merely exemplary, it is generally known that much work related to finding WEB pages, logging in with passwords, and the like is required to successfully do business on the WEB.

What is clearly needed is an interactive Internet portal that will enable users to store their WEB pages, user names, and passwords, and that can accomplish pre-defined tasks such as navigation and interaction between WEB servers based on user pre-programming (user profiles). Such a system would greatly simplify on-line or network-based business transactions.

### SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet Portal is provided, comprising an Internet-connected server; and a portal software executing on the server. The portal, in response to a log-on by a user, presents a secure and personalized page for the user, the personalized page having a list of Internet destinations enabled by hyperlinks, wherein, upon invocation of a hyperlink by the subscriber, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information required for user access at the destination.

The Portal server can be a part of an Internet server used for another purpose, and may be hosted therefore by such as an Internet service provider (ISP).

In some embodiments search functions are provided, and in the same or other embodiments, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software accesses and displays one or more informative displays to the user. Informative displays may be one or more advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In another aspect of the invention an Internet Portal is provided comprising an Internet-connected server; and a portal software executing on the server. In this aspect the portal interacts with a browser plug-in executing on a subscriber's computer station, such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user. In this embodiment as well, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software cooperates with the user's browser plug-in to access and display one or more informative displays to the user. The informative displays may be one or more advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In yet another aspect an Internet Portal application executable on an Internet-connected server is provided, comprising a log-on facility adapted for users to enter log-on information for access to the Portal application; and a plurality of stored personal pages associated each with one or more specific users. In this aspect individual personalized pages list plural Internet destinations enabled by hyperlinks, wherein upon invocation of a hyperlink by a user, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information for user access at the destination. After transparent log-on to an invoked destination, the page at the destination is conveyed to and displayed for the user. The application may be adapted to execute on a server hosted by

US 6,594,766 B2

3

an Internet Service Provider (ISP) to which the users subscribe. There may also be a search function adapted to search selected ones of listed destinations in user's pages for defined search criteria.

In this aspect as well, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software can access and display one or more informative displays to the user, which may be advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In yet another aspect at Internet Portal application executable on an Internet-connected server is provided, comprising a log-on facility adapted for users to enter log-on information for access to the Portal application; and a plurality of stored personal pages associated each with one or more specific users. The portal application interacts with a browser plug-in executing on a subscriber's computer station, such that, when the user invokes a destination from the browser, wherein the destination requires a secure log-on, the portal software cooperates with the browser plug-in to furnish the data necessary for a successful log-on transparent to the user.

In this embodiment as well as others, the application may be adapted to execute on a server hosted by an Internet Service Provider (ISP) to which the users subscribe. Also, as in some other embodiments, after a user invokes a hyperlink, during navigation time to the invoked destination, the Portal software, in cooperation with the browser plug-in, accesses and displays one or more informative displays to the user, which may be commercial advertisements. Further, in some embodiments periodic summaries may be provided for accounts associated with destinations on the user's WEB page.

In addition to the apparatus and software applications provided, several methods are taught in the following enabling disclosure as well. In the disclosure, for the first time, an invention is described that allows a subscriber to safely and securely navigate to any of multiple destinations on the Internet with a single point-and-click, and in the case of destinations requiring secure log on, the log on may be accomplished completely transparently to the user, while still maintaining strict security of the user's passwords and other security data.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 is an overview of an Internet portal-system and network according to an embodiment of the present invention.

FIG. 2 is an exemplary plan view of a personalized Portal home page application as it may be seen on a display monitor according to an embodiment of the present invention.

FIG. 3 is a flow diagram illustrating user interaction with the Internet portal of FIG. 1.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

According to a preferred embodiment of the present invention, a unique Internet portal is provided and adapted to provide unique services to users who have obtained access via an Internet or other network connection from an Internet-capable appliance. Such an interface provides users with a method for storing many personal WEB pages and

4

further provides search function and certain task-performing functions. The methods and apparatus of the present invention are taught in enabling detail below.

FIG. 1 is an overview of an Internet portal system 11 and Internet network 13 according to an embodiment of the present invention. Portal system 11, in this embodiment, operates as an ISP in addition to a unique network portal, but may, in other embodiments be implemented as a stand-alone Internet server. In yet other embodiments the service and apparatus described herein may also be provided by such as a search and listing service (AltaVista™, Yahoo™) or by any other enterprise hosting a WEB-connected server.

Internet 13 is representative of a preferred use of the present invention, but should not be considered limiting, as the invention could apply in other networks and combinations of networks.

ISP 15 in this embodiment comprises a server 31, a modem bank 33, represented here by a single modem, and a mass storage repository 29 for storing digital data. The modem bank is a convenience, as connection to the server could be by another type of network link. ISP 15, as is typical in the art, provides Internet access services for individual subscribers. In addition to well-known Internet access services, ISP 15 also provides a unique subscription service as an Internet portal for the purpose of storing many WEB pages or destinations along with any passwords and or personal codes associated with those pages, in a manner described in more detail below. This unique portal service is provided by execution, of Portal Software 35, which is termed by the inventors the Password-All suite. The software of the invention is referred to herein both as the Portal Software, and as the Password-all software suite. Also, in much of the description below, the apparatus of the invention is referred to by the Password-All terminology, such as the Password-All Server or Password-All Portal.

ISP 15 is connected to Internet 13 as shown. Other equipment known in the art to be present and connected to a network such as Internet 13, for example, IP data routers, data switches, gateway routers, and the like, are not illustrated here but may be assumed to be present. Access to ISP 15 is through a connection-oriented telephone system as is known in the art, or through any other Internet/WEB access connection, such as through a cable modem, special network connection (e.g. T1), ISDN, and so forth. Such connection is illustrated via access line 19 from Internet appliance 17 through modem bank 33.

In a preferred embodiment a user has access to Internet Password-All Portal services by a user name and password as is well-known in the art, which provides an individualized WEB page to the subscriber. In another embodiment wherein a user has other individuals that use his or her Internet account, then an additional password or code unique to the user may be required before access to portal 31 is granted. Such personalized Portal WEB pages may be stored in repository 29, which may be any convenient form of mass storage.

Three Internet servers 23, 25, and 27, are shown in Internet 13, and represent Internet servers hosted by various enterprises and subscribed to by a user operating appliance 17. For example, server 23 may be a bank server wherein interactive on-line banking and account managing may be performed. Server 25 may be an investment server wherein investment accounts may be created and managed. Server 27 may be an airline or travel server wherein flights may be booked, tickets may be purchased, and so on. In this example, all three servers are secure servers requiring user

US 6,594,766 B2

5

ID and password for access, but the invention is not necessarily limited to just secure services.

In a preferred embodiment of the present invention, a subscribing user operating an Internet-capable appliance, such as appliance 17, connects to Password-All Portal system 11 hosted by ISP 15, and thereby gains access to a personalized, interactive WEB page, which in turn provides access to any one of a number of servers on Internet 13 such as servers 23, 25, and 27, without being required to enter additional passwords or codes. In a preferred embodiment the software that enables this service is termed Password-All by the inventors. Password-All may be considered to be a software suite executing on the unique server, and in some instances also on the user's station (client). Additional interactivity provided by portal software 35 allows a connected user to search his listed pages for information associated with keywords, text strings, or the like, and allows a user to program user-defined tasks involving access and interaction with one or more Internet-connected servers such as servers 23, 25, and 27 according to a pre-defined time schedule. These functions are taught in enabling detail below.

FIG. 2 is an illustration of a personalized portal page as may be seen on a display monitor according to an embodiment of the present invention, provided by Password-All Portal software 35 executing on server 31, in response to secure access by a subscriber. Page 32 presents an interactive listing 34 of user-subscribed or member WEB pages, identified in this example by URL, but which may also be identified by any convenient pseudonym, preferably descriptive, along with user name and typically encrypted password information for each page. Listed in a first column under destination, are exemplary destinations LBC.com, My Bank.com, My Stocks.com, My shopping.com, Mortgage.com, and Airline.com. These are but a few of many exemplary destinations that may be present and listed as such on page 33. In order to view additional listings listed but not immediately viewable from within application 33, a scroll bar 35 is provided and adapted to allow a user to scroll up or down the list to enable viewing as is known in the art.

Items listed in list 34 in this example may be considered destinations on such as servers 23, 25, and 27 of FIG. 1. Typically the URL associated with an item on this list will not take a user to a server, per se, but to a page stored on a server. User names and password data associated with each item in list 34 are illustrated in respective columns labeled user name, and password, to the right of the column labeled destination. Each listing, or at least a portion of each listing, is a hyperlink invoking, when selected, the URL to that destination. In some instances a particular service may have more than one associated URL. For example, My Bank.com may have more than one URL associated for such as different accounts or businesses associated also with a single subscriber. In this case there may be a sub-listing for different destinations associated with a single higher-level listing. This expedient is not shown, but, given this teaching the mechanism will be apparent to those with skill in the art.

In some embodiments one page 33 may be shared by more than one user, such as a husband and wife sharing a common account and subscription. An instance of this is illustrated herein with respect to the server labeled Mortgage.com wherein both a John and a Jane Doe are listed together under the column labeled user name. In another embodiment, a network of individuals, perhaps business owners, authorized co-workers, investment parties, or the like may share one application. In this way, system 11 may be adapted for private individuals as well as business uses.

6

After gaining access to application 33 which is served via Internet portal server 31 of FIG. 1, a user may scroll, highlight, and select any URL in his or her list 34 for the purpose of navigation to that particular destination for further interaction. Application 33 already has each password and user name listed for each URL. It is not necessary, however, that the password and user name be displayed for a user or users. These may well be stored transparently in a user's profile, and invoked as needed as a user makes selections. Therefore, a user is spared the need of entering passwords and user names for any destinations enabled by list 34. Of course, each list 34 is built, configured and maintained by a subscribing user or users, and an editing facility is also provided wherein a user may edit and update listings, including changing URL's adding and deleting listings, and the like.

In another aspect of the invention new listings for a user's profile, such as a new passthrough to a bank or other enterprise page, may be added semi-automatically as follows: Typically, when a user opens a new account with an enterprise through interaction with a WEB page hosted by the enterprise, the user is required to provide certain information, which will typically include such as the user's ID, address, e-mail account, and so forth, and typically a new user name and password to access the account. In this process the user will be interacting with the enterprise's page from his/her browser. A Password-All plug-in is provided wherein, after entering the required information for the new enterprise, the user may activate a pre-determined signal (right click, key stroke, etc.), and the Password-All suite will then enter a new passthrough in the user's Password-All profile at the Password-All Portal server.

In a related method for new entries, the enterprise hosting the Password-All Portal may, by agreement with other enterprises, provide log-in and sign-up services at the Password-All Portal, with most action transparent to the user. For example, there may be, at the Password-All Portal, a selectable browser list of cooperating enterprises, such as banks, security services, and the like, and a user having a Password-All Portal subscription and profile may select among such cooperating enterprises and open new accounts, which will simultaneously and automatically be added to the Password-All Portal page for the user and to the server hosted by the cooperating enterprise. There may be some interactivity required for different accounts, but in the main, much information from the user's profile may be used directly without being re-entered.

The inventors have anticipated that many potential users may well be suspicious of providing passwords and user names to an enterprise hosting a Password-All Portal Server executing a service like Password-All according to embodiments of the present invention. To accommodate this problem, in preferred embodiments, it is not necessary that the user provide the cleartext password to Password-All. Instead, an encrypted version of each password is provided. When a user links to his passthrough page in Password-All at the Password-All Portal server, when he/she invokes a hyperlink, the encrypted password is returned to the user's system, which then, by virtue of the kept encryption key or master password, invokes the true and necessary password for connection to the selected destination. It is thus not necessary that cleartext passwords be stored at the Password-All Portal server, where they may be vulnerable to attack from outside sources, or to perceived misuse in other ways as well.

In a related safety measure, in a preferred embodiment of the invention, a user's complete profile is never stored on a

US 6,594,766 B2

7

single server, but is distributed over two or more, preferably more, servers, so any problem with any one server will minimize the overall effect for any particular user.

Password-All, as described above, allows a user to access a complete list of the user's usual cyberspace destinations, complete with necessary log-on data, stored in an encrypted fashion, so a user may simply select a destination (a hyperlink) in the Password-All list, and the user's browser then invokes the selected destination. In an added feature, Password-All may display banner ads and other types of advertisement during the navigation time between a hyperlink being invoked and the time the destination WEB page is displayed.

In yet another embodiment of the invention, a user/subscriber need not access the Password-All page to enjoy the advantages of the unique features provided. In this variation, a Plug-In is provided for the subscriber's WEB browser. If the subscriber navigates by use of the local browser to a WEB page requiring a secure log-in, such as his/her on-line banking destination, when the subscriber is presented with an input window for ID and Password, the plug-in may be activated by a predetermined user input, such as a hot key or right click of the mouse device. The plug-in then accesses, transparently, the Password-All page (which may be cached at the client), and automatically accesses and provides the needed data for log-on.

In yet another aspect of the invention a search option 37 allows a user to search list 34 for specific URL's based on typed input such as keywords or the like. In some cases, the number of URL's stored in list 34 can be extensive making a search function such as function 37 an attractive option. A criteria dialog box 51 illustrated as logically separated from and below list 34 is provided and adapted to accept input for search option 37 as is known in the art. In one embodiment, search option 37 may bring up a second window wherein a dialog box such as box 51 could be located.

In another aspect of the invention the search function may also be configured in a window invoked from window 33, and caused to search all or selected ones of listed destinations, and to return results in a manner that may be, at least to some extent, configured by a user. For example, a dialog box may be presented wherein a user may enter a search criteria, and select among all of the listed destinations. The search will then be access each of the selected destinations in turn, and the result may be presented to the user as each instance of the criteria is found, or results may be listed in a manner to be accessed after the search.

Preferably the search function is a part of the Password-All Portal software, available for all users, and may be accessed by hyperlinks in user's personal pages. In some embodiments users may create highly individualized search functions that may be stored in a manner to be usable only by the user who creates such a function.

In many aspects of the present invention a knowledge of specific WEB pages, and certain types of WEB pages, is highly desirable. In many embodiments characteristics of destination WEB pages are researched by persons (facilitators) maintaining and enhancing Password-All Portal software 35, and many characteristics may be provided in configuration modules for users to accomplish specific tasks. In most cases these characteristics are invoked and incorporated transparent to the user.

In yet another aspect of the present invention, the Password-All suite is structured to provide periodic reports to a user, in a manner to be structured and timed by the user, through the user's profile. For example, reports of changes

8

in account balances in bank accounts, stock purchases, stock values, total airline travel purchases, frequent-flier miles, and the like may be summarized and provided to the users in many different ways. Because the Password-All Portal server with the Password-All software site handles a broad variety of transactional traffic for a user, there is an opportunity to summarize and collect and process statistics in many useful ways. In preferred embodiments of the invention such reports may be furnished and implemented in a number of different ways, including being displayed on the user's secure personal WEB page on the Password-All Portal.

In addition to the ability of performing tasks as described above, task results including reports, and hard documents such as airline tickets may be sent over the Internet or other data packet-networks to user-defined destinations such as fax machines, connected computer nodes, e-mail servers, and other Internet-connected appliances. All tasks may be set-up and caused to run according to user-defined schedules while the user is doing something else or is otherwise not engaged with the scheduled task.

In another embodiment of the present invention, recognizing the increasing use of the Internet for fiscal transactions, such as purchasing goods and services, a facility is provided in a user—s profile to automatically track transactions made at various destinations, and to authorize payment either on a transaction-by-transaction basis, or after a session, using access to the user's bank accounts, all of which may be pre-programmed and authorized by the user.

Other functions or options illustrated as part of application 35 include a last URL option 41, an update function 43, and an add function 45. Function 41 allows a user to immediately navigate to a last visited URL. Update function 43 provides a means of updating URL's for content and new address. An add function enables a user to add additional URL's to list 34. Similarly, function 45 may also provide a means to delete entries. Other ways to add accounts are described above. It should be noted that the services provided by the unique Password-All Portal in embodiments of the present invention, and by the Password-All software suite are not limited to destinations requiring passwords and user names. The Password-All Portal and software in many embodiments may also be used to manage all of a user's bookmarks, including editing of bookmarks and the like. In this aspect, bookmarks will typically be presented in indexed, grouped, and hierarchical ways.

There are editing features provided with Password-All for adding, acquiring, deleting, and otherwise managing bookmarks. As a convenience, in many embodiments of the invention, bookmarks may be downloaded from a user's Password-All site, and loaded onto the same user's local browser. In this manner, additions and improvements in the bookmark set for a user may be used without the necessity of going to Password-All. Further, bookmarks may be uploaded from a user's local PC to his/her home page on the Password-All site by use of one or more Password-All plug-ins.

It will be apparent to the skilled artisan, given the teaching herein, that the functionality provided in various embodiments of the invention is especially applicable to Internet-capable appliances that may be limited in input capability. For example, a set-top box in a WEB TV application may well be without a keyboard for entering IDs and Passwords and the like. In practice of the present invention keyboard entry is minimized or eliminated. The same comments apply to many other sorts of Internet appliances.

US 6,594,766 B2

9 | 10

In preferred embodiments of the invention, once a subscriber-user is in Password-All, only an ability to point-and-click is needed for all navigation. To get into the Password-All site, using a limited apparatus, such as an appliance without a keyboard or keypad, a Smartcard or embedded password may be used, or some other type of authentication.

It will be apparent to one with skill in the art that an interactive application such as application **33** may be provided in a form other than a WEB page without departing from the spirit and scope of the present invention. For example, an application such as application **33** may be provided as a downloadable module or program that may be set-up and configured off-line and made operational when on-line.

FIG. 3 is a flow diagram illustrating user interaction with the Internet Password-All Portal of FIG. 1. The following process steps illustrated, according to an embodiment of the present invention, are intended to illustrate exemplary user-steps and automated software processes that may be initiated and invoked during interaction with an Internet portal of the present invention such as portal **31** of FIG. 1. In step **53** a user connects to the Internet or another previously described switched-packet network via a compatible appliance such as Internet appliance **17** of FIG. 1.

At step **55**, a user enters a user-name and password which, in one embodiment, may simply be his ISP user name and password. In another embodiment, a second password or code would be required to access an Internet portal such as portal server **31** of FIG. 1 after logging onto the Internet through the ISP. In some cases, having a special arrangement with the ISP, there may be one password for both Internet access through the ISP and for Password-All. At step **57** a personal WEB page such as page **32** of FIG. 2 is displayed via Internet portal server **31**. At minimum, the personalized WEB page will contain all user configured URL's, and may also be enhanced with a search function, among other possibilities.

In step **58** a user will, minimally, select a URL from his or her bookmarked destinations, and as is known by hyperlink technology, the transparent URL will be invoked, and the user will navigate to that destination for the purpose of normal user interaction. In this action, the Password-All Portal software transparently logs the user on to the destination page, if such log-on is needed.

At step **60** the user invokes a search engine by clicking on an option such as described option **37** of FIG. 2. At step **62**, the user inputs search parameters into a provided text field such as text field **51** of FIG. 2. After inputting such parameters, the user starts the search by a button such as button **52**. The search engine extracts information in step **64**. Such information may be, in one option, of the form of URL's fitting the description provided by search parameters. A searched list of URL's may be presented in a separate generated page in step **66** after which a user may select which URL to navigate to. In an optional search function, the user may provide search criteria, and search any or all of the possible destinations for the criteria.

In another embodiment wherein WEB pages are cached in their presentable form, information extracted in step **64** may include any information contained in any of the stored pages such as text, pictures, interactive content, or the like. In this case, one displayed result page may provide generated links to search results that include the URL associated with the results. Perhaps by clicking on a text or graphic result, the associated WEB page will be displayed for the user with the result highlighted and in view with regards to the display window.

The method and apparatus of the present invention may be practiced via private individuals on the Internet, businesses operating on a WAN connected to the Internet, businesses operating via private WAN, and so on. There are many customizable situations.

The present invention as taught herein and above should be afforded the broadest of scope. The spirit and scope of the present invention is limited only by the claims that follow.

What is claimed is:

1. An Internet portal, comprising:
   an Internet-connected server;
   a portal software executing on the server; and
   a data repository accessible to the server, the repository storing user-specific data comprising profiles and directions for user-defined functions;
   wherein the server, through execution of the portal software, in response to log-on by an individual user from a user's Internet-connected appliance, presents a secure and personalized web page for the user, the personalized page having a list of Internet destinations enabled by hyperlinks, wherein, upon invocation of a hyperlink by the user, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information required for user access at the destination, and wherein the server automatically performs individual ones of the user-defined functions.

2. The portal of claim 1 wherein the destinations comprise institutions maintaining transactional data for the individual user, and the functions include retrieving current state for the transactional data.

3. The portal of claim 2 wherein the functions include summarizing data for individual users.

4. The portal of claim 3 wherein the functions include displaying summarized data on the personalized web page.

5. The portal of claim 3 wherein the functions include preparing one or more reports of summarized data to be delivered to the individual user.

6. The portal of claim 5 wherein the functions include a facility for authorizing and accomplishing payment for the goods and services.

7. The portal of claim 2 wherein the transactional data includes account balances in the name of the individual user in financial institutions.

8. The portal of claim 2 wherein the transactional data includes stock holdings.

9. The portal of claim 2 wherein the transactional data includes frequent-flier miles accumulated by the individual user.

10. The portal of claim 2 wherein the destinations comprise institutions where the individual user may accomplish transactions requiring payment for goods or services.

11. An Internet Portal application executable on an Internet-connected server, comprising:
   a log-on facility for users to enter log-on information for access to the Portal application;
   a plurality of stored personal pages associated each with one or more specific users; and
   a facility for interacting with a data repository storing user-specific data comprising profiles and directions for user-defined functions;
   wherein the application, in response to log-on by an individual user from a user's Internet-connected appliance, presents the personal page for the user, the personal page having a list of Internet destinations enabled by hyperlinks, wherein, upon invocation of a

US 6,594,766 B2

11

hyperlink by the user, the portal invokes a URL for the destination, and upon connection with the destination, transparently provides any required log-on information required for user access at the destination, and wherein the server automatically performs individual ones of the user-defined functions.

12. The application of claim 11 wherein the Internet destinations comprise institutions maintaining transactional data for the individual user, and the functions include retrieving current state for the transactional data.

13. The application of claim 12 wherein the transactional data includes account balances in the name of the individual user in financial institutions.

14. The application of claim 12 wherein the transactional data includes stock holdings.

15. The application of claim 12 wherein the transactional data includes frequent-flier miles accumulated by the individual user.

16. The application of claim 12 wherein the destinations comprise institutions where the individual user may accomplish transactions requiring payment for goods or services.

17. The application of claim 16 wherein the functions include a facility for authorizing and accomplishing payment for the goods and services.

18. The application of claim 11 wherein the functions include summarizing data for individual users.

19. The application of claim 18 wherein the functions include preparing one or more reports of summarized data to be delivered to the individual user.

20. The application of claim 11 wherein the functions include displaying summarized data on the personalized web page.

21. A method for accessing and interacting with WEB pages on the Internet, comprising steps of:

(a) using an Internet-capable appliance, logging on to a Portal server, which returns from a data repository also

12

storing user-defined functions, a personalized page for the user logging on, the personalized page listing plural Internet destinations enabled by hyperlinks;

(b) selecting a hyperlink in the personalized page, thereby invoking a URL for a destination, and, upon connection to the destination, automatically providing user log-on information for the user; and

(c) performing one or more of the user defined functions.

22. The method of claim 21 wherein the Internet destinations comprise institutions maintaining transactional data for the individual user, and the functions include retrieving current state for the transactional data.

23. The method of claim 22 wherein the functions include summarizing data for individual users.

24. The method of claim 23 wherein the functions include displaying summarized data on the personalized web page.

25. The method of claim 23 wherein the functions include preparing one or more reports of summarized data to be delivered to the individual user.

26. The method of claim 22 wherein the transactional data includes account balances in the name of the individual user in financial institutions.

27. The method of claim 22 wherein the transactional data includes stock holdings.

28. The method of claim 22 wherein the transactional data includes frequent-flier miles accumulated by the individual user.

29. The method of claim 22 wherein the destinations comprise institutions where the individual user may accomplish transactions requiring payment for goods or services.

30. The method of claim 29 wherein the functions include a facility for authorizing and accomplishing payment for the goods and services.

\* \* \* \* \*

# EXHIBIT 23



US006405245B1

(12) **United States Patent**

Burson et al.

(10) Patent No.: **US 6,405,245 B1**
(45) Date of Patent: **\*Jun. 11, 2002**

(54) **SYSTEM AND METHOD FOR AUTOMATED ACCESS TO PERSONAL INFORMATION**

(75) Inventors: **Robert Burson; Dima Ulberg; Gregg Freishtat**, all of Atlanta, GA (US)

(73) Assignee: **Verticalone Corporation**, Atlanta, GA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/427,602**

(22) Filed: **Oct. 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.$^7$ ............................................... **G06F 13/00**
(52) U.S. Cl. ........................ **709/217**; 707/10; 345/705
(58) Field of Search ........................... 707/10; 709/230, 709/217; 345/705

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,347,632 A | 9/1994 | Filepp et al. | 709/202 |
| 5,537,314 A | 7/1996 | Kanter | 705/14 |
| 5,655,089 A | 8/1997 | Bucci | 705/40 |
| 5,696,965 A | \* 12/1997 | Dedrick | 707/10 |
| 5,699,528 A | 12/1997 | Hogan | 705/40 |
| 5,710,887 A | 1/1998 | Chelliah et al. | 705/26 |
| 5,712,979 A | 1/1998 | Graber et al. | 709/224 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0786728 A1 | 7/1997 |
| EP | 0848338 A | 6/1998 |

| | | |
|---|---|---|
| WO | WO 98/28698 | 7/1998 |

OTHER PUBLICATIONS

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999,Redondo, CA, pp. 15–22.

"A Softbot–based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul. 1994, pp. 72–76.

"Strategic Directions in Database Systems—Breaking Out of the Box," *Avi Silberschatz and Stan Zdonik et al.*, ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 1 pp. 129–131, Mar. (1996).

"Managing Security and Privacy of Information," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 4es, Dec. (1996).

"Today's Style Sheet Standards: The Great Vision Blinded," Philip M. Marden, Jr. and Ethan V. Munson, IEEE Computer, pp. 123–125, Nov. (1999).

*Primary Examiner*—Kenneth R. Coulter
(74) *Attorney, Agent, or Firm*—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

This invention is a system and method for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider. A representation of the personal information and a link corresponding to the personal information stored on the personal information are presented to the end use via a client computer. Upon activation of the link, the client computer is automatically driven to the personal information provider presenting to the user via the client computer a page on the personal information provider.

**9 Claims, 11 Drawing Sheets**



## U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,724,567 A | * | 3/1998 | Rose | .................... | 707/2 |
| 5,825,884 A | | 10/1998 | Zdepski et al. | .............. | 705/78 |
| 5,848,396 A | | 12/1998 | Gerace | ................... | 705/10 |
| 5,860,068 A | | 1/1999 | Cook | ...................... | 705/26 |
| 5,862,325 A | * | 1/1999 | Reed et al. | ............... | 709/201 |
| 5,878,219 A | | 3/1999 | Vance, Jr. et al. | ........... | 709/217 |
| 5,884,033 A | | 3/1999 | Duvall et al. | ............. | 709/206 |
| 5,884,045 A | | 3/1999 | Kurihara | .................. | 709/237 |
| 5,893,091 A | | 4/1999 | Hunt et al. | .................. | 707/3 |
| 5,894,554 A | | 4/1999 | Lowery et al. | ............ | 709/203 |
| 5,895,468 A | | 4/1999 | Whitmyer, Jr. | ............ | 707/10 |
| 5,897,622 A | | 4/1999 | Blinn et al. | ............... | 705/26 |
| 5,898,836 A | | 4/1999 | Freivald et al. | ........... | 709/218 |
| 5,913,202 A | | 6/1999 | Motoyama | .................. | 705/35 |
| 5,918,214 A | | 6/1999 | Perkowski | ................. | 705/27 |
| 5,926,798 A | | 7/1999 | Carter | .................... | 705/26 |
| 5,956,709 A | | 9/1999 | Xue | ........................ | 707/3 |
| 5,963,915 A | | 10/1999 | Kirsch | ................... | 705/26 |
| 5,978,766 A | | 11/1999 | Luciw | .................... | 705/1 |
| 5,978,779 A | * | 11/1999 | Stein et al. | .............. | 705/37 |
| 5,983,200 A | | 11/1999 | Slotznick | ................. | 705/26 |
| 5,983,227 A | | 11/1999 | Nazem et al. | ............. | 707/10 |
| 5,987,440 A | * | 11/1999 | O'Neil et al. | ............. | 705/44 |
| 5,987,498 A | | 11/1999 | Athing et al. | ............ | 709/203 |
| 5,991,735 A | | 11/1999 | Gerace | ................... | 705/10 |
| 5,991,756 A | | 11/1999 | Wu | ........................ | 707/3 |
| 5,995,965 A | * | 11/1999 | Experton | .................. | 707/10 |
| 6,006,227 A | * | 12/1999 | Freeman et al. | ........... | 707/7 |
| 6,029,175 A | | 2/2000 | Chow et al. | ............. | 707/104.1 |
| 6,317,783 B1 | * | 11/2001 | Freishtat et al. | .......... | 709/218 |

* cited by examiner

**Figure 1**
**(Prior Art)**





FIG.2



FIG.3



FIG. 4
PRIOR ART



FIG.5

**Figure 6**



FIG.7



FIG.8

FIG.9

# Figure 10



# Figure 11



US 6,405,245 B1

1

# SYSTEM AND METHOD FOR AUTOMATED ACCESS TO PERSONAL INFORMATION

## CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application claims the benefit, pursuant to 35 U.S.C. §119(e), of applicants' provisional U.S. Patent Application Serial No. 60/105,917, filed Oct. 28, 1998, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data" and of applicants' provisional U.S. Patent Application Serial No. 60/134,395, filed May 17, 1999, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data".

## BACKGROUND OF INVENTION

### 1. Field of Invention

The invention relates to a system and method for determining revenue derived from interactions involving personal information. The invention more particularly relates to the determination of revenue derived from an intermediary based on interactions involving personal information associated with end users aggregated from one or more personal information providers.

### 2. Description of Related Art

Looking back over the last five years, it is apparent that as the Internet gained momentum, consumers demanded applications or services that make their online experience simpler, easier to use, and more satisfying. The development of successful Internet Sites has corresponded with a number of themes which have developed over the last few years. When carefully analyzed this evolution is a logical development of the emerging digital economy.

Prior to 1994, the Internet was not a mass media, in part, because the existing technologies (FTP, Archie, Usenet, and Gopher) were not user friendly and required the end user to do all of the work (e.g., the end user had to learn of an existing data source, find the address, navigate to the destination, and download the information). As more consumers began accessing the Internet, Search Engines were created to solve this usability issue. With the advent of the commercial Search Engine, additional content could be easily added to the Internet and the end user had a means of finding and accessing this information. Consumers required better tools than Search Engines for organizing and accessing this wealth of generic content. Push technologies were explored, and, eventually, the portal strategy was successfully adopted as an efficient way for consumers to easily access a variety of content sources in a single, easy to use format. As the volume of available online content continues to grow exponentially, portals are now confronted with the need to make different types of content available to different consumers based upon their particular preferences and tastes.

The phenomenal success of Internet portals and destination sites has demonstrated the importance of creatively and intelligently aggregating, organizing and presenting the mass of information available on the Web. Search engines, portals and destination sites have Internet strategies based on the frequency, duration and quality of end user visits to their sites. For this reason, destination sites and portals are constantly seeking content and/or technologies which drive quality traffic to their site and keep it there. Recent trends indicate that Internet users are up to 25 times more likely to

2

come back to a site when this information is organized according to personal preferences.

FIG. 1 displays the current process of acquiring online PI **100**. The end user first selects an information provider site in step **110**. The end user proceeds to step **120** by locating and entering the Internet address of the selected information provider. This step may be accomplished in several manners with varying levels of complexity. A simple means for accomplishing this step is the utilization of a bookmark or favorite whereas locating an information provider for the first time might involve significant time and effort performing online searches. In step **130**, the end users logs into the selected information provider's Web site utilizing the site's specific logon protocol. This protocol usually involves verifying the identity of the end user using a user name and password or other means of verification, acquiring the verification data from cookies residing on the end user's system or a combination of requested data and cookie data. The end user continues in step **140** by navigating through Web pages on the information provider's Web site until the desired information is located. During this process, the end user is often required to visit Web pages of little or no use to the end user whose goals is to simply acquire the particular PI residing on the Web site. Ultimately in step **150**, the end user is presented with the desired PI. The entire process **100** is repeated for each individual piece of PI desired by the end user. Under this PI access model, the end user must visit each separate information provider, track potentially different identity verification data for each, utilize a different user interface at each site and possibly wade through a significant number of filler Web pages.

FIG. 4 pictorial illustrates the architecture of this current access process. The end user **210** utilizes the client computer **220** to access each PI Web site **250** across the Internet **230**. This current model suffers from several significant deficiencies. The end user must login to each site separately. Each separate site has its own graphical user interface. Each site wants the end user to stay and return; each visited site wants to retain end user focus for as long as possible. No true aggregation of PI exists; multiple accesses simply allow sequential access to particular pieces of PI.

One partial solution to these problems has recently evolved in the form of portal sites. Generic portal sites aggregate resources into categories and provide links to sites covering topics within those categories. Yahoo and Excite are examples of generic portal sites. These sites facilitate horizontal aggregation of generic content; horizontal aggregation refers to aggregation of PI access within a particular information provider category such as banks or utility companies. Some portal site allows individual end users a limited capability to select and configure disparate generic PI. Generic PI refers to PI of interest to the particular end user that does not require specific identity verification to obtain. For example, an end user might be interested in the weather forecast for his local area. This information could be integrated into a portal page without requiring identity verification of the particular end user receiving this PI. The individualized portal page provides a significant benefit to users seeking to aggregate generic PI. However, current portal pages do not generally provide PI requiring identity verification such as an end user's stock portfolio or bank balance. Further, these pages do not facilitate transactions utilizing PI.

Under current technology, aggregating PI available over the Internet requires a significant burden in terms of time, effort and learning curve. An end user wishing to access his PI needs to individually visit a variety of information

US 6,405,245 B1

3

provider sites each with its own requirements, graphical user interface and login protocol.

## SUMMARY OF THE INVENTION

The present invention is a system and method for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider. A representation of the personal information and a link corresponding to the personal information stored on the personal information are presented to the end user via a client computer. Upon activation of the link, the client computer is automatically driven to the personal information provider presenting to the user via the client computer a page on the personal information provider.

In one embodiment, an application is downloaded to the client. The downloaded application initiates a connection between the client computer and the personal information provider. The application navigates through pages on the personal information provider until arriving at the personal information. Finally, the application presents the personal information to the user on the client computer. The application may be either generated with any necessary data associated with the end user and associated with the personal information or such data may be transmitted to the application. The data associated with the personal information provider may include a navigation script for guiding the application to the personal information. The data associated with the end user may include any data necessary to effectuate the navigation via the navigation script.

In a further embodiment, a message including any necessary user data and personal information provider data is transmitted to the client computer causing the client computer to automatically log the end user into the personal information provider, thereby leaving the end user at a post login page. In a preferred embodiment, the message comprises a page containing a form, which includes login information that upon opening by software on the client computer redirects the client computer to a post login page.

In yet a further embodiment, the client computer is driven to the personal information by connecting to the personal information provider, navigating to the personal information on the personal information provider, presenting the personal information to the end user via the client computer and proxying subsequent interactions between the client computer and the personal information provider for a given session with the personal information provider.

The above and other objects and advantages of the present invention will become more readily apparent when reference is made to the following description, taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a process diagram of the current process that end users perform to access Internet available PI.

FIG. 2 is a block diagram of the components that could be used to implement present invention.

FIG. 3 is a block diagram of the components of the PI engine.

FIG. 4 is a diagram of the current PI access architecture.

FIG. 5 is a diagram of an architecture supporting PI access utilizing an intermediary Web site.

FIG. 6 is a diagram of the cookie/client cache architecture.

FIG. 7 is a flowchart for accessing pages underlying particular PI via the traditional process of FIG. 1 and via springboard technology.

4

FIG. 8 depicts the integration model for the dynamic generation of HTML pages.

FIG. 9 displays the run-time process for dynamic generation of HTML page.

FIG. 10 illustrates a process for automated applet interaction utilizing a modified Java virtual machine.

FIG. 11 is a flowchart exemplifying an intermediary Web site transaction structure.

## DETAILED DESCRIPTION OF THE INVENTION

A preferred embodiment of the invention is now described in detail. Referring to the drawings, like numbers indicate like parts throughout the views. As used in the description herein and throughout the claims that follow, the meaning of "a," "an," and "the" includes plural reference unless the context clearly dictates otherwise. Also, as used in the description herein and throughout the claims that follow, the meaning of "in" includes "in" and "on" unless the context clearly dictates otherwise.

In no time, end users will have to log into a large number of different Web Sites, each with separate passwords, security, rules, software and "look and feel"—just to get the information currently obtained by checking one place—the mailbox at the end of the driveway. The Internet will fundamentally change the way in which end users will access Personal Information (PI) and will make e-commerce as familiar as using an ATM. "Personal Information" is all of the data that companies, information providers, have that is specific or unique to each person such as monthly bills, bank account balances, investments information, health care benefits, email, voice and fax messages, $401(k)$ holdings or potentially any other information pertinent to a particular end user.

The present invention alleviates several of the problems with the current PI acquisition methods by automatically aggregating PI, not only generic PI as aggregated by portals but also PI specific to the end user requiring identity verification for access. In one embodiment, the invention automates the PI acquisition and delivery process. FIG. 2 provides a block diagram of components that could be used to implement the present invention. The end user 210 accesses a client computer 220 running client software 270 which in a particular embodiment could be a general Web browser such as Navigator or Communicator (Netscape). The client computer 220 utilizes the Internet 230 to access a PI engine 240 running on a PI host 290. The PI engine 240 examines stored PI 280 for freshness. Any stale PI items are refreshed by directly reacquiring the PI from the particular information provider's Web site 250 running on the provider's computer system 260 accessed across the Internet 230. The PI engine 240 stores the fresh PI in its store 280 and delivers the PI to a selected destination, in this instance across the Internet 230 to the client computer 220 which displays the information to the end user 210 using the client software 270. The PI engine 240 refreshes all stale PI in a like manner prior to forwarding the aggregated PI to both the store 280 and the delivery destination, the client computer 220 in this instance. The PI engine 240 may refresh the PI sequentially or in parallel. For example, the end user's checking account balance would be updated through his bank's Web site, his email from his particular email site, his portfolio information from his broker's site and his electricity bill from his electricity company's site.

FIG. 3 displays a block diagram of the components of the PI engine 240. The PI engine 240 is composed of both

US 6,405,245 B1

5

storage and processing components. The three primary storage components are the PI store 280, the PI Provider store 310 and the user store 360. The first storage component of the PI engine 240 is the PI store 280. The PI store 280 contains each individual's PI record 375; the PI associated with a particular end user is segregated from the PI of all other end users. The PI engine also utilizes a provider store 310 that maintains general parameters associated with particular PI providers. The general parameters of a PI provider define the types of verification data necessary and the procedures to be followed to gain access to the particular PI provider. Each PI provider record also contains the types of PI provided by the PI provider and the types of transactions supported by the provider. Along with the type of PI or transaction, the record also contains the additional types of data and procedures necessary to access the PI or execute the transaction. A user store 360 is also necessary to maintain configuration and verification information concerning particular end users. For each end user, the user selected PI providers, PI and transactions are registered along with the verification data necessary to acquire the PI or execute the transaction from the PI provider.

The PI store 280 may be implemented in a variety of ways. Referring to FIG. 2, the PI store 280 may comprise a database residing on the PI Host 290. Under this approach, the PI for each individual end user 210 is stored as a separate record or object 375 in the database. In yet another embodiment, the PI for each end user 210 could be stored in a separate file 375, thus performing the task of segregating PI of different users at the file level.

In addition, or as an alternative, the PI associated with each end user 210 may reside on his/her client computer 220 using cookie technology as specified in D. Kristol and L. Montulli, "HTTP State Management Mechanism", Request For Comments (RFC) 2109, February, 1997 (available at http://www.ietf.org/rfc/rfc2109.txt), which is expressly incorporated herein in its entirety. The PI associate with the end user 210 would be stored as PI cookies 375. This implementation mechanism provides inherent support for segregating PI associated with one end user 375 from PI associated with all other end users. Utilizing this method as a substitute for a centralized store provides a layer of security against unauthorized access. As a further measure, PI data stored in cookies could be stored in an encrypted format.

FIG. 6 provides a diagram of a typical implementation of the PI store 280 using cookie technology; references in the foregoing description are also made to FIG. 3 with respect to the internal workings of the PI engine 240. When an attempt is made to access PI by an end user 210 directly, or through an intermediary Web server, the PI access/transact component 340 of the PI engine 240 would retrieve stored PI 375 from the PI store 280. Under this approach, this stored PI 375 would be received directly from cookies sent by the client computer 220 of the end user 210. The PI access/transact component 340 would perform any decryption if necessary. Any updates required would be obtained by direct access of PI providers 250. The PI deliver component 350 would provide the mechanism for both updating the PI store 280 as well as transmitting the requested PI to the end user 210, directly or through an intermediary Web site. The PI deliver component 350 would place the updated PI in the PI store 280 by replacing the outdated PI cookies 375 stored on the client computer 220. The PI deliver component 350 would also handle any encryption if necessary. The PI deliver component 350 would also be responsible for transmitting requested PI. In a preferred embodiment, the PI store 280 would be implemented using this cookie-based architecture.

6

The user store 360 may be implemented in a variety of ways. Referring to FIG. 2, the user store 360 may comprise a database residing on the PI Host 290. Under this approach, the personal configuration data for each individual end user 210 is stored as a separate record or object in the database. In addition, or as an alternative, the end user data could be distributed in a manner similar to the cookie/cache architecture describe above with respect to the PI store 280.

In a preferred embodiment, the user store 360 could be implemented through personal information configuration (PIC) files. PIC files store a personal profile such as name, address, and social security number in secure, encrypted fashion for each end user. PIC files facilitate automatic registration of end users with information Providers via the end user configuration component 330. This component will read the PIC file and, using retrieved personal information, pre-populate registration templates for selected Providers. Then, it will prompt the user to enter required information that is missing from profile, if necessary. If the information is complete, the registration is automatically completed. Next, the end user configure component 330 completes any Provider registration forms, gets responses and updates the end user's PIC.

The four primary processing components access and manipulate the data in the three stores. The processing components may execute on a single processor, such as a file server computer system based on a Pentium class (MMX, PRO, II, III, etc.) central processing unit or an equivalent, or multiple processors. These four processing components are the Baseline configure component 320, the end user configure component 330, the PI access/transact component 340 and the PI delivery component 350 as seen in FIG. 3. The Baseline configure component 320 provides the interface by which new user selectable PI providers are added to the system. This component 320 might be implemented in a variety of ways including trial and error followed by manual entry of configuration information, semi-automated trial and error (automated location of Hypertext Markup Language (HTML) <FORM> elements, Javascript functions and Java applets) followed by manual entry of configuration information or, preferably, configuration by example (executing the protocol in a simulated Web client where the simulated Web client automatically generates a list of required data and a list of steps in the access process). These processes would be utilized at two levels: the first level being the set of data and steps required for general access to the particular PI provider and the second level being the set of additional data and steps required for accessing each particular piece of PI on the PI provider's site. The baseline configuration component 320 may be triggered independently when a new PI provider is added to the system, or it might be triggered as a result of a failure of the PI access/transact component 340 potentially indicating a change in access requirements for the failed access. This latter warning would more likely result where the PI access/transact component 340 has made a comparison between requirements supplied by the Provider store 310, both general to the PI provider and specific to the PI or transaction, and the end user data supplied by the user store 360 after seeking end user verification via a request of the end user to confirm the previously entered required access data via the end user configure component 330 and found an inconsistency. When an inconsistency is determined, updates to the Provider store 320 are made to bring the Provider data into conformance with current access/transaction requirements.

The end user configure component 330 allows an end user to select and configure PI and transactions of interest to the

US 6,405,245 B1

7

specific user. This configuration information is maintained in the user store 360. When an end user initially subscribes to the system according to the present invention, the system allows the user to select the types and sources of PI and/or transactions desired. First, the system requests permission from the end user to act on his behalf to obtain any selected PI and to execute any authorized transactions. Next, the system provides the user with a list of known information suppliers and the types of PI supplied from and transactions supported by the particular PI provider from the Provider store 320. The system requests the verification data necessary for accessing each selected PI provider and the additional data required by the particular PIs and/or transactions desired from that PI provider. Assuming the end user is already a registered user with the selected PI provider or the particular PI provider does not require prior registration, the data supplied by the end user is placed in the user store 360.

One method of obtaining any cookie data would be for the end user to access each previously accessed PI utilizing the PI engine 240 as a proxy server. The PI engine 240 would pass the cookie data to the PI provider site with the appropriate Web page requests to obtain the PI or execute the transaction and with the end user's permission retain a copy of the cookie data in this record in the user store 360. An alternate means of obtaining the cookie data would be a direct upload of the cookie information from the end user's computer. In a preferred embodiment, no cookie data is necessary where a user is already registered with a provider. All that is necessary is the verification data for login.

If the end user does not have the requisite information because he is not a registered user of a selected PI provider, the user configure component 330 prompts the user for the information necessary to register the end user with the PI provider and performs the registration procedure required by the PI provider. A simulated Web client could perform this process automatically supplying the access data as required and sending any necessary cookie data. The manner in which such a simulated client registers the end user depends significantly upon the interaction method used on the PI provider Web site. If the Web site uses HTML forms and common gateway interface (CGI) applications, the end user configure component 330 can formulate a uniform resource locator (URL) to replicate the effect of actual form usage and submit this URL to the simulated Web client. The use of a URL to mimic an HTML form is equivalent to manually entering the data into the Web <FORM> element. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite Group Press, 1997, pp. 559–569. If the Web site uses a mixture of HTML forms and Javascript functions, a simulated Web client with a modified Javascript interpreter could effectively register the user by following the cal user registration process for the particular PI provider. The registration process to follow would be obtained from the record of the particular PI provider in the Provider store 320. The Javascript interpreter in the simulated Web client would follow this procedure and supply the data supplied by the end user. A similar process could be used if the registration process on the PI provider Web site utilizes a Java applet. A Web client with a modified Java bytecode interpreter could effectively register the user by following the actual registration process stored for the particular PI provider in the Provider store 320. The bytecode interpreter would supply the data previously entered by the end user rather than requiring interactive input from the end user. If the PI provider Web site utilizes a combination of forms, scripts and applets, the individual procedures above could be used in combination to accomplish the desired registration.

8

With reference to FIG. 2 and FIG. 3, a modification of the Java virtual machine (VM) could allow for automated interaction between the various functional components of the PI Engine 240 and Java applet available through provider Web servers 250. Templates for interacting with particular applets could reside in the Provider store 310. The specific input data utilized by such templates could be stored in the User store 360. When a functional component such as the end user configure 330 or the access/transact 340 components requires automated communication with a Java applet on a provider Web server 250, the modified Java VM would facilitate this interaction.

FIG. 10 illustrates one process utilizing such a modified Java VM to achieve such automated interaction. The functional component requiring interaction identifies the provider and the particular applet on that provider with which the component needs to interact in step 1010. In step 1020, the component accesses the necessary template for interacting with the applet from the Provider store 310. Proceeding to step 1030, the component accesses the User store 360 to obtain the data required by the template. The modified Java VM interprets the applet in step 1040 and, rather than requiring interactive input from a user as in a normal Java applet execution, awaits input from or output to the interacting functional component of the PI engine. In step 1050, the functional component supplies input data to the modified Java VM according to the accessed template and retrieved data and receives output data according to the accessed template. Steps 1040 and 1050 repeat so long as additional input to or output from the applet continues. Upon termination of the applet, the functional component continues with its own processing in step 1060.

A successful registration could result in displaying the registration information to the end user for future reference. Further, the end user configure component 330 stores the requisite access verification data for the PI provider and the additional data required to access the selected PI or transaction in the user store 360.

In a preferred embodiment of such automated registration, any necessary cookie data would be accepted and stored as needed by the end user configure component 330. In many cases, cookie data is session specific and, therefore, of little long term utility. Cookies generated during the registration process are used solely during the registration process then discarded once registration is complete.

A failed registration could result from several situations. First, the end user attempting to register with the PI provider does not qualify for registration; for example, an end user attempting to register with a bank with whom the end user does not maintain an account and where the bank only allows access to account holders. Next, the end user may have supplied improper or incorrect information. For example, a bank registration process might require a social security number, a password, a bank account number and the maiden name of the end user's mother; if the user entered an incorrect social security number, the registration process would fail. Finally, the PI provider may have altered the registration procedure for its Web site. In this situation, following the process supplied from the Provider store 320 would yield a failed registration. In the instance of any registration failure, the end user could be presented with the data initially supplied to the system for registration. The system could then ask the end user to double check the correctness of the information provided and to correct and resubmit the data if an error is found. A second failure resulting from the submission of identical requisite data might generate an error message presented to the end user

US 6,405,245 B1

9                                                    10

stating that either the end user is ineligible to access the selected PI from the selected PI provider or that alteration by the PI provider may have caused an error in registration. This second failure could also trigger a warning suggesting the need to potentially reconfigure the record for the PI provider in the Provider store 320.

Ultimately, the user store 360 would contain a record for each end user. This record as previous described could be a database entry, one or more cookies or a file such as a PIC file. Each record would identify the selected PI providers along with the general access verification data needed and also under each PI provider would be a list of PI supplied and transactions supported by the particular PI provider of interest to the end user along with the additional data, if any, necessary to access that PI or execute that transaction. Specifically, duplicative information such as an end user's name would be centrally stored in the record once.

The end user configure component 330 also allows the end user to select one or more delivery destinations. One destination might be the end user's computer as exemplified by the client computer 220 running client software 270 in FIG. 2; however, a computer is not the only destination contemplated by the present invention. The destination for PI delivery could include facsimile, electronic mail, telephone, conventional mail, pager, other wireless device such as a Palm Pilot (3 Com), Web page or channel, Web browser or other delivery mechanism. The present invention also contemplates indirect access of PI by the end user utilizing a Web site as an intermediary; however, such indirect access would not require the end user to specify a delivery destination unless additional delivery options were desired.

Further, access to the end user configure component 330 may occur through direct access to the PI engine via the Internet as contemplated by the client computer 220 running client software 270 in FIG. 2; however, alternative methods of access are equally feasible. For example, the user might indirectly access the PI engine through the use of an intermediary Web site. A telephone interface to allow access to the end user configure component is another alternative.

With reference to FIG. 3, the PI access/transact component 340 supports the update, acquisition and transaction functionality of the PI engine 240. The PI access/transact component 340 is responsible for accessing and storing user PI and executing transactions authorized by the end user. When access or update is needed for a selected end user, the PI access/transact component 340 combines information from the Provider store 320 and the user store 360 to update end user PI in the PI store 280. For each piece of PI requiring access or update, the PI access/transact component 340 looks up the access procedure and information needed for the particular PI in the Provider store 320. The verification and access data is found in the user store 360. The PI access/transact component 340 utilizes this information to connect to the PI provider's Web site across the Internet and to access the PI. Where multiple pieces of PI require updating or access, the accesses may occur in series or parallel.

Requested transactions would be similarly supported. For each transaction, the PI access/transact component 340 combines information from the Provider store 320 and the user store 360 to perform the requested transaction. The PI access/transact component 340 looks up the transaction procedure and information needed for the particular transaction in the Provider store 320. The verification and access data is found in the user store 360. The PI access/transact

component 340 utilizes this information to perform the transaction across the Internet from the PI provider's Web site.

A simulated Web client could perform access or transaction processes automatically supplying access and verification data as necessary. The manner in which such a simulated client access PI or execute transactions depends significantly upon the interaction method used on the PI provider Web site. If the Web site uses HTML forms and common gateway interface (CGI) applications, the PI access/transact component 340 can formulate a uniform resource locator (URL) to replicate the effect of actual form usage and submit this URL to the simulated Web client. The use of a URL to mimic an HTML form is equivalent to manually entering the data into the Web <FORM> element. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To,* Waite Group Press, 1997, pp. 559–569. If the Web site uses a mixture of HTML forms and Javascript functions, a simulated Web client with a modified Javascript interpreter could effectively access the PI or perform the transaction by following the PI access/transact process for the particular PI or transaction respectively. The access or transaction process to follow would be obtained from the record of the particular PI or transaction in the Provider store 320. The Javascript interpreter in the simulated Web client would follow this procedure and supply the data from the user store 360. A similar process could be used if the PI provider Web site utilizes a Java applet. A Web client with a modified Java bytecode interpreter could effectively access PI or perform transactions by following process stored for the particular PI or transaction in the Provider store 320. The bytecode interpreter would supply the data from the user store 360 rather than requiring interactive input from the end user. If the PI provider Web site utilizes a combination of forms, scripts and applets, the individual procedures above could be used in combination to accomplish the desired access.

In a preferred embodiment of such automated accesses or transactions, any necessary cookie data would be accepted and stored as needed by the PI access/transact component 340. In many cases, cookie data is session specific and, therefore, of little long term utility. Cookies generated are used solely during these functions then discarded once the mining or transaction operation is complete.

In order to provide personal information to an end-user quickly after login, it is necessary for the PI access/transact component 340 to select an end user for data harvesting prior to the login of the end user. One approach to this solution is to update all of an end user's PI whenever the end user, directly or through an intermediary Web site, requests access to his/her PI. Another approach would be to update all of an end user's PI supplied by a particular provider whenever PI from that supplier is requested. Thus, the act of logging into the system by an end user effectively selects that end user for immediate PI update. However, this approach may result in the inefficient use of the PI Engine 240 resources.

Given the large number of potential users and providers, and the goal of providing the freshest data possible, another embodiment includes an algorithm developed to optimize the schedule in which end users are selected for data harvesting from a provider. This algorithm factors in the provider's update policy, the user's login habits, and the user-provider account characteristics. The proper application of the algorithm should ensure that PI is harvested as infrequently as possible for a given user, thus minimizing system resource consumption.

If the next provider update time and the next expected user login can be accurately predicted, a model can be

US 6,405,245 B1

11

created that will allow for smarter harvesting. Rather than harvesting data for all users of a provider at once when the provider updates its site, the harvesting can be spread out over time based on expected login times of users and network activity profiles. For example, if Provider A updates its site on Friday night and a large number of users of that provider are not expected to login again until Monday morning, the harvesting load can be distributed across multiple days. This has the advantage of minimizing both the peak loading of the PI Engine 240 as well as consumption of the provider's bandwidth by the PI Engine 240. To gain this optimization, the PI Engine 240 must maintain and refine models of each provider and user. Such data can be maintained in the provider store 310 and the user store 360 respectively.

Each time a user utilizes the PI Engine 240, the time and date may be captured. Once a sufficient number of login times are accumulated, they may be analyzed with respect to day of month, day of week, and time of day. These are used in a model to predict the next expected user login. The model is then tested and refined with subsequent logins until a measurable degree of confidence is established. Once high confidence is determined, the user model is incorporated into the adaptive harvesting scheduler. Until a high confidence level is reached for a particular end user one of the aforementioned harvesting approaches may be used.

Each provider updates its site based on policy driven by their unique resources and business model. For any adaptive scheduler to work, the policy for each provider must be modeled. In some cases, the policy is self-evident. In others, it must be determined empirically. A provider's policy will most likely fall into one of the following categories:

Type I. Updated periodically for all users

Type II. Updated periodically relative to each user

Type III. Updated in a pseudo-random manner

The following three approaches may be used based upon provider type.

Type I Provider Policy Scheduling Algorithm

1. Assume users with a "no confidence" model have an immediate login time.

2. Order the users chronologically based on their predicted login time.

3. Shift the expected login time for all users back one hour.

4. Perform a density curve fit along temporal boundaries to get a polynomial function that can be used to determine the number of user accounts to harvest for a given epoch.

5. Perform an integral matching algorithm with the inverse of the network activity curve for the time period in question to adjust the distribution curve.

6. If possible, re-distribute peak harvesting time toward time zero to flatten the distribution curve.

7. Assign harvesting times to the sorted users according to the distribution curve.

8. Monitor time and harvest the user account when appropriate.

Type II Provider Policy Scheduling Algorithm

For each provider that falls into this category, an attribute of the user must be identified that determines when the personal information is updated. In some cases, the user may need to be queried for the information. In others, it can be determined from the harvested information. If the attribute cannot be established for a user via either of these means, the provider site may be monitored daily for changes in personal information until a pattern is established.

12

Since there is a natural, even distribution of accounts updated by a provider for a given day, a user's account can be harvested an hour before his expected login time. As in the Type I algorithm, users with a "no confidence" model should be immediately harvested.

Type III Provider Policy Scheduling Algorithm

This type of policy is the most difficult of all. Since the provider updates a user's account in a non-deterministic manner, a decision must be made for each provider as to the criticality of the information relative to the user. For those highly critical providers, each user account should be harvested daily, perhaps even more frequently. For those less critical providers, user accounts should be harvested less frequently and possible when overall system activity is low.

The PI deliver component 350 is responsible for formatting and delivering the PI to the end user. Usually delivery will only occur subsequent to updating all stale PI. The PI will be delivered to one or more destinations (e.g. facsimile, telephone, pager, Web browser, e-mail, etc.) as specified in the user store 360 except where the PI is accessed via an intermediary Web site. Where the destination is not an intermediary Web site, the PI deliver component 350 performs all formatting necessary to deliver the PI to the appropriate destinations. For example, where the destination is a Web browser, the PI would be formatted as an HTML document, or where the destination is a telephone, the PI would be submitted for voice synthesis and transmission.

In the case of an intermediary Web site, the PI is delivered in a format configurable by the intermediary Web site. FIG. 5 pictorial illustrates a possible embodiment of the current invention utilizing an intermediary Web site. An end user 210 utilizes a client computer 220 to access an intermediary Web site 510 across the Internet 230. The end user 210 logs into the intermediary Web site 510. The intermediary Web site 510 contacts the PI engine 240 across the Internet 230 and directly receives the end user's PI updated as required from the PI provider Web sites 250. The intermediary Web site 510 receives the PI, incorporates it into pages according to its particular formatting style and graphical user interface and delivers these pages to the end user 210. The use of the PI engine 240 is transparent to the end user 210. Further, an intermediary Web site 510 serving aggregate PI to an end user 210 may, and most likely will, simultaneously serve as a PI provider.

In another embodiment, this formatting occurs via a dynamic HTML generation system combining stylistic and layout information from a variety of sources. The PI deliver component 350 generates custom HTML pages dynamically. These pages are customized based on a number of stylistic factors (such as background color, foreground color, font size, color and style, page layout, etc) from a variety of sources and content from a variety of sources. Information providers, distributors, the end user, the PI deliver component 350 or any combination of these sources, or other relevant sources, may provide customization factors used in the page generation. Finally, each HTML page must be filled in with data. The data used in such pages may originate from such sources as information providers, distributors, the end user, the PI deliver component 350 or any combination of these sources, or other relevant sources. The required solution is a system representing a generic algorithm for performing such HTML generation at run-time. The style and content may be provided in any suitable format such as the Extensible Stylesheet Language (XSL), as specified by W3C in http://www.w3.org/TR/WD-xsl/, which is expressly incorporated herein by reference in its entirety, and/or the Extensible Markup Language (XML) as specified by W3C

US 6,405,245 B1

13

in http://www.w3.org/TR/REC-xml, which is expressly incorporated herein by reference in its entirety, or other suitable formatting standard. The key requirements for such a system are complete encapsulation of the problem domain and run-time efficiency.

In preferred embodiments, the solution is based on the following basic model as depicted in FIG. 8:

1. Six sets of customization factors are identified: distributor content 810, provider content 820, distributor style specification 830, provider style specification 840, user-specific content 850 and user-specific style 860.

2. Each set of customization factors 810–860 is considered a separate, independent and required input to the run-time system 870 that performs dynamic page generation.

3. Each input 810–860 will be in form of an XML stream.

4. Output 880 will be in form of an HTML stream.

5. The dynamic page generation system 870 will produce valid output 880 for each set of six valid inputs 810–860.

FIG. 9 illustrates an actual run-time sequence of input processing by such a system 870:

1. Distributor content 810 is combined with provider content 820 and with user-specific content 850 to produce a complete content specification 930 by the content merger unit 910.

2. Distributor style 830 is combined with provider style 840 and with user-specific style 860 to produce a complete style specification 940 by the style merger unit 920.

3. The style specification 940 is applied by the style applicator 950 to content specification 930 in order to produce the resulting page 880.

In order to completely encapsulate the problem domain, the following requirements must be placed on the system 870:

1. Each XML input 810–860 is a valid XML stream.

2. All content specifications 810, 820 and 850 are valid with respect to the same Document Type Definition.

3. All style specifications 830, 840 and 860 are valid with respect to the same Document Type Definition (such as the XSL DTD standard).

4. The merging units 910 and 920 whose task is to take two or more XML streams and produce a combined XML output must be able to produce such output for any set of valid XML inputs.

Another method of performing this task would be to format PI as HTML elements with predefined CLASS attributes. The intermediary Web site receiving these elements could dynamically include them in page forwarded to the end user of the PI. The pages incorporating such elements could include different style information associated with the predefined CLASS set. Level 1 cascading style sheet convention could be used to implement such configurability. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite Group Press, 1997, pp. 651–693; Walsh, "An Introduction to Cascading Style Sheets," *World Wide Web Journal*, Winter 1997, pp. 147–156. This option requires minimal programmatic support by the intermediary Web site but restricts to some degree the intermediary Web sites flexibility in presenting the PI to the end user.

Alternatively, an intermediary Web site could develop an application utilizing a standardized application programming interface (API) to directly access the PI data. In this instance, the PI deliver component 350 could either be

14

bypassed or potentially used as the component responsible for servicing API requests for data. Under this model, the intermediary Web site would be responsible for all formatting decisions with respect to the raw PI data. This implementation option requires additional programmatic support by the intermediary Web site but allows for greater flexibility in the use of the raw PI.

The ability to utilize an intermediate Web site to deliver PI is of significant utility. This capability allows an end user already familiar with an existing PI provider to access not only the PI associated with the particular PI provider but also all PI from other PI providers in the comfort of a familiar user interface, namely the existing PI provider Web site. In this situation, the request for PI would directly originate with the intermediary PI provider Web site and indirectly from the end user. Security measures would restrict access to authorized intermediate Web site access. These measure might include verification of the end user and the intermediate Web site. Further, verification of the association between the end user and the particular intermediate Web site might also be required for additional security.

In addition, the use of an intermediary Web site also supports a novel transaction model. In this transaction model, the intermediary site subsidizes, or fully compensates, the PI engine administrator for services provided to the end user. These transactions are facilitated via the auditing and tracking capabilities of the PI engine. These capabilities allow the calculation of per user fees, per transaction fees, per access fees or some combination thereof to be assessed. The assessed values could be directly charged to the intermediary Web site. Alternatively, such values could be debited from a minimum monthly fee charged to the intermediary Web site with any fees beyond the minimum charged directly to the intermediary Web site.

FIG. 11 depicts a flowchart of a typical process according to the described model. The intermediary Web site pays a minimum monthly fee in step 1110. In step 1120, the PI engine audits and tracks end user usage via the intermediary Web site. The audited usage is used to assess a fee on a per user, per access, per transaction or combination basis. In step 1130, this audited amount is debited from the fee paid in step 1110. In step 1140, the intermediary Web site is charged for any fees in excess of the minimum fee paid.

Often an end user may require access to the underlying Web page generated by the provider of a particular piece of PI. The delivery component may deliver not only the PI but also an access point directly to the provider's page supplying that PI. The access point may take the form of a link, a form button or some other interactive access mechanism.

Such an access point significantly improves the efficiency of accessing the underlying page by the end user as exhibited by FIG. 7. In the traditional process 100 for accessing PI, the end user must proceed through numerous intermediary pages requiring a variety of often tedious interactions before reaching the desired page.

The end user must first identify the Provider 110. Next, the end user must locate the Provider's Web address 120. Then, the user the requests the Provider's login page 130. If the end user does not remember the requisite information, this information must be found, or the desired information will remain inaccessible via the Web. The end user then navigates the Provider's Web site 140. This often entails visiting the Provider's main page 710 followed by viewing a variety of intermediate pages on the Provider's site 720. The end user may have to backtrack several times to the main page 710 or accidentally leave the system entirely forcing a second login 140 before finally locating the desired information 150.

US 6,405,245 B1

15

Utilizing springboard technology, the entire process 750 is streamlined into the single click of an access point. The delivery component of the PI Engine delivers an access point to the Provider's underlying page along with the PI. As a consequence, the end user need only perform a single interaction with the PI presentation page 760. This interaction immediately performs the requisite interactions with the Provider's Web site to bring the user to the desired underlying Web page 150.

In one embodiment, this springboard technology could be implemented utilizing a Java applet. With respect to FIG. 2, the applet would be downloaded from the PI Host 290 by the end user's client software 270, usually a Web browser, and executed locally by the end user's computer 220. The applet would drive the client software 270 to the desired page. Such an applet could retrieve procedures and data for driving the client software from the Provider store 310 and the User store 360.

In a further embodiment, the PI engine 240 could act as a proxy server directly accessing the Provider store 310 and the User store 360 as required. When the PI engine 240 receives the request to jump to the source of a particular piece of PI, the engine performs the necessary actions to navigate to the desire page and forwards the desired page to the end user's computer 220. Further interactions with the page might require additional proxying by the PI engine 240 as accumulated cookie data may reside on the PI Host 290. This embodiment is limited to use in handling standard HTTP traffic rather than secure HTTP traffic.

In a preferred embodiment, the springboard provides the end user with automated login into the PI Provider site 250 and allows the end user 210 to navigate via the client software 270. This automated login could be accomplished through the utilization of a hypertext transfer protocol (HTTP) redirect. Upon receiving the a springboard access request from the end user 210 via the client software 270, the PI Host 290 requests the login page from the PI Provider site 250 targeted by the springboard access. The PI engine 240 running on the PI Host 290 receives this login page and constructs a login request by accessing the proper data in the Provider store 310 and the User store 360. The login request is embedded in the HTTP redirect which is forward to the client software 270. The client software 270 is redirected to the targeted PI Provider site 250, and the end user 210 is automatically logged into this site.

Alternatively, this functionality could be implemented via a Java applet as described above. In addition, the PI engine 240 could generate a Javascript page containing the pertinent login request rather than an HTTP redirect. The Javascript page could be returned to the client software 270. This page would then be executed by the client software 270 to accomplish the automated login.

The PI engine 240 of FIG. 3 may also include a site monitor 370 processing component. This component would systematically monitor supported PI provider Web sites for changes. This component enhances the ability of the system to identify alterations in PI provider Web site procedures, data requirements and cookies requirements. This component increases system efficiency by supplementing or supplanting alteration identification via feedback from the PI access/transact component 340.

A further embodiment of the present invention might support the localize manipulation of PI. This could be accomplished where the client software 270 running on the client computer 220 in FIG. 2 is a specialized Web client rather than a general Web client such as Netscape. This specialized client might utilize Web channel technology to

16

automate the local PI download and update processes. Where the PI store is implemented via the aforementioned cookie architecture, this specialized client may provide direct local access to stored PI.

In another embodiment, the PI engine 240 of FIG. 3 might support both system supported PI providers as well as PI providers specific to particular end users. In this embodiment, an end user is not limited to PI available from PI providers present in the Provider store 310. For an end user to add PI provided by a non-supported PI provider, the end user would access the Baseline configure component 320 and create a configuration for the non-supported PI provider. The PI provider and PI configuration along with the verification and access data would be stored along with the user's record in the user store 360.

A further embodiment of the present invention supports the inclusion of PI transaction procedures and access requirements in the Provider store 310 of FIG. 3. The end user specific information necessary to realize such a transaction would reside with the user record in the user store 360. The functionality of the PI access/transact component 340 would expand to support the performance of transactions. This additional functionality could be supported in a manner similar to the procedure described above with respect to performance of access utilizing a simulated Web client. A further feature of this embodiment would include automated or semi-automated account management by providing trigger events to automatically initiate a transaction.

For instance, with reference to FIG. 2 an end user 210 would be able to maintain his/her accounts online through the PI Engine 240. If an information provider has the capability of receiving payments online, the PI Engine 240 could support complete or partial automation of such transactions. If there is a billing due date for a certain information provider, PI Engine 240 could flag that information and send email to the end user 210 notifying him/her of the bill due. Thus, the user will not have to check each of his/her providers individually for due date information. The PI Engine 240 could also automated payments on a limited range of billing amount for providers who allow payments over their Web servers 260, then send an email to the user with the notification of payment.

Due date acquisition could be accomplished utilizing the PI access/transact component 340 seen in FIG. 3. The due date information would be available to the end user via any delivery means supported by the PI deliver component 350. The PI access/transact component 340 would use standard e-commerce bill-paying methods to pay the user's bill/s to the provider if he/she chooses. Once the bill is paid, then an email notification will be sent to the user with the provider information and payment information. The user can specify the range of amount stored in the user store 360 that will be paid automatically. If the bill exceeds the amount specified by the user, then PI engine will simply send out an email notification to the user instead of paying the bill automatically.

The embodiments described above are given as illustrative examples only. It will be readily appreciated that many deviations may be made from the specific embodiment disclosed in this specification without departing from the invention. Accordingly, the scope of the invention is to be determined by the claims below rather than being limited to the specifically described embodiments above.

What is claimed is:

1. A method for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider, the method comprising the steps of:

US 6,405,245 B1

17

(a) presenting on a client computer associated with the end user and in communication with the personal information provider via a network a representation of personal information and a link corresponding to the personal information stored on the personal information provider; and

(b) upon activation of the presented link, transmitting a page containing a form which includes login information that upon opening by the client computer redirects the client computer to a post login page on the personal information provider in accordance with a protocol, the personal information accessible to the client computer in accordance with the protocol also being accessible by the end user via the network independently of the method for automated access to personal information.

2. A method for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider, the method comprising the steps of:

(a) presenting on a client computer associated with the end user and in communication with the personal information provider via a network a representation of personal information and a link corresponding to the personal information stored on the personal information provider;

(b) upon activation of the presented link, downloading an application to the client computer, wherein the downloaded application upon execution on the client computer performs the steps of:

(i) connecting to the personal information provider;

(ii) navigating to the personal information on the personal information provider using a protocol for instructing the client computer how to access the personal information via the network, the personal information accessible to the client computer using the protocol also being accessible by the end user via the network independently of the method for automated access to personal information; and

(iii) presenting the personal information to the user of the client computer.

3. The method of claim 2, and further comprising the steps of:

(c) transmitting end user data associated with the end user to the client computer; and

(d) transmitting personal information provider data associated with the personal information provider to the client computer.

4. The method of claim 3, wherein the step of transmitting personal information provider data associated with the personal information provider comprises transmitting a navigation script corresponding to the personal information.

5. The method of claim 4, wherein the step of transmitting end user data associated with the end user comprises transmitting end user data associated with the end user based on the transmitted navigation script.

6. The method of claim 2, and further comprising the step of generating an application for downloading to the client computer based on personal information provider data associated with the personal information provider, on the personal information and on end user data associated with the end user.

7. A method for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider, the method comprising the steps of:

(a) presenting on a client computer associated with the end user and in communication with the personal

18

information provider via a network a representation of personal information and a link corresponding to the personal information stored on the personal information provider;

(b) upon activation of the presented link, driving the client computer to the personal information stored on the personal information provider by performing the steps of:

(i) connecting to the personal information provider;

(ii) navigating to the personal information on the personal information provider using a protocol for instructing the client computer how to access the personal information via the network, the personal information accessible to the client computer using the protocol also being accessible by the end user via the network independently of the method for automated access to personal information;

(iii) presenting the personal information to the user of the client computer; and

(iv) proxying subsequent requests from the client computer to the personal information provider.

8. A computer-readable storage device storing instructions that upon execution cause a processor to automatically access personal information associated with an end user, wherein the personal information is stored on a personal information provider by performing the steps comprising of:

(a) presenting on a client computer associated with the end user and in communication with the personal information provider via a network a representation of personal information and a link corresponding to the personal information stored on the personal information provider;

(b) upon activation of the presented link, downloading an application to the client computer, wherein the downloaded application upon execution on the client computer performs the steps of:

(i) connecting to the personal information provider;

(ii) navigating to the personal information on the personal information provider using a protocol for instructing the client computer how to access the personal information via the network, the personal information accessible to the client computer using the protocol also being accessible by the end user via the network independently of automatic access by the processor of personal information caused by execution of the instructions; and

(iii) presenting the personal information to the user of the client computer.

9. A system for automated access to personal information associated with an end user, wherein the personal information is stored on a personal information provider in communication with a client computer via a network, the system comprising:

(a) a user store for storing data associated with the end user, the data associated with the end user including information identifying a plurality of information providers storing personal information associated with the end user;

(b) a personal information provider store for storing data associated with the personal information provider, the data associated with the personal information provider including a protocol for instructing a processor how to access the personal information via the network; and

(c) a processor in communication with the user store and the personal information provider store, the processor for performing the steps of:

(i) presenting on a client computer associated with the end user a representation of personal information and

US 6,405,245 B1

**19**

a link corresponding to the personal information stored on the personal information provider;

(ii) upon activation of the presented link, downloading an application to the client computer, wherein the downloaded application upon execution on the client computer performs the steps of:

(A) connecting to the personal information provider;

(D) navigating to the personal information on the personal information provider using the protocol,

**20**

the personal information accessible to the client computer using the protocol also being accessible by the end user via the network independently of the system for automated access to personal information; and

(C) presenting the personal information to the user of the client computers.

* * * * *

# EXHIBIT 24



US006567850B1

(12) **United States Patent**     (10) **Patent No.:**     **US 6,567,850 B1**

Freishtat et al.     (45) **Date of Patent:**     **May 20, 2003**

(54) **SYSTEM AND METHOD FOR DETERMINING REVENUE FROM AN INTERMEDIARY DERIVED FROM SERVICING DATA REQUESTS**

(75) Inventors: **Gregg Freishtat**, Atlanta, GA (US); **Palaniswamy Rajan**, Atlanta, GA (US)

(73) Assignee: **Yodlee, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/427,794

(22) Filed: **Oct. 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.[7] ............................................. G06F 15/173

(52) U.S. Cl. ..................................... 709/224; 705/34

(58) Field of Search ............................. 705/34; 709/224

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,987,538 A | * 1/1991 | Johnson et al. | .............. 364/401 |
| 5,347,632 A | 9/1994 | Filepp et al. | |
| 5,446,891 A | 8/1995 | Kaplan et al. | |
| 5,481,672 A | 1/1996 | Okuno et al. | |
| 5,483,445 A | * 1/1996 | Pickering | ..................... 364/406 |
| 5,537,314 A | 7/1996 | Kanter | |
| 5,590,196 A | 12/1996 | Moreau | |
| 5,613,012 A | 3/1997 | Hoffman et al. | |
| 5,619,648 A | 4/1997 | Canale et al. | |
| 5,640,577 A | 6/1997 | Scharmer | |
| 5,644,576 A | 7/1997 | Bauchot et al. | |
| 5,649,186 A | 7/1997 | Ferguson | |
| 5,655,089 A | 8/1997 | Bucci | .......................... 395/240 |
| 5,696,965 A | 12/1997 | Dedrick | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0786728 A1 | 7/1997 |
| EP | 0848338 A | 6/1998 |
| JP | 7074817 | 3/1995 |
| WO | WO 97/16796 | 5/1997 |
| WO | WO 98/28698 | 7/1998 |
| WO | WO01/33759 A1 | 5/2001 |

OTHER PUBLICATIONS

Unknown, Roboword, Multilingual Dictionary Tool, Jul. 27, 1997, pates 1–3, all.

Chaum, D. Security without identification: tran saction systems to make big brother obsolete. Communication of the ACM. Oct. 1985. vol. 28. Issue 10 pp. 1030–1044.

Stanley, Tracey, "Intelligent Searching Agents on the Web", Jan. 1997, 4 pages, <http://www.ariadne.ac.u k/issue7/search–engines/>.

Jansen, Janes, "Using an Intelligent Agent to Enhance Search Engine Performance", Dec. 1998, 13 pages, <http://www.firstmonday.dk/issues/issue2_3/jansen/>.

(List continued on next page.)

*Primary Examiner*—Kenneth R. Rice

(74) *Attorney, Agent, or Firm*—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

This invention is a system and method for determining revenue from an intermediary derived from end user interactions involving personal information via the intermediary. A host computer monitors interactions between end users and personal information providers via an intermediary computer. The host computer communicates with a personal information store for storing personal information associated with end users and an accounting store for storing accounting data associated with the intermediary computer. The host computer includes a processor that receives requests concerning personal information from the intermediary computer and services these requests based on personal information in the personal information store. The host computer processor updates the accounting data associated with the intermediary computer and generates invoices to the intermediary computer based on the updated accounting data.

**23 Claims, 11 Drawing Sheets**



US 6,567,850 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,699,528 A | 12/1997 | Hogan | 395/240 |
| 5,708,825 A | 1/1998 | Sotomayor | |
| 5,710,887 A | 1/1998 | Chelliah et al. | 395/226 |
| 5,712,979 A | 1/1998 | Graber et al. | |
| 5,724,567 A | 3/1998 | Rose et al. | |
| 5,727,156 A | 3/1998 | Herr-Hoyman et al. | |
| 5,732,074 A | 3/1998 | Spaur et al. | |
| 5,740,549 A | 4/1998 | Reilly et al. | |
| 5,745,884 A * | 4/1998 | Carnegie et al. | 705/34 |
| 5,768,521 A | 6/1998 | Dedrick | |
| 5,768,577 A | 6/1998 | Kleewein et al. | |
| 5,778,367 A | 7/1998 | Wesinger, Jr. et al. | |
| 5,787,425 A | 7/1998 | Bigus | |
| 5,790,793 A | 8/1998 | Higley | |
| 5,793,966 A | 8/1998 | Amstein et al. | |
| 5,794,233 A | 8/1998 | Rubinstein | |
| 5,799,151 A | 8/1998 | Hoffer | |
| 5,812,769 A | 9/1998 | Graber et al. | |
| 5,813,007 A | 9/1998 | Nielsen | |
| 5,815,665 A | 9/1998 | Teper et al. | |
| 5,818,935 A | 10/1998 | Maa | |
| 5,825,884 A | 10/1998 | Zdepski et al. | 380/25 |
| 5,828,839 A | 10/1998 | Moncreiff | |
| 5,832,474 A | 11/1998 | Lopresti et al. | |
| 5,832,494 A | 11/1998 | Egger et al. | |
| 5,838,918 A | 11/1998 | Prager et al. | |
| 5,848,396 A | 12/1998 | Gerace | 705/10 |
| 5,854,897 A | 12/1998 | Radziewicz et al. | |
| 5,855,015 A | 12/1998 | Shoham | |
| 5,860,068 A | 1/1999 | Cook | 705/26 |
| 5,860,073 A | 1/1999 | Ferrel et al. | |
| 5,862,325 A | 1/1999 | Reed et al. | |
| 5,870,552 A | 2/1999 | Dozier et al. | |
| 5,878,215 A | 3/1999 | Kling et al. | |
| 5,878,219 A | 3/1999 | Vance, Jr. et al. | 395/200.47 |
| 5,884,033 A | 3/1999 | Duvall et al. | |
| 5,884,035 A | 3/1999 | Butman et al. | |
| 5,884,045 A | 3/1999 | Kurihara | 395/200.67 |
| 5,887,133 A | 3/1999 | Brown et al. | |
| 5,890,140 A | 3/1999 | Clark et al. | |
| 5,890,152 A | 3/1999 | Rapaport et al. | |
| 5,892,900 A | 4/1999 | Ginter et al. | |
| 5,893,091 A | 4/1999 | Hunt et al. | |
| 5,893,128 A | 4/1999 | Nauckhoff | |
| 5,894,554 A | 4/1999 | Lowery et al. | 395/200.33 |
| 5,895,468 A | 4/1999 | Whitmyer, Jr. | 707/10 |
| 5,897,620 A | 4/1999 | Walker et al. | |
| 5,897,622 A | 4/1999 | Blinn et al. | 705/26 |
| 5,898,836 A | 4/1999 | Freivald et al. | 395/200.48 |
| 5,905,736 A | 5/1999 | Ronen et al. | |
| 5,905,865 A | 5/1999 | Palmer et al. | |
| 5,907,838 A | 5/1999 | Miyasaka et al. | |
| 5,913,202 A | 6/1999 | Motoyama | |
| 5,918,019 A | 6/1999 | Valencia | |
| 5,918,214 A | 6/1999 | Perkowski | 705/27 |
| 5,923,736 A | 7/1999 | Shachar | |
| 5,924,090 A | 7/1999 | Krellenstein | |
| 5,926,798 A | 7/1999 | Carter | 705/26 |
| 5,931,907 A | 8/1999 | Davies et al. | |
| 5,931,947 A | 8/1999 | Burns et al. | |
| 5,933,811 A | 8/1999 | Angles et al. | |
| 5,937,168 A | 8/1999 | Anderson et al. | |
| 5,937,392 A | 8/1999 | Alberts | |
| 5,943,424 A | 8/1999 | Berger et al. | |
| 5,948,040 A | 9/1999 | DeLorme et al. | |
| 5,949,326 A | 9/1999 | Wicks et al. | |
| 5,951,637 A | 9/1999 | Kuzma | |
| 5,951,642 A | 9/1999 | Onoe et al. | |
| 5,956,709 A | 9/1999 | Xue | 707/3 |
| 5,961,593 A | 10/1999 | Gabber et al. | |
| 5,963,915 A | 10/1999 | Kirsch | 705/26 |
| 5,963,924 A | 10/1999 | Williams et al. | |
| 5,963,949 A | 10/1999 | Gupta et al. | |
| 5,963,952 A | 10/1999 | Smith | |
| 5,963,967 A | 10/1999 | Umen et al. | |
| 5,966,441 A | 10/1999 | Calamera | |
| 5,974,406 A | 10/1999 | Bisdikian et al. | |
| 5,974,430 A | 10/1999 | Mutschler et al. | |
| 5,978,766 A | 11/1999 | Luciw | 705/1 |
| 5,978,779 A | 11/1999 | Stein et al. | |
| 5,978,780 A | 11/1999 | Watson | |
| 5,982,891 A | 11/1999 | Ginter et al. | |
| 5,983,170 A | 11/1999 | Goodman | |
| 5,983,200 A | 11/1999 | Slotznick | 705/26 |
| 5,983,214 A | 11/1999 | Lang et al. | |
| 5,983,227 A | 11/1999 | Nazem et al. | 707/10 |
| 5,987,440 A | 11/1999 | O'Neil et al. | |
| 5,987,466 A | 11/1999 | Greer et al. | |
| 5,987,498 A | 11/1999 | Athing et al. | 709/203 |
| 5,987,611 A | 11/1999 | Freund | |
| 5,990,887 A | 11/1999 | Redpath et al. | |
| 5,991,735 A | 11/1999 | Gerace | 705/10 |
| 5,991,756 A | 11/1999 | Wu | 707/3 |
| 5,995,965 A | 11/1999 | Experton | |
| 5,999,940 A | 12/1999 | Ranger | |
| 5,999,975 A | 12/1999 | Kittaka et al. | |
| 6,000,033 A | 12/1999 | Kelly et al. | |
| 6,000,832 A | 12/1999 | Franklin et al. | |
| 6,003,077 A | 12/1999 | Bawden et al. | |
| 6,006,227 A | 12/1999 | Freeman et al. | |
| 6,014,429 A | 1/2000 | LaPorta et al. | |
| 6,014,502 A | 1/2000 | Moraes | |
| 6,023,684 A | 2/2000 | Pearson | |
| 6,029,175 A | 2/2000 | Chow et al. | |
| 6,029,180 A | 2/2000 | Murata et al. | |
| 6,029,182 A | 2/2000 | Nehab et al. | |
| 6,029,195 A | 2/2000 | Herz | |
| 6,032,162 A | 2/2000 | Burke | |
| 6,038,601 A | 3/2000 | Lambert et al. | |
| 6,038,668 A | 3/2000 | Chipman et al. | |
| 6,041,307 A | 3/2000 | Ahuja et al. | |
| 6,041,326 A | 3/2000 | Amro et al. | |
| 6,044,372 A | 3/2000 | Rothfus et al. | |
| 6,044,465 A | 3/2000 | Dutcher et al. | |
| 6,055,236 A | 4/2000 | Nessett et al. | |
| 6,058,417 A | 5/2000 | Hess et al. | |
| 6,061,716 A | 5/2000 | Moncreiff | |
| 6,065,120 A | 5/2000 | Laursen et al. | |
| 6,070,150 A | 5/2000 | Remington et al. | |
| 6,073,173 A | 6/2000 | Bittinger et al. | |
| 6,078,924 A | 6/2000 | Ainsbury et al. | |
| 6,081,830 A | 6/2000 | Schindler | |
| 6,085,188 A | 7/2000 | Bachmann et al. | |
| 6,085,229 A | 7/2000 | Newman et al. | |
| 6,085,238 A | 7/2000 | Yuasa et al. | |
| 6,088,711 A | 7/2000 | Fein et al. | |
| 6,088,722 A | 7/2000 | Herz et al. | |
| 6,101,500 A | 8/2000 | Lau | |
| 6,108,686 A | 8/2000 | Williams, Jr. | |
| 6,108,691 A | 8/2000 | Lee et al. | |
| 6,112,212 A | 8/2000 | Heitler | |
| 6,119,079 A | 9/2000 | Wang et al. | |
| 6,119,098 A | 9/2000 | Guyot et al. | |
| 6,119,101 A | 9/2000 | Peckover | |
| 6,119,229 A | 9/2000 | Martinez et al. | |
| 6,122,673 A | 9/2000 | Basak et al. | |
| 6,125,186 A | 9/2000 | Saito et al. | |
| 6,125,352 A | 9/2000 | Franklin et al. | |
| 6,128,603 A | 10/2000 | Dent et al. | |
| 6,128,624 A | 10/2000 | Papierniak et al. | |
| 6,128,655 A | 10/2000 | Fields et al. | |

US 6,567,850 B1

Page 3

| | | |
|---|---|---|
| 6,134,532 A | 10/2000 | Lazarus et al. |
| 6,134,534 A | 10/2000 | Walker et al. |
| 6,134,548 A | 10/2000 | Gottsman et al. |
| 6,134,658 A | 10/2000 | Multerer et al. |
| 6,138,155 A | 10/2000 | Davis et al. |
| 6,141,333 A | 10/2000 | Chavez, Jr. |
| 6,141,651 A | 10/2000 | Riley et al. |
| 6,147,975 A | 11/2000 | Bowman-Amuah |
| 6,148,402 A | 11/2000 | Campbell |
| 6,169,992 B1 | 1/2001 | Beall et al. |
| 6,172,677 B1 | 1/2001 | Stautner et al. |
| 6,181,786 B1 | 1/2001 | Detampel et al. |
| 6,182,085 B1 | 1/2001 | Eichstaedt |
| 6,182,229 B1 | 1/2001 | Nielsen |
| 6,185,601 B1 | 2/2001 | Wolff |
| 6,192,380 B1 | 2/2001 | Light et al. |
| 6,192,407 B1 | 2/2001 | Smith et al. |
| 6,195,651 B1 | 2/2001 | Handel et al. |
| 6,199,077 B1 | 3/2001 | Inala et al. |
| 6,199,079 B1 | 3/2001 | Gupta et al. |
| 6,199,082 B1 | 3/2001 | Ferrel et al. |
| 6,199,099 B1 | 3/2001 | Gershman et al. |
| 6,199,113 B1 | 3/2001 | Alegre et al. |
| 6,202,062 B1 | 3/2001 | Cameron et al. |
| 6,202,210 B1 | 3/2001 | Ludtke |
| 6,205,456 B1 | 3/2001 | Nakao |
| 6,205,473 B1 | 3/2001 | Thomasson et al. |
| 6,212,548 B1 | 4/2001 | DeSimone et al. |
| 6,219,705 B1 | 4/2001 | Steinberger et al. |
| 6,223,292 B1 | 4/2001 | Dean et al. |
| 6,226,648 B1 | 5/2001 | Appleman et al. |
| 6,226,750 B1 | 5/2001 | Trieger |
| 6,233,592 B1 | 5/2001 | Schnelle et al. |
| 6,233,608 B1 | 5/2001 | Laursen et al. |
| 6,236,991 B1 | 5/2001 | Frauenhofer et al. |
| 6,237,096 B1 | 5/2001 | Bisbee et al. |
| 6,240,443 B1 | 5/2001 | Suzuki et al. |
| 6,243,755 B1 | 6/2001 | Takagi et al. |
| 6,252,544 B1 | 6/2001 | Hoffberg |
| 6,253,188 B1 | 6/2001 | Witek et al. |
| 6,253,326 B1 | 6/2001 | Lincke et al. |
| 6,260,039 B1 | 7/2001 | Schneck et al. |
| 6,263,501 B1 | 7/2001 | Schein et al. |
| 6,266,615 B1 | 7/2001 | Jin |
| 6,271,840 B1 | 8/2001 | Finseth et al. |
| 6,278,993 B1 | 8/2001 | Kumar et al. |
| 6,279,037 B1 | 8/2001 | Tams et al. |
| 6,282,276 B1 | 8/2001 | Doganata et al. |
| 6,286,029 B1 | 9/2001 | Delph |
| 6,286,043 B1 | 9/2001 | Cuomo et al. |
| 6,289,389 B1 | 9/2001 | Kikinis |
| 6,292,787 B1 | 9/2001 | Scott et al. |
| 6,301,621 B1 | 10/2001 | Haverstock et al. |
| 6,317,718 B1 | 11/2001 | Fano |
| 6,317,783 B1 | 11/2001 | Freishtat et al. |
| 6,324,538 B1 | 11/2001 | Wesinger, Jr. et al. |
| 6,324,569 B1 | 11/2001 | Ogilvie et al. |
| 6,330,321 B2 | 12/2001 | Detampel, Jr. et al. |
| 6,330,561 B1 | 12/2001 | Cohen et al. |
| 6,330,592 B1 | 12/2001 | Makuch et al. |
| 6,339,761 B1 | 1/2002 | Cottingham |
| 6,341,353 B1 | 1/2002 | Herman et al. |
| 6,345,300 B1 | 2/2002 | Bakshi et al. |
| 6,349,257 B1 | 2/2002 | Liu et al. |
| 6,349,307 B1 | 2/2002 | Chen |
| 6,351,464 B1 | 2/2002 | Galvin et al. |
| 6,356,834 B2 | 3/2002 | Hancock et al. |
| 6,356,899 B1 | 3/2002 | Chakrabarti et al. |
| 6,356,905 B1 | 3/2002 | Gershman et al. |
| 6,366,923 B1 | 4/2002 | Lenk et al. |
| 6,377,567 B1 | 4/2002 | Leonard |
| 6,380,890 B1 | 4/2002 | Smith et al. |
| 6,385,655 B1 | 5/2002 | Smith et al. |
| 6,397,212 B1 | 5/2002 | Biffar |
| 6,405,245 B1 | 6/2002 | Burson et al. |
| 6,412,073 B1 | 6/2002 | Rangan |
| 6,424,979 B1 | 7/2002 | Livingston et al. |
| 6,442,590 B1 | 8/2002 | Inala et al. |
| 2001/0000537 A1 | 4/2001 | Inala et al. |
| 2001/0016034 A1 | 8/2001 | Singh et al. |
| 2001/0020242 A1 | 9/2001 | Gupta et al. |
| 2001/0023414 A1 | 9/2001 | Kumar et al. |
| 2001/0032182 A1 | 10/2001 | Kumar et al. |
| 2001/0037294 A1 | 11/2001 | Freishtat et al. |
| 2001/0051907 A1 | 12/2001 | Kumar et al. |
| 2002/0007330 A1 | 1/2002 | Kumar et al. |
| 2002/0015480 A1 | 2/2002 | Neil et al. |
| 2002/0019810 A1 | 2/2002 | Kumar et al. |
| 2002/0023104 A1 | 2/2002 | Satyavolu et al. |
| 2002/0059369 A1 | 5/2002 | Kern et al. |
| 2002/0095651 A1 | 7/2002 | Kumar et al. |

OTHER PUBLICATIONS

Lesser, Victor et al., "BIG: A Resource_Bounded Information Gathering Agent", Jan. 1998, 18 pages <http://dis.cs.umass.edu/research/big/>.

Severance, C., Could LDAP be the next killer DAP?, IEEE Computer, vol. 30, Issue 8, Aug. 1997, pp. 88–89.

Gardner, Stephen R., Building the data warehouse, Communications of the ACM, vol. 41, Issue 9, Sep. 1998, pp. 52–60.

Bontepo, Charles et al., The IBM data warehouse, Communications of the ACM, vol. 41, Issue 9, Sep. 1998, pp. 38–48.

Fryer et al. (Eds.), Microsoft Computer Dictionary, 1997, 3rd Edition, pp. 238–240, 487.

Mollohan, Gary, Wireless Revolution,. Appliance. Aug. 1999. vol. 56. No. 8, p. 49.

Anonymous. Dialog file 20 (World Reporter) No. 3629961.

3Com Announces the Pal, VII Connected Organizer, the First Handheld Solution for Out–Of–The–Box Wireless Internet Access. Business Wire. Dec. 2, 1998. 4 pages, especially p. 1, lines 18–33, p. 2, lines 1–10, p. 3, lines 21–30 and p. 4, lines 2–17 and lines 21–24.

Chakrabarti et al., Mining the Web's link s tructure, Computer, Aug. 1999, pp. 60–67.

Das et al., Experiments in using agent–based retrieval from distributed heterogeneous database, Knowledge and Data Engineering Exchange Works, Nov. 1997, abstract.

Frecon, WEBPATH—a three dimensional Web history, Information Visualization IEEE Symposium on Oct. 1998, pp. 3–10.

Park, Intelligent query and browsing information retrieval (QBIR) agent, Acoustics, Speech and Signal Processing, IEEE International Conference, May 1998, pp. 1173–1176.

O'Leary Mick, "NewsWorks, brings new depth to Web news; the site excels with unique sources and value –added editorial features", Information Today, v 14, p. 10.

Pelline, *LookSmart to be ISP home page,* Web page, unverified print date of Sep. 22, 2000, unverified cover date of Aug. 14, 1997.

Macavinta, *Excite, Lycos get more personal,* Web page, unverified print date of Sep. 22, 2000, unverified cover date of Apr. 13, 1998.

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999, Redondo, CA, pp. 15–22.

US 6,567,850 B1

Page 4

"A Softbot-based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul., 1994, pp. 72–76.

"Strategic Directions in Database Systems—Breaking Out of the Box," Avi Silberschatz and Stan Zdonik et al., ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computering Surveys, vol. 28, Issue 1, pp. 129–131, Mar. (1996).

"Managing Security and Privacy of Information," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 4es, Dec. (1996).

Masao Ito, "Product Review WWW Autopilot Software Naminori–yaro Enterprise", Nikkei Windows NT, No. 19, Nikkei BP, Oct. 1, 1998, pp. 26–28 (JPO CSDB Literature No.: National Technical Journal 1998–01804–002).

Masaya Suzuki, "Naminoriyaro Enterprise Ver. 1.0", ASCII NT, vol. 3, No. 10, ASCII Corporation, Oct. 1, 1998, pp. 118–119 (JPO CSDB Literature No.: National Technical Journal 1998–01100–010).

"Naminoriyaro Plays an Active Role in Small Offices", INTER–NET magazine, No. 44, Impress Corporation, Sep. 1, 1998, p. 237 (JPO CSDB Literature No.: National Technical Journal 2000–00181–017).

"Autopilot Software Requires No Waiting Time", ASCII DOS/V ISSUE, vol. 4, No. 10, ASCII Corporation, Oct. 1, 1998, pp. 190–191 (JPO CSDB Literature No.: National Technical Journal 1998–01798–011).

"Introduction to Outdoor Network", DOS/v magazine, vol. 6, No. 10, Soft Bank Corporation, May 15, 1997, pp. 144–155 (JPO CSDB Literature No.: National Technical Journal 1998–01206–003).

Tadatoshi Hirono, "Have a Lead on Active Web Pages! No. 9", Internet ASCII, vol. 3, No. 4, ASCII Corporation, Apr. 1, 1998, pp. 390–391 (JPO CSDB Literature No.: National Technical Journal 2000–00394–027).

Kazuya Ishikawa, "What is a "cookie" which you see on WWW browsers?", INTERNET magazine, No. 39, Impress Corporation, Apr. 1, 1998, pp. 216–217 (JPO CSDB Literature No.: National Technical Journal 2000–00176–008).

Jun Nakajima, "Internet Techniques for Beginners No. 9", In–terface, vol. 24, No. 9, CQ Publishing Co., Ltd., Sep. 1, 1998, pp. 72–76 (JPO CSDB Literature No.: National Technical Journal 1998–01664–001).

Shiro Iba, "What is it ? Explorer File No. 7 'How much is the ease of use of Internet Banking?'", SOHO Computing, vol. 3, No. 9, Cybiz Co., Ltd, Jun. 1, 1998, pp. 55–60 (JPO CSDB Literature No.: National Technical Journal 1998–00782–002)

* cited by examiner

**U.S. Patent**     May 20, 2003     Sheet 1 of 11     US 6,567,850 B1

REPEAT PROCESS TO
SEEK ADDITIONAL PI

100

SELECT
INFORMATION
PROVIDER — 110

LOCATE AND ENTER
PROVIDER
SITE ADDRESS — 120

LOG INTO
PROVIDER SITE — 130

NAVIGATE
EXTRANEOUS WEB
PAGE(S) — 140

VIEW DESIRED PI
FROM PROVIDER
SITE — 150

PRIOR ART

FIG. 1



FIG. 2



FIG. 3



PRIOR ART

FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

US 6,567,850 B1

1

# SYSTEM AND METHOD FOR DETERMINING REVENUE FROM AN INTERMEDIARY DERIVED FROM SERVICING DATA REQUESTS

## CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application claims the benefit, pursuant to 35 U.S.C. §119(e), of applicants' provisional U.S. patent application Ser. No. 60/105,917, filed Oct. 28, 1998, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data" and of applicants' provisional U.S. patent application Ser. No. 60/134,395, filed May 17, 1999, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data".

## BACKGROUND OF INVENTION

### 1. Field of Invention

The invention relates to a system and method for determining revenue derived from interactions involving personal information. The invention more particularly relates to the determination of revenue derived from an intermediary based on interactions involving personal information associated with end users aggregated from one or more personal information providers.

### 2. Description of Related Art

Looking back over the last five years, it is apparent that as the Internet gained momentum, consumers demanded applications or services that make their online experience simpler, easier to use, and more satisfying. The development of successful Internet Sites has corresponded with a number of themes which have developed over the last few years. When carefully analyzed this evolution is a logical development of the emerging digital economy.

Prior to 1994, the Internet was not a mass media, in part, because the existing technologies (FTP, Archie, Usenet, and Gopher) were not user friendly and required the end user to do all of the work (e.g., the end user had to learn of an existing data source, find the address, navigate to the destination, and download the information). As m consumers began accessing the Internet, Search Engines were created to solve this usability issue. With the advent of the commercial Search Engine, additional content could be easily added to the Internet and the end user had a means of finding and accessing this information. Consumers required better tools than Search Engines for organizing and accessing this wealth of generic content. Push technologies were explored and, eventually, the portal strategy was successfully adopted as an efficient way for consumers to easily access a variety of content sources in a single, easy to use format. As the volume of available online content continues to grow exponentially, portals are now confronted with the need to make different types of content available to different consumers based upon their particular preferences and tastes.

The phenomenal success of Internet portals and destination sites has demonstrated the importance of creatively and intelligently aggregating, organizing and presenting the mass of information available on the Web. Search engines, portals and destination sites have Internet strategies based on the frequency, duration and quality of end user visits to their sites. For this reason, destination sites and portals are constantly seeking content and/or technologies which drive

2

quality traffic to their site and keep it there. Recent trends indicate that Internet users are up to 25 times more likely to come back to a site when this information is organized according to personal preferences.

FIG. 1 displays the current process of acquiring online PI 100. The end user first selects an information provider site in step 110. The end user proceeds to step 120 by locating and entering the Internet address of the selected information provider. This step may be accomplished in several manners with varying levels of complexity. A simple means for accomplishing this step is the utilization of a bookmark or favorite whereas locating an information provider for the first time might involve significant time and effort performing online searches. In step 130, the end users logs into the selected information provider's Web site utilizing the site's specific logon protocol. This protocol usually involves verifying the identity of the end user using a user name and password or other means of verification, acquiring the verification data from cookies residing on the end user's system or a combination of requested data and cookie data. The end user continues in step 140 by navigating through Web pages on the information provider's Web site until the desired information is located. During this process, the end user is often required to visit Web pages of little or no use to the end user whose goals is to simply acquire the particular PI residing on the Web site. Ultimately in step 150, the end user is presented with the desired PI. The entire process 100 is repeated for each individual piece of PI desired by the end user. Under this PI access model, the end user must visit each separate information provider, track potentially different identity verification data for each, utilize a different user interface at each site and possibly wade through a significant number of filler Web pages.

FIG. 4 pictorial illustrates the architecture of this current access process. The end user 210 utilizes the client computer 220 to access each PI Web site 250 across the Internet 230. This current model suffers from several significant deficiencies. The end user must login to each site separately. Each separate site has its own graphical user interface. Each site wants the end user to stay and return; each visited site wants to retain end user focus for as long as possible. No true aggregation of PI exists; multiple accesses simply allow sequential access to particular pieces of PI.

One partial solution to these problems has recently evolved in the form of portal sites. Generic portal sites aggregate resources into categories and provide links to sites covering topics within those categories. Yahoo and Excite are examples of generic portal sites. These sites facilitate horizontal aggregation of generic content; horizontal aggregation refers to aggregation of PI access within a particular information provider category such as banks or utility companies. Some portal site allows individual end users a limited capability to select and configure disparate generic PI. Generic PI refers to PI of interest to the particular end user that does not require specific identity verification to obtain. For example, an end user might be interested in the weather forecast for his local area. This information could be integrated into a portal page without requiring identity verification of the particular end user receiving this PI. The individualized portal page provides a significant benefit to users seeking to aggregate generic PI. However, current portal pages do not generally provide PI requiring identity verification such as an end user's stock portfolio or bank balance. Further, these pages do not facilitate transactions utilizing PI.

Under current technology, aggregating PI available over the Internet requires a significant burden in terms of time,

US 6,567,850 B1

| 3 | 4 |

effort and learning curve. An end user wishing to access his PI needs to individually visit a variety of information provider sites each with its own requirements, graphical user interface and login protocol.

## SUMMARY OF THE INVENTION

In the present invention, a host computer monitors interactions between end users and personal information providers via an intermediary computer. Interactions will generally fall into two categories: requests for delivery of personal information and requests for transactions involving personal information. The host computer communicates with a personal information store for storing personal information associated with end users and an accounting store for storing accounting data associated with the intermediary computer. The host computer includes a processor.

The host computer processor receives requests concerning personal information associated with an end user from the intermediary computer and services the request based on personal information associated with the end user in the personal information store. The host computer processor updates the accounting data associated with the intermediary computer. The host computer processor may update the accounting data in a variety of ways. First, the host computer processor may increment a user count for each new user of the intermediary computer over a selected period of time. Next, the host computer processor may count the interactions performed through the intermediary computer. Third, the host computer processor may, where the service request is a request to perform a transaction, increment a commission total an amount based on the serviced request. Finally, the host computer processor may use any combination of these ways to update the accounting data associated with the intermediary computer.

The host computer processor generates invoices to the intermediary computer based on the updated accounting data. The host computer processor may generate such invoices on a periodic basis. In a further embodiment, the host computer processor may deliver the generated invoices to a selected destination such as an electronic mail destination, a print device, a Web page residing on a Web server, an Internet client, a telephone, and a facsimile.

In yet another embodiment, the intermediary computer has an account associated with it. The host computer processor may debit this account prior to generating an invoice so that the generated invoice only reflects additional revenue beyond the amount indicated by the intermediary computer account. The amount debited may be based upon the updated accounting data associated with the intermediary computer using any of the aforementioned update types.

The above and other objects and advantages of the present invention will become more readily apparent when reference is made to the following description, taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a process diagram of the current process that end users perform to access Internet available PI.

FIG. 2 is a block diagram of the components that could be used to implement present invention.

FIG. 3 is a block diagram of the components of the PI engine.

FIG. 4 is a diagram of the current PI access architecture.

FIG. 5 is a diagram of an architecture supporting PI access utilizing an intermediary Web site.

FIG. 6 is a diagram of the cookie/client cache architecture.

FIG. 7 is a flowchart for accessing pages underlying particular PI via the traditional process of FIG. 1 and via springboard technology.

FIG. 8 depicts the integration model for the dynamic generation of HTML pages.

FIG. 9 displays the run-time process for dynamic generation of HTML page.

FIG. 10 illustrates a process for automated applet interaction utilizing a modified Java virtual machine.

FIG. 11 is a flowchart exemplifying an intermediary Web site transaction structure.

## DETAILED DESCRIPTION OF THE INVENTION

A preferred embodiment of the invention is now described in detail. Referring to the drawings, like numbers indicate like parts throughout the views. As used in the description herein and throughout the claims that follow, the meaning of "a," "an," and "the" includes plural reference unless the context clearly dictates otherwise. Also, as used in the description herein and throughout the claims that follow, the meaning of "in" includes "in" and "on" unless the context clearly dictates otherwise.

In no time, end users will have to log into a large number of different Web Sites, each with separate passwords, security, rules, software and "look and feel"—just to get the information currently obtained by checking one place—the mailbox at the end of the driveway. The Internet will fundamentally change the way in which end users will access Personal Information (PI) and will make e-commerce as familiar as using an ATM. "Personal Information" is all of the data that companies, information providers, have that is specific or unique to each person such as monthly bills, bank account balances, investments information, health care benefits, email, voice and fax messages, 401(k) holdings or potentially any other information pertinent to a particular end user.

The present invention alleviates several of the problems with the current PI acquisition methods by automatically aggregating PI, not only generic PI as aggregated by portals but also PI specific to the end user requiring identity verification for access. In one embodiment, the invention automates the PI acquisition and delivery process. FIG. 2 provides a block diagram of components that could be used to implement the present invention. The end user 210 accesses a client computer 220 running client software 270 which in a particular embodiment could be a general Web browser such as Navigator or Communicator (Netscape). The client computer 220 utilizes the Internet 230 to access a PI engine 240 running on a PI host 290. The PI engine 240 examines stored PI 280 for freshness. Any stale PI items are refreshed by directly reacquiring the PI from the particular information provider's Web site 250 running on the provider's computer system 260 accessed across the Internet 230. The PI engine 240 stores the fresh PI in its store 280 and delivers the PI to a selected destination, in this instance across the Internet 230 to the client computer 220 which displays the information to the end user 210 using the client software 270. The PI engine 240 refreshes all stale PI in a like manner prior to forwarding the aggregated PI to both the store 280 and the delivery destination, the client computer 220 in this instance. The PI engine 240 may refresh the PI sequentially or in parallel. For example, the end user's checking account balance would be updated through his

US 6,567,850 B1

<table>
<tr><td>5</td><td>6</td></tr>
</table>

bank's Web site, his email from his particular email site, his portfolio information from his broker's site and his electricity bill from his electricity company's site.

FIG. 3 displays a block diagram of the components of the PI engine 240. The PI engine 240 is composed of both storage and processing components. The three primary storage components are the PI store 280, the PI Provider store 310 and the user store 360. The first storage component of the PI engine 240 is the PI store 280. The PI store 280 contains each individual's PI record 375; the PI associated with a particular end user is segregated from the PI of all other end users. The PI engine also utilizes a provider store 310 that maintains general parameters associated with particular PI providers. The general parameters of a PI provider define the types of verification data necessary and the procedures to be followed to gain access to the particular PI provider. Each PI provider record also contains the types of PI provided by the PI provider and the types of transactions supported by the provider. Along with the types of PI or transaction, the record also contains the additional types of data and procedures necessary to access the PI or execute the transaction. A user store 360 is also necessary to maintain configuration and verification information concerning particular end users. For each end user, the user selected PI providers, PI and transactions are registered along with the verification data necessary to acquire the PI or execute the transaction from the PI provider.

The PI store 280 may be implemented in a variety of ways. Referring to FIG. 2, the PI store 280 may comprise a database residing on the PI Host 290. Under this approach, the PI for each individual end user 210 is stored as a separate record or object 375 in the database. In yet another embodiment, the PI for each end user 210 could be stored in a separate file 375, thus performing the task of segregating PI of different users at the file level.

In addition, or as an alternative, the PI associated with each end user 210 may reside on his/her client computer 220 using cookie technology as specified in D. Kristol and L. Montulli, "HTTP State Management Mechanism", Request For Comments (RFC) 2109, February, 1997 (available at http://www.ietf.org/rfc/rfc2109.txt), which is expressly incorporated herein in its entirety. The PI associate with the end user 210 would be stored as PI cookies 375. This implementation mechanism provides inherent support for segregating PI associated with one end user 375 from PI associated with all other end users. Utilizing this method as a substitute for a centralized store provides a layer of security against unauthorized access. As a further measure, PI data stored in cookies could be stored in an encrypted format.

FIG. 6 provides a diagram of a typical implementation of the PI store 280 using cookie technology; references in the foregoing description are also made to FIG. 3 with respect to the internal workings of the PI engine 240. When an attempt is made to access PI by an end user 210 directly, or through an intermediary Web server, the PI access/transact component 340 of the PI engine 240 would retrieve stored PI 375 from the PI store 280. Under this approach, this stored PI 375 would be received directly from cookies sent by the client computer 220 of the end user 210. The PI access/transact component 340 would perform any decryption if necessary. Any updates required would be obtained by direct access of PI providers 250. The PI deliver component 350 would provide the mechanism for both updating the PI store 280 as well as transmitting the requested PI to the end user 210, directly or through an intermediary Web site. The PI deliver component 350 would place the updated PI in the

PI store 280 by replacing the outdated PI cookies 375 stored on the client computer 220. The PI deliver component 350 would also handle any encryption if necessary. The PI deliver component 350 would also be responsible for transmitting requested PI. In a preferred embodiment, the PI store 280 would be implemented using this cookie-based architecture.

The user store 360 may be implemented in a variety of ways. Referring to FIG. 2, the user store 360 may comprise a database residing on the PI Host 290. Under this approach, the personal configuration data for each individual end user 210 is stored as a separate record or object in the database. In addition, or as an alternative, the end user data could be distributed in a manner similar to the cookie/cache architecture describe above with respect to the PI store 280.

In a preferred embodiment, the user store 360 could be implemented through personal information configuration (PIC) files. PIC files store a personal profile such as name, address, and social security number in secure, encrypted fashion for each end user. PIC files facilitate automatic registration of end users with information Providers via the end user configuration component 330. This component will read the PIC file and, using retrieved personal information, pre-populate registration templates for selected Providers. Then, it will prompt the user to enter required information that is missing from profile, if necessary. If the information is complete, the registration is automatically completed. Next, the end user configure component 330 completes any Provider registration forms, gets responses and updates the end user's PIC.

The four primary processing components access and manipulate the data in the three stores. The processing components may execute on a single processor, such as a file server computer system based on a Pentium class (MMX, PRO, II, III, etc.) central processing unit or an equivalent, or multiple processors. These four processing components are the Baseline configure component 320, the end user configure component 330, the PI access/transact component 340 and the PI delivery component 350 as seen in FIG. 3. The Baseline configure component 320 provides the interface by which new user selectable PI providers are added to the system. This component 320 might be implemented in a variety of ways including trial and error followed by manual entry of configuration information, semi-automated trial and error (automated location of Hypertext Markup Language (HTML) <FORM> elements, Javascript functions and Java applets) followed by manual entry of configuration information or, preferably, configuration by example (executing the protocol in a simulated Web client where the simulated Web client automatically generates a list of required data and a list of steps in the access process). These processes would be utilized at two levels: the first level being the set of data and steps required for general access to the particular PI provider and the second level being the set of additional data and steps required for accessing each particular piece of PI on the PI provider's site. The baseline configuration component 320 may be triggered independently when a new PI provider is added to the system, or it might be triggered as a result of a failure of the PI access/transact component 340 potentially indicating a change in access requirements for the failed access. This latter warning would more likely result where the PI access/transact component 340 has made a comparison between requirements supplied by the Provider store 310, both general to the PI provider and specific to the PI or transaction, and the end user data supplied by the user store 360 after seeking end user verification via a request of the end user to confirm the previously entered

US 6,567,850 B1

7

required access data via the end user configure component 330 and found an inconsistency. When an inconsistency is determined, updates to the Provider store 320 are made to bring the Provider data into conformance with current access/transaction requirements.

The end user configure component 330 allows an end user to select and configure PI and transactions of interest to the specific user. This configuration information is maintained in the user store 360. When an end user initially subscribes to the system according to the present invention, the system allows the user to select the types and sources of PI and/or transactions desired. First, the system requests permission from the end user to act on his behalf to obtain any selected PI and to execute any authorized transactions. Next, the system provides the user with a list of known information suppliers and the types of PI supplied from and transactions supported by the particular PI provider from the Provider store 320. The system requests the verification data necessary for accessing each selected PI provider and the additional data required by the particular PIs and/or transactions desired from that PI provider. Assuming the end user is already a registered user with the selected PI provider or the particular PI provider does not require prior registration, the data supplied by the end user is placed in the user store 360.

One method of obtaining any cookie data would be for the end user to access each previously accessed PI utilizing the PI engine 240 as a proxy server. The PI engine 240 would pass the cookie data to the PI provider site with the appropriate Web page requests to obtain the PI or execute the transaction and with the end user's permission retain a copy of the cookie data in this record in the user store 360. An alternate means of obtaining the cookie data would be a direct upload of the cookie information from the end user's computer. In a preferred embodiment, no cookie data is necessary where a user is already registered with a provider. All that is necessary is the verification data for login.

If the end user does not have the requisite information because he is not a registered user of a selected PI provider, the user configure component 330 prompts the user for the information necessary to register the end user with the PI provider and performs the registration procedure required by the PI provider. A simulated Web client could perform this process automatically supplying the access data as required and sending any necessary cookie data. The manner in which such a simulated client registers the end user depends significantly upon the interaction method used on the PI provider Web site. If the Web site uses HTML forms and common gateway interface (CGI) applications, the end user configure component 330 can formulate a uniform resource locator (URL) to replicate the effect of actual form usage and submit this URL to the simulated Web client. The use of a URL to mimic an HTML form is equivalent to manually entering the data into the Web <FORM> element. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite Group Press, 1997, pp. 559–569. If the Web site uses a mixture of HTML forms and Javascript functions, a simulated Web client with a modified Javascript interpreter could effectively register the user by following the end user registration process for the particular PI provider. The registration process to follow would be obtained from the record of the particular PI provider in the Provider store 320. The Javascript interpreter in the simulated Web client would follow this procedure and supply the data supplied by the end user. A similar process could be used if the registration process on the PI provider Web site utilizes a Java applet. A Web client with a modified Java bytecode interpreter could effectively register the user by following the end user

8

registration process stored for the particular PI provider in the Provider store 320. The bytecode interpreter would supply the data previously entered by the end user rather than requiring interactive input from the end user. If the PI provider Web site utilizes a combination of forms, scripts and applets, the individual procedures above could be used in combination to accomplish the desired registration.

With reference to FIG. 2 and FIG. 3, a modification of the Java virtual machine (VM) could allow for automated interaction between the various functional components of the PI Engine 240 and Java applet available through provider Web servers 250. Templates for interacting with particular applets could reside in the Provider store 310. The specific input data utilized by such templates could be stored in the User store 360. When a functional component such as the end user configure 330 or the access/transact 340 components requires automated communication with a Java applet on a provider Web server 250, the modified Java VM would facilitate this interaction.

FIG. 10 illustrates one process utilizing such a modified Java VM to achieve such automated interaction. The functional component requiring interaction identifies the provider and the particular applet on that provider with which the component needs to interact in step 1010. In step 1020, the component accesses the necessary template for interacting with the applet from the Provider store 310. Proceeding to step 1030, the component accesses the User store 360 to obtain the data required by the template. The modified Java VM interprets the applet in step 1040 and, rather than requiring interactive input from a user as in a normal Java applet execution, awaits input from or output to the interacting functional component of the PI engine. In step 1050, the functional component supplies input data to the modified Java VM according to the accessed template and retrieved data and receives output data according to the accessed template. Steps 1040 and 1050 repeat so long as additional input to or output from the applet continues. Upon termination of the applet, the functional component continues with its own processing in step 1060.

A successful registration could result in displaying the registration information to the end user for future reference. Further, the end user configure component 330 stores the requisite access verification data for the PI provider and the additional data required to access the selected PI or transaction in the user store 360.

In a preferred embodiment of such automated registration, any necessary cookie data would be accepted and stored as needed by the end user configure component 330. In many cases, cookie data is session specific and, therefore, of little long term utility. Cookies generated during the registration process are used solely during the registration process then discarded once registration is complete.

A failed registration could result from several situations. First, the end user attempting to register with the PI provider does not qualify for registration; for example, an end user attempting to register with a bank with whom the end user does not maintain an account and where the bank only allows access to account holders. Next, the end user may have supplied improper or incorrect information. For example, a bank registration process might require a social security number, a password, a bank account number and the maiden name of the end user's mother; if the user entered an incorrect social security number, the registration process would fail. Finally, the PI provider may have altered the registration procedure for its Web site. In this situation, following the process supplied from the Provider store 320

US 6,567,850 B1

9

would yield a failed registration. In the instance of any registration failure, the end user could be presented with the data initially supplied to the system for registration. The system could then ask the end user to double check the correctness of the information provided and to correct and resubmit the data if an error is found. A second failure resulting from the submission of identical requisite data might generate an error message presented to the end user stating that either the end user is ineligible to access the selected PI from the selected PI provider or that alteration by the PI provider may have caused an error in registration. This second failure could also trigger a warning suggesting the need to potentially reconfigure the record for the PI provider in the Provider store 320.

Ultimately, the user store 360 would contain a record for each end user. This record as previous described could be a database entry, one or more cookies or a file such as a PIC file. Each record would identify the selected PI providers along with the general access verification data needed and also under each PI provider would be a list of PI supplied and transactions supported by the particular PI provider of interest to the end user along with the additional data, if any, necessary to access that PI or execute that transaction. Specifically, duplicative information such as an end user's name would be centrally stored in the record once.

The end user configure component 330 also allows the end user to select one or more delivery destinations. One destination might be the end user's computer as exemplified by the client computer 220 running client software 270 in FIG. 2; however, a computer is not the only destination contemplated by the present invention. The destination for PI delivery could include facsimile, electronic mail, telephone, conventional mail, pager, other wireless device such as a Palm Pilot (3 Com), Web page or channel, Web browser or other delivery mechanism. The present invention also contemplates indirect access to PI by the end user utilizing a Web site as an intermediary; however, such indirect access would not require the end user to specify a delivery destination unless additional delivery options were desired.

Further, access to the end user configure component 330 may occur through direct access to the PI engine via the Internet as contemplated by the client computer 220 running client software 270 in FIG. 2; however, alternative methods of access are equally feasible. For example, the user might indirectly access the PI engine through the use of an intermediary Web site. A telephone interface to allow access to the end user configure component is another alternative.

With reference to FIG. 3, the PI access/transact component 340 supports the update, acquisition and transaction functionality of the PI engine 240. The PI access/transact component 340 is responsible for accessing and storing user PI and executing transactions authorized by the end user. When access or update is needed for a selected end user, the PI access/transact component 340 combines information from the Provider store 320 and the user store 360 to update end user PI in the PI store 280. For each piece of PI requiring access or update, the PI access/transact component 340 looks up the access procedure and information needed for the particular PI in the Provider store 320. The verification and access data is found in the user store 360. The PI access/transact component 340 utilizes this information to connect to the PI provider's Web site across the Internet and to access the PI. Where multiple pieces of PI require updating or access, the accesses may occur in series or parallel.

Requested transactions would be similarly supported. For each transaction, the PI access/transact component 340

10

combines information from the Provider store 320 and the user store 360 to perform the requested transaction. The PI access/transact component 340 looks up the transaction procedure and information needed for the particular transaction in the Provider store 320. The verification and access data is found in the user store 360. The PI access/transact component 340 utilizes this information to perform the transaction across the Internet from the PI provider's Web site

A simulated Web client could perform access or transaction processes automatically supplying access and verification data as necessary. The manner in which such a simulated client access PI or execute transactions depends significantly upon the interaction method used on the PI provider Web site. If the Web site uses HTML forms and common gateway interface (CGI) applications, the PI access/transact component 340 can formulate a uniform resource locator (URL) to replicate the effect of actual form usage and submit this URL to the simulated Web client. The use of a URL to mimic an HTML form is equivalent to manually entering the data into the Web <FORM> element. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite Group Press, 1997, pp. 559–569. If the Web site uses a mixture of HTML forms and Javascript functions, a simulated Web client with a modified Javascript interpreter could effectively access the PI or perform the transaction by following the PI access/transact process for the particular PI or transaction respectively. The access or transaction process to follow would be obtained from the record of the particular PI or transaction in the Provider store 320. The Javascript interpreter in the simulated Web client would follow this procedure and supply the data found in the user store 360. A similar process could be used if the PI provider Web site utilizes a Java applet. A Web client with a modified Java bytecode interpreter could effectively access PI or perform transactions by following process stored for the particular PI or transaction in the Provider store 320. The bytecode interpreter would supply the data from the user store 360 rather than requiring interactive input from the end user. If the PI provider Web site utilizes a combination of forms, scripts and applets, the individual procedures above could be used in combination to accomplish the desired access.

In a preferred embodiment of such automated accesses or transactions, any necessary cookie data would be accepted and stored as needed by the PI access/transact component 340. In many cases, cookie data is session specific and, therefore, of little long term utility. Cookies generated are used solely during these functions then discarded once the mining or transaction operation is complete.

In order to provide personal information to an end-user quickly after login, it is necessary for the PI access/transact component 340 to select an end user for data harvesting prior to the login of the end user. One approach to this solution is to update all of an end user's PI whenever the end user, directly or through an intermediary Web site, requests access to his/her PI. Another approach would be to update all of an end user's PI supplied by a particular provider whenever PI from that supplier is requested. Thus, the act of logging into the system by an end user effectively selects that end user for immediate PI update. However, this approach may result in the inefficient use of the PI Engine 240 resources.

Given the large number of potential users and providers, and the goal of providing the freshest data possible, another embodiment includes an algorithm developed to optimize the schedule in which end users are selected for data harvesting from a provider. This algorithm factors in the provider's update policy, the user's login habits, and the

US 6,567,850 B1

11

user-provider account characteristics. The proper application of the algorithm should ensure that PI is harvested as infrequently as possible for a given user, thus minimizing system resource consumption.

If the next provider update time and the next expected user login can be accurately predicted, a model can be created that will allow for smarter harvesting. Rather than harvesting data for all users of a provider at once when the provider updates its site, the harvesting can be spread out over time based on expected login times of users and network activity profiles. For example, if Provider A updates its site on Friday night and a large number of users of that provider are not expected to login again until Monday morning, the harvesting load can be distributed across multiple days. This has the advantage of minimizing both the peak loading of the PI Engine 240 as well as consumption of the provider's bandwidth by the PI Engine 240. To gain this optimization, the PI Engine 240 must maintain and refine models of each provider and user. Such data can be maintained in the provider store 310 and the user store 360 respectively.

Each time a user utilizes the PI Engine 240, the time and date may be captured. Once a sufficient number of login times are accumulated, they may be analyzed with respect to day of month, day of week, and time of day. These are used in a model to predict the next expected user login. The model is then tested and refined with subsequent logins until a measurable degree of confidence is established. Once high confidence is determined, the user model is incorporated into the adaptive harvesting scheduler. Until a high confidence level is reached for a particular end user one of the aforementioned harvesting approaches may be used.

Each provider updates its site based on policy driven by their unique resources and business model. For any adaptive scheduler to work, the policy for each provider must be modeled. In some cases, the policy is self-evident. In others, it must be determined empirically. A provider's policy will most likely fall into one of the following categories:

Type I.  Updated periodically for all users

Type II.  Updated periodically relative to each user

Type III.  Updated in a pseudo-random manner

The following three approaches may be used based upon provider type.

Type I Provider Policy Scheduling Algorithm

1. Assume users with a "no confidence" model have an immediate login time.

2. Order the users chronologically based on their predicted login time.

3. Shift the expected login time for all users back one hour.

4. Perform a density curve fit along temporal boundaries to get a polynomial function that can be used to determine the number of user accounts to harvest for a given epoch.

5. Perform an integral matching algorithm with the inverse of the network activity curve for the time period in question to adjust the distribution curve.

6. If possible, re-distribute peak harvesting time toward time zero to flatten the distribution curve.

7. Assign harvesting times to the sorted users according to the distribution curve.

8. Monitor time and harvest the user account when appropriate.

Type II Provider Policy Scheduling Algorithm

For each provider that falls into this category, an attribute of the user must be identified that determines when the personal information is updated. In some cases, the user may need to be queried for the information. In others, it can be

12

determined from the harvested information. If the attribute cannot be established for a user via either of these means, the provider site may be monitored daily for changes in personal information until a pattern is established.

Since there is a natural, even distribution of accounts updated by a provider for a given day, a user's account can be harvested an hour before his expected login time. As in the Type I algorithm, users with a "no confidence" model should be immediately harvested.

Type III Provider Policy Scheduling Algorithm

This type of policy is the most difficult of all. Since the provider updates a user's account in a non-deterministic manner, a decision must be made for each provider as to the criticality of the information relative to the user. For those highly critical providers, each user account should be harvested daily, perhaps even more frequently. For those less critical providers, user accounts should be harvested less frequently and possible when overall system activity is low.

The PI deliver component 350 is responsible for formatting and delivering the PI to the end user. Usually delivery will only occur subsequent to updating all stale PI. The PI will be delivered to one or more destinations (e.g. facsimile, telephone, pager, Web browser, e-mail, etc.) as specified in the user store 360 except where the PI is accessed via an intermediary Web site. Where the destination is not an intermediary Web site, the PI deliver component 350 performs all formatting necessary to deliver the PI to the appropriate destinations. For example, where the destination is a Web browser, the PI would be formatted as an HTML document, or where the destination is a telephone, the PI would be submitted for voice synthesis and transmission.

In the case of an intermediary Web site, the PI is delivered in a format configurable by the intermediary Web site. FIG. 5 pictorial illustrates a possible embodiment of the current invention utilizing an intermediary Web site. An end user 210 utilizes a client computer 220 to access an intermediary Web site 510 across the Internet 230. The end user 210 logs into the intermediary Web site 510. The intermediary Web site 510 contacts the PI engine 240 across the Internet 230 and directly receives the end user's PI updated as required from the PI provider Web sites 250. The intermediary Web site 510 receives the PI, incorporates it into pages according to its particular formatting style and graphical user interface and delivers these pages to the end user 210. The use of the PI engine 240 is transparent to the end user 210. Further, an intermediary Web site 510 serving aggregate PI to an end user 210 may, and most likely will, simultaneously serve as a PI provider.

In another embodiment, this formatting occurs via a dynamic HTML generation system combining stylistic and layout information from a variety of sources. The PI deliver component 350 generates custom HTML pages dynamically. These pages are customized based on a number of stylistic factors (such as background color, foreground color, font size, color and style, page layout, etc.) from a variety of sources and content from a variety of sources. Information providers, distributors, the end user, the PI deliver component 350 or any combination of these sources, or other relevant sources, may provide customization factors used in the page generation. Finally, each HTML page must be filled in with data. The data used in such pages may originate from such sources as information providers, distributors, the end user, the PI deliver component 350 or any combination of these sources, or other relevant sources. The required solution is a system representing a generic algorithm for performing such HTML generation at run-time. The style and content may be provided in any suitable format such as the

US 6,567,850 B1

13

Extensible Stylesheet Language (XSL), as specified by W3C in http://www.w3.org/TR/WD-xsl/, which is expressly incorporated herein by reference in its entirety, and/or the Extensible Markup Language (XML) as specified by W3C in http://www.w3.org/TR/REC-xml, which is expressly incorporated herein by reference in its entirety, or other suitable formatting standard. The key requirements for such a system are complete encapsulation of the problem domain and run-time efficiency.

In preferred embodiments, the solution is based on the following basic model as depicted in FIG. 8:

1. Six sets of customization factors are identified: distributor content **810**, provider content **820**, distributor style specification **830**, provider style specification **840**, user-specific content **850** and user-specific style **860**.

2. Each set of customization factors **810**–**860** is considered a separate, independent and required input to the run-time system **870** that performs dynamic page generation.

3. Each input **810**–**860** will be in form of an XML stream.

4. Output **880** will be in form of an HTML stream.

5. The dynamic page generation system **870** will produce valid output **880** for each set of six valid inputs **810**–**860**.

FIG. 9 illustrates an actual run-time sequence of input processing by such a system **870**:

1. Distributor content **810** is combined with provider content **820** and with userspecific content **850** to produce a complete content specification **930** by the content merger unit **910**.

2. Distributor style **830** is combined with provider style **840** and with user specific style **860** to produce a complete style specification **940** by the style merger unit **920**.

3. The style specification **940** is applied by the style applicator **950** to content specification **930** in order to produce the resulting page **880**.

In order to completely encapsulate the problem domain, the following requirements must be placed on the system **870**:

1. Each XML input **810**–**860** is a valid XML stream.

2. All content specifications **810**, **820** and **850** are valid with respect to the same Document Type Definition.

3. All style specifications **830**, **840** and **860** are valid with respect to the same Document Type Definition (such as the XSL DTD standard).

4. The merging units **910** and **920** whose task is to take two or more XML streams and produce a combined XML output must be able to produce such output for any set of valid XML inputs.

Another method of performing this task would be to format PI as HTML elements with predefined CLASS attributes. The intermediary Web site receiving these elements could dynamically include them in page forwarded to the end user of the PI. The pages incorporating such elements could include different style information associated with the predefined CLASS set. Level 1 cascading style sheet convention could be used to implement such configurability. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite Group Press, 1997, pp. 651–693; Walsh, "An Introduction to Cascading Style Sheets," *World Wide Web Journal*, Winter 1997, pp. 147–156. This option requires minimal programmatic support by the intermediary Web site but restricts to some degree the intermediary Web sites flexibility in presenting the PI to the end user.

Alternatively, an intermediary Web site could develop an application utilizing a standardized application programming interface (API) to directly access the PI data. In this instance, the PI deliver component **350** could either be bypassed or potentially used as the component responsible

14

for servicing API requests for data. Under this model, the intermediary Web site would be responsible for all formatting decisions with respect to the raw PI data. This implementation option requires additional programmatic support by the intermediary Web site but allows for greater flexibility in the use of the raw PI.

The ability to utilize an intermediate Web site to deliver PI is of significant utility. This capability allows an end user already familiar with an existing PI provider to access not only the PI associated with the particular PI provider but also all PI from other PI providers in the comfort of a familiar user interface, namely the existing PI provider Web site. In this situation, the request for PI would directly originate with the intermediary PI provider Web site and indirectly from the end user. Security measures would restrict access to authorized intermediate Web site access. These measure might include verification of the end user and the intermediate Web site. Further, verification of the association between the end user and the particular intermediate Web site might also be required for additional security.

In addition, the use of an intermediary Web site also supports a novel transaction model. In this transaction model, the intermediary site subsidizes, or fully compensates, the PI engine administrator for services provided to the end user. These transactions are facilitated via the auditing and tracking capabilities of the PI engine. These capabilities allow the calculation of per user fees, per transaction fees, per access fees or some combination thereof to be assessed. The assessed values could be directly charged to the intermediary Web site. Alternatively, such values could be debited from a minimum monthly fee charged to the intermediary Web site with any fees beyond the minimum charged directly to the intermediary Web site.

FIG. 11 depicts a flowchart of a typical process according to the described model. The intermediary Web site pays a minimum monthly fee in step **1110**. In step **1120**, the PI engine audits and tracks end user usage via the intermediary Web site. The audited usage is used to assess a fee on a per user, per access, per transaction or combination basis. In step **1130**, this audited amount is debited from the fee paid in step **1110**. In step **1140**, the intermediary Web site is charged for any fees in excess of the minimum fee paid.

Often an end user may require access to the underlying Web page generated by the provider of a particular piece of PI. The delivery component may deliver not only the PI but also an access point directly to the provider's page supplying that PI. The access point may take the form of a link, a form button or some other interactive access mechanism.

Such an access point significantly improves the efficiency of accessing the underlying page by the end user as exhibited by FIG. 7. In the traditional process **100** for accessing PI, the end user must proceed through numerous intermediary pages requiring a variety of often tedious interactions before reaching the desired page.

The end user must first identify the Provider **110**. Next, the end user must locate the Provider's Web address **120**. Then, the user the requests the Provider's login page **130**. If the end user does not remember the requisite information, this information must be found, or the desired information will remain inaccessible via the Web. The end user then navigates the Provider's Web site **140**. This often entails visiting the Provider's main page **710** followed by viewing a variety of intermediate pages on the Provider's site **720**. The end user may have to backtrack several times to the main page **710** or accidentally leave the system entirely forcing a second login **140** before finally locating the desired information **150**.

US 6,567,850 B1

15

Utilizing springboard technology, the entire process 750 is streamlined into the single click of an access point. The delivery component of the PI Engine delivers an access point to the Provider's underlying page along with the PI. As a consequence, the end user need only perform a single interaction with the PI presentation page 760. This interaction immediately performs the requisite interactions with the Provider's Web site to bring the user to the desired underlying Web page 150.

In one embodiment, this springboard technology could be implemented utilizing a Java applet. With respect to FIG. 2, the applet would be downloaded from the PI Host 290 by the end user's client software 270, usually a Web browser, and executed locally by the end user's computer 220. The applet would drive the client software 270 to the desired page. Such an applet could retrieve procedures and data for driving the client software from the Provider store 310 and the User store 360.

In a further embodiment, the PI engine 240 could act as a proxy server directly accessing the Provider store 310 and the User store 360 as required. When the PI engine 240 receives the request to jump to the source of a particular piece of PI, the engine performs the necessary actions to navigate to the desire page and forwards the desired page to the end user's computer 220. Further interactions with the page might require additional proxying by the PI engine 240 as accumulated cookie data may reside on the PI Host 290. This embodiment is limited to use in handling standard HTTP traffic rather than secure HTTP traffic.

In a preferred embodiment, the springboard provides the end user with automated login into the PI Provider site 250 and allows the end user 210 to navigate via the client software 270. This automated login could be accomplished through the utilization of a hypertext transfer protocol (HTTP) redirect. Upon receiving the a springboard access request from the end user 210 via the client software 270, the PI Host 290 requests the login page from the PI Provider site 250 targeted by the springboard access. The PI engine 240 running on the PI Host 290 receives this login page and constructs a login request by accessing the proper data in the Provider store 310 and the User store 360. The login request is embedded in the HTTP redirect which is forward to the client software 270. The client software 270 is redirected to the targeted PI Provider site 250, and the end user 210 is automatically logged into this site.

Alternatively, this functionality could be implemented via a Java applet as described above. In addition, the PI engine 240 could generate a Javascript page containing the pertinent login request rather than an HTTP redirect. The Javascript page could be returned to the client software 270. This page would then be executed by the client software 270 to accomplish the automated login.

The PI engine 240 of FIG. 3 may also include a site monitor 370 processing component. This component would systematically monitor supported PI provider Web sites for changes. This component enhances the ability of the system to identify alterations in PI provider Web site procedures, data requirements and cookies requirements. This component increases system efficiency by supplementing or supplanting alteration identification via feedback from the PI access/transact component 340.

A further embodiment of the present invention might support the localize manipulation of PI. This could be accomplished where the client software 270 running on the client computer 220 in FIG. 2 is a specialized Web client rather than a general Web client such as Netscape. This specialized client might utilize Web channel technology to

16

automate the local PI download and update processes. Where the PI store is implemented via the aforementioned cookie architecture, this specialized client may provide direct local access to stored PI.

In another embodiment, the PI engine 240 of FIG. 3 might support both system supported PI providers as well as PI providers specific to particular end users. In this embodiment, an end user is not limited to PI available from PI providers present in the Provider store 310. For an end user to add PI provided by a non-supported PI provider, the end user would access the Baseline configure component 320 and create a configuration for the non-supported PI provider. The PI provider and PI configuration along with the verification and access data would be stored along with the user's record in the user store 360.

A further embodiment of the present invention supports the inclusion of PI transaction procedures and access requirements in the Provider store 310 of FIG. 3. The end user specific information necessary to realize such a transaction would reside with the user record in the user store 360. The functionality of the PI access/transact component 340 would expand to support the performance of transactions. This additional functionality could be supported in a manner similar to the procedure described above with respect to performance of access utilizing a simulated Web client. A further feature of this embodiment would include automated or semi-automated account management by providing trigger events to automatically initiate a transaction.

For instance, with reference to FIG. 2 an end user 210 would be able to maintain his/her accounts online through the PI Engine 240. If an information provider has the capability of receiving payments online, the PI Engine 240 could support complete or partial automation of such transactions. If there is a billing due date for a certain information provider, PI Engine 240 could flag that information and send email to the end user 210 notifying him/her of the bill due. Thus, the user will not have to check each of his/her providers individually for due date information. The PI Engine 240 could also automated payments on a limited range of billing amount for providers who allow payments over their Web servers 260, then send and email to the user with the notification of payment.

Due date acquisition could be accomplished utilizing the PI access/transact component 340 seen in FIG. 3. The due date information would be available to the end user via any delivery means supported by the PI deliver component 350. The PI access/transact component 340 would use standard e-commerce bill-paying methods to pay the user's bill/s to the provider if he/she chooses. Once the bill is paid, then an email notification will be sent to the user with the provider information and payment information. The user can specify the range of amount stored in the user store 360 that will be paid automatically. If the bill exceeds the amount specified by the user, then PI engine will simply send out an email notification to the user instead of paying the bill automatically.

The embodiments described above are given as illustrative examples only. It will be readily appreciated that many deviations may be made from the specific embodiment disclosed in this specification without departing from the invention. Accordingly, the scope of the invention is to be determined by the claims below rather than being limited to the specifically described embodiments above.

What is claimed is:

1. A method for monitoring interactions between a personal information provider and an end user of personal information via an intermediary computer to determine revenue derived from the interactions, comprising the steps of:

US 6,567,850 B1

**17**

(a) receiving from the intermediary computer a request concerning personal information associated with the end user;

(b) servicing the received request based on the personal information associated with the end user stored at the personal information provider;

(c) updating accounting data associated with the intermediary computer based on the serviced request; and

(d) generating an invoice to the intermediary computer based on the updated accounting data associated with the intermediary computer.

2. The method of claim 1, wherein the step of generating an invoice occurs periodically.

3. The method of claim 1, and further comprising the step of delivering the generated invoice to a selected destination.

4. The method of claim 3, wherein the selected destination is selected from the group consisting of an electronic mail destination, a print device, a Web page residing on a Web server, an Internet client, a telephone, and a facsimile.

5. The method of claim 1, and further comprising the step of debiting an account associated with the intermediary computer.

6. The method of claim 1, wherein the step of servicing the received request comprises providing personal information to the intermediary computer.

7. The method of claim 6, wherein the step of updating accounting data associated with the intermediary computer comprises incrementing a count of requests concerning personal information made via the intermediary computer for a selected time period.

8. The method of claim 7, and further comprising the step of debiting an account associated with the intermediary computer based on the count of requests.

9. The method of claim 6, wherein the step of updating accounting data associated with the intermediary computer comprises incrementing a count of users associated with the intermediary computer if an end user has not accessed his personal information via the intermediary computer for a selected time period.

10. The method of claim 9, and further comprising the step of debiting an account associated with the intermediary computer based on the count of users.

11. The method of claim 1, wherein the step of servicing the received request comprises executing a transaction involving personal information via the intermediary computer.

12. The method of claim 11, wherein the step of updating accounting data associated with the intermediary computer comprises incrementing a count of requests concerning personal information made via the intermediary computer for a selected time period.

13. The method of claim 12, and further comprising the step of debiting an account associated with the intermediary computer based on the count of requests.

14. The method of claim 11, wherein the step of updating accounting data associated with the intermediary computer comprises incrementing a count of users associated with the intermediary computer if an end user has not executed a transaction concerning his personal information via the intermediary computer for a selected time period.

15. The method of claim 14, and further comprising the step of debiting an account associated with the intermediary computer based on the count of users.

16. The method of claim 11, wherein the step of updating accounting data associated with the intermediary computer

**18**

comprises incrementing a commission total associated with the intermediary computer for a selected time period based on the executed transaction.

17. The method of claim 16, and further comprising the step of debiting an account associated with the intermediary computer based on the commission total.

18. A computer-readable storage device containing instructions that upon execution cause a processor to monitor interactions between a personal information provider and an end user of personal information via an intermediary computer to determine revenue derived from the interactions by performing the steps comprising of:

(a) receiving from the intermediary computer a request concerning personal information associated with the end user;

(b) servicing the received request based on the personal information associated with the end user stored at a selected information provider;

(c) updating accounting data associated with the intermediary computer based on the serviced request; and

(d) generating an invoice to the intermediary computer based on the updated accounting data associated with the intermediary computer.

19. The storage device of claim 18, and storing further instructions that upon execution cause the processor to perform the step of delivering the generated invoice to a selected destination.

20. The storage device of claim 18, and storing further instructions that upon execution cause the processor to perform the step of debiting an account associated with the intermediary computer.

21. A system for monitoring interactions between a personal information provider and an end user of personal information via an intermediary computer to determine revenue derived from the interactions, comprising:

(a) a personal information store for storing personal information associated with an end user;

(b) an accounting store for storing accounting data associated with the intermediary computer;

(c) a host computer in communication with the personal information store, the accounting store and the intermediary computer, the host computer comprising a processor for performing the steps of:

(i) receiving from the intermediary computer a request concerning personal information associated with the end user;

(ii) servicing the received request based on the personal information associated with the end user stored in the personal information store;

(iii) updating accounting data associated with the intermediary computer based on the serviced request in the accounting store; and

(iv) generating an invoice to the intermediary computer based on the updated accounting data associated with the intermediary computer from the accounting store.

22. The system of claim 21, wherein the host computer processor performs the additional step of delivering the generated invoice to a selected destination.

23. The system of claim 21, wherein the host computer processor performs the additional step of debiting an account associated with the intermediary computer.

\* \* \* \* \*

**EXHIBIT 25**



US006199077B1

(12) **United States Patent**

Inala et al.

(10) Patent No.: **US 6,199,077 B1**

(45) Date of Patent: **Mar. 6, 2001**

(54) **SERVER-SIDE WEB SUMMARY GENERATION AND PRESENTATION**

(75) Inventors: **Suman Kumar Inala**, Santa Clara; **P Venkat Rangan**, San Diego; **Ramakrishna Satyavolu**, Santa Clara, all of CA (US)

(73) Assignee: **Yodlee.com, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/323,598**

(22) Filed: **Jun. 1, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/208,740, filed on Dec. 8, 1998.

(51) Int. Cl.⁷ .......................... **G06F 17/21**

(52) U.S. Cl. .......................... **707/501**; 709/202; 709/218; 713/202; 704/1

(58) Field of Search .......................... 707/501, 513, 707/1, 3, 4, 5, 9–10; 713/201–202; 705/26–27; 709/202, 218; 704/1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,649,186 | * 7/1997 | Ferguson | 707/10 |
| 5,708,825 | * 1/1998 | Sotomayor | 707/501 |
| 5,794,233 | * 8/1998 | Rubinstein | 707/4 |
| 5,855,015 | * 12/1998 | Shoham | 707/5 |
| 5,931,907 | * 8/1999 | Davies et al. | 709/218 |
| 5,983,227 | * 11/1999 | Nazem et al. | 707/10 |
| 5,987,466 | * 11/1999 | Greer et al. | 707/10 |
| 6,029,180 | * 2/2000 | Murata et al. | 707/501 |
| 6,029,182 | * 2/2000 | Nehab et al. | 707/523 |
| 6,032,162 | * 2/2000 | Burke | 707/501 |
| 6,038,668 | * 8/2000 | Chipman et al. | 713/201 |
| 6,041,326 | * 3/2000 | Amro et al. | 707/10 |
| 6,108,686 | * 8/2000 | Williams, Jr. | 709/202 |
| 6,119,101 | * 9/2000 | Peckover | 705/10 X |

OTHER PUBLICATIONS

Stanley, Tracey, "Intelligent Searching Agents on the Web", 4 pages, <http://www.ariadne.ac.uk/issu7/search–engines/> Jan. 1997.*

Jansen, James, "Using an Intelligent Agent to Enhance Search Engine Performance", 16 pages, <http o://www.first-monday.dk/issues/issue2_3/jansen/> Dec. 1998.*

Lesser, Victor et al, "BIG: A Resource_Bounded Information Gathering Agent", 18 pages, <http://dis.cs.umass.edu/research/big/> Jan. 1998.*

* cited by examiner

*Primary Examiner*—Joseph H. Feild

(74) *Attorney, Agent, or Firm*—Donald R. Boys; Central Coast Patent Agency

(57) **ABSTRACT**

A portal server includes a software agent configured to do summary searches for subscribers based on Internet destinations provided by the subscribers, to retrieve information from such destinations based on pre-programmed site information, and to download the summary information to the subscriber. The destinations and the nature of the information to be retrieved is pre-programmed. There is further a configuration and intitiation interface for a subscriber to set up and start a summary search. In some cases the summary searches are configured for individual clients as templates stored and retrieved at the Internet-connected server. Also in some cases retrieved information is immediately sent to the subscriber, and in other situations such information is saved at the portal to be retrieved by a subscriber at a later time. In preferred embodiments of the invention autologins are accomplished for a subscriber at Internet destinations by use of pre-stored configuration information.

**12 Claims, 6 Drawing Sheets**





Fig. 1



*Fig. 2*



**Fig. 3**



Fig. 4



*Fig. 5*



117

New summary
process begins

119

Data base
reviewed

121

Knowledge worker
accesses site logic

123

Knowledge worker
modifies/creates
template if required

125

Template
is stored

127

Browser control
begins navigation
process

129

Auto logins
performed at
each site

131

Sites are parsed
for summary data

133

All data
stored

135

Data is
compiled and
rendered as HTML

137

WEB summary
made available to
user

*Fig. 6*

US 6,199,077 B1

1

# SERVER-SIDE WEB SUMMARY GENERATION AND PRESENTATION

## CROSS-REFERENCE TO RELATED DOCUMENTS

The present invention is a continuation in part (CIP) to patent application Ser. No. 09/208,740 entitled "Method and Apparatus for Providing and Maintaining a User-Interactive Portal System Accessible via Internet or other Switched-Packet-Network" filed on Dec. 8, 1998, pending, disclosure of which is incorporated herein in its entirety herein by reference.

## FIELD OF THE INVENTION

The present invention is in the field of Internet navigation including various communication means and connection technologies and pertains more particularly to methods and apparatus, including software, for gathering summary information from users or enterprise-selected WEB sites and presenting the information as HTML to the user using either a push or pull technology.

## BACKGROUND OF THE INVENTION

The information network known as the World Wide Web (WWW), which is a subset of the well-known Internet, is arguably the most complete source of publicly accessible information available. Anyone with a suitable Internet appliance such as a personal computer with a standard Internet connection may access (go on-line) and navigate to information pages (termed web pages) stored on Internet-connected servers for the purpose of garnering information and initiating transactions with hosts of such servers and pages.

Many companies offer various subscription services accessible via the Internet. For example, many people now do their banking, stock trading, shopping, and so forth from the comfort of their own homes via Internet access. Typically, a user, through subscription, has access to personalized and secure WEB pages for such functions. By typing in a user name and a password or other personal identification code, a user may obtain information, initiate transactions, buy stock, and accomplish a myriad of other tasks.

One problem that is encountered by an individual who has several or many such subscriptions to Internet-brokered services is that there are invariably many passwords and/or log-in codes to be used. Often a same password or code cannot be used for every service, as the password or code may already be taken by another user. A user may not wish to supply a code unique to the user such as perhaps a social security number because of security issues, including quality of security, that may vary from service to service. Additionally, many users at their own volition may choose different passwords for different sites so as to have increased security, which in fact also increases the number of passwords a user may have.

Another issue that can plague a user who has many passworded subscriptions is the fact that they must book-mark many WEB pages in a computer cache so that they may quickly find and access the various services. For example, in order to reserve and pay for airline travel, a user must connect to the Internet, go to his/her book-marks file and select an airline page. The user then has to enter a user name and password, and follow on-screen instructions once the page is delivered. If the user wishes to purchase tickets

2

from the WEB site, and wishes to transfer funds from an on-line banking service, the user must also look for and select the personal bank or account page to initiate a funds transfer for the tickets. Different user names and passwords may be required to access these other pages, and things get quite complicated.

Although this preceding example is merely exemplary, it is generally known that much work related to finding WEB pages, logging in with passwords, and the like is required to successfully do business on the WEB.

A service known to the inventor and described in the related case listed under the cross-reference to related documents section provides a WEB service that allows a user to store all of his password protected pages in one location such that browsing and garnering information from them is much simplified. A feature of the above service allows a user to program certain tasks into the system such that requested tasks are executed by an agent (software) based on user instruction. The service stores user password and log-in information and uses the information to log-in to the user's sites, thus enabling the user to navigate without having to manually input log-in or password codes to gain access to the links.

The above-described service uses a server to present a user-personalized application that may be displayed as an interactive home page that contains all of his listed sites (hyperlinks) for easy navigation. The application lists the user's URL's in the form of hyperlinks such that a user may click on a hyperlink and navigate to the page wherein login, if required, is automatic, and transparent to the user.

The application described above also includes a software agent that may be programmed to perform scheduled tasks for the user including returning specific summaries and updates about user-account pages. A search function is provided and adapted to cooperate with the software agent to search user-entered URL's for specific content if such pages are cached somewhere in their presentable form such as at the portal server, or on the client's machine.

In addition to the features described above, it is desirable that the software agent in conjunction with the search function be enabled to navigate to any URL or group of URL's, provided as input by a user or otherwise deemed appropriate by the service provider, for the purpose of providing summary information regarding updated content for each URL, which may be presented as an HTML information-page to the user.

What is clearly needed is a method and apparatus that can independently navigate to user-supplied or known URL's, login with the appropriate password information at each URL (if required), and return requested summary information to a user in the form of a human and machine-readable HTML document. Such a system would provide an effective summarization service wherein important information may be presented to a user without requiring that the user invoke hyperlinks at his personal portal home page.

## SUMMARY OF THE INVENTION

In a preferred embodiment of the present invention an Internet Portal is provided, comprising an Internet-connected server; and a portal software executing on the server, including a summary software agent. The Portal maintains a list of Internet destinations specific for a subscriber, and the summary software agent accesses the Internet destinations, retrieves information according to pre-programmed criteria, and summarizes the retrieved information for delivery to the subscriber.

US 6,199,077 B1

3

In one embodiment the Portal further comprises a configuration and initiation interface for a subscriber to set up and start a summary search, and summary searches may be configured for individual clients as templates stored and retrieved at the Internet-connected server. In some cases summary information is stored to be later downloaded at request of the subscriber, and in others the information is immediately pushed to the client. Also in some embodiments autologins are performed for the subscriber at each Internet site according to a data stored for the subscriber at the Portal.

Methods for practicing the invention in several embodiments are provided as well in the descriptions that follow, and for the first time a system is enabled allowing subscribers to quickly access multiple WEB sites without lengthy log-in procedures, and to also summarize and download the data resulting from a summary search.

## BRIEF DESCRIPTION OF THE DRAWINGS FIGURES

FIG. 1 is an overview of an Internet portal system and network according to an embodiment of the present invention.

FIG. 2 is an exemplary plan view of a personalized Portal home page application as it may be seen on a display monitor according to an embodiment of the present invention.

FIG. 3 is a flow diagram illustrating user interaction with the Internet portal of FIG. 1.

FIG. 4 is a block diagram illustrating a summarization software agent and capabilities thereof according to an embodiment of the present invention.

FIG. 5 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 operating in a user-defined mode.

FIG. 6 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 in a User-independent smart mode with minimum user input.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

According to a preferred embodiment of the present invention, a unique Internet portal is provided and adapted to provide unique services to users who have obtained access via an Internet or other network connection from an Internet-capable appliance. Such an interface provides users with a method for storing many personal WEB pages and further provides search function and certain task-performing functions. The methods and apparatus of the present invention are taught in enabling detail below.

FIG. 1 is an overview of an Internet portal system 11 and Internet network 13 according to an embodiment of the present invention. Portal system 11, in this embodiment, operates as an ISP in addition to a unique network portal, but may, in other embodiments be implemented as a stand-alone Internet server. In yet other embodiments the service and apparatus described herein may also be provided by such as a search and listing service (AltaVista™, Yahoo™) or by any other enterprise hosting a WEB-connected server.

Internet 13 is representative of a preferred use of the present invention, but should not be considered limiting, as the invention could apply in other networks and combinations of networks.

ISP 15 in this embodiment comprises a server 31, a modem bank 33, represented here by a single modem, and

4

a mass storage repository 29 for storing digital data. The modem bank is a convenience, as connection to the server could be by another type of network link. ISP 15, as is typical in the art, provides Internet access services for individual subscribers. In addition to well-known Internet access services, ISP 15 also provides a unique subscription service as an Internet portal for the purpose of storing many WEB pages or destinations along with any passwords and/or personal codes associated with those pages, in a manner described in more detail below. This unique portal service is provided by execution of Portal Software 35, which is termed by the inventors the Password-All suite. The software of the invention is referred to herein both as the Portal Software, and as the Password-all software suite. Also, in much of the description below, the apparatus of the invention is referred to by the Password-All terminology, such as the *Password-All Server or Password-All Portal.*

ISP 15 is connected to Internet 13 as shown. Other equipment known in the art to be present and connected to a network such as Internet 13, for example, IP data routers, data switches, gateway routers, and the like, are not illustrated here but may be assumed to be present. Access to ISP 15 is through a connection-oriented telephone system as is known in the art, or through any other Internet/WEB access connection, such as through a cable modem, special network connection (e.g. T1), ISDN, and so forth. Such connection is illustrated via access line 19 from Internet appliance 17 through modem bank 33.

In a preferred embodiment a user has access to Internet Password-All Portal services by a user name and password as is well known in the art, which provides an individualized WEB page to the subscriber. In another embodiment wherein a user has other individuals that use his or her Internet account, then an additional password or code unique to the user may be required before access to portal 31 is granted. Such personalized Portal WEB pages may be stored in repository 29, which may be any convenient form of mass storage.

Three Internet servers 23, 25, and 27, are shown in Internet 13, and represent Internet servers hosted by various enterprises and subscribed to by a user operating an Internet appliance 17. For example, server 23 may be a bank server wherein interactive on-line banking and account managing may be performed. Server 25 may be an investment server wherein investment accounts may be created and managed. Server 27 may be an airline or travel server wherein flights may be booked, tickets may be purchased, and so on. In this example, all three servers are secure servers requiring user ID and password for access, but the invention is not necessarily limited to just secure services.

In a preferred embodiment of the present invention, a subscribing user operating an Internet-capable appliance, such as appliance 17, connects to Password-All Portal system 11 hosted by ISP 15, and thereby gains access to a personalized, interactive WEB page, which in turn provides access to any one of a number of servers on Internet 13 such as servers 23, 25, and 27, without being required to enter additional passwords or codes. In a preferred embodiment the software that enables this service is termed Password-All by the inventors. Password-All may be considered to be a software suite executing on the unique server, and in some instances also on the user's station (client). Additional interactivity provided by portal software 35 allows a connected user to search his listed pages for information associated with keywords, text strings, or the like, and allows a user to program user-defined tasks involving access and interaction with one or more Internet-connected servers such

US 6,199,077 B1

5

as servers 23, 25, and 27 according to a pre-defined time schedule. These functions are taught in enabling detail below.

FIG. 2 is an illustration of a personalized portal page as may be seen on a display monitor according to an embodiment of the present invention, provided by Password-All Portal software 35 executing on server 31, in response to secure access by a subscriber. Page 32 presents an interactive listing 34 of user-subscribed or member WEB pages, identified in this example by URL, but which may also be identified by any convenient pseudonym, preferably descriptive, along with user name and typically encrypted password information for each page. Listed in a first column under destination, are exemplary destinations LBC.com, My Bank.com, My Stocks.com, My shopping.com, Mortgage.com, and Airline.com. These are but a few of many exemplary destinations that may be present and listed as such on page 33. In order to view additional listings listed but not immediately viewable from within application 33, a scroll bar 35 is provided and adapted to allow a user to scroll up or down the list to enable viewing as is known in the art.

Items listed in list 34 in this example may be considered destinations on such as servers 23, 25, and 27 of FIG. 1. Typically the URL associated with an item on this list will not take a user to a server, per se, but to a page stored on a server. User names and password data associated with each item in list 34 are illustrated in respective columns labeled user name, and password, to the right of the column labeled destination. Each listing, or at least a portion of each listing, is a hyperlink invoking, when selected, the URL to that destination. In some instances a particular service may have more than one associated URL. For example, My Bank.com may have more than one URL associated for such as different accounts or businesses associated also with a single subscriber. In this case there may be a sub-listing for different destinations associated with a single higher-level listing. This expedient is not shown, but given this teaching the mechanism will be apparent to those with skill in the art.

In some embodiments one page 33 may be shared by more than one user, such as a husband and wife sharing a common account and subscription. An instance of this is illustrated herein with respect to the server labeled Mortgage.com wherein both a John and a Jane Doe are listed together under the column labeled user name. In another embodiment, a network of individuals, perhaps business owners, authorized co-workers, investment parties, or the like may share one application. In this way, system 11 may be adapted for private individuals as well as business uses.

After gaining access to application 33 which is served via Internet portal server 31 of FIG. 1, a user may scroll, highlight, and select any URL in his or her list 34 for the purpose of navigation to that particular destination for further interaction. Application 33 already has each password and user name listed for each URL. It is not necessary, however, that the password and user name be displayed for a user or users. These may well be stored transparently in a user's profile, and invoked as needed as a user makes selections. Therefore, a user is spared the need of entering passwords and user names for any destinations enabled by list 34. Of course, each list 34 is built, configured and maintained by a subscribing user or users, and an editing facility is also provided wherein a user may edit and update listings, including changing URL's adding and deleting listings, and the like.

In another aspect of the invention new listings for a user's profile, such as a new passthrough to a bank or other

6

enterprise page, may be added semi-automatically as follows: Typically, when a user opens a new account with an enterprise through interaction with a WEB page hosted by the enterprise, the user is required to provide certain information, which will typically include such as the user's ID, address, e-mail account, and so forth, and typically a new user name and password to access the account. In this process the user will be interacting with the enterprise's page from his/her browser. A Password-All plug-in is provided wherein, after entering the required information for the new enterprise, the user may activate a pre-determined signal (right click, key stroke, etc.), and the Password-All suite will then enter a new passthrough in the user's Password-All profile at the Password-All Portal server.

In a related method for new entries, the enterprise hosting the Password-All Portal may, by agreement with other enterprises, provide log-in and sign-up services at the Password-All Portal, with most action transparent to the user. For example, there may be, at the Password-All Portal, a selectable browser list of cooperating enterprises, such as banks, security services, and the like, and a user having a Password-All Portal subscription and profile may select among such cooperating enterprises and open new accounts, which will simultaneously and automatically be added to the Password-All Portal page for the user and to the server hosted by the cooperating enterprise. There may be some interactivity required for different accounts, but in the main, much information from the user's profile may be used directly without being re-entered.

The inventors have anticipated that many potential users may well be suspicious of providing passwords and user names to an enterprise hosting a Password-All Portal Server executing a service like Password-All according to embodiments of the present invention. To accommodate this problem, in preferred embodiments, it is not necessary that the user provide the cleartext password to Password-All. Instead, an encrypted version of each password is provided. When a user links to his passthrough page in Password-All at the Password-All Portal server, when he/she invokes a hyperlink, the encrypted password is returned to the user's system, which then, by virtue of the kept encryption key or master password, invokes the true and necessary password for connection to the selected destination. It is thus not necessary that cleartext passwords be stored at the Password-All Portal server, where they may be vulnerable to attack from outside sources, or to perceived misuse in other ways as well.

In a related safety measure, in a preferred embodiment of the invention, a user's complete profile is never stored on a single server, but is distributed over two or more, preferably more, servers, so any problem with any one server will minimize the overall effect for any particular user.

Password-All, as described above, allows a user to access a complete list of the user's usual cyberspace destinations, complete with necessary log-on data, stored in an encrypted fashion, so a user may simply select a destination (a hyperlink) in the Password-All list, and the user's browser then invokes the URL for the selected destination. In an added feature, Password-All may display banner ads and other types of advertisement during the navigation time between a hyperlink being invoked and the time the destination WEB page is displayed.

In yet another embodiment of the invention, a user/subscriber need not access the Password-All page to enjoy the advantages of the unique features provided. In this variation, a Plug-In is provided for the subscriber's WEB

US 6,199,077 B1

7

browser. If the subscriber navigates by use of the local browser to a WEB page requiring a secure log-in, such as his/her on-line banking destination, when the subscriber is presented with an input window for ID and Password, the plug in may be activated by a predetermined user input, such as a hot key or right click of the mouse device. The plug-in then accesses, transparently, the Password-All page (which may be cached at the client), and automatically accesses and provides the needed data for log-on.

In yet another aspect of the invention a search option 37 allows a user to search list 34 for specific URL's based on typed input such as keywords or the like. In some cases, the number of URL's stored in list 34 can be extensive making a search function such as function 37 an attractive option. A criteria dialog box 51 illustrated as logically separated from and below list 34 is provided and adapted to accept input for search option 37 as is known in the art. In one embodiment, search option 37 may bring up a second window wherein a dialog box such as box 51 could be located.

In another aspect of the invention the search function may also be configured in a window invoked from window 33, and caused to search all or selected ones of listed destinations, and to return results in a manner that may be, at least to some extent, configured by a user. For example, a dialog box may be presented wherein a user may enter a search criteria, and select among all of the listed destinations. The search will then be access each of the selected destinations in turn, and the result may be presented to the user as each instance of the criteria is found, or results may be listed in a manner that may be accessed after the search.

Preferably the search function is a part of the Password-All Portal software, available for all users, and may be accessed by hyperlinks in user's personal pages. In some embodiments users may create highly individualized search functions that may be stored in a manner to be usable only by the user who creates such a function.

In many aspects of the present invention, knowledge of specific WEB pages, and certain types of WEB pages, is highly desirable. In many embodiments characteristics of destination WEB pages are researched by persons (facilitators) maintaining and enhancing Password-All Portal software 35, and many characteristics may be provided in configuration modules for users to accomplish specific tasks. In most cases these characteristics are invoked and incorporated transparent to the user.

In yet another aspect of the present invention, the Password-All suite is structured to provide periodic reports to a user, in a manner to be structured and timed by the user, through the user's profile. For example, reports of changes in account balances in bank accounts, stock purchases, stock values, total airline travel purchases, frequent-flier miles, and the like may be summarized and provided to the users in many different ways. Because the Password-All Portal server with the Password-All software site handles a broad variety of transactional traffic for a user, there is an opportunity to summarize and collect and process statistics in many useful ways. In preferred embodiments of the invention such reports may be furnished and implemented in a number of different ways, including being displayed on the user's secure personal WEB page on the Password-All Portal.

In addition to the ability of performing tasks as described above, task results including reports, and hard documents such as airline tickets may be sent over the Internet or other data packet-networks to user-defined destinations such as fax machines, connected computer nodes, e-mail servers,

8

and other Internet-connected appliances. All tasks may be set-up and caused to run according to user-defined schedules while the user is doing something else or is otherwise not engaged with the scheduled task.

In another embodiment of the present invention, recognizing the increasing use of the Internet for fiscal transactions, such as purchasing goods and services, a facility is provided in a user's profile to automatically track transactions made at various destinations, and to authorize payment either on a transaction-by-transaction basis, or after a session, using access to the user's bank accounts, all of which may be pre-programmed and authorized by the user.

Other functions or options illustrated as part of application 35 include a last URL option 41, an update function 43, and an add function 45. Function 41 allows a user to immediately navigate to a last visited URL. Update function 43 provides a means of updating URL's for content and new address. An add function enables a user to add additional URL's to list 34. Similarly, function 45 may also provide a means to delete entries. Other ways to add accounts are described above. It should be noted that the services provided by the unique Password-All Portal in embodiments of the present invention, and by the Password-All software suite are not limited to destinations requiring passwords and user names. The Password-All Portal and software in many embodiments may also be used to manage all of a user's bookmarks, including editing of bookmarks and the like. In this aspect, bookmarks will typically be presented in indexed, grouped, and hierarchical ways.

There are editing features provided with Password-All for adding, acquiring, deleting, and otherwise managing bookmarks. As a convenience, in many embodiments of the invention, bookmarks may be downloaded from a user's Password-All site, and loaded onto the same user's local browser. In this manner, additions and improvements in the bookmark set for a user may be used without the necessity of going to Password-All. Further, bookmarks may be uploaded from a user's local PC to his/her home page on the Password-All site by use of one or more Password-All plug-ins.

It will be apparent to the skilled artisan, given the teaching herein, that the functionality provided in various embodiments of the invention is especially applicable to Internet-capable appliances that may be limited in input capability. For example, a set-top box in a WEB TV application may well be without a keyboard for entering IDs and Passwords and the like. In practice of the present invention keyboard entry is minimized or eliminated. The same comments apply to many other sorts of Internet appliances.

In preferred embodiments of the invention, once a subscriber-user is in Password-All, only an ability to point-and-click is needed for all navigation. To get into the Password-All site, using a limited apparatus, such as an appliance without a keyboard or keypad, a Smartcard or embedded password may be used, or some other type of authentication.

It will be apparent to one with skill in the art that an interactive application such as application 33 may be provided in a form other than a WEB page without departing from the spirit and scope of the present invention. For example, an application such as application 33 may be provided as a downloadable module or program that may be set-up and configured off-line and made operational when on-line.

FIG. 3 is a flow diagram illustrating user interaction with the Internet Password-All Portal of FIG. 1. The following

US 6,199,077 B1

9                                                                              10

process steps illustrated, according to an embodiment of the present invention, are intended to illustrate exemplary user-steps and automated software processes that may be initiated and invoked during interaction with an Internet portal of the present invention such as portal 31 of FIG. 1. In step 53 a user connects to the Internet or another previously described switched-packet network via a compatible appliance such as Internet appliance 17 of FIG. 1.

At step 55, a user enters a user-name and password, which, in one embodiment, may simply be his ISP user name and password. In another embodiment, a second password or code would be required to access an Internet portal such as portal server 31 of FIG. 1 after logging onto the Internet through the ISP. In some cases, having a special arrangement with the ISP, there may be one password for both Internet access through the ISP and for Password-All. At step 57 a personal WEB page such as page 32 of FIG. 2 is displayed via Internet portal server 31. At minimum, the personalized WEB page will contain all user configured URL's, and may also be enhanced by a search function, among other possibilities.

In step 58 a user will, minimally, select a URL from his or her bookmarked destinations, and as is known by hyperlink technology, the transparent URL will be invoked, and the user will navigate to that destination for the purpose of normal user interaction. In this action, the Password-All Portal software transparently logs the user on to the destination page, if such log-on is needed.

At step 60 the user invokes a search engine by clicking on an option such as described option 37 of FIG. 2. At step 62, the user inputs search parameters into a provided text field such as text field 51 of FIG. 2. After inputting such parameters, the user starts the search by a button such as button 52. The search engine extracts information in step 64. Such information may be, in one option, of the form of URL's fitting the description provided by search parameters. A searched list of URL's may be presented in a separate generated page in step 66 after which a user may select which URL to navigate to. In an optional search function, the user may provide search criteria, and search any or all of the possible destinations for the criteria.

In another embodiment wherein WEB pages are cached in their presentable form, information extracted in step 64 may include any information contained in any of the stored pages such as text, pictures, interactive content, or the like. In this case, one displayed result page may provide generated links to search results that include the URL associated with the results. Perhaps by clicking on a text or graphic result, the associated WEB page will be displayed for the user with the result highlighted and in view with regards to the display window.

Enhanced Agent for WEB Summaries

In another aspect of the present invention, a software agent, termed a gatherer by the inventors, is adapted to gather and return summary information about URL's according to user request or enterprise discretion. This is accomplished in embodiments of the present invention by a unique scripting and language parsing method provided by the inventor wherein human knowledge workers associated with the service provide written scripts to such a gatherer according to subscriber or enterprise directives. Such a software gatherer, and capabilities thereof, is detailed in enabling detail below.

Referring now to FIG. 1, there is illustrated an exemplary architecture representing a portal service-network which, in this case is hosted by ISP 15. Portal software 35 in this embodiment executes on portal server 31 set-up at the ISP location. Mass repository 29 is used for storing subscriber information such as passwords, login names, and the like. Internet servers 23, 25, and 27 represent servers that are adapted to serve WEB pages of enterprises patronized by a subscriber to the portal service such as one operating Internet appliance 17.

The main purpose of portal software 35 as described above with reference to FIG. 2, is to provide an interactive application that lists all of the subscriber's WEB sites in the form of hyperlinks. When a user invokes a hyperlink from his personal list, software 35 uses the subscriber's personal information to provide an automatic and transparent login function for the subscriber while jumping the subscriber to the subject destination.

Referring again to FIG. 2, an interactive list 34 containing user-entered hyperlinks and a set of interactive tools is displayed to a subscriber by portal software 35 of FIG. 1. One of the tools available to a subscriber interacting with list 34 is agent (software) 39. Agent 39 may be programmed to perform certain tasks such as obtaining account information, executing simple transactions, returning user-requested notification information about upcoming events, and so on. Search function 37 and update function 43 may be integrated with agent 39 as required to aid in functionality.

It is described in the above disclosure that agent 39 may, in some embodiments, search for and return certain summary information contained on user-subscribed WEB pages, such as account summaries, order tracking information and certain other information according to user-defined parameters. This feature may be programmed by a user to work on a periodic time schedule, or on demand.

In the following disclosure, enhancements are provided to agent 39. Such enhancements, described in detail below, may be integrated into agent 39 of portal software 35 (FIGS. 1 and 2) and may be provided as a separate agent or gatherer to run with portal software 35; or may, in some embodiments, be provided as a standalone service that is separate from portal software 35.

FIG. 4 is a block diagram illustrating a summarization software agent 67 and various capabilities and layers thereof according to an embodiment of the present invention. Summarization agent 67, hereinafter termed gatherer 67, is a programmable and interactive software application adapted to run on a network server. Gatherer 67 may, in one embodiment, be integrated with portal software 35 of FIG. 1 and be provided in the form of a software module separate from agent 39 (FIG. 2). In another embodiment, gatherer 67 may be a part of agent 39 as an enhancement to the function of that agent as previously described. In still another embodiment, gatherer 67 may be provided as a parent or client-side application controlled by a separate service from the portal service described above.

In this exemplary embodiment gatherer 67 is a multi-featured software application having a variety of sub-modules and interface modules incorporated therein to provide enhanced function. Gatherer 67 has a client/service interface layer 69 adapted to enable directive input from both a client (user) and a knowledge worker or workers associated with the service. A browser interface 77 is provided in layer 69, and adapted to provide access to application 67 from a browser running on a client's PC or other Internet or network appliance. Interface 77 facilitates bi-directional communication with a user's browser application (not shown) for the purpose of allowing the user to input summary requests into gatherer 67 and receive sum-

US 6,199,077 B1

**11**

mary results. Interface 77 supports all existing network communication protocols such as may be known in the art, and may be adapted to support future protocols.

Layer 69 also comprises a unique input scripting module 79 that is adapted to allow a human knowledge worker to create and supply directive scripts containing the site logic needed by gatherer 67 to find and retrieve data from a WEB site. In this case, gatherer 67 executes and runs on a network server such as server 31 of FIG. 1. However, this is not required in order to practice the present invention.

It is assumed in this example that gatherer 67 is part of the portal software suite 35 running on server 31 of FIG. 1. Gatherer 67 may be provided as several dedicated agents, or as one multi-functional agent without departing from the spirit and scope of the present invention. For example, one gatherer 67 may be scripted and programmed to execute a single user request with additional gatherers 67 called upon to perform additional user-requests. Alternatively, one gatherer 67 may be dedicated and assigned to each individual user and adapted to handle all requests from that user.

Interface layer 69 facilitates exchange of information from both a client and a knowledge worker. A client operating a WEB browser with an appropriate plug-in is enabled to communicate and interact with gatherer 67. For example, a user may enter a request to return a summary of pricing for all apartments renting for under $1000.00 per month located in a given area (defined by the user) from apartments.com (one of user's registered WEB sites). The just mentioned request would be categorized as either a periodic request, or a one time (on demand) request. The communicated request initiates a service action wherein a knowledge worker associated with the service uses module 79 to set-up gatherer 67 to perform it's function. Module 79 is typically executed from a network-connected PC operated by the knowledge worker.

According to an embodiment of the present invention, a unique scripting method facilitated by module 79 is provided to enable gatherer 67 to obtain the goal information requested by a user. For example, the above mentioned example of WEB-site apartments.com has a specific HTML (hyper-text-markup-language) logic that it uses to create its site and post its information. Such site logic is relatively standard fare for a majority of different sites hosted by different entities. Using this knowledge, a knowledge worker creates a site-specific script or template for gatherer 67 to follow. Such a template contains descriptions and locations of the appropriate fields used, for example, at apartments.com. Apartment description, location, deposit information, rental information, agent contact information, and other related fields are matched in terms of location and label description on the template created with module 79. Completed templates are stored in a database contained in a storage facility such as, perhaps, repository 29 of FIG. 1. Such templates may be reused and may be updated (edited) with new data.

In one embodiment, one script may contain site logics for a plurality of WEB pages, and instructions for specific navigational instruction and password or login information may be contained therein and executed serially, such as one site at a time. It is important to note that the knowledge worker or workers may perform much of their scripting via automatic controls such as by object linking and embedding (OLE) and a minor portion of scripting may be performed manually in an appropriate computer language, many of which are known in the art.

Gatherer 67 also has a process layer 71 adapted for internal information gathering and parameter configuration.

**12**

An optional portal server interface 81 is provided and adapted to allow gatherer 67 to provide updated information to a user's list of hyperlinks and also to obtain data from portal server 31 if required. For example, required hyperlinks may be mirrored from a user's home page to a scripting template for navigational purposes. In an embodiment wherein gatherer 67 is part of a standalone service, a convention for providing user login information may be supplied at the client's end when a request is made. For example, an encrypted password may be supplied by a client plug-in and gatherer 67 may temporarily borrow the user's encryption key when auto login is performed.

An appliance configuration module 83 is provided and adapted to allow a user to define and configure an Internet appliance to communicate with the service and receive summary information. Such appliances may include but are not limited to palm top PC's, lap top PC's, cellular telephones, WEB TV's, and so on. Typically, a user will be presented a configuration WEB page from a network server that displays in his browser window on his desktop PC. The page contains an interface for communicating device parameters and communication protocol types to module 83. In this way, a user may configure a preferred device for receipt of summary information. Device parameters and communication protocols inherent to such a device are incorporated into the scripting of the site template and are used as instructions for WEB summary delivery.

A navigation layer 73 is provided and adapted to perform the function of external site navigation and data gathering for gatherer 67. To this end, a communication interface/browser control module 85 is provided and adapted to function as a WEB browser to access WEB sites containing WEB data. Control 85 receives it's instruction from the scripted template created by the knowledge worker.

A parsing engine 87 is provided and adapted to parse individual WEB sites according to a template created via scripting module 79. Parsing engine 87 may be a PERL engine, an IE HTML engine, or any other or combination of known parsing engines. The template (not shown) tells control 85 and parsing engine 87 where to go and what fields at the destination site to look for to access desired data. Once the data fields are located, parsing engine 87 gathers current data in the appropriate field, and returns that data to the service for further processing such as data conversion, compression and storage, and the like.

Because WEB sites use tools that use consistent logic in setting up their sites, this logic may be used by the summarization service to instruct control 83 and parsing engine 87. The inventor provides herein an exemplary script logic for navigating to and garnishing data from Amazon™.com. The hyperlinks and/or actual URLs required for navigation are not shown, but may be assumed to be included in the template script. In this example, a company name Yodlee (known to the inventors) is used in the script for naming object holders and object containers, which are in this case Active X™ conventions. In another embodiment, Java™ script or another object linking control may be used. The scripted template logic example is as follows:

```
# Site amazon.orders.x - shows status of orders from Amazon
login( 7 );
get( "/exec/obidos/order-list/" );
my @tables = get_tables_containing_text( "Orders:" );
my $order_list = new Yodlee::ObjectHolder( 'orders' );
```

US 6,199,077 B1

13

-continued

```
$order_list->source( 'amazon' );
$order_list->link_info( get_link_info() );
my @href_list;
my @container_list;
foreach my $table ( @tables ) {
        my @rows = get_table_rows();
foreach my $i ( 0 . . $#rows ) {
        select_row( $i );
        my $text = get_text( $rows[ $i ] );
        next if /Orders:Status/;
        my @items = get_row_items();
        next unless @items >= 4;
        my( $order_num, $date, $status );
        select_cell( 1 );
        $order_num = get_cell_text();
        my $href = get_url_of_first_href( get_cell() );
        select_cell( 2 );
        $date = get_cell_text();
        select_cell( 3 );
        $status = get_cell_text();
        next unless defined $order_num and defined $date and defined
$status;
        my $order = new Yodlee::Container( 'orders' );
        $order->order_number( $order_num );
        $order->date( $date );
        $order->status( $status );
        $order_list->push_object( $order );
        if( defined $href ) {
            push( @href_list, $href )
            push( @container_list, $order );
foreach my $i ( 0 . . $#href_list ) {
        get( $href_list[ $i ] );
        @tables = get_tables_containing_text( "Items Ordered:" );
foreach my $table ( @tables ) {
        my @rows = get_table_rows();
foreach my $j ( 0 . . $#rows ) {
        select_row( $j );
        my $href = get_url_of_first_href( get_row() );
        next unless defined $href;
        my @child_list = get_children( get_row(), 'a' );
        next unless defined $child_list[ 0 ];
        my $text = get_text( $child_list );
        $container_list[ i ]->description( $text );
            }
        }
}
result( $order_list );
```

The above example is a script that instructs control 85 and parser 87 to navigate to and obtain data from Amazon™.com, specifically that data that reflects the user's current order status. Scripts may also be written to obtain virtually any type of text information available from any site. For example, a user may wish to obtain the New York Times headlines, the top ten performing stocks, a comparative list of flights from San Francisco to New York, etc. In one embodiment, metadata may be associated with and used in-place of the actual scripted language for the purpose of reducing complication in the case of many scripts on one template.

A data processing layer 75 is provided and adapted to store, process, and present returned data to users according to enterprise rules and client direction. A database interface module 89 is provided and adapted to provide access for gatherer 67 to a mass repository such as repository 29 of FIG. 1, for the purpose of storing and retrieving summary data, templates, presentation directives, and so on. Gatherer agent 67 may also access data through interface 89 such as profile information, user account and URL information, stored site logics and so on. Data scanned from the WEB is stored in a canonical format in a database such as repository 29, or in another connected storage facility. All stored data is, of course, associated with an individual who requested it,

14

or for whom the data is made available according to enterprise discretion.

A summarization page module 91 is provided and adapted to organize and serve a WEB summary page to a user. Module 91, in some embodiments, may immediately push a WEB summary to a user, or module 91 may store such summarized pages for a user to access via a pull method, in which case a notification may be sent to the user alerting him of the summary page availability. Summarization module 91 includes an HTML renderer that is able to format data into HTML format for WEB page display. In this way, e-mail messages and the like may be presented as HTML text on a user's summarization page. Moreover, any summary data from any site may include an embedded hyperlink to that site. In this way, a user looking at an e-mail text in HTML may click on it and launch the appropriate e-mail program. Other sites will, by default, be linked through the summary page.

Many users will access their summary data through a WEB page as described above, however, this is not required in order to practice the present invention. In some embodiments, users will want their summary information formatted and delivered to one of a variety of Internet-capable appliances such as a palm top or, perhaps a cell phone. To this end, the renderer is capable of formatting and presenting the summary data into a number of formats specific to alternative devices. Examples of different known formats include, but are not limited to XML, plain text, VoxML, HDML, audio, video, and so on.

In a preferred embodiment of the present invention, gather 67 is flexible in such a way as it may act according to enterprise rules, client directives, or a combination of the two. For example, if a user makes a request for summary data about a user/subscribed WEB page to be periodically executed and presented in the form of a HTML document, then gather 67 would automatically access and analyze the required internal information and user provided information to formulate a directive. Using scripting module 79, a knowledge worker provides a template (if one is not already created for that site) that contains the "where to go" and "what to get" information according to site logic, user input, and known information.

Alternatively, if a user requests a summary about data on one of his sites such as, perhaps, current interest rates and re-finance costs at his mortgage site, the service may at it's own discretion provide an additional unsolicited summary from an alternate mortgage site for comparison. This type of summarization would be designed to enhance a user's position based on his profile information. In this case, updated data about latest interest rates, stock performances, car prices, airline ticket discounts, and so on would be stored by the service for comparative purposes. If a user request for a summary can be equaled or bettered in terms of any advantage to the user, such summary data may be included.

In many cases, created templates may be re-used unless a WEB site changes it's site logic parameters, in which case, the new logic must be accessed and any existing templates must be updated, or a new template may be created for the site. The templates contain site-specific script obtained from the site and stored by the knowledge workers. In one embodiment, companies hosting WEB pages automatically provide their site logics and any logic updates to the service by virtue of an agreement between the service and the WEB hosts.

In an alternative embodiment gatherer 67 may be implemented as a client application installed on a user's PC. In

US 6,199,077 B1

15

this embodiment, a user would not be required to supply log-in or password codes. Summarization scripts may be sent to the client software and templates may be automatically created with the appropriate scripts using log-in and password information encrypted and stored locally on the user's machine.

In addition to providing WEB summary information, gatherer 67 may also be used to provide such as automatic registration to new sites, and for updating old registration information to existing sites. For example, if a user whishes to subscribe, or register at a new site, only the identification of the site is required from the user as long as his pertinate information has not changed. If a new password or the like is required, gatherer 67 through control module 73 may present login or password codes from a list of alternative codes provided by a user. In another embodiment, a database (not shown) containing a wealth of password options may be accessed by gatherer 67 for the purpose of trying different passwords until one is accepted by the site. Once a password or log-in code is accepted, it may be sent to a user and stored in his password list and at the network level.

It will be apparent to one with skill in the art that a software application such as gatherer 67 may be implemented in many separate locations connected in a data network. For example, a plurality of gatherer applications may be distributed over many separate servers linked to one or more mass repositories. Client applications include but are not limited to a WEB-browser plug-in for communicating to the service. Plug-in extensions may also be afforded to proxy servers so that auto-login and data access may still be performed transparent to a user.

In another embodiment, plug-ins enabling communication with gatherer 67 may be provided and configured to run on other network devices for the purpose of enabling such a device to initiate a request and get a response without the need for a desktop computer.

In most embodiments a user operating a desktop PC will order a one time or periodic summary related to some or all of his subscribed WEB sites. A logical flow of an exemplary request/response interaction is provided below.

FIG. 5 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 operating in a user-defined mode. In step 93, a user has initiated a new request for a summary (summary order). It is assumed for the purpose of discussion, that the request of step 93 involves a site wherein no template has been created. In step 95, the request is received and analyzed. A knowledge worker will likely perform this step. The new request may be posted to the user's portal home page, sent directly to gatherer 67, or even communicated through e-mail or other media to the service.

In step 97 a knowledge worker accesses particular site logic associated with the request URLs. For example, if the request involves a plurality of URLs, then all site logics for those URLs are accessed. Logic may be available in a repository such as repository 29 of FIG. 1 if they were obtained at the time of user registration to a particular URL, or sent in by WEB-site hosts shortly after registration. If it is a completely new URL, then the logic must be obtained from the site. In most cases however, the logic will be known by virtue of a plurality of users accessing common URLs. Therefore cross-linking in a database of logic/user associations may be performed to access a logic for a site that is new to one particular user, but not new to another.

In step 99, the knowledge worker creates a template by virtue of scripting module 79 (FIG. 4) containing all site

16

logic, URLs, log-in and password information, and the user request information. As described previously, templates may be re-used for a same request. In most cases, scripting may be mostly automated with minimum manual input performed by the knowledge worker. In many cases, an existing template will match a new request exactly, and may be re-used. In that case steps 97, 99, and 101 would not be required.

In step 101 the template is stored and associated with the requesting user. The stored template may now be delivered at a scheduled time for performing the summary gathering. At step 103, a browser control such as module 85 of FIG. 4 is activated to access the stored template and navigate to specified URLs for the purpose of gathering summary data. If a timing function is attributed to the template stored in step 101, then the template may self execute and call up the browser function. In another embodiment, the knowledge worker may notify the browser control to get the template for it's next task. In some embodiments, a plurality of controls may be used with one template as previously described.

In step 105, automatic log-in is performed, if required, to gain access to each specified URL. In step 107, a specified WEB-page is navigated to and parsed for requested data according to the logic on the template. If there are a plurality of WEB -pages to parse, then this step is repeated for the number of pages. A variety of parsing engines may be used for this process such as an IE™ parser, or a PERL™ parser. Only the requested data is kept in step 107.

A request may be an on-demand request requiring immediate return, or a scheduled request wherein data may be posted. At step 109, such logic is confirmed. If the data is to be presented according to a periodic schedule, then summary data parsed in step 107 is stored for latter use in step 111. In step 113, the summary data is rendered as HTML if not already formatted, and displayed in the form of a summary WEB-page in step 115. The summary page may be posted for access by a user at a time convenient to the user (pull), or may be pushed as a WEB-page to the user and be made to automatically display on the user's PC. Notification of summary page availability may also be sent to a user to alert him of completion of order.

If the summary data is from a one-time on-demand request and required immediately by a user, then a network appliance and data delivery method (configured by the user) is confirmed, and the data is rendered in the appropriate format for delivery and display in step 117. In step 119, the summary data is delivered according to protocol to a user's designated appliance. In step 121 a user receives requested information in the appropriate format

It will be apparent to one with skill in the art that there may be more or fewer logical steps as well as added sub-steps than are illustrated in this example. For example, step 105 may in other embodiments include sub-steps such as getting an encryption key from a user. In still another embodiment, part of a request may be rendered as HTML as in step 113 while certain other portions of the same request data might be rendered in another format and delivered via alternative methods. There are many possibilities.

The method and apparatus of the present invention may be used to present summaries to users without user input. Process logic such as this is detailed below.

FIG. 6 is a logical flow chart illustrating an exemplary summarization process performed by the software agent of FIG. 4 in a User-independent smart mode with minimum or no user input. In step 117 an enterprise-initiated summary

US 6,199,077 B1

17

process begins. In this case, the enterprise may be assisting a user in finding a better deal or, perhaps presenting the individual with summaries from and links to alternative pages not yet subscribed to by a user.

In step 119, a database containing user information and parameters is accessed and reviewed. Certain information specific to a user may be required to initiate an enterprise-sponsored summary report. At step 121, the knowledge worker accesses the site logic specific to the specified target site or sites for summarization. In step 123, the knowledge worker modifies an existing user template, or creates a new one if necessary. At step 125 the template is stored in a repository such as repository 29 and associated with the user.

As described in FIG. 5, the template either self-executes according to a timed function and invokes a browser control such as control 85 (FIG. 4), or is accessed by control 85 as a result of task notification. In step 127, the browser control begins navigation. Auto logins are performed, if required, in step 129 to gain access to selected sites. If the WEB pages are new to a user, and the user has no registration with the WEB site, then through agreement, or other convention, the service may be provided access to such sites. Such an agreement may be made, for example, if the host of the WEB site realizes a possibility of gaining a new customer if the customer likes the summary information presented. In many other situations, no password or login information is required to obtain general information that is not personal to a client.

In step 131, all sites are parsed for summary data and stored in canonical fashion in step 133. At step 135, the data is compiled and rendered as HTML for presentation on a summary page. In step 137, a WEB summary containing all of the data is made available to a user and the user is notified of it's existence.

Providing certain information not requested by a user may aid in enhancing a user's organization of is current business on the WEB. Moreover, unsolicited WEB summaries may provide better opportunities than the current options in the user's profile. Of course, assisting a user in this manner will require that the enterprise (service) have access to the user's profile and existing account and service information with various WEB sites on the user's list. A user may forbid use of a user's personal information, in which case, no enterprise-initiated summaries would be performed unless they are conducted strictly in an offer mode instead of a comparative mode.

The method and apparatus also may be practiced in a language and platform independent manner, and be imple-mented over a variety of scalable server architectures.

The method and apparatus of the present invention may be practiced via private individuals on the Internet, busi-nesses operating on a WAN connected to the Internet, businesses operating via private WAN, and so on. There are many customizable situations.

The present invention as taught herein and above should be afforded the broadest of scope. The spirit and scope of the present invention is limited only by the claims that follow.

18

What is claimed is:

1. An Internet Portal, comprising:

an Internet-connected server;

a list of addresses of Internet sites associated with a specific person, which sites store information specific to the person; and

a software suite executing on the server, the software suite including a set of gathering spitware agents, with at least one gatherer agent dedicated to each of the Internet sites;

wherein the Portal accomplishes a gathering cycle by accessing individual ones of the Internet sites, authen-ticating too each site accessed as the person, and the gathering agent dedicated to each site accessed extracts data from that site.

2. The Portal of claim 1 further comprising a configura-tion and initiation interface for the person to set up and start a gathering cycle.

3. The Portal of claim 1 wherein the data gathered by the gathering agents is summarized and/or aggregated at the portal to be provided to the person.

4. The Portal of claim 1 wherein the data gathered by the path agents is data specific to the person.

5. The Portal of claim 1 wherein the portal stores user names and passwords for the person for each Internet site visited and uses the stored user games and passwords to authenticate to each site as the person.

6. The Portal of claim 1 wherein the gathering agents comprise a parsing process in searching the accessed sites for data.

7. In an Internet Portal system, a method for gathering data specific to a person from a plurality of Internet sites storing data specific to that person, the method comprising the steps of:

(a) initiating a gathering cycle accessing individual ones of the plurality of sites;

(b) authenticating to the sites as the person; and

(c) executing a software gathering agent at each site accessed to gather data from the site, the gathering agent dedicated to each site accessed.

8. The method of claim 7 wherein the Portal further comprises a configuration and initiation interface, and fur-ther comprising a step for the person to configure and initiate a gathering cycle through the interface.

9. The method of claim 7 further comprising a step for summarizing at the Portal the data gathered by the gathering agents, the resulting summary to be provided to the person.

10. The method of claim 7 wherein the data gathered by the gathering agents is specific to the person.

11. The method of claim 7 wherein in step (a) the portal stores user names and passwords for the person for each Internet site visited, and uses the stored user names and passwords to authenticate to each site as the person.

12. The method of claim 7 wherein in step (c) the gathering agents comprise a parsing process in searching the accessed sites for data.

*     *     *     *     *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 6,199,077 B1                                    Page 1 of 1
DATED           : March 6, 2001
INVENTOR(S)     : Suman Kumar Inala et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Title page,</u>
Item [75], Inventor, now reads: "**Suman Kumar Inala**, Santa Clara;
                                **P Venkat Rangan**, San Diego;
                                **Ramakrishna Satyavolu**, Santa Clara,
                                all of CA (US)"

              should read: -- **Suman Kumar Inala**, Santa Clara;
                                **P Venkat Rangan**, San Diego;
                                **Ramakrishna Satyavolu**, Santa Clara,
                                **Sreeranga Prasannakumar Rajan**, Santa Clara
                                all of CA (US) --

Signed and Sealed this

Eighteenth Day of February, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

# EXHIBIT 26



US006317783B1

(12) **United States Patent**
Freishtat et al.

(10) Patent No.: **US 6,317,783 B1**
(45) Date of Patent: **Nov. 13, 2001**

(54) **APPARATUS AND METHODS FOR AUTOMATED AGGREGATION AND DELIVERY OF AND TRANSACTIONS INVOLVING ELECTRONIC PERSONAL INFORMATION OR DATA**

(75) Inventors: **Gregg Freishtat; Palaniswamy Rajan**, both of Atlanta, GA (US)

(73) Assignee: **Verticalone Corporation**, Atlanta, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/428,511**

(22) Filed: **Oct. 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/105,917, filed on Oct. 28, 1998, and provisional application No. 60/134,395, filed on May 17, 1999.

(51) Int. Cl.[7] .................................................. **G06F 13/00**
(52) U.S. Cl. ............................................. **709/218**; 707/10
(58) Field of Search ............................. 707/10; 709/217, 709/218

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,347,632 | 9/1994 | Filepp et al. | 709/202 |
| 5,537,314 | 7/1996 | Kanter | 705/14 |

(List continued on next page.)

OTHER PUBLICATIONS

"Strategic Directions in Database Systems—Breaking Out of the Box," Avi Silberschatz, and Stan Zdonik et al., ACM Computing Surveys, vol. 28, No. 4, pp. 764–778, Dec. (1996).

"Database Security and Privacy," Sushil Jajodia, ACM Computing Surveys, vol. 28, Issue 1 pp. 129–131, Mar. (1996).

"Managing Security and Privacy of information," Sushil Jajodia, ACM Computing Surveys, vol. 28 Issue 4es, Dec. (1996).

"Today's Style Sheet Standards: The Great Vision Blinded," Philip M. Marden, Jr. and Ethan V. Munson, IEEE Computer, pp. 123–125.

"Collapsible User Interfaces for Information Retrieval Agents," Martin Frank and Pedro Szekely, Proceedings of International Conference on Intelligent User Interfaces, Jan. 5–8, 1999, Redondo, CA, pp. 15–22.

"A Softbot–based Interface to the Internet," Oren Etzioni and Daniel Weld, Communications of the ACM, vol. 37, No. 7, Jul., 1994, pp. 72–76.

*Primary Examiner*—Kenneth R. Coulter
(74) *Attorney, Agent, or Firm*—Needle & Rosenberg, P.C.

(57) **ABSTRACT**

A system for delivering personal information according to the present invention includes a user store including end user data, a provider store including information provider data, a personal information store including personal information and a processor that communicates with these data stores. The processor selects an end user for personal information aggregation. The processor connects with one or more information providers. The processor then proceeds to retrieve personal information for the selected end user from the connected information providers. This retrieval is based on end user data associated with the selected end user and provider data associated with the connected information providers. The retrieved personal information is stored in the personal information store.

**36 Claims, 11 Drawing Sheets**



## US 6,317,783 B1
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,655,089 | 8/1997 | Bucci | 705/40 |
| 5,696,965 * | 12/1997 | Dedrick | 707/10 |
| 5,699,528 | 12/1997 | Hogan | 705/40 |
| 5,710,887 | 1/1998 | Chelliah et al. | 705/26 |
| 5,712,979 | 1/1998 | Graber et al. | 709/224 |
| 5,724,567 * | 3/1998 | Rose | 707/2 |
| 5,825,884 | 10/1998 | Zdepski et al. | 705/78 |
| 5,848,396 | 12/1998 | Gerace | 705/10 |
| 5,860,068 | 1/1999 | Cook | 705/26 |
| 5,862,325 * | 1/1999 | Reed et al. | 709/201 |
| 5,878,219 | 3/1999 | Vance, Jr. et al. | 709/217 |
| 5,884,033 | 3/1999 | Duvall et al. | 709/206 |
| 5,884,045 | 3/1999 | Kurihara | 709/237 |
| 5,893,091 | 4/1999 | Hunt et al. | 707/3 |
| 5,894,554 | 4/1999 | Lowery et al. | 709/203 |
| 5,895,468 | 4/1999 | Whitmyer, Jr. | 707/10 |
| 5,897,622 | 4/1999 | Blinn et al. | 705/26 |
| 5,898,836 | 4/1999 | Freivald et al. | 709/218 |
| 5,913,202 | 6/1999 | Motoyama | 705/35 |
| 5,918,214 | 6/1999 | Perkowski | 705/27 |
| 5,926,798 | 7/1999 | Carter | 705/26 |
| 5,956,709 | 9/1999 | Xue | 707/3 |
| 5,963,915 | 10/1999 | Kirsch | 705/26 |
| 5,978,766 | 11/1999 | Luciw | 705/1 |
| 5,978,779 * | 11/1999 | Stein et al. | 705/37 |
| 5,983,200 | 11/1999 | Slotznick | 705/26 |
| 5,983,227 | 11/1999 | Nazem et al. | 707/10 |
| 5,987,440 * | 11/1999 | O'Neil et al. | 705/44 |
| 5,987,498 | 11/1999 | Athing et al. | 709/203 |
| 5,991,735 | 11/1999 | Gerace | 705/10 |
| 5,991,756 | 11/1999 | Wu | 707/3 |
| 5,995,965 * | 11/1999 | Experton | 707/10 |
| 5,999,975 * | 12/1999 | Kittaka et al. | 709/224 |
| 6,029,175 | 2/2000 | Chow et al. | 707/104 |

* cited by examiner

**Figure 1**
**(Prior Art)**



SELECT INFORMATION PROVIDER — 100

LOCATE AND ENTER PROVIDER SITE ADDRESS — 120

LOG INTO PROVIDER SITE — 130

NAVIGATE EXTRANEOUS WEB PAGE(S) — 140

VIEW DESIRED PI FROM PROVIDER SITE — 150

REPEAT PROCESS TO SEEK ADDITIONAL PI

100

Figure 2



**Figure 3**
**240**





Figure 4
(Prior Art)

Figure 5

**Figure 6**



Figure 7



**Figure 8**



Figure 9



Figure 10



## Figure 11



US 6,317,783 B1

1

# APPARATUS AND METHODS FOR AUTOMATED AGGREGATION AND DELIVERY OF AND TRANSACTIONS INVOLVING ELECTRONIC PERSONAL INFORMATION OR DATA

## CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application claims the benefit, pursuant to 35 U.S.C. §119(e), of applicants' provisional U.S. Patent Application Ser. No. 60/105,917, filed Oct. 28, 1998, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data" and of applicants' provisional U.S. Patent Application Ser. No. 60/134,395, filed May 17, 1999, entitled "Apparatus and Method for Automated Aggregation and Delivery of and Transactions Involving Electronic Personal Information or Data".

## BACKGROUND OF INVENTION

### 1. Field of Invention

The invention relates to an apparatus and process for automated aggregation and delivery of electronic personal information or data (PI). The invention further relates to the automation of transactions involving electronic PI.

### 2. Description of Related Art

Looking back over the last five years, it is apparent that as the Internet gained momentum, consumers demanded applications or services that make their online experience simpler, easier to use, and more satisfying. The development of successful Internet Sites has corresponded with a number of themes which have developed over the last few years. When carefully analyzed this evolution is a logical development of the emerging digital economy.

Prior to 1994, the Internet was not a mass media, in part, because the existing technologies (FTP, Archie, Usenet, and Gopher) were not user friendly and required the end user to do all of the work (e.g., the end user had to learn of an existing data source, find the address, navigate to the destination, and download the information). As more consumers began accessing the Internet, Search Engines were created to solve this usability issue. With the advent of the commercial Search Engine, additional content could be easily added to the Internet and the end user had a means of finding and accessing this information. Consumers required better tools than Search Engines for organizing and accessing this wealth of generic content. Push technologies were explored, and eventually, the portal strategy was successfully adopted as an efficient way for consumers to easily access a variety of content sources in a single, easy to use format. As the volume of available online content continues to grow exponentially, portals are now confronted with the need to make different types of content available to different consumers based upon their particular preferences and tastes.

The phenomenal success of Internet portals and destination sites has demonstrated the importance of creatively and intelligently aggregating, organizing and presenting the mass of information available on the Web. Search engines, portals and destination sites have Internet strategies based on the frequency, duration and quality of end user visits to their sites. For this reason, destination sites and portals are constantly seeking content and/or technologies which drive quality traffic to their site and keep it there. Recent trends indicate that Internet users are up to 25 times more likely to

2

come back to a site when this information is organized according to personal preferences.

FIG. 1 displays the current process of acquiring online PI **100**. The end user first selects an information provider site in step **110**. The end user proceeds to step **120** by locating and entering the Internet address of the selected information provider. This step may be accomplished in several manners with varying levels of complexity. A simple means for accomplishing this step is the utilization of a bookmark or favorite whereas locating an information provider for the first time might involve significant time and effort performing online searches. In step **130**, the end users logs into the selected information provider's Web site utilizing the site's specific logon protocol. This protocol usually involves verifying the identity of the end user using a user name and password or other means of verification, acquiring the verification data from cookies residing on the end user's system or a combination of requested data and cookie data. The end user continues in step **140** by navigating through Web pages on the information provider's Web site until the desired information is located. During this process, the end user is often required to visit Web pages of little or no use to the end user whose goals is to simply acquire the particular PI residing on the Web site. Ultimately in step **150**, the end user is presented with the desired PI. The entire process **100** is repeated for each individual piece of PI desired by the end user. Under this PI access model, the end user must visit each separate information provider, track potentially different identity verification data for each, utilize a different user interface at each site and possibly wade through a significant number of filler Web pages.

FIG. 4 pictorial illustrates the architecture of this current access process. The end user **210** utilizes the client computer **220** to access each PI Web site **250** across the Internet **230**. This current model suffers from several significant deficiencies. The end user must login to each site separately. Each separate site has its own graphical user interface. Each site wants the end user to stay and return; each visited site wants to retain end user focus for as long as possible. No true aggregation of PI exists; multiple accesses simply allow sequential access to particular pieces of PI.

One partial solution to these problems has recently evolved in the form of portal sites. Generic portal sites aggregate resources into categories and provide links to sites covering topics within those categories. Yahoo and Excite are examples of generic portal sites. These sites facilitate horizontal aggregation of generic content; horizontal aggregation refers to aggregation of PI access within a particular information provider category such as banks or utility companies. Some portal site allows individual end users a limited capability to select and configure disparate generic PI. Generic PI refers to PI of interest to the particular end user that does not require specific identity verification to obtain. For example, an end user might be interested in the weather forecast for his local area. This information could be integrated into a portal page without requiring identity verification of the particular end user receiving this PI. The individualized portal page provides a significant benefit to users seeking to aggregate generic PI. However, current portal pages do not generally provide PI requiring identity verification such as an end user's stock portfolio or bank balance. Further, these pages do not facilitate transactions utilizing PI.

Under current technology, aggregating PI available over the Internet requires a significant burden in terms of time, effort and learning curve. An end user wishing to access his PI needs to individually visit a variety of information

US 6,317,783 B1

3

provider sites each with its own requirements, graphical user interface and login protocol.

## SUMMARY OF THE INVENTION

In the present invention, a networked computer is used to facilitate end user access, of manipulation of and transactions involving electronic PI associated with the particular end user such as stock portfolio, local weather, sports scores, bank account balances or other pertinent information or data. According to the present invention, the PI relevant to the particular end user is aggregated on the networked computer. This information or data is delivered to the end user in a unified manner by a variety of selectable delivery platforms such as facsimile, client computer, telephone, conventional mail, electronic mail, pager, other wireless device, Web page or channel or other delivery vehicle. The present invention further facilitates a variety of electronic transactions involving PI such as stock trading, retail purchases, bill payment, bank account fund transfers or other transactions.

A system for delivering personal information according to the present invention includes a user store including end user data, a provider store including information provider data, a personal information store including personal information and a processor that communicates with these data stores. The processor supports the aggregation of personal information. The processor selects an end user for personal information aggregation. Once the end user is selected, the processor connects with one or more information providers. The processor then proceeds to retrieve personal information for the selected end user from the connected information providers. This retrieval is based on end user data associated with the selected end user and provider data associated with the connected information providers. The retrieved personal information is stored in the personal information store.

The above and other objects and advantages of the present invention will become more readily apparent when reference is made to the following description, taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a process diagram of the current process that end users perform to access Internet available PI.

FIG. 2 is a block diagram of the components that could be used to implement present invention.

FIG. 3 is a block diagram of the components of the PI engine.

FIG. 4 is a diagram of the current PI access architecture.

FIG. 5 is a diagram of an architecture supporting PI access utilizing an intermediary Web site.

FIG. 6 is a diagram of the cookie/client cache architecture.

FIG. 7 is a flowchart for accessing pages underlying particular PI via the traditional process of FIG. 1 and via springboard technology.

FIG. 8 depicts the integration model for the dynamic generation of HTML pages.

FIG. 9 displays the run-time process for dynamic generation of HTML page.

FIG. 10 illustrates a process for automated applet interaction utilizing a modified Java virtual machine.

FIG. 11 is a flowchart exemplifying an intermediary Web site transaction structure.

## DETAILED DESCRIPTION OF THE INVENTION

A preferred embodiment of the invention is now described in detail. Referring to the drawings, like numbers indicate

4

like parts throughout the views. As used in the description herein and throughout the claims that follow, the meaning of "a," "an," and "the" includes plural reference unless the context clearly dictates otherwise. Also, as used in the description herein and throughout the claims that follow, the meaning of "in" includes "in" and "on" unless the context clearly dictates otherwise.

In no time, end users will have to log into a large number of different Web Sites, each with separate passwords, security, rules, software and "look and feel"—just to get the information currently obtained by checking one place—the mailbox at the end of the driveway. The Internet will fundamentally change the way in which end users will access Personal Information (PI) and will make e-commerce as familiar as using an ATM. "Personal Information" is all of the data that companies, information providers, have that is specific or unique to each person such as monthly bills, bank account balances, investments information, health care benefits, email, voice and fax messages, 401(k) holdings or potentially any other information pertinent to a particular end user.

The present invention alleviates several of the problems with the current PI acquisition methods by automatically aggregating PI, not only generic PI as aggregated by portals but also PI specific to the end user requiring identity verification for access. In one embodiment, the invention automates the PI acquisition and delivery process. FIG. 2 provides a block diagram of components that could be used to implement the present invention. The end user 210 accesses a client computer 220 running client software 270 which in a particular embodiment could be a general Web browser such as Navigator or Communicator (Netscape). The client computer 220 utilizes the Internet 230 to access a PI engine 240 running on a PI host 290. The PI engine 240 examines stored PI 280 for freshness. Any stale PI items are refreshed by directly reacquiring the PI from the particular information provider's Web site 250 running on the provider's computer system 260 accessed across the Internet 230. The PI engine 240 stores the fresh PI in its store 280 and delivers the PI to a selected destination, in this instance across the Internet 230 to the client computer 220 which displays the information to the end user 210 using the client software 270. The PI engine 240 refreshes all stale PI in a like manner prior to forwarding the aggregated PI to both the store 280 and the delivery destination, the client computer 220 in this instance. The PI engine 240 may refresh the PI sequentially or in parallel. For example, the end user's checking account balance would be updated through his bank's Web site, his email from his particular email site, his portfolio information from his broker's site and his electricity bill from his electricity company's site.

FIG. 3 displays a block diagram of the components of the PI engine 240. The PI engine 240 is composed of both storage and processing components. The three primary storage components are the PI store 280, the PI Provider store 310 and the user store 360. The first storage component of the PI engine 240 is the PI store 280. The PI store 280 contains each individual's PI record 375; the PI associated with a particular end user is segregated from the PI of all other end users. The PI engine also utilizes a provider store 310 that maintains general parameters associated with particular PI providers. The general parameters of a PI provider define the types of verification data necessary and the procedures to be followed to gain access to the particular PI provider. Each PI provider record also contains the types of PI provided by the PI provider and the types of transactions supported by the provider. Along with the type of PI or

US 6,317,783 B1

5

transaction, the record also contains the additional types of data and procedures necessary to access the PI or execute the transaction. A user store 360 is also necessary to maintain configuration and verification information concerning particular end users. For each end user, the user selected PI providers, PI and transactions are registered along with the verification data necessary to acquire the PI or execute the transaction from the PI provider.

The PI store 280 may be implemented in a variety of ways. Referring to FIG. 2, the PI store 280 may comprise a database residing on the PI Host 290. Under this approach, the PI for each individual end user 210 is stored as a separate record or object 375 in the database. In yet another embodiment, the PI for each end user 210 could be stored in a separate file 375, thus performing the task of segregating PI of different users at the file level.

In addition, or as an alternative, the PI associated with each end user 210 may reside on his/her client computer 220 using cookie technology as specified in D. Kristol and L. Montulli, "HTTP State Management Mechanism", Request For Comments (RFC) 2109, February, 1997 (available at http://www.ietf.org/rfc/rfc2109.txt), which is expressly incorporated herein in its entirety. The PI associate with the end user 210 would be stored as PI cookies 375. This implementation mechanism provides inherent support for segregating PI associated with one end user 375 from PI associated with all other end users. Utilizing this method as a substitute for a centralized store provides a layer of security against unauthorized access. As a further measure, PI data stored in cookies could be stored in an encrypted format.

FIG. 6 provides a diagram of a typical implementation of the PI store 280 using cookie technology; references in the foregoing description are also made to FIG. 3 with respect to the internal workings of the PI engine 240. When an attempt is made to access PI by an end user 210 directly, or through an intermediary Web server, the PI access/transact component 340 of the PI engine 240 would retrieve stored PI 375 from the PI store 280. Under this approach, this stored PI 375 would be received directly from cookies sent by the client computer 220 of the end user 210. The PI access/transact component 340 would perform any decryption if necessary. Any updates required would be obtained by direct access of PI providers 250. The PI deliver component 350 would provide the mechanism for both updating the PI store 280 as well as transmitting the requested PI to the end user 210, directly or through an intermediary Web site. The PI deliver component 350 would place the updated PI in the PI store 280 by replacing the outdated PI cookies 375 stored on the client computer 220. The PI deliver component 350 would also handle any encryption if necessary. The PI deliver component 350 would also be responsible for transmitting requested PI. In a preferred embodiment, the PI store 280 would be implemented using this cookie-based architecture.

The user store 360 may be implemented in a variety of ways. Referring to FIG. 2, the user store 360 may comprise a database residing on the PI Host 290. Under this approach, the personal configuration data for each individual end user 210 is stored as a separate record or object in the database. In addition, or as an alternative, the end user data could be distributed in a manner similar to the cookie/cache architecture describe above with respect to the PI store 280.

In a preferred embodiment, the user store 360 could be implemented through personal information configuration (PIC) files. PIC files store a personal profile such as name,

6

address, and social security number in secure, encrypted fashion for each end user. PIC files facilitate automatic registration of end users with information Providers via the end user configuration component 330. This component will read the PIC file and, using retrieved personal information, pre-populate registration templates for selected Providers. Then, it will prompt the user to enter required information that is missing from profile, if necessary. If the information is complete, the registration is automatically completed. Next, the end user configuration component 330 completes any Provider registration forms, gets responses and updates the end user's PIC.

The four primary processing components access and manipulate the data in the three stores. The processing components may execute on a single processor, such as a file server computer system based on a Pentium class (MMX, PRO, II, III, etc.) central processing unit or an equivalent, or multiple processors. These four processing components are the Baseline configure component 320, the end user configure component 330, the PI access/transact component 340 and the PI delivery component 350 as seen in FIG. 3. The Baseline configure component 320 provides the interface by which new user selectable PI providers are added to the system. This component 320 might be implemented in a variety of ways including trial and error followed by manual entry of configuration information, semi automated trial and error (automated location of Hypertext Markup Language (HTML) <FORM> elements, Javascript functions and Java applets) followed by manual entry of configuration information or, preferably, configuration by example (executing the protocol in a simulated Web client where the simulated Web client automatically generates a list of required data and a list of steps in the access process). These processes would be utilized at two levels: the first level being the set of data and steps required for general access to the particular PI provider and the second level being the set of additional data and steps required for accessing each particular piece of PI on the PI provider's site. The baseline configuration component 320 may be triggered independently when a new PI provider is added to the system, or it might be triggered as a result of a failure of the PI access/transact component 340 potentially indicating a change in access requirements for the failed access. This latter warning would more likely result where the PI access/transact component 340 has made a comparison between requirements supplied by the Provider store 310, both general to the PI provider and specific to the PI or transaction, and the end user data supplied by the user store 360 after seeking end user verification via a request of the end user to confirm the previously entered required access data via the end user configure component 330 and found an inconsistency. When an inconsistency is determined, updates to the Provider store 320 are made to bring the Provider data into conformance with current access/transaction requirements.

The end user configure component 330 allows an end user to select and configure PI and transactions of interest to the specific user. This configuration information is maintained in the user store 360. When an end user initially subscribes to the system according to the present invention, the system allows the user to select the types and sources of PI and/or transactions desired. First, the system requests permission from the end user to act on his behalf to obtain any selected PI and to execute any authorized transactions. Next, the system provides the user with a list of known information suppliers and the types of PI supplied from and transactions supported by the particular PI provider from the Provider store 320. The system requests the verification data neces-

US 6,317,783 B1

7

sary for accessing each selected PI provider and the additional data required by the particular PIs and/or transactions desired from that PI provider. Assuming the end user is already a registered user with the selected PI provider or the particular PI provider does not require prior registration, the data supplied by the end user is placed in the user store 360.

One method of obtaining any cookie data would be for the end user to access each previously accessed PI utilizing the PI engine 240 as a proxy server. The PI engine 240 would pass the cookie data to the PI provider site with the appropriate Web page requests to obtain the PI or execute the transaction and with the end user's permission retain a copy of the cookie data in the his record in the user store 360. An alternate means of obtaining the cookie data would be a direct upload of the cookie information from the end user's computer. In a preferred embodiment, no cookie data is necessary when the user is already registered with a provider. All that is necessary is the verification data for login.

If the end user does not have the requisite information because he is not a registered user of a selected PI provider, the user configure component 330 prompts the user for the information necessary to register the end user with the PI provider and performs the registration procedure required by the PI provider. A simulated Web client could perform this process automatically supplying the access data as required and sending any necessary cookie data. The manner in which such a simulated client registers the end user depends significantly upon the interaction method used on the PI provider Web site. If the Web site uses HTML forms and common gateway interface (CGI) applications, the end user configure component 330 can formulate a uniform resource locator (URL) to replicate the effect of actual form usage and submit this URL to the simulated Web client. The use of a URL to mimic an HTML form is equivalent to manually entering the data into the Web <FORM> element. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite Group Press, 1997, pp. 559–569. If the Web site uses a mixture of HTML forms and Javascript functions, a simulated Web client with a modified Javascript interpreter could effectively register the user by following the end user registration process for the particular PI provider. The registration process to follow would be obtained from the record of the particular PI provider in the Provider store 320. The Javascript interpreter in the simulated Web client would follow this procedure and supply the data supplied by the end user. A similar process could be used if the registration process on the PI provider Web site utilizes a Java applet. A Web client with a modified Java bytecode interpreter could effectively register the user by following the end user registration process stored for the particular PI provider in the Provider store 320. The bytecode interpreter would supply the data previously entered by the end user rather than requiring interactive input from the end user. If the PI provider Web site utilizes a combination of forms, scripts and applets, the individual procedures above could be used in combination to accomplish the desired registration.

With reference to FIG. 2 and FIG. 3, a modification of the Java virtual machine (VM) could allow for automated interaction between the various functional components of the PI Engine 240 and Java applet available through provider Web servers 250. Templates for interacting with particular applets could reside in the Provider store 310. The specific input data utilized by such templates could be stored in the User store 360. When a functional component such as the end user configure 330 or the access/transact 340 components requires automated communication with a Java applet on a provider Web server 250, the modified Java VM would facilitate this interaction.

8

FIG. 10 illustrates one process utilizing such a modified Java VM to achieve such automated interaction. The functional component requiring interaction identifies the provider and the particular applet on that provider with which the component needs to interact in step 1010. In step 1020, the component accesses the necessary template for interacting with the applet from the Provider store 310. Proceeding to step 1030, the component accesses the User store 360 to obtain the data required by the template. The modified Java VM interprets the applet in step 1040 and, rather than requiring interactive input from a user as in a normal Java applet execution, awaits input from or output to the interacting functional component of the PI engine. In step 1050, the functional component supplies input data to the modified Java VM according to the accessed template and retrieved data and receives output data according to the accessed template. Steps 1040 and 1050 repeat so long as additional input to or output from the applet continues. Upon termination of the applet, the functional component continues with its own processing in step 1060.

A successful registration could result in displaying the registration information to the end user for future reference. Further, the end user configure component 330 stores the requisite access verification data for the PI provider and the additional data required to access the selected PI or transaction in the user store 360.

In a preferred embodiment of such automated registration, any necessary cookie data would be accepted and stored as needed by the end user configure component 330. In many cases, cookie data is session specific and, therefore, of little long term utility. Cookies generated during the registration process are used solely during the registration process then discarded once registration is complete.

A failed registration could result from several situations. First, the end user attempting to register with the PI provider does not qualify for registration; for example, an end user attempting to register with a bank with whom the end user does not maintain an account and where the bank only allows access to account holders. Next, the end user may have supplied improper or incorrect information. For example, a bank registration process might require a social security number, a password, a bank account number and the maiden name of the end user's mother; if the user entered an incorrect social security number, the registration process would fail. Finally, the PI provider may have altered the registration procedure for its Web site. In this situation, following the process supplied from the Provider store 320 would yield a failed registration. In the instance of any registration failure, the end user could be presented with the data initially supplied to the system for registration. The system could then ask the end user to double check the correctness of the information provided and to correct and resubmit the data if an error is found. A second failure resulting from the submission of identical requisite data might generate an error message presented to the end user stating that either the end user is ineligible to access the selected PI from the selected PI provider or that alteration by the PI provider may have caused an error in registration. This second failure could also trigger a warning suggesting the need to potentially reconfigure the record for the PI provider in the Provider store 320.

Ultimately, the user store 360 would contain a record for each end user. This record as previous described could be a database entry, one or more cookies or a file such as a PIC file. Each record would identify the selected PI providers along with the general access verification data needed and also under each PI provider would be a list of PI supplied

US 6,317,783 B1

9

and transactions supported by the particular PI provider of interest to the end user along with the additional data, if any, necessary to access that PI or execute that transaction. Specifically, duplicative information such as an end user's name would be centrally stored in the record once.

The end user configure component **330** also allows the end user to select one or more delivery destinations. One destination might be the end user's computer as exemplified by the client computer **220** running client software **270** in FIG. **2**; however, a computer is not the only destination contemplated by the present invention. The destination for PI delivery could include facsimile, electronic mail, telephone, conventional mail, pager, other wireless device such as a Palm Pilot (3 Com), Web page or channel, Web browser or other delivery mechanism. The present invention also contemplates indirect access of PI by the end user utilizing a Web site as an intermediary; however, such indirect access would not require the end user to specify a delivery destination unless additional delivery options were desired.

Further, access to the end user configure component **330** may occur through direct access to the PI engine via the Internet as contemplated by the client computer **220** running client software **270** in FIG. **2**; however, alternative methods of access are equally feasible. For example, the user might indirectly access the PI engine through the use of an intermediary Web site. A telephone interface to allow access to the end user configure component is another alternative.

With reference to FIG. **3**, the PI access/transact component **340** supports the update, acquisition and transaction functionality of the PI engine **240**. The PI access/transact component **340** is responsible for accessing and storing user PI and executing transactions authorized by the end user. When access or update is needed for a selected end user, the PI access/transact component **340** combines information from the Provider store **320** and the user store **360** to update end user PI in the PI store **280**. For each piece of PI requiring access or update, the PI access/transact component **340** looks up the access procedure and information needed for the particular PI in the Provider store **320**. The verification and access data is found in the user store **360**. That PI access/transact component **340** utilizes this information to connect to the PI provider's Web site across the Internet and to access the PI. Where multiple pieces of PI require updating or access, the accesses may occur in series or parallel.

Requested transactions would be similarly supported. For each transaction, the PI access/transact component **340** combines information from the Provider store **320** and the user store **360** to perform the requested transaction. The PI access/transact component **340** looks up the transaction procedure and information needed for the particular transaction in the Provider store **320**. The verification and access data is found in the user store **360**. The PI access/transact component **340** utilizes this information to perform the transaction across the Internet from the PI provider's Web site

A simulated Web client could perform access or transaction processes automatically supplying access and verification data as necessary. The manner in which such a simulated client access PI or execute transactions depends significantly upon the interaction method used on the PI provider Web site. If the Web site uses HTML forms and common gateway interface (CGI) applications, the PI access/transact component **340** can formulate a uniform resource locator (URL) to replicate the effect of actual form

10

usage and submit this URL to the simulated Web client. The use of a URL to mimic an HTML form is equivalent to manually entering the data into the Web <FORM> element. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To,* Waite Group Press, 1997, pp. 559–569. If the Web site uses a mixture of HTML forms and Javascript functions, a simulated Web client with a modified Javascript interpreter could effectively access the PI or perform the transaction by following the PI access/transact process for the particular PI or transaction respectively. The access or transaction process to follow would be obtained from the record of the particular PI or transaction in the Provider store **320**. The Javascript interpreter in the simulated Web client would follow this procedure and supply the data found in the user store **360**. A similar process could be used if the PI provider Web site utilizes a Java applet. A Web client with a modified Java bytecode interpreter could effectively access PI or perform transactions by following process stored for the particular PI or transaction in the Provider store **320**. The bytecode interpreter would supply the data from the user store **360** rather than requiring interactive input from the end user. If the PI provider Web site utilizes a combination of forms, scripts and applets, the individual procedures above could be used in combination to accomplish the desired access.

In a preferred embodiment of such automated accesses or transactions, any necessary cookie data would be accepted and stored as needed by the PI access/transact component **340**. In many cases, cookie data is session specific and, therefore, of little long term utility. Cookies generated are used solely during these functions then discarded once the mining or transaction operation is complete.

In order to provide personal information to an end-user quickly after login, it is necessary for the PI access/transact component **340** to select an end user for data harvesting prior to the login of the end user. One approach to this solution is to update all of an end user's PI whenever the end user, directly or through an intermediary Web site, requests access to his/her PI. Another approach would be to update all of an end user's PI supplied by a particular provider whenever PI from that supplier is requested. Thus, the act of logging into the system by an end user effectively selects that end user for immediate PI update. However, this approach may result in the inefficient use of the PI Engine **240** resources.

Given the large number of potential users and providers, and the goal of providing the freshest data possible, another embodiment includes an algorithm developed to optimize the schedule in which end users are selected for data harvesting from a provider. This algorithm factors in the provider's update policy, the user's login habits, and the user-provider account characteristics. The proper application of the algorithm should ensure that PI is harvested as infrequently as possible for a given user, thus minimizing system resource consumption.

If the next provider update time and the next expected user login can be accurately predicted, a model can be created that will allow for smarter harvesting. Rather than harvesting data for all users of a provider at once when the provider updates its site, the harvesting can be spread out over time based on expected login times of users and network activity profiles. For example, if Provider A updates its site on Friday night and a large number of users of that provider are not expected to login again until Monday morning, the harvesting load can be distributed across multiple days. This has the advantage of minimizing both the peak loading of the PI Engine **240** as well as consumption of the provider's bandwidth by the PI Engine **240**. To gain this optimization, the PI Engine **240** must maintain and

US 6,317,783 B1

11

refine models of each provider and user. Such data can be maintained in the provider store 310 and the user store 360 respectively.

Each time a user utilizes the PI Engine 240, the time and date may be captured. Once a sufficient number of login times are accumulated, they may be analyzed with respect to day of month, day of week, and time of day. These are used in a model to predict the next expected user login. The model is then tested and refined with subsequent logins until a measurable degree of confidence is established. Once high confidence is determined, the user model is incorporated into the adaptive harvesting scheduler. Until a high confidence level is reached for a particular end user one of the aforementioned harvesting approaches may be used.

Each provider updates its site based on policy driven by their unique resources and business model. For any adaptive scheduler to work, the policy for each provider must be modeled. In some cases, the policy is self-evident. In others, it must be determined empirically. A provider's policy will most likely fall into one of the following categories:

Type I. Updated periodically for all users

Type II. Updated periodically relative to each user

Type III. Updated in a pseudo-random manner

The following three approaches may be used based upon provider type.

Type I Provider Policy Scheduling Algorithm

1. Assume users with a "no confidence" model have an immediate login time.

2. Order the users chronologically based on their predicted login time.

3. Shift the expected login time for all users back one hour.

4. Perform a density curve fit along temporal boundaries to get a polynomial function that can be used to determine the number of user accounts to harvest for a given epoch.

5. Perform an integral matching algorithm with the inverse of the network activity curve for the time period in question to adjust the distribution curve.

6. If possible, re-distribute peak harvesting time toward time zero to flatten the distribution curve.

7. Assign harvesting times to the sorted users according to the distribution curve.

8. Monitor time and harvest the user account when appropriate.

Type II Provider Policy Scheduling Algorithm

For each provider that falls into this category, an attribute of the user must be identified that determines when the personal information is updated. In some cases, the user may need to be queried for the information. In others, it can be determined from the harvested information. If the attribute cannot be established for a user via either of these means, the provider site may be monitored daily for changes in personal information until a pattern is established.

Since there is a natural, even distribution of accounts updated by a provider for a given day, a user's account can be harvested an hour before its expected login time. As in the Type I algorithm, users with a "no confidence" model should be immediately harvested.

Type III Provider Policy Scheduling Algorithm

This type of policy is the most difficult of all. Since the provider updates a user's account in a non-deterministic manner, a decision must be made for each provider as to the criticality of the information relative to the user. For those highly critical providers, user account should be harvested daily, perhaps even more frequently. For those less critical providers, user accounts should be harvested less frequently and possible when overall system activity is low.

The PI deliver component 350 is responsible for formatting and delivering the PI to the end user. Usually delivery

12

will only occur subsequent to updating all stale PI. The PI will be delivered to one or more destinations (e.g. facsimile, telephone, pager, Web browser, e-mail, etc.) as specified in the user store 360 except where the PI is accessed via an intermediary Web site. Where the destination is not an intermediary Web site, the PI deliver component 350 performs all formatting necessary to deliver the PI to the appropriate destinations. For example, where the destination is a Web browser, the PI would be formatted as an HTML document, or where the destination is a telephone, the PI would be submitted for voice synthesis and transmission.

In the case of an intermediary Web site, the PI is delivered in a format configurable by the intermediary Web site. FIG. 5 pictorial illustrates a possible embodiment of the current invention utilizing an intermediary Web site. An end user 210 utilizes a client computer 220 to access an intermediary Web site 510 across the Internet 230. The end user 210 logs into the intermediary Web site 510. The intermediary Web site 510 contacts the PI engine 240 across the Internet 230 and directly receives the end user's PI updated as required from the PI provider Web sites 250. The intermediary Web site 510 receives the PI, incorporates it into pages according to its particular formatting style and graphical user interface and delivers these pages to the end user 210. The use of the PI engine 240 is transparent to the end user 210. Further, an intermediary Web site 510 serving aggregate PI to an end user 210 may, and most likely will, simultaneously serve as a PI provider.

In another embodiment, this formatting occurs via a dynamic HTML generation system combining stylistic and layout information from a variety of sources. The PI deliver component 350 generates custom HTML pages dynamically. These pages are customized based on a number of stylistic factors (such as background color, foreground color, font size, color and style, page layout, etc) from a variety of sources and content from a variety of sources. Information providers, distributors, the end user, the PI deliver component 350 or any combination of these sources, or other relevant sources, may provide customization factors used in the page generation. Finally, each HTML page must be filled in with data. The data used in such pages may originate from such sources as information providers, distributors, the end user, the PI deliver component 350 or any combination of these sources, or other relevant sources. The required solution is a system representing a generic algorithm for performing such HTML generation at run-time. The style and content may be provided in any suitable format such as the Extensible Stylesheet Language (XSL), as specified by W3C in http://www.w3.org/TR/WD-xsl/, which is expressly incorporated herein by reference in its entirety, and/or the Extensible Markup Language (XML) as specified by W3C in http://www.w3.org/TR/REC-xml, which is expressly incorporated herein by reference in its entirety, or other suitable formatting standard. The key requirements for such a system are complete encapsulation of the problem domain and run-time efficiency.

In preferred embodiments, the solution is based on the following basic model as depicted in FIG. 8:

1. Six sets of customization factors are identified: distributor content 810, provider content 820, distributor style specification 830, provider style specification 840, user-specific content 850 and user-specific style 860.

2. Each set of customization factors 810–860 is considered a separate, independent and required input to the run-time system 870 that performs dynamic page generation.

3. Each input 810–860 will be in form of an XML stream.

US 6,317,783 B1

13

4. Output **880** will be in form of an HTML stream.

5. The dynamic page generation system **870** will produce valid output **880** for each set of six valid inputs **810**–**860**.

FIG. 9 illustrates an actual run-time sequence of input processing by such a system **870**:

1. Distributor content **810** is combined with provider content **820** and with user-specific content **850** to produce a complete content specification **930** by the content merger unit **910**.

2. Distributor style **830** is combined with provider style **840** and with user-specific style **860** to produce a complete style specification **940** by the style merger unit **920**.

3. The style specification **940** is applied by the style applicator **950** to content specification **930** in order to produce the resulting page **880**.

In order to completely encapsulate the problem domain, the following requirements must be placed on the system **870**:

1. Each XML input **810**–**860** is a valid XML stream.

2. All content specifications **810**, **820** and **850** are valid with respect to the same Document Type Definition.

3. All style specifications **830**, **840** and **860** are valid with respect to the same Document Type Definition (such as the XSL DTD standard).

4. The merging units **910** and **920** whose task is to take two or more XML streams and produce a combined XML output must be able to produce such output for any set of valid XML inputs.

Another method of performing this task would be to format PI as HTML elements with predefined CLASS attributes. The intermediary Web site receiving these elements could dynamically include them in page forwarded to the end user of the PI. The pages incorporating such elements could include different style information associated with the predefined CLASS set. Level 1 cascading style sheet convention could be used to implement such configurability. See Kerven, Foust, Zakour, *HTML 3.2 Plus How-To*, Waite Group Press, 1997, pp. 651–693; Walsh, "An Introduction to Cascading Style Sheets," *World Wide Web Journal*, Winter 1997, pp. 147–156. This option requires minimal programmatic support by the intermediary Web site but restricts to some degree the intermediary Web sites flexibility in presenting the PI to the end user.

Alternatively, an intermediary Web site could develop an application utilizing a standardized application programming interface (API) to directly access the PI data. In this instance, the PI deliver component **350** could either be bypassed or potentially used as the component responsible for servicing API requests for data. Under this model, the intermediary Web site would be responsible for all formatting decisions with respect to the raw PI data. This implementation option requires additional programmatic support by the intermediary Web site but allows for greater flexibility in the use of the raw PI.

The ability to utilize an intermediate Web site to deliver PI is of significant utility. This capability allows an end user already familiar with an existing PI provider to access not only the PI associated with the particular PI provider but also all PI from other PI providers in the comfort of a familiar user interface, namely the existing PI provider Web site. In this situation, the request for PI would directly originate with the intermediary PI provider Web site and indirectly from the end user. Security measures would restrict access to authorized intermediate Web site access. These measure might include verification of the end user and the intermediate Web site. Further, verification of the association

14

between the end user and the particular intermediate Web site might also be required for additional security.

In addition, the use of an intermediary Web site also supports a novel transaction model. In this transaction model, the intermediary site subsidizes, or fully compensates, the PI engine administrator for services provided to the end user. These transactions are facilitated via the auditing and tracking capabilities of the PI engine. These capabilities allow the calculation of per user fees, per transaction fees, per access fees or some combination thereof to be assessed. The assessed values could be directly charged to the intermediary Web site. Alternatively, such values could be debited from a minimum monthly fee charged to the intermediary Web site with any fees beyond the minimum charged directly to the intermediary Web site.

FIG. 11 depicts a flowchart of a typical process according to the described model. The intermediary Web site pays a minimum monthly fee in step **1110**. In step **1120**, the PI engine audits and tracks end user usage via the intermediary Web site. The audited usage is used to assess a fee on a per user, per access, per transaction or combination basis. In step **1130**, this audited amount is debited from the fee paid in step **1110**. In step **1140**, the intermediary Web site is charged for any fees in excess of the minimum fee paid.

Often an end user may require access to the underlying Web page generated by the provider of a particular piece of PI. The delivery component may deliver not only the PI but also an access point directly to the provider's page supplying that PI. The access point may take the form of a link, a form button or some other interactive access mechanism.

Such an access point significantly improves the efficiency of accessing the underlying page by the end user as exhibited by FIG. 7. In the traditional process **100** for accessing PI, the end user must proceed through numerous intermediary pages requiring a variety of often tedious interactions before reaching the desired page.

The end user must first identify the Provider **110**. Next, the end user must locate the Provider's Web address **120**. Then, the user the requests the Provider's login page **130**. If the end user does not remember the requisite information, this information must be found, or the desired information will remain inaccessible via the Web. The end user then navigates the Provider's Web site **140**. This often entails visiting the Provider's main page **710** followed by viewing a variety of intermediate pages on the Provider's site **720**. The end user may have to backtrack several times to the main page **710** or accidentally leave the system entirely forcing a second login **140** before finally locating the desired information **150**.

Utilizing springboard technology, the entire process **750** is streamlined into the single click of an access point. The delivery component of the PI Engine delivers an access point to the Provider's underlying page along with the PI. As a consequence, the end user need only perform a single interaction with the PI presentation page **760**. This interaction immediately performs the requisite interactions with the Provider's Web site to bring the user to the desired underlying Web page **150**.

In one embodiment, this springboard technology could be implemented utilizing a Java applet. With respect to FIG. 2, the applet would be downloaded from the PI Host **290** by the end user's client software **270**, usually a Web browser, and executed locally by the end user's computer **220**. The applet would drive the client software **270** to the desired page. Such an applet could retrieve procedures and data for driving the client software from the Provider store **310** and the User store **360**.

US 6,317,783 B1

15
16

In a further embodiment, the PI engine 240 could act as a proxy server directly accessing the Provider store 310 and the User store 360 as required. When the PI engine 240 receives the request to jump to the source of a particular piece of PI, the engine performs the necessary actions to navigate to the desire page and forwards the desired page to the end user's computer 220. Further interactions with the page might require additional proxying by the PI engine 240 as accumulated cookie data may reside on the PI Host 290. This embodiment is limited to use in handling standard HTTP traffic rather than secure HTTP traffic.

In a preferred embodiment, the springboard provides the end user with automated login into the PI Provider site 250 and allows the end user 210 to navigate via the client software 270. This automated login could be accomplished through the utilization of a hypertext transfer protocol (HTTP) redirect. Upon receiving the a springboard access request from the end user 210 via the client software 270, the PI Host 290 requests the login page from the PI Provider site 250 targeted by the springboard access. The PI engine 240 running on the PI Host 290 receives this login page and constructs a login request by accessing the proper data in the Provider store 310 and the User store 360. The login request is embedded in the HTTP redirect which is forward to the client software 270. The client software 270 is redirected to the targeted PI Provider site 250, and the end user 210 is automatically logged into this site.

Alternatively, this functionality could be implemented via a Java applet as described above. In addition, the PI engine 240 could generate a Javascript page containing the pertinent login request rather than an HTTP redirect. The Javascript page could be returned to the client software 270. This page would then be executed by the client software 270 to accomplish the automated login.

The PI engine 240 of FIG. 3 may also include a site monitor 370 processing component. This component would systematically monitor supported PI provider Web sites for changes. This component enhances the ability of the system to identify alterations in PI provider Web site procedures, data requirements and cookies requirements. This component increases system efficiency by supplementing or supplanting alteration identification via feedback from the PI access/transact component 340.

A further embodiment of the present invention might support the localize manipulation of PI. This could be accomplished where the client software 270 running on the client computer 220 in FIG. 2 is a specialized Web client rather than a general Web client such as Netscape. This specialized client might utilize Web channel technology to automate the local PI download and update processes. Where the PI store is implemented via the aforementioned cookie architecture, this specialized client may provide direct local access to stored PI.

In another embodiment, the PI engine 240 of FIG. 3 might support both system supported PI providers as well as PI providers specific to particular end users. In this embodiment, an end user is not limited to PI available from PI providers present in the Provider store 310. For an end user to add PI provided by a non-supported PI provider, the end user would access the Baseline configure component 320 and create a configuration for the non-supported PI provider. The PI provider and PI configuration along with the verification and access data would be stored along with the user's record in the user store 360.

A further embodiment of the present invention supports the inclusion of PI transaction procedures and access requirements in the Provider store 310 of FIG. 3. The end user specific information necessary to realize such a transaction would reside with the user record in the user store 360. The functionality of the PI access/transact component 340 would expand to support the performance of transactions. This additional functionality could be supported in a manner similar to the procedure described above with respect to performance of access utilizing a simulated Web client. A further feature of this embodiment would include automated or semi-automated account management by providing trigger events to automatically initiate a transaction.

For instance, with reference to FIG. 2 an end user 210 would be able to maintain his/her accounts online through the PI Engine 240. If an information provider has the capability of receiving payments online, the PI Engine 240 could support complete or partial automation of such transactions. If there is a billing due date for a certain information provider, PI Engine 240 could flag that information and send email to the end user 210 notifying him/her of the bill due. Thus, the user will not have to check each of his/her providers individually for due date information. The PI Engine 240 could also automated payments on a limited range of billing amount for providers who allow payments over their Web servers 260, then send an email to the user with the notification of payment.

Due date acquisition could be accomplished utilizing the PI access/transact component 340 seen in FIG. 3. The due date information would be available to the end user via any delivery means supported by the PI deliver component 350. The PI access/transact component 340 would use standard e-commerce bill-paying methods to pay the user's bill/s to the provider if he/she chooses. Once the bill is paid, then an email notification will be sent to the user with the provider information and payment information. The user can specify the range of amount stored in the user store 360 that will be paid automatically. If the bill exceeds the amount specified by the user, then PI engine will simply send out an email notification to the user instead of paying the bill automatically.

The embodiments described above are given as illustrative examples only. It will be readily appreciated that many deviations may be made from the specific embodiment disclosed in this specification without departing from the invention. Accordingly, the scope of the invention is to be determined by the claims below rather than being limited to the specifically described embodiments above.

What is claimed is:

1. A method for delivering non-public personal information relating to an end user via a wide-area computer network to an end user from at least one of a plurality of information providers securely storing the personal information under control of a processor located remotely from the information providers and the end user, the method comprising the steps of:

(a) the processor connecting with at least one information provider;

(b) for a selected end user, the processor retrieving personal information for the selected end user from the connected at least one information provider based on end user data associated with the selected end user and information provider data associated with the connected one or more information providers, the end user data including information identifying the plurality of information providers securely storing the personal information relating to the end user, the provider data including a protocol for instructing the processor how to access the securely stored personal information via the network, the information accessible to the processor

US 6,317,783 B1

17

using the protocol also being accessible by the end user via the network independently of the system for delivering personal information; and

(c) the processor storing the retrieved personal information in a personal information store for access by the selected end user.

2. The method of claim 1, further comprising the step of monitoring information providers for changes.

3. The method of claim 1, further comprising the step of updating the provider store to conform with requirements of the information provider.

4. The method of claim 1, further comprising the step of executing a transaction for the selected end user with a selected information provider based on the accessed end user and the accessed information provider data associated with the selected information provider.

5. The method of claim 4, wherein the execution step is triggered according to the accessed end user data.

6. The method of claim 1, further comprising the step of outputting the personal information associated with the selected end user from the personal information store.

7. The method of claim 6, wherein the outputting step outputs the personal information to a delivery platform specified in the accessed end user data.

8. The method of claim 7, wherein the specified delivery platform is selected from the group consisting of electronic mail, facsimile, pager, telephone, wireless device, ftp server, Web server, gopher server and Web client.

9. The method of claim 6, wherein the outputting step outputs the personal information via a world wide web site.

10. The method of claim 9, wherein the outputting step outputs personal information as a formatted Web page to the world wide web site.

11. The method of claim 9, wherein the outputting step outputs personal information as formatted Web elements to the world wide web site.

12. The method of claim 9, wherein the outputting step outputs personal information data to the world wide web site.

13. The method of claim 1, wherein the connecting step comprises the substeps of:

(i) accessing the end user data associated with the selected end user;

(ii) identifying information providers specified in the accessed end user data; and

(iii) establishing a communication link with each of the identified information providers.

14. The method of claim 1, further comprising the step of outputting the retrieved personal information to an intermediary web site, wherein the intermediary web site has an associated user interface format.

15. The method of claim 14, wherein the retrieved personal information is output to the intermediary web site in a format other than the format associated with the intermediary web site.

16. The method of claim 14, wherein the intermediary web site outputs the retrieved personal information to a web client, and the web client displays the retrieved personal information.

17. The method of claim 16, wherein the web client displays the retrieved personal information in the format associated with the intermediary web site.

18. A computer-readable, digital storage device storing executable instructions which cause a processor to deliver non-public personal information relating to an end user from at least one of a plurality of information providers securely storing the personal information to the end user via a wide-area computer network by performing the steps comprising of:

18

(a) connecting with at least one information provider;

(b) for a selected end user, retrieving personal information for the selected end user from the connected at least one information provider based on end user data associated with the selected end user and information provider data associated with the connected one or more information providers, the end user data including information identifying the plurality of information providers securely storing the personal information relating to the end user, the provider data including a protocol for instructing the processor how to access the securely stored personal information via the network, the information accessible to the processor using the protocol also being accessible by the end user via the network independently of the system for delivering personal information; and

(c) storing the retrieved personal information in a personal information store.

19. The storage device of claim 18, further storing executable instructions to perform the connecting step by performing substeps comprising of:

(i) accessing the end user data associated with the selected end user;

(ii) identifying information providers specified in the accessed end user data; and

(iii) establishing a communication link with each of the identified information providers.

20. A system for delivering non-public personal information relating to an end user via a network from at least one of a plurality of information providers, the information providers securely storing the personal information, the system comprising:

(a) a user store for storing end user data associated with each end user, the user store including information identifying the plurality of information providers securely storing the personal information relating to the end user;

(b) a provider store for storing information provider data associated with each information provider, the provider data including a protocol for instructing the processor how to access the securely stored personal information via the network, the information accessible to the processor using the protocol also being accessible by the end user via the network independently of the system for delivering personal information;

(c) a personal information store for storing personal information associated with each end user retrieved from the information providers;

(d) a processor in communication with the user store, the provider store and the personal information store, for performing the steps of:

(i) connecting with at least one information provider;

(ii) for a selected end user, retrieving personal information for the selected end user from the connected at least one information provider based on end user data associated with the selected end user and information provider data associated with the connected one or more information providers; and

(iii) storing the retrieved personal information in the personal information store for accessible to the selected end user.

21. The system of claim 20, wherein the processor performs the additional step of monitoring information providers for changes.

22. The system of claim 20, wherein the processor performs the additional step of updating the provider store to conform with requirements of the information provider.

US 6,317,783 B1

19

20

23. The system of claim 20, wherein the processor performs the additional step of executing a transaction for the selected end user with a selected information provider based on the end user data associated with the selected end user and the information provider data associated with the selected information provider.

24. The system of claim 23, wherein the processor automatically performs the transaction execution step according to end user data in the user store.

25. The system of claim 20, wherein the processor performs the additional step of outputting the personal information associated with the selected end user from the personal information store.

26. The system of claim 25, wherein the outputting step performed by the processor outputs the personal information to a delivery platform specified in the end user data associated with the selected end user.

27. The system of claim 26, wherein the specified delivery platform is selected from the group consisting of electronic mail, facsimile, pager, telephone, wireless device, ftp server, Web server, gopher server and Web client.

28. The system of claim 25, wherein the outputting step of the processor outputs the personal information via a world wide web site.

29. The system of claim 28, wherein the outputting step of the processor outputs personal information as a formatted Web page to the world wide web site.

30. The system of claim 28, wherein the outputting step of the processor outputs personal information as formatted Web elements to the world wide web site.

31. The system of claim 28, wherein the outputting step outputs personal information data to the world wide web site.

32. The system of claim 20, wherein the connecting step of the processor performs the following substeps:

(A) accessing the end user data associated with the selected end user;

(B) identifying information providers specified in the accessed end user data; and

(C) establishing a communication link with each of the identified information providers.

33. The system of claim 20, further including an intermediary web site having an associated user interface format, wherein the processor performs the additional step of outputting the retrieved personal information to the intermediary web site.

34. The system of claim 33, wherein the retrieved personal information is output by the processor to the intermediary web site in a format other than the format associated with the intermediary web site.

35. The system of claim 33, further including a web client, wherein the intermediary web site outputs the retrieved personal information to the web client, and the web client displays the retrieved personal information.

36. The system of claim 35, wherein the web client displays the retrieved personal information in the format associated with the intermediary web site.

\* \* \* \* \*